# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

| | |
|---|---|
| TIMOTHY JAMES COATES;<br>GENE CLAPS;<br>MARK MITCHELL; and<br>KEVIN CURRIER<br><br>     Plaintiffs - Appellees,<br><br>v.<br><br>RICHARD A. REIGENBORN,<br><br>     Defendant - Appellant. | Case No. 22-1339 |

On Appeal from the United States District Court
For the District of Colorado
The Honorable Magistrate Judge Scott T. Varholak
Civil Action No. 1:20-cv-01936-STV

---

## APPELLANT'S RESPONSE TO PLAINTIFFS-APPELLEES' MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION

---

## INTRODUCTION

Sheriff Reigenborn's appeal presents the narrow question of whether Section 1983 plaintiffs who sue a state constitutional officer for that officer's own conduct can circumvent his qualified immunity by recasting the officer as an entity based on a footnote in *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978). Because the district court's order has the same practical effect as denying the Sheriff qualified immunity, the collateral order doctrine applies and the Plaintiffs-Appellees' motion to dismiss for lack of jurisdiction should be denied.

## BACKGROUND

When the Sheriff came into office in 2019, he exercised his exclusive statutory powers under Colo. Rev. Stat. § 30-10-506 to send notices of intent to dismiss four former high-ranking sheriff's deputies who—the district court later held—were constructively discharged. Those former deputies sued Sheriff Reigenborn (and the "Adams County Sheriff's Office") in his personal and official capacity under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments.

2

Sheriff Reigenborn is the sole defendant in this action. Sheriff Reigenborn is not a municipality. He is not a quasi-governmental entity. He is a natural person who holds an elected constitutional office as a County Sheriff. In his capacity as the County Sheriff, he personally made the decision to discharge the Plaintiffs under his exclusive statutory authority. *See* Colo. Rev. Stat. § 30-10-506.

The separate legal entity, Adams County, Colorado, was not sued. It was not named in the complaint. It was not served. No discovery was conducted by it or gathered from it. Sheriff Reigenborn was not alleged to be a policymaker for the County. Nor, given the allegations of the complaint, could he have been. The County played no role in the Sheriff's decision to constructively discharge the Plaintiffs. Moreover, no *Monell* claim was pled in the Plaintiffs complaint against any defendant. (*See* Exhibit A hereto, Compl. at ¶¶ 1-191.[1])

---

[1] The elements of a *Monell* claim are: (1) an official policy or custom, (2) causation, and (3) a showing that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury. *See Schneider v. Grand Junction Police Dept.*, 717 F.3d 760, 769 (10th Cir. 2013). The complaint did allege the Sheriff was "a final policymaker" for the Sheriff's office (Exhibit A at ¶ 8), which is a non-existent legal entity. (Pr. R. at 46, n.13 & *id.* at 50.) Even then, there was no allegation

On summary judgment, the district court dismissed the Sheriff's "Office" as a defendant. (Pr. R. at 57.) It also ruled in the Sheriff's favor on the Plaintiffs' Fourteenth Amendment claim. As for their First Amendment claim, the district court held there were disputed questions of fact. Nevertheless, it held the Sheriff was entitled to qualified immunity on that claim—but only in his personal capacity. The district court construed the deputies' claim against the Sheriff in his "official capacity" as a claim under *Monell* by equating the Sheriff with Adams County. (Pr. R. at 49 ("the Court holds that the County is the proper municipal defendant, and that Plaintiffs' claims have been properly brought against it by naming Sheriff Reigenborn in his official capacity"); *see also* Mot. at 10 ("Reigenborn in his official capacity is effectively the County.").)

In consequence, Sheriff Reigenborn will still have to participate in a trial that puts at issue his exercise of his own statutory powers to discharge the Plaintiffs. The Plaintiffs allege the Sheriff's personal

---

the Sheriff's office had an official policy or custom that was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.

motivation was retaliation against them for their First Amendment activities, including campaigning for the Sheriff's political opponent. The Sheriff will have to testify as to the facts, circumstances, and grounds for his sole decision to constructively discharge the Plaintiffs. In addition, the Sheriff as the "hiring authority" will have to establish whether the Plaintiffs' positions were sufficiently high-ranking as to involve work that required political allegiance. (Pr. R. at 34, *quoting Branti v. Finkel*, 445 U.S. 507, 518 (1980).) On either issue, the County will have no evidence to present. The County is not the hiring authority and it has no knowledge of the Sheriff's private motivations. Only the Sheriff can adduce evidence on those points. Thus, the district court's ruling requires Sheriff Reigenborn to still go to trial for the exact same conduct for which he is supposed to have qualified immunity from suit.

## STANDARD

Under 28 U.S.C. § 1291, this Court has "jurisdiction of appeals from all final decisions from the district courts." While partial denials of motions for summary judgment are not ordinarily reviewable as a final decision, the collateral-order doctrine creates appellate jurisdiction over

5

certain intermediate rulings on pure issues of law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009).

An order can be collaterally appealed where it "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment." *Johnson v. Jones*, 515 U.S. 304, 310 (1995).

Denials of qualified immunity fall squarely within the collateral-order doctrine. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014); *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). This is because qualified immunity is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526. The collateral-order doctrine has been held to extend to district court orders, like the one at issue here, that effectively denies qualified immunity. *See*, *e.g.*, *Workman v. Jordan*, 958 F.2d 332, 336 (10th Cir. 1992) (order postponing a decision on qualified immunity effectively denied it and was reviewable as a collateral order); *see also Isayeva v. Sacramento Sheriff's*

Exhibit C, Page 6 of 48

*Dep't*, 872 F.3d 938, 945 (9th Cir. 2016) (order that "misapplied the law on qualified immunity" reviewable as a collateral order); *Carswell v. Camp*, 37 F.4th 1062, 1065 (5th Cir. 2022) (orders "tantamount to . . . order[s] denying the defendants qualified immunity" are reviewable collateral orders) (quotation omitted).

## ARGUMENT

The Plaintiffs-Appellees' motion to dismiss challenges the second and third element of the collateral order test—whether the district court's summary judgment ruling is sufficiently "important" and is "effectively unreviewable on appeal from a final judgment." (Mot. at 9-10.) To do this, Plaintiffs attempt to thin-slice Sheriff Reigenborn into two separate dimensions—his personal capacity and his official capacity.

That legal construct has some force where the person is acting as an agent of third-party, especially where that third-party is an entity. But that is not the case here. Legal labels aside, Sheriff Reigenborn is being sued for his own conduct—conduct he undertook on behalf of his own constitutional office. He was at no point acting on behalf of the County in doing so—nor was alleged in the complaint. The mere presence

Exhibit C, Page 7 of 48

of the term "official capacity" in the caption of the case does not change the essential nature of Defendant Reigenborn or the Plaintiffs' claims.[2] *See Am. Nat. Bank v. Nat'l Wall-Paper Co.*, 77 F. 85, 92 (8th Cir. 1896) ("The law is not to be cheated by any gloss of words. It judges things by what they are in fact, and not by their names. Words are not things."); *Taite v. Ramos*, 618 F. App'x 392, 394 n.1 (10th Cir. July 8, 2015) ("[T]he substance of a pleading—not its caption—controls").

As it stands, the Sheriff will still have to participate in a trial that puts at issue his exclusive exercise of his own statutory powers. That separates this case—involving Sheriff Reigenborn personally—from a case where a *municipality—i.e.*, a governmental entity—seeks review of the denial of summary judgment on a *Monell* claim. *Accord Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 42, 44 (1995). Here Sheriff

---

[2] Plaintiffs assert that Sheriff Reigenborn will be replaced in his "official capacity" in January 2023 when a new Sheriff is elected. Presumably, Plaintiffs allude to F.R.C.P. 25(d)(1). But that assertion only begs the question as to whether there is a viable official capacity claim apart from the individual capacity claim where the conduct at issue is exactly the same and the official is otherwise immune from suit. The Court should also be made aware that Plaintiff Claps is one of the two candidates for that office.

Reigenborn's right not to stand trial will be irretrievably lost unless this Court reviews the issue now.

Plaintiffs-Appellees' reliance on *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43 (1995), is misplaced. In *Swint*, the Supreme Court held an Alabama county's argument that it was not liable under *Monell* was a defense to liability, not an immunity to suit, and was thus not immediately appealable under the collateral order doctrine. But in *Swint*, the County was directly sued for its policies. The Sheriff, it was alleged, was a policymaker for the County and authorized a series of warrantless raids.

That is not the case here, however. Here, Adams County was not sued. Sheriff Reigenborn was not alleged to be a policymaker for *the County*. Nor, given the allegations of the complaint, could he have been. A state statute exclusively vests the authority to make hiring and firing decisions involving deputies in the Sheriff. *See* Colo. Rev. Stat. § 30-10-506. Colorado case law, moreover, has repeatedly upheld the Sheriffs' exclusive control over deputies against attempts by the County, through its board of county commissioners, to trench on it through the budgeting

Exhibit C, Page 9 of 48

process. *See*, *e.g.*, *Schroeder v. Bd. of County Comm'rs*, 381 P.2d 820, 822-23 (Colo. 1963) (holding that once a board of county commissioners has approved the salary for an employee of a county official, it cannot use its budgetary power to force the official to fire that employee, where the official's power to hire and fire was established by state law); *Tunget v. Bd. of County Comm'rs*, 992 P.2d 650, 652 (Colo. App. 2000) ("The sheriff, not the county or the Board, has the right of control with respect to the deputies."); *see also Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1215 (10th Cir. 2002) ("[U]nder Colorado law a Board lacks the power to control the hiring, termination, or supervision of a Sheriff's employees, or otherwise control the terms and conditions of their employment."); *Myers v. Koopman*, No. 09-cv-02802-REB-MEH, 2011 WL 650328, *31-32 (D. Colo. Feb. 11, 2011) ("Although it is undisputed that the BOCC has the duty and authority to appropriate funds for the operation of the sheriff's office, under Colorado law only a sheriff has the right to supervise and control the sheriff's deputies.").

When the Sheriff hires deputies, he does not do so to benefit the County. Rather, deputies assist him in the performance of his own law

Exhibit C, Page 10 of 48

enforcement duties delegated to him by the State. *See Pelliteri v. Pine*, 776 F.3d 777, 782 (11th Cir. 2015).

Thus, Adams County—the quasi-governmental entity[3]—has no control over the Sheriff's hiring and firing of his own deputies. Even if respondeat superior was available under *Monell*, which it isn't, it still would be a stretch in this case because, unlike in certain home rule jurisdictions, Adams County does not hire the Sheriff. He was elected to a constitutional office by the residents of Adams County. His statutory powers are his alone and were given to him by the State. The County's conduct, therefore, is not implicated in any way by the Plaintiff's claims. No additional information can be provided by the County regarding a

---

[3] Colo. Rev. Stat. § 30-11-101(1)(a) (counties are organized as a "body corporate and politic"); *see Denver v. Bonesteel*, 65 P. 628, 628 (Colo. 1901) ("The county is merely a subdivision of the state for the purposes of state government. Its officers are virtually officers of the state, charged with the administration and execution of its laws. In short, it is nothing more than an agency of the state for the general administration of its affairs."); *see also Bd. of Cty. Comm'rs of Adams Cty. v. Colo. Dep't of Pub. Health & Env't.*, 218 P.3d 336, 344-45 (Colo. 2009). As a quasi-governmental entity, a county is different still from a municipality—*i.e.*, a municipal corporation—which has some element of inherent sovereign authority. *See Bonesteel*, 65 P. at 628.

decision wholly made by the Sheriff, in whom a state statute exclusively vests the authority to make the decision he did.

Under state statutes, at most, the County may owe a subsequent financial duty of indemnification to the Sheriff.[4] That is not, however, a basis to equate the Sheriff with the County. *Monell* does not hold otherwise. To the contrary, it excludes respondeat superior claims. Here, based on the district court's analysis, the Sheriff's liability is now directly the County's liability—and the connection is even more tenuous than a respondeat superior claim because the County did not hire Sheriff Reigenborn. He was elected to his independent constitutional office.

---

[4] If such a duty exists, it arises under either the Liability of Police Officers Act, Colo. Rev. Stat. § 29-5-111, or the Colorado Governmental Immunity Act, Colo. Rev. Stat. § 24-10-118. On its face, Colo. Rev. Stat. § 30-25-104, cited by the district court, merely bars judgment collections on County property and, instead, provides the County the authority to levy taxes to cover judgments. (Pr. R. at 50, n.14) It does not impose an unqualified obligation on County's to pay all judgments against County officials. *Contra Chavez v. Bd. of Cty. Comm'rs*, 426 F. Supp. 3d 802, 812-13 (D. Colo. 2019) ("[W]hen a *Monell* claim is based on a sheriff-made policy, any distinction between suing the sheriff's office versus suing the county becomes purely theoretical, because the county will pay regardless.").

Exhibit C, Page 12 of 48

## CONCLUSION

The district court's ruling effectively nullifies Sheriff Reigenborn's qualified immunity for the exact same conduct—*his* decision to constructively discharge the Plaintiffs. The Sheriff will still have to participate in a trial that puts at issue his exclusive exercise of his own statutory powers. If individual state actors can be recast into entities subject to suit under *Monell*, it will eviscerate their qualified immunity. As such, the district court's order is both sufficiently important and effectively unreviewable to warrant appellate review now. Sheriff Reigenborn, therefore, respectfully requests this Court deny Plaintiffs-Appellees' motion to dismiss based on the collateral order doctrine.

DATED:  November 3, 2022.          Respectfully submitted,

<div style="margin-left:40%">

*s/Michael A. Sink*
Michael A. Sink
Assistant County Attorney
Adams County Attorney's Office
4430 S. Adams County Pkwy
5th Floor, Suite C5000B
Brighton, CO  80601
Phone:  (720) 523-6116
Fax:  (720) 523-6114
msink@adcogov.org
*Counsel for Defendant-Appellant*
*Richard A. Reigenborn*

</div>

Exhibit C, Page 13 of 48

## CERTIFICATE OF COMPLAINCE

As required by Federal Rule of Appellate Procedure 32(g)(1), I certify that this motion is proportionally spaced and contains 2,403 words. I relied on my word processor to obtain the count, and this information is true and correct to the best of my knowledge.

DATED:  November 3, 2022.        Respectfully submitted,


                                    *s/Michael A. Sink*

Exhibit C, Page 14 of 48

## CERTIFICATE OF SERVICE

I hereby certify that November 3, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the PACER system which will send notification of such filing to all counsel of record.

> *s/Michael A. Sink*
> Michael A. Sink
> Assistant County Attorney
> Adams County Attorney's Office
> 4430 S. Adams County Pkwy
> 5th Floor, Suite C5000B
> Brighton, CO  80601
> Phone:  (720) 523-6116
> Fax:  (720) 523-6114
> msink@adcogov.org
> *Counsel for Defendants*
> *The Adams County Sheriff's Office,*
> *and Richard A. Reigenborn*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

TIMOTHY JAMES COATES, GENE CLAPS, MARK MITCHELL, and KEVIN CURRIER

     Plaintiffs,

v.

THE ADAMS COUNTY SHERIFF'S OFFICE, a governmental entity;
RICHARD A. REIGENBORN, in his official and individual capacity

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Timothy James Coates, Gene Claps, Mark Mitchell, and Kevin Currier, by and through counsel Iris Halpern, Felipe Bohnet-Gomez, and Siddhartha H. Rathod of RATHOD | MOHAMEDBHAI LLC, respectfully allege for their Complaint and Jury Demand as follows:

### NATURE OF THE ACTION

This case concerns serial violations of the First and Fourteenth Amendments of the United States Constitution by Defendants Adams County Sheriff's Office ("ACSO") and its recently elected Sheriff, Richard A. Reigenborn. Plaintiffs Chief Timothy James Coates, Chief Gene Claps, Captain Mark Mitchell, and Commander Kevin Currier have collectively served over 100 years as law enforcement agents, working seamlessly under both Republican and Democrat administrations. However, during the November 2018 elections for Adams County Sheriff, Plaintiffs all openly campaigned for Sheriff

Reigenborn's opponent, then-incumbent Michael McIntosh, while at the same time expressing highly critical opinions of the Fraternal Order of Police ("FOP"), a law enforcement organization central to Sheriff Reigenborn's political ascent.

On January 8, 2019, the same day Sheriff Reigenborn assumed office, he rescinded all of ACSO's personnel policies and warned staff that all future employment decisions were solely at his whim. The very next day, on January 9, 2019, Sheriff Reigenborn notified Plaintiffs of their imminent terminations, citing only his need to take ACSO in a "different direction." Plaintiffs had no right to appeal.

The First Amendment to the U.S. Constitution ensures that a government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). This is because the dangers posed by patronage, cronyism, and nepotism to the fiscal and political health of our democracy have been widely recognized. We no longer live in the days of Boss Tweed and Tammany Hall. Elected officials are expected to enforce the law, not violate it.

### I.      JURISDICTION, VENUE, AND PARTIES

1.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Venue is proper within this District under 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the District of Colorado. Defendant ACSO is located

in this District and all of the individual parties were residents of the State of Colorado at the time of the events giving rise to this litigation.

3.    Plaintiff Coates is a resident of, and domiciled in, the State of Colorado.

4.    Plaintiff Claps is a resident of, and domiciled in, the State of Colorado.

5.    Plaintiff Mitchell is a resident of, and domiciled in, the State of Colorado.

6.    Plaintiff Currier is a resident of, and domiciled in, the State of Colorado.

7.    Defendant ACSO is the law enforcement agency of Adams County.

8.    Defendant Reigenborn was and remains the elected Sheriff of ACSO, a final policymaker for ACSO, and an agent of ACSO. At all relevant times, Sheriff Reigenborn acted under color of state law in his capacity as the Sheriff of Adams County.  *See* C.R.S. § 30-10-506 (vesting power of appointment in the office of sheriff); *Tonjes v. Park Cty. Sheriff's Office*, 300 F.Supp. 3d 1308, 1332 (D. Colo. 2018) ("C.R.S. § 30-10-506 plainly makes the sheriff the final policymaker for the Sheriff's Office with respect to employment of deputies.").

## II.    FACTUAL ALLEGATIONS

### A.    Plaintiffs' Extensive Careers in Law Enforcement

9.    Plaintiffs have collectively worked over 100 years in law enforcement.

10.    Throughout their careers, Plaintiffs have served under both Republican and Democratic sheriffs, including at ACSO.

11.    During their careers at ACSO, Plaintiffs received a number of promotions. These promotions occurred under both Republican and Democratic sheriffs.

### *Chief Timothy James Coates*

12.    Chief Coates served a 35-year career in law enforcement, a majority of it with ACSO.

13.    Chief Coates began his career as a Patrolman with the Northglenn Police Department, where he became the second officer in the department's history to earn a Medal of Honor.

14.    On January 7, 1993, Chief Coates joined ACSO as a Reserve Deputy.

15.    In 1995, Chief Coates became a full-time Deputy.

16.    ACSO then promoted Chief Coates to a position of Field Training Officer in the Patrol Division.

17.    While working as a Field Training Officer, Chief Coates completed his undergraduate college degree at Metropolitan State College of Denver.

18.    In 1999, ACSO assigned Chief Coates to the Detective Division, making him ACSO's first Domestic Violence Detective.

19.    On July 12, 2002, ACSO promoted Chief Coates to a Sergeant position in the Jail Division.

20.    As a Sergeant in the Jail Division, Chief Coates supervised approximately 30 deputies.

21.    In approximately September of that same year, ACSO made Chief Coates a Sergeant in the Patrol Division.

22.    In 2005, ACSO awarded Chief Coates a Meritorious Achievement Award.

23.    In April 2006, ACSO promoted Chief Coates to the position of Lieutenant in

the Jail Division.

24.     As a Lieutenant in the Jail Division, Chief Coates supervised a platoon of over 60 deputies.

25.     At the same time, Chief Coats completed training with the Northwestern Center for Public Safety's Command School.

26.     In 2009, ACSO made Chief Coates a Lieutenant in the Patrol Division.

27.     In 2011, ACSO awarded Chief Coates the Dale R. McLaughlin Memorial Award.

28.     On June 1, 2011, then-Sheriff Doug Darr (a Democrat) promoted Chief Coates to Acting Captain.

29.     Within six months of the Acting Captain promotion, ACSO made the Captain promotion permanent, assigning Chief Coates to the Patrol Division.

30.     As a Captain in the Patrol Division, Chief Coates supervised approximately 120 deputies. His duties included budgeting, allocating resources, annual reporting, and direct supervision over every unit in the Division.

31.     Following the election of then-Sheriff McIntosh (a Republican) in 2014, ACSO made Chief Coates a Captain in the Detective Division, a position equally broad in scope with similar supervision responsibilities as his preceding position, and the one which he held until Sheriff Reigenborn fired him.

### *Chief Gene Claps*

32.     Chief Gene Claps served a 22-year career in law enforcement, all of it at ACSO.

33.    On January 22, 1997, Chief Claps joined ACSO as a Posse Deputy.

34.    On November 10, 1997, ACSO promoted Chief Claps to a position of Deputy Sheriff in the Jail Division.

35.    After three years as a Deputy in the Jail Division, ACSO assigned Chief Claps to the Patrol Division.

36.    On or about that time, ACSO also made Chief Claps a Field Training Officer.

37.    In April 2001, ACSO awarded Chief Claps a Meritorious Achievement Award.

38.    In February 2004, ACSO promoted Chief Claps to Lead Detective of the Critical Incident Team in the Detective Division, where he worked for the next seven years.

39.    During that time, ACSO also made Chief Claps an instructor for ACSO Police Academy.

40.    In August 2005, ACSO warded Chief Claps the Employee of the Month Award.

41.    In January 2011, then-Sheriff Darr temporarily promoted Chief Claps to the rank of Sergeant.

42.    Less than six months later, then-Sheriff Darr made the promotion permanent, making Chief Claps a Traffic Sergeant in the Patrol Division where Chief Claps supervised a team of approximately 24 deputies and county employees.

43.    That same year, The National Association of TRIADS, a partnership between law enforcement, older adults, and community groups, honored Chief Claps as

Law Enforcement Officer of the Year.

44.    On January 14, 2015, ACSO promoted Chief Claps to the position of Commander in the Jail Division, where he supervised approximately 35 deputies and over 70 volunteers.

45.    On or about this time, ACSO charged Chief Claps with oversight of the Jail Division's Field Training Officer program.

46.    In April 2015, ACSO awarded Chief Claps the Deputy David R. Martinez Award for Excellence.

47.    In February 2016, then-Sheriff McIntosh promoted Chief Claps to the position of Captain in the Jail Division, where Chief Claps supervised approximately 300 employees.

48.    On January 2, 2018, ACSO promoted Chief Claps to Division Chief of the Jail Division, the position he held until Sheriff Reigenborn fired him.

### _Captain Mark Mitchell_

49.    Captain Mitchell served a 29-year career in law enforcement, all of it with ACSO.

50.    In 1990, Capt. Mitchell joined ACSO as a Community Service Officer in the Jail Division.

51.    On June 26, 1991, ACSO promoted Capt. Mitchell to a Deputy position in the Jail Division.

52.    In March 1995, ACSO assigned Capt. Mitchell to the Patrol Division, where he worked as a Patrol Deputy for the next nine years.

53.    In April 1997, ACSO awarded Capt. Mitchell a Lifesaving Award for rescuing a man who attempted suicide.

54.    That same year, ACSO awarded Capt. Mitchell the Meritorious Achievement Award in honor of his arresting two suspects in an armed robbery.

55.    In April 1999, ACSO made Capt. Mitchell a Field Training Officer for the Patrol Division.

56.    In April 2001, ACSO assigned Capt. Mitchell to its Tactical Team ("SWAT").

57.    On January 30, 2004, ACSO promoted Capt. Mitchell to the position of Sergeant in the Jail Division, where he supervised approximately 30 deputies.

58.    On February 14, 2005, ACSO transferred Capt. Mitchell to the Patrol Division, where he supervised approximately 10 patrol deputies.

59.    In March 2005, ACSO made Capt. Mitchell a SWAT Team Leader and a Field Training Officer Supervisor

60.    In July 2008, then-Sheriff Darr temporarily promoted Capt. Mitchell to the position of Acting Lieutenant of the Jail Division, where Capt. Mitchell supervised a platoon of four sergeants and 60 deputies.

61.    In May 2009, ACSO promoted Capt. Mitchell to the rank of Lieutenant in the Jail Division.

62.    In November 2010, ACSO made Capt. Mitchell an Administrative Lieutenant in the Patrol Division.

63.    In March 2011, ACSO assigned Capt. Mitchell to command of a platoon in the Patrol Division and promoted him to the position of SWAT Team Commander.

64.     In February 2016, after ACSO changed the rank of Lieutenant to Commander, then-Sheriff McIntosh promoted Capt. Mitchell to the newly created rank of Captain.

65.     In July 2016, ACSO temporarily appointed Capt. Mitchell to Patrol Division Chief in an acting capacity.

66.     In October 2016, Capt. Mitchell returned to serving as Captain of the Patrol Division, the position he held until Sheriff Reigenborn fired him.

### *Commander Kevin Currier*

67.     Commander Kevin Currier served a 24-year career in law enforcement, all of it at ACSO.

68.     In 1995, Cdr. Currier joined ACSO as a Deputy Sheriff in the Jail Division.

69.     In 1998, ACSO assigned Cdr. Currier to the Patrol Division.

70.     In August 2001, ACSO made Cdr. Currier a SWAT Team Negotiator, where he worked as a Negotiator for the first year, and as a Tactical Operator for six years more.

71.     During this time, ACSO also made Cdr. Currier a Field Training Officer.

72.     In 2004, ACSO assigned Cdr. Currier to the Detective Division, where he remained a Property Detective until 2009.

73.     On January 6, 2010, then-Sheriff Darr promoted Cdr. Currier to the position of Patrol Sergeant.

74.     Four months later, ACSO assigned Cdr. Currier to the rank of Sergeant in the Community Resource Team.

75.     In 2011, ACSO assigned Cdr. Currier to the Detective Division, where he

9

supervised the entire Property Crimes Section.

76.    On January 14, 2015, then-Sheriff McIntosh promoted Cdr. Currier to the position of Commander in the Detective Division. Currier led approximately 30 homicide investigations while at the Detective Division.

77.    In 2015, then-Sheriff McIntosh also assigned Cdr. Currier the additional duties of a Coordinator for the 17th Judicial District's Critical Investigation Team, during which time Cdr. Currier investigated roughly 40 officer-involved shootings or other critical incidents as part of the Critical Investigation Team.

78.    In his role as Coordinator for the 17th Judicial District's Critical Investigation Team, ACSO entrusted Cdr. Currier with supervising the investigation of ASCO Deputy Heath Gumm's murder.

79.    Cdr. Currier served as Commander and Coordinator for the 17th Judicial District until Sheriff Reigenborn fired him.

**B.    Plaintiffs' Contentious History with the Fraternal Order of Police**

80.    The Fraternal Order of Police ("FOP") is a fraternal organization of sworn law enforcement officers.

81.    FOP has chapters across the United States.

82.    Colorado Lodge 1 is a FOP chapter for law enforcement agencies in the Adams County area, including the Adams County Sheriff's Office.

83.    Lodge 1 endorses candidates for office, and through its donor committee, makes financial contributions to the campaigns of candidates.

84.    Sheriff Reigenborn has held various leadership positions at Lodge 1,

including:

        a.  Sergeant at Arms,

        b.  1st Vice President,

        c.  2nd Vice President,

        d.  President.

85.    Sheriff Reigenborn first became President of Lodge 1 in 2004 and served in that capacity until 2012.

86.    After that, Sheriff Reigenborn held several elected positions within the Colorado State FOP, including Sergeant-At-Arms for six years, and two terms as the 2nd Vice President.

87.    Sheriff Reigenborn was in the midst of serving his second term as 2nd Vice President when he was elected the Adams County Sheriff and stepped down.

88.    Some years back, Sheriff Reigenborn and other Lodge 1 and state-level FOP leadership began a campaign to implement collective bargaining at ACSO.

89.    Plaintiffs openly opposed the campaign and collective bargaining at ACSO.

90.    In 2016, Plaintiffs, who opposed collective bargaining and Lodge 1 leadership, helped elect Paul Gregory and Adam Sherman to the Lodge's Board of Directors.

91.    Sheriff Reigenborn opposed the election of Gregory and Sherman to the Board.

92.    By 2018, the Lodge had increased its membership dues, in part to pay for a study into the feasibility of collective bargaining at ACSO.

93.     Due to disagreements about collective bargaining and the increase in dues, the Lodge lost many members, including Plaintiffs.

94.     On or about this time, Cdr. Currier also reached out to the Colorado Police Protective Association ("CPPA"), an advocacy association in competition with FOP, asking that the organization come make a presentation to disaffected members.

95.     The presentation never occurred after FOP leadership found out and asked CPPA not to speak with FOP members.

96.     After he took office, Sheriff Reigenborn later demoted or terminated many of the individuals who rescinded their involvement with the FOP.

**C.     Plaintiffs' First Amendment Protected Activities During the 2014 and 2018 Elections for Adams County Sheriff**

97.     In both 2014 and 2018, Sheriff Reigenborn, running as a Democrat, challenged McIntosh for Adams County Sheriff.

98.     Sheriff Reigenborn lost to McIntosh in 2014.

99.     Plaintiffs were among the largest donors to McIntosh's 2014 and 2018 campaigns.

100.    Plaintiffs collectively contributed a total of $3,375 in cash and in-kind contributions to McIntosh's 2014 campaign, accounting for 5.12% of that campaign's total contributions.

101.    Plaintiffs' support is even greater when considering the contributions of Plaintiffs' family members and other donations solicited by Plaintiffs in support of McIntosh.

102.    Plaintiffs engaged in the following non-exhaustive list of constitutionally

EXHIBIT C, Page 22 of 43

protected activities in 2014 in support of McIntosh's candidacy:

> a.    At a FOP Lodge 1 forum with the candidates Capt. Mitchell spoke publicly in support of McIntosh.

> b.    Capt. Mitchell donated $1,550 to McIntosh's campaign.

> c.    Capt. Mitchell placed a yard sign in support of McIntosh on his lawn.

> d.    Chief Claps served on McIntosh's campaign committee, which met monthly to strategize and plan campaign activities.

> e.    Chief Claps hosted fundraisers for McIntosh and placed a yard sign on his lawn and prominent signs at some of the commercial properties he and other families own, all in support of McIntosh's candidacy.

> f.    Chief Claps donated at least $500 to McIntosh's campaign.

> g.    Chief Coates contributed $1,225 to McIntosh's campaign.

> h.    Chief Coates hosted a fundraiser for McIntosh at his house in July 2014, raising McIntosh $1,800. His immediate family also contributed an additional $2,450 towards McIntosh's campaign.

> i.    Chief Coates placed yard signs in his lawn and also arranged for a local care dealership to post signs.

> j.    Cdr. Currier donated $100 to McIntosh's campaign.

103.  Campaign contributions are publicly available information in Colorado.

104.  In 2014, FOP Lodge 1 endorsed Reigenborn's candidacy.

105.  In 2014, the State FOP also endorsed Reigenborn.

106.  Reigenborn received approximately $16,750 in FOP-related donations

during his 2014 campaign.

107.    In 2018, Reigenborn again sought to challenge McIntosh.

108.    McIntosh received FOP Lodge 1's endorsement but received only $5,700 in financial contributions.

109.    For the 2018 election, Plaintiffs contributed approximately $6,665 to McIntosh's campaign, accounting for 11.25% of all contributions.

110.    Plaintiffs' support is even greater when considering the contributions of Plaintiffs' family members and other donations solicited by Plaintiffs in support of McIntosh.

111.    Plaintiffs also engaged in the following, non-exhaustive list of constitutionally protected activities in 2018 in support of McIntosh's candidacy:

    a.    Chief Coates donated $1,900 including an in-kind donation of $1,800 to host a campaign fundraiser at the Ranch Country Club for McIntosh which was attended by approximately 70-80 attendees resulting in an additional $2,375 for the campaign.

    b.    Chief Coates solicited an additional $1,100 for the McIntosh campaign from his family and friends.

    c.    Chief Claps donated a total of $2,725 to McIntosh throughout the campaign.

    d.    Chief Claps volunteered with McIntosh's campaign committee, meeting monthly to organize campaign activities.

    e.    Chief Claps sponsored and organized a campaign fundraiser in

14

support of McIntosh at the Grizzly Rose.

f.      Cdr. Currier donated at least $940 in financial and in-kind donations to McIntosh's campaign.

g.      Cdr. Currier served on McIntosh's campaign committee and helped organize fundraising and other campaign activities, including the Brighton parade at which Sheriff Reigenborn was also present.

h.      Capt. Mitchell donated $1,100 to McIntosh's campaign.

112.    On November 6, 2018, Sheriff Reigenborn unseated McIntosh and won the election for Adams County Sheriff by a margin of 8,169 votes.

113.    Sheriff Reigenborn selected Tommie McLallen as his Undersheriff.

114.    Before that position, Undersheriff McLallen had served as Chief of the now-disbanded Walsenburg Police Department.

115.    Undersheriff McLallen was active in the FOP, having served as President of FOP Lodge 7 in Pueblo. He was also active in the Colorado State FOP chapter, which is where he and Sheriff Reigenborn became more closely acquainted.

**D.      Sheriff Reigenborn Fires Plaintiffs the Day After Assuming Office in Violation of Their First Amendment Rights**

116.     After winning the election, but before taking office, Sheriff Reigenborn complained to a reporter about "the command staff that wants to continue to be loyal to Sheriff McIntosh."

117.    Sheriff Reigenborn took his oath of office on January 8, 2019.

118.    On January 9, 2019, through Judy Najera, Sheriff Reigenborn sent an email to ACSO personnel with the subject line "Policy Changes."

119.    The email stated that "as a newly elected Sheriff I plan to make some changes within the organization."

120.    The email further stated that "[m]y hope is that most employees will be able to move forward and contribute positively to my team. I am, however, anticipating that some employees may not remain in their current positions and may not retain their current salaries."

121.    The email went on to inform personnel that "[d]uring this transition time, it is necessary to rescind the employment and personnel policies of previous sheriffs."

122.    Affixed to the end of the email was Sheriff Reigenborn's electronic signature.

123.    The email also included an attached document entitled, "Notice to Sheriff's Office Employees Regarding Employment Policies."

124.    The Notice was dated January 8, 2019.

125.    The Notice informed ACSO staff that "Sheriff Reigenborn hereby rescinds any employment or personnel policies of former Sheriffs."

126.    The Notice further specified that "[a]ny policy regarding recruitment and hiring, discipline of employees, termination of employees, and promotional processes are no longer valid."

127.    Accompanying the Notice was four new policies adopted by Sheriff Reigenborn, including an "At-Will Employment Policy and Termination Procedures," a "Recruitment and Promotion Policy," and a "Discipline and Investigations Policy."

128.    Sheriff Reigenborn's "At-Will Employment Policy and Termination

Procedures" specified that, "[t]he Sheriff may terminate employees or revoke deputy appointments at will, with or without cause."

129.   Sheriff Reigenborn's "Recruitment and Promotion Policy" included language stating that, "[t]he Sheriff reserves the right to select managers and command staff within his Office. Promotions and the selection of managers and command staff will be solely at the Sheriff's discretion…Employees of the Sheriff's Office hired prior to Sheriff Reigenborn's term of office are not entitled to maintain their current rank, position, or salary. Determination of position and salary will be made by the Sheriff at his sole discretion."

130.   Sheriff Reigenborn's "Discipline and Investigations Policy" provided that employee discipline is at the "sole discretion" of the Sheriff, and that "there are no policies or procedures applicable to the disciplinary process other than the termination procedures set forth in [the "At-Will Employment Policy and Termination Procedures"]."

131.   Later in the day on January 9, 2019, Plaintiffs received substantially identical letters from Sheriff Reigenborn informing them of the end of their employment.

132.   In these letters, Sheriff Reigenborn stated: "I have my own vision for how to best meet the needs and objectives of the Office. After careful review and deliberation, I do not believe retaining you is in the best interests of the organization. I intend to revoke your appointment with the Adams County Sheriff's Office."

133.   Sheriff Reigenborn further stated: "I am informing you of the anticipated termination of your employment and the opportunity to meet with me prior to your termination."

134. Sheriff Reigenborn instructed Plaintiffs that if they wanted to meet with him prior to the end of their employment, they had to request to do so no later than noon on January 10, 2019, otherwise, "your termination will be effective at 8:00am on January 11, 2019."

135. Finally, Sheriff Reigenborn informed Plaintiffs that "[e]ffective immediately, you are being placed on Administrative Leave."

136. Thus, Plaintiffs were no longer "allowed in any secured or unsecured area of the Sheriff's Office without prior approval from Sheriff Reigenborn of his appointee."

137. Plaintiffs all requested meetings pursuant to the instructions in the letters.

138. On January 15, 2019, Plaintiffs each in turn met with Sheriff Reigenborn.

139. To Chief Claps, Sheriff Reigenborn stated that "[f]or me, I just don't think that you're going to be able to change and be part of the culture that we're headed towards." Sheriff Reigenborn stated that, "I need to take the agency in a different direction and the only way I can do that is by making some cultural changes…It's just the only way that I can get the line troops to see that we're going in a different direction, is to truly just make us go in another direction and so…"

140. These were the only reasons provided by Sheriff Reigenborn to Chief Claps as the basis for the termination.

141. Sheriff Reigenborn offered Chief Claps the option of resigning.

142. Because he would forfeit his retirement benefits if he did not accept, Chief Claps agreed to a resignation in lieu of termination.

143. To Capt. Mitchell, Sheriff Reigenborn stated that "we're going in a different

direction. We don't think that you fit where we are going."

144.    This was the only reason provided by Sheriff Reigenborn to Capt. Mitchell as the basis for the termination.

145.    When Captain Mitchell asked Sheriff Reigenborn to "explain that direction." Sheriff Reigenborn responded only, "I just did."

146.    When Captain Mitchell asked for an explanation about the "different direction," Sheriff Reigenborn stated only, "I don't need to tell you the direction."

147.    Towards the end of the meeting, Capt. Mitchell mentioned his political support of McIntosh.

148.    Specifically, Capt. Mitchell stated that, "…I just want to say one more thing before I walk out of here for the last time. You never heard anything negative from me ever about you in any way, shape or form through two campaigns, through the entire time that we worked together. Not once."

149.    To this statement, Sheriff Reigenborn replied, "[s]o we will agree to disagree on that."

150.    Sheriff Reigenborn offered Capt. Mitchell the option of resigning.

151.    Because he would forfeit his retirement benefits if he did not accept, Capt. Mitchell agreed to a resignation in lieu of termination.

152.    To Chief Coates, Sheriff Reigenborn stated that the basis for the termination was "about me moving the agency in a different direction…" and provided no other reason.

153.    Sheriff Reigenborn offered Chief Coates the option of resigning.

154.    Because he would forfeit his retirement benefits if he did not accept, Chief Coates agreed to a resignation in lieu of termination.

155.    To Cdr. Currier, Sheriff Reigenborn stated that the basis for the termination was "about me moving the agency in a different direction…"

156.    Sheriff Reigenborn did not describe that different direction.

157.    This was the only reason provided to Cdr. Currier for the termination.

158.    Sheriff Reigenborn offered Cdr. Currier the option of resigning.

159.    Because he would forfeit his retirement benefits if he did not accept, Cdr. Currier agreed to a resignation in lieu of termination.

160.    After ACSO ended their employment, Plaintiffs were offered financial severance only if they signed agreements conditioned on a full release of claims and a covenant to "keep . . . the circumstances leading to Employee's resignation [sic] strictly confidential. . ."

161.    Plaintiffs declined to sign the proposed severance agreements.

162.    Sheriff Reigenborn also took adverse actions, including demotion and/or termination, of a number of other dedicated McIntosh supporters.

163.    Simultaneously, Sheriff Reigenborn often filled these new vacancies with supporters of his campaign, many of whom lacked significant law enforcement background or expertise. For example:

a.    Mark Toth: Sheriff Reigenborn hired Toth as Division Chief of the Patrol Division. Toth was the former chief of the Mountain View Police Department, where Reigenborn also once worked. Under Toth's leadership,

20

the Department gained a reputation for hiring officers who had been fired or forced to resign from other departments due to misconduct.

b.      Michael Bethel: Sheriff Reigenborn appointed Bethel as the Interim Division Chief of the Detective Division despite the fact that Bethel had previously been fired from the Pueblo Police Department for allegedly engaging in felony witness tampering relating to a sex tape featuring Bethel's wife and a suspect in a burglary case. Bethel now holds the position of Division Chief for the Professional Standards Division at ACSO.

c.      William Dunning: Sheriff Reigenborn made Dunning his "Chief-of-Staff," a position that had never existed before. He did so despite the fact that Dunning left ACSO in or about December 1994 or January 1995 and has not been employed in law enforcement since, instead working as an RV salesman and technician. The newly created Chief-of-Staff position is a highly paid civilian position with no defined job description. No similar position exists in any other sheriff's offices across the state. Dunning is a longtime friend of Sheriff Reigenborn and was active in both of Reigenborn's campaigns.

d.      J.D. Cordova: Sherriff Reigenborn promoted Cordova to rank of Commander despite the fact that Cordova resigned from the Fort Collins Police Department in 2006 to embark on a career of finance and sales, and only retuned to law enforcement in 2016 as a Deputy in Denver. At the time of the promotion he had never held a supervisory position or worked for

ACSO. But Cordova had served as Colorado State FOP President from 2000 – 2006 and administered FOP's Legal Defense Program thereafter.

e.     Glover Jarmin: Sheriff Reigenborn promoted Jarmin, a close personal friend, to rank of Commander even though Jarmin had only worked at ACSO for a short time.

### III.     CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Retaliation**
**(All Plaintiffs against All Defendants)**

164.     Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

165.     Defendants were acting under color of state law in their actions and inactions at all times relevant to this lawsuit.

166.     The First Amendment of the United States Constitution protects public employees from termination on the basis of their political speech, association, and beliefs.

167.     Plaintiffs Timothy James Coates, Gene Claps, Mark Mitchell, and Kevin Currier had a constitutionally protected and clearly established right to express criticism of collective bargaining, of the FOP Lodge 1, and of the FOP Lodge 1's leadership, including, but not limited to, Reigenborn.

168.     Plaintiffs Timothy James Coates, Gene Claps, Mark Mitchell, and Kevin Currier also had a constitutionally protected and clearly established right to express support for the political campaign of McIntosh, to donate to him, to campaign for him, and to associate with him and others who supported his campaign.

22

169.    "Patronage . . . is inimical to the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 357 (1976) (internal quotations omitted).

170.    Defendants violated Plaintiffs' First Amendment rights by terminating them, or requiring Plaintiffs resign in lieu of termination, because of their political beliefs, opinions, expression, activity, and donation history for McIntosh, as well as their political association with McIntosh and his supporters.

171.    Defendants violated Plaintiffs' First Amendment rights by terminating them, or requiring Plaintiffs resign in lieu of termination, because of their criticism of the FOP, the leadership of FOP Lodge 1, and because they withdrew membership from FOP.

172.    When Defendant Sheriff Reigenborn fired Plaintiffs, or required they resign in lieu of termination, he was acting as a final policymaker and decision-maker for Defendant ACSO.

173.    Defendants ACSO's and Reigenborn's actions deprived Plaintiffs of their federally protected First Amendment rights.

174.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiffs' federally protected rights.

175.    Defendants' conduct violated clearly established rights belonging to the Plaintiffs of which reasonable law enforcement and/or elected officials knew or should have known.

176.    Plaintiffs were and continue to be damaged by Defendants' violation of their First Amendment rights.

177.    As a direct result of Defendants' unlawful actions, Plaintiffs suffered actual economic and emotional injuries, in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Procedural Due Process**
(**All Plaintiffs Against All Defendants**)

178.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

179.    Defendants were acting under color of state law in their actions and inactions at all times relevant to this lawsuit.

180.    By their actions and inactions described herein, Defendants subjected Plaintiffs to the deprivation of their rights under the Fourteenth Amendment.

181.     Specifically, Plaintiffs had a right to procedural due process under the Fourteenth Amendment before being deprived of their jobs.

182.    Colorado state law requires that sheriffs must notify deputies of the reason for the proposed revocation of an appointment and shall give deputies an opportunity to be heard by the sheriff before revocation occurs.

183.    Colorado state law also requires that each sheriff adopt personnel policies for the review and revocation of appointments.

184.    Under the Fourteenth Amendment, Plaintiffs were entitled to notice of the charges against them and a hearing to plead their cases prior to termination.

185.    Defendants ACSO and Reigenborn did not give Plaintiffs notice of the charges against them, nor did Plaintiffs have the chance to be heard before the decision to terminate occurred.

186.    Defendants ACSO and Reigenborn did not adopt personnel policies for the review and revocation of appointments.

187.    To the extent that Defendants ACSO and Reigenborn's "At-Will Employment Policy and Termination Procedures" purported to adopt personnel policies for the review and revocation of appointments, these policies were illusory and did not satisfy the requirements of C.R.S. § 30-10-506.

188.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiffs' federally protected rights.

189.    Defendants' conduct violated clearly established rights belonging to the Plaintiffs of which a reasonable sheriff and/or elected official knew or should have known.

190.    Plaintiffs were and continue to be damaged by Defendants' violation of their Fourteenth Amendment rights.

191.    As a direct result of Defendants' unlawful actions, Plaintiffs suffered actual economic and emotional injuries, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

a.      A declaration that Defendants have violated Plaintiffs' First and Fourteenth Amendment rights under the United States Constitution;

b.      Issuance of an injunction prohibiting Defendants and their agents from continuing to violate Plaintiffs constitutionally-protected rights;

c.      Actual economic damages as established at trial;

d.      Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

e.      Punitive damages for all claims allowed by law in an amount to be determined at trial;

f.      Front pay in lieu of reinstatement;

g.      Pre-judgment and post-judgment interest at the highest lawful rate;

h.      A tax offset for any damages award;

i.      Attorneys' fees and costs; and

j.      Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully Submitted: July 1, 2020

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern
Siddhartha H. Rathod
Felipe Bohnet-Gomez
2701 Lawrence St., Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
ih@rmlawyers.com
sr@rmlawyers.com
fbg@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | |
|---|---|
| TIMOTHY JAMES COATES, GENE CLAPS, MARK MITCHELL, and KEVIN CURRIER | ) )  ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) )  Civil Action No.   1:20-cv-1936 |
| THE ADAMS COUNTY SHERIFF'S OFFICE and RICHARD A. REIGENBORN | ) ) ) |
| *Defendant(s)* | ) ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  THE ADAMS COUNTY SHERIFF'S OFFICE
332 North 19th Ave.
Brighton, CO 80601

        A lawsuit has been filed against you.

        Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Iris Halpern, Rathod | Mohamedbhai, LLC, 2701 Lawrence St. Denver, CO 80205

        If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____

                                                     *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   1:20-cv-1936

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | |
|---|---|
| TIMOTHY JAMES COATES, GENE CLAPS, MARK MITCHELL, and KEVIN CURRIER | ) ) ) ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| THE ADAMS COUNTY SHERIFF'S OFFICE and RICHARD A. REIGENBORN | ) ) ) |
| _____ | ) ) |
| *Defendant(s)* | ) |

Civil Action No.   1:20-cv-1936

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  THE ADAMS COUNTY SHERIFF'S OFFICE
332 North 19th Ave.
Brighton, CO 80601

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Iris Halpern, Rathod | Mohamedbhai, LLC, 2701 Lawrence St. Denver, CO 80205

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  1:20-cv-1936

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                                        *Server's signature*

                                                                        _____
                                                                        *Printed name and title*


                                                                        _____
                                                                        *Server's address*

Additional information regarding attempted service, etc:

JS 44 (Rev. 09/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| TIMOTHY JAMES COATES, GENE CLAPS, MARK MITCHELL, and KEVIN CURRIER | THE ADAMS COUNTY SHERIFF'S OFFICE and RICHARD A. REIGENBORN |

| (b)  County of Residence of First Listed Plaintiff     Adams | County of Residence of First Listed Defendant     Adams |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c)  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Iris Halpern, Felipe Bohnet-Gomez, Siddhartha Rathod; Rathod \| Mohamedbhai, LLC, 2701 Lawrence Street, Suite 100, Denver, CO 80205; (303) 578-4400; ih@rmlawyers.com, fbg@rmlawyers.com | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
Employer violation of first amendment rights

☐ AP Docket

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
- DEMAND $
- CHECK YES only if demanded in complaint:
- JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 07/01/2020 | *s/ Iris Halpern* |

**FOR OFFICE USE ONLY**

RECEIPT # _____     AMOUNT _____     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____

JS 44 Reverse (Rev. 09/19)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.