# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

TIMOTHY JAMES COATES;
GENE CLAPS;
MARK MITCHELL; and
KEVIN CURRIER,

       Plaintiffs-Appellees,

v.

RICHARD A. REIGENBORN, in his
official and individual capacity,

       Defendant-Appellant.

Case No. 22-1339

---

On Appeal from the United States District Court
For the District of Colorado
Magistrate Judge Scott T. Varholak
Civil Action No. 1:20-cv-01936-STV

---

## APPELLANT'S OPENING BRIEF

---

Respectfully submitted,

Michael A. Sink
Adams County Attorney's Office
4430 S. Adams County Parkway,
Brighton, CO 80601
Phone: (720) 523-6116
Email: msink@adcogov.org

December 14, 2022

ORAL ARGUMENT IS REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF PRIOR RELATED APPEALS ........................................... viii

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 3

    I.   DISTRICT COURT JURISDICTION ................................................ 3

    II.  APPELLATE JURISDICTION......................................................... 3

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ....................... 5

STATEMENT OF THE CASE ........................................................... 6

    I.   UNDERLYING FACTS RELEVANT TO THE APPEAL. .................................... 6

    II.  PROCEDURAL HISTORY........................................................... 7

    III. SUMMARY JUDGMENT BRIEFING AND ORDER. ..................................... 10

        A.  *The named Defendants' motion for summary judgment.* ................. 10

        B.  *The former deputies' partial motion for summary judgment.* .......... 12

        C.  *The District Court's order on summary judgment.* ........................... 13

SUMMARY OF THE ARGUMENT ................................................... 17

STANDARD OF REVIEW .............................................................. 18

ARGUMENT ............................................................................ 19

I.   *Monell* Is Not Available Unless Sheriff Reigenborn Is the Final Policymaker for Adams County as to the Hiring and Firing of Deputies under Colorado Law, which He Is Not................................. 21

   A.   *In cases involving alleged final policymakers, Monell only applies if the policymaker is an agent of an entity from which the policymaker received a delegation of authority or ratification.*..................................... 23

   B.   *Sheriff Reigenborn is independent of Adams County, a separate legal entity, for purposes of hiring and firing deputies under Colorado law. ..* 27

   C.   *Footnote 55 in Monell does not authorize courts to overlook legal form or entity status.* ......................................................................... 29

   D.   *The former deputies never asserted a claim under Monell against Adams County.* ......................................................................... 34

   E.   *Suing the "Adams County Sheriff's Office" is not equivalent to suing Adams County, the governmental entity.* .................................................. 35

   F.   *Adams County's qualified duty to indemnify and defend the Sheriff does not make the Sheriff and the County interchangeable.* .................... 37

II.   In His Official Capacity, the Adams County Sheriff Is an Arm of the State of Colorado as to the Hiring and Firing of Deputies and Is, Therefore, Entitled to Eleventh Amendment Immunity................... 40

CONCLUSION................................................................. 44

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ............................ 45

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)................................ 46

CERTIFICATE OF DIGITAL SUBMISSION ................................. 47

CERTIFICATE OF SERVICE........................................................ 48

ATTACHMENTS ............................................................. 49

   *Attachment 1 – District Court Doc. No. 71 – Order on Motions for Summary Judgment filed September 28, 2022.* ....................................... 49

# TABLE OF AUTHORITIES

**CASES:**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................4

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997) ....22

*Bd. of Cty. Comm'rs v. Davis*, 150 P. 324 (Colo. App. 1915)..................28

*Beacom v. Board of County Comm'rs*, 657 P.2d 440 (Colo. 1983) ..........38

*Bennett v. Passic*, 545 F.2d 1260 (10th Cir. 1976).................................22

*Brandon v. Holt*, 469 U.S. 464 (1985) ........................................31, 34, 35

*Bristol v. Bd. of County Comm'rs of Clear Creek*,
 312 F.3d 1213 (10th Cir. 2002) (en banc)....... 13, 16, 28, 29, 36, 37, 40

*Calahan v. County of Jefferson*, 429 P.2d 301 (Colo. 1967)...................36

*Callahan v. Poppell*, 471 F.3d 1155 (10th Cir. 2006) ............................18

*Chavez v. Bd. of Cty. Comm'rs of Lake Cty.*,
 426 F. Supp. 3d 802 (D. Colo. 2019) ......................................11, 16, 39

*Chilcoat v. San Juan Cnty.*, 41 F.4th 1196 (10th Cir. 2022)..................41

*Coates v. Adams Cnty. Sheriff's Office*,
 No. 20-cv-01936-STV, 2022 WL 4493972 (D. Colo. Sept. 9, 2022).....13

*Couser v. Gay*, 959 F.3d 1018 (10th Cir. 2020)......................................40

*Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015)........................................19

*Deutsch v. Jordan*, 618 F.3d 1093 (10th Cir. 2010)...............................18

*Dixon v. People*, 127 P. 930 (Colo. 1911) ..........................................40, 44

*Edelman v. Jordan*, 415 U.S. 651 (1973)...........................................4, 41

iv

*Gonzales v. Martinez*, 403 F.3d 1179 (10th Cir. 2005) ..................... 34, 35

*Goodwin v. Debekker*, 716 F. Supp. 1363 (D. Colo. 1989)....................... 28

*Johnson v. City of Shelby, Miss.*, 574 U.S. 10 (2014)............................. 12

*Johnson v. Jones*, 515 U.S. 304 (1995)....................................................... 4

*Kentucky v. Graham*, 473 U.S. 159 (1985)........................................ 21, 32

*Kilman v. Brown*, 833 F. App'x 475 (10th Cir. Jan. 13, 2021) .............. 21

*Laidley v. McClain*, 914 F.2d 1386 (10th Cir. 1990) ............................. 38

*Lewis v. Clarke*, 581 U.S. 155 (2017) .............................. 19, 20, 22, 23, 39

*Lontine v. Van Cleave*, 483 F.2d 966 (10th Cir. 1973)............................ 12

*Lucas v. O'Loughlin*, 831 F.2d 232 (11th Cir. 1987)............................... 42

*Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc).................... 43

*Martinez v. Winner*, 771 F.2d 424 (10th Cir. 1985) ............................... 36

*McMillan v. Monroe County*, 520 U.S. 781 (1997)................. 5, 18, 41, 43

*Mitchell v. Forsyth*, 472 U.S. 511 (1985).................................................. 4

*Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978)
…....................................... 1, 2, 5, 9, 11, 12, 16-18, 20-22, 24, 29-31, 33-35

*Monroe v. Pape*, 365 U.S. 167 (1967) ............................................... 29, 31

*Northern Ins. Co. of New York v. Chatham Cty.*,
   547 U.S. 189 (2006)............................................................................ 41

*Owen v. City of Independence*, 445 U.S. 622 (1980)............................... 31

*Pelliteri v. Pine*, 776 F.3d 777 (11th Cir. 2015) ................................ 42-44

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1989)...................... 5, 23-26

*People v. Buckallew*, 848 P.2d 904 (1993) ...............................................27

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ................................................4

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993) ...............................................................................4

*Rozek v. Topolnicki*, 865 F.2d 1154 (10th Cir. 1989) ..............................38

*Ruybalid v. Bd. of Cty. Comm'rs of the Cty. of Las Animas Cty.*,
    442 P.3d 423 (Colo. 2019) ....................................................................38

*Schroeder v. Bd. of Cty. Comm'rs*, 381 P.2d 820 (Colo. 1963) ...............29

*Simpson v. Little*, 16 F.4th 1353 (10th Cir. 2021) ...................................19

*Struble v. Barger*, 261 P.2d 497 (Colo. 1953) ..........................................42

*Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35 (1995) ........................4, 5

*Tihonovich v. Williams*, 582 P.2d 1051 (Colo. 1978) ..............................28

*Tonjes v. Park Cty. Sheriff's Office*,
    300 F. Supp. 3d 1308 (D. Colo. 2018) .............................................7, 11

*Tunget v. Bd. of Cty. Comm'rs*, 992 P.2d 650 (Colo. App. 2000) ............29

*United States v. Evans*, 318 F.3d 1011 (10th Cir. 2003) ........................44

CONSTITUTIONS:

Colo. Const., art. IV, § 2 ........................................................................43

Colo. Const., art. XIV, § 8........................................................................27

Colo. Const., art. XIV, § 8.5.....................................................................27

U.S. Const., amend. 1.........................................................3, 6, 14, 17, 40

U.S. Const., amend. 11...........................................4, 18, 20, 40, 41, 44, 45

U.S. Const., amend. 14 ........................................................ 3, 6, 14, 17, 40

**STATUTES:**

28 U.S.C. § 636(c)(1) ...................................................................... 3

28 U.S.C. § 1291 ............................................................................. 3

28 U.S.C. § 1331 ............................................................................. 3

42 U.S.C. § 1983 ........................................................... 3, 6, 22, 25

Colo. Rev. Stat. § 20-1-303 .......................................................... 38

Colo. Rev. Stat. § 24-10-108 ........................................................ 38

Colo. Rev. Stat. § 24-10-118 ........................................................ 38

Colo. Rev. Stat. § 29-5-111 .......................................................... 38

Colo. Rev. Stat. § 30-10-506 ........................................ 6, 7, 12, 18, 27, 28

Colo. Rev. Stat. § 30-11-101 ........................................................ 28

Colo. Rev. Stat. § 30-11-103 ........................................................ 28

Colo. Rev. Stat. § 30-11-105 .................................................... 34, 35

Colo. Rev. Stat. § 30-11-107 ........................................................ 28

Colo. Rev. Stat. § 30-11-118 ........................................................ 38

Colo. Rev. Stat. § 30-25-104 .................................................. 16, 39, 40

**RULES:**

10th Cir. R. 28.1(A)(1) .................................................................. 3

Fed. R. Civ. P. 30(b)(6) ............................................................... 10

**SECONDARY SOURCES:**

3 J. BOUVIER, BOUVIER'S LAW DICTIONARY (8th ed. 1914) ...................... 42

Colo. Att'y Gen'l Op., No. 99-7,
    1999 Colo. AG LEXIS 4 (Sept. 8, 1999) ............................................. 27

R. COOLEY, HANDBOOK ON THE LAW OF MUNICIPAL CORPORATIONS (1914)
    ............................................................................................................. 42

## STATEMENT OF PRIOR RELATED APPEALS

There are no prior or related appeals in this matter.

# INTRODUCTION

Sheriff Reigenborn's appeal presents the legal question of whether Section 1983 plaintiffs who sue a state constitutional officer for that officer's own conduct can circumvent his immunity by recasting the officer as equivalent to a separate municipal entity based on little more than a footnote in *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978) regarding "official capacity" claims.

Here, the district court ruled the Sheriff had qualified immunity for his constructive discharge of four Adams County sheriff's deputies in 2019. However, it then effectively circumvented that immunity expressly to provide the former deputies an alternate avenue for relief. It did that by assuming that the Sheriff, in his official capacity, must be some entity's agent. It then held that the entity must be Adams County, even though Adams County never appeared in the case and did not, nor could not legally, control the Sheriff's employment actions towards the four deputies.

Sheriff Reigenborn, however, is the real party in interest in this case. He, not the County, undertook the actions at issue. He, not the

County, will have to participate at trial. And he and his successors, not the County, will be bound by the legal effect of any judgment entered because their exclusive statutory powers are impacted. If individual governmental actors can be split into separate entities wholly within themselves under *Monell* and then parceled out to separate entities, it would eviscerate important constitutional and statutory distinctions created by *Monell* and threaten the viability of qualified immunity.

What is more, thin slicing the Sheriff into two capacities further raises the prospect of Eleventh Amendment immunity because the Sheriff was exercising an exclusive statutory power given to him by the State of Colorado, not by a separate municipal entity. If the Sheriff must be an agent for some entity, for this function at least, he is an agent of the State of Colorado. Thus, Sheriff Reigenborn respectfully requests this Court reverse the district court's denial of summary judgment in his favor.

## JURISDICTIONAL STATEMENT

### I.    District Court Jurisdiction.

The former deputies asserted two causes of action under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the United States Constitution. Subject matter jurisdiction in the district court existed pursuant to 28 U.S.C. § 1331. The parties consented to a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

### II.   Appellate Jurisdiction.

The district court entered its order on summary judgment on September 28, 2022. App. Vol. XI at 188.[1] Sheriff Reigenborn timely filed his notice of appeal on October 6, 2022. App. Vol. XI at 230.

This Court has jurisdiction under 28 U.S.C. § 1291 over "appeals from all final decisions from the district courts." While partial denials of motions for summary judgment are not ordinarily reviewable as a final decision, the collateral-order doctrine creates appellate jurisdiction over

---

[1] For record citations, Sheriff Reigenborn uses the convention suggested by 10th Cir. R. 28.1(A)(1).

certain intermediate rulings on pure issues of law. *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009).

A collateral order can be where it "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment." *Johnson v. Jones*, 515 U.S. 304, 310 (1995). Denials of qualified immunity fall squarely within the collateral-order doctrine. *Plumhoff v. Rickard*, 572 U.S. 765, 771-72 (2014); *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). So too do orders that effectively deny Eleventh Amendment immunity, which may be asserted at any time. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993); *Edelman v. Jordan*, 415 U.S. 651, 677-78 (1973).

The four former deputies have filed a separate motion to dismiss this appeal. In it they challenge the applicability of the collateral order doctrine based on *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43 (1995). The Sheriff filed a response in opposition on November 3, 2022, and the former deputies filed their reply on November 10, 2022. The motion was referred to the merits panel.

The proper classification of the defendant, however, was not at issue in *Swint*. There, the County was directly and expressly sued for its policies. The Sheriff, it was alleged, was a delegated policymaker for the County and authorized a series of warrantless raids. Unlike in *Swint*, the classification of the Sheriff as the real party in interest is at issue here. Sheriff Reigenborn is not a municipality. Nor is he the agent of Adams County, a governmental entity, when it comes to hiring and firing deputies. He is, rather, an agent of the State of Colorado for that function. Thus, the merits of the Sheriff's appeal are inextricably intertwined with the jurisdictional question.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

(1)     Whether contrary to *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1989), the district court's summary judgment order practically denies Sheriff Reigenborn qualified immunity by forcing him to stand trial for the exact same actions by merely recasting him under *Monell* as a final policymaker for an entity that has delegated him no authority.

(2)     Whether contrary to *McMillan v. Monroe County*, 520 U.S. 781 (1997), the district court's summary judgment order ignores the

Sheriff's independent status as a state constitutional officer for the purposes of hiring and firing deputies and thereby implicates Eleventh Amendment immunity.

## STATEMENT OF THE CASE

### I.   Underlying Facts Relevant to the Appeal.

In 2018, Richard A. Reigenborn was elected as the Adams County Sheriff. App. Vol. II at 68. When Sheriff Reigenborn came into office in January 2019, he exercised his exclusive statutory powers under Colo. Rev. Stat. § 30-10-506 to send notices of intent to dismiss four former high-ranking sheriff's deputies. App. Vol. II at 66. After holding separate in-person interviews with each of the four deputies, they chose to resign, which—the district court later held—constituted constructive discharge. App. Vol. II at 68-69 & Vol. XI at 199-205.

Those former deputies sued the "Adams County Sheriff's Office" and Sheriff Reigenborn in his personal and official capacity under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments. App. Vol. I at 18-50. In particular, the four former deputies alleged Sheriff Reigenborn retaliated against them for their support for the re-

election of his predecessor, former Adams County Sheriff Michael McIntosh. *Id.* at 39-41. In addition, they alleged retaliation for their previous opposition to the potential unionization of the Adams County Sheriff's office. *Id.* They also claimed a property right in their positions as Sheriff's deputies. *Id.* at 41-42. The former deputies requested various forms of relief, including the "[i]ssuance of an injunction prohibiting Defendants and their agents from continuing to violate Plaintiffs constitutionally-protected rights[.]" *Id.* at 43.

## II.   Procedural History.

In the body of the complaint, the former deputies alleged "Defendant [The Adams County Sheriff's Office] ACSO is the law enforcement agency of Adams County." App. Vol. I at 20, ¶7. Significantly, as to Sheriff Reigenborn, the complaint alleged:

> Defendant Reigenborn was and remains the elected Sheriff of ACSO, a final policymaker for ACSO, and an agent of ACSO. At all relevant times, Sheriff Reigenborn acted under color of state law in his capacity as the Sheriff of Adams County. *See* C.R.S. § 30-10-506 (vesting power of appointment in the office of sheriff); *Tonjes v. Park Cty. Sheriff's Office*, 300 F. Supp. 3d 1308, 1332 (D. Colo. 2018) ("C.R.S. § 30-10-506 plainly makes the sheriff the final policymaker for the Sheriff's Office with respect to employment of deputies.").

*Id.* at 20, ¶8.

Neither Adams County, the governmental entity, nor the Board of County Commissioners, its authorized decisionmaker, was separately named in the caption or anywhere else in the body of the complaint. Neither of the two claims for relief pled the elements of a claim under *Monell*, although the former deputies did twice allege the Sheriff was a final "policymaker" for the Adams County Sheriff's Office, with no further elaboration. App. Vol. I at 20, ¶8 ("Defendant Reigenborn was and remains the elected Sheriff of ACSO, a final policymaker for ACSO, and an agent of ACSO"); *id.* at 40, ¶172 ("When Defendant Sheriff Reigenborn fired Plaintiffs, or required they resign in lieu of termination, he was acting as a final policymaker and decision-maker for Defendant ACSO").

On July 7, 2020, the named Defendants waived service of the complaint. App. Vol. I at 51 & 52. Neither Adams County, nor the Board of County Commissioners were served with the complaint. Nor did they waive service. *Id.*; *see* Vol. I at 6-17. On July 8, 2020, attorneys from the Adams County Attorney's office entered an appearance on behalf of the named Defendants. *Id.* at 53, 55 & 58. No attorney entered an appearance for Adams County or the Board of County Commissioners. *Id.*

In August 2020, the named Defendants filed a motion to dismiss. App. Vol. I at 84. Neither Adams County nor the Board of County Commissioners filed a motion to dismiss. *Id.*; *see also* Vol. I at 6-17. No reference to *Monell* was made in any of the dismissal briefing. App. Vol. I at 84-95; 117-129 & 130-137. The motion was denied by the district court on January 26, 2021, with no reference to *Monell*. App. Vol. I at 145.

In September 2020, the Court entered a scheduling order that governed discovery in the case and set the joinder of parties and amendment of pleadings deadline at November 30, 2020. App. Vol. I at 113. Neither Adams County nor the Board of County Commissioners were referenced in the Scheduling Order. App. Vol. I at 96-116.

Beginning in November 2020, the Plaintiffs served discovery solely on Sheriff Reigenborn, in both his capacities. App. Vol. II at 57-65; Vol. V at 85-107. No written discovery was served on the Adams County Sheriff's Office. App. *Id.* Neither Adams County nor the Board of County Commissioners received, responded to, or served their own discovery. *Id.* Nor was that contemplated under the Scheduling Order. In September

9

2021, Plaintiffs conducted a deposition of the Adams County Sheriff's office pursuant to Fed. R. Civ. P. 30(b)(6). App. Vol. IX at 16. A deputy sheriff was the designee. *Id.* Neither Adams County nor any member of the Board of County Commissioners was deposed in this action.

### III.  Summary Judgment Briefing and Order.

On November 22, 2021, Plaintiffs and the named Defendants filed cross-motions for summary judgment. App. Vol. I at 182-208 & Vol. II at 66-86. Neither Adams County nor the Board of County Commissioners filed a motion for summary judgment. App. Vol. I at 6-17. At the outset, it should be observed that no facts were adduced in the extensive summary judgment briefing by either party that Adams County, or its Board of County Commissioners, participated in or ratified the Sheriff's employment decisions with respect to the Plaintiffs. App. Vol. X at 28-115 & 122-148.

### A. The named Defendants' motion for summary judgment.

The named Defendants filed a motion for summary judgment on all claims. App. Vol. II at 66-86. In it, as relevant to the issues now on appeal, they first argued that Sheriff Reigenborn in his individual capacity was

10

the only proper defendant in the action. *Id.* at 70-72. In support they argued that an official capacity claim was not available because Sheriff Reigenborn is separate from Adams County, that Adams County did not appear in the case, that the Sheriff was gravamen of the alleged injury, and that the plaintiffs had not pled the elements of a *Monell* claim in any event. *Id.* They also argued that the "Adams County Sheriff's Office" is not a legal entity capable of being sued. *Id.* at 71-72. Finally, they asserted the Sheriff, in his personal capacity, had qualified immunity for his actions. *Id.* at 82-85.

The former deputies filed their response in opposition. App. Vol. VII at 16-41. In pertinent part, they now claimed for the first time in the case that, despite expressly pleading *Tonjes v. Park Cty. Sheriff's Office*, 300 F. Supp. 3d 1308, 1332 (D. Colo. 2018), which pertained to the "Sheriff's Office," their theory was now that the Sheriff was a policymaker for *Adams County*. App. Vol. I at 20, ¶8 & Vol. VII at 21. They further argued that any distinction between the two was irrelevant. App. Vol. VII at 21. In support they cited *Chavez v. Bd. of Cty. Commissioners of Lake Cty., Colorado*, 426 F. Supp. 3d 802, 813 (D. Colo. 2019). App. Vol. VII at 21.

11

As for the Defendant's point that a *Monell* claim had not actually been pled in the complaint, the former deputies characterized their own allegations as merely an "imperfect statement" of their legal theory, which did not warrant "dismissal of [their] complaint." App. Vol. VII at 20, quoting *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). The former deputies then argued the "Adams County Sheriff's Office" really was a proper party after all. App. Vol. VII at 21.

The named Defendants replied in support of the original motion. App. Vol. X at 16.

### B. *The former deputies' partial motion for summary judgment.*

For their part, the former deputies' motion was a partial one focused on whether, despite their resignations, they had been actually or constructively discharged. App. Vol. I at 182. They also argued the named Defendants acted under the color of state law. *Id.* at 182-183.

In response, the named Defendants conceded the Sheriff in his individual capacity had acted under color of state law based on *Lontine v. Van Cleave*, 483 F.2d 966, 968 (10th Cir. 1973) (suspension of Adams County deputy under predecessor to Section 506 was done under color of

state law). App. Vol. VIII at 26. The named Defendants, however, reiterated their argument that the Sheriff in his official capacity could not set policy for the Adams County Board of County Commissioners in this area, nor was the Adams County Sheriff's Office a legal entity. *Id.* at 25-26.

In reply, the former deputies largely incorporated their argument made in response to the named Defendants' motion for summary, while attempting to distinguish this Court's ruling in *Bristol v. Bd. of County Comm'rs of Clear Creek*, 312 F.3d 1213, 1220-21 (10th Cir. 2002) (en banc). App. Vol. X at 120-121.

### C. The District Court's order on summary judgment.

On September 28, 2022, the Court granted in part the Sheriffs' motion for summary judgment. App. Vol. XI at 188. The district court's decision is reported. *See Coates v. Adams Cnty. Sheriff's Office*, No. 20-cv-01936-STV, 2022 U.S. Dist. LEXIS 179774, 2022 WL 4493972 (D. Colo. Sept. 9, 2022).

The district court began by denying the named Defendants' motion for summary judgment on the merits of the former deputies' First

Amendment claim. App. Vol. XI at 212 & 229. It granted it, however, on the merits of their Fourteenth Amendment claim. *Id.* at 217 & 229.

As to the issues most relevant to this appeal, after summarizing the arguments of the parties and certain case law, the Court evaluated the named Defendants' arguments regarding the separate legal status of the various governmental entities at issue. It first noted the named Defendants' argument that the Adams County Sheriff's office was not a separate legal entity subject to suit. App. Vol. XI at 218, n.13. It later dismissed the Adams County Sheriff's Office as a Defendant. *Id.* at 229.

The court then summarized the thrust of the Sheriff's central argument:

> Defendants appear to argue both that the County cannot be liable for Sheriff Reigenborn's actions because Sheriff Reigenborn is not under the County's control and therefore his actions cannot be imputed to the County, and that ACSO cannot be sued separately because it is simply an office or department within the County with no separate legal entity. These positions are untenable.

App. Vol. XI at 219-220.[2] After surveying a split of legal authority within the United States District Court for the District of Colorado, the district court cast the named Defendant's arguments as seeking to create a "type of municipal-liability loophole[,]" that "would unfairly punish Plaintiffs for the legal uncertainty, despite their viable municipal liability claims." *Id.* at 221.

The district court then turned to the crux of the issue and held as follows:

> While recognizing the dispute, the Court holds that the County is the proper municipal defendant, and that Plaintiffs' claims have been properly brought against it by naming Sheriff Reigenborn in his official capacity. […] Defendants argue that the County cannot be held liable for Sheriff Reigenborn's actions because the County does not control his employment decisions. [#53 at 6] But this simply means that Sheriff Reigenborn is the final policymaker on personnel

---

[2] The district court's summary of the Sheriff's argument that the Sheriff's office "is simply an office or department *within* the County" is not the named Defendants' position. It likely comes from a footnote in the former deputies' response to the named Defendants' motion. App. Vol. VII at 19, n.2. The named Defendants did argue by analogy to "any other office or department of Adams County," App. Vol. II at 71, but as the rest of their argument makes clear they did not intend imply the Sheriff's office was "within" the legal entity of the County, which is controlled by the Board. The Sheriff's office is a department or agency supervised by the Sheriff. The County has no more supervisory power over the Sheriff's deputies than it does the Sheriff.

matters for the County and that his employment decisions are therefore chargeable as an official act of the County. […]

App. Vol. XI at 221 (citations omitted where noted by ellipses).

After distinguishing this Court's decision in *Bristol*, the district court then dropped footnote 14, where the court deemed the distinction between the Sheriff and the County to be immaterial. *Id.* at 222, n.14. It stated:

> It is worth noting that the precise identity of the municipal defendant in this case "ultimately . . . does not matter" under Colorado law—especially where, as here, discovery has been completed. *Chavez*, 426 F. Supp. 3d at 809 (D. Colo. 2019). Pursuant to a Colorado statute, judgments against: 1) "a county of this state;" 2) "any county officer . . . in his official capacity;" or 3) "any county officer . . . in his . . . name of office" are paid for in the same way—by the county and through a county tax. C.R.S. § 30-25-104; *Chavez*, 426 F. Supp. at 812-13 ("[W]hen a *Monell* claim is based on a sheriff-made policy, any distinction between suing the sheriff's office versus suing the county becomes purely theoretical, because the county will pay regardless.").

*Id.* at 222, n.14.

The court then turned to Sheriff Reigenborn in his personal capacity and granted him qualified immunity for the former deputies' First Amendment claim. App. Vol. XI at 228-229. It did so on the grounds that the applicable law was not clearly established. *Id.* Thus, all that

16

remains of the former deputies' claims is a First Amendment retaliation claim against the Sheriff in his official capacity, which the district court has asserted is now a claim against Adams County, the separate governmental entity. *See* App. Vol. XI at 229.

## SUMMARY OF THE ARGUMENT

Sheriff Reigenborn is the sole defendant in this action and is the real party in interest. Despite the Sheriff receiving qualified immunity in his personal capacity for the former deputies' only remaining claim, the Sheriff will still have to participate extensively at trial. His conduct is being challenged. He and his official successors, moreover, will be bound by the effect of any judgment, including the injunctive relief requested by the former deputies. The Adams County Sheriff's Office is not a juridical entity capable of being sued.

The district court nevertheless construed the deputies' claim against the Sheriff in his "official capacity" as a claim under *Monell* by equating the Sheriff with Adams County. The separate legal entity, Adams County, Colorado, however, was not named in the complaint and for good reason. The conduct at issue is solely the Sheriff's arising out his

17

exercise of his own exclusive statutory powers under Colo. Rev. Stat. § 30-10-506. Adams County had nothing to do with the Sheriff's exercise of his own statutory powers. At most, the County may owe a subsequent duty of indemnification to the Sheriff. That is not, however, a basis to equate the Sheriff with the County. *Monell* and its progeny do not hold otherwise.

The district court's assumption that the Sheriff in his official capacity must be an agent of some governmental entity raises the issue of Eleventh Amendment immunity. If the district court's assumption holds, then the Sheriff is an arm of the State as to the hiring and firing of deputies. As such, he is entitled to Eleventh Amendment immunity under *McMillian*, 520 U.S. at 785 & 793.

## STANDARD OF REVIEW

This Court reviews denials of immunity on summary judgment *de novo*–whether involving qualified or Eleventh Amendment immunity. *See Deutsch v. Jordan*, 618 F.3d 1093, 1099 (10th Cir. 2010) and *Callahan v. Poppell*, 471 F.3d 1155, 1158 (10th Cir. 2006).

"The district court's factual findings and reasonable assumptions comprise the universe of facts upon which" the Court bases it legal review of whether a defendant is entitled to immunity. *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (quotations omitted). The Court "may, however, review the factual record de novo when (1) the district court at summary judgment fails to identify the particular charged conduct that it deemed adequately supported by the record, (2) the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record, or (3) the district court commits legal error en route to a factual determination." *Simpson v. Little*, 16 F.4th 1353, 1360 (10th Cir. 2021) (citations and quotations omitted).

## ARGUMENT

In the suits against government employees or entities, "courts should look to whether the sovereign is the real party in interest to determine whether sovereign immunity bars the suit[.]" *Lewis v. Clarke*, 581 U.S. 155, 162 (2017). "[L]awsuits brought against employees in their official capacity represent only another way of pleading an action against an entity of which an *officer is an agent*, and they may also be barred by

19

sovereign immunity." *Id.* (quotation omitted and emphasis added). Labeling is not sufficient to address the issue. The critical issue is "who may be legally bound by the court's adverse judgment[.]" *Id.* at 165. "A suit against a state officer in his official, rather than individual, capacity might implicate the Eleventh Amendment." *Id.* at 166, n.5.

What the Court in *Lewis* stated as to cases expressly involving state-level government is equally true at county-level government where a county official serves several different roles, some of which may implicate the Eleventh Amendment. Based on footnote 55 in *Monell*, the district court short-circuited the real party in interest inquiry by simply assuming that the Sheriff must be some entity's agent and that entity must be Adams County. *Monell*, however, is not available unless Sheriff Reigenborn is the final policymaker for Adams County as to the hiring and firing of deputies under Colorado law, which he is not. Rather, in his official capacity, the Adams County Sheriff is an arm of the State of Colorado as to the hiring and firing of deputies. He is, therefore, entitled to Eleventh Amendment immunity in that capacity.

I. ***Monell* Is Not Available Unless Sheriff Reigenborn Is the Final Policymaker for Adams County as to the Hiring and Firing of Deputies under Colorado Law, which He Is Not.**

The district court construed the deputies' claim against Sheriff Reigenborn in his "official capacity" as a claim under *Monell* by equating the Sheriff with Adams County. Relying on *Kilman v. Brown*, 833 F. App'x 474, 475 (10th Cir. Jan. 13, 2021), the district court held "the County is the proper municipal defendant, and that Plaintiffs' claims have been properly brought against it by naming Sheriff Reigenborn in his official capacity." App. Vol. XI at 221. For its part, this Court's unpublished decision in *Kilman* relied on *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), to hold that a suit against the Arapahoe County Sheriff in his official capacity "functioned as a suit against Arapahoe County itself." 833 F. App'x at 475. The language the Court quoted from *Kentucky v. Graham*, in turn, was derived from *Monell*. *See* 473 U.S. 165-66. But neither *Monell* nor its progeny support the district court's conclusion nor *Kilman*'s reading of *Kentucky v. Graham*.

Under very limited circumstances, *Monell* and its progeny allow a plaintiff to assert a claim against a governmental entity based on the

single action of a policymaker, provided several requirements are all met. Respondeat superior is not a basis for entity liability under Section 1983. *See Monell*, 436 U.S. at 663, n.7 & 691.

Rather, the entity must have either undertaken some affirmative act of delegation to the policymaker in the first instance or ratified the decision after the fact. This is, in part, because direct participation is a requirement of Section 1983 liability. *See Bennett v. Passic*, 545 F.2d 1260, 1262-62 (10th Cir. 1976). Thus, plaintiffs must expressly identify and prove the *entity's* involvement leading to its liability. This is meant to be a "rigorous" standard. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997). If the entity is meant to be liable because of the actions of a final policymaker, the plaintiff must identify an affirmative act of delegation.

The entity, moreover, not the officer, must be the real-party-in-interest. *See Lewis*, 581 U.S. at 162. The touchstone of that inquiry is whether the entity's conduct (assuming there was any) was the "moving force" behind the injury. *Monell*, 436 U.S. at 694. Indemnification obligations, moreover, are not relevant to the real-party-in-interest

inquiry. *Lewis*, 581 U.S. at 165. "The critical inquiry is who may be legally bound by the court's adverse judgment, not who will ultimately pick up the tab." *Id.*

> **A. In cases involving alleged final policymakers, Monell *only applies if the policymaker is an agent of an entity from which the policymaker received a delegation of authority or ratification.***

Sheriff Reigenborn is not an agent of Adams County for purposes of hiring and firing deputies. The power exercised by the Sheriff was given to him and him alone by the Colorado General Assembly—not Adams County. He cannot be the final policymaker for an entity that has delegated him no authority for the conduct at issue.

The closest case raising the legal and factual issues raised here is *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). In *Pembaur*, the plaintiff sued several county police officers, among others, for breaking down the door to his medical clinic without a search warrant to execute an arrest warrant on a third-party. *Id.* at 472-73. The county police officers on the scene broke down the door only after consulting their supervisors who in turn advised them to contact the county prosecutor. *Id.* The county prosecutor advised the officers to break down the door. *Id.*

at 473. On appeal, the Supreme Court held that the county sheriff and the county prosecutor set county policy for *Monell* purposes when they advised the officers to break down the door despite the absence of a county policy or practice. *Id.* at 484-85.

In so holding, the Court reasoned that *Monell*'s "'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which *the municipality is actually responsible*." *Id.* at 479 (emphasis added). Under *Monell*, "recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which *the municipality has officially sanctioned or ordered*." *Id.* at 480 (emphasis added). Because "a single decision by [a municipality's] properly constituted legislative body" can constitute a policy, *id.* at 480, then so too could a "decision to adopt [a] particular course of action" when "*properly made* by *that government's authorized* decisionmakers." *Id.* at 481 (emphasis added). Because at the time, county policy allowed the county sheriff and

the county prosecutor to make the decision as to how to execute an arrest warrant, their instructions to the policy officers constituted county policy.

In a portion of the opinion, Part II-B, which only commanded a plurality of four Justices, the plurality "hasten[ed] to emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability." *Id.* at 481. In a footnote, the plurality suggested an example where a county would not be liable for a decision by the county sheriff:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Id.* at 483, n.12.

Justice O'Connor, who did not join Part II-B, filed a concurrence. In her much narrower opinion, Justice O'Connor noted an important further limitation to the Court's reasoning—namely, that warrantless forcible entry was not unlawful at the time the county sheriff and the county prosecutor instructed the police officers to do so. *Id.* at 491. Only because it was a then-legally-permissible choice could it constitute county policy. *Id.* (citing Justice White's separate concurrence). But under that concurrence, a knowingly unconstitutional act cannot become county policy precisely because it is unconstitutional. Justice O'Connor further expressed "fear that the standard the majority articulat[ed] may be misread to expose municipalities to liability beyond that envisioned by the Court in *Monell*." *Id.* at 491. Thus, under Justice O'Connor's narrower reasoning in *Pembaur*, the County cannot be liable for Sheriff Reigenborn's actions if the County for some reason cannot delegate such unlawful authority to the Sheriff.

Even under the broader plurality, however, Sheriff Reigenborn is not a policymaker for the County precisely because the County did not delegate any authority to him. It had no authority to delegate. The power

26

exercised by the Sheriff was given to him and him alone by the Colorado General Assembly—not Adams County. He cannot be the final policymaker for an entity that has delegated him no authority for the conduct at issue.

> ### B. Sheriff Reigenborn is independent of Adams County, a separate legal entity, for purposes of hiring and firing deputies under Colorado law.

The Sheriff is an independently elected state constitutional officer. Colo. Const., Art. XIV, §§ 8 & 8.5. His powers are statutory. *See People v. Buckallew*, 848 P.2d 904 (1993); *see also* Colo. Att'y Gen'l Op., No. 99-7, 1999 Colo. AG LEXIS 4 (Sept. 8, 1999). In this case, the power exercised by the Sheriff was given to him and him alone by the Colorado General Assembly. Colo. Rev. Stat. § 30-10-506 provides:

> Each sheriff may appoint as many deputies as the sheriff may think proper and may revoke such appointments at will; except that a sheriff shall adopt personnel policies, including policies for the review of revocation of appointments. Before revoking an appointment of a deputy, the sheriff shall notify the deputy of the reason for the proposed revocation and shall give the deputy an opportunity to be heard by the sheriff. Persons may also be deputized by the sheriff or undersheriff in writing to do particular acts.

This power has been repeatedly held to be "exclusive." *See Tihonovich v. Williams*, 582 P.2d 1051, 1055 (Colo. 1978); *Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219-20 (10th Cir. 2002) (en banc), *superseded in part by 2006 amendment to* Colo. Rev. Stat. § 30-10-506.

Adams County is a separate quasi-governmental legal entity. Colo. Rev. Stat. § 30-11-101(1) & (a). It has enumerated powers that are wholly controlled by the Board. Colo. Rev. Stat. §§ 30-11-101, 30-11-103 & 30-11-107. Even if the County wanted to, it could not delegate any its powers to the Sheriff. *See Bd. of Cty. Comm'rs v. Davis*, 150 P. 324, 326 (Colo. App. 1915) ("The board cannot shift or evade its responsibility for performance of its duties; within the scope of its powers it is supreme; in the exercise of its reasonable discretion, in the administration of county affairs, it cannot be superseded[.]").

Nowhere in Adams County's powers is the authority to supervise the Sheriff's department or control the Sheriff's employment decisions. *See Bristol*, 312 F.3d at 1219-20 & *Goodwin v. Debekker*, 716 F. Supp. 1363, 1365 (D. Colo. 1989). Colorado courts have jealously guarded the Sheriff's hiring and firing authority against attempts by County

governments to limit it. *See Schroeder v. Bd. of Cty. Comm'rs*, 381 P.2d 820, 822-23 (Colo. 1963) (Board cannot use budgetary authority to coerce the firing of a county official's employee); *see also Tunget v. Bd. of Cty. Comm'rs*, 992 P.2d 650, 652 (Colo. App. 2000) & *Bristol*, 312 F.3d at 1215.

> C. Footnote 55 in *Monell* *does not authorize courts to overlook legal form or entity status.*

In *Monell*, a class of female employees of the Department of Social Services and of the Board of Education of the City of New York filed suit under § 1983 challenging an official policy of the Department and the Board requiring pregnant employees to take unpaid leaves of absence. The plaintiffs named six defendants: the Department, its Commissioner, the Board, its Chancellor, the City of New York, and its Mayor. *Id.* at 661. "In each case, the individual defendants were sued solely in their official capacities." *Id.*

Relevant to the issues here, *Monell* did four things. First, it overruled *Monroe v. Pape*, 365 U.S. 167 (1967), "insofar as it [held] that local governments are *wholly* immune from suit under § 1983." *Monell*, 436 U.S. at 663 (emphasis added); *see also id.* at 701 ("[W]e express no views on the scope of any municipal immunity beyond holding that

29

municipal bodies sued under § 1983 cannot be entitled to absolute immunity[.]"). Second, it reaffirmed *Monroe* "insofar as it holds that the doctrine of *respondeat superior* is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees." *Id.* at 663, n.7; *see also id.* at 691. Third, it held a municipal or governmental "body" can be held liable for its own official policies or well-settled customs that cause constitutional deprivations. *Id.* at 690-91.

Finally, of special significance here, the Court in footnote 55 addressed the status of certain "official-capacity" suits. The Court stated:

> Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent—at least where Eleventh Amendment considerations do not control analysis—our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name.

*Id.* at 690, n.55.

On its face, the Court's footnote was only a "general" statement of principle. Even still it contained two caveats. First, it does not apply where Eleventh Amendment considerations enter into the analysis. Second, it only applies where the officer "is an agent" of an *entity*. That

point is further emphasized by Court's further limitation of its statement to "those cases in which . . . a local government would be suable *in its own name.*" *Id.* (emphasis added).

Subsequent Supreme Court cases have been careful to preserve the narrow boundaries of *Monell*. In *Brandon v. Holt*, 469 U.S. 464, 469 (1985), the Court reaffirmed footnote 55 from *Monell* in a case that had been filed before the decision in *Monell* was issued. In *Holt*, the Director of the City of Memphis police department was sued in his official capacity for a failure to adequately supervise and discipline police officers, one of whom attacked the plaintiffs. 469 U.S. at 467-68. The Court held that an official capacity claim against the Director was tantamount to an action against the City of Memphis and, therefore, the Director could not assert qualified immunity because a municipality is not entitled to assert that defense. *Id.* at 472-73, *relying on Owen v. City of Independence*, 445 U.S. 622 (1980).

Although the City of Memphis had not been named in the suit, the Court in *Holt* excused this omission in part because "[t]he complaint in this case was filed . . . before *Monroe v. Pape* was overruled[.]" *Id.* at 469.

The Court also pointed out that the action against the Director "was in his official capacity and *only in that capacity*," *id.* (emphasis added), and that the City had received "due notice of the proceedings." *Id.* at 472, n.20. At its crux, the Court in *Holt* held "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond." *Id.* at 471-72.

In *Kentucky v. Graham*, the plaintiffs sued a spate of city, county, and state police officers for excessive force arising out of their arrest attendant to an investigation into the murder of a state trooper. 473 U.S. 159, 161-62 (1985). One of the defendants was a state police commissioner who was sued both in his individual and official capacities. *Id.* at 162. The Commonwealth of Kentucky was also named as a defendant for the limited purpose of a fee award. *Id.* The Supreme Court eventually held that fees cannot be "recovered from a governmental entity when a plaintiff prevails in a suit against government employees in their personal capacities." *Id.* at 163; *see also id.* at 167.

In reaching that result, the Court in *Graham* cautioned that in "damages actions against public officials requir[e] careful adherence to the distinction between personal- and official-capacity suits." *Id.* at 165. The Court noted "this distinction apparently continues to confuse lawyers and confound lower courts" and, therefore, sought to "define it more clearly through concrete examples of the practical and doctrinal differences" between the two. *Id.*

Finally, in a footnote, the Court also advised that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly for damages and injunctive relief." *Id.* at 167, n.14.

While federal courts still allow parties to invoke footnote 55 of *Monell*, there is no warrant in either that footnote or in the body of the Court's analysis that warrants eliminating the legal and factual distinctions between different governmental officers and entities. To the contrary, the Court has labored mightily to preserve those distinctions. The district court's treatment of the distinction between the Sheriff and the County as immaterial essentially recreates respondeat superior

liability and upsets the careful balance *Monell* sought to establish. It was, therefore, legal error for the district court to equate the Sheriff and the County here.

### D. *The former deputies never asserted a claim under* Monell *against Adams County.*

Where a plaintiff seeks to name the entity through the pleading construct of naming an elected official in his official capacity as noted in footnote 55 of *Monell*, the plaintiff must still give the entity "due notice" of the suit and an opportunity to respond. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Neither the former deputies' complaint, nor the course of legal proceedings met either of these requirements.

As noted above, under Colorado law, the former deputies failed to file suit against Adams County in compliance with state law. *See* Colo. Rev. Stat. § 30-11-105; *Gonzales*, 403 F.3d at 1182 n.7. Adams County was aware of the existence of the lawsuit because it issued a preliminary indemnification resolution and requested the Adams County Attorney's office provide representation to the Sheriff. But the County, through the Board, was never provided notice by the former deputies that they were, in reality, attempting to sue the County. Nor did the Plaintiffs plead even

a superficial *Monell* claim against the County or the Sheriff in his official capacity in their complaint. Merely alleging the Sheriff is a policymaker for a law enforcement agency (one that is not a legal entity) does not plead a *Monell* claim against that agency, let alone a separate governmental entity.

It is therefore unsurprising that neither the County nor the Board participated in any way in the case. In sum, Adams County did not receive due notice and an opportunity to respond as required by *Holt*, 469 U.S. at 471-72.

### E. Suing the "Adams County Sheriff's Office" is not equivalent to suing Adams County, the governmental entity.

Under Colorado law, if a claim is meant to be asserted against Adams County as a legal entity, a plaintiff is required by a Colorado statute to bring an action against a county in the name of the board of county commissioners. *See* Colo. Rev. Stat. § 30-11-105 (requiring plaintiff to name "The board of county commissioners for the county of [....]" in all suits against a county). A failure to comply with that pleading requirement is a jurisdictional flaw. *Gonzales v. Martinez*, 403 F.3d 1179, 1182 n.7 (10th Cir. 2005) (citing Colo. Rev. Stat. § 30-11-105 and labeling

a failure to meet that requirement a "jurisdictional flaw"); *see also Calahan v. County of Jefferson*, 429 P.2d 301, 301 (Colo. 1967). The former deputies did not comply with Section 105 in this case.

Instead, they repeatedly named the "Adams County Sheriffs Office." That, however, is not a legal or juridical entity. It is no more than an informal label for an organization or agency supervised by the Sheriff—not wholly unlike the FBI or the DOJ. *See Martinez v. Winner*, 771 F.2d 424, 442 (10th Cir. 1985) ("the Department of Justice was properly dismissed as a named defendant, if for no other reason, because it is not a juridical entity separate from the United States or the individual officers and employees who direct and work for it. The same is true of the Federal Bureau of Investigation as a named defendant."). It is a recognizable law enforcement agency, but it has no legal existence that can cause it to be sued in federal court.

Nor is the "Adams County Sheriffs Office" a synonym or metonymy for Adams County, the legal entity. The Sheriff's "office" is not a department within the governing structure of Adams County, the legal entity. Adams County, through its Board, has no statutory power to

supervise a law enforcement agency. At most, Adams County provides a vehicle through which the State ensures disparate constitutional actors within the jurisdictional boundaries of the county receive funding from local revenue sources, acquire and maintain property, and receive contracting support. In this respect, to make an analogy suggested by this Court in *Bristol*, 312 F.3d at 1216 n.2, suing Adams County, the legal entity, for a Sheriff's decision to terminate a deputy is not unlike a federal law clerk attempting to sue the General Services Administration (GSA) because she or he was fired by a judicial officer. *Id.* ("Employees of the County Sheriff are, of course, 'County employees' in the same sense that employees of the federal judiciary are 'federal employees[,]' [but] [s]uch common usage has no bearing on our construction of the ADA.").

> F. *Adams County's qualified duty to indemnify and defend the Sheriff does not make the Sheriff and the County interchangeable.*

As set forth above, the Sheriff and Adams County are distinct constitutional and legal persons. Adams County is, among other things, the principal funding arm of the state within the geographic bounds of the county. As such, it owes certain qualified financial obligations to

various other separate governmental officers and entities within the jurisdiction.

Whether under the Liability of Peace Officers Act, Colo. Rev. Stat. § 29-5-111, or the Colorado Governmental Immunity Act, Colo. Rev. Stat. §§ 24-10-108 & 118, the County has a qualified duty to indemnify other elected officials. Pursuant to those statutes, the Board has the option to control the defense. It may, therefore, appoint the County Attorney's office to represent the Sheriff, as it did here, provided there is not a direct conflict of interest. *See* Colo. Rev. Stat. § 30-11-118. The Board also authorizes civil defense in certain cases other constitutionally separate officers, for example the District Attorney. *See*, *e.g.*, *Ruybalid v. Bd. of Cty. Comm'rs of the Cty. of Las Animas Cty.*, 442 P.3d 423 (Colo. 2019); Colo. Rev. Stat. § 20-1-303. But that does not transform the District Attorney, who is an executive officer of the state separate from the County, into an agent of the County. *See Rozek v. Topolnicki*, 865 F.2d 1154, 1158 (10th Cir. 1989); *Beacom v. Board of County Comm'rs*, 657 P.2d 440, 445-46 (Colo. 1983); *see Laidley v. McClain*, 914 F.2d 1386, 1391-92 (10th Cir. 1990) (Oklahoma county is not directly liable for

district attorney's decision to terminate employees for political opposition because the district attorney is an arm of the state).

As for *Chavez*, 426 F. Supp. 3d at 812, its reliance on the significance of a county's duty to indemnify a sheriff both misreads Colo. Rev. Stat. § 30-25-104 and is inconsistent with the U.S. Supreme Court's holding in *Lewis*. That statute protects a county, which may sometimes be a direct judgment creditor, from having its property liened. Instead, the statute authorizes the County to raise taxes to satisfy direct judgments. Additionally, it authorizes the County to use its taxing power to raise funds to satisfy indemnification obligations. Either way, they have to be "lawful *county* charges," Colo. Rev. Stat. § 30-25-104(1) (emphasis added), which means either the County has agreed to pay them or the County is the real party in interest.

In any event, the statute does not transform independently elected constitutional county officers into agents of the legal entity, Adams County. This Court en banc in *Bristol* previously noted that a county sheriff's deputies are employees of the sheriff and not the board of county commissioners for purposes of the Americans with Disabilities Act.

*Bristol*, 312 F.3d at 1216 (en banc). In the course of doing so, it noted the existence of Colo. Rev. Stat. § 30-25-104, but found it irrelevant to the issue before it, which turned on the legal separateness of the board and the sheriff for employment purposes under the ADA. *Id.* at 1216, n.2. As noted above, the Court even warned against possible conflation of the two separate parties due to the mere commonality of the word "county" in their names. *Id.* The Court was right to do so. *Dixon v. People*, 127 P. 930, 932 (Colo. 1911) (holding a county court is part of the state judicial branch and noting that sometimes the Colorado Constitution's "use of the word[ . . .] 'county' . . . has no other significance than to give appropriate names to tribunals of government").

Thus, footnote 14 in the district court's opinion does not provide a sufficient legal basis to equate the Sheriff with Adams County.

## II. In His Official Capacity, the Adams County Sheriff Is an Arm of the State of Colorado as to the Hiring and Firing of Deputies and Is, Therefore, Entitled to Eleventh Amendment Immunity.

"Eleventh Amendment immunity applies not only to a state but also to an entity that is an arm of the state." *Couser v. Gay*, 959 F.3d 1018, 1023 (10th Cir. 2020). While the Supreme Court "has repeatedly refused

40

to extend [Eleventh Amendment] sovereign immunity to counties[,]" *Northern Ins. Co. of New York v. Chatham Cty.*, 547 U.S. 189, 193 (2006), county-level officers, including county sheriffs, can receive Eleventh Amendment immunity when they exercise State, rather than county powers. *See McMillian*, 520 U.S. at 785 & 793 (holding that an Alabama county sheriff was a State, not county, "policy maker" and entitled to Eleventh Amendment immunity when investigating a murder under the state's criminal code). That inquiry is not a "categorical, 'all or nothing'" one, but must be determined in "a particular area, or on a particular issue." *Id.*; *see also Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1220 n.26 (10th Cir. 2022) (same).

The Eleventh Amendment was not raised below. But it may be asserted at any time. *Edelman*, 415 U.S. at 677-78. What raises it now is the district court's assumption that the Sheriff in his official capacity, even though he is an independent state constitutional officer, must nevertheless be an agent of *some* governmental entity. That assumption has some support from caselaw from the Eleventh Circuit. *See Pelliteri v.*

*Pine*, 776 F.3d 777, 782 (11th Cir. 2015).[3] If that assumption holds, it begs the separate question of which entity the Sheriff is an agent for when hiring and firing deputies pursuant to the exclusive powers vested in him pursuant to state statute. To state the question is very nearly to answer it.

As set forth in detail above, county sheriffs in Colorado are independently-elected state constitutional officers with jurisdictional limits tied to a geographic boundary. As such, they serve in a variety of roles. *See Struble v. Barger*, 261 P.2d 497, 498 (Colo. 1953) (referring to the office of the county sheriff serving as both an "executive officer" and an "officer of the court"); *see also* R. COOLEY, HANDBOOK ON THE LAW OF MUNICIPAL CORPORATIONS 512 (1914) ("Sheriffs, coroners, clerks and other so-called county officers are properly state officers for the county. Their functions and duties pertain chiefly to the affairs of state in the county"); 3 J. BOUVIER, BOUVIER'S LAW DICTIONARY 3058 (8th ed. 1914)

---

[3] The district circuit sua sponte looked to case law from the Eleventh Circuit involving county sheriffs, albeit to a different case. App. Vol. XI at 222, *citing Lucas v. O'Loughlin*, 831 F.2d 232, 233-36 (11th Cir. 1987) (involving county sheriffs in Florida).

(defining sheriff as "[a] county officer representing the executive or administrative power of the state within his county"). Under the Colorado Constitution, law enforcement is executive in nature. *See* Colo. Const., art. IV, § 2 (granting to Governor "supreme executive power of the state" and imposing duty to "take care that the laws be faithfully executed"); *see also Manders v. Lee*, 338 F.3d 1304, 1313 (11th Cir. 2003) (en banc).

Here, the function at issue is a county sheriff's authority to hire and fire deputies. *See McMillian*, 520 U.S. at 785 & 793. By statute, the General Assembly has conveyed sole and exclusive authority, as was the case in in *Pelliteri*. That makes the hiring and firing of sheriff's deputies an exercise of state, not local, power. The sheriff's deputies, moreover, are the chief law enforcement officers for the investigation and prosecution of state crime. Deputies perform services at the direction of the Sheriff, not the County. If the Sheriff in his official capacity must be an agent of some governmental entity, then for this function that entity is the State of Colorado.

One cannot simply assume an agency relationship with the County legal entity, as the district court did, merely because the Sheriff's title

43

has the word "county" in it. *See Dixon*, 127 P. at 932 ("prefixes can in no sense imply that the persons, who, under the law, become the members or officers of such tribunals, thereby become officers of the respective entities that bear such prefixes as their territorial designation."). Sheriffs are not employees of the County subject to their direction and control.

The fact that the County must provide some of the funding for the Sheriff's "office" according to state legal requirements does not decide against Eleventh Amendment immunity. *See Pellitteri*, 776 F.3d at 782. Nor does the fact that Sheriff and the separate legal entity, Adams County, at most share the same geographic jurisdictional boundaries make one the agent of another. *Accord United States v. Evans*, 318 F.3d 1011, 1022 (10th Cir. 2003) (warning against presumptions regarding law enforcement jurisdiction at the county level). As such, the Sheriff in his official capacity is entitled to Eleventh Amendment immunity for the function of hiring and firing deputies.

## CONCLUSION

Sheriff Reigenborn is the real party in interest in this case. It is his conduct the former deputies challenge. It is his statutory power the

former deputies challenge. It is he and his successors who will be bound in the future by the judgment of the Court. Their conduct will be restrained or modified. By treating the Sheriff and the County as interchangeable, the Court's order jeopardizes the Sheriff's constitutional and statutory autonomy under Colorado law and circumvents both his qualified and Eleventh Amendment immunities. As such, the Court should reverse the district court's denial of the Sheriff's motion for summary judgment and enter judgment in his favor on all counts.

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

This appeal presents complicated questions of state and federal constitutional law and issues of qualified and Eleventh Amendment immunity. Sheriff Reigenborn, therefore, requests oral argument.

Dated: December 14, 2022.

Respectfully submitted,

*s/Michael A. Sink*
Michael A. Sink
Adams County Attorney's Office
4430 S. Adams County Pkwy
Suite C5000B
Brighton, CO  80601
Phone: (720) 523-6116
msink@adcogov.org
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This brief complies with the page limitation of Fed. R. App. P. 32(a)(7)(B) because this brief does not exceed 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). It contains 8,912 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point, Century Schoolbook.

Dated: December 14, 2022

*s/Michael A. Sink*
Michael A. Sink

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir.R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, TrendMicro Apex One Security Agent version 14.0.10064, and according to those programs are free of viruses.

Dated: December 14, 2022.

*s/Michael A. Sink*
Michael A. Sink

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2022, I caused the forgoing to be electronically filed with the Clerk of the Court using the PACER system which will send notification to all counsel of record.

<div style="margin-left: 45%;">

*s/Michael A. Sink*
Michael A. Sink
Assistant County Attorney
Adams County Attorney's Office
4430 S. Adams County Pkwy
Suite C5000B
Brighton, CO  80601
Phone:  (720) 523-6116
Fax:  (720) 523-6114
msink@adcogov.org
*Counsel  for Defendant-Appellant*

</div>

# ATTACHMENTS

Attachment 1 – District Court Doc. No. 71 – Order on Motions for Summary Judgment filed September 28, 2022.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01936-STV

TIMOTHY JAMES COATES,
GENE CLAPS,
MARK MITCHELL,
KEVIN CURRIER,

      Plaintiffs,

v.

ADAMS COUNTY SHERIFF'S OFFICE,
RICHARD A. REIGENBORN,

      Defendants.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion") [#51] and Defendants' Motion for Summary Judgment ("Defendants' Motion") [#53] (collectively, the "Motions"). The Motions are before the Court on the parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment. [##15, 16] This Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motions. For the following reasons, Defendants' Motion for Summary Judgment [#53] is **GRANTED in part** and **DENIED in part** and Plaintiffs' Motion for Partial Summary Judgment [#51] is **GRANTED**.

## I.    FACTUAL BACKGROUND[1]

Plaintiffs are career law enforcement officers who have spent the majority of their careers as deputy sheriffs at the Adams County Sheriff's Office ("ACSO").  [#61-1, PSOF3]  Plaintiffs have held a variety of ranks and served under both Republican and Democratic sheriffs.  [*Id.*, PSOF4]  As of 2018, Plaintiffs held the following ranks and assignments:  Timothy Coates—Division Chief of Detectives [#60-1, DSOF3]; Gene Claps—Division Chief of the Jail Division [*id.*, DOSF4]; Mark Mitchell—Captain of the Patrol Division [*id.*, DSOF5]; Kevin Currier—Commander of the Detective Division [*id.*, DSOF6].  While the exact extent of Plaintiffs' authority is disputed [*id.*, DSOF11-12], Plaintiffs all testified to having some degree of discretion in how they ran their departments [##53-2 at 84-85 (84:22-85:13); 53-3 at  79-80 (79:11-80:23); 53-4 at 73 (73:10-18); 53-16 at 77 (77:3-19)], and some degree of involvement in the budgetary and spending process [##53-2 at 88-89 (88:10-89:18); 53-3 at 86 (86:1-6); 53-4 at 66 (66:9-17); 53-16 at 84-85 (84:18-85:7)].  No Plaintiff had a written employment contract with ACSO. [#60-1, DSOF13]

Defendant Richard A. Reigenborn is the elected Sheriff of Adams County, Colorado.  [#61-1, PSOF1]  Sheriff Reigenborn runs ACSO and is the final decisionmaker with respect to the termination or revocation of deputies' appointments.  [*Id.*, PSOF2] From 1991 to 2015, Sheriff Reigenborn was employed as a deputy at ACSO, holding

---

[1] The undisputed facts are drawn from the Separate Statement of Facts filed with Defendants' Motion for Summary Judgment [#60-1] and Plaintiffs' Motion for Partial Summary Judgment [#61-1].  The Court refers to the sequentially numbered facts set forth in the Separate Statement of Facts associated with Defendants' Motion as "DSOF#" and those associated with Plaintiffs' motion as "PSOF#."  The Court periodically cites directly to the exhibits cited by the parties to provide additional context.  Disputed facts are identified as such.

various ranks. [#60-1, DSOF 14]  Sheriff Reigenborn challenged Michael McIntosh for Adams County Sheriff in the 2014 and 2018 elections.  [#61-1, PSOF5]  Sheriff Reigenborn lost to Sheriff McIntosh in the 2014 election, but unseated McIntosh in the 2018 election to become Adams County Sheriff.  [*Id.*, PSOF6, 7]  Each Plaintiff claims that they supported Sheriff McIntosh in the 2018 election through financial contributions and public statements of support. [##60-1, DSOF18-19]

Sheriff Reigenborn took office on January 8, 2019.  [#61-1, PSOF15]  On January 8 or 9, he rescinded all of the ACSO's then-existing employment and personnel policies and adopted a new policy, Policy 1, titled "At-Will Employment Policy and Procedures," which stated that "[a]ll employees of [ACSO] are at-will employees. Nothing in this document or any other document or policy alters the at-will status of [ACSO] employees. The Sheriff may terminate employees or revoke deputy appointments at will, with or without cause."  [##61-1, PSOF16-17, 52-8 at 1]  Policy 1 further stated that "[i]n the event an employee is terminated from employment, the Sheriff will follow applicable Colorado state law, which may include:  Notification to the employee of the proposed termination and reason for termination; and [a]n opportunity for the employee to be heard by the Sheriff prior to termination." [##61-1, PSOF18; 52-8 at 1-2]  The policy changes gave Defendants the ability to issue letters telling employees about their proposed termination. [#61-1, PSOF21]  Through the policy notice, Sheriff Reigenborn intended to communicate that he would do as he saw fit with respect to employment decisions at ACSO.  [*Id.*, PSOF20]

Sheriff Reigenborn was concerned about Plaintiffs' loyalty to ACSO at least in part because of their support for McIntosh in the 2014 and 2018 elections.  [##53-7 at 205-

206 (205:14-206:10); 61-1, PSOF8]  On January 4, 2019, Sheriff Reigenborn sent a text message to his Undersheriff, Tommie McLallen, stating: "Terminations so far. Gene Claps . . . Kevin Currier . . . Mark Mitchell . . . TJ Coates."[2]  [#61-1, PSOF14]  No Plaintiff was facing any type of disciplinary proceeding. [*Id.*, PSOF73]

On January 9, 2019, Plaintiffs and several other deputies each received substantially identical letters from Sheriff Reigenborn informing them that he intended to revoke their appointments with the ACSO.  [## 60-1, DSOF 23-24, 61-1, PSOF22]  The letters invoked the termination procedures set forth in Policy 1 and stated in relevant part:

> I intend to revoke your appointment with the Adams County Sheriff's Office. . . . I am informing you of the anticipated termination of your employment and the opportunity to meet with me prior to your termination. . . . If you do not request a meeting [before January 10, 2019 at 12:00 pm], your termination will be effective at 8:00am on January 11, 2019. Effective immediately, you are being placed on Administrative Leave. You are not allowed in any secured or unsecured area of the Sheriff's Office without prior approval from Sheriff Reigenborn or his appointee. You will need to immediately return any keys, vehicles, Sheriff's Office identification credentials and badge(s). Upon termination, you will be required to turn in all remaining Sheriff's Office equipment. . . . I wish you the best in your future endeavors.

[##61-1, PSOF24-25, 27-28; 52-10; 52-11; 52-12; 52-13]  A copy of Policy 1 was provided with the letters.  [#61-1, PSOF26]  Undersheriff McLallen hand-delivered the January 9, 2019 letters to Plaintiffs and collected their keys, badges, and access cards.  [*Id.*, PSOF33]  On January 10, 2019, McLallen circulated an office-wide memorandum stating: "Effective immediately, the following individuals are no longer allowed unescorted access into any of the secured areas of the Sheriff's Office. . . .Gene Claps[,] T.J. Coates[,] . . . Kevin Currier[,] . . . Mark Mitchell[.]"  [##52-15; 61-1, PSOF34]  On January 11, 2019,

---

[2] The text message listed seven other individuals as well.  [#52-7 at 1]

Sheriff Reigenborn's executive assistant, Judy Najera, requested personnel orders from Adams County Human Resources in reference to Plaintiffs' proposed termination. [##52-16; 61-1, PSOF37]

Plaintiffs each requested to meet with Sheriff Reigenborn regarding their terminations. [#61-1, PSOF35] They each met separately with Sheriff Reigenborn on January 15, 2019 to discuss their proposed termination. [*Id.*, PSOF38] Chief Claps met with Sheriff Reigenborn at approximately 10:00 a.m. on January 15, 2019. [*Id.*, PSOF39] At the meeting, Chief Claps stated that he "would like to be able to have the opportunity to retain some type of a position or career with [ACSO], so I can finish my career out." [##52-18(3:1-4); 61-1, PSOF41] In the alternative, Chief Claps asked "to be able to retire at the end of the month." [##52-18 at 4 (3:15-16); 60-1, DSOF31] He asked Sheriff Reigenborn for confirmation that "I am not being offered any other positions . . . with this agency," to which Sheriff Reigenborn replied, "[n]o, not at this time." [#61-1, PSOF42] At the meeting, the Assistant County Attorney informed Chief Claps that "by going to retirement in good standing, you get all of the LEOSA,[3] and I believe you said the badge, the plaque, all of that stuff." [*Id.*, PSOF43]

Commander Currier met next with Sheriff Reigenborn, at approximately noon. [*Id.*, PSOF44] At the beginning of Commander Currier's meeting, Sheriff Reigenborn stated that "we're here for the final hearing; that's where we're at." [*Id.*, PSOF45] Sheriff Reigenborn informed Commander Currier that the agency was "downsizing," telling Mr.

---

[3] The Law Enforcement Officers Safety Act ("LEOSA," or "H.R. 218") is a federal law that allows former law enforcement officers to carry a concealed firearm and carry a retired badge. [#61-1, PSOF70] In order to qualify for benefits under LEOSA, a law enforcement officer must leave in good standing. [*Id.*, PSOF71]

Currier that "[i]f you want to retire in good standing so that you qualify for [LEOSA], I'll do that, but we have to have something in writing from you saying that you want to retire." [*Id.*, PSOF46-47]  Sheriff Reigenborn also told Commander Currier that "[t]he badges are important to us. If I terminate you, I can't let you leave with the badge. If you leave in good standing, I have no issue."  [*Id.*, PSOF48]  Commander Currier indicated that he would submit a written request for retirement.  [##60-1, DSOF31]

Captain Mitchell met with Sheriff Reigenborn at approximately 2 pm.  [#61-1, PSOF50]  Captain Mitchell asked Sheriff Reigenborn "what kind of decision-making process was put in place to fire [him]," to which Sheriff Reigenborn replied "[ACSO is] going in a different direction. We don't think that you fit where we're going."  [*Id.*, PSOF51-52]  When asked by Captain Mitchell to "explain that direction," Sheriff Reigenborn stated, "I don't need to tell you the direction."  [##61-1, PSOF53; 52-22 at 3-4 (2:13-3:2)]  Sheriff Reigenborn further stated that Captain Mitchell's position of captain was being eliminated, but never directly responded to Captain Mitchell's questioning of why he was not offered a different position when his counterpart was offered a different position.  [##61-1, PSOF54-55; 52-22 at 6-7 (5:24-6:15)]  When asked by Captain Mitchell how to explain his departure from the sheriff's office, Sheriff Reigenborn replied "that's pretty easy. That you retired in good standing because that's what it will show. Otherwise, you wouldn't be getting the credentials for the H.R. 218, the LEOSA bill. . . .  If I terminate you, you don't qualify for that because you won't be in good standing. That's the biggest part of that.  So you left here in good standing if you retire." [##61-1, PSOF56; 52-22 at 17-18 (2:21-3:7)]  During the meeting, Captain Mitchell stated that he "would like to retire and leave and

have all the benefits that a retired deputy would . . . ." [##60-1, DSOF31; 52-22 at 4-5 (3:20-4:6)]

Chief Coates was the final Plaintiff to meet with Sheriff Reigenborn. [#61-1, PSOF57] Chief Coates asked Sheriff Reigenborn "to tell [him] why [he was] being released," to which Sheriff Reigenborn replied, "I don't think your vision is going to fit our vision." [*Id.*, PSOF59-60] Sheriff Reigenborn informed Chief Coates that "[i]f you want to retire you can. We will honor what we have offered to other people as well." [##61-1, PSOF61; 52-23] After citing his service with ACSO, Chief Coates stated "of course, yes, I would like to retire in good standing." [##60-1, DSOF31; 52-25 at 4(3:7-9)]

Plaintiffs each submitted requests to retire or resign.[4] [#61-1, PSOF64] Plaintiffs' employment files indicate that Plaintiffs all retired.[5] [#60-1, DSOF33] Plaintiffs were all offered severance, which they each declined. [#61-1, PSOF74]

Plaintiffs initiated this action in July 2020 asserting two claims for relief: Claim One for First Amendment retaliation and Claim Two for Fourteenth Amendment procedural due process violations. [#1, ¶¶ 164-91] Plaintiffs filed their Motion for Partial Summary Judgment on November 22, 2021, and a response and a reply have been filed. [## 51, 57, 61] Defendants also filed their Motion for Summary Judgment on November 22, 2021, and a response and a reply have been filed. [## 53, 56, 60]

---

[4] The record only contains written notices of resignation or retirement from Plaintiffs Claps, Currier, and Mitchell, with no record of a written notice from Chief Coates. [#60-1, DSOF32] But, Plaintiffs do not contest that Chief Coates "submitted [a] request to retire or resign," and Defendants' position is that Chief Coates' separation from ACSO was a retirement. [#61-1, PSOF 64]

[5] Not every deputy who received a notice from Sheriff Reigenborn was terminated or submitted a retirement request. [*Id.*, DSOF34]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citations omitted). When reviewing a cross-motion, the Court must "construe all inferences in favor of the party against whom the motion under consideration is made." *Pirkheim v. First Unum Life Insurance*, 229 F.3d 1008, 1010 (10th Cir. 2000) (quoting *Andersen v. Chrysler Corp.*, 99 F.3d 846, 856 (7th Cir. 1996)).

The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact, which the movant may do "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim" when the movant does not bear the burden of persuasion at trial. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If the moving party bears the burden of proof at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim or affirmative defense on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D.

8

Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331). If the movant carries its initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Adler*, 144 F.3d at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Evidence, including testimony, offered in support of or in opposition to a motion for summary judgment must be based on more than mere speculation, conjecture, or surmise. *Bones v. Honeywell Int'l Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III.    ANALYSIS

In Plaintiffs' Motion, Plaintiffs seek a determination that they were either actually or constructively discharged under color of state law.  [#51]  In Defendant's Motion, Defendants argue that: (1) Plaintiffs' positions required political loyalty such that they were not entitled to the First Amendment protections that they claim, entitling Defendants to summary judgment on Plaintiffs' First Amendment Retaliation claim; (2) Plaintiffs did not have a federally protected property interest in their employment, entitling Defendants to summary judgment on Plaintiffs' Fourteenth Amendment Procedural Due Process claim; (3) Sheriff Reigenborn in his individual capacity is the only proper defendant in this suit; and (4) Sheriff Reigenborn in his individual capacity is entitled to qualified immunity because his conduct did not violate Plaintiffs' clearly established rights.  [#53]  The Court begins with Plaintiffs' Motion, then moves to Defendants' Motion, taking each argument in turn.

### A.  Adverse Employment Action

To succeed in their First Amendment retaliation claims, Plaintiffs must show that their "public employer ha[s] taken some adverse employment action against [them]." *Hook v. Regents of Univ. of Cal.*, 394 F. App'x 522, 534 (10th Cir. 2010) (citing *Couch v. Bd. of Trs. of Mem'l Hosp.*, 587 F.3d 1223, 1235-36 (10th Cir. 2009)). The test for determining whether an employment action is adverse is "identical to the test which is applied in Title VII retaliation claims." *Id.* at 535 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). In Plaintiffs' Motion for Partial Summary Judgment,

Plaintiffs seek a determination that they were either actually or constructively discharged under color of state law.[6] [#51]

### i. Actual Discharge

"An actual discharge . . . occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe that his tenure has been terminated." *Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008) (quotation omitted). However, when the record contains undisputed evidence that the employee resigned, the court will analyze the claim as one for constructive discharge. *See, e.g.*, *id.* at 980 ("An actual discharge does not occur, however, when the employee chooses to resign rather than work under undesirable conditions." (citation omitted)); *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978 (10th Cir. 1996) ("This Court has recognized that an employee can prove a *constructive* discharge by showing that she was faced with a choice between resigning or being fired." (emphasis added)); *Honeyfield v. City of Gallup*, No. 8-CV-1034, 2010 WL 11526774, at *4-5 (D.N.M. Feb. 17, 2010) (holding that no actual discharge occurred when it was undisputed that the plaintiff resigned, despite his argument that he was terminated for the purposes of Title VII), *aff'd*, 436 F. App'x 836 (10th Cir. 2011). In this case, the record contains written notice of retirement from three of the Plaintiffs,[7] and verbal requests to retire in good standing from all four. [##60-1, DSOF31-32] All four of Plaintiffs' employment files indicate "Retirement" as the reason for separation, as opposed to involuntary separation. [*Id.*, DSOF33; #53-18] While Plaintiffs dispute the voluntary nature of their resignations, they do not dispute that they

---

[6] Defendants concede that Sheriff Reigenborn's action was under color of state law. [#57 at 1-2]

[7] The record does not contain any written notice from Chief Coates.

"each submitted requests to retire or resign . . . ." [#61-1 PSOF 64; *see also* #1, ¶¶141-42, 150-51, 153-54, 158-59 (alleging in the Complaint that Sheriff Reigenborn "offered [each Plaintiff] the option of resigning," and that "[each Plaintiff] agreed to a resignation in lieu of termination")].    Accordingly, the Court holds that Plaintiffs are not entitled to a finding that, as a matter of law, they were actually discharged, and instead proceeds under the constructive discharge framework.

### ii.    Constructive Discharge

"Even if an employee resigns, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that he was constructively discharged." *Fischer*, 525 F.3d at 980. "Constructive discharge occurs when 'the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.'" *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998) (quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986)).  "The plaintiff's burden is substantial."  *Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121, 1133 (10th Cir. 2013) (quoting *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009)). "Essentially, a plaintiff must show that she had '*no other choice* but to quit.'" *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir.1992)) (emphasis in original).  Put differently, a plaintiff "must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004). "The standard is objective: the employer's subjective intent and the employee's subjective views on the situation are irrelevant."  *Strickland*, 555 F.3d at 1228.

12

"[A] plaintiff who voluntarily resigns cannot claim that he or she was constructively discharged." *Exum*, 389 F.3d at 1135. "To determine whether a jury question exists as to the voluntariness of Plaintiffs' respective resignations, [the Court must] consider the totality of the circumstances under an objective standard." *Yearous*, 128 F.3d at 1356. "Among the factors [the Court] consider[s] in determining the voluntariness of an employee's resignation are (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice [s]he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether [s]he was permitted to select the effective date of resignation." *Id.* (quotation omitted). When an employee faces "more than the mere *possibility* of employment consequences" and resigns, then that resignation is not voluntary, as "the 'choice' between resignation and [severe employment consequences is] effectively no choice at all." *Barone v. United Airlines, Inc.*, 355 F. App'x 169, 185-86 (10th Cir. 2009) (unpublished) (distinguishing *Exum*, where the plaintiff had the option to comply with a superior's orders and only faced *possible* employment consequences); *see also Burks*, 81 F.3d at 978 ("This Court has recognized that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired."); *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990) (affirming jury's constructive-discharge finding where employer gave employee choice between either quitting and taking early retirement benefits or being terminated and losing retirement benefits), *abrogated on other grounds by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).

13

Considering the totality of the circumstances, the Court finds that Plaintiffs were constructively discharged. First, the day after Sheriff Reigenborn took office, Plaintiffs all received notices from Sheriff Reigenborn informing them that he "d[id] not believe retaining [Plaintiffs] [wa]s in the best interests of the organization," and that he "intend[ed] to revoke [their] appointment with [ACSO]." [##52-10, 52-11, 52-12, 52-13]  The notice further placed each Plaintiff on Administrative Leave, barred them from the "secured [and] unsecured area[s] of the Sheriff's Office without prior approval," and instructed them to return their keys, vehicles, credentials, and badges. [*Id.*]  Finally, the notice instructed the Plaintiffs on what to do "[u]pon termination," and "wish[ed] [them] the best in [their] future endeavors." [*Id.*]

Plaintiffs were next allowed to meet with Sheriff Reigenborn to discuss the notice. [#61-1, PSOF38]  In each meeting, however, Sheriff Reigenborn made clear that the only options for Plaintiffs were termination or resignation.  In his meeting, Chief Claps made clear his desire to "retain some type of a position or career with [ACSO]," pointing out that he had been an effective employee for many different administrations. [#52-18 at 3-4 (2:17-3:9)]  Only in the event of non-retention did Chief Claps ask for retirement in good standing. [*Id.* at 4-5 (3:12-4:2)]  Sheriff Reigenborn responded that he "just [didn't] think that [Claps was] going to be able to change and be part of the culture that [ACSO was] headed towards." [*Id.* at 5 (4:3-6)]  After a brief recess, Chief Claps asked Sheriff Reigenborn:  "So I am not offered any other positions . . . with this agency[?]" [*Id.* at 6 (5:8-9)]  Sheriff Reigenborn replied:  "No, not at this time." [*Id.* (5:10)]  Finally, Sheriff Reigenborn instructed Chief Claps to submit a retirement request in writing "no later than

14

tomorrow by 5 p.m.," and that "[o]therwise . . . I will send a letter of termination and you don't qualify [for LEOSA or severance]."  [*Id.* at 7 (6:8-15)]

Sheriff Reigenborn made similar statements to Commander Currier during his meeting. Sheriff Reigenborn told Commander Currier at the beginning of the meeting that "I'm still your friend, but, professionally, I'm going in a different direction."  [#52-20 at 3 (2:18-19)]  Then, after prefacing his statement with "here's the part that I hate," Sheriff Reigenborn informed Commander Currier that ACSO was "downsizing," and then immediately informed Commander Currier that he was eligible to retire.  [*Id.* at 8 (7:2-15)] Sheriff Reigenborn gave Commander Currier the same 5 p.m. deadline to submit a written retirement request, and explained that "[i]f I don't get an email from you by tomorrow at 5:00, then I'm going to have to terminate you with the same termination date."  [*Id.* (7:17-24)]

Captain Mitchell opened his meeting with Sheriff Reigenborn by directly asking "what kind of decision-making process was put in place to fire an employee with 29 years of experience . . . ."  [#52-22 at 3 (2:6-9)]  Sheriff Reigenborn did not deny that Mitchell's employment was ending, but simply responded that ACSO was "going in a different direction. We don't think that you fit where we're going."  [*Id.* (2:10-12)]  After Sheriff Reigenborn explained that he was eliminating the captain's position, Captain Mitchell asked Sheriff Reigenborn to explain "why my counterpart at the jail was offered a sergeant's position, and I was fired," noting the inconsistency.  [*Id.* at 6-7 (5:20-6:3)] Sheriff Reigenborn replied, "I get that, Mark." [*Id.* at 7 (6:4)]  When pressed by Captain Mitchell for more explanation, Sheriff Reigenborn asked Captain Mitchell to step outside. [*Id.* at 7 (6:5-15)]  After a recess, Sheriff Reigenborn explained to Captain Mitchell that, if

he wanted to retire, Sheriff Reigenborn would "need a letter from you no later than 5 p.m. tomorrow saying you wish to retire."  [#52-22 at 17 (2:5-8)]   After Captain Mitchell confirmed details and asked how this action would show up on a future job application, Sheriff Reigenborn replied: "That you retired in good standing . . . . Otherwise, you wouldn't be getting the credentials for [LEOSA]. You already know that. . . . If I terminate you, you don't qualify for that because you wouldn't be in good standing. That's the biggest part of it."  [*Id.* at 17-18 (2:21-3:7)]

Finally, Chief Coates began his meeting by asking Sheriff Reigenborn to "tell me why I'm being released."  [#53-25 at 3 (2:4-6)]   Again, Sheriff Reigenborn did not deny that Chief Coates was being released, but responded: "I don't think your vision is going to fit our vision," or words to that effect.  [#61-1, PSOF60]   Chief Coates then asked whether he would get "the same opportunity to retire by tomorrow . . . , or am I terminated." [#52-25 at 3 (2:9-11)]   After explaining that "[t]his is about me moving the agency in a different direction, and it's not personal," Sheriff Reigenborn answered that Chief Coates would be allowed to retire.  [*Id.* (2:17-23)]

In sum, Plaintiffs were sent letters saying that they would be terminated and presenting them with plainly intolerable working conditions—administrative leave with no access to the office and the surrender of their keys, credentials, badges, and vehicles. Then, in their meetings, Plaintiffs were never presented with an option to remain at ACSO or ameliorate the administrative action taken against them.  *See Yearous*, 128 F.3d at 1356 (considering "whether the employee was given some alternative to resignation" as a factor to determine whether a resignation was voluntary).  Instead, they were told that they would not fit the future "direction," "vision," or "culture" of ACSO, and were given a

deadline to resign of less than 48 hours. *See id.* (considering "whether the employee was given a reasonable time in which to choose" and "whether [the employee] was permitted to select the effective date of resignation" as factors to determine whether a resignation was voluntary). Sheriff Reigenborn explicitly stated to Chief Claps and Commander Currier that if he did not receive a written retirement request by the next day, then they would be terminated. He directly answered Captain Mitchell's and Chief Coates's questions as to why they were being "released" or "fired," implicitly acknowledging that these Plaintiffs' employment at ACSO would not continue. And when explicitly asked by Chief Claps and Captain Mitchell about alternative jobs available within ACSO, Sheriff Reigenborn either offered no answer or confirmed that he would not be offering an alternative position.

Defendants argue that the facts are disputed as to whether Sheriff Reigenborn would have fired Plaintiffs had they not resigned. Defendants point out that the notices only stated an "intent" to terminate Plaintiffs, that they would be given a hearing, and that other deputies who received the notices retained employment at ACSO. [#57 at 8-9; *see also* #60-1, DSOF34] The Court agrees that the notice is not dispositive in this case, and the Court's holding is not based on any notion of the notice constituting a final action by ACSO. Nonetheless, the notice informing Plaintiffs of Sheriff Reigenborn's intent to terminate them, placing them on Administrative Leave, instructing them of what to do "upon termination," and wishing them well in their "future endeavors" is certainly relevant in determining how, considering the totality of the circumstances, a reasonable person would understand the situation. Moreover, at the hearing, Plaintiffs were not given an option of staying at ACSO; indeed, two Plaintiffs were explicitly told that they would be

terminated and the other two were implicitly given that message. And the fact that other deputies were retained is not enough to create a genuine dispute regarding the totality of the circumstances experienced by *these* Plaintiffs, who were not offered any alternatives to termination or resignation.

Defendants also rely on Sheriff Reigenborn's testimony that Plaintiffs would not have been terminated had they not requested retirement. [#57 at 9; *see also* #52-26 at 2] The testimony on Sheriff Reigenborn's intent is contradictory [#61-1 PSOF66] and ultimately irrelevant for the purposes of this inquiry. Again, "[t]he standard is objective: the employer's subjective intent . . . [is] irrelevant." *Strickland*, 555 F.3d at 1229. Objectively viewed, Defendants did not communicate any opportunity for Plaintiffs to retain employment at ACSO in any form. Indeed, Coates was explicitly denied that opportunity. When asked why they were being "fired" or "released," Sheriff Reigenborn provided a purported justification for the action as opposed to any type of clarification that they would be offered different positions. And Sheriff Reigenborn clearly communicated that if Plaintiffs did not submit retirement notices by the end of the following day, then they would be terminated. The only options communicated to Plaintiffs were termination or retirement. Under these circumstances, this did not constitute the kind of "choice" that is required for a resignation to be voluntary. Because "the evidence is susceptible to but one interpretation" as to the issue of constructive discharge, Plaintiffs' Motion [#51] is GRANTED.[8] *Id.* at 1229.

---

[8] Defendants raise two other arguments in their response to Plaintiff's Motion. First, they argue that constructive discharge is not an available theory for Plaintiff's substantive due process claims. [#57 at 9-10] Because, for the reasons detailed below, the Court agrees that Defendants are entitled to summary judgment on Plaintiffs' substantive due process claims, the Court does not address whether a constructive discharge theory would be

### B. Positions Requiring Political Loyalty

"The First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance." *Snyder v. City of Moab*, 354 F.3d 1179, 1184 (10th Cir. 2003) (quoting *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1451 (10th Cir.1997), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011)). Defendants argue that, assuming Plaintiffs were in fact terminated for their First Amendment activities,[9] summary judgment is still warranted on this claim because Plaintiffs' high-ranking positions within ACSO exempted them from any First Amendment protections for their employment.  [#53 at 9-11]

In determining whether a plaintiff's work requires political allegiance, "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980).  "Or, more precisely, in these circumstances the issue is whether political loyalty or affiliation with *particular persons* can be made an appropriate requirement for effective performance in the positions the plaintiffs held." *Dickeson v. Quarberg*, 844 F.2d 1435, 1442 (10th Cir. 1988) (emphasis added).  The position's

---

available to Plaintiffs on those claims.  Second, Defendants argue that only Sheriff Reigenborn in his individual capacity is a proper Defendant.  [*Id.* at 10-11]  This argument, which largely incorporates the same argument raised in Defendants' Motion, is addressed in detail below.

[9] Defendants initially moved for summary judgment on the grounds that Plaintiffs had no evidence that Sheriff Reigenborn's actions were motivated by Plaintiffs' First Amendment activities. [#53 at 8]  In their Reply in Support of Defendants' Motion, however, Defendants set that argument aside, conceding the point for the purposes of summary judgment.  [#60 at 2]

"political dimension" and its "discretionary authority" are important considerations. *Poindexter v. Bd. of Cnty. Comm'rs*, 548 F.3d 916, 920 (10th Cir. 2008).

"The employer . . . bears the burden of proving whether political association is an appropriate requirement for the effective performance of the public office involved." *Snyder*, 354 F.3d at 1185.  This inquiry entails a holistic review of "the nature of the employee's duties and responsibilities." *Dickeson*, 844 F.2d at 1442 (citing *Elrod v. Burns*, 427 U.S. 347, 367-68 (1976) (plurality opinion)).  "[T]itles alone" are not dispositive, *id.*, and "'no clear line can be drawn' between positions that require political allegiance and those that do not," *Snyder*, 354 F.3d at 1185 (quoting *Elrod*, 427 U.S. at 367).  When the facts as to the nature of the employee's duties are undisputed, a district court may resolve this issue as a matter of law. *Barker v. City of Del City*, 215 F.3d 1134, 1138 (10th Cir. 2000). Otherwise, this presents a question of fact.  *Id.*  "In close cases, doubt should be resolved in favor of the public employee subject to the dismissal." *Dickeson*, 844 F.2d at 1442 (citing *Elrod*, 427 U.S. at 368).

The Court finds that this constitutes a "close case," but that ultimately there is a genuine dispute of fact as to whether the Plaintiffs' positions required political loyalty. The analysis begins with the highest-ranking Plaintiff: Chief Coates.  In 2018, Chief Coates held the position of "Division Chief of Detectives."  [#60-1, DSOF3]  According to Chief Coates' resume and testimony, he was "third in command" at ACSO, which required "input in executive level decision making." [##60-4; 53-2 at 84 (84:4-13)] "This included creating and implementing policy and procedures, managing employee disciplinary issues, budgetary oversight . . . and assuming command of the Sheriff and Undersheriff's positions in their absence." [*Id.*] Coates testified that he was "entrusted with high-level

information that others within the agency [we]re not," and that he interacted with the public and other agencies in his role as chief. [#53-2 at 87 (87:1-4, 87:19-23)]

In *Poindexter*, a divided Tenth Circuit panel held that a County Commissioner's "Road Foreman" had such a "significant political dimension and sufficient discretionary authority" that the County Commissioner "may properly take political loyalty into account" as a matter of law. 548 F.3d at 920. The majority relied on evidence that the Road Foreman supervised employees and inmates working within the district, terminated employees for cause, delegated project assignments, worked as County Commissioner in the Commissioner's absence, made modest expenditures on his own authority, and regularly communicated with the public on behalf of the Commissioner. *Id.* This communication element consisted of acting as "an ambassador to the community on behalf of the Commissioner," and included answering "what seem[ed] like 10,000 calls a year" on the Commissioner's behalf. *Id.*

In contrast, Chief Coates did not exercise the same degree of discretionary authority as the Road Foreman in *Poindexter*. He could only make recommendations to the sheriff as to personnel, with no authority to hire or fire. [##53-2 at 88 (88:2-9); 52-1 at 10-11 (10:22-11:5)] Moreover, Chief Coates had, in the form of the undersheriff, an additional intermediary between himself and the final policymaker. *See* [#53-2 at 52 (52:2-16)] To be sure, Plaintiffs are incorrect in asserting that "the record lacks any evidence of Plaintiffs having any independent policymaking authority." [#56 at 15] Chief Coates' resume listed "*creating* and implementing policy and procedures" [#60-4 (emphasis added)], and Chief Coates testified that one of his "vast responsibilities" was "contributing my thoughts in policy and procedure" [#53-2 at 83-84 (83:16-84:5-6)]. But there is

conflicting evidence as to the extent of Chief Coates' discretionary authority. Chief Coates also testified that "there's not a lot" of discretion in how he ran the division because "the direction [is] the sheriff['s]." [*Id.* at 84 (84:18-22)]  That is, "the sheriff is the sheriff and everyone else is a deputy. . . . [A]t the end of the day, we all get the same policies and procedures [from the Sheriff] and generally they are fairly well outlined." [*Id.* at 85 (85:17-22)]  And Sheriff Reigenborn testified that any policy put out by a Division Chief that did not align with the Sheriff's views were rescinded because "they're not the direction that I want the agency to go . . . ."  [52-1 at 5 (21:2-11)]

Moreover, "the label 'policymaker' is not dispositive . . . ." *Jantzen v. Hawkins*, 188 F.3d 1247, 1255 n.3 (10th Cir. 1999) (citing *Branti*, 445 U.S. at 518). The guiding question, again, is whether political loyalty or affiliation with a particular party, or particular persons, is an appropriate requirement for effective performance of Coates' job.  *Branti*, 445 U.S. at 518; *Dickeson*, 844 F.2d at 1442.  Thus, in *Poindexter*, the Tenth Circuit relied on the Road Foreman's role as "ambassador" as the "most important single fact in support of the conclusion that the job ha[d] a component of political loyalty."  548 F.3d at 920, 923; *see also Branti*, 445 U.S. at 518 (citing as a "clear" example of a position requiring political loyalty a Governor's staff-member who assists with speechwriting, speaks with the press on the Governor's behalf, or communicates with the legislature).  Defendants do not argue that Chief Coates served in this communication-forward political capacity.  [##53 at 9-1; 60 at 2-7]  And as far as his ability to effectively perform his job with underlying policy disagreements, the record is unclear. Take this exchange during Coates' deposition:

Q: What if you disagreed with the sheriff's policy?

A: I think, at the end of the day, I was successful because I believed in the sheriff.  I believed in the best practices of the profession. . . . And, again, in the structure of rank and file, in this job, where . . . we're trained from early

on that I found it to be un-beneficial to have that type of opposition. I just
didn't believe in it.

[#53-2 at 86 (86:6-17)] A reasonable jury could conclude from this statement that a
Division Chief must "believe[] in the sheriff" in order to be effective, and that a political
disagreement could hinder that relationship. But Chief Coates could also be reasonably
understood as testifying that because of the highly structured "rank and file" nature of the
job, successful Division Chiefs are well-trained to not let their political disagreements with
any individual person holding the office of "Sheriff" impact their ability to perform their
duties.

Along similar lines, Chief Coates indicated that the "simplistic . . . bureaucratic
nature of chain of command, and policies and procedures[] and mandates [instituted by
the sheriff], and uniformity" of the job were the controlling factors for an effective Division
Chief, not the Chief's political affiliation to the acting sheriff or undersheriff. [*Id.* at 52-53
(52:21-53:7)] Indeed, under ASCO policy, all employees regardless of rank "retain[ed]
their right to vote as they choose, to support candidates of their choice and to express
their opinions as private citizens . . . on political subjects and candidates at all times while
off-duty." [#60-1, DSOF 88] The existence of this policy supports the conclusion that
political support or affiliation was not a necessary component to effective service for any
deputy. Finally, the Court credits the fact that Chief Coates, and the other three Plaintiffs,
had served in a variety of ranks under both Republican and Democratic sheriffs. [#61-1,
PSOF 4] This indicates that, while the job may benefit from loyalty to and respect for the
sheriff as an individual, the *political* loyalties or affiliations of the Plaintiffs as compared to
those of the acting sheriff may not have impacted their abilities to perform their duties.
*See Branti*, 445 U.S. at 518 ("[T]he question is whether the hiring authority can

23

demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."); *Jantzen*, 188 F.3d at 1253 (noting that "there is ample proof that [the plaintiffs] actually did effectively perform their jobs despite political differences with the Sheriff").

This holding is consistent with precedent in this District and this Circuit. In *Nicastle v. Adams Cnty. Sheriff's Off.*, the court allowed a First Amendment claim brought by a Colorado sheriff's deputy with the rank of lieutenant[10] arising out of his allegedly retaliatory demotion to proceed to a jury.   No. 10-CV-00816-REB-KMT, 2011 WL 1598062, at *3, 7 (D. Colo. Apr. 28, 2011). In *Jantzen*, the Tenth Circuit similarly determined that a genuine dispute over whether a Colorado jailer and sheriff's deputies "could effectively perform their jobs without being politically loyal to the Sheriff." 188 F.3d at 1253.  Similarly, in *Francia v. White*, 594 F.2d 778 (10th Cir. 1979), a case involving New Mexico deputy sheriffs who were allegedly terminated for their political activities, the Tenth Circuit "pointed out that these plaintiffs were serving in non-policy-making, non-confidential positions."  594 F.2d at 782.  While the Court does not view these cases as dispositive in light of the fact- and circumstance-intensive nature of the inquiry, they are persuasive support for finding, as in those cases, that a genuine dispute of fact exists here.

Accordingly, a genuine dispute of fact exists as to whether Chief Coates' job required political allegiance. Moreover, the record is clear that none of the other Plaintiffs exercised more discretion or had a greater need for political loyalty than Coates, the third-

---

[10] Defendants concede that this is now the rank of "Commander," the same held by Commander Currier. [#53 at 19]

in-command at ACSO.  *See* [#53-5] (written job descriptions).  Defendants do not contest this.  [#60 at 3-5] (Defendants listing the job description of "Commander," then listing the job description of "Captain" as "all duties described for Commander, plus: [additional duties]," and finally listing the job description of "Chief[]" as "all duties described for Commander, plus: [additional duties]").  Because a genuine dispute of fact exists as to Chief Coates on this issue, the Court finds that a genuine dispute of fact exists as to the other three Plaintiffs, who had substantially similar job responsibilities as Chief Coates but with less discretionary authority and no heightened political element.   For the foregoing reasons, Defendant's Motion is DENIED as to Plaintiffs' First Amendment retaliation claim.

### C.  Fourteenth Amendment Protected Property Right

In Claim Two, Plaintiffs allege that they were deprived of their jobs without due process, in violation of the Fourteenth Amendment.  [#1, ¶¶ 178-91]  "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment."  *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976) (quotations omitted). "To determine whether a plaintiff was denied procedural due process, [the Court must] engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?"  *Roberts v. Winder*, 16 F.4th 1367, 1376 (10th Cir. 2021) (quoting *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998)).  Defendants argue that Plaintiffs did not have a protected property interest in their employment and therefore fail at step one.  [#53 at 16-17]

"The standard for the existence of a property right in employment is whether the plaintiff has a legitimate expectation of continued employment." *Hennigh*, 155 F.3d at 1253 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). The Tenth Circuit has held that "if state statutes or regulations place substantive restrictions on a government actor's ability to make personnel decisions, then the employee has a protected property interest." *Id.* (citing *Campbell v. Mercer*, 926 F.2d 990, 993 (10th Cir.1991)). So, "if the statute or regulation places substantive restrictions on the discretion to demote an employee, such as providing that discipline may only be imposed for cause, then a property interest is created." *Roberts*, 16 F.4th at 1376 (quoting *Hennigh*, 155 F.3d at 1254). However, "[p]rocedural detail in a statute or regulation, standing alone, is not sufficient to establish a protected property interest in an employment benefit." *Id.* (quoting *Hennigh*, 155 F.3d at 1254). "At-will employees lack a property interest in continued employment." *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 828 (10th Cir. 2016) (citing *Darr v. Town of Telluride*, 495 F.3d 1243, 1252 (10th Cir. 2007)).

Here, Plaintiffs primarily rely on Colorado Revised Statute § 30-10-506 to create a protected property interest. [#56 at 20-24] That statute provides in relevant part:

> Each sheriff may appoint as many deputies as the sheriff may think proper and may revoke such appointments at will; except that a sheriff shall adopt personnel policies, including policies for the review of revocation of appointments. Before revoking an appointment of a deputy, the sheriff shall notify the deputy of the reason for the proposed revocation and shall give the deputy an opportunity to be heard by the sheriff.

Colo. Rev. Stat. § 30-10-506. Plaintiffs argue that the notice and hearing requirements added to the statute in a 2006 amendment provide a substantive limitation on the sheriff's "at will" revocation authority. [#56 at 20-22]

Multiple courts in this District have analyzed Section 506 after its 2006 amendment. All have rejected the argument that this statutory provision provides the type of "substantive restrictions on the [sheriff's] discretion" required to create a protected property right. *McLallen v. Taylor*, No. 10-CV-01187-RPM, 2012 WL 502697, at *4 (D. Colo. Feb. 15, 2012) ("[Section 506] contains no substantive restriction on the sheriff's discretion in revoking the appointment of a deputy . . . . [T]he statute does not create a property interest within the constitutional protection."); *Nicastle*, 2011 WL 1598062, at *5 ("[Section 506] provides procedural detail but does not place substantive restrictions on the discretion of a sheriff to revoke an appointment . . . ."); *Harrison v. Bd. of Cnty. Comm'rs*, No. 11-CV-03407-MSK-KMT, 2013 U.S. Dist. LEXIS 33903, *11-12 (D. Colo. Feb. 8, 2013) (holding that, in accordance with *McLallen* and *Nicastle*, "[Section 506] does not create a cognizable property interest" sufficient to sustain a Fourteenth Amendment claim), *report and recommendation adopted*, 2013 WL 950785 (D. Colo. Mar. 12, 2013). In addition, the Tenth Circuit has held that sheriff's deputies are still at-will employees, even after the amendment of Section 506. *Williams v. McKee*, 655 F. App'x 677, 686-87 (10th Cir. 2016) (quoting Section 506 for the proposition that a sheriff in Colorado "may revoke . . . appointments at will," and holding that a sheriff's deputy's "due process claims [arising out of his termination must] fail" due to lack of a protected property interest). In accordance with this weight of authority directly applying Section 506 after its 2006 amendment, the Court holds that Section 506's notice and hearing requirements are procedural details that do not create a protected property interest for the purposes of the Fourteenth Amendment.

Plaintiffs also briefly argue that "the practices and understandings within the Sheriff's Office"—specifically the "understanding" that no termination would take place without a job-related reason or an internal affairs investigation—created a protected property right. [#56 at 22-23]   Plaintiffs do not point to any written policy or contract between ACSO and themselves supporting this practice as ACSO policy.[11] Plaintiffs instead rely on an implied "understanding" that existed within ACSO that such an investigation would normally take place before termination and that termination would only be for job-related reasons. This type of unwritten policy may create a protected property right. *See Schulz v. City of Longmont*, 465 F.3d 433, 444 (10th Cir. 2006) ("State law sources for property interests can include statutes, municipal charters or ordinances, and express or implied contracts.").   However, as a matter of law, a written contract or policy specifying at-will employment will supersede an unwritten understanding. *See Coleman*, 673 F. App'x at 828 (holding that, as a matter of law, Plaintiff's valid at-will contract superseded a "mutual[ ] . . . understanding" that she would retain her job and governed her relationship with her public employer); *Van Dam v. Guernsey*, No. 20-CV-60-SWS, 2021 WL 1774137, at *13-14 (D. Wyo. May 4, 2021) (holding that, as a matter

---

[11] The Court notes the existence of Policy 1024, which Plaintiffs appear to reference in their Notice of Supplemental Authorities. [#65]   Policy 1024.4.1 restricts an ACSO employee's ability to engage in certain forms of political speech or activities in a way that could be perceived as representing ACSO.   [#56-11 at 3]   It then disclaims any infringement of an employee's right to engage in political activity while off-duty. [*Id.*]  While Policy 1024 bolsters Plaintiffs' entitlement to First Amendment protection from retaliation, it does not create a protected property interest in continued employment. Reinforcing the well-established legal rule that an at-will government employee is protected by the First Amendment does not create a protected property interest in continued employment.  *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) ("While protecting First Amendment freedoms [for, among others, at-will government employees,] we have, however, acknowledged that the First Amendment does not create property or tenure rights . . . .").

of law, an express disclaimer acknowledging that Plaintiff's employment was at-will superseded any allegedly "official but unwritten policies" to the contrary).

In this case, no Plaintiff had a written contract. [#60-1, DSOF13] And the operative ACSO policy, issued on Sheriff Reigenborn's first day in office, stated that: "All employees of [ACSO] are at-will employees. . . . The Sheriff may terminate employees or revoke deputy appointments at will, with or without cause." [#52-8 at 1] It further stated that "[t]here are no policies or procedures applicable to the disciplinary process other than the termination procedures set forth in Policy 1 above"—that is, notice and a hearing. [*Id.* at 2] Plaintiffs give the Court no reason to think that this policy was invalidly enacted, and the statutory text contains no restrictions on a new sheriff's ability to issue new employment policies so long as deputies are given notice and an opportunity to be heard. C.R.S. § 30-10-506; *accord. Cummings v. Arapahoe Cnty. Sheriff's Dep't*, 440 P.3d 1179, 1186 (Colo. App. 2018) ("[T]he amended statute requires a sheriff to promulgate written employment policies. The sheriff must give his deputies the rights of notice and opportunity to be heard. Other employment policies promulgated by the sheriff may be, but are not required to be, binding."). Accordingly, any unwritten understanding within ACSO cannot supersede this clear and unambiguous operative policy language. *See Rooker v. Ouray Cty.*, 841 F.Supp.2d 1212, 1216-19 (D. Colo. 2012) (finding no protected property interest when a written policy provided an opportunity to be heard before termination, but also specified that employment was at-will employment and failure to adhere to any provision hereof shall not create any additional rights or remedies"), *aff'd*, 504 Fed. App'x 734 (10th Cir. 2012); *Jeffers v. Denver Pub. Sch.*, No. 16–cv–02243–CMA–MJW, 2017 WL 2001632, at *5 (D. Colo. May 11, 2017) (finding no protected

29

property right when policy stated that "employment may be terminated for any time, with or without cause"), *report and recommendation adopted*, 2017 WL 5441612 (D. Colo. June 1, 2017), *recon. den'd*, 2017 WL 5256359 (D. Colo. Nov. 13, 2017).   For the foregoing reasons, Defendant's Motion is GRANTED as to Plaintiffs' Fourteenth Amendment procedural due process claims.

Finally, in their response to Defendants' Motion for Summary Judgment, Plaintiffs seek leave to amend their complaint to add a Breach of Implied Contract Claim.[12]  [#56 at 24]  The Court declines to construe this request as a motion to amend the pleadings. Should Plaintiffs wish to amend their pleading, they are instructed to file a motion that complies with the Federal Rules of Civil Procedure and the local rules, to be properly briefed and set for a hearing, if needed.

### D. Proper Defendants

Plaintiffs assert claims against Sheriff Reigenborn in his official and individual capacities, and against ACSO.  [#1]  Defendants argue that Sheriff Reigenborn in his individual capacity is the only proper defendant, and that Sheriff Reigenborn in his official capacity and ACSO should be dismissed.  [#53 at 5-7]  Defendants argue that a suit against Sheriff Reigenborn in his official capacity is the equivalent of a suit against Adams

---

[12] Plaintiffs also cite *Brosh v. Duke*, No. 12-CV-00337-CMA-MJW, 2012 WL 5289536 (D. Colo. Oct. 24, 2012), *aff'd*, 616 F. App'x 883 (10th Cir. 2015), for the proposition that the Court has inherent authority to "convert" Plaintiffs' Fourteenth Amendment claim into a state-law contract claim.  [#56 at 24]  To the extent that such authority exists, the Court declines to exercise it. In *Brosh*, Plaintiffs claimed that their Eighth Amendment rights were violated.  2012 WL 5289536, at *1.  While their pleadings only alleged an Eighth Amendment claim of constitutionally inadequate conditions of confinement, the court allowed the claim to proceed as an Eighth Amendment excessive force claim. *Id.* at *4 & n.3. Here, Plaintiffs seek to convert a claim alleging that their federally protected rights were violated into one alleging a breach of state contract law.  This is a bridge too far for purely judicial action.

County (the "County"). [*Id.* at 5]  And, according to Defendants, Colorado counties do not control the employment decisions of "the Sheriff's office," meaning that the County cannot be held responsible for Sheriff Reigenborn's individual employment decisions.  [*Id.* at 6] As to ACSO, Defendants argue that it is not a legal entity subject to suit and is therefore not a proper party.[13]  [*Id.* at 6-7]  Thus, according to Defendants, no governmental entity would be liable under Section 1983 when a Colorado Sheriff violates an employee's constitutional rights through an unlawful employment action.

As a general rule, "municipalities and municipal entities . . . are not liable under 42 U.S.C. § 1983 solely because their employees inflict injury on a plaintiff."  *Fofana v. Jefferson Cnty. Sheriff's*, No. 11-cv-00132-BNB, 2011 WL 780965, at *2 (D. Colo. Feb. 28, 2011) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978) and *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).  Instead, "they are responsible only for their *own* actions." *Simmons v. Uintah Health Care Special Dist.*, 506

---

[13] Defendants did not waive this argument by failing to raise it in their Rule 12 motion [#14]. While Defendants make an errant reference to "this Court's [lack of] in-personam jurisdiction" over ACSO [#53 at 6], the thrust of Defendants' argument is that Plaintiffs' Section 1983 claim fails against ACSO because ACSO is not a "person" under the statute [*id.* at 6-7]. The Tenth Circuit and numerous district courts in this circuit have decided the merits of this argument on a motion for summary judgment.  *See, e.g.*, *Harper v. Colorado State Bd. of Land Comm'rs*, 248 F. App'x 4, 9 (10th Cir. 2007) ("[B]ecause the § 1983 claims at issue in this appeal are asserted against the Land Board, an entity that is not a 'person' under that statute, the district court's grant of summary judgment was proper."); *Hunt v. Bd. of Regents*, 338 F. Supp. 3d 1251, 1267 (D.N.M. 2018) ("[T]he Court concludes that Defendants are entitled to summary judgment on all of Hunt's claims against them. As explained above, the Board of Regents is an entity, not a 'person' that may be held liable under Section 1983."), *aff'd sub nom. Hunt v. Bd. of Regents*, 792 F. App'x 595 (10th Cir. 2019); *Grayson v. Kansas*, No. 06-cv-2375-KHV, 2007 WL 2994070, at *11 (D. Kan. Oct. 12, 2007) ("[T]he State of Kansas argues that it is not a person under Section 1983. Plaintiff concedes this point and the Court therefore finds that the State of Kansas is entitled to summary judgment on plaintiff's Fourth Amendment and Fourteenth Amendment claims." (citations omitted)).

F.3d 1281, 1284 (10th Cir. 2007) (citing *Monell*, 436 U.S. at 691-95 and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-80 (1986)).  Nonetheless, an action may be attributed to a municipality or municipal entity when: 1) the action was taken in compliance with a longstanding policy or custom; or 2) the action was taken by the municipality's final policymakers.  *Id.* at 1285 ("[A] municipality is responsible for *both* actions taken by subordinate employees in conformance with preexisting official policies or customs *and* actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality.").

"In determining whether an official has final policymaking authority, [the Court] look[s] to state and local law."  *Jackson v. City & Cnty. of Denver*, No. 20-1051, 2022 WL 120986, at *4 (10th Cir. Jan. 13, 2022) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988)).  Colorado sheriffs plainly hold final policymaking authority with respect to employment decisions for their office.  *See* C.R.S. § 30-10-506 ("[e]ach sheriff may appoint as many deputies as the sheriff may think proper and may revoke such appointments at will," subject to the sheriff's own personnel policies and a notice and hearing requirement); *Tonjes v. Park Cnty. Sheriff's Off.*, 300 F. Supp. 3d 1308, 1332 (D. Colo. 2018) ("C.R.S. § 30–10–506 plainly makes the sheriff the final policymaker for the Sheriff's Office with respect to employment of deputies . . . .").  Indeed, the parties do not dispute that Sheriff Reigenborn was the final policymaker with respect to employment decisions at ACSO.  [## 60-1, DSOF 37; 61-1, PSOF 2]

Defendants appear to argue both that the County cannot be liable for Sheriff Reigenborn's actions because Sheriff Reigenborn is not under the County's control and therefore his actions cannot be imputed to the County, and that ACSO cannot be sued

separately because it is simply an office or department within the County with no separate legal entity. These positions are untenable. To be sure, this District is split as to whether the proper municipal defendant is ACSO or the County. *See Chavez v. Bd. of Cnty. Commissioners of Lake Cnty., Colorado*, 426 F. Supp. 3d 802, 809-810 (D. Colo. 2019). Some cases hold that the proper defendant is the Sheriff's Department because it is a constitutionally separate office. *See id.* (concluding, based on an analysis of *Tunget v. Bd. of Cnty. Comm'rs*, 992 P.2d 650 (Colo. App. 1999) and *Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc), that sheriff's offices in Colorado have the capacity to be sued in a § 1983 case); *Tonjes* 300 F. Supp. 3d at 1332 ("C.R.S. § 30–10–506 plainly makes the sheriff the final policymaker for the Sheriff's Office with respect to employment of deputies, and if the sheriff acted unconstitutionally in those duties, the Sheriff's Office can be held liable for his actions."). Some cases hold that the county is the proper defendant because the sheriff's office, like a municipal fire or police department, has no separate legal existence from the county. *Lancaster v. Windsor Police Sgt. Straightline*, No. 15-CV-02852-GPG, 2016 WL 852863, at *3 (D. Colo. Mar. 4, 2016) ("Plaintiff may not sue the Weld County Sheriff and Weld County Jail because these entities are not 'persons' subject to suit under 42 U.S.C. § 1983."); *Johnson v. Correct Care Sols., LLC*, No. 17-CV-00782-RM-STV, 2018 WL 7372075, at *4 (D. Colo. Nov. 21, 2018) ("The Arapahoe County Sheriff's Department therefore is not a proper defendant under Colorado law."), *report and recommendation adopted*, No. 1:17-CV-00782-RM-STV, 2019 WL 764602 (D. Colo. Feb. 21, 2019). And at least one has held that both are proper defendants. *See De Gomez v. Adams Cnty.*, No. 20-CV-01824-CMA-NYW, 2022 WL 1439113, at *10 (D. Colo. May 6, 2022) ("[T]he claims against the

individuals in their official capacities are viewed as claims against Adams County and the Adams County Sheriff's Office."). But none have allowed the type of municipal-liability loophole that Defendants seek to create here. Such a result would unfairly punish Plaintiffs for the legal uncertainty, despite their viable municipal liability claims.

While recognizing the dispute, the Court holds that the County is the proper municipal defendant, and that Plaintiffs' claims have been properly brought against it by naming Sheriff Reigenborn in his official capacity. *See Kilman v. Brown*, 833 F. App'x 474, 475 (10th Cir. 2021) (explaining that "[b]ecause [plaintiff] named Sheriff Brown in his official capacity, his suit functioned as a suit against Arapahoe County itself"). Defendants argue that the County cannot be held liable for Sheriff Reigenborn's actions because the County does not control his employment decisions. [#53 at 6] But this simply means that Sheriff Reigenborn is the final policymaker on personnel matters for the County and that his employment decisions are therefore chargeable as an official act of the County. *See Simmons*, 506 F.3d at 1286 ("It is undisputed before us that the Board was the final policymaker on personnel matters for the District. . . . The decision to fire Ms. Simmons is thus . . . chargeable as an official act of the District . . . ." (emphasis omitted)).

Defendants' citation to *Bristol* is unpersuasive. There, the Tenth Circuit acknowledged caselaw "suggest[ing] that counties can be held liable for the misdeeds of Sheriffs . . . when the Sheriff is held to set 'official policy' for the county." *Id.* at 1221. The court then held that "the Sheriff was not setting 'official policy' in firing [the plaintiff], *except to the extent that* requiring employees to be able to perform their jobs can be called a 'policy.'" *Id.* (emphasis added) That is, the court accepted that a termination creates official policy. It simply rejected the notion that the policy set in that case was actionable

against the County in any way. And, indeed, one of the cases cited in Bristol for the proposition that caselaw "suggest[s] that counties can be held liable for the misdeeds of Sheriffs," *id.* at 1221, involved a case in which the Eleventh Circuit held that a county could be held liable when a sheriff, who had "absolute and unfettered authority over the appointment, retention, rate of pay and acts of his deputies," terminated a deputy sheriff in violation of the First Amendment. *Lucas v. O'Loughlin*, 831 F.2d 232, 233-36 (11th Cir. 1987).

Thus, the Court holds that Plaintiffs' case is properly pled against Sheriff Reigenborn in his official capacity, but not against ACSO.[14] Accordingly, Defendant's Motion is GRANTED IN PART and DENIED IN PART with respect to Plaintiffs' municipal liability claims.

### E. Qualified Immunity

Defendants argue that Sheriff Reigenborn is entitled to qualified immunity for the claims brought against him in his individual capacity. [#53 at 17-20] Because the Court grants summary judgment for Defendants on Plaintiffs' Fourteenth Amendment claims, it only considers Sheriff Reigenborn's qualified immunity as to Plaintiffs' First Amendment claims.

---

[14] It is worth noting that the precise identity of the municipal defendant in this case "ultimately . . . does not matter" under Colorado law—especially where, as here, discovery has been completed. *Chavez*, 426 F. Supp. 3d at 809 (D. Colo. 2019). Pursuant to a Colorado statute, judgments against: 1) "a county of this state;" 2) "any county officer . . . in his official capacity;" or 3) "any county officer . . . in his . . . name of office" are paid for in the same way—by the county and through a county tax. C.R.S. § 30-25-104; *Chavez*, 426 F. Supp. at 812-13 ("[W]hen a *Monell* claim is based on a sheriff-made policy, any distinction between suing the sheriff's office versus suing the county becomes purely theoretical, because the county will pay regardless.").

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted). Once the defense of qualified immunity has been raised, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent" such that it is "settled law." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." *Id.* at 591 n.8. The Tenth Circuit, however, has stated that "[o]rdinarily this standard requires either that there is a Supreme Court or Tenth Circuit decision on point, or that the 'clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.'" *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011)).

The Tenth Circuit has explained the "clearly established" prong of the qualified immunity analysis as follows:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have

> placed the statutory or constitutional question beyond debate. The dispositive question is whether the violative nature of the *particular conduct* is clearly established. . . . Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quotations and citations omitted).

The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, 138 S. Ct. at 590 (quotation omitted).

Plaintiffs' First Amendment claims allege that Sheriff Reigenborn violated their First Amendment rights by retaliating against them for their protected speech, association, and beliefs. [#1 at ¶¶164-77]  As discussed above, "[t]he First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance." *Snyder*, 354 F.3d at 1184 (quoting *Mason*, 115 F.3d at 1451).  "'[N]o clear line can be drawn' between positions that require political allegiance and those that do not." *Id.* at 1184 (quoting *Elrod*, 427 U.S. at 367).  Defendants argue that Sheriff Reigenborn did not have a clearly established basis to believe that senior deputies of ACSO were not positions that required political loyalty. [#53 at 18-19]  The Court agrees.

Plaintiffs cite two cases for the notion that their First Amendment rights were clearly established in this context—*Elrod* and *Tice v. Dougherty*, 846 F. App'x 705 (10th Cir. 2021). [#56 at 24-25]  In *Elrod*, the United State Supreme Court held that a "Chief Deputy" who "supervised all departments of the Sheriff's Office working on the seventh floor of the building housing that office" stated a legally cognizable claim when he brought a First Amendment relation claim.  427 U.S. at 350-51, 373.  But the Court did not establish that

Chief Deputies are necessarily entitled to First Amendment protections. A divided Court recognized that First Amendment protections could be restricted to positions requiring political loyalty, and a plurality articulated a preliminary standard as to which positions require political loyalty and which do not.[15]  *Id.* at 367-68 (plurality opinion); *see also id.* at 374-75 (Stewart, J., concurring).  But the Court ultimately affirmed the Seventh Circuit's ruling, which recognized that "the issue of whether plaintiffs were policy-making employees who may be dismissed for partisan political reasons is a matter of factual defense to be established by defendants at trial."  *Burns v. Elrod*, 509 F.2d 1133, 1136 (7th Cir. 1975), *aff'd*, 427 U.S. 347 (1976).  Indeed, the Plurality explained that "[n]o clear line can be drawn between" positions requiring political loyalty and those that do not, and explicitly noted that this issue would require further development on remand. *Elrod*, 427 U.S. at 367-68 (plurality opinion).

The notion that *Elrod* clearly established these Plaintiffs' right to be free from First Amendment retaliation is further belied by the existing circuit split over whether deputy sheriffs—of any rank—are positions requiring political loyalty. *Compare Jenkins v. Medford*, 119 F.3d 1156, 1164 (4th Cir. 1997) ("We therefore hold that such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the *Elrod–Branti* exception to prohibited political terminations."), *and Terry v. Cook*, 866 F.2d 373, 377 (11th Cir. 1989) ("Under the *Elrod–Branti* standard, loyalty to the individual sheriff and the goals and policies he seeks to implement through his office is an appropriate requirement for the effective performance of a deputy sheriff."); *with Hall v. Tollett*, 128

---

[15] The standard articulated by the *Elrod* plurality was substantially clarified by the Court in *Branti v. Finkel*, 445 U.S. 507 (1980).

F.3d 418, 429 (6th Cir. 1997) ("We conclude that defendant has failed to show that political affiliation is 'an appropriate requirement for the effective performance' of [sheriff's deputy in Cumberland County]."), *and Jantzen*, 188 F.3d at 1256 ("[W]e must conclude that there exists a genuine dispute of material fact over the appropriateness of political loyalty as a job requirement for deputy sheriffs."); *see also Upton v. Thompson*, 930 F.2d 1209, 1217 (7th Cir. 1991) ("While a circuit split is not helpful in determining whether or not a deputy sheriff is protected by the First Amendment from patronage firing, such a split is indicative of the fact that the deputy sheriff's rights in this regard are currently unsettled as a matter of constitutional law and therefore were not 'clearly established' at the time of the deputies' firings."). Accordingly, *Elrod* does not clearly establish the contours of Plaintiffs' First Amendment right that they claim was violated.

Plaintiffs also point to *Tice* as establishing their claimed right within the Tenth Circuit. In *Tice*, the Tenth Circuit held that "the contours of [a deputy sheriff's] First Amendment right to political association were clearly established when she was terminated in November 2016." 846 F. App'x at 710. Nonetheless, *Tice* and the Tenth Circuit cases it relied on fail to clearly establish the contours of these Plaintiffs' rights. Critically, unlike Defendants here, the defendant in Tice "d[id] not suggest Plaintiff's employment required political allegiance." 846 F. App'x at 708. Thus, the *Tice* court did not need to engage in the fact-intensive inquiry that analyzes "the nature of the employee's duties and responsibilities," *Snyder*, 354 F.3d at 1185, let alone decide whether prior precedent clearly established the non-political nature of the deputy sheriff's position.

39

Moreover, the cases that *Tice* relied on to hold that the deputy's right was clearly established in that case do not apply with the same force to this case. 846 F. App'x at 710 (citing *Jantzen*, *Dickeson* and *Francia*).[16]  In *Jantzen*, the plaintiffs were the jailer and two deputy sheriffs. 188 F.3d at 1254-56.  The jailer was only afforded responsibility over "day-to-day" administrative tasks such as "(1) receiving and booking inmates, (2) regulating inmates' meals, (3) regulating inmates' medication, (4) monitoring jail activity and conducting cell checks, and (5) keeping jail records."  *Id.* at 1254.  And the deputies only had authority to "execute and enforce the law."  *Id.* at 1255.  There was no cited evidence of supervisory authority, budgetary input, external communications, or receipt of confidential information. Indeed, the record reflected that the sheriff was a self-described "benevolent dictator" who may have taken deputy "suggestions" but was otherwise "a hands-on sheriff."  *Id.* at 1255-56 & n.5.

In *Dickeson*, the plaintiffs were the head jailer for the joint law enforcement facility for the County of Hot Springs and the Town of Thermopolis and the administrative assistant and special deputy to the sheriff.  844 F.2d 1435, 1443.  The head jailer's "duties included preparing the work schedule for the jailers, ordering food, planning menus, and preparing meals."  *Id.* at 1443.  He was not a sworn deputy sheriff.  *Id.*  The administrative assistant's duties "were secretarial" and "included filing, typing, bookkeeping, radio communication, and general office work."  *Id.*  The remainder of her duties "encompassed matron work and serving civil process."  *Id.*  Because the "job duties of the plaintiffs

---

[16] *Tice* also cited to *Mason*.  As in *Tice*, however, the defendants in *Mason* "d[id] not argue that [plaintiff's] position . . . require[d] political allegiance."  115 F.3d at 1451.

range[d] from clerical to the housing and feeding of prisoners," the *Dickeson* court concluded that their positions did not demand political loyalty from the sheriff. *Id.* at 1444.

Finally, in *Francia*, the defendant denied terminating plaintiffs because of their political affiliations and, as a result, the court did not conduct any analysis on the political loyalty question. 594 F.2d at 779-80, 782. Thus, the court itself stated that the question it was considering was "whether there [wa]s evidence in support of the trial court's findings that plaintiffs were terminated solely because of their political affiliations." *Id.* at 782. And, indeed, the *Francia* court acknowledged "that these [deputies] were serving in non-policy-making, non-confidential positions." *Id.*

As discussed above, whether Plaintiffs' positions required political loyalty is a deeply fact-intensive inquiry that analyzes "the nature of the employee's duties and responsibilities." *Snyder*, 354 F.3d at 1185. "[T]itles alone do not provide the answer." *Dickeson*, 844 F.2d at 1442. Thus, it is not dispositive that some "deputy sheriffs" positions have been held to be positions not requiring political loyalty in the Tenth Circuit. And while the Court acknowledges that there need not be a case with "precisely the same facts" [#56 at 25 (quoting *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015))], *Jantzen*, *Dickeson* and *Francia*—which Plaintiffs fail to even cite in their qualified immunity analysis—do not provide the "obvious clarity" required to place Sheriff Reigenborn on fair notice that his conduct was unconstitutional. *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The facts recited in *Jantzen*, *Dickeson* and *Francia* simply do not reflect the same degree of authority exercised by Plaintiffs in this case. Accordingly, Plaintiffs have failed to meet their burden of establishing that the right they claim was clearly established at the time of

the violation. Thus, for the foregoing reasons, Defendant's Motion is GRANTED with respect to Sheriff Reigenborn's qualified immunity defense.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [#53] is **GRANTED in part** and **DENIED in part** and Plaintiffs' Motion for Partial Summary Judgment [#51] is **GRANTED**. More specifically, the Court holds as follows:

(1) partial summary judgment is **GRANTED** in favor of Plaintiffs as to the issue of whether they were discharged under color of state law;

(2) summary judgment is **DENIED** on Plaintiffs' First Amendment retaliation claim;

(3) summary judgment is **GRANTED** in favor of Defendants on Plaintiffs' Fourteenth Amendment procedural due process claims;

(4) summary judgment is **DENIED** as to Sheriff Reigenborn in his official capacity;

(5) the Adams County Sheriff's Office is **DISMISSED** as a Defendant; and

(6) Sheriff Reigenborn in entitled to qualified immunity on Plaintiff's First Amendment retaliation claim and, therefore, Sheriff Reigenborn in his individual capacity is **DISMISSED** as a Defendant.

DATED: September 27, 2022      BY THE COURT:

s/Scott T. Varholak
United States Magistrate Judge