**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. ~~_____~~ 20-cv-1936-STV

TIMOTHY JAMES COATES, GENE CLAPS, MARK MITCHELL, and KEVIN CURRIER

     Plaintiffs,

v.

~~THE ADAMS COUNTY SHERIFF'S OFFICE~~ THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF ADAMS, a governmental entity~~,~~ _, and_ RICHARD A. REIGENBORN, in his ~~official and~~ individual capacity _._

     Defendants.

---

## <u>FIRST AMENDED</u> COMPLAINT AND JURY DEMAND

---

Plaintiffs Timothy James Coates, Gene Claps, Mark Mitchell, and Kevin Currier, by and through counsel Iris Halpern, Felipe Bohnet-Gomez, and Siddhartha H. Rathod of RATHOD I MOHAMEDBHAI LLC, respectfully allege for their Complaint and Jury Demand as follows:

### NATURE OF THE ACTION

This case concerns serial violations of the First and Fourteenth Amendments of the United States Constitution by Defendants ~~Adams~~ the Board of County ~~Sheriff's Office~~ ("~~ACSO~~ Commissioners for the County of Adams ("Adams County") and ~~its recently~~ the county's then-elected Sheriff, Richard A. Reigenborn. Plaintiffs Chief Timothy James Coates, Chief Gene Claps, Captain Mark Mitchell, and Commander Kevin Currier have collectively served over 100 years as law enforcement agents, working seamlessly under

both Republican and Democrat administrations. However, during the November 2018 elections for Adams County Sheriff, Plaintiffs all openly campaigned for Sheriff Reigenborn's opponent, then-incumbent Michael McIntosh, while at the same time expressing highly critical opinions of the Fraternal Order of Police ("FOP"), a law enforcement organization central to Sheriff Reigenborn's political ascent.

On January 8, 2019, the same day Sheriff Reigenborn assumed office, he rescinded all ~~of ACSO's~~ personnel policies of the Adams County Sheriff's Office ("ACSO") and warned staff that all future employment decisions were solely at his whim. The very next day, on January 9, 2019, Sheriff Reigenborn notified Plaintiffs of their imminent terminations, citing only his need to take ACSO in a "different direction." Plaintiffs had no right to appeal.

The First Amendment to the U.S. Constitution ensures that a government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). This is because the dangers posed by patronage, cronyism, and nepotism to the fiscal and political health of our democracy have been widely recognized. We no longer live in the days of Boss Tweed and Tammany Hall. Elected officials are expected to enforce the law, not violate it.

## I.   JURISDICTION, VENUE, AND PARTIES

1.    This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant

to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Venue is proper within this District under 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the District of Colorado. Defendant ~~ACSO~~Adams County is located in this District and all of the individual parties were residents of the State of Colorado at the time of the events giving rise to this litigation.

3.      Plaintiff Coates is a resident of, and domiciled in, the State of Colorado.

4.      Plaintiff Claps is a resident of, and domiciled in, the State of Colorado.

5.      Plaintiff Mitchell is a resident of, and domiciled in, the State of Colorado.

6.      Plaintiff Currier is a resident of, and domiciled in, the State of Colorado.

7.      ~~Defendant~~ ACSO is the law enforcement agency of Defendant Adams County.

8.      Defendant Reigenborn was ~~and remains~~at all relevant times herein the elected Sheriff of ~~ACSO~~Adams County, a final policymaker for ~~ACSO~~Adams County, and an agent of ~~ACSO~~Adams County. At all relevant times, Sheriff Reigenborn acted under color of state law in his capacity as the Sheriff of Adams County.  *See* C.R.S. § 30-10-506 (vesting power of appointment in the office of sheriff); *Tonjes v. Park Cty. Sheriff's Office*, 300 F.Supp. 3d 1308, 1332 (D. Colo. 2018) ("C.R.S. § 30-10-506 plainly makes the sheriff the final policymaker for the Sheriff's Office with respect to employment of deputies.").

## II.      FACTUAL ALLEGATIONS

**A.      Plaintiffs' Extensive Careers in Law Enforcement**

9.      Plaintiffs have collectively worked over 100 years in law enforcement.

10.     Throughout their careers, Plaintiffs have served under both Republican and Democratic sheriffs, including at ACSO.

11.     During their careers at ACSO, Plaintiffs received a number of promotions. These promotions occurred under both Republican and Democratic sheriffs.


### ***Chief Timothy James Coates***

12.     Chief Coates served a 35-year career in law enforcement, a majority of it with ACSO.

13.     Chief Coates began his career as a Patrolman with the Northglenn Police Department, where he became the second officer in the department's history to earn a Medal of Honor.

14.     On January 7, 1993, Chief Coates joined ACSO as a Reserve Deputy.

15.     In 1995, Chief Coates became a full-time Deputy.

16.     ACSO then promoted Chief Coates to a position of Field Training Officer in the Patrol Division.

17.     While working as a Field Training Officer, Chief Coates completed his undergraduate college degree at Metropolitan State College of Denver.

18.     In 1999, ACSO assigned Chief Coates to the Detective Division, making him ACSO's first Domestic Violence Detective.

19.     On July 12, 2002, ACSO promoted Chief Coates to a Sergeant position in the Jail Division.

20.     As a Sergeant in the Jail Division, Chief Coates supervised approximately 30 deputies.

21.     In approximately September of that same year, ACSO made Chief Coates a Sergeant in the Patrol Division.

22.     In 2005, ACSO awarded Chief Coates a Meritorious Achievement Award.

23.     In April 2006, ACSO promoted Chief Coates to the position of Lieutenant in the Jail Division.

24.     As a Lieutenant in the Jail Division, Chief Coates supervised a platoon of over 60 deputies.

25.     At the same time, Chief Coats completed training with the Northwestern Center for Public Safety's Command School.

26.     In 2009, ACSO made Chief Coates a Lieutenant in the Patrol Division.

27.     In 2011, ACSO awarded Chief Coates the Dale R. McLaughlin Memorial Award.

28.     On June 1, 2011, then-Sheriff Doug Darr (a Democrat) promoted Chief Coates to Acting Captain.

29.     Within six months of the Acting Captain promotion, ACSO made the Captain promotion permanent, assigning Chief Coates to the Patrol Division.

30.     As a Captain in the Patrol Division, Chief Coates supervised approximately 120 deputies. His duties included budgeting, allocating resources, annual reporting, and direct supervision over every unit in the Division.

31.     Following the election of then-Sheriff McIntosh (a Republican) in 2014,

ACSO made Chief Coates a Captain in the Detective Division, a position equally broad in scope with similar supervision responsibilities as his preceding position, and the one which he held until Sheriff Reigenborn fired him.

### *Chief Gene Claps*

32.    Chief Gene Claps served a 22-year career in law enforcement, all of it at ACSO.

33.    On January 22, 1997, Chief Claps joined ACSO as a Posse Deputy.

34.    On November 10, 1997, ACSO promoted Chief Claps to a position of Deputy Sheriff in the Jail Division.

35.    After three years as a Deputy in the Jail Division, ACSO assigned Chief Claps to the Patrol Division.

36.    On or about that time, ACSO also made Chief Claps a Field Training Officer.

37.    In April 2001, ACSO awarded Chief Claps a Meritorious Achievement Award.

38.    In February 2004, ACSO promoted Chief Claps to Lead Detective of the Critical Incident Team in the Detective Division, where he worked for the next seven years.

39.    During that time, ACSO also made Chief Claps an instructor for ACSO Police Academy.

40.    In August 2005, ACSO warded Chief Claps the Employee of the Month Award.

41.    In January 2011, then-Sheriff Darr temporarily promoted Chief Claps to the

rank of Sergeant.

42.     Less than six months later, then-Sheriff Darr made the promotion permanent, making Chief Claps a Traffic Sergeant in the Patrol Division where Chief Claps supervised a team of approximately 24 deputies and county employees.

43.     That same year, The National Association of TRIADS, a partnership between law enforcement, older adults, and community groups, honored Chief Claps as Law Enforcement Officer of the Year.

44.     On January 14, 2015, ACSO promoted Chief Claps to the position of Commander in the Jail Division, where he supervised approximately 35 deputies and over 70 volunteers.

45.     On or about this time, ACSO charged Chief Claps with oversight of the Jail Division's Field Training Officer program.

46.     In April 2015, ACSO awarded Chief Claps the Deputy David R. Martinez Award for Excellence.

47.     In February 2016, then-Sheriff McIntosh promoted Chief Claps to the position of Captain in the Jail Division, where Chief Claps supervised approximately 300 employees.

48.     On January 2, 2018, ACSO promoted Chief Claps to Division Chief of the Jail Division, the position he held until Sheriff Reigenborn fired him.

### ***Captain Mark Mitchell***

49.     Captain Mitchell served a 29-year career in law enforcement, all of it with ACSO.

50.     In 1990, Capt. Mitchell joined ACSO as a Community Service Officer in the Jail Division.

51.     On June 26, 1991, ACSO promoted Capt. Mitchell to a Deputy position in the Jail Division.

52.     In March 1995, ACSO assigned Capt. Mitchell to the Patrol Division, where he worked as a Patrol Deputy for the next nine years.

53.     In April 1997, ACSO awarded Capt. Mitchell a Lifesaving Award for rescuing a man who attempted suicide.

54.     That same year, ACSO awarded Capt. Mitchell the Meritorious Achievement Award in honor of his arresting two suspects in an armed robbery.

55.     In April 1999, ACSO made Capt. Mitchell a Field Training Officer for the Patrol Division.

56.     In April 2001, ACSO assigned Capt. Mitchell to its Tactical Team ("SWAT").

57.     On January 30, 2004, ACSO promoted Capt. Mitchell to the position of Sergeant in the Jail Division, where he supervised approximately 30 deputies.

58.     On February 14, 2005, ACSO transferred Capt. Mitchell to the Patrol Division, where he supervised approximately 10 patrol deputies.

59.     In March 2005, ACSO made Capt. Mitchell a SWAT Team Leader and a Field Training Officer Supervisor

60.     In July 2008, then-Sheriff Darr temporarily promoted Capt. Mitchell to the position of Acting Lieutenant of the Jail Division, where Capt. Mitchell supervised a platoon of four sergeants and 60 deputies.

61.    In May 2009, ACSO promoted Capt. Mitchell to the rank of Lieutenant in the Jail Division.

62.    In November 2010, ACSO made Capt. Mitchell an Administrative Lieutenant in the Patrol Division.

63.    In March 2011, ACSO assigned Capt. Mitchell to command of a platoon in the Patrol Division and promoted him to the position of SWAT Team Commander.

64.    In February 2016, after ACSO changed the rank of Lieutenant to Commander, then-Sheriff McIntosh promoted Capt. Mitchell to the newly created rank of Captain.

65.    In July 2016, ACSO temporarily appointed Capt. Mitchell to Patrol Division Chief in an acting capacity.

66.    In October 2016, Capt. Mitchell returned to serving as Captain of the Patrol Division, the position he held until Sheriff Reigenborn fired him.

### ***Commander Kevin Currier***

67.    Commander Kevin Currier served a 24-year career in law enforcement, all of it at ACSO.

68.    In 1995, Cdr. Currier joined ACSO as a Deputy Sheriff in the Jail Division.

69.    In 1998, ACSO assigned Cdr. Currier to the Patrol Division.

70.    In August 2001, ACSO made Cdr. Currier a SWAT Team Negotiator, where he worked as a Negotiator for the first year, and as a Tactical Operator for six years more.

71.    During this time, ACSO also made Cdr. Currier a Field Training Officer.

72.    In 2004, ACSO assigned Cdr. Currier to the Detective Division, where he

remained a Property Detective until 2009.

73.    On January 6, 2010, then-Sheriff Darr promoted Cdr. Currier to the position of Patrol Sergeant.

74.    Four months later, ACSO assigned Cdr. Currier to the rank of Sergeant in the Community Resource Team.

75.    In 2011, ACSO assigned Cdr. Currier to the Detective Division, where he supervised the entire Property Crimes Section.

76.    On January 14, 2015, then-Sheriff McIntosh promoted Cdr. Currier to the position of Commander in the Detective Division. Currier led approximately 30 homicide investigations while at the Detective Division.

77.    In 2015, then-Sheriff McIntosh also assigned Cdr. Currier the additional duties of a Coordinator for the 17th Judicial District's Critical Investigation Team, during which time Cdr. Currier investigated roughly 40 officer-involved shootings or other critical incidents as part of the Critical Investigation Team.

78.    In his role as Coordinator for the 17th Judicial District's Critical Investigation Team, ACSO entrusted Cdr. Currier with supervising the investigation of ASCO Deputy Heath Gumm's murder.

79.    Cdr. Currier served as Commander and Coordinator for the 17th Judicial District until Sheriff Reigenborn fired him.

**B.    Plaintiffs' Contentious History with the Fraternal Order of Police**

80.    The Fraternal Order of Police ("FOP") is a fraternal organization of sworn law enforcement officers.

81.     FOP has chapters across the United States.

82.     Colorado Lodge 1 is a FOP chapter for law enforcement agencies in the Adams County area, including the Adams County Sheriff's Office.

83.     Lodge 1 endorses candidates for office, and through its donor committee, makes financial contributions to the campaigns of candidates.

84.     Sheriff Reigenborn has held various leadership positions at Lodge 1, including:

        a.  Sergeant at Arms,

        b.  1st Vice President,

        c.  2nd Vice President,

        d.  President.

85.     Sheriff Reigenborn first became President of Lodge 1 in 2004 and served in that capacity until 2012.

86.     After that, Sheriff Reigenborn held several elected positions within the Colorado State FOP, including Sergeant-At-Arms for six years, and two terms as the 2nd Vice President.

87.     Sheriff Reigenborn was in the midst of serving his second term as 2nd Vice President when he was elected the Adams County Sheriff and stepped down.

88.     Some years back, Sheriff Reigenborn and other Lodge 1 and state-level FOP leadership began a campaign to implement collective bargaining at ACSO.

89.     Plaintiffs openly opposed the campaign and collective bargaining at ACSO.

90.     In 2016, Plaintiffs, who opposed collective bargaining and Lodge 1

leadership, helped elect Paul Gregory and Adam Sherman to the Lodge's Board of Directors.

91.     Sheriff Reigenborn opposed the election of Gregory and Sherman to the Board.

92.     By 2018, the Lodge had increased its membership dues, in part to pay for a study into the feasibility of collective bargaining at ACSO.

93.     Due to disagreements about collective bargaining and the increase in dues, the Lodge lost many members, including Plaintiffs.

94.     On or about this time, Cdr. Currier also reached out to the Colorado Police Protective Association ("CPPA"), an advocacy association in competition with FOP, asking that the organization come make a presentation to disaffected members.

95.     The presentation never occurred after FOP leadership found out and asked CPPA not to speak with FOP members.

96.     After he took office, Sheriff Reigenborn later demoted or terminated many of the individuals who rescinded their involvement with the FOP.

**C.     Plaintiffs' First Amendment Protected Activities During the 2014 and 2018 Elections for Adams County Sheriff**

97.     In both 2014 and 2018, Sheriff Reigenborn, running as a Democrat, challenged McIntosh for Adams County Sheriff.

98.     Sheriff Reigenborn lost to McIntosh in 2014.

99.     Plaintiffs were among the largest donors to McIntosh's 2014 and 2018 campaigns.

100.    Plaintiffs collectively contributed a total of $3,375 in cash and in-kind

contributions to McIntosh's 2014 campaign, accounting for 5.12% of that campaign's total contributions.

101.    Plaintiffs' support is even greater when considering the contributions of Plaintiffs' family members and other donations solicited by Plaintiffs in support of McIntosh.

102.    Plaintiffs engaged in the following non-exhaustive list of constitutionally protected activities in 2014 in support of McIntosh's candidacy:

a.    At a FOP Lodge 1 forum with the candidates Capt. Mitchell spoke publicly in support of McIntosh.

b.    Capt. Mitchell donated $1,550 to McIntosh's campaign.

c.    Capt. Mitchell placed a yard sign in support of McIntosh on his lawn.

d.    Chief Claps served on McIntosh's campaign committee, which met monthly to strategize and plan campaign activities.

e.    Chief Claps hosted fundraisers for McIntosh and placed a yard sign on his lawn and prominent signs at some of the commercial properties he and other families own, all in support of McIntosh's candidacy.

f.    Chief Claps donated at least $500 to McIntosh's campaign.

g.    Chief Coates contributed $1,225 to McIntosh's campaign.

h.    Chief Coates hosted a fundraiser for McIntosh at his house in July 2014, raising McIntosh $1,800. His immediate family also contributed an additional $2,450 towards McIntosh's campaign.

i.    Chief Coates placed yard signs in his lawn and also arranged for a

local care dealership to post signs.

      j.     Cdr. Currier donated $100 to McIntosh's campaign.

103.   Campaign contributions are publicly available information in Colorado.

104.   In 2014, FOP Lodge 1 endorsed Reigenborn's candidacy.

105.   In 2014, the State FOP also endorsed Reigenborn.

106.   Reigenborn received approximately $16,750 in FOP-related donations during his 2014 campaign.

107.   In 2018, Reigenborn again sought to challenge McIntosh.

108.   McIntosh received FOP Lodge 1's endorsement but received only $5,700 in financial contributions.

109.   For the 2018 election, Plaintiffs contributed approximately $6,665 to McIntosh's campaign, accounting for 11.25% of all contributions.

110.   Plaintiffs' support is even greater when considering the contributions of Plaintiffs' family members and other donations solicited by Plaintiffs in support of McIntosh.

111.   Plaintiffs also engaged in the following, non-exhaustive list of constitutionally protected activities in 2018 in support of McIntosh's candidacy:

      a.     Chief Coates donated $1,900 including an in-kind donation of $1,800 to host a campaign fundraiser at the Ranch Country Club for McIntosh which was attended by approximately 70-80 attendees resulting in an additional $2,375 for the campaign.

      b.     Chief Coates solicited an additional $1,100 for the McIntosh

campaign from his family and friends.

c.      Chief Claps donated a total of $2,725 to McIntosh throughout the campaign.

d.      Chief Claps volunteered with McIntosh's campaign committee, meeting monthly to organize campaign activities.

e.      Chief Claps sponsored and organized a campaign fundraiser in support of McIntosh at the Grizzly Rose.

f.      Cdr. Currier donated at least $940 in financial and in-kind donations to McIntosh's campaign.

g.      Cdr. Currier served on McIntosh's campaign committee and helped organize fundraising and other campaign activities, including the Brighton parade at which Sheriff Reigenborn was also present.

h.      Capt. Mitchell donated $1,100 to McIntosh's campaign.

112.    On November 6, 2018, Sheriff Reigenborn unseated McIntosh and won the election for Adams County Sheriff by a margin of 8,169 votes.

113.    Sheriff Reigenborn selected Tommie McLallen as his Undersheriff.

114.    Before that position, Undersheriff McLallen had served as Chief of the now-disbanded Walsenburg Police Department.

115.    Undersheriff McLallen was active in the FOP, having served as President of FOP Lodge 7 in Pueblo. He was also active in the Colorado State FOP chapter, which is where he and Sheriff Reigenborn became more closely acquainted.

**D.    Sheriff Reigenborn Fires Plaintiffs the Day After Assuming Office in Violation of Their First Amendment Rights**

116.    After winning the election, but before taking office, Sheriff Reigenborn complained to a reporter about "the command staff that wants to continue to be loyal to Sheriff McIntosh."

117.    Sheriff Reigenborn took his oath of office on January 8, 2019.

118.    On January 9, 2019, through Judy Najera, Sheriff Reigenborn sent an email to ACSO personnel with the subject line "Policy Changes."

119.    The email stated that "as a newly elected Sheriff I plan to make some changes within the organization."

120.    The email further stated that "[m]y hope is that most employees will be able to move forward and contribute positively to my team. I am, however, anticipating that some employees may not remain in their current positions and may not retain their current salaries."

121.    The email went on to inform personnel that "[d]uring this transition time, it is necessary to rescind the employment and personnel policies of previous sheriffs."

122.    Affixed to the end of the email was Sheriff Reigenborn's electronic signature.

123.    The email also included an attached document entitled, "Notice to Sheriff's Office Employees Regarding Employment Policies."

124.    The Notice was dated January 8, 2019.

125.    The Notice informed ACSO staff that "Sheriff Reigenborn hereby rescinds any employment or personnel policies of former Sheriffs."

126.    The Notice further specified that "[a]ny policy regarding recruitment and

hiring, discipline of employees, termination of employees, and promotional processes are no longer valid."

127.    Accompanying the Notice was four new policies adopted by Sheriff Reigenborn, including an "At-Will Employment Policy and Termination Procedures," a "Recruitment and Promotion Policy," and a "Discipline and Investigations Policy."

128.    Sheriff Reigenborn's "At-Will Employment Policy and Termination Procedures" specified that, "[t]he Sheriff may terminate employees or revoke deputy appointments at will, with or without cause."

129.    Sheriff Reigenborn's "Recruitment and Promotion Policy" included language stating that, "[t]he Sheriff reserves the right to select managers and command staff within his Office. Promotions and the selection of managers and command staff will be solely at the Sheriff's discretion…Employees of the Sheriff's Office hired prior to Sheriff Reigenborn's term of office are not entitled to maintain their current rank, position, or salary. Determination of position and salary will be made by the Sheriff at his sole discretion."

130.    Sheriff Reigenborn's "Discipline and Investigations Policy" provided that employee discipline is at the "sole discretion" of the Sheriff, and that "there are no policies or procedures applicable to the disciplinary process other than the termination procedures set forth in [the "At-Will Employment Policy and Termination Procedures"]."

131.    Later in the day on January 9, 2019, Plaintiffs received substantially identical letters from Sheriff Reigenborn informing them of the end of their employment.

132.    In these letters, Sheriff Reigenborn stated: "I have my own vision for how to

best meet the needs and objectives of the Office. After careful review and deliberation, I do not believe retaining you is in the best interests of the organization. I intend to revoke your appointment with the Adams County Sheriff's Office."

133.   Sheriff Reigenborn further stated: "I am informing you of the anticipated termination of your employment and the opportunity to meet with me prior to your termination."

134.   Sheriff Reigenborn instructed Plaintiffs that if they wanted to meet with him prior to the end of their employment, they had to request to do so no later than noon on January 10, 2019, otherwise, "your termination will be effective at 8:00am on January 11, 2019."

135.   Finally, Sheriff Reigenborn informed Plaintiffs that "[e]ffective immediately, you are being placed on Administrative Leave."

136.   Thus, Plaintiffs were no longer "allowed in any secured or unsecured area of the Sheriff's Office without prior approval from Sheriff Reigenborn of his appointee."

137.   Plaintiffs all requested meetings pursuant to the instructions in the letters.

138.   On January 15, 2019, Plaintiffs each in turn met with Sheriff Reigenborn.

139.   To Chief Claps, Sheriff Reigenborn stated that "[f]or me, I just don't think that you're going to be able to change and be part of the culture that we're headed towards." Sheriff Reigenborn stated that, "I need to take the agency in a different direction and the only way I can do that is by making some cultural changes…It's just the only way that I can get the line troops to see that we're going in a different direction, is to truly just make us go in another direction and so…"

140.    These were the only reasons provided by Sheriff Reigenborn to Chief Claps as the basis for the termination.

141.    Sheriff Reigenborn offered Chief Claps the option of resigning.

142.    Because he would forfeit his retirement benefits if he did not accept, Chief Claps agreed to a resignation in lieu of termination.

143.    To Capt. Mitchell, Sheriff Reigenborn stated that "we're going in a different direction. We don't think that you fit where we are going."

144.    This was the only reason provided by Sheriff Reigenborn to Capt. Mitchell as the basis for the termination.

145.    When Captain Mitchell asked Sheriff Reigenborn to "explain that direction." Sheriff Reigenborn responded only, "I just did."

146.    When Captain Mitchell asked for an explanation about the "different direction," Sheriff Reigenborn stated only, "I don't need to tell you the direction."

147.    Towards the end of the meeting, Capt. Mitchell mentioned his political support of McIntosh.

148.    Specifically, Capt. Mitchell stated that, "…I just want to say one more thing before I walk out of here for the last time. You never heard anything negative from me ever about you in any way, shape or form through two campaigns, through the entire time that we worked together. Not once."

149.    To this statement, Sheriff Reigenborn replied, "[s]o we will agree to disagree on that."

150.    Sheriff Reigenborn offered Capt. Mitchell the option of resigning.

151.   Because he would forfeit his retirement benefits if he did not accept, Capt. Mitchell agreed to a resignation in lieu of termination.

152.   To Chief Coates, Sheriff Reigenborn stated that the basis for the termination was "about me moving the agency in a different direction…" and provided no other reason.

153.   Sheriff Reigenborn offered Chief Coates the option of resigning.

154.   Because he would forfeit his retirement benefits if he did not accept, Chief Coates agreed to a resignation in lieu of termination.

155.   To Cdr. Currier, Sheriff Reigenborn stated that the basis for the termination was "about me moving the agency in a different direction…"

156.   Sheriff Reigenborn did not describe that different direction.

157.   This was the only reason provided to Cdr. Currier for the termination.

158.   Sheriff Reigenborn offered Cdr. Currier the option of resigning.

159.   Because he would forfeit his retirement benefits if he did not accept, Cdr. Currier agreed to a resignation in lieu of termination.

160.   After ACSO ended their employment, Plaintiffs were offered financial severance only if they signed agreements conditioned on a full release of claims and a covenant to "keep . . . the circumstances leading to Employee's resignation [sic] strictly confidential. . ."

161.   Plaintiffs declined to sign the proposed severance agreements.

162.   Sheriff Reigenborn also took adverse actions, including demotion and/or termination, of a number of other dedicated McIntosh supporters.

163.    Simultaneously, Sheriff Reigenborn often filled these new vacancies with supporters of his campaign, many of whom lacked significant law enforcement background or expertise. For example:

a.      Mark Toth: Sheriff Reigenborn hired Toth as Division Chief of the Patrol Division. Toth was the former chief of the Mountain View Police Department, where Reigenborn also once worked. Under Toth's leadership, the Department gained a reputation for hiring officers who had been fired or forced to resign from other departments due to misconduct.

b.      Michael Bethel: Sheriff Reigenborn appointed Bethel as the Interim Division Chief of the Detective Division despite the fact that Bethel had previously been fired from the Pueblo Police Department for allegedly engaging in felony witness tampering relating to a sex tape featuring Bethel's wife and a suspect in a burglary case. Bethel now holds the position of Division Chief for the Professional Standards Division at ACSO.

c.      William Dunning: Sheriff Reigenborn made Dunning his "Chief-of-Staff," a position that had never existed before. He did so despite the fact that Dunning left ACSO in or about December 1994 or January 1995 and has not been employed in law enforcement since, instead working as an RV salesman and technician. The newly created Chief-of-Staff position is a highly paid civilian position with no defined job description. No similar position exists in any other sheriff's offices across the state. Dunning is a longtime friend of Sheriff Reigenborn and was active in both of Reigenborn's

campaigns.

d.      J.D. Cordova: Sherriff Reigenborn promoted Cordova to rank of Commander despite the fact that Cordova resigned from the Fort Collins Police Department in 2006 to embark on a career of finance and sales, and only retuned to law enforcement in 2016 as a Deputy in Denver. At the time of the promotion he had never held a supervisory position or worked for ACSO. But Cordova had served as Colorado State FOP President from 2000 – 2006 and administered FOP's Legal Defense Program thereafter.

e.      Glover Jarmin: Sheriff Reigenborn promoted Jarmin, a close personal friend, to rank of Commander even though Jarmin had only worked at ACSO for a short time.

## III.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Retaliation
### (All Plaintiffs against All Defendants)

164.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

165.    Defendants were acting under color of state law in their actions and inactions at all times relevant to this lawsuit.

166.    The First Amendment of the United States Constitution protects public employees from termination on the basis of their political speech, association, and beliefs.

167.    Plaintiffs Timothy James Coates, Gene Claps, Mark Mitchell, and Kevin Currier had a constitutionally protected and clearly established right to express criticism

of collective bargaining, of the FOP Lodge 1, and of the FOP Lodge 1's leadership, including, but not limited to, Reigenborn.

168.   Plaintiffs Timothy James Coates, Gene Claps, Mark Mitchell, and Kevin Currier also had a constitutionally protected and clearly established right to express support for the political campaign of McIntosh, to donate to him, to campaign for him, and to associate with him and others who supported his campaign.

169.   "Patronage . . . is inimical to the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 357 (1976) (internal quotations omitted).

170.   Defendants violated Plaintiffs' First Amendment rights by terminating them, or requiring Plaintiffs resign in lieu of termination, because of their political beliefs, opinions, expression, activity, and donation history for McIntosh, as well as their political association with McIntosh and his supporters.

171.   Defendants violated Plaintiffs' First Amendment rights by terminating them, or requiring Plaintiffs resign in lieu of termination, because of their criticism of the FOP, the leadership of FOP Lodge 1, and because they withdrew membership from FOP.

172.   When Defendant Sheriff Reigenborn fired Plaintiffs, or required they resign in lieu of termination, he was acting as a final policymaker and decision-maker for Defendant ~~ACSO~~Adams County.

173.   Defendants ~~ACSO's~~Adams County's and Reigenborn's actions deprived Plaintiffs of their federally protected First Amendment rights.

174.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiffs' federally protected rights.

175.    Defendants' conduct violated clearly established rights belonging to the Plaintiffs of which reasonable law enforcement and/or elected officials knew or should have known.

176.    Plaintiffs were and continue to be damaged by Defendants' violation of their First Amendment rights.

177.    As a direct result of Defendants' unlawful actions, Plaintiffs suffered actual economic and emotional injuries, in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Procedural Due Process**
(**All Plaintiffs Against All Defendants**)

178.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

179.    Defendants were acting under color of state law in their actions and inactions at all times relevant to this lawsuit.

180.    By their actions and inactions described herein, Defendants subjected Plaintiffs to the deprivation of their rights under the Fourteenth Amendment.

181.    Specifically, Plaintiffs had a right to procedural due process under the Fourteenth Amendment before being deprived of their jobs.

182.    Colorado state law requires that sheriffs must notify deputies of the reason for the proposed revocation of an appointment and shall give deputies an opportunity to be heard by the sheriff before revocation occurs.

183.    Colorado state law also requires that each sheriff adopt personnel policies for the review and revocation of appointments.

184.    Under the Fourteenth Amendment, Plaintiffs were entitled to notice of the charges against them and a hearing to plead their cases prior to termination.

185.    Defendants ~~ACSO~~Adams County and Reigenborn did not give Plaintiffs notice of the charges against them, nor did Plaintiffs have the chance to be heard before the decision to terminate occurred.

186.    Defendants ~~ACSO~~Adams County and Reigenborn did not adopt personnel policies for the review and revocation of appointments.

187.    To the extent that Defendants ~~ACSO~~Adams County and Reigenborn's "At-Will Employment Policy and Termination Procedures" purported to adopt personnel policies for the review and revocation of appointments, these policies were illusory and did not satisfy the requirements of C.R.S. § 30-10-506.

188.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiffs' federally protected rights.

189.    Defendants' conduct violated clearly established rights belonging to the Plaintiffs of which a reasonable sheriff and/or elected official knew or should have known.

190.   Plaintiffs were and continue to be damaged by Defendants' violation of their Fourteenth Amendment rights.

191.   As a direct result of Defendants' unlawful actions, Plaintiffs suffered actual economic and emotional injuries, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

a.      A declaration that Defendants have violated Plaintiffs' First and Fourteenth Amendment rights under the United States Constitution;

b.      Issuance of an injunction prohibiting Defendants and their agents from continuing to violate Plaintiffs constitutionally-protected rights;

c.      Actual economic damages as established at trial;

d.      Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

e.      Punitive damages for all claims allowed by law in an amount to be determined at trial;

f.      Front pay in lieu of reinstatement;

g.      Pre-judgment and post-judgment interest at the highest lawful rate;

h.      A tax offset for any damages award;

      i.       Attorneys' fees and costs; and

      j.       Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully Submitted: December 22, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Iris HalpernFelipe Bohnet-*

*Gomez*

Felipe Bohnet-Gomez
Iris Halpern
Siddhartha H. Rathod
Felipe Bohnet-Gomez
2701 Lawrence St., Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
fbg@rmlawyers.com
ih@rmlawyers.com
sr@rmlawyers.com
fbg@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS