1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3   Civil Action No. 20-cv-01936-STV

4   TIMOTHY JAMES COATES, et al.,

5        Plaintiffs,

6        vs.

7   BOARD OF COUNTY COMMISSIONS FOR THE COUNTY OF ADAMS,

8        Defendant.

9   ------------------------------------------------------------

10                 REPORTER'S TRANSCRIPT

11                   Trial, Vol. I

12  ------------------------------------------------------------

13        Proceedings before the HONORABLE SCOTT T. VARHOLAK,
    Magistrate Judge, United States District Court for the District
14  of Colorado, commencing on the 21st day of January, 2025, in
    Courtroom A402, United States Courthouse, Denver, Colorado.
15

16                   APPEARANCES
    For the Plaintiffs:
17  IRIS HALPERN, FELIPE S. BOHNET-GOMEZ, VIRGINIA BUTLER and
    SIDDHARTHA RATHOD, Rathod Mohamedbhai LLC, 2701 Lawrence
18  Street, Suite 100, Denver, Colorado 80205

19

20  For the Defendant:
    KATHERINE PRATT, CHRISTY REDMOND and SAUGAT THAPA, Thompson Coe
21  Cousins & Irons LLP, 1700 Broadway, Suite 900, Denver, Colorado
    80290
22

23
    Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street,
24  Denver, CO 80294, (303)335-2105

25

20-cv-01936-STV   Trial, Vol. I   January 21, 2025

```
 1                 P R O C E E D I N G S

 2          (Proceedings commenced at 8:42 a.m.)

 3          (In open court)

 4          THE COURT:  A couple things to take up before we bring

 5   our jury in.  First, I had asked the parties to talk about the

 6   length of the trial.  It is my understanding, you all think you

 7   can be done in seven days; is that accurate?

 8          MS. PRATT:  Yes, your Honor.

 9          THE COURT:  And as to the named defendant, we're going

10   with Board of County Commissioners?

11          MS. PRATT:  That's correct.

12          THE COURT:  The exhibits, there's been objections by

13   Plaintiff to Q, R, S, T and then A7 13, 14, 15, 16, 17, 18 and

14   19.  I think we're just going to have to take that up as we go

15   through to see whether or not you can lay a proper foundation

16   for those exhibits.

17          And then each side has objected to two exhibits -- no,

18   I'm sorry -- the Defendants have objected to three exhibits and

19   Plaintiff has objected to one exhibit for failure to disclose.

20          Have the parties reached any agreements on those

21   exhibits?

22          MS. BUTLER:  Your Honor, Plaintiffs are withdrawing

23   their Rule 37 objection.

24          THE COURT:  And Defendant?

25          MS. PRATT:  No, your Honor, we have not reached any
```

1   agreement with regard to the late disclosure of those.

2          THE COURT:  It's going to be Exhibits 109, 110 and

3   111; correct?

4          MS. PRATT:  That's correct.  Although, I believe

5   Plaintiffs' counsel has withdrawn at least 110 and 111, if I'm

6   not mistaken.

7          MR. BOHNET-GOMEZ:  That's correct.

8          THE COURT:  So it's just 109?

9          MS. PRATT:  That's correct.

10          THE COURT:  I think we can probably take that up at

11   the lunch hour, since it's just one exhibit.  And it's my

12   understanding it's just a question as to whether or not to

13   allow it.  And I doubt we're going to get through jury

14   selection and certainly not through jury selection and opening

15   before lunch, so why don't we plan to take that up at the lunch

16   hour.

17          The Plaintiffs have objected to Exhibits E, F, G and H

18   under the best evidence rule.  Preliminarily, I'm inclined to

19   overrule that objection.  I don't think the best evidence rule

20   applies, in regards to if a party is seeking to prove the

21   contents of a writing, recording or photograph, introduce the

22   original document or explain why it cannot be produced.  In

23   this case, it appears that the Defendant is seeking to prove

24   the content of a conversation, not the contents of any tape

25   recording.  And under the United States v. Boley, 730 F.2d at

1  1326 -- or excuse me, 730 F.2d 1326 at 1332, 1333, the Tenth

2  Circuit held that there's no violation where the government was

3  simply proving the contents of the conversation, not the

4  contents of the tape recording.

5          As to any further objections to the exhibits, I think

6  they're pretty -- we need to see.  Most of the remaining

7  objections are relevance objections, and I just need to see how

8  the evidence comes in order to rule on those.

9          Any stipulation of facts, if you have any as this case

10  proceeds, it should be formatted as a pleading and marked as

11  exhibits.

12          Are there any and have they been included with the

13  exhibits at this point?

14          MS. PRATT:  Yes, I believe so.  Yes, your Honor.  We

15  have included those as an exhibit.  Sorry, I don't have the

16  number.

17          THE COURT:  No, that's okay.

18          MS. HALPERN:  A20, I believe.

19          MS. PRATT:  Thank you.

20          THE COURT:  With respect to -- and I'm not going to

21  get too deep into closing instructions now, we'll deal with

22  that later at the charging conference -- but competing

23  Instruction Number 14 is no longer going to be given to the

24  jury.  That was the First Amendment free speech claim.

25          The remaining closing instructions, like I said, I'll

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    take a look at it as we move forward.

2            Let me ask, Plaintiffs have removed a discussion of

3    the FOP and the collective bargaining from the statement of the

4    case.  Are you planning to introduce any evidence regarding

5    union affiliation or collective bargaining?

6            MS. HALPERN:  Your Honor, it might come up in

7    testimony.  It's not going to be the crux of the claim.

8            THE COURT:  The reason I ask is competing instruction

9    on 15 of the free association claim, your proposed instruction

10    includes opposition to the FOP, which I have not ruled on.  The

11    question then is whether the Tenth Circuit applied the public

12    concern requirement from the test of freedom of association

13    claims, more specifically whether the association with the

14    union without a collective bargaining agreement, such as the

15    Fraternal Order of Police, triggers the collective public

16    concern prong.  If you're not going to introduce any of that, I

17    don't know if that becomes an issue with respect to that

18    closing instruction.

19            MS. HALPERN:  I think that's right, your Honor.

20            THE COURT:  Okay.  The second question I have, then,

21    with that -- and the reason I bring this up now is because I

22    may need some briefing on it -- both parties' proposed

23    instruction, asked the jury, not the Court, to decide the first

24    element of the free association claim, which is the Plaintiff

25    engaged in protected political beliefs, activity or

20-cv-01936-STV   Trial, Vol. I   January 21, 2025

1   association.  The question, though, is if we do apply the

2   public concern requirement to freedom of association claims,

3   does the Court need to decide as a matter of law what protected

4   political beliefs, activity or association is prior to

5   instructing the jury?

6           So I don't need an answer on this now.  It's not going

7   to be in the preliminary instructions.  But that's something

8   we're going to need once we get closer to the end of trial, for

9   the parties to be prepared to address.

10          With respect to the remaining preliminary

11  instructions, these are my rulings.  The first issue was the

12  parties dispute the statement of the case.  I have adopted a

13  modified version of Plaintiffs' proposed description of their

14  own case, some of the -- what I consider -- argumentartive

15  terms.

16          With respect to the Defendant's proposed description

17  of the case, I have adopted theirs, minus one.  The Defendant

18  contends that Sheriff Reigenborn would have discharged each

19  Plaintiff regardless of any alleged protected activity.  That

20  was the reading pursuant to my granting in the Plaintiffs'

21  motion in limine to exclude evidence of the same decision

22  affirmative defense.  And in any event, worded as it was, it

23  appeared more to be an affirmative defense to the free speech

24  claim, which is no longer part of the case.  I have retained

25  the language, The Defendant alleges that Sheriff Reigenborn's

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    decision was not motivated by party opposition to party

2    affiliation, union activity or other protected activity.  I

3    have also eliminated that Defendant contends it is not the

4    proper party in this case, because the Sheriff is a separate

5    legal entity from the County.  Again, that was deleted pursuant

6    to my earlier ruling.

7          The second issue is the parties dispute whether to

8    include a paragraph that specifies who the proper defendant is

9    and the issues the Court has already determined as a matter of

10   law.  And I'm adopting only the portion of Plaintiffs' proposed

11   instruction, which includes the explanation of who the proper

12   defendant is.  The rest of that, I think, is inconsequential.

13         The third issue is the parties dispute the elements of

14   the claim for First Amendment retaliation or free speech, that

15   was deleted pursuant to my ruling on Thursday.

16         The fourth issue is the parties dispute the third

17   element of the claim for First Amendment retaliation, free

18   association, i.e. whether the association was a substantial

19   motivating factor or whether the association was a motivating

20   factor in Defendant's decision to terminate Plaintiffs.  In

21   support of their proposed instructions, both parties rely upon

22   the Mt. Healthy case, in which the Supreme Court held that a

23   plaintiff must show that protected First Amendment, quote,

24   conduct was a substantial factor or, to put it in other words,

25   that it was a motivating factor in the Defendant's challenged

1    action.

2            Tenth Circuit precedent has used both proposed

3    formulations, i.e. substantial or motivating or substantial

4    motivating.  Compare Poindexter v. Board of County

5    Commissioners, 548 F.3d 916, 919, a Tenth Circuit decision from

6    2008, which required an employee to show political affiliation

7    and/or beliefs were substantial or motivating factors in a

8    demotion with Maestas v. Segura, 416 F.3d 1182 at 1187, a Tenth

9    Circuit decision from 2005, which used the phrase substantial

10   motivating.  But the Tenth Circuit's varying use or omission of

11   "or" is ultimately consequential.

12           In applying this test, the Supreme Court has equated

13   substantial factor with motivating.  In Maestas, the Tenth

14   Circuit used the phrase substantial motivating, but quoted Mt.

15   Healthy, which equated substantial factor with motivating

16   factor.  Because the Tenth Circuit has varied in its

17   application of the applicable standard, I find instructive the

18   instructions used in this district in pattern jury instructions

19   that other courts of appeals have used.  And I cite Nicastle v.

20   Adams County Sheriff's Office, 10-cv-00816, ECF No. 102-4, as

21   well as the pattern civil jury instructions for the Eleventh

22   Circuit, which used the phrase motivating factor.

23           As a result, to eliminate potential confusion with the

24   terms, substantial and motivating have different meanings, I

25   will follow the Eleventh Circuit pattern instruction using only

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    the word motivating.

2         Accordingly, the third element reads, quote, Any of

3    the Plaintiffs' political beliefs, activity or association was

4    a motivating factor in Mr. Reigenborn's decision to discharge

5    the Plaintiff.

6         Issue number five is the parties dispute the

7    description of the political loyalty affirmative defense.  I

8    have adopted a modified version of Defendant's preliminary

9    instruction.  Plaintiffs' proposed instruction misstates the

10   political loyalty instruction by phrasing it as a, quote,

11   essential requirement for the effective performance of the

12   position held by the Plaintiff.  But the correct standard is

13   whether it was, quote, an appropriate requirement.  That's

14   Snyder v. City of Moab, 354 F.3d 1179 at 1185, a Tenth Circuit

15   decision from 2003.

16        Finally, issue number six is the parties dispute the

17   portion of the instruction related to credibility of witnesses.

18   I have adopted a modified version of Defendant's proposed

19   preliminary instruction.  Plaintiffs' instruction is the same

20   in all material respects, it adds some phrases.

21        So that's my ruling on the preliminary instructions.

22        Anything that we need to take up before we bring the

23   jury down?

24        MS. PRATT:  Yes, your Honor.  I have two minor issues.

25        One, with respect to sequestration, I think we already

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

 1    talked about this, but I want to make sure we have a

 2    sequestration order by the Court now that the trial has begun.

 3         THE COURT:  Yes.

 4         MS. PRATT:  And then with regard to people at counsel

 5    table, it would be completely impractical to have the Board of

 6    County Commissioners seated at counsel table with us.  So I

 7    would like to ask the Court to instruct Plaintiffs' counsel not

 8    to mention that to the jury.

 9         THE COURT:  Any objection?

10         MS. HALPERN:  No objection.  We weren't going to

11    mention that.

12         MS. PRATT:  Okay.

13         THE COURT:  With regard to the sequestration order,

14    obviously, each of the Plaintiffs can remain and whoever your

15    witness is can remain.  And then I just ask the parties to keep

16    an eye on -- I'm not going to know if they're a witness or if

17    they're just a member of the public, so if somebody rolls in,

18    I'm not going to know.  But if you see somebody who you all

19    know is a witness and they're in here, notify me.

20         Anything further before we bring them in?

21         MS. PRATT:  No.

22         THE COURT:  Let's go get our jury.

23         Let me ask, while we're getting the jury, I know the

24    IT personnel are sitting there.  There's going to be jurors

25    sitting behind them.  Is that going to create any issue with

20-cv-01936-STV   Trial, Vol. I   January 21, 2025

1    those jurors being able to see anything?

2          MR. HEETER:  I won't have anything pertaining to this

3    case pulled up.

4          THE COURT:  It won't be an issue once we have the jury

5    selected, because then there won't be anybody behind you, but

6    while we select them there's going to be.

7          THE DEPUTY CLERK:  Would you like to take a recess,

8    your Honor?

9          THE COURT:  Sure.  We'll be in brief recess.

10         (Recess)

11         (Voir Dire conducted)

12      (A jury of 9 was impaneled and sworn)

13         THE COURT:  Members of the jury, before we break for

14   lunch, I have some preliminary instructions to give you.  Pay

15   attention to these, it will probably take about 20 minutes,

16   right about the lunch hour, and then we'll break for lunch.

17         Before we begin the trial of the case you heard about

18   during jury selection, I will provide you some preliminary

19   instructions to help you understand how the trial will proceed

20   and how you must conduct yourselves during the trial.  At the

21   end of the trial, I will give you more detailed guidance on the

22   law and on how you will go about reaching your decision.

23         Timothy James Coates, Gene Claps, Mark Mitchell and

24   Kevin Currier bring a civil action against the Board of County

25   Commissions for the County of Adams.  I will sometimes refer to

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    Timothy James Coates, Gene Claps, Mark Mitchell and Kevin

2    Currier as the Plaintiffs.  And I will sometimes refer to the

3    Board of County Commissioners for the County of Adams as Adams

4    County or the County or the Defendants.  The Plaintiffs,

5    Timothy James Coates, Gene Claps, Mark Mitchell and Kevin

6    Currier are represented by Felipe Bohnet-Gomez, Iris Halpern,

7    Siddhartha Rathod and Virginia Butler.  Adams County is

8    represented by Katherine Pratt, Saugat Thapa and Christy

9    Redmond.

10          Plaintiffs allege the following:  Timothy James

11   Coates, Gene Claps, Mark Mitchell and Kevin Currier were career

12   law enforcement officers who spent decades working at the Adams

13   County Sheriff's Office.  In 2014 and again in 2018, they

14   opposed the candidacy of Richard Reigenborn for Adams County

15   Sheriff and publicly supported his opponent, Michael McIntosh.

16          In 2014, Michael McIntosh won the race for Adams

17   County Sheriff.  In 2018, Richard Reigenborn won the race for

18   Adams County Sheriff.

19          After Mr. Reigenborn took his oath of office,

20   Plaintiffs were discharged from their positions.  Plaintiffs

21   allege that their terminations were unlawfully motivated by

22   their political affiliation in violation of their First

23   Amendment right under the United States Constitution.

24          Defendant alleges the following:

25          Upon taking office, former Adams County Sheriff,

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    Richard Reigenborn, decided to make personnel changes within

2    the upper management team of the department he was elected to

3    lead.  Defendant's position is that this was an appropriate

4    exercise of then Sheriff Reigenborn's authority as Sheriff and

5    that former Sheriff Reigenborn's decision to terminate the

6    Plaintiffs' employment was not motivated by party affiliation

7    or political activity.  Defendant alleges that former Sheriff

8    Reigenborn's decision to terminate Plaintiffs' employment was

9    not motivated by Plaintiffs' opposition to union activity and

10    collective bargaining.  Defendant contends that each

11    Plaintiffs' employment required loyalty.

12              This is the end of the parties' description of the

13    case.

14              Burden of proof means the obligation a party has to

15    prove his or her claims.  The party with the burden of proof

16    can use evidence produced by any party to persuade you.  You

17    might have heard proof beyond a reasonable doubt.  This is the

18    standard for criminal proceedings and is not the burden of

19    proof in civil proceedings.  Because this is a civil case, the

20    burden of proof is by a preponderance of the evidence.

21              Under a preponderance of the evidence standard, each

22    Plaintiff has the burden of proving his claims, which require

23    him to prove every such element of claims by a preponderance of

24    the evidence.  Defendant has the burden of proving each of the

25    elements of an affirmative defense by a preponderance of the

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    evidence.

2          Preponderance of the evidence is evidence sufficient

3    to persuade you that a fact is more likely present than not

4    present.  In other words, a preponderance of the evidence means

5    such evidence as, when considered and compared with the

6    evidence opposed to it, has more convincing force and produces

7    in your minds a belief that what is sought to be proved is more

8    likely true than not true.  The standard does not require proof

9    to an absolute certainty because proof to an absolute certainty

10   is seldom possible in any case.  If a party fails to prove its

11   claim by a preponderance of the evidence or if the evidence

12   weighs so evenly that you are unable to say that there is a

13   preponderance on either side, you must reject that claim or

14   defense.

15         I will now provide some preliminary instructions on

16   the elements of the claim in this case.  Before I do so,

17   however, I instruct you that the Court has already determined

18   that Adams County, through its Board of County Commissioners,

19   is the proper defendant in this case.  Therefore, I'm

20   instructing you that Mr. Reigenborn's conduct, actions and

21   statements with respect to each claim are attributed to the

22   Board of County Commissioners and the County of Adams.

23         The First Amendment to the United States Constitution

24   protects public employees from discrimination based upon their

25   political beliefs, affiliation or nonaffiliation, and

1    government employers must not retaliate against their employees

2    for exercise of this right.  In this case, each Plaintiff

3    claims that the County of Adams through the actions and conduct

4    of Mr. Reigenborn violated his Constitutional right to free

5    association by terminating his employment because of his

6    political beliefs, affiliation or nonaffiliation.

7            In order for a Plaintiff to recover on this claim

8    against Defendant, he must prove each of the following by a

9    preponderance of the evidence:

10           First, the Plaintiff engaged in protected political

11   beliefs, activity or association;

12           Second, Mr. Reigenborn, as then Sheriff of Adams

13   County, took an adverse action under Colorado State Law;

14           And third, any of the Plaintiff's political beliefs,

15   activity or association was a motivating factor in

16   Mr. Reigenborn's decision to discharge Plaintiff.

17           Not all three elements of the Plaintiffs' First

18   Amendment claim are before you to decide today; only the first

19   and third elements are questions you must answer.  I have

20   already ruled that Plaintiffs' were discharged, resulting in an

21   adverse employment action toward Plaintiff, and that this was

22   under color of state law.  You must accept that fact as proven.

23           Furthermore, you will be provided instructions about a

24   defense to Mr. Reigenborn's conduct that the Defendant has

25   raised.  It's called an affirmative defense.  Therefore, in

20-cv-01936-STV    Trial, Vol. I    January 21, 2025                    16

1    this case, even if you find that Plaintiff has proven all of

2    the elements of his claim by a preponderance of the evidence,

3    you must find for the Defendant if it proves by a preponderance

4    of the evidence that political loyalty or allegiance to

5    Mr. Reigenborn was an appropriate requirement of Plaintiffs'

6    performance and Plaintiffs' position.

7         Once I finish providing you this instruction, counsel

8    for the parties will deliver their opening statement.  Counsel

9    for the Plaintiffs will tell you about the evidence that

10   Plaintiffs intend to put before you for this trial.  The

11   opening statement, however, is not evidence.  Its purpose is

12   only to help you understand what the evidence will be.  It is a

13   roadmap to show you what is ahead.  After Plaintiffs' opening

14   statement, counsel for Defendant will make an opening

15   statement, which also is not evidence.  After these opening

16   statements, evidence will be presented from which you will have

17   to determine the facts.

18        The evidence consists of:

19        One, the sworn testimony of witnesses on both direct

20   and cross-examination, regardless of who called the witness.

21   Depositions may also be received in evidence.  Depositions

22   contain sworn testimony with the lawyers for each party being

23   entitled to ask questions.  Deposition testimony should be

24   judged by you subject to the same instructions applied to

25   witnesses testifying in open court.

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1          Two, documents and other things received into evidence

2    is evidence.

3          And three, facts on which the lawyers agree or which I

4    instruct you to accept as true.

5          Plaintiffs will offer their evidence first and counsel

6    for Defendant may cross-examine the witnesses.  After

7    Plaintiffs have finished presenting the evidence, Defendant may

8    choose to present evidence, but it is not required to produce

9    any evidence or call any witnesses because, as explained

10   earlier, each Plaintiff has a burden to prove its claims by a

11   preponderance of the evidence.  Counsel for Plaintiffs may

12   cross-examine any witness called by Defendant.  If Defendant

13   submits evidence, Plaintiffs may then introduce rebuttal

14   evidence.

15         Due to the witness' schedules, Defendant may call a

16   witness during Plaintiffs' presentation of evidence or

17   Plaintiffs may call a witness during Defendant's presentation.

18   Similarly, because some of Defendant's witnesses are the same

19   as Plaintiffs' witnesses, counsel for Defendant may directly

20   examine Plaintiffs' witnesses during Plaintiffs' case.  You are

21   to treat this testimony the same as other testimony offered by

22   that party during its presentation of witnesses.

23         At times during the trial, a lawyer may make an

24   objection to a question asked by another lawyer or to an answer

25   by a witness.  This simply means that the lawyer is requesting

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    that I make a decision on a particular rule of law.  Do not

2    draw any conclusion for such objections or my rulings on the

3    objections.  When I sustain an objection, I am excluding that

4    evidence from this trial for a good reason.  When I overrule an

5    objection, I am permitting that evidence to be admitted into

6    evidence.  If I sustain an objection to a question, the witness

7    may not answer.  Do not attempt to guess what answer might have

8    been given if I had allowed the answer.

9         If I tell you not to consider a particular statement,

10   you may not refer to that statement in your later

11   deliberations.  Similarly, if I tell you to consider a

12   particular piece of evidence for a specific purpose, you may

13   consider it only for that purpose.  If I overrule the

14   objection, treat the answer as any other.

15        It is a parties' duty to object when the other side

16   offers testimony or other evidence that the party believes is

17   inadmissible.  You should not be unfair or impartial against an

18   attorney or the attorneys' client because the parties made an

19   objection.  You should not infer or conclude from any ruling or

20   other comment I make that I have any opinions on the merits of

21   the case favoring one side or the other.  I do not favor one

22   side or the other.

23        Ordinarily, the attorneys will develop all the

24   relevant evidence that will be necessary for the jury to reach

25   a verdict.  During the course of a trial, I may have to

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    interrupt the proceedings to confer with the attorneys about

2    the rules of law that should apply.  Sometimes we will talk

3    briefly at the bench, you have seen some of those already.  But

4    some of these conferences may take more time, so I will excuse

5    you from the courtroom.  I will try to avoid such interruptions

6    whenever possible, but please be patient if the trial seems to

7    be moving slowly, because conferences often actually save time

8    in the end.  You should not speculate about the content of the

9    conferences, try to overhear them or draw any inferences about

10   the case from them.

11        During the course of the trial, I may ask a question

12   of a witness.  If I do, it does not indicate I have any opinion

13   about the facts of the case.  I am only trying to bring out

14   facts that you may consider.  You should not place emphasis on

15   any question asked by me or try to draw any conclusions about

16   my views on the case based upon any such questions.

17        In rare situations, a juror may think that a question

18   is critical to reaching a decision regarding a necessary

19   element of the case.  Prior to dismissing each witness from the

20   stand, I will ask you whether anyone has any questions for that

21   witness.  In the exceptional circumstance where you believe the

22   question is critical, you may write out the question for me to

23   consider in consultation with the lawyers.  If it is determined

24   to be a proper and necessary question, I will ask it.  If I do

25   not ask it, you should recognize that I have determined it is

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    not a legally appropriate question, and you should not worry

2    about why it was not asked or the answer that would be given.

3            You are to consider all of the evidence received in

4    this trial, but you may only consider the evidence presented

5    during the trial and the reasonable inferences that may be

6    drawn from that evidence.  An inference is a deduction or

7    conclusion that reason and common sense lead the jury to draw

8    from other facts that have been proved.

9            There are, generally speaking, two types of evidence

10    on which a jury may properly determine the facts of a case.

11    One is direct evidence, such as a testimony of an eyewitness

12    about what they directly saw, heard or did.  The other is

13    indirect or circumstantial evidence, that is the proof of a

14    chain of facts that point to the existence or nonexistence of

15    certain other facts.  As a general rule, the law makes no

16    distinction between direct and circumstantial evidence.  The

17    law simply requires that you find the facts in accord with all

18    the evidence in the case, both direct and circumstantial.

19            You are the sole judges of the credibility of the

20    witnesses and the weight to be given to their testimony.  An

21    important part of your job will be making judgments about which

22    witnesses to believe and which witnesses not to believe.  You

23    should take into consideration knowledge, strength of memory

24    and opportunities for observation, the reasonableness or

25    unreasonableness of their testimony, the consistency or lack of

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    consistency in their testimony, their motives, whether their

2    testimony has been contradicted or supported by other evidence,

3    their bias, prejudice or interest, if any, their manner or

4    demeanor upon the witness stand and all other facts and

5    circumstances shown by the evidence which affect the

6    credibility or believability of the witness.  Based upon these

7    considerations, you may believe all, part or none of the

8    testimony of a witness.

9          The weight of evidence is not necessarily determined

10   by the number of witnesses testifying to a particular fact.

11   The law does not require any party to call as witnesses all

12   persons who may have been present at any time or place involved

13   in a case or who may appear to have some knowledge of the

14   matters at issue at this trial, nor does the law require any

15   party to produce as exhibits all papers and things mentioned

16   during the trial.

17         Ultimately, it will be up to you to decide what

18   evidence is believe and how much of any witness' testimony to

19   accept or reject.  During the trial, however, you should keep

20   an open mind and should not form or express any opinion about

21   the case until you have heard all of the testimony and

22   evidence, the attorneys' arguments and my closing instructions

23   to you on the applicable law.

24         After you have heard all the evidence on both sides, I

25   will instruct you on rules of law that you will use to reach

1    your verdict.  Plaintiffs and Defendant will then each be given

2    time for their final arguments.

3           During the course of the trial, you should not talk

4    with any witness, with either of the parties or with any of the

5    lawyers at all.  Similarly, the witnesses, parties and

6    attorneys are not allowed to speak with you during the trial.

7    If you see them at recess or pass them in the halls and they do

8    not speak to you, they are not being rude or unfriendly, they

9    are simply following the law.

10           In addition, during the course of the trial, you must

11    not talk about the trial or any of the participants in the

12    trial with anyone else, including your family, friends and

13    fellow jurors.  Do not discuss the case or any of the parties,

14    witnesses or attorneys with anyone or provide any information

15    during the trial or the participants with anyone outside of the

16    courtroom until the verdict is received.  Do not use the

17    internet, mobile devices, social media or any other form of

18    electronic communication to research or provide any information

19    about the trial and its participants.  Simply put, do not

20    communicate with anyone or conduct your own research regarding

21    the trial or its participants until after your verdict in this

22    case.  You may only tell people you are a juror in the case and

23    I have instructed you not to tell them anything else about the

24    case until I have discharged you.

25           Further, you should not make up your own mind about

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

1    what the verdict should be or discuss the case among yourselves

2    until you have heard all of the evidence, have been instructed

3    on the law and have gone to the jury room to make your decision

4    at the end of the trial.  It is important that you wait until

5    all of the evidence is received and you have heard my

6    instructions on the controlling rules of law before you reach

7    any conclusions or deliberate among yourselves.  Keep an open

8    mind until then.

9          Allow me to emphasize that, during the course of the

10   trial, you will receive all of the evidence you properly may

11   consider to decide the case.  Because of this, you should not

12   attempt to consider any information or do any research on your

13   own.  Do not attempt to visit any places mentioned in the case,

14   either actually or on the internet.  Do not in any other way

15   try to learn about the case outside the courtroom.  Violation

16   of these instructions could cause a mistrial, meaning all of

17   our efforts over the course of the trial would have been wasted

18   and we would have to start all over again with a new trial

19   before a new jury.  If you were to cause a mistrial by

20   violating this order, you would be subject to paying all the

21   costs of these proceedings and you could also be punished for

22   contempt of court.  I expect you will tell me immediately if

23   you become aware of another juror's violation of these

24   instructions.

25         The court reporter will be making stenographic notes

20-cv-01936-STV    Trial, Vol. I    January 21, 2025

 1    of everything that is said during the trial.  This is basically

 2    to assist in the resolution of any appeals.  However, a

 3    typewritten copy of the testimony will not be available for

 4    your use during deliberations.  So please listen to the

 5    evidence carefully.  Any exhibits received into evidence,

 6    however, will be available to you during your deliberations.

 7            If you would like to take notes during the trial, you

 8    may.  On the other hand, you are not required to take notes.

 9    If you do decide to take notes, be careful not to get so

10    involved in note taking that you become distracted, and

11    remember that your notes will not necessarily reflect exactly

12    what was said, so your notes should be only used as memory

13    aids.  Therefore, you should not give your notes precedence

14    over your independent recollection of the evidence.  You should

15    also not be unduly influenced by the notes of other jurors.  In

16    your deliberations, give no more nd no less weight to the views

17    of a fellow juror because that juror did or did not take notes.

18    If you did take notes, leave them in the jury room at night and

19    do not discuss the contents of your notes until you begin

20    deliberations.  We will make sure the jury deliberation room is

21    locked after you leave in the evening and unlocked before you

22    arrive in the morning.

23            Now that the trial has begun you must not discuss the

24    case with anyone and must not read about it in the media or on

25    the internet.  The reason for this is because your decision in

1    the case must be based solely on the evidence presented at the

2    trial.

3              With that, before we begin opening statements, we will

4    take our lunch recess.  There's a few things we need to take up

5    amongst the attorneys during his lunch recess, so let's take a

6    slightly longer break and let's have you all back by 1:15 p.m.

7    and you'll hear opening statements and we'll begin the

8    presentation of evidence.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury not present)

2            THE COURT:  I need to grab my notes.  I know we need

3    to take up the exhibit that you're challenging and you want in.

4    Let me grab my notes on that, and we'll take anything else up

5    and then we'll break for lunch.

6            So the challenge is to Exhibit 109 as being untimely

7    disclosed.

8            Let me ask, what is it and when did you receive it?

9            MS. PRATT:  Exhibit 109, your Honor, is an apology

10   letter from a witness, Tommie McLallan, the former

11   Undersheriff, to the employees of Adams County Sheriff's Office

12   pertaining to criminal charges that were brought and then he

13   has subsequently pled guilty to.  So that exhibit simply

14   didn't -- it never existed during the course of discovery of

15   this case, given the pendency -- the life of the pendency of

16   this case.

17           And we also feel that it would be unduly prejudicial

18   for the jury to see and have this admitted into evidence as to

19   Mr. McLallan.

20           So it was both late produced, given that he literally

21   just pled guilty, I believe, within the last several months.

22   So this document has only been in our possession for a few

23   months.

24           THE COURT:  Let me hear from Plaintiffs.

25           MS. BUTLER:  Your Honor, Mr. McLallan pled guilty in

1    January of 2024, and this was included in Plaintiffs' eleventh

2    supplemental disclosure on March 28th of 2024, a description of

3    the document.  And then it was produced to defense counsel on

4    December 16th of 2024.  So they have been aware of the

5    existence of this document since March of 2024, and there's --

6    yes, this document didn't exist in discovery, that's because

7    there had been -- a lot of time has elapsed between when

8    discovery in this case took place and where we are now because

9    of various things that have happened in the case, but that

10   doesn't mean that these exhibits are inadmissible, because they

11   have been produced in a timely manner and under -- I don't

12   think that under Rule 37 or any of the Woodworker's factors

13   defense counsel can show any type of prejudice to themselves.

14   And they were able to use it in trial preparations.

15           THE COURT:  Why wasn't it -- I mean, you were aware of

16   it in March, or you disclosed the existence of it in March, why

17   wasn't the document turned over?

18           MS. BUTLER:  Your Honor, we didn't have it in our

19   possession.  We knew that it existed, but we didn't have it in

20   our possession until more recently.  Part of the apology letter

21   was a condition of his plea agreement, I believe, that he write

22   this apology letter, so we knew that it would exist, and that's

23   why we disclosed it.  But we didn't have it in our possession

24   until more recently, which is when we disclosed its contents as

25   an actual exhibit.

```
 1         THE COURT:  Address the prejudice component.  If you
 2   knew about it in March -- put aside whether this document is
 3   unduly prejudicial, I am not going to rule on that, at this
 4   point, I need to see how it plays out -- but the prejudice from
 5   any late disclosure.
 6         MS. PRATT:  Right.  The prejudice that I see from late
 7   disclosure, your Honor -- and I still don't have a clear
 8   understanding of when Plaintiffs' counsel actually obtained
 9   this document -- the fact that they produced it to us in
10   December, when we were already well on our way to trial
11   preparation, I think does result in some prejudice to the
12   defense.  And I similarly don't have a clear understanding of
13   when they obtained the document versus when they provided it to
14   us.
15         THE COURT:  You can answer that.  When did you get
16   custody of this?
17         MS. BUTLER:  Your Honor, I don't have the exact date
18   of when we obtained the document, but it was shortly
19   thereafter.  It's not like we have been sitting on this
20   document since March.  I believe we obtained the document in
21   December -- and my co-counsel can correct me if I am wrong --
22   but I believe we disclosed it shortly thereafter.
23         MR. BOHNET-GOMEZ:  Yes, your Honor.  It would have
24   been, at most, two to three days of actually sending them the
25   copy.
```

 1          THE COURT:  Did you have access to the document

 2  before?

 3          MS. PRATT:  Before what time?

 4          THE COURT:  Before that December disclosure.  They

 5  made you aware of it, did you have --

 6          MS. PRATT:  No, your Honor.

 7          THE COURT:  Was this part of the criminal --

 8          MS. PRATT:  That's my understanding.  And we certainly

 9  had no involvement in any of the criminal proceedings

10  pertaining to Mr. McLallan.  And I did not have any sort of

11  access to Mr. McLallan.  He was a represented party at that

12  time, it would have been inappropriate for me to reach out to

13  him.  And no, we simply did not have any contact with him.

14          THE COURT:  My discovery close in this case came

15  before that March letter was even in existence; is that

16  correct?

17          MS. PRATT:  That's my recollection, your Honor,

18  although I was not involved in any of the discovery in this

19  case, so yes.

20          THE COURT:  Is that correct?

21          MR. BOHNET-GOMEZ:  Yeah, so the discovery period would

22  have been at least a year closed at that point.

23          THE COURT:  I'm going to take that under advisement,

24  and I will come back out after the lunch break and issue my

25  order on the Woodworker's component of it.  I'm not going to

1    exclude it at this point based upon it being unduly

2    prejudicial.  I need to see how the evidence comes in on the

3    case.  And my thoughts -- but I'll let you all address it when

4    it comes up -- is that portion of the prejudice, again, not the

5    Woodworker's prejudice, but the unduly prejudicial, the

6    prejudice is the conduct that he committed less so than --

7    which I have already ruled can come in -- less so than perhaps

8    the apology letter, but I will look at the apology letter

9    myself and we'll take that up as we get to that point.  But I'm

10   going to take that under advisement, the Woodworker's

11   component, the factors, and I'll give you my ruling on that

12   before we bring the jury in.

13           Anything else we need to take up before we break?

14           I am seeing a bunch of nos.  We're good.  I appreciate

15   the efficiency picking the jury.  I typically do get a jury

16   before lunch.  I thought this one was going to much more

17   controversial, but we didn't have a lot of strikes for cause.

18   If everybody could be back here 5 after 1:00 p.m. or so, I'll

19   give you my ruling on the exhibit, and that way the jury is not

20   waiting.

21           (Lunch recess)

22           (Continued on next page)

23

24

25

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

```
 1                       AFTERNOON SESSION

 2                          1:12 p.m.

 3        (In open court; jury not present)

 4            THE COURT:  Before we bring the jury in, I'm prepared

 5    to rule on Exhibit Number 109.  First, I'm not sure there's

 6    been any improper delay with disclosing this document.  It was

 7    disclosed after discovery.  It was created after discovery.

 8    It's a document that didn't exist when the discovery took place

 9    here.  The existence of it was disclosed shortly after the

10    Plaintiffs learned of the exhibit.  The copy of the exhibit --

11    which again, I'm not sure whether that exhibit would have been

12    responsive to any of the discovery requests, requests for

13    production, so I'm not sure they had an actual obligation to

14    disclose the document itself until the exchange of exhibits in

15    this case -- but in any event, there were representations made

16    that they didn't actually receive it themselves until shortly

17    before the disclosure of the actual document occurred.  So I

18    don't think that there's been any discovery violation.  But

19    even to the extent it was, under Woodworker's Supply v.

20    Principal Mutual Insurance Company, 170 F.3d 985 at 993, I

21    would still allow the admission of the exhibit.

22            The first issue is whether there's been prejudice or

23    surprise, here.  Again, the existence of it has been disclosed

24    for nearly 10 months now.

25            Two, the ability of the party to cure the prejudice.
```

1   Had Defendant sought to, they could have attempted to reopen

2   discovery to -- I don't know what exactly I would do with it,

3   but perhaps question the individual who created the apology

4   letter.

5          Three, to the extent which introducing such evidence

6   would disrupt the trial.  And again, had it been all that

7   important, I'm not sure that -- I may have considered reopening

8   the discovery back in March.  But in any event, I don't think

9   it would have disrupted the trial, and there's been no showing

10  of willfulness.

11         So I am going to permit it, Exhibit 109 to be

12  introduced, again, subject to a 403 analysis, whenever we get

13  there.

14         Can we bring our jury in?

15         MS. PRATT:  Not just yet, your Honor.  We do have

16  another slight issue to raise.  Just at the lunch break, at

17  noon, I was handed a copy of a demonstrative chart that the

18  Plaintiffs have indicated they would like their clients to fill

19  out while on the stand testifying.  I have a couple of

20  objections to this.  And I apologize for the late notice, but I

21  just got it myself about an hour ago.

22         THE COURT:  Okay.

23         MS. PRATT:  The problem I have with this potential

24  demonstrative are threefold.  First off, they're going to need

25  to show that they can lay a proper foundation to demonstrate

1    why this demonstrative would assist the jury in understanding

2    the evidence.  The other problem that I have with this is I

3    think it's an improper attempt at a Rule 1006 summary, and they

4    would need to show that the evidence is simply too voluminous

5    to be properly put in front of the jury.  And I don't think

6    that's the case here.  There's things like wage statements, tax

7    returns that go to Plaintiffs' alleged damages in this case.

8          And then, finally, to the extent that this is a

9    demonstrative, it was just handed to me at noon today, which I

10   think is a late disclosure.

11         THE COURT:  What is it?

12         MS. PRATT:  It's a chart, your Honor.  I would be

13   happy to approach.

14         THE COURT:  If it was just disclosed to you moments

15   ago, it's not been disclosed to me either.

16         Why is this just being disclosed now?

17         At the trial preparation, I asked whether there were

18   demonstratives and asked the parties to disclose them.

19         MS. HALPERN:  Your Honor, I guess we didn't

20   conceptualize this as a demonstrative.  We were just going to

21   help -- they're going to be testifying to their damages.  We

22   were going to just basically write what they testify to like on

23   the Elmo.  It's not being introduced as an exhibit or anything

24   like that, as a substantive exhibit.  It's just to organize

25   information.

                                                                        34

 1           THE COURT:  I'll take it under advisement.  I'm not

 2    sure it's demonstrative, but I need to think about it.

 3           MS. HALPERN:  So, your Honor, just to -- you have it

 4    in front of you.  We're just going to walk them through what

 5    their salaries were every year, what their bonuses were, any

 6    healthcare costs, and then total it just so that the jury can

 7    follow it.

 8           THE COURT:  And you are certainly able to do that.

 9    The question is then introducing it on here.  I need to think

10    about it.

11           Let's bring the jury in.  We're not going to get to it

12    before the afternoon break anyway, because I'm guessing that

13    the afternoon break, let's say, is at 2:45 p.m., 3ish, it's an

14    hour and 45 minutes, I'm guessing openings are going to be a

15    combined hour, and then I don't think the first thing you are

16    going to ask -- even if you call one of your clients first,

17    this is isn't the first thing you're going to introduce.  So

18    I'll take it up at the afternoon break.

19           Do you want this?

20           MS. PRATT:  Yes, your Honor.  I'll take that back.

21    Thank you.

22           THE COURT:  Let's get our jury.

23           I'll ask counsel, I know we have a lot of people in

24    the room, I don't know who all of them are.  Again, I am

25    leaving it to you all to make sure that the sequestration order

 1    I have entered, that there's no issue with it.

 2              (Continued on next page)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Opening - Mr. Bohnet-Gomez

1        (In open court; jury present)

2        THE COURT:  Members of the jury, we will now begin our

3   opening statements.  I want to remind you, opening statements

4   are not evidence.

5        With that said, Plaintiffs may present their opening

6   statement.

7        MR. BOHNET-GOMEZ:  On January 9th, 2019, four senior

8   officers of the Adams County Sheriff's Office stood in the

9   parking lot with a box of their personal belongings waiting for

10  a ride home.  That morning, they were handed termination

11  letters telling them to turn in their badge and leave.  Their

12  careers were over.

13        These weren't rookies.  Together, they had given more

14  than 100 years of combined service to Adams County.  They had

15  worked their way up through every rank, serving under

16  Republican sheriffs and Democrat Sheriffs alike.

17        These weren't political appointees.  They were career

18  law enforcement officers.

19        They weren't fired because of performance.  They

20  weren't fired because they were old school.  They weren't fired

21  because they did anything wrong.  They were fired because of

22  who they voted for, who they supported in the last election.

23  That violates the First Amendment, which protects public

24  employees' right to freely support the candidate of their

25  choice, not their boss' choice.  That's what this case is

Opening - Mr. Bohnet-Gomez

 1    about.

 2            Because law enforcement officers must enforce the law

 3    equally and fairly, regardless of politics, regardless of

 4    personal relationships, regardless of who supported who in the

 5    last election.  But none of that mattered to Rick Reigenborn,

 6    who had just taken office as Sheriff the day before.

 7            His first act was to throw out all the agency's

 8    employment policies.  His second act was to fire these four

 9    experienced officers, who had supported his opponent in the

10    election.  No internal affairs investigation, no issues brought

11    up, no explanation.

12            The man who fired them, Rick Reigenborn, claims these

13    terminations had nothing to do with politics.  But you will see

14    that Sheriff Reigenborn abused his power to settle political

15    scores, then tried to hide the truth behind shifting,

16    after-the-fact explanations and vague stories about culture and

17    vision.

18            Let me introduce these officers to you again.

19            Timothy Coates, could you please stand.  Mr. Coates

20    spent 35 years in law enforcement, most of it with Adams

21    County.  Starting as a patrol officer, he rose up through every

22    rank to become division chief of the detective division.  In

23    the Sheriff's Office a chief is two ranks below the Sheriff.

24            Sheriff Claps, could you please stand.  Gene Claps

25    gave over 22 years to Adams County, rising from deputy to

Opening - Mr. Bohnet-Gomez

1   division chief of the jail division.  He was elected Adams

2   County Sheriff after Rick Reigenborn.  You'll hear more about

3   that.

4            Mark Mitchell, could you please stand.  Mr. Mitchell

5   served Adams County for 29 years, ending up as a captain in the

6   patrol division.  Captain was three ranks below the Sheriff.

7            Kevin Currier, could you please stand.  Mr. Currier

8   dedicated 24 years to Adams County and was a commander in the

9   detective division when he was discharged.  Commander was four

10  ranks below Sheriff.

11           These men served with distinction under multiple

12  Sheriffs.  Every day they put on their uniform, they risked

13  their lives to serve their community and honor the badge.  For

14  them, law enforcement wasn't just a job.  It was a way of life.

15  They implemented policies they agreed with and policies they

16  didn't because that's what professional law enforcement

17  officers do.  They understood the difference between personal

18  loyalty to an individual and professional dedication to the

19  office and the community.

20           But Rick Reigenborn saw things differently.  To

21  understand how we got here, we have to go back to 2014 when

22  Mr. Reigenborn was a sergeant at the Sheriff's Office.  He ran

23  for Sheriff against Mike McIntosh, and he lost.  But he

24  remembered who supported him and who didn't.  And he was

25  focused on these four officers because they openly supported

Opening - Mr. Bohnet-Gomez

1    Mike McIntosh.  They believed McIntosh was the better, more

2    experienced candidate.

3         Shortly after losing the 2014 election, Mr. Reigenborn

4    resigned from the Sheriff's Office.  He claims these officers

5    would have retaliated against him for running against Mike

6    McIntosh.  He believed they would come up with false

7    allegations to get him fired.  That never happened.  But

8    Reigenborn's fear of political retaliation tells us something

9    important about his state of mind.  He was paranoid and

10   suspicious of McIntosh supporters.

11        After leaving the Sheriff's Office, Mr. Reigenborn

12   worked as a part-time detective at the Mountain View Police

13   Department.  He didn't interact with these officers for nearly

14   four years.  But Mr. Reigenborn wasn't done with politics.

15        He decided to run for Sheriff again in 2018.  And

16   again, the race was against Mike McIntosh.

17        During the campaign, Mr. Reigenborn monitored the

18   campaign donations to his election opponent.  You'll see

19   evidence that he kept track of who at the Sheriff's Office was

20   supporting Mike McIntosh.  He also talked to people, he went to

21   political events, he found out who was supporting who.  He

22   wanted to know who was supporting Mike McIntosh because he was

23   going to use that information to decide if these individuals

24   could stay and in what position.

25        You see, Mr. Reigenborn believed that some of the

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Opening - Mr. Bohnet-Gomez

1    command staff at the Sheriff's Office just wanted to remain

2    loyal to Sheriff McIntosh.  You'll see that, before taking

3    office, he talked about his plans to clean out the McIntosh

4    supporters.  This wasn't just talk.  Even before he was sworn

5    in, Mr. Reigenborn had already selected replacements for some

6    of these officers.

7          You'll see evidence that, by December 2018, he had

8    already picked a replacement for Gene Claps as division chief

9    of the jail.  He already picked Mark Toth, his boss at Mountain

10   View, for another position.  This wasn't about evaluating

11   merit.  It wasn't about giving people a chance.  These

12   decisions had already been made.

13         And later in December 2018, Mr. Reigenborn scheduled

14   brief meet and greets with every supervisor at the Sheriff's

15   Office.  He made it a point to ask everyone if they could be

16   loyal.  Everyone told him the same thing; they could be loyal

17   to the Sheriff's Office no matter who sits behind that desk.

18   These officers understood that professional dedication means

19   implementing policies you agree with and those you don't and

20   following lawful orders regardless of personal politics.  These

21   men understood the chain of command.  They had spent their

22   working lives at an organization structured and modeled after

23   the military.

24         But Mr. Reigenborn didn't believe these officers could

25   be personally loyal to him because they had supported Mike

Opening - Mr. Bohnet-Gomez

1    McIntosh in the last two elections.  Before taking office, he

2    had already put together a list of people to fire.  Everyone on

3    that list was a McIntosh supporter.

4         He sent that list to Tommie McLallan, who he hand

5    picked as his Undersheriff.  Mr. McLallan will testify that the

6    people on Mr. Reigenborn's termination list were there because

7    he didn't trust them.  Mr. Reigenborn didn't trust them because

8    of the political affiliation with Mike McIntosh.

9    Mr. Reigenborn himself will admit that he had concerns about

10   these officers' loyalty to him, because they had supported

11   McIntosh's campaign, even though they had served under multiple

12   sheriffs, Republican and Democrat.

13        Then came January 8th, 2019, Mr. Reigenborn's first

14   day as Sheriff.  His very first act was unprecedented in Adams

15   County history.  He rescinded all the agency's employment

16   policies.  He replaced them with new ones that had no policy

17   for hiring, firing, discipline and promotion.  All that would

18   be at Mr. Reigenborn's sole discretion.  No incoming Sheriff

19   had ever done anything like this.  Getting rid of those

20   personnel policies enabled what came next.

21        That next day, Mr. Reigenborn's first full day in

22   office, he had Mr. McLallan, his Undersheriff, hand out

23   termination letters to these four officers and other McIntosh

24   supporters.  This was extraordinary.

25        In the normal course, an officer is only fired from

Opening - Mr. Bohnet-Gomez

1    the Adams County Sheriff's Office after an internal affairs

2    investigation into specific misconduct.  The internal affairs

3    process gives officers a right to know the charges against

4    them, hear the evidence and present a defense.  But

5    Mr. Reigenborn skipped all that.

6         The letters he handed them were identical.  They all

7    said Mr. Reigenborn did not believe retaining them was in the

8    best interest of the organization, he wished them well in their

9    future endeavors.  They were immediately placed on

10   administrative leave.  They had to turn in their badges, guns

11   and credentials on the spot.  They were banned from Sheriff's

12   Office property, their vehicles were taken, and they were

13   walked out of the building with some personal belongings to

14   find a ride home.  They had to request a termination meeting by

15   5:00 p.m. the next day.

16        Those meetings took place on January 15th, and they

17   were recorded.  You will hear them for yourself throughout this

18   trial.  The first termination meeting was between

19   Mr. Reigenborn and Gene Claps.  It set the tone.  Mr. Claps

20   specifically asked to keep his job and continue his service

21   with the agency he dedicated his life to.  He asked to continue

22   his career with dignity.  Mr. Reigenborn refused.

23        And when these officers asked Mr. Reigenborn why they

24   were being terminated, Mr. Reigenborn offered only vague

25   explanations about culture and vision and going in a different

Opening - Mr. Bohnet-Gomez

1    direction.  And when Mark Mitchell asked Mr. Reigenborn what

2    that different direction was, Mr. Reigenborn said, I don't need

3    to tell you the direction.  Mr. Reigenborn didn't tell these

4    officers any concrete reasons for their termination.  He just

5    told them, resign by tomorrow or you are fired.

6         Now, Mr. Reigenborn wants you to believe that these

7    terminations are about performance, that they were about

8    behavior.  That's what he's claimed in this lawsuit.

9         He'll tell you T.J. Coates was disrespectful, that he

10   mocked people and kept dolls in his desk.  He'll say Gene Claps

11   was intimidating, that his nickname was the hatchet man.  He'll

12   claim Captain Mitchell was rumored to have inappropriate

13   relationships.  He'll say Kevin Currier liked to stir the pot.

14   Those are reasons that Mr. Reigenborn disclosed for the first

15   time during this lawsuit.

16        But look at what actually happened.  Mr. Reigenborn

17   fired them at the very first opportunity, before these officers

18   had even worked a single day under his leadership.  They hadn't

19   worked together in four years.  Mr. Reigenborn wasn't even at

20   the agency.

21        He never looked at their personnel files.  He never

22   investigated any claimed issue, whether performance or

23   behavior.  And when they asked him directly why they were being

24   fired, he never mentioned any of his later concerns.

25        Listen to what Mr. Reigenborn says in those meetings.

Opening - Mr. Bohnet-Gomez

1   No mention of any issues.  There was no opportunity for these

2   officers to prove their merits.

3           You'll also hear Mr. Reigenborn say that what he

4   really wanted to hear from them is that they wanted to stay and

5   be a part of the agency so that he could find them a position,

6   that he had every intention of finding a position for everyone

7   that wanted to stay, that it depended on what they said at

8   their termination meetings.  Mr. Reigenborn claims that firing

9   these Plaintiffs, taking their careers was a test of their

10  character, to see how they might react in a crisis, like an

11  officer involved shooting.  Never mind that these men had been

12  in actual life or death situations many times before.

13          Mr. Reigenborn now claims he never actually intended

14  to fire Kevin Currier.  But you'll hear the recording where he

15  told Kevin Currier that the agency was downsizing, where he

16  told him that if he didn't retire by tomorrow, he would be

17  fired.

18          Mr. Reigenborn also insists that he hadn't made up his

19  mind about Gene Claps, that he was considering retaining him,

20  but there wasn't an opportunity to talk about it at the

21  termination meeting.  But you'll hear Gene Claps ask to be

22  retained more than once, and you will hear Mr. Reigenborn tell

23  him no.

24          The truth is simpler.  These terminations weren't

25  about performance.  They weren't about behavior.  They were

Opening - Mr. Bohnet-Gomez

1   about politics.  They were about these officers supporting Mike

2   McIntosh across two elections.

3          And when these officers refused to sign the severance

4   agreements that they were presented in their termination

5   meetings, Mr. Reigenborn had to cover his tracks with shifting

6   stories that don't match what actually happened.  But those

7   shifting, after-the-fact stories aren't the only evidence of

8   Mr. Reigenborn's motives.  You will see evidence of how he

9   continued to retaliate against those he believed were

10  politically disloyal.

11         Take what happened with Terrance O'Neill.  Like with

12  these officers, Mr. Reigenborn questioned O'Neill's loyalty

13  because of his support for McIntosh's campaign.  Mr. Reigenborn

14  demoted him.  When O'Neill considered running for Sheriff in

15  June of 2020, Mr. Reigenborn discussed firing him and others

16  who were rumored to support his campaign.  O'Neill was warned

17  that he would likely be fired if he ran for office.  He decided

18  not to run after all.

19         And you'll hear from Sergeant Jason Gallegos, who is

20  Mr. Reigenborn's friend and President of the Fraternal Order of

21  Police, the police officer's union.  After the organization

22  that Gallegos led endorsed Mike McIntosh in 2018, not

23  Mr. Reigenborn, Mr. Reigenborn blamed Sergeant Gallegos

24  personally.  Their friendship ended.

25         It isn't just Mr. Reigenborn's after-the-fact story,

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Opening - Mr. Bohnet-Gomez

1    the inconsistencies and contradictions.  When you evaluate the

2    claims Mr. Reigenborn makes in this case about these officers,

3    you'll learn something else important.  While serving as

4    Sheriff, Mr. Reigenborn committed multiple crimes of dishonesty

5    in his official capacity.  He pled guilty to official

6    misconduct and felony forgery of public records.

7            And you will also learn that Tommie McLallan, the man

8    that Mr. Reigenborn picked as his Undersheriff, also pled

9    guilty to official misconduct.  They no longer get to wear the

10   badge that they tried to take from these officers.

11           You will receive instructions from the Court about how

12   you can consider these criminal convictions in evaluating

13   Mr. Reigenborn and Mr. McLallan's credibility, in evaluating

14   whether their testimony, their reasons are true or false.

15           Even Mr. Reigenborn's legal defense wants to have it

16   both ways.  On the one hand, he claims that each of these

17   officers' positions, all three ranks required political loyalty

18   to him personally as the Sheriff, that he had the absolute

19   right to fire anyone who didn't support him politically.  But

20   in the same breath, he also claims that his decisions have

21   nothing to do with politics.

22           But despite what Mr. Reigenborn now claims, these

23   positions never required political loyalty.  The Sheriff's

24   Office has clear written policies about employees' political

25   activity.  The agency's employee speech policy says that

Opening - Mr. Bohnet-Gomez

 1    employees retain the right to vote as they choose, to support

 2    candidates of their choice and to express their opinions as

 3    private citizens on political subjects and candidates at all

 4    times.

 5            The agency's standards of conduct policy states that

 6    Sheriff's Office employees may participate in any political

 7    campaign.

 8            These policies apply to every employee, including

 9    these officers.  No exceptions.

10            None of the Plaintiffs' actual job duties on their job

11    descriptions require political loyalty.  You will hear

12    Mr. Reigenborn admit that.  And you will hear his Undersheriff,

13    Mr. McLallan, admit it too.

14            In fact, Mr. Reigenborn previously provided a sworn

15    statement in another lawsuit about political loyalty, his

16    testimony that the position of commander held by Kevin Currier

17    does not require political loyalty and has never required

18    political loyalty.

19            The evidence will show these are professional, career

20    law enforcement positions.  They don't require political

21    loyalty.  They don't require that you belong to the same

22    political party as the Sheriff.  They don't require supporting

23    the Sheriff in the last election or the next one.  No.

24            What they required was loyalty to the badge, loyalty

25    to the job, commitment to the agency and protecting and serving

Opening - Mr. Bohnet-Gomez

1    the community.  They require professional dedication, not

2    personal loyalty.

3              How do we know?

4              Because Gene Claps went on to win the election as

5    Adams County Sheriff in 2022.  And when he took office, he

6    showed exactly how professional law enforcement should work.

7    He didn't fire anyone for their political support of Rick

8    Reigenborn.  He kept Paul Gregory, who Mr. Reigenborn had

9    picked as Undersheriff after mr. McLallan resigned.  He kept

10   Bill Dunning as division chief, even though Dunning had

11   volunteered as Reigenborn's campaign and maxed out his campaign

12   contributions.  He rehired Mr. Mitchell and Mr. Currier.

13             Why?

14             Because it's about merit, because people's lives and

15   safety are at stake, because you need the best person for the

16   job, regardless of who supported who in the last election,

17   because that's what the First Amendment requires.

18             And throughout this trial, you might see Sheriff

19   Claps, Mark Mitchell or Kevin Currier come and go from the

20   courtroom if there's an emergency.  Not as a sign of

21   discourtesy to this court, but out of responsibility to the

22   community they serve.

23             Even after having their careers taken for supporting

24   the wrong candidate, they didn't give up on public service.

25   They still wear the badge.  And they have a duty to protect and

Opening - Mr. Bohnet-Gomez

1    serve the community, no matter how much they want to be here

2    for every minute of this trial.

3              Now, the impact of these terminations was significant,

4    not just on these officers, but on Adams County itself.  These

5    were experienced law enforcement professionals.  When they were

6    fired, the community lost decades of institutional knowledge

7    that couldn't be replaced overnight.  You will hear evidence

8    about what happened to these officers after their termination.

9              Despite their decades of experience, they struggled to

10   find equivalent positions.  They had to start over from scratch

11   after 20 years, 30 years at the Sheriff's Office.  These

12   weren't just jobs.  They were careers built over decades,

13   destroyed in a day.  Not because of their abilities, not

14   because they couldn't do their jobs, but because they supported

15   the wrong candidate for Sheriff.

16             The evidence will paint a clear picture.  These

17   officers were fired in retaliation for their political beliefs,

18   for their political affiliation with Mike McIntosh and for

19   their lack of political affiliation with Rick Reigenborn.

20             On one side, you have four officers with over a

21   century of combined service, who worked their way up through

22   the ranks, who served under Republican and Democratic Sheriffs

23   alike, who were committed to law enforcement, officers who

24   implemented policies they agreed with and policies they didn't,

25   because that's what professionals do.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Opening - Mr. Bohnet-Gomez

 1            On the other side, you have a Sheriff who made a

 2    termination list full of political opponents, who told others

 3    he would clean house before he even took office, who picked

 4    replacements before being sworn in, who scrapped all the

 5    employment policies on his first day to enable these

 6    terminations, a Sheriff who never gave these officers an

 7    opportunity to discuss anything with him, who offered shifting,

 8    after-the-fact explanations, and who now stands before you as a

 9    convicted felon, a forger, guilty of official misconduct.

10            Law enforcement officers must enforce the law equally

11    and fairly, regardless of politics, regardless of personal

12    connections, regardless of who supported who in the last

13    election.  They serve the community, not the candidate.

14    Politics has no place in professional law enforcement.  That's

15    why the Sheriff's Office had and continues to have policies

16    that explicitly protect employees' rights to participate in the

17    political process.  That's why we have First Amendment

18    protections against political retaliation and that's why we're

19    here today.

20            And that's why, at the end of this trial, we will ask

21    you to hold the Defendant accountable and send a clear message.

22    We will not tolerate the destruction of careers built over

23    decades simply because someone exercised their First Amendment

24    right to support the candidate they believed would best serve

25    the public.

                                                                    51
                        Opening - Mr. Thapa

1              Thank you.

2              THE COURT:  Thank you, counsel.

3              For the defense.

4              MR. THAPA:  Thank you, your Honor.

5              Members of the jury, this case is not about political

6    beliefs or political support.  It's about people.  It's about

7    an elected Sheriff's decision to pick the people that he could

8    trust to help him run his new administration.  It's about his

9    decision to pick the people that he could trust to serve as

10   some of his closest advisers and members of his executive

11   leadership team.

12             In November of 2018, the people of Adams County

13   elected Richard Reigenborn as their new Sheriff.

14   Mr. Reigenborn had served the Adams County Sheriff's Office for

15   more than 20 years, starting in 1991 until he retired in 2015.

16             After Mr. Reigenborn was elected the Sheriff in 2018,

17   he had the task of putting together his executive leadership

18   team, which is also known as the Sheriff's command staff.  Now,

19   the command staff consists of high ranking positions within the

20   organization.  It consists of chiefs of the various divisions;

21   the detective's division, the jail division, the patrol

22   division, et cetera.  It also includes important supervisory

23   level positions, like captains and commanders.  As you heard,

24   each of the Plaintiffs held command staff positions in the

25   organization before Reigenborn took over.


                   SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

52
Opening - Mr. Thapa

1           Now, the Plaintiffs claim that Mr. Reigenborn

2   terminated them because of their political beliefs or their

3   political support for his election opponent, former Sheriff

4   McIntosh.  But the evidence will show that that is not the

5   case.

6           The evidence will show that Mr. Reigenborn's decision

7   was based on the Plaintiffs, their personalities and how they

8   behaved as leaders in the organization, not their political

9   beliefs or their political support for former Sheriff McIntosh.

10  It was based on Mr. Reigenborn's past experiences at the

11  Sheriff's Office, his experiences with the Plaintiffs and how

12  they conducted themselves in high ranking leadership positions.

13          The evidence will show that whether anyone politically

14  supported Mr. McIntosh was not a basis for that decision.  And

15  what Plaintiffs' counsel didn't tell you in their opening

16  statement is that, after Sheriff Reigenborn met with most of

17  the people from the command staff from the prior

18  administration, he kept on many of Mr. McIntosh's command staff

19  members and McIntosh supporters.

20          You will hear about Paul Gregory.  Mr. Gregory was an

21  active supporter of Mr. McIntosh.  And Mr. Reigenborn kept him

22  on in his administration.  And not just that, Mr. Reigenborn

23  promoted him, not just once, but twice; first, to the position

24  of division chief, and then to the position of Undersheriff,

25  his second in command of the organization.  Mr. Gregory's


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

53
Opening - Mr. Thapa

1    political support of Mr. McIntosh was not an issue for

2    Mr. Reigenborn.

3            I'll give you another example.  You'll hear about Jim

4    Morgan.  Mr. Morgan was the public information officer for the

5    McIntosh administration.  And after Sheriff Reigenborn won the

6    election, Mr. Morgan went as far as to criticize the voters of

7    Adams County for electing Mr. Reigenborn.  Mr. Morgan was not

8    fired, was not demoted.  Mr. Reigenborn kept him on in his

9    administration.  Mr. Morgan's political support for

10   Mr. McIntosh was not an issue for Mr. Reigenborn.

11           Now, these are two examples, but you will hear, as I

12   mentioned, about others from the McIntosh command staff that

13   were kept on by Mr. Reigenborn.  You heard this reference to

14   clearing the house.  Well, that was not the case.  He didn't

15   get rid of everybody from the McIntosh command staff.

16           Ultimately, the evidence will show that Reigenborn's

17   decision was about the people and not their political beliefs

18   or their political support.

19           Now, I want to highlight three points that will help

20   you in understanding the evidence during the course of this

21   trial.  The first is Mr. Reigenborn's 20 plus years of

22   experience of working at the Sheriff's Office and how that

23   shaped his view of the culture of the office and his vision for

24   what he wanted to change.  The second is the important role of

25   the command staff in helping a Sheriff implement his policies

Opening - Mr. Thapa

1    and pursue his vision.  And third is how the Plaintiffs'

2    behavior over the years led Reigenborn to believe that they

3    were not suitable for these positions in his administration.

4          We start out by addressing the first point, which is

5    Reigenborn's experience, dating back to 1991, when he started

6    as a deputy in the jail division of Adams County Sheriff's

7    Office.  He worked at the jail division, worked in the patrol

8    division, worked at a drug task force during his time there,

9    before ultimately retiring in 2015 at the rank of sergeant.

10         Just like the Plaintiffs, Mr. Reigenborn had decades

11   of experience working at the Sheriff's Office.  However, unlike

12   the Plaintiffs, Sheriff Reigenborn was never -- he never held a

13   command staff position before he retired in 2015.  And this is

14   important, because he retired as a sergeant, one of the boots

15   on the ground and that shaped his view of the culture at the

16   Sheriff's Office when he left.

17         Mr. Reigenborn believed that there was a cultural

18   problem at the Sheriff's Office.  He saw this as a good old

19   boys system where who you know meant more than what you know.

20   Where, if you weren't part of the in crowd, you were left out.

21   And Mr. Reigenborn believed that he experienced the unfairness

22   of the system when he himself was passed on for positions, even

23   though he qualified through testing.  And this background is

24   important to understanding the view that he had of the culture

25   and what he wanted to change when he got into office.

Opening - Mr. Thapa

1          Coming from a sergeant position, he also believed that

2     there was a disconnect between the command staff and the rest

3     of the troops.  He believed that the line level employees

4     didn't have a voice and that there was a culture of fear and

5     intimidation by those in high level positions, and that's what

6     he wanted to change.  He wanted to cultivate a culture where

7     the respect went both ways, not just from line level employees

8     to the command staff, but from the command staff to the line

9     level employees as well, a culture where high level employees

10    didn't talk down and demean subordinates.

11         I want to move on to the second point that I mentioned

12    earlier, which is the importance of the Sheriff's command staff

13    in implementing the Sheriff's visions and why that matters in

14    this case.

15         When Sheriff Reigenborn took over, the Sheriff's

16    Office had around 600 employees, and the Plaintiffs were at the

17    near top of this organizational structure.  They were not

18    sergeants, they were not line deputies.  While those positions

19    are, of course, very important, the reason I mention that is

20    because each of them held high ranking leadership positions

21    that could shape the culture of the administration.

22         As you heard Plaintiffs' counsel allude to, Mr. Coates

23    was the chief of the detectives unit.  The only people above

24    him were the Undersheriff and the Sheriff.

25         Mr. Claps was chief of the jail division.  The only

Opening - Mr. Thapa

1    people above him were the Undersheriff and the Sheriff.

2           Mr. Mitchell was a captain of the patrol division.  He

3    was just one of just two captains in the organization.

4           And Mr. Currier was a commander in the detectives

5    division.  The only people above him directly in his chain of

6    command were his division chief, the Undersheriff and the

7    Sheriff.

8           These are high ranking positions.  And the reason I

9    mentioned that is because this is part of the Sheriff's upper

10   management level team.  And why that matters is because this is

11   the Sheriff's executive leadership team.  These are the people

12   that the Sheriff will have regular meetings with when he's

13   running his administration.  These are the people that he's

14   going to consult with, be his advisers and be part of

15   implementing his policies and goals of the Sheriff's Office.

16   These positions require the Sheriff and the command staff

17   members to have a close working relationship where they can

18   respect each other, respect each other as leaders, see eye to

19   eye so that they can effectively run the administration.  And

20   that's why this matters.

21          The evidence will show how important these positions

22   were to not just effectively running the administration, but

23   also being the Sheriff's closest advisers and leaders in the

24   organization.  You will hear evidence about their roles,

25   including the roles of the chiefs that were in charge of

Opening - Mr. Thapa

1    running their own divisions, providing input in executive

2    decision-making, personnel matters, budgetary matters, creating

3    and implementing policies and many other important matters for

4    the organization.

5            You will hear about these important leadership roles

6    from some of the Plaintiffs, as well as some of the people who

7    came on as chiefs for the Reigenborn administration.  You will

8    hear about the close working relationships that they shared

9    with the Sheriff, in terms of working toward the Sheriff's

10   goals and visions.  You will hear about the importance of

11   having a relationship of trust and confidence with each other,

12   between the Sheriff and the command staff.  And you will hear

13   that it didn't matter whether someone was a Republican or a

14   Democrat or whatever their political affiliation is.  What

15   mattered is whether they can work together as part of this

16   executive leadership team.

17           This takes me to the third point that I mentioned

18   earlier, which is why Sheriff Reigenborn did not trust the

19   Plaintiffs to be part of his leadership team.  You have heard

20   about the long careers that each of the Plaintiffs have had,

21   and we're not here to deny that.  We're not here to downplay

22   that.  But that is not what this case is about.

23           The case is about people, their personalities and how

24   and whether they could work as part of this executive

25   leadership team.  Sheriff Reigenborn put the people that could

Opening - Mr. Thapa

1    see eye to eye with his vision, see the culture the way that he

2    saw it when he left the Sheriff's Office as a sergeant and

3    people that he could rely on for good advice and also people

4    that would convey his message down the line to the rest of the

5    troops without it being adulterated, people that he could work

6    with and people that would work with him, as opposed to working

7    against him from the inside.

8            Now, it's very important to note that Sheriff

9    Reigenborn had known the Plaintiffs for decades.  This isn't a

10   case where a new Sheriff comes into town and doesn't know

11   anyone and clears house, as we heard earlier.  As I mentioned

12   Sheriff Reigenborn came in, he met with people from the

13   McIntosh administration's command staff, and he kept many of

14   them on in his administration.  Sheriff Reigenborn had history

15   with the Plaintiffs and he had knowledge about how he perceived

16   them.  And based on the Plaintiffs' history, Reigenborn

17   believed that they contributed to this cultural problem that he

18   saw at the Sheriff's Office.

19           During the course of trial, you will hear the details

20   of some of this behavior, and Plaintiffs counsel alluded to

21   some of this during their opening.  You will hear, for example,

22   about an incident after Sheriff Reigenborn lost the 2014

23   election, while he was still working at the Sheriff's Office,

24   where Mr. Coates and Mr. Mitchell mocked and belittled him in

25   the office.  This was an incident that almost pushed -- that

Opening - Mr. Thapa

1    pushed Sheriff Reigenborn towards retirement.

2           Plaintiffs' counsel alluded to it earlier, you will

3    hear how Mr. Claps called himself the hatchet man and how he

4    treated his subordinates in the jail division.

5           You will hear about other incidents with Mr. Mitchell.

6    And as referenced earlier, Mr. Currier tried to stir up trouble

7    for Reigenborn's shift while he worked there.

8           You will hear about some of the Plaintiffs'

9    reputations among the Sheriff's Office employees and how that

10   contributed to Reigenborn's decision.

11          If it's not already evident to you, during the course

12   of trial, it will be that -- the Plaintiffs didn't think very

13   highly of Mr. Reigenborn either.  And the reason that matters

14   is, given the close working relationships that's needed between

15   the Sheriff and his command staff, the two parties need to see

16   eye to eye so they can move forward in running the

17   administration.

18          Sheriff Reigenborn could not trust the Plaintiffs as

19   his advisers, and he couldn't trust them to be a part of his

20   executive leadership team.

21          Before I wrap up, I want to remind you that Judge

22   Varholak has instructed you about your roles as jurors and will

23   give you more instructions after the close of the evidence.  We

24   ask that you please follow his instructions and decide this

25   case based on the evidence and not any feelings of sympathy or

Opening - Mr. Thapa

1  prejudice.

2          You heard from Plaintiffs' counsel that Mr. Reigenborn

3  pled guilty to forgery, and he won't deny that fact.  He will

4  come before you and he will take responsibility for that.  But

5  that is not what this case is about.  This is not

6  Mr. Reigenborn's criminal trial.  This is not the People versus

7  Rick Reigenborn.  This is not even the Plaintiffs versus Rick

8  Reigenborn.

9          This is the Plaintiffs versus Adams County.  And each

10  of the Plaintiffs have the burden of proving that it was their

11  political beliefs, their political support for Mr. McIntosh

12  that was the reason that Reigenborn terminated him.  And the

13  evidence will show that that is not the case.

14          We also ask you not to decide the case, as the judge

15  instructed, until you hear all of the evidence.  The reason

16  that matters is because, in our system, as you can tell, the

17  Plaintiff gets to go first.  They get to call their witnesses

18  first.  So we please ask you to wait to decide the case until

19  you have heard all of the evidence.

20          Lastly, I want to remind you that it is each of the

21  Plaintiffs' burden to prove that they were retaliated against

22  for their political beliefs and their political support.  The

23  evidence will show that that is not the case and that the

24  Plaintiffs should not be awarded any damages.

25          Thank you.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

```
 1              THE COURT:  Thank you, counsel.

 2              Are the Plaintiffs prepared to call their first

 3    witness?

 4              MS. HALPERN:  We are.  Your Honor, the Plaintiffs

 5    would like to call Timothy James Coates to the stand.

 6    TIMOTHY JAMES COATES,

 7         called as a witness by the Plaintiffs,

 8         having been duly sworn, testified as follows:

 9    DIRECT EXAMINATION

10    BY MS. HALPERN:

11    Q.  Good afternoon, Mr. Coates.  Thank you for the

12    introduction.

13              I want to really quickly ask you, have you ever been

14    commonly referred to by any other nicknames?

15    A.  T.J.

16    Q.  And I want to ask you a couple questions just to

17    contextualize who you are.

18              How old are you?

19    A.  I'm going to be 64 here next month or something.

20    Q.  Where do you currently reside?

21    A.  I live with my wife in Westminster, Colorado.

22    Q.  And where did you grow up?

23    A.  I grew up here.  I'm a native of Denver.

24    Q.  And what was your family like growing up?

25    A.  I was raised on South Gaylord Street in a two-bedroom house
```

Coates - Direct

1    with -- my parents had 9 children; 7 boys, 2 girls.  My father

2    was an attorney, head counsel for Fred Hamilton Oil Company.

3    My mother was a homemaker to some degree, raising the children,

4    although she attended college at night and obtained her

5    bachelor's degree, her master's degree and just short of a

6    doctorate degree in English.  And she taught school at the

7    Denver public school system, North High School, West High

8    School.

9    Q.  And do you have your own family now?

10   A.  I have -- I am married with my wife and a stepson who is 23

11   years old, who is attending his last year in college.

12   Q.  And what is your current occupation?

13   A.  I am currently retired.

14   Q.  And what was your career before you retired?

15   A.  My career spanned three and a half decades as a law

16   enforcement officer.

17   Q.  I want to ask you a little bit about that career now.  But

18   before we get into it, could you please let us know what your

19   educational attainment was before entering law enforcement.

20   A.  I had attended Regis High School.  All 7 boys attended

21   Regis.  My sisters attended St. Mary's.  So upon graduating

22   from high school, I wasn't quite as smart as my siblings, and I

23   took on the job of working construction.  And probably a year

24   after that, I entered security work, being a security guard at

25   Target and Shane Diamond Company.  And that kind of spurred me

Coates - Direct

 1    on to become a law enforcement officer.  So during that span of

 2    time, I entered into Arapaho Community College and started

 3    trying to obtain my associate's degree in criminology.

 4    Q.  And what was the first position you held in law

 5    enforcement?

 6    A.  I tested for the City of Northglenn at the end of '82 and

 7    was sworn in as a police officer in January of 1983.

 8    Q.  And how long did you work at the City -- in the City of

 9    Northglenn?

10    A.  I worked as a policemen for 9 years for the City of

11    Northglenn.  Two of those years, I was assigned in a general

12    assignment, ranging from any type of crime there is, from theft

13    to homicide.  And I had that rotating position for a two-year

14    span.

15    Q.  And when did you leave the City of Northglenn?

16    A.  I left the City of Northglenn at the end of 1991.

17    Q.  And why did you leave law enforcement with the City of

18    Northglenn in 1991?

19    A.  I just needed a break at that time.  And I was also

20    involved with a family member.  My brother Paul had established

21    Pizza Time.  It was a pizza outlet store, similar to like

22    Dominos.  And he had 70 stores, whether they be franchise or

23    corporate.  And we had one sitdown restaurant out on Arapaho

24    Road, and I was a part owner of that, probably since 1987,

25    1988.  And when I left the City of Northglenn, I also purchased

                                                                         64
                          Coates - Direct

 1    two franchise stores from my brother, Paul, as well as oversaw

 2    as the manager of his corporate stores in the Denver metro

 3    area.

 4    Q.  And how did running pizza franchises go for you?

 5    A.  Well, it wasn't exciting, you know.  Once you make 1,200

 6    pizzas, it came up a little short from my true calling.

 7    Q.  Were you still attending school at this time at all?

 8    A.  Yes.

 9    Q.  What courses were you taking?

10    A.  I was still, at that time -- well, I had transferred over

11    to University of Metro, where I continued my degree, bachelor's

12    degree, trying to obtain my bachelor's degree in criminology

13    and associate in sociology.

14    Q.  Did you return to law enforcement at some point in time?

15    A.  I did.  Within a very short period of time, you know, maybe

16    10 minutes, there was a sense that -- again, my true calling.

17    So I would guess probably within six months, I had applied to

18    become a reserve at the Adams County Sheriff's Office.

19    Q.  I want to ask you a little bit about your career at the

20    Adams County Sheriff's Office.

21         But let me just ask you, did you ever finish the

22    degree that you were working towards obtaining?

23    A.  I did.  I think I completed the bachelor's degree in 1997.

24    Q.  What was that degree in?

25    A.  Criminology.

Coates - Direct

1    Q.  And you just referenced that you started working for the

2    Adams County Sheriff's Office.  If I refer to the Adams County

3    Sheriff's Office as ACSO, will you know what I refer to?

4    A.  Yes, ma'am.

5    Q.  Was it common to call the Adams County Sheriff's Office

6    ACSO?

7    A.  Yes.

8    Q.  And so you just talked about the reserve.  What is a

9    reserve officer that you went back to at the ACSO in 1993?

10   A.  Well, the Adams County Sheriff's Department, being a rather

11   large department, had a reserve unit and they -- it was

12   probably, at that time, 20 to 30 reserve officers, and they

13   would complement the patrol division.  They would also deal

14   with crowd control and the parades and things like that.  But

15   because of my unique experience, I -- I was able to run a

16   single car for service, so I was basically working within the

17   patrol division in a solo car answering calls for service for

18   Adams County.

19   Q.  And when were you hired full time at the Adams County

20   Sheriff's Office?

21   A.  In January of 1995.

22   Q.  And who was the Sheriff at that time?

23   A.  Well, I -- I take that back, in 1993, Sheriff Ed Camp swore

24   me in as a reserve officer.  And I went full time in 1995.  And

25   the Sheriff at that time was Bill Shearer.

Coates - Direct

1    Q.  And what position did you hold when you first started

2    working full time at the ACSO?

3    A.  Deputy Sheriff working with what the County refers to as

4    District 1.

5    Q.  What was the position that you next held at the Adams

6    County Sheriff's Office?

7    A.  I applied for the detective division in 1998, and I went

8    through the testing process.  I was number one on the

9    eligibility list.  And I was entered into the detective

10   division in January of 1999, I believe.

11   Q.  And can you explain to us what it means to be number one on

12   the list.  I think you just referred to that.

13   A.  That's just a ranking order of the candidates, whether it

14   have been 1 to 20 people applying for the position, and it goes

15   through a process of written tests and oral boards.

16   Q.  What's an oral board?

17   A.  That would be a panel of officers from different rank to

18   determine or not whether you have established the job knowledge

19   to proceed to get promoted.

20   Q.  And was your move to detective considered a promotion?

21   A.  I don't recall at that time.  At some point, we went from

22   deputy to deputy 2, and you had to be a deputy 2 to advance to

23   that.  I cannot recall whether that was a deputy 2 position

24   designated.

25   Q.  I'm going to ask you a little bit about some names of the

Coates - Direct

1    different positions, titles of the different positions in a

2    second.

3              But what position did you hold next at the Adams

4    County Sheriff's Office?

5    A.  The next position I held, I tested for sergeant in probably

6    2001 -- probably 2002.  And I was number one on the eligibility

7    list.  And from there, I was promoted and reentered the patrol

8    division.

9    Q.  Where did you go next?

10   A.  After however many years in the patrol division, I tested

11   for lieutenant.  I believe that was in or around the year 2006.

12   And I was number one on the eligibility list and promoted to

13   lieutenant in 2006, I believe.

14   Q.  And what happened after that?  What happened after the

15   promotion in 2006?

16   A.  2006, I was transferred to the Adams County detention

17   facility.  And I worked a platoon.  There was two platoons

18   designated by day; Sunday through Wednesday, Wednesday through

19   Saturday.  So I was in charge of one of the platoons.  And I

20   did that until, I believe, 2009, where I was transferred to the

21   patrol division.

22   Q.  And then what happened next in your career projection at

23   the ACSO?

24   A.  2009, as I stated, I returned to the patrol division.  I

25   was one of the platoon lieutenants, again, designated by those

Coates - Direct

1    days.  And in 2011, December, I became the captain of the

2    patrol division.

3    Q.  For the position of captain, did you apply or were you

4    appointed?

5    A.  For the most part, I was appointed.  It was a career

6    development path, and so I don't recall the paperwork, if there

7    was paperwork.  I met with the Sheriff, and he basically

8    stated, I'm going to give you this opportunity.  It was due to

9    a retirement of the captain of the patrol division.  And the

10   Sheriff put me on a career development for a period of six

11   months, I believe.  And it was basically an on-the-job

12   determination whether I could fulfill the requirements.

13   Q.  And were you able to fulfill those requirements after the

14   six months?

15   A.  I did.

16   Q.  What happened then?

17   A.  Well, then I was the captain of the patrol division until

18   January of 2015.  And then I was transferred to the detective

19   division, where I worked from January 2015 to the day I was

20   terminated.

21   Q.  When you were first made captain, who was the Sheriff at

22   that time?

23   A.  That was Sheriff Doug Darr.

24   Q.  Do you know what his political party affiliation was?

25   A.  He was a registered Democrat.

Coates - Direct

1   Q.  And when you were reassigned as captain of the patrol

2   division, who was the Sheriff at that time?

3   A.  I'm sorry, could you repeat that.

4   Q.  Sure.  When you were reassigned to the patrol division as a

5   captain there, who was Sheriff at that time?

6   A.  Doug Darr was the Sheriff when I was in the -- as a captain

7   in the patrol division.

8   Q.  Let me just ask you, have the titles at the Adams County

9   Sheriff's Office ever changed?

10  A.  They did.  They changed from the term of captain to chief.

11  And that was basically -- I think, as I recall, Doug Darr

12  wanted a little more consistency with the Sheriff's Office

13  throughout the state.  And it was kind of an insignia on your

14  lapel, stars or bars, and the Sheriff has four stars and the

15  undersheriff has three and the division chiefs have two and the

16  commanders are one.  So we were intermixed with bars and stars,

17  so I think he wanted the consistency of stars.

18  Q.  And were there any changes to your job responsibilities

19  when the title changed from captain to division chief?

20  A.  No, ma'am.

21  Q.  You said you worked as the chief, I think, until 2008,

22  division chief; is that right?

23  A.  I went to the detective division as the division chief from

24  2015 to 2018, and that was under Sheriff Michael McIntosh.

25  Q.  And Sheriff McIntosh, are you aware of what his political

Coates - Direct

1    affiliation was?

2    A.  He's a registered Republican.

3    Q.  And so tell us a little bit, which ones of those positions

4    that you just described to us were a promotion during your

5    career at the ACSO?

6    A.  Well, they are promotion through every rank, with the

7    exception of the appointment or career development that did not

8    require a panel of folks.  But every position up until division

9    chief.

10   Q.  Could you just explain to the jury what the different

11   titles are at the Adams County Sheriff's Office before and then

12   after the name change.

13   A.  As it relates to sworn deputies, you have the lowest end,

14   the reserve and a deputy, deputy sheriff, sergeant, lieutenant,

15   captain and Undersheriff and the Sheriff.  As we moved forward,

16   it would have been reserve officer, deputy sheriff, deputy 2 or

17   senior deputy, and then sergeant and then commander because

18   those two names changed as well, from lieutenant to commander,

19   again, with the insignia on the lapels.  And then there was --

20   from commander, there was two slots at captain; one in the

21   patrol division, one in the detention facility.  And then there

22   was a division chief and Undersheriff and the Sheriff.

23   Q.  And when lieutenant changed over to commander, was there

24   any substantive change in the job duties there?

25   A.  No, ma'am.

Coates - Direct

1    Q.  And it seems like there was a position created, that was

2    captain, that was different than the captain that you held

3    before becoming division chief; is that right?

4    A.  That's correct.

5            As the agency got larger, particularly in the two

6    largest divisions, being the detention facility and the patrol

7    division, the Sheriff wanted another layer of supervision in

8    there.

9    Q.  During your tenure at the Adams County Sheriff's Office,

10   were you ever disciplined?

11   A.  No.

12   Q.  And I just want to ask you about some of the accolades and

13   awards that you received along the way.

14           Can you describe some of them that come to mind during

15   your career in law enforcement.

16   A.  I was like most career officers with three and a half

17   decades.  I had an array of commendations and awards and

18   letters of -- commendations and letters of appreciation, so I

19   had a full gamut that really spanned from the beginning to the

20   end.

21   Q.  Any in specific that you are recalling or coming to mind?

22   A.  It ranged from the medal of honor to an appreciation

23   letter.

24           MS. HALPERN:  Would it please be possible to call up

25   Plaintiff's Exhibit 1.


            SADIE L. HERBERT, RPR, RCR
     901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1    Q.  Mr. Coates, do you see Plaintiff's Exhibit 1 before you?

2    A.  I do.

3    Q.  Do you recognize what this document is?

4    A.  That is a written plaque for the medal of honor.

5    Q.  And is this a copy of the plaque that you received?

6    A.  Yes.

7            MS. HALPERN:  Your Honor, I would move for admission.

8            THE COURT:  Any objections?

9            MS. PRATT:  No objection.

10           THE WITNESS:  It came with --

11           MS. HALPERN:  One moment.

12           Could we please publish to the jury.

13       (Plaintiff's Exhibit 1 received in evidence)

14   BY MS. HALPERN:

15   Q.  Go ahead.  You were going to say?

16   A.  The medal of honor was in a shadow box and it was a medal.

17   This was a plaque.

18   Q.  Could you please describe what brought about you receiving

19   this medal of honor.

20   A.  This was a robbery hostage situation that occurred at the

21   Osco Drug located on 104th.  It was a strip mall.  The

22   businesses spanned from one end of the block to the other.  Two

23   bandits entered the pharmacy of the Osco Drug and attempted to

24   rob the pharmacist.  They found out there was no money in the

25   pharmacy.  They got a little derailed and they ended up going

Coates - Direct

1    and leaving the establishment.  Two of the employees started to

2    follow them.

3            And one of the bandits or suspects turned and began

4    firing at them with a handgun.  They were fortunately not

5    struck.

6            And the other suspect went westbound, ended up going

7    behind an apartment complex behind the strip mall, kidnapped a

8    person and made them take them down to Denver, drop them off on

9    Carr Boulevard, I believe.  And the victim called the police

10   from there.

11           The second bandit came out of the entrance of the

12   Osco.  And after shooting at the employees, there was an

13   officer that arrived.  He engaged the officer as the officer

14   was, I think, getting out of his car, striking the car three

15   times.  Fortunately, the officer survived or was not hit.  And

16   at that point, the bandit ran eastbound through the complex and

17   ended up taking a woman coming out of the medical center

18   hostage, put a gun to her head, tried to commandeer her car.

19   This was about the time that I entered the parking lot, came up

20   on him, started to get out of my car to engage him and he let

21   go and -- of the hostage, who later became a victim advocate at

22   the Sheriff's Office.  So she always had a soft spot for me.

23   And then the bandit ultimately ended up going into a place

24   called the World of Fitness.  It was a gymnasium.  He took the

25   owner hostage.  And by this time, we had set up a perimeter.

Coates - Direct

1    There was a rear door to the gym leading into the alley, and of

2    course, the front door.  I had taken up a position at the front

3    door.  And we kind of settled it down, contained the situation,

4    knew he was inside, knew that he had a hostage.  The patrons

5    started coming out the front door screaming that he was going

6    out the back door.  I happened to know the layout of this

7    particular place because I work out there.  And he went out the

8    back door with his arm around the hostage's neck.  And over the

9    shoulder of the hostage, he engaged the officer in the back,

10   began firing at him.  That officer wasn't able to return fire,

11   obviously, because of the hostage.  And I was able to take

12   up -- it was a hallway situation where one side was where he

13   was at trying to get out the back door, and then there was

14   another entrance into a separate room and it was divided by

15   this hallway, so I -- when I entered -- when I got into the

16   position I was in the doorway of this separate room, I was

17   approximately four feet from the suspect and the hostage, and

18   he was coming back into the hallway.  And without going into

19   detail, I neutralized him and -- with lethal -- with lethality,

20   and the hostage was able to run down the hallway and that --

21   that was about the extent of it.

22        MS. HALPERN:  Can we take that down and pull up

23   Exhibit 2, Plaintiff's Exhibit 2, please.

24   Q.  Now, Mr. Coates, do you have Exhibit 2 before you?

25   A.  Yes.

Coates - Direct

1  Q.  Could you identify what Exhibit 2 is.

2  A.  That's a nomination for exemplary service award for myself

3  and multiple officers.

4       MS. HALPERN:  Your Honor, I would move for admission.

5       THE COURT:  Any objection?

6       MS. PRATT:  No objection.

7       THE COURT:  It's admitted.

8  (Plaintiff's Exhibit 2 received in evidence)

9       MS. HALPERN:  If we could please publish to the jury.

10 BY MS. HALPERN:

11 Q.  Mr. Coates, you were about to say, what kind of -- what

12 actions brought about your receiving Exhibit Number 2?

13 A.  This was an event that occurred -- appears to be about

14 1:15 a.m. in the morning.  I was -- I was sitting at 114th and

15 Washington when there was an explosion, explosion loud enough

16 and kind of shook the ground.  So I knew there was a large

17 explosion to the north of me.  I proceeded north.  And a house

18 had exploded.  It was obviously a natural gas explosion.  I

19 think the party, in the middle of the night, at 1:00 o'clock in

20 the morning got up to smoke a cigarette, as I remember, and he,

21 unbeknownst to him, had a leak and it took the house completely

22 off the foundation, scattered the contents of the house and the

23 house itself multiple blocks in either direction.  It was a

24 townhome, so there was adjacent -- attached townhomes.  Fire

25 rolled and probably -- I don't recall -- five, six, eight

Coates - Direct

1    houses became -- from a roof fire started -- you know, the

2    houses caught fire.

3    Q.  And what was your role in responding to that explosion?

4    A.  Well, our -- as first responders, we arrived on scene.

5    Secondary explosions going off.  I mean, it was quite a scene.

6    And of course, we knew we had residents in there, so we worked

7    as quickly and as fast as possible to get the homeowners out of

8    harm's way.

9            MS. HALPERN:  We can take that down.

10           Could we pull up Exhibit 29.  And could we go to

11   Pages 7 and 8 of Exhibit 29.  I can do it by Bates Number too,

12   if that's easier for you.

13   Q.  Now, Mr. Coates, the Court is going to show you Pages 7 and

14   8 of Exhibit 29.  I believe this is Page 7.  And the next page

15   is Page 8.

16           Do you recognize Pages 7 and 8 of Exhibit 29?

17   A.  Yes, ma'am.

18   Q.  What is contained in those exhibits?

19   A.  It consists of a plaque and a commendation letter from the

20   Adams County Board of County Commissioners.

21   Q.  Is this a plaque and a letter that you received?

22   A.  I did.

23           MS. HALPERN:  Your Honor, I would move for admission

24   of Pages 7 and 8 of Exhibit 29.

25           THE COURT:  Any objection?

Coates - Direct

```
 1              MS. PRATT:  No objection.

 2              THE COURT:  It's admitted.

 3         (Plaintiff's Exhibit 29, Pages 7 and 8 received in

 4    evidence)

 5              MS. HALPERN:  If we could publish Page 7 of Exhibit 29

 6    to the jury.  Thank you.

 7    BY MS. HALPERN:

 8    Q.  Mr. Coates, could you please tell us about this employee of

 9    the month award.

10    A.  This was for recognition of my duties as a detective.  When

11    I went in the detective division in January of 1999, they had

12    opened up a position that was specifically allocated to

13    domestic violence.  So while I was in the detective division,

14    my two assignments were rotating homicides and domestic

15    violence detective.

16              Because of some previous work that I have done in some

17    cases, I had a passion for working domestic violence cases.  I

18    found it to be horrendous, and I believed in helping those that

19    were in danger and couldn't help themselves.  And I took this

20    role on.  It was a rather encompassing role, because it was one

21    of the first assignments that -- an unmarked cage car was back

22    into the detective division.  There was none of those at that

23    time.  But it was part of a grant, I believe, for the domestic

24    violence.  And then, of course, the captain knew who I was and

25    my passion for these things, and he knew that I would see these
```

Coates - Direct

1   domestic violence cases through from start to finish, including

2   transporting suspects to jail.

3           So I also did a lot of work with the victim advocates

4   in training.  And I think the sergeant of the division put me

5   in for this after hundreds -- literally hundreds -- of arrests.

6   Q.  And this award, was this kind of an internal Adams County

7   Sheriff's Office award or who gave you this award?

8   A.  I think it was submitted by my sergeant in the division,

9   but it was a -- it is an honor from an employee throughout the

10  entire county.  So however many employees there were in the

11  county at that time, you know, 2,000 or whatever it might be, I

12  was chosen as the employee of the month for that year.

13  Q.  Thank you for explaining that, Mr. Coates.

14          MS. HALPERN:  Now, if we could please look at Page 4.

15  And I think we have to take this down and then turn to Page 4

16  of Exhibit 29.

17  Q.  Mr. Coates, have you seen Page 4 of Exhibit 29 before?

18  A.  Yes.

19  Q.  What is Page 4 of Exhibit 29?

20  A.  That is a plaque from the Adams County Sheriff's Department

21  for a meritorious achievement award in recognition of

22  exceptional contribution towards the progress of the Adams

23  County Sheriff's Office by submitting a program which was

24  adopted and instrumental in improving the operations of the

25  Sheriff's Office.

Coates - Direct

1    Q.  Is this an award that was received by you?

2    A.  Yes, ma'am.

3         MS. HALPERN:  Your Honor, we would move to admit

4    Page 4 of Exhibit 29.

5         THE COURT:  Any objection?

6         MS. PRATT:  No objection.

7         THE COURT:  It's admitted.

8    (Plaintiff's Exhibit 29, Page 4 received in evidence)

9         MS. HALPERN:  If we could please publish to the jury.

10   Thank you.

11   BY MS. HALPERN:

12   Q.  Now, Mr. Coates, could you please explain what program is

13   being referred to here in this meritorious achievement award.

14   A.  That award was due to my concern when I was a patrolman and

15   I was a field training officer.  And I think the year of this

16   was 2005.  So at some point, I recognized that the officers

17   always had issues writing reports.  It's not the most favorite

18   thing for policemen to do.  They like a little -- they just

19   don't like to write reports that much.  So I saw a need that

20   was an opportunity to create 20, 25 of the most common reports

21   that we took and every piece of paper associated with that

22   crime, whether it was domestic violence, which I recall had 11

23   pieces of paper, whether it was custody reports, summonses, the

24   affidavit, the offense report.  I don't know why I remember

25   there was 11 pieces.  But I just saw the need that they needed

                                                                    80
                            Coates - Direct

1    a reference manual and that they had struggles, that -- and

2    then that the reports didn't get monitored well enough

3    sometimes that they were lost.  So I -- I just saw the need for

4    that, and that's what I did.

5            MS. HALPERN:  We can take that down now.  If we could

6    look at Page 3 of Exhibit 29, please.

7    Q.  Mr. Coates, could you please identify what you see before

8    you on Page 3 of Exhibit 29.

9    A.  This is a plaque, an award, the Dale R. McLaughlin award

10   for leadership, states in recognition of the exceptional

11   leadership ability, competence and commitment that you have

12   demonstrated as a supervisor at the Adams County Sheriff's

13   Office and within the community.

14   Q.  Is this an award that you received, Mr. Coates?

15   A.  Yes.

16           MS. HALPERN:  Your Honor, I would move for admission

17   of Page 3 of Exhibit 29.

18           THE COURT:  Any objection?

19           MS. PRATT:  No objection.

20           THE COURT:  It's admitted.

21       (Plaintiff's Exhibit 29, Page 3 received in evidence)

22           MS. HALPERN:  If we could publish to the jury, please.

23   BY MS. HALPERN:

24   Q.  Mr. Coates, what led to you receiving this particular

25   award?


                    SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1    A.  Well, I think this was just bestowed upon me due to my

2    exceptional evaluations year after year, the things that I had

3    done, the contributions to the community, the contributions to

4    the officers and, you know, I had a relentless commitment to

5    it.  I was always trying to improve myself, and I think it was

6    recognized and I received the award.

7    Q.  How often is the Dale R. McLaughlin award handed out at the

8    Adams County Sheriff's Office?

9    A.  I believe it's a yearly award.

10        MS. HALPERN:  We can take that down now.  Thank you.

11   Q.  And how were your annual evaluations at the ACSO?

12   A.  Near perfection.  I think I -- my last eight years, we had

13   a scale system from 1 to 5; one being unsatisfactory, two being

14   needs help, needs assistance, three being satisfactory, four

15   being above standard and five being exceptional.  And depending

16   upon the grade you were in, there would be more categories that

17   you were rated on.  As a chief, I think there was approximately

18   ten.  And I think, for my entire time as a division chief, my

19   evaluations ranged probably from 4.3 to 4.91.

20   Q.  And do you have one or two accomplishments or assignments

21   that you are particularly proud of from the time that you

22   served at the Adams County Sheriff's Office?

23   A.  You know, there's a lot of stuff, additional things than

24   this.  But I think the barometer of my success and

25   self-reflection and whether I was doing my job on any given

82
Coates - Direct

1   morning that I woke up was that I had a continuation of

2   accolades and I -- you know, my accolades come from your peers.

3   They come from the citizens.  They come from outside of

4   yourself.  So one I remember mostly is that -- confirming that

5   I was doing the right thing every day.  So nothing really

6   sticks out, other than probably I could certainly say that, you

7   know, I spent three days at the Aurora shooting, I spent my

8   last -- in January of -- January, I forget the exact date,

9   18th, possibly, 2018 -- our deputy was shot and killed in an

10  ambush, and it rocked us to the core.  Due to circumstances, it

11  was going to be investigated by the detective division, and it

12  took 34 years of experience to get the team through it.  So

13  those are important.

14  Q.  Thank you.

15       While it is slightly more boring of a topic, I am

16  going to ask you about your job duties as a chief, so if you

17  could bear with me.

18       THE COURT:  Counsel, I'm just going to interrupt you.

19  I want to make sure we get our jurors their afternoon break.

20  It's about 2:45 now.  I want to break somewhere between now and

21  3 o'clock.  Is now a good stopping point?

22       MS. HALPERN:  Now would be a good time.  I'm changing

23  topics to talk about job duties.

24       THE COURT:  Members of the jury, as I indicated, I'm

25  going to try to give you an afternoon break, a morning break

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

 1   and a lunch break.  It's warm in here, we've been going about

 2   an hour and a half.  I think now is a good time to give you all

 3   a 15-minute break or so.  If you can break and if we can

 4   plan -- there's one matter that I need to take up with

 5   counsel -- so why don't we make it 20 minutes.  Be back and

 6   ready to go by 3:05 p.m.

 7              (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  I'm not sure why it's so hot in here, but

3     it is.  So we may have a little bit longer of a break and see

4     how it plays out this afternoon.

5          MS. HALPERN:  Your Honor, is Mr. Coates able to leave

6     the stand?

7          THE COURT:  Yes.

8          I'll try to keep that in mind as we look at how long

9     we go here and see if there's some way they can have this fixed

10    by tomorrow.  I'm not sure why it's so warm in here.  It's

11    normally not.

12         Let's take up the demonstrative exhibit.  Let me ask,

13    first, are you intending to admit this to send it back to the

14    jury or what exactly is -- on what basis are you seeking to

15    have this done, what rule and what are you hoping to do with

16    it?

17         MS. HALPERN:  Your Honor, what we were hoping to do

18    with it is be able to track the information visually with the

19    jury, based on the testimony that's coming in.  So instead of

20    trying to create a 1006 compilation of W-2s and 1099s, we

21    thought that it would be easier for them to explain their

22    damages jus through testimony in a single exhibit, which I have

23    an example of that exhibit, which is Exhibit 18.  I don't know

24    if we can get it pulled up.

25         THE COURT:  What are they going to testify based upon?

 1          MS. HALPERN:  Exhibit 8 is an example.

 2          If you could go to the next page.

 3          It's going to be kind of their final pay, their final

 4     bonuses, their final pay rate before they left office.  And so

 5     that's going to be the form that we were anticipating using to

 6     project their damages.

 7          So for example, there's a column here that says base

 8     wages, they were going to testify, here was my final base wage.

 9     Typically speaking, you know, there's a cost of living

10     adjustment that's about 5 percent that they're going to testify

11     to every year, so we can project the base salary through the

12     years that they were not employed there.  You can see that in

13     the first row.

14          Would it help if you actually had the chart in the

15     front of you?  My apologies.

16          THE COURT:  Yes, that would be helpful.  I have

17     Exhibit 8, but I don't have the chart.

18          MS. HALPERN:  Your Honor, so the first row was going

19     to be them testifying based on kind of their final pay rate,

20     their final pay scale, which is going to be coming in through

21     an exhibit like Exhibit 8.  They were going to testify to their

22     typical cost of living adjustments, so the following year,

23     2019, would have that 5 percent increase, then 2020 that

24     5 percent increase, et cetera.  The lump sum bonus, that is

25     because they are going to testify -- and this is also based on

1    Exhibit 8 -- that their pay increases had to get paid out in

2    lump sum bonuses instead of going on their base salary because

3    they were at the top of their pay scales, so that's how they

4    were receiving their merit bonuses.  So that was going to go

5    down the second row.  We were planning on doing this with each

6    of the Plaintiffs.  And then the third one was just if they had

7    a difference in the benefits that they received, in terms of

8    how much they were paying for healthcare, so when they went on

9    COBRA, for example, talk about the cost of them going on COBRA

10   is an example.

11          And we were going to simply total them for an overall

12   number.  I guess this is the row -- on this chart there isn't

13   going to be numbers on your row, but there will be a total

14   number, and that's just going to be for the economic hard

15   damages.

16          THE COURT:  And it's pursuant to 1006, that's what you

17   are --

18          MS. HALPERN:  But we're not compiling it based on

19   other documents.  They're compiling it off of testimony.  So

20   1006 is going to be voluminous documents, right, that you are

21   summarizing, but the underlying data has to be available.

22   We're not planning on this summarizing -- which is why we

23   didn't think of this as a 1006.  It's not summarizing

24   voluminous amounts of data.  It's just their testimony, based

25   on testimony.

1          THE COURT:  How are they going to know these numbers

2     without referring to documents?

3          MS. HALPERN:  Exhibit 8.  So we're just going to do

4     the math.  So we're going to give them a calculator, like what

5     is 5 percent from your cost of living adjustment for your last

6     base salary.  So they're going to be basing it off of their

7     last base salary when they left the agency.

8          THE COURT:  Are you going to be seeking to have this

9     admitted?

10          MS. HALPERN:  We would be open to having it admitted,

11     but we -- I think if it's possible, we would like to have it

12     admitted.

13          THE COURT:  Let me hear you.

14          MS. PRATT:  Your Honor, I still renew my objection to

15     this.  I don't think there's been any -- well, first off, I

16     think what counsel has just said is the Plaintiffs are going to

17     be basing their testimony on some type of documents, in which

18     case I think this chart has to meet the requirements of

19     Rule 1006 and it does not.  There's been no showing that there

20     was any sort of voluminous material here that needs to be

21     summarized in this fashion.

22          I would also renew my objection, given that we just

23     got this chart at noon today, which I think is a late

24     disclosure of a proposed demonstrative exhibit that should not

25     go to the jury, I don't think.


                    SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

1          And if the Court is inclined to even allow them to

2    create this chart based on testimony, then I certainly don't

3    think it should go back to the jury room and it should be used

4    only for demonstrative purposes since this has been a

5    completely undisclosed document until today.

6          THE COURT:  Let me take it under advisement, and then

7    I will get you my ruling hopefully before the jury comes out

8    here.

9          MS. HALPERN:  Your Honor, just really briefly, there

10   is not any documents other than Exhibit 8.  It's not trying to

11   summarize subsequent documents from 2019, 2020, 2021.

12         THE COURT:  Okay.  We'll be in brief recess.

13         (Recess)

14         THE COURT:  Before I issue my ruling, we have an issue

15   my courtroom deputy brought to my attention.  Juror -- is it

16   Jabari?

17         THE DEPUTY CLERK:  Yes.

18         THE COURT:  Juror Jabari, who is the juror that

19   defense counsel raised some concerns about ability to --

20   apparent confusion, has raised several concerns with my

21   courtroom deputy, including that he didn't realize this was 8

22   to 5, and that's going to be a significant hardship.  That he

23   didn't realize he couldn't get reimbursed for cab fees, and

24   that's going to be a significant hardship.  And some issues

25   with lunch and other things.  And he's asked to be removed.

1          We can do one of two things.  We can keep going and I

2     can instruct him that this is mandatory, and I don't know how

3     he didn't realize.  I told him we were going to 8 to 5.  This

4     is what defense counsel raised concerns about.

5          The other option is we can exclude him.  We would have

6     8 jurors.  We need 6.  I go to 9 in case we have issues like

7     this.  My inclination is let's just excuse him, because I don't

8     think he's making it through a 7-day trial.  I could be wrong,

9     but I don't want it impacting the rest of the jurors or

10    anything else.

11         My inclination is to bring him out separately, excuse

12    him from service.  And then I'll just tell the group we had to

13    excuse one of the jurors and we have alternates for a reason

14    and that's not an issue.  But I'll let you all make a record if

15    you have any concerns.

16         MS. HALPERN:  Your Honor, Plaintiffs do not have a

17    concern with that.

18         MS. PRATT:  No concern from the Defendant.

19         THE COURT:  We'll go with 8 then.  Like I said, many

20    in this district, many in this court go with 8 to start.  I

21    like 9 in case we have these problems.  We just need to make it

22    through to 6 by the end of it.  Then we will excuse him.

23         Before we bring him out, I'm prepared to issue my

24    ruling on the summary chart.  It's not 1006 because it's not

25    summarizing large sums of documents.  What it could be admitted

1    under is Rule 611.  611 provides that the Court shall exercise

2    reasonable control over the mode and order of interrogating

3    witnesses and presenting evidence as to, one, the interrogation

4    and presentation effective for the ascertainment of the truth;

5    two, avoid needless consumption of time; and three, protect

6    witnesses from harassment or undue embarrassment.

7         In United States v. Irvin, 682 F.3d 1254, the Court

8    went on to explain that, one, the exhibits -- it's nothing in

9    the Rule 611(a), the way the case is interpreting it, indicates

10   that such exhibits can be used to summarize otherwise

11   inadmissible hearsay evidence, basically discussing 611(a)

12   summaries are typically used to summarize evidence be

13   affirmatively admitted into evidence, something that's not

14   being sought here.

15        Moreover, in United States v. Granterian [ph], 607

16   F.3d 1245 at 1252 and 53, it says that in considering

17   Rule 611(a), the Court considers whether the summary chart aids

18   the jury in ascertaining the truth.  Relevant factors include

19   the length of the trial, complexity of the case and the

20   possible confusion generated by a large number of exhibits.

21   The Court considers any possible prejudice whether the witness

22   is available for cross-examination and whether the Court gave

23   limiting instructions.

24        Here, exercising my discretion, I am not going to

25   allow this exhibit.  One, it was just brought to Defendant's

1    attention at lunch today.  I think that that doesn't allow them

2    to properly prepare for this.  True, they can still

3    cross-examine the witness on this testimony, but again, it

4    being sprung on them in the middle of the first day of trial, I

5    think, is prejudicial.  Moreover, I don't think it's going to

6    be all that much assistance to the jury, at least not much more

7    than what the jury could already do.

8          The jury all has notebooks.  When they go through his

9    testimony, they could write it down.  Assuming that the

10   withins' testimony goes through the numbers that you are

11   seeking to use, you can use it in closing and you can

12   essentially put something very similar to what you have here up

13   in closing and the jury, with their notebooks, can write down

14   that number.

15         I think allowing it to go back to the jury, which is

16   really the only value, because instead of being able to write

17   it down, they have a chart that they can take back I think

18   creates the potential prejudice to the Defendant because it

19   provides one side's presentation of what they think the damages

20   are as an exhibit that goes back.  And so I think the danger of

21   prejudice just outweighs any benefit that we're going to have

22   with this, and so, as a result, I'm not going to permit the

23   witness to go through and use that chart.  You can present the

24   testimony, but just not in this chart fashion that's going to

25   then go back to the jury.

 1          MS. HALPERN:  Your Honor, may I just ask a quick

 2    clarifying question.

 3          THE COURT:  Sure.

 4          MS. HALPERN:  Am I still able to use the Elmo and just

 5    handwrite while they're testifying?

 6          THE COURT:  You can write whatever notes you want.

 7    But are you saying you want to publish this to the jury?

 8          MS. HALPERN:  No, we don't have to publish it.  In

 9    effect, I'm asking, would I be able to replicate it -- it would

10    not then be admissible as evidence, but replicate it while the

11    witness is talking.

12          THE COURT:  You can go through it with the witness.

13    Your base wages were 100,000.  You would have to present

14    testimony as to why he thinks he's entitled to a 5 percent

15    increase or whatever it is, and then ask him, okay -- if he

16    needs something to write down, now, take 100,000 and multiply

17    it by 0.05, what number does that give you.  You can go through

18    it.

19          What I think the only value of actually using this in

20    a publication to the jury is to have them take it back with

21    them.  Because again, at your closing, you can go through a

22    PowerPoint that has these same numbers on it.  I just don't

23    want it going back as an exhibit, and I think that's the only

24    value it would have.

25          MS. HALPERN:  Your Honor, understood.  Is it possible

1    for him to look at it without the jury seeing it just as I walk

2    through it?

3            THE COURT:  You mean --

4            MS. HALPERN:  So I say like, 2018, what was your

5    salary, can you tell me 2019, so he has something to write on.

6    Blank piece of paper will due as well.  I'm asking --

7            THE COURT:  It's really a calculation, it's a pure

8    mathematical calculation.

9            MS. PRATT:  If what counsel is suggesting is possibly

10   giving the witness a piece of paper upon which to record his

11   own addition that does not go to the jury, that isn't shown to

12   the jury, I don't think I have any problem with that.

13           THE COURT:  That's fine.  I mean, your concern is it

14   goes to the jury and creates prejudice.

15           MS. PRATT:  Correct.  If he wants to sit there with

16   the piece of paper or the Elmo on the stand just so that he can

17   do math, that's fine with me.

18           THE COURT:  He can use this.  If it's easier to use

19   the chart, that's fine, as long as it doesn't go to the jury.

20           MS. HALPERN:  Thanks, your Honor.

21           THE COURT:  Let's bring in Mr. Jabari first, because I

22   don't want to do that in the presence of the -- I don't want to

23   taint the rest of the jury, so my thoughts are, unless anybody

24   objects, is to bring Mr. Jabari in separately, excuse

25   Mr. Jabari, and then bring the rest of the jurors in and just

1   make it very -- Mr. Jabari had an issue that we just became

2   aware of, and we have decided to release Mr. Jabari as a juror.

3           Let's bring in Mr. Jabari first, then.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; juror present)

2          THE COURT:  Mr. Jabari, have a seat.

3          JUROR:  Thank you.  Thank you, I appreciate it.

4          THE COURT:  Mr. Jabari, it's been --

5          JUROR:  Thank you, your Honor.

6          THE COURT:  It's been brought to my attention that you

7   are having some difficulty staying here through 5:00 each day,

8   as well as perhaps some financial difficulty getting here

9   without reimbursement, and you have asked to be removed from

10  the jury.  I have spoken to both counsel about this, they have

11  agreed that you can be released, so we will excuse you from any

12  further service on the jury, okay.

13         JUROR:  Thank you, your Honor.

14         THE COURT:  You're welcome.

15         JUROR:  I appreciate that.  This is for me a pleasure,

16  and I never thought I will be selected to be able to learn a

17  lot about American democracy and law.  I love to -- I love to

18  be here, but since my going and coming back is limited, I don't

19  have transportation.  And by bus, it takes so long to come to

20  here to be on time.  And otherwise, I really -- I am

21  apologizing to your Honor and these great people.  Beautiful

22  for me to learn.  If I could, I would really stay.  But for me,

23  it takes a lot of time.  My daughter needs help, and I have to

24  work few hours to make the living for time being.

25         THE COURT:  Okay.

1              JUROR:  As your decision is, I agree with.

2              THE COURT:  Mr. Jabari, do you have any other personal

3    items back in the jury room?

4              I see you have your coat.  Do you have anything else

5    of yours back in the jury room?  Do you have any other items --

6              JUROR:  No, sir.  I have everything.

7              THE COURT:  Then you are excused, and you can go right

8    out there.  And if you can give that and your notebook to --

9              JUROR:  Can I take this page?

10             THE COURT:  No, it has to stay --

11             JUROR:  I have written something on it.

12             THE COURT:  Something about the case, though?  If it's

13   about the case, it has to stay here.

14             JUROR:  Okay.

15             THE COURT:  You are excused, Mr. Jabari.

16             JUROR:  Thank you so much.

17             THE COURT:  You're welcome.

18             JUROR:  Thank you.  Thank you everybody.  Thank you,

19   your Honor.

20             THE COURT:  You're welcome.

21             JUROR:  Thank you everyone.

22             (Juror exited the courtroom)

23             (Continued on next page)

24

25


                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1       (In open court; jury present)

2            THE COURT:  Members of the jury, before we continue

3    the testimony for today, Mr. Jabari, one of the jury members,

4    had an unexpected issue that will prohibit him from further

5    serving on the jury.  It's not a problem.  I always go -- in a

6    civil case, you don't need 9 jurors, and I always go a few more

7    than you need just in case something like this happens.  So we

8    have excused Mr. Jabari from further jury duty in this case.

9    And other than that, we are ready to proceed.

10           I will just remind you you are still under oath.

11   BY MS. HALPERN:

12   Q.  Mr. Coates, right before we took a break, I was getting to

13   the exciting topic of asking you about your job duties as a

14   chief.  So if you are ready to continue.

15   A.  Yes.

16   Q.  Could you please describe for us what the major job duties

17   were for the position of division chief when you were in the

18   patrol division.

19   A.  The main function was to oversee all elements of the

20   division and the units contained within.  So there would be, as

21   I talked about a little bit earlier, there's a patrol division

22   that's established between A and B platoon, again, designated

23   by days.  There would be three shifts, day, swings and graves.

24   Swings and graves overlapped, so there would be 6 sergeants and

25   maybe 60, 70 deputies assigned to that.  And then of course --

Coates - Direct

1    so I was -- I oversaw that as well as -- whether it be the bomb

2    unit, K-9 unit, SWAT unit, school resource officers, scat team

3    or the particular team that focuses on high crime areas.  So

4    really any unit that fell under the purview of the patrol

5    division I oversaw.

6    Q.  And how about When you were division chief over the

7    detective division, how did that differ, if at all?

8    A.  It would be the same thing.  I would be answering to the

9    Sheriff.  The units within the detective division, the

10   detective division, there was the case working detectives,

11   there was the criminal lab, the property evidence room, victim

12   advocates, officers assigned to North Metro Drug Task Force.

13   And I believe that's it.

14   Q.  And as a division chief, what was your role, if any, in

15   creating or providing input into policies, Sheriff's Office

16   policies?

17   A.  For the most part, when Doug Darr was the Sheriff -- and

18   so, I don't know, maybe 8, 10 years running -- we used a

19   company out of Southern California called Lexipol, which was

20   established by three gentleman that were policemen and later on

21   became lawyers or, at the same time, actually, some of them.

22   And they created this software for best practices, subject

23   matter experts.  It was vetted by legal.  And they distributed

24   these throughout the country.  And it helped agencies,

25   regardless of the size, make sure that everybody was up with

99

Coates - Direct

1    the best standards.

2    Q.  And did you ever -- who had the authority to adopt policies

3    for the Adams County Sheriff's Office?

4    A.  Well, just to kick back a little bit.  The policies that

5    I -- I don't know the number of pages in them currently, but

6    there was hundreds.  So I don't think it would be farfetched to

7    say there's a thousand pages in our policies and procedures

8    identifying everything.  So when these policies and

9    procedures -- it also would be on a continuing basis.  So as

10   the law changes, we would get new policies and procedures and

11   we would have to vet them as it related to the nuances of our

12   department.

13        So I spent a fair amount of time, as everyone did,

14   because we could have deputies that were subject matter experts

15   in K-9s, and so it would really start, at least as far as

16   vetting them as it related to the nuances of the Sheriff's

17   Office, we would make sure those things were in play; best

18   practices, grammatical errors, just things like that that we

19   would all be responsible for reviewing.

20        And then, ultimately, when all was said and done, they

21   were forwarded to the Sheriff and, of course, I had pretty good

22   personal knowledge that Sheriff Darr and Sheriff McIntosh would

23   have read every one of those and participated in a lot of them

24   and ultimately authorized them to be the marching orders, as

25   you might say, for the deputies from top to bottom.

100

Coates - Direct

1   Q.  And what role did you have in implementing policies at the

2   Adams County Sheriff's Office when you were division chief?

3   A.  I was responsible for knowing the policies.  And if there

4   was any issues with violation of the policies, I would

5   implement the policies.  But the policies, as I stated, were

6   pretty thorough and probably right down to how long your hair

7   would be.

8   Q.  Did you determine assignments or priority of work in either

9   of the divisions that you worked in when you were division

10  chief?

11  A.  I was authorized to do that, yes.  But we had pretty

12  standard set assignments.

13  Q.  Could you explain what you mean by you were authorized?

14  A.  Well, I was authorized to run the division via the Sheriff.

15  But basically, they were through his policies and procedures.

16  Q.  And speaking about the Sheriff, did you ever fill in for

17  the Undersheriff or Sheriff when they were not available?

18  A.  By succession, I was -- in policies and procedures, I was

19  third in command being the division commander of the -- or I'm

20  sorry -- division chief of the detective division.

21          In 2014, I believe -- or I'm sorry, that's not true --

22  2018, the Undersheriff had some medical issues, and there was

23  about a three-month period where he was away from the office,

24  and I took on some of his duties as it related to internal

25  affairs, some of the meetings that he was attending.

Coates - Direct

1                    And as far as the Sheriff goes, I think there was only

2       one time in 2015 that he and the Undersheriff were gone at a

3       conference for maybe a couple hours, and so I was in charge,

4       yet they were two hours away and available by phone.

5       Q.   And when you're a division chief, how much discretion did

6       you have in supervising the work of the deputies in your

7       division, et cetera?

8       A.   Within the narrow lines of the policies and procedures.

9       Q.   And did you have any authority to terminate, promote or

10      discipline the employees within your division when you were a

11      division chief?

12      A.   I did not.

13      Q.   Who had the authority to terminate employees at the

14      Sheriff's Office when you were division chief?

15      A.   The Sheriff.

16      Q.   Did anyone else have authority to do that?

17      A.   No.

18      Q.   And how about promoting, who made the final decisions on

19      promotions at the ACSO when you were division chief?

20      A.   The Sheriff.

21      Q.   And did anyone else at the ACSO have the authority to do

22      that?

23      A.   No.

24      Q.   Let's talk about discipline.  Who had the authority to

25      discipline at the ACSO when you were division chief?

Coates - Direct

1   A.  Well, it depends on what type of discipline.  If it was a

2   low level discipline that might require a verbal warning or an

3   entry into their evaluations, and that would be things such as

4   a patrolman speeding and we may get a complaint from a citizen

5   that they saw the officer speeding and that would be something

6   that the sergeant could give a verbal warning or, if need be, a

7   written warning.  But as you progress to something, then it

8   took on a different role with the internal affairs unit.

9   Q.  I'm sorry, I think you mentioned sergeant.  Who had the

10  authority within the division to institute minor discipline

11  like you were describing, what ranks?

12  A.  All ranks.

13  Q.  So that would be which ranks when you were there?

14  A.  Well, that basically would have been sergeant, commander --

15  or lieutenant at the time -- captain, chief, Undersheriff,

16  Sheriff.

17  Q.  What about more significant disciplines, like suspensions

18  or administrative leaves?

19  A.  Suspensions would require a full blown internal affair.

20  And of course, there was a step-by-step process for that.  And

21  if it got to that level, then it would be investigated by

22  internal affairs unit.  And then there was a succession of

23  hearings thereafter.  Ultimately, leading to the Sheriff and/or

24  the Undersheriff, and that's where the final decision of

25  discipline would occur.

Coates - Direct

1    Q.  And we spoke a little bit about your input into policies.

2            Were you entrusted with any high level information

3    that others in the agency were not privy to when you were

4    division chief?

5    A.  Yes.

6    Q.  What types of information are you referring to?

7    A.  Well, I can't think of anything -- any employee issues,

8    could be drug investigations, things that are -- you know, that

9    are need-to-know basis.

10   Q.  And was that kind of need-to-know basis information only

11   communicated to division chiefs or was it communicated to other

12   staff as appropriate as well?

13   A.  As appropriate.  It could have been chiefs only,

14   Undersheriff only or HR only or down to division chiefs.

15   Q.  And having access to that information, did that impact your

16   powers to influence the Sheriff's Office at all?

17   A.  No.

18   Q.  And as division chief, did you interact with the public or

19   other agencies?

20   A.  Constantly.

21   Q.  Could you describe some of those interactions with other

22   agencies, with the public?

23   A.  Well, we were surrounded by multiple agencies, so there

24   would be inner agreements that if we had certain critical

25   incidents, we worked with other departments.  We would provide

                                                    104
                          Coates - Direct

 1   resources to them and then likewise.

 2          Could you repeat the question again?

 3   Q.  I was just asking you to describe what types of interaction

 4   with the public or other agencies you had when you were

 5   division chief.

 6   A.  So the other agencies, that would be one description there.

 7          And then as far as the community, it was every day, we

 8   would -- we would have large events, but we were in contact

 9   with them on a daily basis through calls or whatnot and

10   communication.  But we had numerous events that we would have

11   close contact with the community.

12   Q.  And how did that differ from other officers in management

13   or even the deputies, if at all?

14   A.  I would say not at all.

15   Q.  And how about your role in determining budget, did you have

16   any role at all as a division chief in determining or shaping

17   the budget?

18   A.  No.

19   Q.  Did you have any discretion in how the budget was spent at

20   the Sheriff's Office when you were the division chief?

21   A.  Very limited discretion that -- as easy as I can describe

22   it, in the detective division, you would get, on a yearly

23   basis, the budget.  But under these circumstances, the budget

24   is, as it relates to personnel and benefits, it may be

25   98 percent of the budget.

105

Coates - Direct

1          So there would be an operations and maintenance budget

2    for each division for the daily activities.  So an example

3    would be, maybe, the detective division had a 6, 700,000-dollar

4    line item budget and you may have 30 to 50 items; training,

5    uniforms, equipment, those type of things, maintenance

6    contracts for surveillance, for the evidence property room,

7    alarms, we had alarms on refrigerators due to needing to keep

8    the exact temperature because we would have evidence in there,

9    so those type of things and -- but again, those were, for the

10   most part, redundant from year to year.  But there was some

11   discretion in these line items that -- an example would be, if

12   I thought that there needed to be more funds in a training for

13   the deputies or the detectives, then I could take a certain

14   amount of money from one line item and put it in that.  But

15   that was always authorized and in conjunction with the finance

16   officer and then, ultimately, authorized by the Sheriff.

17   Q.  How did you go about determining assignments, work

18   assignments or priority of work in the two divisions you worked

19   in when you were division chief?

20   A.  As I stated, you know, this is pretty well set in policy

21   and procedure.  In the detective division, we had 6,500 cases

22   coming in that needed -- there was a percentage that would

23   be -- need immediate attention.  There would be a couple

24   thousand that needed to be followed up.  And then, of course,

25   you have however many detectives working those particular

Coates - Direct

```
1    cases.  So case management would generally be done by a

2    sergeant.  It would be overseen by the commander.  And so, to

3    not let anybody get overwhelmed, of course, we had implemented

4    so many cases that we would top it at 10 or 15 cases per month

5    so they didn't get overwhelmed.  And then the cases were

6    handled the way they needed to be.

7    Q.  And from your experience, did any of those job duties --

8    were any of those job duties impacted based on who you voted

9    for in the election --

10   A.  No, ma'am.

11   Q.  -- for Sheriff?

12          And how about, was personal loyalty to a particular

13   candidate for Sheriff, did that impact the performance of any

14   of those duties?

15   A.  No, ma'am.

16          MS. HALPERN:  And if we could please pull up

17   Defendant's Exhibit Y.  We are removing our objection to it, so

18   I assume it is stipulated.

19          MS. PRATT:  As to Exhibit Y?

20          MS. HALPERN:  Right.

21          MS. PRATT:  Yes, that's fine.

22          MS. HALPERN:  Because it's stipulated, I would move

23   for admission and be able to publish to the jury.

24          THE COURT:  Any objection?

25          MS. PRATT:  No objection.
```

107
Coates - Direct

1              THE COURT:  It's admitted.

2         (Defendant's Exhibit Y received in evidence)

3    BY MS. HALPERN:

4    Q.  Mr. Coates, this is a job description for division chief of

5    the jail division.  It's a little bit post dated when you were

6    there.  But if you can take a look at it.  And if you need it

7    to be enlarged, we might have the capacity to do that.

8              MR. HEETER:  Any particular section?

9              MS. HALPERN:  Just the job duties in general.  I think

10   the top of the document does not matter that much.  If you can

11   publish it to the jury, I don't know if it has been.

12   Q.  Can you review those quickly and see if they correspond

13   with your recollection of what your job duties were as chief

14   when you were employed at the Adams County Sheriff's Office.

15   A.  I would say, overall, these are pretty encompassing of some

16   of the policies and procedures.

17   Q.  And do you see anything that kind of is inaccurate or

18   doesn't describe a job duty that you had when you were division

19   chief?

20   A.  No.

21   Q.  Could you walk through each of these bullet points and let

22   us know which of these duties applied uniquely to division

23   chiefs and which applied to -- more broadly to encompass other

24   employees at the Adams County Sheriff's Office?

25   A.  One by one?

Coates - Direct

1    Q.  If you have the patience, yes, that would be helpful.

2    A.  Well, I'll start from the top.  The first one is:  Adhere

3    to policy, procedures and post orders.  Second one is

4    responsible for the protection of life, property, prevention of

5    crime --

6    Q.  Could you let us know who that applies to, that first

7    bullet point, if it's unique to the position of division chief

8    or if it applies more broadly to any other employees.

9    A.  So the policy, procedures and post orders, that would

10   entail every employee from deputy to Sheriff.

11   Q.  Okay.  If you move to the next duty.

12   A.  Responsible for protection of life and property; prevention

13   of crimes; apprehension of criminals.  All deputies.

14   Q.  The next one.

15   A.  Duties include, but not limited to, answer calls for

16   service; complete appropriate and required paperwork; testify

17   in court; resolve conflict; complete required training;

18   communicate clearly with citizens and other law enforcement

19   professionals; dispense information to those who need it.  That

20   would be applicable to all deputies.

21   Q.  The next bullet point.

22   A.  Prepare a variety of reports, comprehensive documents.  All

23   deputies.

24   Q.  And the next one.

25   A.  Enforce federal, state and local laws and regulations.  All

Coates - Direct

1   deputies.

2   Q.  And the next job duty.

3   A.  Safely carry and handle firearms and operate county

4   vehicles.  All deputies.

5   Q.  And the next one.

6   A.  Review and approve detailed reports and documents.  All

7   deputies.

8   Q.  And the next job duty.

9   A.  Directly supervises employees.  That would be applicable to

10  the supervisors.

11  Q.  And who is encompassed in that definition?

12  A.  That could be basically anyone from a field training

13  officer up to the Sheriff.

14  Q.  And the next job duty.

15  A.  Assist in preparation of the budget.  Monitor and review

16  budgetary expenditures.  That would probably be more associated

17  with division chiefs, commanders.

18  Q.  And the next job duty.

19  A.  Review activities of assigned employees and complete

20  evaluations on performance of employees.  That would be as

21  well, field training officer, deputy, all the way up to the

22  Undersheriff or Sheriff.

23  Q.  And is that true for reviewing activities and also

24  evaluations?

25  A.  Yes.

110
Coates - Direct

1    Q.  And the next job duty.  I think it's train, supervise --

2    A.  Train, supervise and review the work of supervisors.

3    Supervise daily operations of assigned division.  That would

4    probably pertain to commanders and up.

5    Q.  And the next job duty.

6    A.  Ability to plan projects, proposals and grants.  That could

7    just about be anyone.  An example of that would be, again, a

8    deputy that has subject matter expertise in K-9s.

9    Q.  How about the next job duty listed here in Exhibit Y?

10   A.  Attend various committees, operations and board meetings.

11   Could be from deputy up.

12   Q.  Okay.  How about the next job duty?

13   A.  Knowledge and application of current employment laws

14   effecting employee rights and benefits.  All deputies.

15   Q.  Okay.  What about the next job duty?

16   A.  Makes formal recommendations to include:  Hiring,

17   promotion, demotion, transfer, reassignment and separations.

18   That would probably entail sergeants and up.

19   Q.  And I think we discussed this before, the final authority

20   resides with the Sheriff?

21   A.  Always.

22   Q.  What about the next duty?

23   A.  Respond and manage critical incidents.  That could be all

24   deputies.

25   Q.  What about the next job duty?

Coates - Direct

1   A.  Commands, plans and has administrative responsibility of

2   their respective division.  That would probably entail sergeant

3   and above.

4   Q.  And what about the next job duty?

5   A.  Maintain a thorough working knowledge of department

6   policies and procedures.  All employees.

7   Q.  The next job duty.

8   A.  Develop and maintain working relationships with members of

9   legal community, that would include district attorneys, defense

10  attorneys, civil lawyers, judges, court personnel and other law

11  enforcement agencies.  All deputies.

12  Q.  What about the next job duty?

13  A.  Provide training and guidance to other members of the

14  Sheriff's Office, community, academy cadets and other law

15  enforcement agencies.  All deputies.

16  Q.  What about the next job duty?

17  A.  Participate and complete annual law enforcement driving

18  certification.  All deputies.

19  Q.  And the next one.

20  A.  Participate and complete 16 hours of annual training in the

21  area of PPCT, must be certified every quarter.  And that's --

22  PPCT stands for self-defense.  I can't remember the acronym.

23          The next one is --

24  Q.  Who did that apply to?  I'm sorry.

25  A.  All deputies.

Coates - Direct

1    Q.   And the next one.

2    A.   Participate in training, quarterly range qualification,

3    PPCT, Taser and OC recertification.

4    Q.   And who would that apply to?

5    A.   All deputies.

6    Q.   And the final bullet point says, Perform other duties that

7    are assigned.  Were you assigned any other duties that aren't

8    described in Exhibit Y when you were division chief, other than

9    anything we spoke about earlier?

10   A.   I'm sure there was, as it would be so for all deputies.

11   Q.   And in your experience, do any of the job duties exhibited

12   here in Exhibit Y, were any of them impacted by who the

13   division chief voted for?

14   A.   No.

15   Q.   And how about personal loyalty, any of these duties

16   impacted by personal loyalty to the Sheriff?

17   A.   No, ma'am.

18        MS. HALPERN:  You can take this exhibit down.

19   Q.   And you spent how many years, again, as a division chief?

20   A.   I was into my eighth year.

21   Q.   Because you spent so much time at the Adams County

22   Sheriff's Office, I want to lay a little groundwork for some of

23   the policies and procedures that were in operation at the Adams

24   County Sheriff's Office while you were there.

25        How familiar were you with the discipline and

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

113
Coates - Direct

1    termination policies at the Adams County Sheriff's Office?

2    A.  I was very familiar at the time.  But the span of time, I'm

3    probably a little weak on it right now, but I have an overall

4    sense.

5         MS. HALPERN:  Can we please pull up Exhibit 79,

6    Plaintiff's Exhibit 79.

7         I will skip that policy and come back to it.  Tech

8    problems.

9    Q.  So when you were at the Adams County Sheriff's Office --

10   I'll go back to talking about internal investigations and

11   discipline in a moment -- but were you familiar with the Adams

12   County Sheriff's Office standards of conduct?

13   A.  Yes.

14        MS. HALPERN:  Is it possible to pull up Exhibit 98?

15        Your Honor, I believe we're missing a chunk of about a

16   hundred exhibits.  So my efforts to short circuit that while we

17   troubleshoot that have failed.  Is it possible to have three

18   minutes?

19        THE COURT:  Sure.

20   BY MS. HALPERN:

21   Q.  While these exhibits are downloaded, Mr. Coates, could you

22   tell us a little about what you recall from the --

23        MS. HALPERN:  We needed 79, 98 and 59.  Thank you.

24        Sorry about that.  Thank you for your patience.

25   Q.  Mr. Coates, we were about to talk about the discipline and

Coates - Direct

1   termination policies and procedures at the Adams County

2   Sheriff's Office.

3           MS. PRATT:  Your Honor, I'm going to have to object to

4   this exhibit on the grounds of relevance.

5           THE COURT:  Let's not publish it.  Let's lay some

6   foundation for that.

7           MS. HALPERN:  For the relevance as well?

8           THE COURT:  Yes.

9           MS. HALPERN:  Through the witness?

10          THE COURT:  Yes.

11          MS. HALPERN:  Okay.  Exhibit 79 has not been

12   published, but if we could please show it to the witness.

13   BY MS. HALPERN:

14   Q.  Mr. Coates, try to take a look at Exhibit 79.  I believe

15   it's a few pages.  And the Court can flip through it a little

16   bit to show it to you.

17          Now, Mr. Coates, have you -- are you familiar with the

18   discipline and termination policies that were at Adams County

19   Sheriff's Office when you were division chief?

20   A.  I certainly was at the time.

21   Q.  And how are you familiar with the discipline and

22   termination policies at Adams County when you were there?

23   A.  I was aware of them.  I --

24   Q.  And did you have any role in internal investigations or

25   IAs?

115
Coates - Direct

1    A.  Over the -- over the years, I did.  But as a supervisor,

2    most of mine was reviewing and making recommendations on

3    disciplinary issues.

4    Q.  And could you explain to the jury what the typical

5    discipline or termination procedure was when you were at the

6    Adams County Sheriff's Office?

7    A.  Well, if it rose to that level, it would require the

8    intake.  The complaint came in, whether it was from a citizen

9    or an employee, a supervisor would review, obtain the who,

10   what, how, why, where and collect documents from the

11   complainant; videos, cellphone records, things of that nature.

12   And they would do an encompassing investigation on what the

13   allegation was.  And they were able to refer back to the

14   policies and procedures throughout that.  But at the conclusion

15   of an assigned sergeant, who investigated the case, once they

16   had completed their investigation, that investigation would be

17   delivered in book form to the employee's supervisor and --

18   which generally started at per se -- it was a deputy, it would

19   start at the sergeant's supervisor level, he would review it

20   and make recommendation.  The book then would be forwarded to

21   the commander of the particular division, he would make

22   recommendations and findings.  And then it would be gone to the

23   division chief, who again would review, recommend and determine

24   findings.  And at the conclusion of those three reviews, it

25   would be forwarded to the Undersheriff of the Adams County

Coates - Direct

1    Sheriff's Office, and he would make his determination after

2    reviewing the book.

3         And if there was an agreement, then it would be

4    forwarded back to the division chief or the division of the

5    employee where a predetermination hearing was held, which

6    basically stated what the impressions were, what the findings

7    were, and it gave the deputy an opportunity to review it.  And

8    within a period of time, might have been 72 hours -- again, I'm

9    foggy on this stuff -- they could produce information or

10   evidence that would be contrary to the findings.  Sometimes

11   they did, sometimes they didn't.  And there would be at that

12   point an ability for the employee to -- once the findings were

13   determined, they would have the ability to appeal it to the

14   appeals board and/or the Sheriff, or they could have got --

15   they could have skipped the appeals board and straight to the

16   Sheriff.

17   Q.  And Mr. Coates, during your tenure at the Adams County

18   Sheriff's Office, are you familiar with -- are you aware of any

19   deputy that was terminated without going through the process

20   that you have described just now to us?

21   A.  I am not.  The only caveat there would be if there was a

22   particular serious, serious situation, and perhaps the employee

23   might be under arrest.  Then, of course, things would be

24   expedited.

25   Q.  And do you recall receiving a -- and I'm going a little

117

Coates - Direct

 1   bit, chronologically, out of time -- but do you recall

 2   receiving an email on behalf of then Sheriff Reigenborn, his

 3   first full day in office rescinding all of the employment

 4   policies at the Adams County Sheriff's Office?

 5   A.  I do.  I recall that.  I was sitting at my desk in the

 6   detective division, and I got an email from his secretary

 7   indicating the policies.

 8   Q.  And one of those policies that was rescinded was the

 9   disciplinary procedures that had been in operation at the Adams

10   County Sheriff's Office prior to that point?

11   A.  That's correct.

12   Q.  And if you look at Exhibit 79, you had a few minutes to

13   review it, does that reflect the termination process or

14   discipline process that you recall from -- that was rescinded

15   from when you were at the Adams County Sheriff's Office?

16   A.  I'm assuming so, yes.

17        MS. HALPERN:  Your Honor, I would move for admission.

18        THE COURT:  Any objection?

19        MS. PRATT:  Yes.  I still object, your Honor.  And

20   actually, I think I need to approach to explain the basis of

21   why.

22        THE COURT:  Okay.

23      (Continued on next page)

24

25

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1      (At sidebar)

2           MS. PRATT:  Policies in a case like this, when you are

3      talking about the Constitutional standard, it may confuse the

4      jury as to the applicability standard.  To the extent that

5      Plaintiffs want to argue that annihilation of a policy is some

6      evidence of a Constitutional violation, I think that is both

7      irrelevant and potentially runs afoul of Rule 403, the cite is

8      Porro v. Barnes, 624 F.3d 1322, wherein specifically the Tenth

9      Circuit found that a violation of a policy does not necessarily

10     equate to a violation of a Constitutional right.  So that's my

11     problem with this and possibly other policies and procedures.

12          MS. HALPERN:  If I may.  So two things, we're not

13     saying that's a Constitutional violation.  But one of the

14     major -- one of the major ways to prove pretext is divergent

15     from policies and procedures that had been in long-term

16     operation, that's in our closing jury instructions.  We're not

17     arguing that because he rescinded this that he somehow violated

18     the Constitution.  We're using it as evidence of pretext,

19     because he had a motive.  If he rescinded all those policies,

20     he would be able to circumvent them to be able to terminate

21     Plaintiffs and demote other individuals who supported McIntosh.

22     And so those are two reasons, I think.

23          The other thing is that, I mean, the evidence is going

24     to come in that he rescinded all of these policies.  And the

25     policies applied to division chiefs.  It's not a Constitutional

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

 1   issue.  The point is that's a protection that was in place the

 2   whole entire time, in place at the Adams County Sheriff's

 3   Office and is still there now.

 4        THE COURT:  I agree with Plaintiffs, the pretext of

 5   termination for cause, the opening statement suggested that

 6   Sheriff Reigenborn is going to come in and say that he

 7   terminated -- some of it was related to difference in vision,

 8   but there was also this discussion of each of these Plaintiffs

 9   had some issue, like sexual harassment or something like that.

10   And if those were the history of the office as far back as we

11   know, suddenly he's doing some things different that could lead

12   to pretext.  To the extent we need a limiting instruction down

13   the road that says he changed the policy or violated prior

14   policy, I think -- he didn't violate, he rescinded the

15   policy -- to the extent we need a limiting instruction that

16   violation of a policy is not sufficient for a Constitutional

17   violation, we can do that.  But I agree with Plaintiffs.

18        (Continued on next page)

19

20

21

22

23

24

25

120
Coates - Direct

1        (In open court; jury present)

2             THE COURT:  The objection is overruled.

3             Did you move to admit 79?

4             MS. HALPERN:  I just moved to admit it, yes, your

5    Honor.

6             THE COURT:  The objection is overruled.  It is

7    admitted and can be published.

8        (Plaintiff's Exhibit 79 received in evidence)

9             MS. HALPERN:  Can we publish to the jury.

10   BY MS. HALPERN:

11   Q.  We did this in a little bit of a reverse order, Mr. Coates,

12   but how -- you walked us through kind of the steps that

13   typically took place at the Adams County Sheriff's Office when

14   there was a termination or a significant discipline.  And let

15   me just try to clarify.

16            Was that the case for the entire 36 years that you

17   worked there?

18   A.  I think it was standard for the entire time I was there,

19   since 1993, so 26 years.

20   Q.  And how many times did you personally -- how many times

21   were you personally aware of this process taking place before

22   there was significant discipline or a discharge, the process

23   that's described in Exhibit 79?

24   A.  As a supervisor, sergeant level, starting in 2002, I

25   certainly saw hundreds of disciplinary issues from a verbal

Coates - Direct

1   warning to termination.

2   Q.  And I want to ask you about a couple other policies as well

3   that you might be familiar with.

4        MS. HALPERN:  We can take Exhibit 79 down.  Is it

5   possible to load Exhibit 98?

6   Q.  If you could take a few minutes, Mr. Coates, I'm

7   particularly interested in Page 8 of Exhibit 98.  Could you

8   take a look at Page 8, political activity on Adams County

9   Sheriff's Office -- at the Adams County Sheriff's Office and

10  review that.

11  A.  I think you have to go back to Page 7.

12  Q.  Okay.  It starts at Page 7.  Thank you for the correction.

13  A.  Thank you.

14  Q.  And then, I think, to the next page.

15  A.  This is -- I'm sorry, did you want me to read that?

16  Q.  I just wanted to make sure you saw the next page because

17  it --

18  A.  Yes.

19  Q.  Now, Mr. Coates, what is the policy that we are looking at

20  that's part of Exhibit 98?

21  A.  It is dealing with how employees deal with political

22  activity.

23  Q.  Does that reflect the practice that was in place when you

24  were at the Adams County Sheriff's Office?

25  A.  Very similar.

122
Coates - Direct

1    Q.  And how would you know that?  Do you have any familiarity

2    with that policy from the time that you were there?

3    A.  I -- I have personal knowledge of it due to my single

4    internal affair that occurred in March of 2014.  I was the

5    subject of an anonymous internal affair regarding political

6    activity.

7    Q.  And what was the result of that internal affair?

8    A.  It was unsustained, found to be politically motivated.

9             MS. HALPERN:  And since you are familiar with this

10   policy, I would ask that the policy be introduced into

11   evidence.

12            THE COURT:  Any objection?

13            MS. PRATT:  No objection as to 98.

14            THE COURT:  98 is admitted.

15       (Plaintiff's Exhibit 98 received in evidence)

16            MS. HALPERN:  If we could publish Page -- start at

17   Page 7 of Exhibit 98.

18   BY MS. HALPERN:

19   Q.  Now, what was the rule, the policy at the Adams County

20   Sheriff's Office while you were there about engaging in

21   political activity?

22   A.  It was very simple.  We were not to engage in any political

23   activity while on duty or in our car or any relevance as it

24   related to our job duties as a deputy.

25   Q.  And were there any limitations on what type of campaign

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

123
Coates - Direct

```
 1   activity you could engage in or speech you could engage in when

 2   you were off duty?

 3   A.  It was -- it was -- you could have political activity off

 4   duty.

 5   Q.  And did this policy apply to division chiefs?

 6   A.  It applied to every employee.

 7   Q.  Including division chiefs?

 8   A.  Yes, ma'am.

 9   Q.  And did you find, in your experience, that there was any

10   disruption or problems with the performance of anyone's job

11   duties because of their off duty political speech or activity

12   while you were at the Adams County Sheriff's Office?

13   A.  No.  I would give one caveat there.  There was a situation

14   in 2010 when Mark Nicastle and Doug Darr were running for

15   Sheriff, and there was some sense that Mark Nicastle had an

16   internal affair for political activity on duty.

17   Q.  But that wasn't off duty?

18   A.  Well, the allegation was on duty.  But again, that was --

19   I -- I wasn't privy to, you know, the ins and outs of that.

20   Q.  Let me try to clarify my question.

21        Did you find that anyone's off duty political activity

22   impacted their job performance or their duties at the Adams

23   County Sheriff's Office while you were there?

24   A.  No, ma'am.

25        MS. HALPERN:  We can take that one down.  If we can
```

Coates - Direct

 1    pull up Exhibit 59, please.  And if we could turn to Page --

 2    can you flip through that.  I don't think it's quite that long.

 3            Here we go, it's right here.  This is Page 3 of

 4    Exhibit 59.

 5    Q.  Could you review the policy 1024.4.1, please, Mr. Coates.

 6    A.  I'm sorry, 1024.4.1?

 7    Q.  Yes.

 8    A.  I have read it.

 9    Q.  Mr. Coates, were you familiar with the policy in 1024.4.1?

10    A.  This is dated in 2019 while I was not at the Sheriff's

11    Department, and it -- you know, I don't -- I don't recall this

12    being that lengthy.  I don't -- I don't recall.

13    Q.  Do you recall any unauthorized endorsement or advertisement

14    policies from when you were at the Adams County Sheriff's

15    Office?

16    A.  Yes.  And I'm just going off my limited recollection.  I --

17    it encompassed all of these things.  It's just that this is in

18    2019.  I don't know whether it's the exact policy that was

19    there prior to my termination.

20    Q.  Did you have an opportunity to review it and see if it

21    corresponded with what was in operation then?

22    A.  Yes.  It -- like I said, it encompasses the same things

23    that my recollection that they were at the time I was there.

24    Q.  Do you recall -- when you look at the language there on

25    supporting candidates, is that similar to the policy that you

                                                                    125
                              Coates - Direct

 1    recall from the Adams County Sheriff's Office when you were

 2    there?

 3    A.  Yes.

 4          MS. HALPERN:  Your Honor, move to -- I would move to

 5    introduce Exhibit 59 into evidence.

 6          THE COURT:  Response?

 7          MS. PRATT:  I would renew my objection on the same

 8    basis as 79.

 9          THE COURT:  I'm going to sustain the objection to

10    introducing, at this point, Exhibit 59.  He can certainly

11    testify about what his recollection is.  But his testimony was

12    that he doesn't recall this particular policy being this long,

13    and so I don't think he's authenticated it.  And he says this

14    wasn't the one in effect when he was there, so I don't think he

15    can testify to the extent necessary to give this to the jury.

16    He can testify what he remembers about the policy.  But as far

17    as admitting 59, I can't do that based on this testimony.  So

18    I'll sustain the objection to 59.

19    BY MS. HALPERN:

20    Q.  So Mr. Coates, if you could, look at the language in the

21    bottom paragraph of Exhibit 59.

22    A.  In which paragraph?

23    Q.  The bottom paragraph on Page 3 of Exhibit 59.

24    A.  Yes.

25    Q.  When you were at the Adams County Sheriff's Office, did


                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1   employees retain their right to vote as they chose?

2   A.  Yes.

3   Q.  And did employees retain their right to support candidates

4   of their choice and to express their opinions as private

5   citizens?

6   A.  They did.

7   Q.  Did employees retain their right to voice their opinions on

8   political subjects and candidates at all times while off duty?

9   A.  Yes.

10  Q.  And did you ever find that -- and did those rights exist

11  for everybody in the department?

12  A.  They did.

13  Q.  In the -- sorry -- in the Adams County Sheriff's Office?

14  A.  Yes.

15  Q.  Including division chiefs?

16  A.  Yes.

17  Q.  Did you ever see that impacting that kind of activity, off

18  duty activity impact anyone's ability to perform their work?

19  A.  I did not.

20  Q.  Did it ever impact your ability to perform your work?

21  A.  No.

22       MS. HALPERN:  We can take that down.  It hasn't been

23  published.

24  Q.  Mr. Coates, I am going to change topics on you now.  Thank

25  you for kind of explaining some of the background at the Adams

Coates - Direct

1    County Sheriff's Office to everybody.

2            Do you know who Richard Reigenborn is?

3    A.  I do.

4    Q.  And how do you know Mr. Reigenborn?

5    A.  I met Mr. Reigenborn, I'm going to guess, in 1994, 1995.

6    Q.  And how did you first come to meet Mr. Reigenborn?

7    A.  I think we were both patrolmen on the street in 1995.  And

8    again, it could have been 1994.  I don't recall working with

9    him specifically, but we could have crossed paths, an

10   overlapping shift, things like that.

11   Q.  Were you a supervisor at the time?

12   A.  I was not.

13   Q.  You were peers?

14   A.  Peers, yes.

15   Q.  And after that, did the relationship between the two of

16   you, the professional relationship between the two of you

17   change?

18           I can rephrase that if that's confusing.

19           When is the next time you worked with Mr. Reigenborn?

20   A.  I didn't directly work with Mr. Reigenborn until I was a

21   division chief of the patrol division.  And he had gone about

22   his career path.  And I believe, in 2013, maybe, 2014 --

23   probably 2014, 2015, he came to the patrol division from the

24   North Metro Drug Task Force Unit, I believe.

25   Q.  And this is the time when you were a captain, that was the

Coates - Direct

```
 1   same as a division chief?

 2   A.  Yes, ma'am.

 3   Q.  And were you a direct supervisor at that point in time?

 4   A.  I was not.

 5   Q.  Who was his direct supervisor?

 6   A.  It would have been --

 7   Q.  What position?

 8   A.  It would have either been Commander Harold Lawson or

 9   Commander John Bungartz.

10   Q.  Did you have a lot of interaction with Mr. Reigenborn when

11   you were the division chief and he was in the division?

12   A.  I did not.

13   Q.  Could you describe your relationship with Mr. Reigenborn at

14   that time?

15   A.  It was rather benign.  We would see each other in the

16   hallways.  You know, I clearly remember him calling me Timmy

17   regardless of my rank.  I believe I called him Ricky.  And

18   no -- no animosity, it's just we were two different supervisory

19   levels, and I basically didn't hang out with the same crowds

20   and just didn't have any contact with him since -- from '95 to

21   2015.

22   Q.  And what position did he hold when you were the division

23   chief in your division?

24   A.  He was a patrol sergeant.  So whether he was on A platoon

25   or B platoon -- again, Sunday through Wednesday; Wednesday
```

                                                                              129
                                Coates - Direct

1    through Friday -- he was one of the patrol sergeants with a

2    span of control of maybe 12 deputies.

3    Q.   And was that a supervisorial position at the time?

4    A.   Yes.

5    Q.   And how did you feel about Mr. Reigenborn as a supervisor?

6    A.   I thought Mr. Reigenborn was an average supervisor.  I

7    don't recall having any internal affairs issues.  There was no

8    written discipline.  I don't know if he approved of or liked my

9    style of supervision.  But basically, I had a full plate and

10   I -- I just didn't interact with him.

11   Q.   And why do you say that you don't know if Mr. Reigenborn

12   liked your style of supervision?

13   A.   Well, I was rather autocratic in nature.  Just by the span

14   of control of my position, I had a lot of job functions that

15   just didn't allow much interaction with the deputies on the

16   street or the sergeants.  Most of my interaction was with the

17   commanders, Sheriff, the Undersheriff, HR, like peers.

18   Q.   And did Mr. Reigenborn ever lodge a complaint against you

19   when you were division chief?

20   A.   He did not.

21   Q.   Did he ever come and speak with you about any concerns or

22   problems that he had with you when you were division chief?

23   A.   He did not.

24   Q.   And how long did Mr. Reigenborn work in your division when

25   you were division chief?


                        SADIE L. HERBERT, RPR, RCR
            901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

 1  A.  As I stated, I was the patrol captain/chief from November

 2  of 2011 to January of 2015, and he transferred into our

 3  division, the patrol division.  My best recollection would

 4  probably have been 2014.  I just don't know.

 5  Q.  And what happened after -- did Mr. Reigenborn work for you

 6  until the time he first left the Adams County Sheriff's Office?

 7  A.  He was in the patrol division, yes.

 8  Q.  And what do you recall about him resigning from the Adams

 9  County Sheriff's Office?

10  A.  I don't really recall anything about it.

11  Q.  I'm going to fast forward a little bit to the 2014 Sheriff

12  elections.

13        So just by way of background, could you walk the jury

14  through who the Sheriffs were that you had worked for during

15  your tenure at the Adams County Sheriff's Office.

16  A.  I worked for Ed Camp from '93 to '95.  I worked for Bill

17  Shearer for 8 years thereafter.  I worked for Doug Darr 12

18  years thereafter, and 4 years with Michael McIntosh.

19  Q.  And in which of those campaigns for Sheriff do you recall

20  an incumbent having to run against a challenger?

21  A.  I don't.  I don't recall.  I don't know.  I --

22  Q.  I'll rephrase that.

23        Is there any elections that you recall where the

24  incumbent ran again for office and had to face a challenger?

25  A.  Yes.

Coates - Direct

1   Q.  Could you just tell us which races those were between.

2   A.  Ed Camp and Doug Darr ran for election in '95 -- no, I'm

3   sorry, that's not true.  In '95, it was Ed Camp and Bill

4   Shearer.  Bill Shearer won the election, was the Sheriff for

5   eight years.  His undersheriff toward the end was Doug Darr.

6   It was a smooth transition from Doug Darr.  He ran for election

7   against -- I can't remember -- but he had three terms that he

8   was successful with, one was against Mark Nicastle, and I think

9   Frank Carillo in one of the elections, and there was a third.

10  And then, of course, Michael McIntosh succeeded Doug Darr.

11  Q.  After any of these elections, do you recall any significant

12  changes occurring to command staff after a new Sheriff came to

13  office?

14  A.  The only one I recall was in '95.

15  Q.  Go ahead.

16  A.  When Bill Shearer took office after he won the election,

17  after running against Ed Camp.

18  Q.  And was there any other time that you recall there being a

19  significant change to command staff when a new Sheriff was

20  elected?

21  A.  No.

22  Q.  Did you observe any disruptions in service to the community

23  or problems with performance when any of these incoming

24  Sheriffs retained command staff from the prior Sheriff?

25  A.  I did not.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

132
Coates - Direct

1    Q.  Can you tell us a little bit about the Sheriff contest in

2    2014.  Who did you support?

3    A.  I supported Sheriff -- well, running for Sheriff -- Michael

4    McIntosh.

5    Q.  Why did you support Mr. McIntosh?

6    A.  I thought he was an excellent Sheriff candidate.  I had

7    worked with him for quite some time.  He had kind of gone

8    through the ranks as I did.  He was an outstanding,

9    knowledgeable, full of wisdom, collaborative supervisor.  And I

10   worked closely with him because, at some point, we were both

11   division chiefs.  And I was just -- I was impressed with him.

12   Q.  And what kind of activities did you engage in during the

13   2014 election to support Mike McIntosh?

14   A.  I -- in 2014, I think I donated personally $1,225 to

15   Michael McIntosh.  I believe my personal family -- my family

16   members donated $2,450 to Michael McIntosh.  I had a party for

17   him at my house.  I think some personal friends contributed,

18   perhaps, $1,800 to Michael McIntosh.  I had contacted my

19   friend, Jack Sampson, who owns Brighton Ford in Brighton, and

20   he allowed Michael McIntosh to put a large billboard on his

21   Ford dealership property, the Bromley, Highway 85.  I had

22   another friend that was a ranch -- a real-estate broker, and he

23   allowed Michael McIntosh to put up a very large sign at the

24   corner -- southwest corner of 120th and Pecos on his property.

25   And I attended fundraisers.  I had signs in my yard and

Coates - Direct

1    supported him, in the sense of folks that would inquire to me,

2    who would be a good candidate, I would express those opinions.

3    Q.  And what was the outcome of the 2014 election?

4    A.  Michael McIntosh became the Sheriff.

5    Q.  And did you consider that election to be contentious in

6    2014?

7    A.  Yes.

8    Q.  Why is that?

9    A.  I think that Mr. Reigenborn was heavily into the FOP, and

10   it seemed like the FOP probably --

11   Q.  Can I interrupt you, what is the FOP?

12   A.  Sorry.  Fraternal Order of Police, it's the Adams County

13   Fraternal Order of Police, Lodge 1.  And it's made up of

14   employees of the Adams County Sheriff's Department.  And it's

15   an at-large fraternal order, so there was other folks that were

16   allowed in, such as Federal Heights Police Department.

17   Q.  Go ahead, sorry.

18   A.  It was a nonunionized fraternal order.

19   Q.  And you are saying you thought it was contentious because

20   of the Fraternal Order of Police.  I didn't mean to cut you

21   off.  I just wanted you to explain what the FOP was.  So if you

22   could continue, please.

23   A.  I just -- Rick Reigenborn was entrenched in the FOP, and

24   the main issue with me was, in 2014, in March, I received, as I

25   had stated earlier, this internal affair indicating that I was

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1    politically motivating and intimidating people, along with

2    Michael McIntosh to vote for him while on duty.  And this came

3    from the FOP's attorney.  And it was anonymous.  And I had to

4    hire a lawyer, although I couldn't go to the FOP main lawyers

5    because the letter was from that attorney, and so I had to hire

6    an attorney through the FOP, another form of it, but I -- they

7    allow different law firms.  And their main one was one firm,

8    but I went to another firm.  And I had to seek legal counsel to

9    get through this internal affair that was alleging that I had

10    coerced employees.

11        So I didn't quite know how that all factored in with

12    the FOP.  It was coming from the FOP.  It was determined to be

13    politically motivated through the investigation, that was the

14    determination.

15        There was also, you know, the incidents of the FOP now

16    starting to donate a lot of money to the candidates.  I believe

17    in 2010, there was a $20,000 donation given to Mark Nicastle

18    who was running for Sheriff, and some of that money needed to

19    be returned because it wasn't authorized or exceeded the

20    amount.  But I'm not clear on all that.  I do know that I was

21    able to -- I had to have $96.09, I think, refunded to me

22    because of the excessive amount.  And again, that was a rather

23    contentious election, 2010, between Doug Darr and Mark

24    Nicastle.

25        And going forward, there was just some -- there was

135
Coates - Direct

1    some animosity at a meeting regarding who we were going to

2    support, while we were at the FOP, as it related to Michael

3    McIntosh and Rick Reigenborn.  And this was after the

4    primaries.

5            And there was some discussion, I recall, at a meeting,

6    it was probably in the summer of 2014.  There was an argument,

7    it got rather heated.  There was talk of, who are we going to

8    support.  And it became kind of divisive in the sense of we had

9    FOP members with two good standing candidates, and we were

10   starting to -- it was starting to become contentious.  And the

11   only thing I can really remember about the meeting was that

12   whatever I said, as it related to not supporting the two or we

13   needed to, you know, support both of them or not get involved,

14   I just remember that I was shouted down by Rick Reigenborn.

15   And while this is the FOP lodge, you kind of drop your rank at

16   the door and this is a fraternal order, so this was no rank,

17   but I -- I clearly remember him shouting at me in front of the

18   crowd.  And I made a conscious decision not to engage him

19   because of my rank.

20           So I recall that.  And as it went on, I just -- I --

21   there was an increase in dues that was unbeknownst to us.  And

22   that was found out during a meeting at the Sheriff's Office for

23   supervisors.  And at the conclusion of that, I stepped down,

24   stepped out of the FOP.  I felt it became too political in

25   nature.

Coates - Direct

1              It used to be that there was a fraternal order, and

2    the business side of that was -- did not cause problems within

3    the department.  It just -- you know, my experience with

4    Northglenn and my experience with Adams County, I just found

5    the politics of that nature to be a little distasteful.  And

6    you know, as I stated, it used to be kind of a benevolent order

7    and we would do community events.  And I did a yearly weight

8    lifting contest to support Easter Seals.  And the main

9    reason -- and on top of that was that it provided legal

10   defense, the LDF.  So that was incorporated through the FOP.

11             So through the years, for the most part, in my

12   experience, people joined the Fraternal Order of Police, the

13   Adams County Lodge 1, for the camaraderie and the community

14   goals and to provide legal representation, if required.

15   Q.   And who did the FOP endorse in 2014?

16   A.   Rick Reigenborn.

17   Q.   And do you recall if they donated anything to his campaign?

18   A.   They -- it was 1,500 -- or $15,000 plus.

19   Q.   Did anything else happen during the 2014 campaign that you

20   felt made it contentious -- let me rephrase that.

21             Is there anything -- did the 2014 campaign get at all

22   dirty or messy between the candidates?

23   A.   Well, again, that was -- that was when this FOP anonymous

24   letter came out about Michael McIntosh --

25             MS. PRATT:  Objection, asked and answered.

Coates - Direct

 1              THE COURT:  Response?

 2              MS. HALPERN:  I can try to rephrase the question.  I'm

 3    trying to ask a different question than that.

 4              THE COURT:  Go ahead.

 5    BY MS. HALPERN:

 6    Q.  Not related to anything with the Fraternal Order of Police,

 7    do you remember anything else from the 2014 campaign that was

 8    particularly dirty or contentious during the campaign for

 9    Sheriff?

10    A.  Well, not -- not that I can think of.

11    Q.  And --

12              THE COURT:  Counsel, I'm going to interrupt just for a

13    moment.  It's 47 after.  I don't want the jury staying past 5,

14    so once you get to a comfortable spot where you're ready to

15    transition or you think it's a good place to break for the

16    night, just let me know, and we'll do that.

17              MS. HALPERN:  We're almost done with this chapter.

18              THE COURT:  Okay.

19    BY MS. HALPERN:

20    Q.  Do you recall any police reports that were leaked about

21    Richard Reigenborn during the 2014 election?

22    A.  I -- I recall something, but I can't -- it had something to

23    do with whether -- restraining orders.  I -- I recall there was

24    an alleged domestic abuse in the past.  I just can't pinpoint

25    the dates and the time and when I heard those things.

Coates - Direct

1  Q.  And after the election, Sheriff McIntosh, did he terminate

2  any of Mr. Reigenborn's supporters?

3  A.  He did not.

4  Q.  Did you speak with Mr. Reigenborn at all after the 2014

5  election?

6  A.  I did not.

7  Q.  Did you have any disputes with Mr. Reigenborn before he

8  left the ACSO in 2015?

9  A.  I did not.

10  Q.  And what were your interactions with Mr. Reigenborn after

11  he left the Adams County Sheriff's Office until he ran for

12  Sheriff in 2018?

13  A.  There was none.

14       MS. HALPERN:  I think it would be a good time to stop.

15       THE COURT:  Great.

16       Members of the jury, we're going to pause here for the

17  day.  If you could be back by a little bit before 8:30 a.m., we

18  plan on getting started right at 8:30 a.m. or as close to 8:30

19  as we can.

20       I just remind you of your obligations.  One, not to

21  discuss the case with anyone.  You can tell people that you

22  were selected for a jury and tell them the number of days we

23  anticipate going.  I think every one of you are employed, you

24  are free to tell your employer how long it will be.  Don't

25  discuss the topics or the case today with anybody, including

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1   amongst yourselves.  And also, don't do any independent

2   research, internet research or driving by locations or any of

3   that stuff.

4           All right.  We will excuse our jury.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury not present)

2             THE COURT:  So just to try to get a sense of where

3    we're going tomorrow, how much longer do you think you have

4    with this witness?

5             You can step down.

6             MS. HALPERN:  I mean, it's certainly not going to be

7    as long as today because I had to do a lot of background laying

8    work.  It's going to be the events of 2018, the termination,

9    et cetera, so I think it's probably still going to be an hour.

10            THE COURT:  Okay.  Anything we need to take up now

11   before tomorrow?

12            I'm seeing everybody shaking their head no.  That's

13   good.  We'll try to stay on pace and re-evaluate tomorrow

14   afternoon.  Hopefully it's not as hot as it was in here.  This

15   courtroom is not usually this hot.  It feels like it may be

16   cooling down.  I don't know why it's so hot.

17            Thanks everybody.  We'll be in recess.

18            (Adjourned to January 22, 2025 at 8:30 a.m.)

19                              *  *  *

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination  of:                         Page

 3   TIMOTHY JAMES COATES

 4   Direct By Ms. Halpern  . . . . . . . . . . . . .61

 5                    PLAINTIFF EXHIBITS

 6   Exhibit No.                              Received

 7   1  . . . . . . . . . . . . . . . . . . . .72

 8   2  . . . . . . . . . . . . . . . . . . . .75

 9   29, Pages 7 and 8  . . . . . . . . . . . . .77

10   29, Page 4  . . . . . . . . . . . . . . . .79

11   29, Page 3  . . . . . . . . . . . . . . . .80

12   79  . . . . . . . . . . . . . . . . . . . 120

13   98  . . . . . . . . . . . . . . . . . . . 122

14                    DEFENDANT EXHIBITS

15   Exhibit No.                              Received

16   Y  . . . . . . . . . . . . . . . . . . . 107

17

18

19

20

21

22

23

24

25
```

I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes.


*Sadie L. Herbert*
Official Court Reporter
U.S. District Court