1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-01936-STV

4    TIMOTHY JAMES COATES, et al.,

5         Plaintiffs,

6         vs.

7    BOARD OF COUNTY COMMISSIONS FOR THE COUNTY OF ADAMS,

8         Defendant.

9    -----------------------------------------------------------

10                   REPORTER'S TRANSCRIPT

11                    Trial, Vol. II

12   -----------------------------------------------------------

13         Proceedings before the HONORABLE SCOTT T. VARHOLAK,
     Magistrate Judge, United States District Court for the District
14   of Colorado, commencing on the 22nd day of January, 2025, in
     Courtroom A402, United States Courthouse, Denver, Colorado.
15

16                      APPEARANCES
     For the Plaintiffs:
17   IRIS HALPERN, FELIPE S. BOHNET-GOMEZ, VIRGINIA BUTLER and
     SIDDHARTHA RATHOD, Rathod Mohamedbhai LLC, 2701 Lawrence
18   Street, Suite 100, Denver, Colorado 80205

19

20   For the Defendant:
     KATHERINE PRATT, CHRISTY REDMOND and SAUGAT THAPA, Thompson Coe
21   Cousins & Irons LLP, 1700 Broadway, Suite 900, Denver, Colorado
     80290
22

23
     Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street,
24   Denver, CO 80294, (303)335-2105

25


                   SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

20-cv-01936-STV   Trial, Vol. II   January 22, 2025

```
 1              P R O C E E D I N G S

 2       (Proceedings commenced at 8:35 a.m.)

 3       (In open court; jury not present)

 4            THE COURT:  Before we bring the jury in, I just want

 5   to let everybody know, Mr. Jabari showed up today apparently

 6   confused that he had been excused for the trial, thinking he

 7   had just been excused yesterday to go tell his work.  Monique

 8   Ortiz, who is my former courtroom deputy, but helping out here

 9   today saw him, explained to him that, no, he had been excused

10   for the trial.  He seemed disappointed by that.  But he had

11   missed part of the testimony, we can't have him.  So I just

12   wanted to let you all know that we had this issue, that he was

13   here.  I think only one other juror saw him here.  It doesn't

14   affect anything, but I just wanted to put it on the record so

15   everybody knew what was going on.  I think it confirms that his

16   confusion probably makes it better that we're an eight-person

17   jury.

18            Anything before we bring the jury in?

19            Let's bring them in.

20            (Continued on next page)

21

22

23

24

25
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

 1      (In open court; jury present)

 2          THE COURT:  Counsel, you may continue your

 3   examination.

 4   TIMOTHY JAMES COATES,

 5      having been previously duly sworn, testified as follows:

 6          THE COURT:  I just want to remind you, you are still

 7   under oath.

 8          THE WITNESS:  Yes, sir.

 9   DIRECT EXAMINATION(continued)

10   BY MS. HALPERN:

11   Q.  Good morning, Mr. Coates.

12   A.  Good morning.

13   Q.  We're going to jump right into it.  Yesterday, I believe we

14   had finished asking you some questions about the 2014 election

15   between Mike McIntosh and Rick Reigenborn.

16          Do you recall that?

17   A.  Yes.

18   Q.  I'm going to switch topics now to the 2018 election.  Who

19   was involved in the 2018 election for Sheriff at the Adams

20   County Sheriff's Office?

21   A.  It was between Michael McIntosh and Mr. Reigenborn.

22   Q.  And who did you support in 2018 in that race?

23   A.  I supported Sheriff McIntosh.

24   Q.  And what did you do to support Mr. McIntosh in the 2018

25   campaign?

Coates - Direct

 1   A.  It was very similar to 2014 that I described.  I think he

 2   had a kickoff campaign fundraiser at the beginning, and I think

 3   I donated a hundred dollars to him.  I think, in 2014, in the

 4   summer, I hosted a fundraiser at the Ranch Country Club.

 5   Q.  Sorry, 2014 or 2018?

 6   A.  I'm sorry, 2018.  In 2018, I hosted a fundraiser at the

 7   Ranch Country Club.  I think it cost me $1,800 to put on.  At

 8   that fundraiser, I think, from personal friends, we raised

 9   $2,375 or so.  I think my immediate family donated $1,100

10   throughout that campaign period.  I had signs in the yard.  And

11   my recollection is I gave a few signs to some close friends

12   within the Ranch to post in their yard.

13   Q.  And at the fundraiser that you talked about, how many

14   people attended that, do you know?

15   A.  Well, there was quite a few employees and probably some

16   friends from the Ranch to the degree of probably close to a

17   hundred that were in and out.

18   Q.  And who won that election in November of 2018?

19   A.  Mr. Reigenborn.

20   Q.  And what were your initial thoughts when Mr. Reigenborn won

21   that election?

22   A.  I thought that due to my circumstances with Sheriff

23   McIntosh and my supporting him and some of the issues, just my

24   personal issues with the Fraternal Order of Police, that

25   certainly there was a sense to me that I might be in trouble.

Coates - Direct

1    Q.  And what gave you that understanding that you might be in

2    trouble?

3    A.  Well, I -- I mean, I just -- I didn't know Rick Reigenborn

4    that well.  Again, I had the one incident at the FOP meeting

5    where he shouted me down.  I think, clearly, he was running for

6    Sheriff, and I was fearful.  I didn't have any facts.  I was

7    fearful that, with the change, and I think with any type of

8    change, you know, you don't know what's going to occur.  But

9    certainly, in the back of my mind, I -- I felt, with my

10    support, staunch support to Sheriff McIntosh that I could have

11    that problem.

12    Q.  Did anything take place in the news that buttressed your

13    concerns?

14    A.  Well, I had seen a couple of articles in the newspaper, the

15    local newspaper -- I think there's a local rag called the

16    Brighton Blade, and I think at the end of October, I saw that

17    he was in that article and he indicated that --

18            MS. PRATT:  Objection, your Honor.  This calls for

19    hearsay.

20            THE COURT:  Response?

21            MS. HALPERN:  Your Honor, we have a direct quote on

22    audio from Mr. Reigenborn, which we can play first, which would

23    be a party statement, and I think I can reorder the questioning

24    after that.

25            THE COURT:  Sustained.

 1              MS. HALPERN:  Okay.  Also, present sense impression.

 2              THE COURT:  Sustained.

 3              MS. HALPERN:  Your Honor, if I may ask one question,

 4       can I try to lay a foundation?

 5              THE COURT:  Sure.

 6              MS. HALPERN:  Can you please bring up Exhibit 58.

 7       BY MS. HALPERN:

 8       Q.  Mr. Coates, do you recall seeing on TV a presentation on

 9       Denver 7 about the results of the election involving a

10       sergeant --

11              MS. PRATT:  Objection, hearsay.

12              THE COURT:  Response?

13              MS. HALPERN:  This is for present sense impression,

14       because Mr. Coates thought he was going to get terminated.  And

15       there's also a direct audio quote of Mr. Reigenborn calling in

16       and stating --

17              THE COURT:  Let's have counsel approach.

18              (Continued on next page)

19

20

21

22

23

24

25

Coates - Direct

1        (At sidebar)

2            MS. HALPERN:  I can play the audio.  This is his own

3    words.

4            THE COURT:  Just because it's a recorded statement

5    doesn't mean it's not hearsay.

6            MS. HALPERN:  So a party statement is not hearsay,

7    it's an exception to hearsay, first.  And second, it's against

8    interest because he says he's going to get rid of all -- that

9    the McIntosh supporters are creating problems, are still loyal

10   to McIntosh.  We have it on the audio.

11           THE COURT:  A recording saying I'm getting rid of all

12   the --

13           MS. HALPERN:  All the McIntosh --

14           THE COURT:  -- McIntosh people because of the --

15   that's a statement --

16           MS. PRATT:  Mr. Reigenborn is no longer a party to

17   this action.  I don't think that his statements come in as

18   admissions of a party opponent.  And furthermore, present sense

19   impression doesn't apply because he wasn't observing something

20   and speaking about it in real time after his observation.

21           THE COURT:  Do you need it through this witness?

22   Can't you just ask Mr. Reigenborn when he's on the stand?

23           MS. HALPERN:  We can play the audio, so it should be

24   able to be used against the party.

25           THE COURT:  He's no longer the defendant in this case.

Coates - Direct

 1            MS. HALPERN:  But his --

 2            MS. PRATT:  He was not in office at the time.

 3            MS. HALPERN:  The preliminary instructions and the

 4   final instructions noted that the Sheriff is the decision-maker

 5   and that Adams County is liable because he can only act through

 6   its primary agent.  In essence, every statement in this entire

 7   lawsuit is going to be Mr. Reigenborn saying something.

 8            THE COURT:  Why can't you get it in through

 9   Mr. Reigenborn?

10            MS. HALPERN:  Would we be allowed to get it in through

11   Mr. Reigenborn?

12            THE COURT:  When he's on the stand, you can ask him if

13   that's what he said.

14            MS. HALPERN:  That's for impeachment.  Because it's a

15   statement of a party opponent, it can be used for any reason,

16   including that Mr. Coates is called in for a meeting and the

17   termination letters we talked about, because he saw all this

18   stuff on the news saying they were going to get rid of all the

19   McIntosh supporters because they're loyal to McIntosh.

20            MS. PRATT:  I would state, Mr. Reigenborn is not a

21   party in this lawsuit anymore for any capacity.  Moreover, he

22   was not in office at the time of this alleged statement, so I

23   fail to see how that can bind the County, statements when he

24   was not the policymaker.

25            MS. HALPERN:  Your Honor, if I may.  He did take the

Coates - Direct

1    position -- I know his attorneys weren't there -- that he was

2    covered by attorney-client privilege.

3           We had a hearing with your Honor when he and Sheriff

4    McLallan were talking to the lawyers before they took office,

5    because he had been elected and there was attorney-client

6    privilege before he was coming in and that was early in this

7    litigation.  And then he is high up enough in the organization

8    that you can attribute it to the Defendant.  I mean, this is

9    the Sheriff.

10          THE COURT:  Your predecessors in this matter -- it's

11   going to come in at some point in this case once Mr. Reigenborn

12   takes the stand.  I'm going to find it's an admission of a

13   party opponent.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Coates - Direct

1        (In open court; jury present)

2    BY MS. HALPERN:

3    Q.  Mr. Coates, we were talking about news coverage that you

4    were about to refer to for a channel -- on Denver Channel 7

5    after the election.

6            Do you recall I was asking you about that?

7    A.  Yes.

8            THE COURT:  Counsel, can you approach one more time.

9        (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Coates - Direct

1      (At sidebar)

2           MS. HALPERN:  I have the audio all cued up.

3           THE COURT:  The audio, then, let's introduce --

4  because I can see Reigenborn's statement is an admission of a

5  party opponent.  The news coverage of it is double hearsay.  I

6  don't see how you get it in.

7           MS. HALPERN:  I have the audio recording of him.  I

8  was trying to lay a foundation.

9           THE COURT:  Let's get straight to it.

10          MS. PRATT:  What exhibit is this alleged audio?

11          MS. HALPERN:  58, I think 58 is what I just put up.

12          So it's the Denver 7, it's the printed coverage of the

13  audio and then the transcript of it.

14          MS. PRATT:  The audio itself has not been disclosed.

15          MS. HALPERN:  The audio was attached to the --

16          MS. PRATT:  The only exhibit that was produced to us

17  is the paper document.  We never got produced any sort of audio

18  file.

19          MS. HALPERN:  It's a public audio --

20          THE COURT:  Do you have the audio?

21          MS. HALPERN:  Yes, I do have the audio file from the

22  internet, where everyone can get it.  It's news coverage.

23          THE COURT:  So you have Mr. Reigenborn --

24          MS. HALPERN:  Yes.

25          THE COURT:  -- on an audio file --

Coates - Direct

1                MS. HALPERN:  Yes.

2                THE COURT:  -- saying --

3                MS. HALPERN:  Yes.

4                THE COURT:  I'll allow it.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Coates - Direct

1        (In open court; jury present)

2    BY MS. HALPERN:

3    Q.  We were about to talk about some news coverage that you

4    heard after the 2018 election.

5            MS. HALPERN:  I'm going to tee up an audio clip, which

6    I will work with you on.  This is the video.  And can you

7    please go to minute 2:10.

8        (Media played)

9    BY MS. HALPERN:

10   Q.  Now, Mr. Coates, do you recall hearing that on Denver 7

11   after the 2018 election?

12   A.  Yes.

13   Q.  And was that Mr. Reigenborn calling in and talking -- what

14   was Mr. Reigenborn calling in and speaking about during that

15   media presentation?

16   A.  Well, I assumed he was referring to that the command staff

17   was loyal to Sheriff McIntosh and that was going to be an

18   issue.

19           MS. HALPERN:  Your Honor, could I move for admission

20   on the audio clip that we just played.

21           THE COURT:  Any objection?

22           MS. PRATT:  I'll just renew my objection.

23           THE COURT:  That's overruled.

24           Yes, I will admit that small portion that was just

25   played.  Before it goes back to the jury, we're going to need

155
Coates - Direct

1    to trim the clip down to just that.

2             MS. HALPERN:  Yes, your Honor.

3    BY MS. HALPERN:

4    Q.  Mr. Coates, what happened next?

5    A.  After the election?

6    Q.  No, after you heard the audio clip.  What do you remember

7    your next interaction being with Mr. Reigenborn?

8    A.  My next interaction was a short meet and greet at the end

9    of December with him at the Adams County government building.

10   Q.  And can you tell us about that meet and greet.  How did you

11   learn about it?

12   A.  I had -- I don't recall who I learned it through, but the

13   process was that there was this idea that Sheriff Reigenborn

14   wanted his Undersheriff to meet all the supervisors in the

15   department.  And he had set up a -- what we thought was a type

16   of meet and greet.  And it was a 20 to 30-minute introduction

17   period.  And we were -- I don't know whether we were asked the

18   standard questions, everyone was asked the same questions, but

19   it was basically to introduce ourselves and tell the

20   Undersheriff who we were.

21   Q.  And was there anyone else that you were meeting that day in

22   addition to Mr. Reigenborn?

23   A.  The Sheriff, Sheriff Reigenborn was there, and the

24   Undersheriff, Tommie McLallan.

25   Q.  And did you know Mr. McLallan in the past?

Coates - Direct

1    A.  I did not.

2    Q.  And who told you about these meet and greets?

3            MS. PRATT:  Objection, hearsay.

4            THE COURT:  Response?

5            MS. HALPERN:  I can rephrase it.  I'm just trying to

6    establish how they got scheduled.

7            THE COURT:  Sustained.

8    BY MS. HALPERN:

9    Q.  Mr. Coates, what was your understanding of these meet and

10   greets?  Were they supposed to be formal, informal?

11   A.  It was an informal introduction to what I believed was the

12   Undersheriff.

13   Q.  And what do you recall discussing during your meet and

14   greet?

15   A.  Basic pleasantries to begin with.  And he asked me a little

16   bit about my assignment in the detective division.  I was

17   telling him that -- the overall sense of the division, of

18   course, and two of my primary concerns at that time.

19           And then we -- we were still going through the court

20   process with the death of Deputy Gumm, and there was an awful

21   lot of work still to be done.  And I told him about another

22   case, 2014-107, that was a double homicide that impacted me

23   heavily, and I was still working that case to that day.  And I

24   believe we had set up some interviews on that particular case.

25   And so I was kind of giving him the significance of those two

Coates - Direct

 1  cases and whether that took 15 minutes, I'm not sure.

 2       The other aspect of it was I think they asked me my

 3  leadership style.  And I think that, you know, I told them I

 4  was kind of by the book and best practices and the policies and

 5  procedures given by the Sheriff.

 6       Again, it was a very short meeting and just not an

 7  opportunity to go into any depth.

 8  Q.  How long was the meeting?

 9  A.  I think it was 20 to 30 minutes.

10  Q.  Was that the first conversation that you had with

11  Mr. McLallan?

12  A.  I had an earlier conversation, probably a few weeks prior.

13  I was in my basement and I got a call from him, never talked to

14  him before.  And he, at that time, introduced himself on the

15  phone and he stated -- or wanted to kind of know about the

16  detective division.  And he also wanted to let me know a little

17  bit about his experience.

18  Q.  And after the -- before the meet and greet, had you tried

19  to reach out to Mr. Reigenborn at all between the time that he

20  won the election and this meet and greet?

21  A.  I did not.

22  Q.  And this meet and greet was in the end of December, in

23  2018?

24  A.  Yes.

25  Q.  And what were your thoughts leaving the meeting that day,

Coates - Direct

1    in December?

2    A.  Again, I, at that point, had some concerns, but I presented

3    myself to the Sheriff and Undersheriff and didn't really have a

4    feeling one way or the other during the interview.  But

5    certainly, you know, upon leaving, I had the same reflective

6    problems that I had possibly after seeing the news article

7    and -- you know, I was unsure.

8    Q.  And is that the audio clip we were just referring to, where

9    Mr. Reigenborn was talking about the loyalty of McIntosh

10   command staff?

11   A.  It is.  And again, there was another article I had seen

12   that --

13            MS. PRATT:  Objection, hearsay.

14            THE COURT:  Response?

15            MS. HALPERN:  Your Honor, this was just him describing

16   his concerns and why he was worried about potentially being

17   terminated.

18            THE COURT:  So you are not offering it for truth of

19   what was --

20            MS. HALPERN:  I am not.

21            THE COURT:  Overruled.

22   BY MS. HALPERN:

23   Q.  Go ahead, Mr. Coates.

24   A.  As I started, I saw the initial article, it was from the

25   Brighton Blade.  And I don't remember the exact verbiage, but

Coates - Direct

```
 1   he indicated that the command staff had become too heavy and he

 2   needed to clean house a little.

 3   Q.  And did you think this was a job interview in 2018 at this

 4   meet and greet?

 5   A.  I did not.

 6   Q.  What do you recall happening next, in terms of your

 7   employment at the Adams County Sheriff's Office?

 8   A.  This happened, I believe, towards the end of December.  So

 9   into January, I think the next thing I recall is I believe I

10   received my pay scale on January 3rd from the Board of County

11   Commissioners and the Sheriff indicating my new pay rate for

12   the 2019 year.  I remember talking to Sheriff McIntosh and

13   Undersheriff Harold Lawson, that there was -- what they told me

14   was that in their conversation --

15           MS. PRATT:  Objection, hearsay.

16           THE COURT:  Response?

17           MS. HALPERN:  I don't know what Mr. Coates was about

18   to say, so it's hard for me to respond.

19           THE COURT:  I'll sustain it, then.  And why don't you

20   redirect.

21           MS. HALPERN:  Okay.

22   BY MS. HALPERN:

23   Q.  Mr. Coates, you were telling us about pay scales that you

24   received.  And did your opinion of whether you were susceptible

25   to termination change at all in between the interim period that
```

Coates - Direct

1    you had this meet and greet with Mr. Reigenborn and

2    Mr. McLallan and the time that Mr. Reigenborn took office?

3    A.  I lost you a little bit.  Could you repeat that, please.

4    Q.  Sure.  Were you still concerned for your job in the weeks

5    leading up to when Mr. Reigenborn was sworn into office?

6    A.  Yes, as I stated.

7    Q.  And do you recall when Mr. Reigenborn was sworn into

8    office?

9    A.  I believe he was sworn in January 8th of 2019.

10   Q.  Did you see Mr. Reigenborn at any point later that day?

11   A.  I did not.

12   Q.  How about January 9th, what do you recall happening on

13   January 9th, 2019?

14   A.  January 9th, I was sitting in my office, and I recall Judy,

15   Judy Najera sent out correspondence relating to --

16   Q.  Who was Judy Najera, again?

17   A.  She was, I believe, at that time, Sheriff Reigenborn's

18   personal secretary.  She had worked at the Sheriff's Office for

19   quite some time.  And I think she was appointed by Sheriff

20   Reigenborn as his personal secretary.

21   Q.  And I'm sorry, you said you received a letter from Judy

22   Najera?

23   A.  And I just remember the correspondence, and there was an

24   email to all employees of the Adams County Sheriff's Department

25   of his taking over the department and welcoming everyone.  And

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1    I believe it was associated with the rescinding of the policies

2    and procedures as he indicated in 4 or 5 of the policies.

3            MS. HALPERN:  Could we please pull up Exhibit 49.

4    Could you show the witness the pages.

5    Q.  Mr. Coates, have you seen Exhibit 49 before?

6    A.  Yes.

7            THE WITNESS:  And may I ask, Judge, can I get my

8    glasses there.  Sorry, it's a little bit about that almost

9    being 64.

10   Q.  And I'm going to particularly turn your attention to

11   Pages 2 and 3.

12   A.  Yes.

13   Q.  Of Exhibit 49.

14   A.  Yes.

15   Q.  Is that the email and memo attached that you are referring

16   to that you received?

17   A.  Yes, ma'am.

18           MS. HALPERN:  Your Honor, I move to include Pages 2

19   and 3 of Exhibit 49 into evidence.

20           THE COURT:  Any objection?

21           MS. PRATT:  No objection.

22           THE COURT:  It's admitted.

23       (Plaintiff's Exhibit 49, Pages 2 and 3 received in

24   evidence)

25           MS. HALPERN:  Can you please publish to the jury.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1          I'm sorry, is there more pages there?  It goes through

2     5, there's 4 and 5 that goes through the rest of the policies

3     rescinded.  Could you pull it up.  Could you go to Pages 4 and

4     5.  It's the original Exhibit 49.

5     BY MS. HALPERN:

6     Q.  Let me rephrase that.

7          Mr. Coates, do you recognize Pages 2 through 5 of

8     Exhibit 49?

9     A.  Yes.

10    Q.  Is that the email and the rescinding of policies that you

11    were referring to?

12         MS. HALPERN:  Your Honor, if I may correct the record

13    and introduce into evidence Pages 2 through 5 of Exhibit 49.

14         THE COURT:  Any objection?

15         MS. PRATT:  No objection.

16         THE COURT:  They're admitted.

17    (Plaintiff's Exhibit 49, Pages 2 through 5 received in

18    evidence)

19         MS. HALPERN:  Can we publish Pages 2 through 5 to the

20    jury, please.

21    BY MS. HALPERN:

22    Q.  What do you recall going through your mind when you

23    received Exhibit 49?

24    A.  I think I briefly read them and certainly had my concerns

25    about the structure of some of what I had been exposed to for

Coates - Direct                                    163

1    30 years, that they were -- seemed to be changing drastically.

2    Q.  Do you recall that the memorandum was actually dated

3    January 8th, 2019, even though it was disseminated on

4    January 9th, 2019?

5    A.  Yes.

6           MS. HALPERN:  We can take that down.

7    Q.  And what do you recall happening next that day, on

8    January 9th, 2019?

9    A.  Well, I'm not -- I didn't look at the exact time on that,

10   but I continued through my day.  And then I -- I think it was

11   after the lunch hour, I had received a call from Commander Sue

12   Nielsen, who was overseeing the internal affairs unit at

13   headquarters, and she advised me that I needed --

14          MS. PRATT:  Objection, hearsay.

15          THE COURT:  Response?

16          MS. HALPERN:  Your Honor, it explains why he had to go

17   to headquarters.  Defendant said he went on his own.  He was

18   told to go there after --

19          THE COURT:  So you're not offering it for the truth of

20   the matter asserted?

21          MS. HALPERN:  No, it's just to explain what happened

22   next.

23          THE COURT:  Overruled.

24   BY MS. HALPERN:

25   Q.  Mr. Coates, go on.

Coates - Direct

 1   A.  I received a phone call after lunch from Commander Nielsen

 2   stating that I needed to respond at a specific time, I think it

 3   was probably 4:00 o'clock, 3 to 4:00 o'clock in the afternoon,

 4   to respond to headquarters to see the Undersheriff.

 5   Q.  And why did you think you were being summoned to

 6   headquarters when Ms. Nielsen called you?

 7   A.  Well, that -- by that time, I had a pretty good

 8   understanding of a few people that I talked to, including Chief

 9   Gene Claps, that he had been relieved of duty.  And I think

10   there was one or two others, and that there was a number of

11   people being summoned to headquarters.  So my impression was

12   that my meeting for 3 or 4 o'clock was for just that.

13   Q.  And what happened when you arrived at headquarters?

14   A.  I came through the back security gates, I parked by the

15   front -- the back door, which is adjacent to the Undersheriff's

16   office.  I walked through the back door, took 16 steps to the

17   left.  I met him in the doorway of his office.  You know, I

18   knew who he was, I had met him at the meet and greet.  He

19   attempted to shake my hand and I -- I did not, I did not shake

20   his hand.  He handed me a letter, an envelope.  I knew what the

21   envelope contained.  And he requested my car keys and my badge

22   and my ID and handed me a letter, which I read quickly, and

23   that was about it.

24        MS. HALPERN:  Can you please pull up Exhibit 72.

25        Your Honor, I believe this exhibit is stipulated to.

Coates - Direct

1          MS. PRATT:  Yes, it is.

2          MS. HALPERN:  So I would ask that Exhibit 72 be

3     admitted into evidence.

4          THE COURT:  It is.

5     (Plaintiff's Exhibit 72 received in evidence)

6          MS. HALPERN:  Can you please publish it to the jury.

7     BY MS. HALPERN:

8     Q.  Mr. Coates, is this the letter that you are referring to

9     that Mr. McLallan handed to you at headquarters on January 9th?

10    A.  Yes.

11    Q.  And what stood out to you when you read this short letter?

12    A.  Well, I think the word termination jumped off the page, or

13    anticipated termination, I just read through -- I just remember

14    looking at termination, termination, and that I was being put

15    on administrative leave.  So you know, those two things was a

16    pretty quick summation that I was giving up my credentials, I

17    was giving up my car keys, and I was on administrative leave.

18    Q.  And if you look at the last sentence in the first

19    paragraph, what does revoke your appointment mean?

20    A.  My appointment is my job.

21    Q.  And in the following paragraph, is that what you're

22    referring to when you said anticipated termination and

23    termination kind of midway through the paragraph, and then

24    termination underneath that?

25    A.  Yes.

Coates - Direct

1    Q.  Were you upset during this meeting with Mr. McLallan on

2    January 9th, 2019?

3    A.  Yes.

4    Q.  What happened next?

5            MS. HALPERN:  You can take this down.

6    Q.  What happened after you received the letter?

7    A.  I walked out the door.  I was led out the door.  And I -- I

8    met up with Mark Mitchell and Kevin Currier and we were trying

9    to find a ride home.

10   Q.  And why didn't you have a ride home?

11   A.  Because I didn't have a car.

12   Q.  Why is that?

13   A.  Because I had to relinquish my badge and my ID and my

14   credentials, my oath of office and my keys.

15   Q.  At any time during your meeting with Mr. McLallan did he

16   indicate to you that you might be able to remain employed at

17   the Adams County Sheriff's Office?

18   A.  He did not.

19   Q.  And what happened the following day, on January 10th, 2019,

20   did you hear from anyone at the Adams County Sheriff's Office?

21           MS. PRATT:  Objection, calls for hearsay.

22           THE COURT:  That question is not asking -- it's not

23   asking what he heard, just asking whether he heard from

24   anybody, so that question doesn't.  It's overruled.

25           THE WITNESS:  Within that letter, the administrative

Coates - Direct

1    letter, I was advised that if I wanted to have a hearing with

2    the Sheriff for cause, I needed to respond by email to him by

3    noon the next day, so that would have been January 10th.  So I

4    went home and sent an email requesting a meeting.

5    BY MS. HALPERN:

6    Q.  And what happened after that?

7    A.  I think I had talked to Patty Duncan, who was a longtime

8    human resource personnel, friend.  She had moved over to the

9    county building, and I spoke with her on the 10th or 11th and,

10   you know, she apologized for the situation and indicated that

11   the County was offering a severance pay.  And she, in the next

12   day or so, sent me a boilerplate for a severance and

13   nondisclosure.

14   Q.  And did you end up signing that severance agreement or

15   nondisclosure agreement?

16   A.  I did not.

17   Q.  What happened next, do you recall?

18   A.  Certainly, between that time and the arranged meeting on

19   the 15th, I had spoken to legal counsel.  Again, FOP, we had --

20   Fraternal Order of Police, the lodge, we had LDF, but I had

21   terminated my FOP membership and I was now with CPPA, Colorado

22   Police Officers Association, I believe, something.  And I had

23   my LDF through them.  And I contacted Mark Cohen, who was a

24   longtime defense attorney for police officers and kind of set

25   up that process.

                                                                                    168
                                    Coates - Direct

 1    Q.  Had you had your final meeting with Mr. Reigenborn at that

 2    point in time?

 3    A.  I had a final meeting with Sheriff Reigenborn on the 15th.

 4    Q.  And could you tell us about that meeting on January 15th,

 5    2019?

 6    A.  Due to the letter, due to the -- I just assumed I was

 7    terminated.  So I think I walked in the door, and I

 8    basically -- he indicated that I had set up this meeting and

 9    wanted to come in and chat, and so there was my forum to do so.

10    And I told him that -- it was recorded, there was a portion of

11    it recorded, and the rest of it was documented.  It was

12    basically, he told me that he had great -- he had respected me

13    one or two, three times, but he was going in a different

14    direction and that I probably couldn't meet that direction and

15    that I had -- I guess I had said, you know, because I knew some

16    of the other instance that I -- if I had the right to retire.

17    And of course, he said, of course you do, you know.

18            And I guess I probably said -- I told him that I was a

19    career officer and that I was sworn to my oath and that I had

20    worked for three police chiefs, four sheriffs and that I was a

21    by-the-book guy, because that's how the business is run.  We

22    have a thousand pages, policy that dictates how we act, and the

23    citizens know that that's -- or at least the citizens need to

24    know that we're there and that we're doing our job, and that

25    requires a lot of policy, a lot of direction, and that's how

Coates - Direct

1    you can trust us.  So I told him I was that guy.

2    Q.  And you said it was partially recorded, why do you only

3    have a partial recording of that hearing?

4    A.  I took my phone in and I recorded it.  I'm not that good

5    with technology, but I recorded a thousand interviews in my

6    day, and I recorded the substance of it.  And I don't know

7    whether it's a phone -- I have no idea.  I remember the phone

8    went off, it was on vibrate, and I think I touched a button to

9    turn it off, and the phone -- it was in my pocket, it stopped

10   recording.

11   Q.  Did you shout or yell at anyone or swear at anyone during

12   this meeting on January 15th?

13   A.  I did not.  When I get stern sometimes -- I guess I learned

14   that from my father, you know, joke in the family, don't use

15   your dad voice -- so I was stern, like you know I have a fairly

16   loud voice.  My oldest brother's nickname was whispers.  We're

17   loud.

18            MS. HALPERN:  Could we please pull up Exhibit 22.

19            Your Honor, this exhibit has been stipulated to, so I

20   move to admit it into evidence.

21            THE COURT:  Any objection?

22            MS. PRATT:  No objection.

23       (Plaintiff's Exhibit 22 received in evidence)

24            MS. HALPERN:  Play it for the jury please.

25       (Media played)

Coates - Direct

1    BY MS. HALPERN:

2    Q.  Mr. Coates, who is in the room with you during this

3    meeting?

4    A.  Sheriff Reigenborn and the Undersheriff, Tommie McLallan,

5    Sarah, I don't recall her last name, she was taking notes, and

6    Kasandra, the county attorney, deputy county attorney.

7    Q.  And when she was talking to you about severance and you

8    mentioned the boilerplate agreement, is that the settlement

9    agreement that you had received the week before?

10          MS. PRATT:  Objection, your Honor, 408.

11          THE COURT:  Approach.

12      (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

171
Coates - Direct

1        (At sidebar)

2        MS. HALPERN:  Your Honor, first, they have stipulated

3    to at least one of the settlement severance agreements as an

4    agreement, that was just the only one that was actually -- that

5    we had that was signed.  But they just offered it to him.  He

6    didn't say that he was engaged in negotiation, nobody was

7    trying to settle anything.  They were just -- that's not two

8    parties trying to resolve the issue, it's severance to get a

9    waiver of claim, but the other side isn't asking for that or

10   have any say in that.

11       MS. PRATT:  Regardless of whether they had asked for

12   such a severance agreement, the fact is the terms of the

13   agreement would have resolved a potential dispute that would

14   have been arising under that set of circumstances, in which

15   case it's barred.

16       THE COURT:  What's the relevance of it?

17       MS. HALPERN:  To address Ms. Pratt's concerns first,

18   you are not supposed to use a settlement agreement to show

19   any -- to use any of the terms of it to imply that the person

20   had done anything wrong or is guilty, that's not what is

21   happening here.  He's describing the meeting, and they're the

22   ones that brought up that they were going to give him severance

23   to waive his claims.

24       THE COURT:  It is an offer of settlement.

25       MS. PRATT:  Your Honor, to that point, it would

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1    inherently suggest to the jury at least that something here was

2    amiss or something was awry, that the County felt the need to

3    go ahead and offer settlement.

4        MS. HALPERN:  This is also a party statement against

5    their interest.  They're offering it to people, but also a lot

6    of people took that severance and they have been stating

7    including in opening statements, that these are the only four

8    individuals that were terminated.  A lot of people accepted

9    resignation and settlement so they could not be here, but it is

10   a misnomer to imply that they somehow were kept on or

11   voluntarily left.

12       THE COURT:  I'm going to sustain the objection, given

13   my ruling that the Board of County Commissioners is the County

14   and given the testimony, the recorded testimony will come in

15   where you have the County offering you -- from here forward,

16   the employees of either the Sheriff's department or the County

17   make a statement is admissible -- at least on basis of hearsay

18   is admissible because it's a statement of the employee or an

19   employee of the Board of County Commissioners, I just want to

20   make that clear going forward, but I am going to sustain the

21   objection.

22       MS. HALPERN:  Can I ask one other question.  They

23   stipulated to it as an exhibit.

24       MS. PRATT:  Which exhibit?

25       (Conferring)

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1          THE COURT:  Counsel, let's do this, we've been going

2     about an hour, why don't I give the jury an early mid-morning

3     break, and we can take this up outside the presence of the

4     jury.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Coates - Direct

 1        (In open court; jury present)

 2            THE COURT:  Members of the jury, in my opening

 3   preliminary instructions I told you there may be times where we

 4   need to excuse you and have a conference.  This is one of those

 5   times.  So we're going to take an early mid-morning break, at

 6   this point.  If you could be prepared to be back by 9:50, and

 7   hopefully we'll be ready to take this up again at that point.

 8   Thank you.

 9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

175

```
1        (In open court; jury not present)

2             THE COURT:  Which is the exhibit?

3             MS. HALPERN:  31, which I believe has been stipulated

4   to.

5             THE COURT:  I have 31 as stipulated.

6             MS. PRATT:  I see it.

7             MS. HALPERN:  It has been stipulated to.

8             THE COURT:  It's been stipulated to, so I'm going to

9   allow it anyway.

10            MS. PRATT:  Yes.

11            THE COURT:  Anything we can anticipate rolling in with

12   the remainder of this witness that we can take up now, as

13   opposed to sidebar, because I would like to avoid any further

14   sidebars.

15            MS. HALPERN:  Other than objections on hearsay, we're

16   just trying to get through the termination.  I doubt there's --

17            MS. PRATT:  I don't think there's -- with the Court's

18   ruling, I understand your position.

19            THE COURT:  Then we'll take a brief recess.  And then

20   I told the jury to come back at 9:50.  And hopefully we can

21   power through lunch at that point.

22            How much more do you have with this witness?

23            MS. HALPERN:  Probably not that much.  The only thing

24   that might take a few minutes is doing the damages that we had

25   discussed.  But short of that, we're getting close to it.
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

```
 1          THE COURT:  Then we'll take a brief recess.

 2          (Recess)

 3          THE COURT:  Couple things real quick.  One, it's my

 4   understanding -- this is how I understood it at the time --

 5   what is being admitted on Exhibit 58 is just a portion of the

 6   audio clip with Reigenborn calling into the station.

 7          MS. HALPERN:  And your Honor, if I may, I know I had

 8   it introduced as evidence, we didn't assign a number to it.  I

 9   think that we were just talking about it, should we designate

10   that as Exhibit 58A --

11          THE COURT:  Sure.

12          MS. HALPERN:  -- and we'll submit the actual clip, you

13   told us to edit and resubmit it on a flashdrive.

14          THE COURT:  Sure.

15          MS. PRATT:  Could you also ensure that we get a copy

16   of the shortened clip.

17          THE COURT:  Two other things.  The jurors had

18   questions, I guess concerns, about not being able to hear all

19   that well the recording and also they have before them the jury

20   question form if they want to ask questions.  What I would like

21   to do when I bring them in is tell them, I heard you had some

22   concerns about not being able to completely heard the audio,

23   each exhibit that's admitted, including these audio tapes are

24   going to go back with you when you deliberate.  So during your

25   deliberation, if there's parts that you didn't hear or parts
```

1   you want to rehear, you will have the opportunity to do so,

2   just because they're concerned about that.

3           And then, two, just explain to them what this form --

4   this is the juror question form, where they write out if they

5   have a question for a particular witness, just tell them what

6   it is because they're concerned.

7           MS. HALPERN:  And your Honor, if I may, the

8   transcripts which I was about to introduce before break have

9   also been stipulated to, so I will -- I wasn't planning on

10  doing very much with it, but I understood that there might be

11  some hearing issues, so we will also move to admit the

12  transcript.

13          And then the parties have agreed to try to sync the

14  transcripts with the video for the next three.  But we will go

15  ahead and do that.  And then obviously they can listen to the

16  audio as much as they want.

17          THE COURT:  You are okay with me telling them that

18  they're going to have a transcript to go back with them?

19          MS. PRATT:  Yes, absolutely.  That's fine.

20          THE COURT:  Let's bring the jury in, then.  And that

21  will hopefully help with their concerns on that.

22          (Continued on next page)

23

24

25

1          (In open court; jury present)

2          THE COURT:  Members of the jury, a couple of items

3   that you brought to my attention during this last break.  The

4   first is I understand there's some concern because that audio

5   recording, the last audio recording wasn't great.  Every

6   exhibit that's admitted in this case, including that last audio

7   tape which was admitted, will go back with you to the jury

8   room.  So when you go to deliberate -- not before then, but

9   when you go to deliberate -- if you weren't able to hear it

10  well, you'll have it back there with you and you'll be able to

11  hear it again.

12          Also, in addition, what is forthcoming to be admitted

13  is a transcript of that, and that will be admitted too.  And so

14  you'll have a transcript of that.  And I believe there will be

15  transcripts of most of the audio recordings that you are going

16  to hear in this case.  Don't panic if there were parts you were

17  unable to hear, you will have an opportunity to hear it again.

18          The other item that was brought to my attention is I

19  believe there was some question as to the juror question forms

20  in front of you.  If you remember during my preliminary

21  instructions, I had indicated that you would be permitted to

22  ask witnesses questions.  That's how this is done.  Once each

23  witness is done testifying, so it would be for Plaintiffs'

24  witness, Plaintiffs' counsel asks questions and then

25  Defendant's counsel and then Plaintiffs' counsel has an

Coates - Direct

1  opportunity to ask any further questions, once all of that is

2  concluded, I'll turn to you and if any jurors have any

3  questions, what you do is write on this form, pass it up.  And

4  then I'll call the attorneys up, see if the questions are

5  acceptable.  If they are, we'll ask them.  If not, then it will

6  just be one of those questions that doesn't get asked.

7        Mr. Coates, you are still under oath.

8        You may continue your examination.

9  BY MS. HALPERN:

10 Q.  Mr. Coates, I think we worked out a couple of issues at the

11 break, and I would like to do two things.  Do you recall that

12 we were talking about your termination and we had just listened

13 to the audio recording that you had of that meeting?

14 A.  Yes.

15 Q.  How long did the entire meeting take, to your recollection?

16 A.  Well, I would guess it was 12 minutes.

17       MS. HALPERN:  And can we please pull up Exhibit 31.

18       Your Honor, Exhibit 31 has been stipulated to.  I move

19 for admission.

20       THE COURT:  Any objection?

21       MS. PRATT:  No objection.

22       THE COURT:  It's admitted.

23    (Plaintiff's Exhibit 31 received in evidence)

24       MS. HALPERN:  Can we publish to the jury, please.

25 BY MS. HALPERN:

                           Coates - Direct

1   Q.  Mr. Coates, can you take a look at -- scroll through

2   Exhibit 31.  Is this similar to the severance agreement, that

3   boilerplate that you referred to that you had received the week

4   before from Adams County?

5   A.  Yes.

6          MS. HALPERN:  You can take that down.

7          And I would like to introduce Exhibit 54, which is the

8   transcript, your Honor, it's been stipulated to, of the audio

9   recording.

10         THE COURT:  It's admitted.

11     (Plaintiff's Exhibit 54 received in evidence)

12         MS. HALPERN:  Your Honor, I guess we can publish that

13  to the jury very quickly.

14  BY MS. HALPERN:

15  Q.  Mr. Coates, are you aware that there was a transcript made

16  of the audio recording that the jury just heard us play?

17  A.  Yes.

18  Q.  And scroll through Exhibit 54.  Is it kind of an accurate

19  reflection of that recording, to the best of your knowledge?

20  A.  Yes.

21  Q.  And you said that the audio recording got cut off when a

22  phone call came in; is that correct?

23  A.  Yes.

24  Q.  Can you describe the rest of what you recall during that

25  meeting?


                   SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1   A.  Well, I think the continuation was more or less a statement

2   from me indicating that -- what I thought and, again, going

3   back to who I had worked for over 35 years; police chiefs,

4   sheriffs, that, you know, I was there to -- I took an oath of

5   office, and I upheld that oath for 35 years.  And I was just

6   trying to convey to him that it didn't matter that he was the

7   new sheriff.  You know, I take the marching orders, and they're

8   generally -- from the day I started, best practices of the

9   profession, they clearly outlined what I could and could not do

10   and, you know, I like the structure.  So I was indicating to

11   him that, you know, I was -- I was there for him.

12          And you get -- you know, when you have 650 employees,

13   you need good leaders, you need good managers, and I had -- I

14   was a proven commodity at leadership and management.  And

15   sometimes you don't get those two together.  And it takes a lot

16   of work to combine those two, to be the best at both.  And I

17   did my best, and I tried to convey that to him.

18   Q.  Did your tone of voice change after the recording that the

19   jury heard, for the rest of the meeting?

20   A.  It did not.  It's the same.

21   Q.  I think you answered this, but did you swear at anyone

22   during that meeting?

23   A.  I did not.

24   Q.  And in your career at the Adams County Sheriff's Office,

25   did you ever swear at all?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1   A.  I did.

2   Q.  Can you describe the circumstances in which you maybe swore

3   when you were at the Adams County Sheriff's Office?

4   A.  Well, I -- I think that -- I think the time and the place

5   is critical.  I think when you are with your close peers, I

6   think even at times when you were out on the street and had to

7   be demonstrative to get a point across, I'm sure I cursed a

8   time or two on the street, and I cursed a time or two with my

9   friends, and I would say more than two.  But I think there is a

10  sense of -- some of the things that we go through, you know, we

11  do have some dark humor.  We do banter.  We do laugh because

12  our fellow officers are, you know, our psychiatrists.  I

13  couldn't go home and tell my wife what I did every day, my son.

14  But I could tell these guys.  So absolutely, was there -- was

15  there, you know, a tremendous amount of banter, but it was

16  always time and place.

17         MS. HALPERN:  And I would like to pull up Defendant's

18  Exhibit E.  We withdrew our objection, so I believe it was

19  stipulated to.

20         MS. PRATT:  Yes.

21         MS. HALPERN:  Your Honor, I would move for admission

22  of Defendant's Exhibit E.

23         THE COURT:  Any objection?

24         MS. PRATT:  No objection.

25         THE COURT:  It's admitted.

Coates - Direct

```
 1      (Defendant's Exhibit E received in evidence)

 2          MS. HALPERN:  Could we publish to the jury, please.

 3   BY MS. HALPERN:

 4   Q.  Mr. Coates, could you just take a few moments to review

 5   Exhibit E, the pages of Exhibit E and see if you think it

 6   accurately summarizes the rest of the conversation that was not

 7   caught on the recording.

 8   A.  It's a summary of what I said, yes.

 9   Q.  And do you know what Exhibit E is?

10   A.  I think that's a transcript or a summary of the

11   conversation I had with Sheriff Reigenborn.

12   Q.  And looking at it -- but you didn't produce Exhibit E, it's

13   not something you produced; right?

14   A.  I did not.

15   Q.  And does it say anywhere in Exhibit E that you shouted or

16   yelled or swore?

17   A.  Nope.

18   Q.  And that would be accurate; right?

19   A.  Yes.

20   Q.  And I would like to ask you a couple questions, if we could

21   get to the final page of Exhibit E, Page 3.

22          Is that kind of a -- did you say anything other than

23   what is summarized here in the last page of Exhibit E, during

24   the part of the meeting that wasn't recorded by you?

25   A.  It summarizes what I said.
```

Coates - Direct

```
 1  Q.  Has it left anything out that either you or anyone else in

 2  the room said?

 3  A.  It's not verbatim, so -- but in summary, it's fairly

 4  accurate.

 5  Q.  And substantively, is there anything missing from this

 6  conversation that you recall?

 7  A.  No.

 8  Q.  And it says you spoke very quickly and loudly.

 9      Do you recall that?

10  A.  Yes.

11  Q.  What do you recall about that?

12  A.  Well, I heard the tape recording of -- that you played,

13  the -- I don't know if I was speaking that quickly, but I speak

14  pretty loudly.

15  Q.  And we discussed that earlier, your tone didn't change from

16  when the audio recording took place; is that right?

17  A.  It did not.

18  Q.  Do you recall at all knocking your fist on the desk or

19  anything to that effect?

20  A.  I do not.

21  Q.  Did, at any point in time during this meeting, did anyone

22  from the Adams County Sheriff's Office indicate to you that you

23  might be able to keep your job?

24  A.  No.

25  Q.  And you don't see that mentioned anywhere in these notes
```

Coates - Direct

1  either; is that right?

2  A.  I do not.

3  Q.  Now, Mr. Coates, how did you feel that day after final

4  termination?

5  A.  I guess, in the most simplistic terms, devastated.

6  Q.  Why is that?

7  A.  I lost my career.  I lost my oath of office.  I lost my

8  commitment and -- you know, I was put on this earth to serve

9  the citizens, and they entrusted me and I did my best for them.

10  Q.  How did being terminated impact your life?

11  A.  I could go through a punch list of the norms, you know,

12  whether it be losing your identity, whether you wake up every

13  day with some sense of anger.  I've lost family members.  It's

14  a death of what you did.  You don't get over it, you know, but

15  I -- you know, I -- you know, I'm realistic.  People have got

16  problems, everybody's got problems, everybody has probably

17  bigger problems than I have.  I just -- since I was 19 years

18  old, this is what I -- this is what I did.  And I never -- I

19  didn't let you down, so...

20  Q.  And what was it like trying to get back on the job market

21  after you were terminated?

22  A.  I was 58 years old.  These are traditional institutions,

23  and the way you become a manager and a leader of my caliber was

24  to be within that institution, mentored, coached by all the

25  people that made me who I was, citizens, district attorney's

186
Coates - Direct

1   office, my officers, I mean, this is who I was, and I was made

2   by others, just as I made others myself.  But I learned from --

3   these were incredible people, hundred percent dedicated.  These

4   gays, hundred percent.

5   Q.  And did you struggle to or how did it feel the next day

6   when you had to wake up and not go back to the Adams County

7   Sheriff's Office?

8   A.  Again, I -- I don't really know what to tell you.  I -- I

9   could get up and go out today and jump in a car and serve you,

10  so, you know, I was angry.  I was demoralized.  I was ashamed.

11  Not easy to tell your family.  That's the way it is.  I've been

12  moving on, trying to move on since then.

13         But because of my age, I could do -- I know I could go

14  out there and serve you, but no one is going to hire me at 50,

15  60, 64 years old.  And when I was terminated, I was, I don't

16  know, 58, 59 years old.  I had six good -- a good six years

17  left to serve the citizens, and it was cut short.  So, you

18  know, there's a lot of feelings about I let them down, I have

19  let you down, and that's the way it is.

20  Q.  Did you try to get a job after the Adams County Sheriff's

21  Office?

22  A.  I did.  I put in that -- generally, if you are going to get

23  hired at a police department, Sheriff's department, they want

24  the young officer coming in and going through their traditions.

25  And occasionally, some of these departments, due to lack of

Coates - Direct

```
 1    experience or whatnot, they may institute a promotional process
 2    for a higher ranking job.  And I saw that the City of
 3    Northglenn posted a commander's job.  And I wanted to, you
 4    know -- I wanted to give it a try, knowing full well that it
 5    was not going to be successful.  But I thought, maybe there
 6    might be an opportunity to complete that circle of my service
 7    to -- it started with Northglenn, but was within Adams County.
 8           And so I gave that a try, and I went through the
 9    process, which was extensive.  And again, it was out -- I'm
10    putting my life out there to be reviewed, and I failed.
11    Q.  So you were not selected for that job at the Northglenn
12    office?
13    A.  I was not.
14    Q.  And was it -- and you were promoted through the ranks when
15    you were at the Adams County Sheriff's Office; isn't that
16    right?
17    A.  I was, in a very slow, methodical process.
18    Q.  And did you find that that was typical in other Sheriff's
19    office and police departments in the area?
20    A.  Yes.  It's critical.
21    Q.  And how do you know that?  How do you know it's similar in
22    other law enforcement agencies?
23    A.  I knew thousands of law enforcement officers through my
24    three and a half decades.  I knew chief of police, I knew
25    everyone from chief of police to sheriff's to -- down to the
```

188
Coates - Direct

1    reserve officers.  I worked closely with the Denver Police

2    Department, the Thornton Police Department, federal, any

3    surrounding areas, and that's why, when I talk about serving

4    you, I'm sure I was within the cities, whether it be Aurora and

5    every area in the metro area I -- you know, we were -- we were

6    law enforcement officers that had to help each other for times

7    of need.  And therefore, while you might not have been in Adams

8    County, you would have been probably in close proximity or

9    within the cities that I provided services to because we were

10   always overlapping.

11   Q.  And so have you earned any wages from working since you

12   left the Adams County Sheriff's Office?

13   A.  I have not.

14           MS. HALPERN:  Could we please pull up Exhibit 8.

15           Your Honor, this exhibit has been stipulated to, so I

16   move for admission.

17           THE COURT:  Any objection?

18           MS. PRATT:  No objection.

19           THE COURT:  It's admitted.

20      (Plaintiff's Exhibit 8 received in evidence)

21           MS. HALPERN:  If we could please publish to the jury.

22           Your Honor, would it be possible for me to approach

23   the witness just to give him a piece of paper to write on while

24   we're doing some math calculations.

25           THE COURT:  Sure.

Coates - Direct

1          MS. HALPERN:  And to give him a calculator.

2          THE COURT:  Sure.

3          THE WITNESS:  Thank you.

4    BY MS. HALPERN:

5    Q.  Mr. Coates, can you explain to the jury what Exhibit 8 is?

6    And we can scroll through the pages.

7          Can you see it okay?

8    A.  Yes.  You keep flashing back and forth.

9    Q.  Okay.  The first page, I think, we can kind of stabilize

10   on -- or the second page, my apologies.

11   A.  This is the basic salary change from one year to the next,

12   and that generally incorporates cost of living or market

13   adjustment increases, but it's our pay structure.

14   Q.  And can you let us know what your last rate of pay was

15   annually based on Exhibit 8?

16   A.  It appears to be $129,191.78.

17   Q.  And what is the performance rating on kind of the row

18   underneath to the left, what is that indicating?

19   A.  That is the merit increase, which would have been the

20   evaluations that we received on a yearly basis on your

21   anniversary.  And that was -- what I might have explained, the

22   evaluation was rated from 0 to 5, from unsatisfactory to

23   exceptional, and that indicates a 4.91, which would have fallen

24   into an exceptional category.

25   Q.  And what was the percent pay increase associated with being

190
Coates - Direct

1    in that category of performance rating?

2    A.   5 percent.

3    Q.   And was that standard during your time at the Adams County

4    Sheriff's Office?

5    A.   Yes.

6    Q.   And if you could explain to the jury what lump sum means?

7    A.   Well, the lump sum, that 5 percent is indicative of

8    5 percent of your salary for a lump sum on your anniversary

9    date after you are topped out at your pay rate.  So obviously,

10   with my tenure, I was topped out as an employee.  And

11   therefore, my salary was just adjusted on a yearly basis at the

12   first of the year for a market adjustment or cost of living.

13   And so that particular number, whatever it may be, which was

14   valid from January 1st to December 31st was your salary.  And

15   because there was a bonus or a merit system on your anniversary

16   date, you would receive the -- after you receive an exceptional

17   score in your rating, I will receive a 5 percent lump sum of

18   your salary.

19   Q.   Was this kind of your final pay rate and bonus before you

20   were terminated by Mr. Reigenborn?

21   A.   No.  I started the first of the year.  I think I stated I

22   got the pay scale from the Sheriff and the Board of County

23   Commissioners indicating, I think, on January 3rd, what my new

24   salary would be.  And at least for 30 days, I was probably

25   under a new salary.  I think it was about $136,000.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Coates - Direct

1          When I was terminated on the 15th, I think they rolled

2     us over into the Adams County pay schedule or payroll and --

3     but I -- for the month of January, I would have had the cost of

4     living.

5     Q.  And do you know what the cost of living was at that time?

6     A.  I don't recall.

7          MS. HALPERN:  Scroll to the first page.

8     A.  The annual cost of living or my salary starting January 1st

9     was $136,297.36.

10    Q.  Now, I'm going to have you walk through a little bit of

11    math.

12         So the base salary in 2019 should have been

13    $136,297.36; is that right?

14    A.  Yes.

15    Q.  What would you have expected the base salary to be after

16    cost of living adjustments the following year, in 2020?

17    A.  If it was 5 percent, it would be $143,111.96.

18    Q.  If you would do me the favor of tracking that on a piece of

19    paper in front of you, that would be very helpful.

20         What did you say that sum was?

21    A.  So the expected pay and -- well, what it was was

22    $136,297.36 for the year of 2019, times 5 percent of that.  The

23    starting salary in January of 2020 would be $143,111.96.  And

24    then it just -- kind of repetitive 5 percent for the next.

25    Q.  So what would it be for 2021?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

192
Coates - Direct

1   A.  For the starting of 2021, it would be $150,267.55.

2   Q.  And what about 2022 with the cost of living adjustment of

3   5 percent?

4   A.  It would have been $157,780.92.

5   Q.  What would you have anticipated in the year 2019 would have

6   been your lump sum bonus, based on that expected base salary,

7   if you continued to get exceptional evaluations?

8   A.  For 2019 with the base salary of $136,297.36, if you were

9   to take 5 percent of that for the lump sum, that lump sum would

10  have been $6,814.68.

11  Q.  And how about, what would you have expected your 5 percent

12  bonus to be in 2020?

13  A.  $7,155.59.

14  Q.  How about 2021?

15  A.  Are we into 2022?  I --

16  Q.  2021.

17  A.  2021, of the $150,000, it would have been $7,513.37.

18  Q.  And how about 2022?

19  A.  I think it's $7,889.40.

20  Q.  And 2023 is when Gene Claps was elected as Sheriff; isn't

21  that right?

22  A.  2022, in November.

23  Q.  Or he got sworn in -- sorry, go ahead.

24  A.  In the following months of 20 -- January he would have

25  taken office.

Coates - Direct

1  Q.  But you remained retired at that point in time; is that

2  right?

3  A.  Yes.

4  Q.  And did you incur any additional cost increases to your

5  healthcare, for your healthcare benefits during the duration of

6  your -- following your termination from Adams County Sheriff's

7  Office, the beginning of 2019?

8  A.  I -- I'm not sure I'm going to be able to remember what the

9  numbers were.  I was on -- I used COBRA, which is federally

10  mandated, when I was terminated, I had the option to go onto

11  COBRA, which was 18 months of insurance.  And I think, for the

12  11 months of 2019, from February 1st to December 31st, it's my

13  recollection that I was paying $710 a month, maybe.

14        And in 2020, there were some increases to COBRA, and I

15  think it went to $750 or so, so I would have paid that from

16  January 1st to July 31st, so 7 months.

17        And I then went on my wife's insurance policy.  At

18  that time, she was working for DXC.  And I would have gone onto

19  her policy from August 1st to the end of that year, and I can't

20  really remember that -- that was around $4,000, maybe.

21  Q.  So about $312 or so dollars a month?

22  A.  Yeah, I -- I don't have the numbers in front of me.  I have

23  the policies and whatnot.  But that's as much as I can recall.

24  I was on DXC five months of the year, it was around $4,000.

25        And going into 2021, I continued on my wife's policy

Coates - Direct

1    at DXC for, I think, 3 months.  I don't remember the exact

2    figure for that as well.

3            And from there, I went on -- she went to Ball

4    Industry, and I went on her insurance for Ball.  And that was

5    from basically April 1st till the end of 2022.  And I would

6    guess, 2022, I think I paid in the area of $4,000 for the year.

7    Q.  When you kind of total what you just told us about your

8    increased costs to maintain health insurance, what does that

9    number approximately look like?

10   A.  You know, I can't -- it would help if I could look at my

11   items.  But for 2019, it was $710 times 11.  It was $7,810 for

12   the year of 2019.

13           $700 was for 7 months -- or $750 because of the

14   increase.  That was $5,200 for the year of '20, so it was -- it

15   was $7,800 for the first 7 months and $5,000 -- I'm a little

16   confused.

17           I'm sorry.  I just -- I don't have the numbers.

18   Q.  Well, let's start with counting through your base wages.

19           Could you total up those for the four years.  What

20   would that number be for your total base wages lost?

21   A.  I think the four columns add to $587,463.

22   Q.  And can you also total up your lump sum bonuses?

23   A.  I'm going to have to go through each category and write

24   them down.

25           THE COURT:  While he's doing that, can I have counsel

Coates - Direct

1    approach.

2        (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Coates - Direct

1       (At sidebar)

2           THE COURT:  I'm just worried about losing the jury.

3           MS. HALPERN:  If you would allow us to --

4           THE COURT:  Can't you just put it up in closing, this

5   is the total?  Doing this with all four of these witnesses --

6           MS. HALPERN:  Okay.

7           THE COURT:  I'm not sure the jury -- it seems like

8   this is something you could put up in closing.

9           MS. HALPERN:  We have to get the testimony on.

10          THE COURT:  I understand you need to get this --

11          (Inaudible)

12          THE COURT:  I would expect it -- do you agree, do you

13  have any issues?

14          MS. HALPERN:  I don't like spending time on damages.

15          MS. PRATT:  It's their witness.

16          MS. HALPERN:  I was trying not to lead.

17          THE COURT:  I'll allow some leading to move through

18  this.

19          (Continued on next page)

20

21

22

23

24

25

Coates - Cross

1      (In open court; jury present)

2  BY MS. HALPERN:

3  Q.  Did you finish with that?

4  A.  The total sum for the four years for the lump sum equated

5  to $29,371.

6          MS. HALPERN:  We can take this Exhibit 8 down.

7          I am finished with my examination of you.  If there's

8  anything else you would like to tell the jury, please let me

9  know.  Otherwise, counsel for the Defendant is going to have an

10  opportunity to ask you some questions.

11          MS. PRATT:  Objection, that calls for narrative.

12          THE COURT:  Sustained.

13          Cross-exam.

14          MS. PRATT:  Yes, cross-examination.

15  CROSS-EXAMINATION

16  BY MS. PRATT:

17  Q.  Good morning, Mr. Coates.

18  A.  Good morning.

19  Q.  So Mr. Reigenborn that was the Sheriff of Adams County at

20  the time of these events terminated your employment because you

21  supported his opponent in the election, Mr. McIntosh.  Do I

22  have that right?

23  A.  Yes.

24  Q.  And that's the sole reason that you are claiming that then

25  Sheriff Reigenborn terminated your employment; correct?

Coates - Cross

1   A.  Yes, ma'am.

2   Q.  Are you familiar with a person named Paul Gregory?

3   A.  I am.

4   Q.  He's the current Undersheriff, is he not?

5   A.  Yes, ma'am.

6   Q.  And Mr. Gregory was also employed at the Adams County

7   Sheriff's Office when Mr. Reigenborn took office; isn't that

8   right?

9   A.  Yes.

10  Q.  And he was retained?

11  A.  Yes.

12  Q.  Terrance O'Neill, do you know Terrance O'Neill?

13  A.  I do.

14  Q.  Mr. O'Neill was a McIntosh supporter, was he not?

15  A.  Yes.

16  Q.  He was retained; correct?

17  A.  Yes.

18  Q.  Mr. Gregory was also a McIntosh supporter; right?

19  A.  Yes.

20  Q.  He was retained, yes?

21  A.  Yes.

22  Q.  Do you know a person named John Bungartz?

23  A.  I do.

24  Q.  And Mr. Bungartz was also a McIntosh supporter; correct?

25  A.  That's correct.

                              Coates - Cross

 1   Q.  He was retained; right?

 2   A.  Yes.

 3   Q.  And another example would be a man named Sam Thede, he was

 4   a McIntosh supporter; is that right?

 5   A.  Yes.

 6   Q.  Do you know Mr. Thede?

 7   A.  I do.

 8   Q.  And he was retained by then Sheriff Reigenborn, wasn't he?

 9   A.  Yes, ma'am.

10   Q.  So the truth is that Mr. Reigenborn in fact actually did

11   keep on staff a number of people who supported then Sheriff

12   McIntosh in the election; right?

13   A.  Yes, ma'am.

14   Q.  Now, yesterday, the jury heard you testify some about the

15   FOP.

16           Do you remember that line of questions?

17   A.  Yes.

18   Q.  And the FOP, again, that stands for Fraternal Order of

19   Police; correct?

20   A.  Yes.

21   Q.  And you gave some testimony yesterday about an anonymous

22   complaint that resulted in an internal affairs investigation

23   into you; right?

24   A.  Yes, ma'am.

25   Q.  You don't know who made that complaint; correct?

Coates - Cross

 1    A.  I do not.

 2    Q.  It was anonymous?

 3    A.  Yes, ma'am.

 4    Q.  And you said also yesterday that you had to retain an

 5    attorney to represent you in the internal affairs

 6    investigation; accurate?

 7    A.  I did.

 8    Q.  That attorney, though, was provided to you by the Fraternal

 9    Order of Police; correct?

10    A.  By the legal defense fund with the FOP, yes.

11    Q.  You have mentioned a couple of times the LDF, does that

12    stand for legal defense fund?

13    A.  Yes.

14    Q.  And that's a benefit to members of the FOP; correct?

15    A.  It's what the dues go to.

16    Q.  Right.

17    A.  So it's a conglomerate of attorneys.  They had their main

18    ones, but there would be three or four law firms that you could

19    choose as to which attorney you wanted to represent you.

20    Q.  And that's what you did with regard to the attorney that

21    you retained for purposes of representation in the internal

22    affairs investigation; right?

23    A.  Yes, ma'am.

24    Q.  You didn't pay out-of-pocket for that attorney's services;

25    correct?

Coates - Cross

1    A.  I did not.

2    Q.  Now, we heard you a little bit earlier today, I believe,

3    talk about this notion of a revocation of your appointment.

4           Do you remember that line of questioning?

5    A.  Yes, ma'am.

6    Q.  And isn't it correct that the Sheriff is the person who

7    makes appointments of deputies?

8    A.  Yes.

9    Q.  And yesterday, you testified that the Sheriff had the sole

10   hiring and firing authority at the Sheriff's Office; correct?

11   A.  Yes, ma'am.

12   Q.  Yesterday, you also talked to the jury some about your

13   position when you were division chief at the Adams Sheriff's

14   Office.

15          Do you remember that line of questions?

16   A.  Yes.

17   Q.  And at the time of the -- of your separation from the

18   Sheriff's Office, you were in fact the division chief over the

19   detectives division; correct?

20   A.  That's correct.

21   Q.  And that's a leadership position within the Adams County

22   Sheriff's Office, isn't it?

23   A.  Yes.

24          MS. PRATT:  Could we please pull up Plaintiff's

25   Exhibit 87.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

                                                                                    202
                              Coates - Cross

 1              And your Honor, this is a stipulated exhibit.

 2              THE COURT:  Any objection?

 3              MS. PRATT:  And may I publish this to the jury.

 4              THE COURT:  Any objection?

 5              I have it marked as stipulated.

 6              MS. HALPERN:  No objection.

 7              THE COURT:  It's admitted.

 8         (Plaintiff's Exhibit 87 received in evidence)

 9              MS. PRATT:  May we publish it to the jury, please.

10              THE COURT:  Yes.

11              MS. PRATT:  Now, I realize the print is a little bit

12    small.  I'm going to ask Jon if he can zoom to the upper

13    left-hand quadrant of this document.  Great.  Thank you so

14    much.

15    BY MS. PRATT:

16    Q.  Now, Mr. Coates, do you see there all the way over to the

17    left-hand side, where it has your name and says, chief

18    detective division?

19    A.  Yes.

20    Q.  And then if we follow that black line around, it goes up to

21    Undersheriff Lawson; correct?

22    A.  Yes.

23    Q.  And so you would have directly reported to Undersheriff

24    Lawson in the hierarchy; correct?

25    A.  Yes.

Coates - Cross

 1   Q.  And then the Undersheriff reports to the Sheriff?

 2   A.  Yes.

 3   Q.  So my understanding is that you had responsibility for

 4   running the entire detective division; is that right?

 5   A.  I had the authority to -- I was the top ranking officer of

 6   the detective division, yes.

 7   Q.  And so that -- in that role, you would have been involved

 8   in overseeing detectives who were below you in the chain of

 9   command?

10   A.  Yes, ma'am.

11   Q.  You oversaw the crime lab?

12   A.  I had -- obviously, there was layers of supervision.  So

13   they would have a sergeant, a lieutenant, and of course, they

14   would -- that was their span of control.  But under that span

15   of control, yes, I ultimately was responsible for the

16   activities.

17   Q.  Right.  You oversaw as part of your duties as the division

18   chief of the detectives division, you oversaw the operations of

19   the crime lab, yes?

20   A.  Yes.

21   Q.  You also oversaw the operations of the evidence room; is

22   that right?

23   A.  Yes.

24   Q.  You oversaw the victim advocate unit; correct?

25   A.  Yes.

Coates - Cross

1    Q.  You also oversaw the North Metro Task Force; isn't that

2    right?

3    A.  Not so much as their day-to-day activity, just the assigned

4    officers that were there.

5    Q.  But you had responsibility for assigning those officers to

6    the North Metro Task Force; correct?

7    A.  Not necessarily.  That would have been a process for -- not

8    necessarily a promotion, but an assignment that people sought

9    and put in for.

10   Q.  The North Metro Task Force, that's a narcotics task force;

11   is that right?

12   A.  Yes.

13   Q.  And as third in command of the Sheriff's Office, you also

14   participated in oral boards for potential new hires; is that

15   correct?

16   A.  Not new hires, but more promotional aspects.

17   Q.  But you would participate in the interview process for

18   people who were potentially going to be promoted within the

19   detectives division; is that right?

20   A.  Could have been, yes.

21   Q.  And as third in command, you also would contribute your

22   thoughts to the Sheriff and the Undersheriff about what types

23   of policies and procedures should be enacted for the

24   detective's division, to the extent there was any need for

25   change to any policy; isn't that right?

Coates - Cross

1  A.  If need be.  I can't really recall any, but yes.

2  Q.  And there were also times that you would fill in for the

3  Undersheriff when Undersheriff Lawson was away; is that right?

4  A.  I think I indicated yesterday that there was a three-month

5  period that I took on some of the responsibilities of the

6  Undersheriff.  And I had the one incident where I was the only

7  one in town, but again, they were within phone calls and a

8  couple hours away, I think.

9  Q.  But at that time, when Mr. Lawson was away, you stepped

10  into his role to be the acting Undersheriff; is that right?

11  A.  I was not the -- no, I was not the acting Undersheriff.  I

12  just took on some of his duties of the Undersheriff.

13  Q.  If both the Undersheriff and the Sheriff were away, though,

14  you were the acting Sheriff, were you not?

15  A.  If that ever occurred.  So as I indicated, there was the

16  one particular time that they went on a conference, and so just

17  logistically, if something occurred, they may not be able to

18  get back for, you know, two hours.

19       Sheriff McIntosh was out of the state when Deputy Gumm

20  was killed.  So basically, you know, he was still the Sheriff.

21  The Undersheriff stepped in for some of his responsibilities.

22  So it was just -- you know, these guys were available 24 hours

23  a day, 7 days a week, and it just became a logistical issue.

24  Q.  Sure.  I understand.

25       Do you remember having your deposition taken in this

Coates - Cross

1   case, it was a few years ago now?

2   A.  I remember, yes.

3   Q.  And you took an oath during that deposition, right, just

4   like you did yesterday and today for your testimony here in

5   court?

6   A.  Yes, ma'am.

7   Q.  There was some testimony that you gave at your deposition

8   that I think might help clarify this issue a bit for the jury.

9           MS. PRATT:  So with the Court's permission and if

10  there's no objection from counsel, I would like to ask the

11  clerk to please hand the witness the pre-prepared deposition

12  binder that contains Mr. Coates' deposition transcript.

13          THE COURT:  Any objection?

14          MS. HALPERN:  I'm objecting because I don't know the

15  line or the page.

16          MS. PRATT:  I will absolutely --

17          MS. HALPERN:  And are you using it to impeach or

18  refresh recollection?

19          MS. PRATT:  Refresh recollection.

20          MS. HALPERN:  No objection to refreshing recollection.

21  BY MS. PRATT:

22  Q.  Mr. Coates, in front of you there is a binder, and

23  hopefully there are names on each one of the tabs.  So if you

24  will please turn to the tab marked with your name.

25  A.  Okay.

Coates - Cross

```
 1   Q.  Do you see that transcript there in front of you, sir?

 2   A.  I do.

 3   Q.  And that is your deposition transcript?

 4          MS. HALPERN:  Object to --

 5   Q.  You can certainly check the signature page, if you would

 6   like.

 7   A.  Yes.

 8   Q.  Now, if you would please turn to Page 83.

 9   A.  Okay.

10   Q.  Specifically, Line 2, at the top of Page 83.  You'll see

11   there's lines on -- pardon me -- numbers on the left-hand side

12   of the page there.

13   A.  Yes.

14   Q.  So you were asked the following question during your

15   deposition:

16          The questioner said, So moving on --

17          MS. HALPERN:  Judge, this isn't refreshing

18   recollection.

19          THE COURT:  Sustained.

20   BY MS. PRATT:

21   Q.  Mr. Coates, do you remember testifying just a moment ago

22   about your role as acting Sheriff?

23   A.  Yes.

24   Q.  If you could just take a moment, please, and review your

25   deposition testimony from Page 83 going on to Page 84 and see
```

                                    208
                          Coates - Cross

1    if that helps you to remember whether in fact you would take on

2    the duty of the acting Sheriff when the Sheriff and the

3    Undersheriff were not available.

4    A.  Okay.

5    Q.  Does that help to refresh your memory as to whether in fact

6    you acted as the acting Sheriff if both the Sheriff and the

7    Undersheriff were away?

8         MS. HALPERN:  Your Honor, I believe he is supposed to

9    put the document back down if it's just for refreshing

10   recollection.

11        THE COURT:  Overruled.

12        THE WITNESS:  I'm sorry, your question?

13   BY MS. PRATT:

14   Q.  In reviewing your testimony from Pages 83 and 84 of your

15   deposition, does that help you to remember that in fact you did

16   take on the acting Sheriff duties when then Sheriff McIntosh

17   and Undersheriff Lawson were away?

18   A.  I took on a portion of the duties.  As I described,

19   Undersheriff Harold Lawson, because some of the things are time

20   sensitive, like internal affairs, so I can clearly remember

21   that I took on some of those duties as the Undersheriff's

22   duties, as well as numerous meetings that he was mandated in

23   his position to attend.

24        So whether it's a miscommunication there, you know, I

25   was still a division chief, acting in some of their roles as

Coates - Cross

1    their position.  I was never changed from HR as an acting

2    Undersheriff or an acting Sheriff.  These would be instants

3    that were short lived and you are taking on responsibility.  So

4    if I didn't clarify, I didn't clarify.

5    Q.  Sure.  At the time, though, sir, you said, "A time or two,

6    both of them left and I was the acting Sheriff."

7              Did I read that accurately?

8    A.  You did.

9    Q.  Now, as the division chief over the detectives division,

10   you had autonomy to get your job done; correct?

11   A.  Yes.

12   Q.  And you also had responsibility for implementing the

13   Sheriff's policies; correct?

14   A.  Yes.

15   Q.  You needed to be able to disseminate those policies to the

16   troops, so to speak; right?

17   A.  Yes, ma'am.

18   Q.  And it's your job also to ensure that the people under your

19   chain of command, so people like the commanders, the sergeants

20   and the line deputies were in fact following the Sheriff's

21   policies; correct?

22   A.  Yes.

23   Q.  You also had a role as a mentor in the Sheriff's Office;

24   right?

25   A.  I did.

210
Coates - Cross

1   Q.  And you helped to determine various assignments within the

2   detectives division; correct?

3   A.  Again, the detective division is very structured, because

4   you have layers of supervision and spanned control of those, so

5   ultimately, people adhered to the same policies of the Sheriff.

6   And as I stated, the procedures themselves kind of outline what

7   each function is.  So as an overall role, in that sense, I'm

8   just ensuring that the policies of the Sheriff are, to the best

9   of my ability, adhered to and corrected if not.

10  Q.  Right.  And in so doing, part of your job was to make

11  assignments within the division to ensure the right people were

12  in the right places to carry out those policies; correct?

13  A.  At the beginning, you know, people were -- took on their

14  establishments and they maintained their supervisory role

15  throughout my entire time in the detective division.  So there

16  wasn't a change in the process, moving people around, at least

17  at the supervision level.

18  Q.  Understood.

19          You testified, I think, a moment ago that you also

20  would make or you would participate in the oral boards with

21  regard to promotions; correct?

22  A.  Yes, ma'am.

23  Q.  And that would include, I take it, after the conclusion of

24  the oral boards, you would make recommendations about who

25  should get promoted over some other candidate; correct?

Coates - Cross

1    A.  Yes.  There would be a panel of numerous people; Sheriff,

2    Undersheriff, HR executive, the division chiefs, maybe the

3    captains were in there.  So it was a panel of people that had

4    set questionnaires and typical oral board.  And at the

5    conclusion, we probably, if I recall -- it was, again, kind of

6    a numbers evaluation, where you evaluated them and scored them.

7    And then at the end, you know, we would talk about it.

8    Q.  Right.  So you would participate in that recommendation

9    process; fair?

10   A.  Yes.

11   Q.  You also participated in the preparation of the budget for

12   the detectives division?

13   A.  Not necessarily in the operating and the maintenance, kind

14   of the reset button.  But there would be times I would submit

15   business plans with finance and the Sheriff for things that we

16   wanted to get done as capital projects that were funded by the

17   county.  Such things as I remodeled the detectives division to

18   make sure they had all new working areas, remodeled the

19   interview rooms to make them more conducive to interviews in

20   the modern day, you know, a lot of work in the

21   property/evidence room as it related to the disposition of

22   thousands and thousands of items, as we were starting to lose

23   room in the room.  And we had drugs, and we had guns.  And a

24   lot of things needed to be done.  We also needed to have

25   surveillance of those items.  We need to have alarms of those

212
Coates - Cross

1    items.  So those type of things were capital projects that I

2    worked with facilities, Adams County facilities for those type

3    of things.

4          Same thing happened in the patrol division, when I

5    remodeled the patrol division.  I -- I ensured that the

6    exercise rooms were up to date.  And I would get a line item

7    for maintenance of the equipment.

8          So there was the line items that were more or less a

9    reset and the capital projects that were discussed with the

10   Sheriff and Undersheriff and finance and those type of things,

11   but I -- as far as the dollar goes, nothing to do with those

12   things, just submitting what we were requesting.

13   Q.  And that's my point, though.  You participated in the

14   process of making requests for various budgetary items in order

15   to meet the needs of your division --

16   A.  Yes.

17   Q.  -- correct?

18   A.  Yes.

19   Q.  Yesterday, Mr. Coates, you testified that you have what you

20   styled as an autocratic leadership style; correct?

21   A.  Yes, ma'am.

22   Q.  And you would also agree with me that, in your view, you

23   ran a pretty strict ship; correct?

24   A.  I will say that my style was autocratic as it related to

25   the policies and procedures.  But as with any good leader, you

Coates - Cross

1    are able to transform from one leadership style to the next,

2    and I could do that in a moment's notice, depending upon what

3    was standing in front of me.  But as it related to the business

4    end and implementing the policies of the Sheriff, that was more

5    autocratic, in the sense of there wasn't -- there wasn't a lot

6    of leeway in those type of things.  The policies and procedures

7    are pretty black and white.

8    Q.  If you can please turn to Page 48 of your deposition

9    transcript, sir.  And specifically, I'll direct your attention

10   to the line -- Line 15.

11   A.  Yes.

12   Q.  And just for context, the paragraph -- your answer there,

13   sir, you said, "So it was my belief that there wasn't much

14   reason for me to reach out.  Obviously, Mr. Reigenborn has

15   known me for an awfully long time.  I'm assuming he gives some

16   credibility to the fact that I was promoted, educated, ran a

17   pretty strict ship and that my heart was in the right place and

18   would be for him."

19           Did I read that accurately?

20   A.  Yes, ma'am.

21   Q.  And that was your testimony; correct?

22   A.  Yes.

23   Q.  You would agree with me too that, when it comes to

24   leadership style, you have a different philosophy from

25   Mr. Reigenborn; would you agree with that?

Coates - Cross

1    A.  I'm not acquainted to Mr. Reigenborn's leadership style to

2    any great extent.

3    Q.  Go ahead and turn to Page 35 of your deposition transcript,

4    please.  And specifically, I'm referring to Line 17.

5         Do you see Line 17 there?

6    A.  Yes, ma'am.

7    Q.  And you were asked the following question:  "And how was

8    Rick Reigenborn different?"

9         And you answered as follows:  "I think Rick Reigenborn

10   spent a lot of time on the outside doing other things.  I was

11   dedicated to the job.  He was an FOP member.  He seemed to --

12   you know, the FOP often had disgruntled folks, employees or

13   gripes about the administration.  I think he was -- you know,

14   the conferences that the FOP board members and members went to

15   on a yearly basis were significant, and I just had a different

16   philosophy from him."

17        Did I read that accurately?

18   A.  You did.

19   Q.  And that was your testimony at the time; correct?

20   A.  Yes, ma'am.

21   Q.  Now, Mr. Coates, you kept a naked Barbie doll in your desk

22   drawer, did you not?

23   A.  I did not.

24   Q.  You deny that you had a doll named Little Suzie in your

25   desk drawer?

215
Coates - Cross

1    A.  I had two little figurines that were fully clothed in my

2    desk drawer that someone, while I was at the Adams County Jail,

3    put on my desk.  And for whatever reason, they were left in the

4    desk, and they made their way down to the patrol division.  I

5    had them in my desk there.  And I think when I went to the

6    detective division, they got thrown in the boxes.  You move

7    your stuff, and I believe they stayed in a closet next to my

8    office for the next four years.

9    Q.  So you deny that you had a naked Barbie doll called Little

10   Suzie in your desk drawer; correct?

11   A.  I certainly do.

12   Q.  You don't like Mr. Reigenborn very much, do you?

13   A.  I don't really know Mr. Reigenborn, to tell you the truth.

14   Q.  Well, you referred to Mr. Reigenborn as Ragenfuck[ph] --

15   and I apologize to the Court for the profanity -- however,

16   that's your word, sir; correct?

17   A.  Yes.

18         MS. PRATT:  Could we please take down this exhibit and

19   bring up Exhibit A-13, please.

20   BY MS. PRATT:

21   Q.  Mr. Coates, I will direct your attention to Exhibit A-13.

22         MS. PRATT:  And specifically, if we could please

23   enlarge the bottom portion under that blacked out section.

24   Q.  Now, do you see there on the top line, where it says, local

25   user, and it's got the name T. O'Neill there --

Coates - Cross

1   A.  Yes, ma'am.

2   Q.  -- do you see that?

3        And right under that, it says, partner name, and then

4   your name is right next to that; correct?

5   A.  That's correct.

6   Q.  Partner phone number is also listed there; correct?

7   A.  Yes, ma'am.

8   Q.  And that's your phone number at the time at least; correct?

9   A.  Yes.

10  Q.  And the message reads, "I think Ragenfuck is going to need

11  you.  Maybe these positions won't be so easy to fill with

12  competency anyway."

13       Did I read that correctly?

14  A.  Yes.

15  Q.  And that was a message that you sent to Mr. O'Neill;

16  correct?

17  A.  Yes.

18  Q.  And that message was sent, if we look at the date and time,

19  on November 21st of the year 2018; correct?

20  A.  Yes.

21  Q.  At approximately 3:18 p.m. in the afternoon?

22  A.  Yes.

23  Q.  And November 21st, 2018 is roughly just a couple of weeks

24  after the 2018 election that Mr. Reigenborn had just won;

25  correct?

Coates - Cross

 1  A.  Yes, ma'am.

 2          MS. PRATT:  Let's go to the second page, please, and

 3  scroll down, thank you.  And specifically if we could look at

 4  the third message, it's noted record 295, please.  If we could

 5  blow that up.

 6  Q.  Mr. Coates, do you see record 295 on the screen there?

 7  A.  Yes, ma'am.

 8  Q.  Also, once again, local user, Mr. O'Neill's name appears on

 9  that line; correct?

10  A.  Yes, ma'am.

11  Q.  And partner name, T.J. Coates, that's you; correct?

12  A.  Yes.

13  Q.  And again, this is another message that you sent to

14  Mr. O'Neill; correct?

15  A.  Yes.

16          MS. HALPERN:  Your Honor, I think we have laid a

17  sufficient foundation to have this admitted into evidence, and

18  I'd like to publish it to the jury.

19          THE COURT:  Any objection?

20          MS. HALPERN:  Yes, your Honor, 401, 403 and 404.

21          THE COURT:  Well, overruled.

22          MS. HALPERN:  Your Honor --

23          THE COURT:  Overruled.  I think it's relevant because

24  it goes to the issue of the reasons that Defendants have given

25  for the termination.  And any prejudicial value is not -- does

Coates - Cross

1    not substantially outweigh that.

2            MS. HALPERN:  Your Honor, Mr. Reigenborn didn't know

3    about these messages before making his decision, so it can't go

4    towards the decision-maker's --

5            THE COURT:  Do you want to respond to that?

6            MS. PRATT:  This is with regard to Mr. Coates'

7    attitude toward Mr. Reigenborn.  I think, as an admission of a

8    party opponent, it certainly comes in.  And I also do think

9    that it's relevant because it goes to Mr. Reigenborn's

10   perception of -- even if he wasn't aware of this specific text

11   message -- of how Mr. Coates treated him during the course of

12   their relationship.

13           THE COURT:  I'm going to overrule the objection.

14           A-13 is admitted and may be published.

15       (Defendant's Exhibit A-13 received in evidence)

16   BY MS. PRATT:

17   Q.  Staying with record 295, Mr. Coates.  Do you see the text

18   there in the section that's marked message?

19   A.  Yes, ma'am.

20   Q.  And again, this is a message that you sent to Mr. O'Neill

21   on November 21st, 2018; is that correct?

22   A.  Yes, ma'am.

23   Q.  This one was at 6:55 p.m.; right?

24   A.  Yes, ma'am.

25   Q.  And you wrote to Mr. O'Neill, "I hope you guys are able to

Coates - Cross

1    enjoy the holiday.  I've been very concerned about your family

2    under this ridiculous time we find ourselves in.  I do believe

3    and have not heard Ragenfuck speak negatively about you.  I

4    think you and McNair should survive this bullshit, maybe not

5    perfectly, but in a manageable program.  Hope it's the same in

6    Arapahoe."

7              Do you see that that?

8    A.  I do.

9    Q.  Those were your words writing to Mr. O'Neill just two weeks

10   after the 2018 election; correct?

11   A.  Apparently, yes.

12             MS. PRATT:  We can take that exhibit down.

13   Q.  Now, Mr. Coates, I think we have this pretty clear, in

14   2018, when Mr. Reigenborn was running against then Sheriff

15   McIntosh, you supported McIntosh, just to be perfectly clear

16   about that; right?

17   A.  Clear.

18   Q.  And you didn't engage in any political speech making in any

19   sort of public forum other than the campaign events that you

20   have already testified about; correct?

21   A.  Yes.

22   Q.  Now, in 2018, I just want to focus on the 2018 campaign for

23   a moment.  In your direct examination you testified about some

24   events that you participated in and some money that you donated

25   and others donated money as well to Mr. McIntosh's campaign;

                                    220
                          Coates - Cross

1   correct?

2   A.  Yes, ma'am.

3   Q.  But you weren't on Mr. McIntosh's campaign committee in any

4   way, were you?

5   A.  I was not.

6   Q.  And in fact, your political affiliation and beliefs and

7   participation were very, very limited; correct?

8   A.  They are what I testified to.

9   Q.  You worked at the Adams County Sheriff's Office at the time

10  that Bill Shearer was elected as Sheriff; is that correct?

11  A.  Yes.

12  Q.  And I believe you testified earlier that you first came to

13  the Adams County Sheriff's Office under Sheriff Camp; is that

14  right?

15  A.  Yes, ma'am.

16  Q.  And when that transition happened between Sheriff Camp and

17  Sheriff Shearer, there were approximately 12 or 13 people who

18  were terminated; correct?

19  A.  That's my understanding.

20  Q.  And you agree that Sheriff Camp and then newly elected

21  Sheriff Shearer clashed from time to time; correct?

22  A.  Apparently.

23  Q.  I want to turn and talk about the opportunity to be heard

24  meeting that you testified to on direct examination.

25          Do you remember that line of questions?

Coates - Cross

1    A.  Yes.

2    Q.  And we listened to Exhibit 22, which was the audio

3    recording of that hearing; correct?

4    A.  Yes.

5    Q.  It was a little bit hard to hear, but we also looked at

6    Exhibit 54, which was the transcript of that meeting; correct?

7    A.  Yes.

8    Q.  And then, likewise, because the recording cut off, we also

9    looked at Defendant's Exhibit E, which was that summary of the

10   remainder of the conversation; correct?

11   A.  Yes.

12   Q.  And you have already testified that those are accurate

13   representations of what happened in that meeting; correct?

14   A.  I did.

15   Q.  And no one in that meeting said anything to you about your

16   opinions about the Fraternal Order of Police; correct?

17   A.  No, ma'am.

18   Q.  No one mentioned anything to you about collective

19   bargaining and your views on that issue; right?

20   A.  No, ma'am.

21   Q.  And no one said anything to you in that meeting about your

22   support for Sheriff McIntosh; correct?

23   A.  No, ma'am.

24   Q.  Now, at the end of your testimony, when Ms. Halpern was

25   speaking with you, you talked about the fact that you have not

Coates - Redirect

```
 1   gone back to work since you were let go from the Adams County

 2   Sheriff's Office; is that right?

 3   A.  That's correct.

 4   Q.  You don't hold any outside employment presently; correct?

 5   A.  No, ma'am.

 6   Q.  Now, with you, one of your co-Plaintiffs is current Sheriff

 7   Gene Claps; correct?

 8   A.  Yes, ma'am.

 9   Q.  And he was elected in the 2022 election; right?

10   A.  Yes.

11   Q.  He took office in early January of 2023?

12   A.  Yes.

13   Q.  And you haven't gone back to work for Sheriff Claps;

14   correct?

15   A.  No.

16        MS. PRATT:  Thank you.  I have nothing further for

17   you, sir.

18        THE COURT:  Thank you.

19        Redirect.

20   REDIRECT EXAMINATION

21   BY MS. HALPERN:

22   Q.  Mr. Coates.

23   A.  Yes.

24   Q.  If you could put that folder away, I just have a couple

25   quick questions.
```

Coates - Redirect

1              So you heard earlier Ms. Pratt asking you about Paul

2    Gregory; is that right?

3    A.  Yes.

4    Q.  And you -- and she asked you if he was retained at the

5    Adams County Sheriff's Office; isn't that right?

6    A.  Yes.

7    Q.  Do you know if Mr. Gregory received a similar termination

8    letter as you did on January 9th, 2019?

9    A.  Yes, he did.

10   Q.  And was Mr. Gregory a McIntosh supporter?

11   A.  Yes.

12   Q.  And did Mr. Gregory actually retain the same position that

13   he had prior to Mr. Reigenborn taking office?

14   A.  He did not.

15   Q.  What happened to Mr. Gregory?

16   A.  Mr. Gregory had a hearing and subsequently was demoted by

17   two ranks.  I believe, at least my recollection, that

18   Mr. Gregory told me that he could no longer do his off-duty

19   work.  He's a firearms expert, trains thousands of people, and

20   part of his ability to raise his three children is he has an

21   off-duty or a shooting range out of his home.  And he was told,

22   as I recall him telling me, he was unable to continue that or

23   it was suspended for a period of time so -- and he was

24   transferred to the headquarters where he would be working at

25   headquarters.  He couldn't work off-duty, and he was demoted by

Coates - Redirect

```
 1   two ranks, I believe.

 2   Q.  And I believe Ms. Pratt referred to someone named Sam

 3   Thede.  Who is Sam Thede?

 4   A.  Sam Thede is another officer that received that same letter

 5   and, you know, I remember him at my house after that event, and

 6   he was -- he was nervous.  And I think, ultimately, he -- he

 7   did -- he went back or was able to retain his job of some sort,

 8   I don't know whether he was demoted or not.  I don't remember

 9   at this time.

10   Q.  But he received a termination letter at the same time you

11   did; is that what you are referring to?

12   A.  Yes.

13   Q.  And I believe Ms. Pratt referenced someone named Terrance

14   O'Neill; is that right?

15   A.  Yes.

16   Q.  Let me ask you one quick question.

17           Was Sam Thede also a McIntosh supporter?

18   A.  Yes.

19   Q.  And I believe Ms. Pratt mentioned someone named Terrance

20   O'Neill; is that right?

21   A.  Yes.

22   Q.  Was he a McIntosh supporter?

23   A.  Yes.

24   Q.  Do you know if he received a termination letter around the

25   same time as you, January 9th, 2019?
```

Coates - Redirect

 1   A.  He did.

 2   Q.  And Ms. Pratt had asked you if Mr. O'Neill was retained.

 3   Did he manage to retain the same position, do you know?

 4   A.  He did not.

 5   Q.  What happened to Mr. O'Neill?

 6   A.  He was demoted, I believe, to commander.

 7   Q.  I believe, changing topics, that Ms. Pratt asked you about

 8   your participation as a division chief on the oral boards.

 9         Do you recall that line of questioning?

10   A.  Yes.

11   Q.  And she asked if you participated in those.  Were any other

12   positions at the Adams County Sheriff's Office involved in

13   those oral boards, titles?

14   A.  As participants in the oral board?

15   Q.  That's correct.

16   A.  I think -- I believe division chiefs were there, and the

17   Undersheriff and the Sheriff and the HR executive, as I

18   indicated.  And I think those are the ones, you know, I readily

19   remember being in the promotional process and the oral boards.

20   And I think that was from sergeant and above.

21   Q.  So sergeants were also involved in the oral boards?

22   A.  I mean, those were the candidates.

23   Q.  I think you testified earlier, so HR was also involved?

24   A.  Yes.

25   Q.  And I think you testified earlier that the ultimate

Coates - Redirect

 1  decision was made by the Sheriff; is that right?

 2  A.  Yes.

 3  Q.  And I believe Ms. Pratt asked you about mentorship.  Did

 4  you serve as a mentor at any other time, other than as division

 5  chief?

 6  A.  Did I serve as a mentor?

 7  Q.  Yes.

 8  A.  I was a professional mentor and coach throughout my entire

 9  career.

10  Q.  And I want to switch topics to Exhibit 13-A, Defendant's

11  Exhibit 13-A, when Ms. Pratt asked you about referring to

12  Mr. Reigenborn using a swear word.

13       MS. HALPERN:  Can we just pull that up to refresh

14  the -- Mr. Coates' recollection.

15  Q.  What date did these text messages happen?

16       MS. HALPERN:  I think you can maybe narrow it down so

17  he can see it.

18  A.  11 -- November 21st, 2018.

19  Q.  Now, did you ever recall calling Mr. Reigenborn anything

20  similar prior to this time?

21  A.  No.

22  Q.  Can you please give us the context of this conversation

23  that took place on November 21st, 2018, why were you referring

24  to Mr. Reigenborn that way?

25  A.  I -- as we had kind of talked about earlier, I had read the

Coates - Redirect

1    newspaper about him cleaning house.

2    Q.  Did you also hear that clip that we played from Exhibit 58?

3    A.  Yes.

4    Q.  Okay.

5    A.  I think that occurred on November 7th or so.  I read the

6    newspaper article.  I think that was in -- at the end of

7    October.  And as I stated earlier, after the election and with

8    those type of things that I read, I was nervous, and I felt

9    like, you know, some bad things could happen here.

10   Q.  Go ahead.

11   A.  So I -- I don't -- I don't recall this text message.  What

12   I remember is being greatly concerned about the guys that got

13   the termination letters and their families.  And I was angry at

14   the situation, and I did refer to that according to the text.

15   Q.  And what were you and Mr. O'Neill discussing in this set of

16   texts?

17          And if you need to review them, we can do that.  If

18   you're ready.  Do you want him to keep scrolling?

19   A.  Yes.

20          Okay.

21   Q.  What were you discussing in Exhibit 13-A with Mr. O'Neill

22   when you used swear words?

23   A.  Well, I -- as we stated, I was concerned about his family.

24   I was -- I thought it was, you know, a ridiculous -- that we

25   found ourselves in this situation, so I guess there was back

Coates - Redirect

```
 1   and forth on that.  And really, I had hoped that my partners,
 2   that they would have retained their jobs, and there was this
 3   thin hope that it would be okay.  I don't -- you know, I don't
 4   know.  There was a concern that, you know, one minute you are
 5   doing your job and you are doing it to the best of your ability
 6   and the next day you are not.
 7   Q.  So 13-A, you are discussing the chances of you losing your
 8   jobs?
 9   A.  Yes.
10   Q.  And you and Mr. -- you never actually spoke to
11   Mr. Reigenborn directly referring to him in any derogatory way;
12   is that right?
13   A.  I did not.
14   Q.  And you didn't produce a record of these, copy of these
15   text messages to Mr. Reigenborn, did you?
16   A.  No.
17           MS. HALPERN:  I think you can take that down.
18   Q.  And then I think Ms. Pratt asked you about a number of
19   individuals who were let go when Mr. Shearer won the Sheriff's
20   race; is that right?
21   A.  Yes.
22   Q.  And do you know what happened with those individuals?
23   A.  Well, that's going back -- that's going back some time
24   and -- 1995, Bill Shearer had been working in the department,
25   and I think whatever caused their implosion of their
```

Coates - Redirect

1    relationship, Bill Shearer ended up leaving, whether he was

2    fired or left on his own will, I don't know, but he ended up

3    working as an investigator at the district attorney's office.

4    And I know that Bill Shearer won the election, and Bill Shearer

5    came in and terminated a number of the employees.

6    Q.  Do you know the outcome of that?  What did the employees do

7    after that?

8    A.  Do I know -- I know that -- I know I remember the -- it was

9    referred to as the dirty dozen that were let go, and I clearly

10   remember that they -- they had filed a lawsuit, and I remember

11   that they settled out of court.  And I don't -- I don't know

12   why, but my -- I just kind of remember, it was for a million,

13   million two, million four, and they signed nondisclosures.  And

14   of course, these officers, to this day, you know, will not

15   discuss it.

16   Q.  And that was the only time you recall kind of any change in

17   command staff, when a new Sheriff came in; is that right?

18   A.  Yes.

19          MS. HALPERN:  I have no further questions, thank you,

20   Mr. Coates.

21          THE COURT:  Thank you.

22          Let me ask the jury, do any jurors have any questions

23   for Mr. Coates?

24          Thank you.  You are excused.

25          THE WITNESS:  Thank you, sir.

230
Templeton - Direct

 1          THE COURT:  Plaintiff wish to call their next witness.

 2          Counsel, while we're getting the next witness, it's

 3    about 11:30 a.m., roughly.  How long do you think this witness

 4    will be on direct?

 5          MS. BUTLER:  I anticipate around 45 minutes, your

 6    Honor.

 7          THE COURT:  I don't want to keep the jury too much

 8    past noon, so I'll let you know when we get to 5, 10 minutes

 9    before noon, and you can pick a natural point to break at that

10    point.

11          MS. BUTLER:  Thank you, your Honor.

12          THE COURT:  Please swear in our witness.

13    DOUGLAS TEMPLETON,

14          called as a witness by the Plaintiffs,

15          having been duly sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MS. BUTLER:

18    Q.  Thank you, Mr. Templeton.  Mr. Templeton, did Rick

19    Reigenborn talk to you about firing T.J. Coates, Mark Mitchell,

20    Kevin Currier and Gene Claps if he were to win the 2018 Adams

21    County Sheriff's election?

22    A.  Yes.

23    Q.  Before we get into the details of Plaintiffs getting fired,

24    I want you to tell the jury a little about yourself.

25          Where are you from, Mr. Templeton?

Templeton - Direct

1  A.  I am a native of Brighton, Colorado, born and raised there.

2  Q.  When did you start working in law enforcement?

3  A.  I started with the Brighton Police Department in 1985.

4  Q.  And why did you decide to join law enforcement?

5  A.  Well, my grandfather was the Sheriff of Adams County --

6  actually, great grandfather was the Sheriff of Adams County at

7  one point in time and just always had a calling to help other

8  people.

9  Q.  And does your family have any other history with Adams

10  County Sheriff's Office?

11  A.  Have any other issues?

12  Q.  Excuse me, any other history with the Adams County

13  Sheriff's Office?

14  A.  Yes.  Well, my son worked there at Adams County for a

15  little while, and then he moved on to Colorado State Patrol.

16  And of course, later died in the line of duty in 2007.

17  Q.  Did you stay in law enforcement after your son was killed

18  in the line of duty?

19  A.  Yes.

20  Q.  Why did you decide to stay after this happened?

21  A.  Well, there's still community.  I have family in Adams

22  County.  There's citizens in Adams County I liked.  I enjoy the

23  people, camaraderie with the department.

24  Q.  Is the legacy of your son's law enforcement important to

25  you and why you stayed?

Templeton - Direct

1    A.  Well, it is, yeah.

2    Q.  Let's talk about your career with the Adams County

3    Sheriff's Office in a little bit more detail.  And if I refer

4    to it as the ACSO, is that a common reference?

5    A.  Yes.

6    Q.  When did you start with the ACSO?

7    A.  In 1989.

8    Q.  Can you briefly walk me through your progression with the

9    ACSO from when you started to the end of your employment,

10   please.

11   A.  Sure.  I started as a deputy in 1989 under Sheriff Camp's

12   regime.  I worked in corrections for 10 years.  During that

13   time was an FTO, got promoted to booking officer.  And then,

14   after 10 years, I transferred to patrol in the ACSO, worked for

15   ACSO, I don't know, 10 years, somewhere around there.  Did SWAT

16   duties, FTO duties with my patrol duties, and then got promoted

17   in 2011 as a sergeant and moved to the training facility at

18   Flatrock, trained the new officers for the northern part of

19   Colorado.  And then, shortly after that, got transferred back

20   to the jail again to run a shift, and then to a transport unit

21   to help -- assist the courts with prisoner transports, and then

22   later on was a supervisor for the civil division.

23   Q.  And was that your last position as a sergeant in the civil

24   division with the ACSO?

25   A.  That was my last position, yes.

Templeton - Direct

1  Q.  And now, let's talk about the end of your employment with

2  the ACSO.

3         When did your career end?

4  A.  April 8th, 2019.

5  Q.  And by 2019, how many years had you worked at the ACSO?

6  A.  30 years and a couple months.

7  Q.  In April of 2019, who was the Sheriff at the ACSO?

8  A.  Sheriff Rick Reigenborn.

9  Q.  And after Mr. Reigenborn was elected, were you subject to

10  an internal affairs investigation?

11  A.  Yes, I was.

12  Q.  And how did this -- if I refer to that as an IA, is that an

13  abbreviation you are familiar with?

14  A.  Yes.

15  Q.  How did this IA start?

16  A.  This started when I was teaching at the academy at Flatrock

17  in observation and perceptions, it's one of the post criteria

18  for the curriculum, teaching that.

19  Q.  And was there a complaint made against you?

20  A.  Yes, there was.

21  Q.  And what was the complaint?

22  A.  The complaint was I was discriminating.

23  Q.  And the class that this complaint pertained to, you said

24  that was an observations class?

25  A.  Yes.

Templeton - Direct

1    Q.  And how many times had you taught this class before?

2    A.  I started teaching the class in 2007 and twice a year.

3    Q.  For how many years?

4    A.  11 years.

5    Q.  So twice a year for 11 years, around 22 times, does that

6    sound right?

7    A.  Sounds about right.

8    Q.  So you taught this class for 22 times.  Had you ever had a

9    complaint about it?

10   A.  About 2019.

11   Q.  Apart from the complaint in 2019, had you ever received a

12   complaint about how you taught the class?

13   A.  No.

14   Q.  And when you were teaching this class about observations,

15   were you talking about bias with the cadets?

16   A.  I was.

17   Q.  And why did you think it was important to talk with the

18   incoming police cadets about bias?

19   A.  Well, because it's important to understand that we all have

20   biases and, you know, whether we're raised in our culture,

21   religion, our ethics, and that we have to have those bias to

22   move on and get to the observation of our job.  Sometimes we

23   contact those people, so we have to recognize our own biases

24   first so we don't include that in our report.

25   Q.  So did you think it was important to talk to cadets about

Templeton - Direct

1    recognizing their own biases?

2    A.  Yes.

3    Q.  So that they could serve the community that was made up of

4    people of all different types of races, religions and all

5    different aspects of life?

6    A.  Yes.

7    Q.  So was your intention in teaching this class in order to

8    empower these cadets to go out and serve the community in an

9    unbias way?

10   A.  Yes.

11   Q.  So what happened after you received a complaint about your

12   class?

13   A.  After I received a complaint from my class, I was put on

14   administrative leave.

15   Q.  And did you have an interview as part of that process?

16   A.  Yes.

17   Q.  And what happened in that interview?

18   A.  In that interview, I was cited for professional conduct,

19   unsatisfactory performance, discrimination.  And then later on,

20   in the second interview was for truthfulness.

21   Q.  And what were the allegations against you that you were

22   lacking in truthfulness?

23   A.  I had identified to the class or the cadets that I was

24   identifying as a Democrat at that point in time.  The question

25   was asked if I had registered as a Democrat, and I had said no.

Templeton - Direct

```
 1   Then they pulled up the registration from 2016 showing I was
 2   registered as a Republican.
 3   Q.  And this was during your internal affairs investigation?
 4   A.  Yes.
 5   Q.  So as part of your internal affairs investigation, you were
 6   asked whether you had registered as a Democrat or a Republican?
 7   A.  Yes.
 8   Q.  And then you were told that you were being untruthful
 9   because you told the class you were a Democrat when, in fact,
10   you had registered as a Republican?
11   A.  Yes.
12   Q.  And was that part of the basis for your termination in
13   2019?
14   A.  I'm going to assume so.  I mean, he told me attitude.
15       MS. REDMOND:  Object, speculation, your Honor.
16       THE COURT:  Response?
17       MS. BUTLER:  Your Honor, I can get him to develop the
18   testimony more fully.
19       THE COURT:  Sustained.
20   BY MS. BUTLER:
21   Q.  When you were terminated in 2019, was it pursuant to this
22   internal affairs investigation?
23   A.  Yes.
24   Q.  And as part of this internal affairs investigation, were
25   you told that you were subject to untruthfulness and that was
```

Templeton - Direct

1  part of the discipline?

2  A.  I was.

3  Q.  So does -- did your untruthfulness about your political

4  party affiliation play a role in your termination?

5  A.  Yes.

6        MS. REDMOND:  Object to speculation, your Honor, and

7  lack of foundation.

8        THE COURT:  Overruled.

9  BY MS. BUTLER:

10  Q.  How did you feel when you were asked about your political

11  party affiliation as part of your internal affairs

12  investigation?

13  A.  I was stunned.

14  Q.  Does your experience being terminated prevent you from

15  being able to testify fairly and accurately today?

16  A.  No.

17  Q.  Mr. Templeton, I want to talk about each of these four

18  Plaintiffs in this lawsuit.

19        During your 30-year career with the Sheriff's Office,

20  did you work with each of these men?

21  A.  Yes.

22  Q.  Let's talk about T.J. Coates first.

23        When did you work with T.J. Coates?

24  A.  When did I work with T.J. Coates?  When I was assigned to

25  the patrol division, he was the supervisor for a year or two.

238
Templeton - Direct

1    Q.  What did you think of Mr. Coates as a supervisor?

2    A.  I thought he was a great supervisor, always mentoring,

3    teaching.  He knew the importance of report writing,

4    observations in patrol.

5    Q.  What did you think of Mr. Coates as a law enforcement

6    officer?

7    A.  I thought he was very good.

8    Q.  And why did you think that?

9    A.  Well, he had a great amount of knowledge, experience, you

10   know, that he brought with him.

11   Q.  What did you think of Mr. Coates' commitment to the Adams

12   County Sheriff's Office?

13   A.  I thought he was a dedicated and loyal member.

14   Q.  I want to talk about Mark Mitchell next.

15        When did you work with Mr. Mitchell?

16   A.  We parallelled our work assignments the 30 years I was

17   there.

18   Q.  What did you think of Mr. Mitchell as a law enforcement

19   officer?

20   A.  He was a great officer, a friend.

21   Q.  And I want to talk about Kevin Currier next.

22        When did you work with Mr. Currier?

23   A.  Currier and I first -- we went down to patrol together and

24   completed our FTO in Phase 1, 2, 3, 4.  And as we got out to

25   the streets, we relieved each other.

Templeton - Direct

1   Q.  What did you think of Mr. Currier as a law enforcement

2   officer?

3   A.  I thought he was great.

4   Q.  And why did you think that?

5   A.  Well, his demeanor.  He was gaining knowledge, like we all

6   were at that time, always took the time to listen and chat.

7   Q.  And last, I want to talk about Gene Claps.

8        When did you work with Gene Claps?

9   A.  Gene Claps and I kind of worked together in the jail for a

10  little while, when he was a deputy.  And then later on, when he

11  was at patrol, he worked the opposite platoon, but those --

12  when we were coming and going, we worked together.  And then he

13  was promoted to commander and was put in place of -- or in

14  charge of transport at that time.  That's my first -- he got me

15  things I needed for transport.  And then later on, he became a

16  captain in the jail division, and I worked under -- with him in

17  civil.

18  Q.  Was Mr. Claps ever your supervisor?

19  A.  Yes.

20  Q.  What did you think of Mr. Claps as a supervisor?

21  A.  A workaholic.

22  Q.  Did you feel that he was moving your team forward when he

23  was your supervisor?

24  A.  I thought we were making great strides.  He always made

25  sure I had the equipment I needed.  We were moving civil

Templeton - Direct

 1   forward with technology and a couple of those things, we got a

 2   lot of praises across the country for, you know, some of the

 3   things we did with civil.

 4   Q.  Did you feel like he supported you when he was a supervisor

 5   and helped you with what you needed to get done?

 6   A.  Never hesitated, yes.

 7   Q.  What did you think of Mr. Claps as a law enforcement

 8   officer?

 9   A.  Great, diligent officer, paid attention to detail.

10   Q.  What did you think of his commitment to the Sheriff's

11   Office?

12   A.  Dedicated, loyal.

13   Q.  Now, Mr. Templeton, I want to talk about your history with

14   Rick Reigenborn.

15         When did you meet Mr. Reigenborn?

16   A.  I met Mr. Reigenborn in -- well, for sure in 1985.

17   Q.  And how did you meet Mr. Reigenborn in 1985?

18   A.  He joined the Brighton Police Department.  We served

19   together.

20   Q.  And did you work with Mr. Reigenborn on the Brighton Police

21   reserve unit?

22   A.  Well, we did on weekends.

23   Q.  And did you and Mr. Reigenborn become friendly in that

24   process?

25   A.  Yes.

Templeton - Direct

1   Q.  And how long did you all work together in Brighton?

2   A.  I think it was just a couple years, and then I moved on to

3   ACSO.

4   Q.  And did Mr. Reigenborn join you at the ACSO at some point?

5   A.  Yes.

6   Q.  Do you remember when that was?

7   A.  Not really.

8   Q.  Would it have been -- and remind me when you joined the

9   ACSO.

10  A.  I joined in '89.  I want to say 1991 for Rick.

11  Q.  So a couple of years after you joined?

12  A.  Yes.

13  Q.  He joined as well?

14  A.  Yes.

15  Q.  And how long did you and Mr. Reigenborn work together at

16  the ACSO, then?

17  A.  Well, I -- until he resigned, I think, in 2014.  I don't

18  know how many years he had.

19  Q.  So 20 years plus a little bit, maybe; does that sound

20  right?

21  A.  Yes.

22  Q.  And what sort of relationship did you and Mr. Reigenborn

23  have when you were working together at the ACSO?

24  A.  We were friends.  We chatted back and forth, talked about

25  some of our hobbies.

Templeton - Direct

1    Q.  What sort of hobbies do you and Mr. Reigenborn enjoy

2    together?

3    A.  Oh, we like working on automobiles, trucks.

4    Q.  And did you and Mr. Reigenborn ever exchange parts or work

5    on vehicles together?

6    A.  I did.  I loaned him some tools so he could pull an engine,

7    an engine hoist, and then, you know, return.

8    Q.  And did you ever do any other activities together outside

9    of work?

10   A.  Other than talk, maybe sometimes I went to his house once

11   or twice to go look at the vehicle he was working on, have a

12   beer and then leave.

13   Q.  And did you ever -- I know you said you would maybe go to

14   his house and have a beer, would you guys ever get drinks

15   together after work, after shift?

16   A.  No, not too often.  He worked a different shift than we

17   did.

18   Q.  But sometimes you guys would get together; is that fair?

19   A.  Yes.

20   Q.  And what divisions in the jail did you work together in?

21   A.  The jail division, just corrections.  He worked in the

22   module.  I worked in booking.

23   Q.  And throughout your time at the ACSO, did you consider

24   Mr. Reigenborn a friend?

25   A.  Yes.

                                                                        243
                        Templeton - Direct

 1   Q.  Would you ever call him to chat?

 2   A.  Yes.

 3   Q.  I want to talk about the 2014 Sheriff's election.

 4            Who was the 2014 Sheriff's election between?

 5   A.  Michael McIntosh and Rick Reigenborn.

 6   Q.  And you were working at the Sheriff's Office at this point;

 7   right?

 8   A.  Yes.

 9   Q.  And who did you support in the 2014 election?

10   A.  Rick Reigenborn.

11   Q.  How did you support Mr. Reigenborn?

12   A.  Well, gossip, I guess, talking with my family members,

13   people I know in the Adams County area.  They would ask, you

14   know, who -- Sheriff, so I spoke highly of him.

15   Q.  Did you ever put up any yard signs?

16   A.  I did.

17   Q.  Did you ever talk to Mr. Reigenborn about his campaign in

18   2014?

19   A.  Not too much, other than just solicit votes for him.

20   Q.  But did you talk with him at all about his campaign?

21   A.  I didn't go to any of his campaign meetings, other than --

22   not in 2014, anyway.

23   Q.  Moving on to the 2018 election.  I want to talk about the

24   run up to the election in November of 2018.

25            You said that Mr. Reigenborn left the Sheriff's Office


                 SADIE L. HERBERT, RPR, RCR
        901 19th Street, Denver, CO 80294  (303)335-2105

Templeton - Direct

1    in 2015; is that right?

2    A.  Yes.

3    Q.  After Mr. Reigenborn left the Sheriff's Office in 2015, how

4    frequently did you talk to Mr. Reigenborn?

5    A.  Occasionally.

6    Q.  A couple times a year, is that right, or what do you mean

7    by occasionally?

8    A.  Yeah, about once or twice a year.

9    Q.  Was this usually phone calls or in person?

10   A.  Always phone calls.

11   Q.  When did you learn that Mr. Reigenborn was going to run for

12   Sheriff again in 2018?

13   A.  I don't know the exact date or time, you know.

14   Q.  How far in advance of the election did you know that

15   Mr. Reigenborn was running?

16   A.  Probably, I would say, 7 or 8 months.

17   Q.  After you learned that Mr. Reigenborn was running again in

18   2018, what happened to your communication with him; did it go

19   up, go down, stay the same?

20   A.  Well, we talked a little more frequent.

21   Q.  And who did you support in the 2018 election?

22   A.  Rick Reigenborn.

23   Q.  So did you tell Mr. Reigenborn you were supporting him

24   again in 2018?

25   A.  Yes.

Templeton - Direct

 1   Q.  And I want to talk about these conversations you said you

 2   had with Mr. Reigenborn before the 2018 election.

 3           Approximately, how many times did you talk with

 4   Mr. Reigenborn?

 5   A.  In that year, probably four or five times.

 6   Q.  And were these conversations in person or over the phone?

 7   A.  Over the phone.

 8   Q.  Did you discuss personnel changes to the Sheriff's Office

 9   if Mr. Reigenborn were to win the election?

10   A.  Yes.

11   Q.  And what did Mr. Reigenborn tell you about each of the

12   Plaintiffs in this lawsuit?

13   A.  He told me that he was, I guess -- he said, when we talked

14   about T.J. Coates, he said, he's gone.  And then I said, and

15   what other admin.  Mark Mitchell is gone.  Currier is gone.

16   Claps is gone.

17   Q.  What did Mr. Reigenborn tell you about his personnel plans

18   for employees who had supported Mr. McIntosh?

19   A.  He was going to get rid of the McIntosh supporters.

20   Q.  And why do you remember these conversations?

21   A.  They were surprising to me.

22   Q.  And what was surprising to you about it?

23   A.  That's a lot of experience leaving the department.  And I

24   thought we were all friends.  I didn't understand the reason

25   for why they were leaving.

246
Templeton - Direct

1    Q.    What was Mr. Reigenborn's demeanor when he talked about

2    firing each of these men?

3    A.    Very firm in his tone.

4    Q.    Sorry, go ahead.

5    A.    When he said gone, it was just gone, period.

6    Q.    Did you ever talk to Mr. Reigenborn about possible legal

7    ramifications from him firing McIntosh supporters?

8    A.    He talked to me about it.

9    Q.    And what did he tell you?

10   A.    He told me he realized that Darr had went through a lawsuit

11   with Mark Nicastle, and he had been talking to attorneys,

12   county attorney, you know, Don Sisson, how he could get rid of

13   the old administration and bring in a new one.

14   Q.    Who is Don Sisson?

15   A.    I believe he's the FOP attorney.

16   Q.    What did Mr. Reigenborn tell you about what his plan was

17   going to be?

18   A.    When?

19   Q.    What did he tell you his plan was to avoid possible legal

20   ramifications?

21   A.    He told me that he had talked and found a loophole, a

22   reference, and he was going to set up interviews with the admin

23   staff and he'd sit down and chat with them.

24   Q.    What did you think of Mr. Reigenborn's plan to avoid being

25   sued?

Templeton - Direct

1    A.  You know, I'm still surprised, you know.  It was -- to me,

2    it was a cover for what his real intentions were.

3          THE COURT:  Counsel, just so you know, it's about 7 to

4    12 now, so whenever you get a convenient --

5          MS. BUTLER:  I think we'll actually be able to finish

6    this by noon.

7          THE COURT:  Okay.  Go ahead, then.

8    BY MS. BUTLER:

9    Q.  Mr. Templeton, I want to move, then, to what happened after

10   Mr. Reigenborn was sworn in as Sheriff.

11          What was the first policy-related decision

12   Mr. Reigenborn made that you were aware of?

13   A.  He rescinded all the policies.

14   Q.  What did you think when Mr. Reigenborn rescinded all of the

15   policies?

16   A.  I thought the County had a great amount of liability.

17          MS. REDMOND:  Objection, speculation, your Honor.

18          MS. BUTLER:  Your Honor, this is his opinion, based on

19   what he saw.  And these are merely his reactions to what was

20   happening, based on his 30 years of experience at the Sheriff's

21   Office.

22          MS. REDMOND:  I would also add relevance, your Honor.

23          THE COURT:  What's the relevance of it?

24          MS. BUTLER:  Your Honor, it's relevant to show that he

25   was surprised that Mr. Reigenborn had rescinded all these

                                                                        248
                          Templeton - Direct

1   policies.  This had never happened when he was there before.

2            THE COURT:  Well, he's testified to that.

3            I'll sustain this objection.

4   BY MS. BUTLER:

5   Q.  Mr. Templeton, had you ever seen all of the employment

6   policies be rescinded in the 30 years you spent at the

7   Sheriff's Office?

8   A.  No.

9   Q.  How did you find out that Mr. Reigenborn had fired

10  Mr. Coates, Mr. Currier, Mr. Mitchell and Mr. Claps?

11  A.  How did I find out?  They were called in one at a time over

12  the PA system.  I was out at Flatrock that day.  We were

13  qualifying with our handguns.

14  Q.  What was your reaction when you learned that each of these

15  men had been fired?

16  A.  Well, I was -- I was -- I didn't understand why.  And where

17  was the leadership, and who was the new leadership.

18  Q.  Before you left in April, had Mr. Reigenborn filled any of

19  the positions that these men had held at the Sheriff's Office?

20  A.  The only position I know of was the Undersheriff.

21  Q.  So by the time you left, their positions still sat vacant?

22  A.  Yes.

23  Q.  Having known Mr. Reigenborn and been his friend for

24  decades, did you notice any changes in his personality and

25  behavior after he ran for Sheriff in 2018?

Templeton - Direct

1    A.  Yes.

2    Q.  What did you notice?

3    A.  Well, he avoided to talk to me a little longer, probably

4    more so after the IA.  He -- he became a little more

5    narcissistic, is that what I want say.

6    Q.  Did you ever feel that he was suspicious of people after he

7    was running for Sheriff?

8    A.  Yes.

9    Q.  How did your communication with Mr. Reigenborn change after

10   he was elected Sheriff?

11   A.  Well, I thought he was keeping tabs on me.

12   Q.  And why did you think he was keeping tabs on you?

13   A.  One day I had lunch with some people that had supported

14   McIntosh that were admin type.  And about an hour after lunch,

15   I had left and went back to work, he had called me and -- on my

16   phone in my vehicle and asked me if I was alone.  And I told

17   him yes.  And he said, what are these pictures I'm getting from

18   a patron.  And I said, what pictures.  He says, were you guys

19   shit talking me.  And I said, no.  I said, everybody was

20   wondering what course we're going to take, where we're going

21   with the Adams County Sheriff's Office, with leadership.

22   Q.  So was Mr. Reigenborn saying that someone had sent him a

23   picture of you at lunch with McIntosh supporters?

24   A.  Yes.

25   Q.  And he was calling you to ask you if you had been shit

Templeton - Direct

```
 1   talking him?

 2   A.  Yes.

 3   Q.  How did it feel for your friend of decades to accuse you of

 4   shit talking him?

 5   A.  I didn't feel very good.

 6   Q.  And at this point, this would have been in January of 2019;

 7   is that correct?

 8   A.  It was shortly -- yeah, whenever he got sworn in.  It was

 9   after that.

10   Q.  So this was before your IA; is that correct?

11   A.  Yes.

12   Q.  So just a couple of weeks after the man you had helped

13   become Sheriff became Sheriff, he accused you of shit talking

14   him to other people?

15   A.  Yes.

16   Q.  Mr. Templeton, based on your conversations with

17   Mr. Reigenborn about Mr. Coates, Mr. Currier, Mr. Mitchell and

18   Mr. Claps, what did you conclude about why Mr. Reigenborn fired

19   them?

20        MS. REDMOND:  Objection, your Honor.  Speculation,

21   lack of foundation, and opinion on the overall issue.

22        THE COURT:  Sustained.

23        You can ask him what he and Sheriff Reigenborn

24   discussed.  But unless Sheriff Reigenborn told him why, that's

25   speculation on his part.  Sustained.
```

                          251
                    Templeton - Direct

 1   BY MS. BUTLER:

 2   Q.  Mr. Templeton, going back to the conversations that you

 3   testified about earlier, do you remember testifying that

 4   Mr. Reigenborn told you he was going to clear out McIntosh

 5   supporters?

 6   A.  Yes.

 7   Q.  And is it your understanding that that's why he fired each

 8   of these men?

 9        MS. REDMOND:  Objection, speculation, lack of

10   foundation, and opinion on the overall issue.

11        THE COURT:  Overruled.

12        He's now set the basis on that conversation he had

13   with Reigenborn in which Reigenborn said he was going to clear

14   out McIntosh supporters, so overruled.

15   BY MS. BUTLER:

16   Q.  Do you remember the question or should I re-ask it?

17   A.  Please re-ask it.

18   Q.  What was your understanding when Mr. -- based on your

19   conversation where Mr. Reigenborn told you he was going to

20   clear out McIntosh supporters, what was your understanding of

21   why he fired each of these men?

22   A.  Because they had supported McIntosh and didn't feel that he

23   was a good leader.

24        MS. BUTLER:  A moment to confer with my colleagues,

25   your Honor.


                 SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Templeton - Direct

1          (Conferring)

2               MS. BUTLER:  No further questions.

3               THE COURT:  Thank you.

4               This is a good time for our lunch break for our

5     jurors.  If you all could be back by 5 after 1, we'll plan on

6     getting started at that point.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Be seated.  I want to test -- IT has been

3     doing some work remotely on this.

4          MS. BUTLER:  Your Honor, can Mr. Templeton come down

5     from the stand?

6          THE COURT:  Yes.

7          I just want the record clear, because the one sidebar

8     that we had, our court reporter was having difficulty hearing

9     because my mic was not picking it up.

10         During Mr. Claps' testimony about damages, while he

11    was calculating, attempting to calculate damages, we had a

12    sidebar in which I asked Plaintiffs' counsel whether or not he

13    needed to go through all these calculations or whether it was

14    sufficient for him to simply put on the record his base salary,

15    his yearly increases, yearly bonuses, and then the additional

16    expenses that he incurred, indicating that she was free to go

17    through that, but that I had concerns we were losing the jury.

18    And then said that she could refer to cumulative numbers, since

19    it was a simple mathematical calculation, in closing arguments.

20    So since that was not picked up, I just want the record to be

21    clear.

22         MS. PRATT:  Your Honor, for the record, it was during

23    Mr. Coates' testimony.

24         THE COURT:  Thank you.  Coates.  If I'm clarifying the

25    record, let's at least get it clear.

254

```
 1              So on that issue, again, you are free with the other
 2     witnesses to go through the calculations.  But if there's a way
 3     to just lay the foundation and then have your closing to do it
 4     or go over the calculations with them during one of the breaks,
 5     and then if they don't remember the number, use it to refresh
 6     their -- the final number, does it refresh their recollection,
 7     something.  I'm worried the jury was falling asleep.
 8              MS. HALPERN:  Your Honor, I dislike walking through
 9     damages calculations.  I was trying not to ask leading --
10              THE COURT:  On that --
11         (Indiscernible crosstalk)
12              MS. HALPERN:  Sorry.  Is it not picking us up here
13     either?
14              Are we able to do that, because we did have numbers,
15     but I didn't think we would be able to refresh recollection
16     using them since they hadn't already been submitted to opposing
17     counsel?
18              THE COURT:  I'm fine with leading during that portion.
19     It's math.  It's not that controversial.  So if you want to
20     lead a little bit in that, that's fine.
21              Anything else we need to take up before the jury comes
22     back in?
23              Hearing nothing, then, we will -- if you all could be
24     back here at 1, that way if something pops up during the lunch
25     break, we'll take it up.  Otherwise, we'll get the jury in.
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1   Thanks everyone.

2             (Lunch recess)

3             (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                            1:11 p.m.

3          (In open court; jury not present)

4              THE COURT:  Let's bring in the jury.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Templeton - Cross

```
 1        (In open court; jury present)

 2              THE COURT:  Can we have the witness retake the stand.

 3              Sir, just a reminder, you are still under oath.

 4              THE WITNESS:  Yes.

 5              THE COURT:  Cross-examination.

 6              MS. REDMOND:  Yes, your Honor.

 7    CROSS-EXAMINATION

 8    BY MS. REDMOND:

 9    Q.  Good afternoon, Mr. Templeton.

10    A.  Good afternoon.

11    Q.  You were talking about on direct examination that after

12    former Sheriff Reigenborn took office in early 2019, you

13    retained your position initially at the Adams County Sheriff's

14    Office; correct?

15    A.  Yes, ma'am.

16    Q.  In February of 2019, you taught a training class at the

17    Flatrock training facility; right?

18    A.  Yes.

19    Q.  You were placed on administrative leave the next day; is

20    that right?

21    A.  That's correct.

22    Q.  That's because you were accused of making racially

23    derogatory remarks during that class?

24    A.  Discrimination.

25    Q.  Racially derogatory, yes, discrimination.
```

                                        258
                           Templeton - Cross

 1   A.  Oh, yes.

 2   Q.  You told a cadet that was of Mexican heritage he was the

 3   reason that America was building the wall?

 4   A.  No.

 5   Q.  It's your testimony you did not say that?

 6   A.  No, my testimony is that I told him that he was the reason

 7   why we weren't building the wall.

 8   Q.  Later, while you were on administrative leave, there was an

 9   internal investigation conducted; correct?

10   A.  Yes.

11   Q.  And you later had a meeting with Undersheriff McLallan

12   regarding that investigation?

13   A.  Yes.

14   Q.  Where he told you that the allegations against you

15   regarding professional conduct, unsatisfactory performance and

16   discrimination had been sustained?

17   A.  Yes.

18   Q.  But with respect to the truthfulness allegation regarding

19   your party affiliation, that was not sustained; correct?

20   A.  Yes.

21   Q.  During that meeting with Undersheriff McLallan, he told you

22   that you were suspended for two weeks?

23   A.  Yes.

24   Q.  And that suspension was made retroactive?

25   A.  Yes.

Templeton - Cross

```
 1   Q.  So you left that meeting, you went to the jail to pick up
 2   your badge; correct?
 3   A.  Yes.
 4   Q.  And upon arriving at the jail, when you were asked how your
 5   day was going, you responded by saying you wanted to get the
 6   fuck out of Adams County; right?
 7   A.  Yes.
 8   Q.  The next day, you received notification of your anticipated
 9   termination?
10   A.  Yes.
11   Q.  You had the opportunity to meet with then Sheriff
12   Reigenborn?
13   A.  Yes.
14   Q.  You met with him regarding your termination?
15   A.  Yes.
16   Q.  In May of 2019, you filed a lawsuit against Sheriff
17   Reigenborn?
18   A.  That's correct.
19   Q.  You were seeking to have his termination decision
20   overturned?
21   A.  Yes.
22   Q.  That lawsuit was dismissed by the court?
23   A.  Yes.
24   Q.  Sheriff Reigenborn's termination decision was not --
25              THE COURT:  Hang on, counsel.  One second.  Are you
```

Templeton - Redirect

1   having trouble hearing?

2        Could you just speak up just a little bit.  Thank you.

3   BY MS. REDMOND:

4   Q.  Sheriff Reigenborn's termination decision was not

5   overruled; correct?

6   A.  Yes.

7        MS. REDMOND:  I have nothing further, your Honor.

8        THE COURT:  Any redirect?

9        MS. BUTLER:  Just a couple of questions.

10        THE COURT:  Counsel, if you could speak up too.

11   REDIRECT EXAMINATION

12   BY MS. BUTLER:

13   Q.  Mr. Templeton, you just testified about your IA with

14   respect to truthfulness.

15        Do you remember that?

16   A.  Yes.

17   Q.  And the IA about truthfulness, was that when you were

18   talking about how you got asked your political party

19   affiliation?

20   A.  Yes.

21   Q.  And so that was about whether or not you had been truthful

22   about whether you were a registered Democrat or Republican?

23   A.  Yes.

24   Q.  And when you were suspended for two weeks, were you upset?

25   A.  Yes.

Templeton - Redirect

1    Q.  And why were you upset?

2    A.  Because I wasn't working.

3    Q.  And when you were upset, did you say that you were ready to

4    get out of Adams County after that?

5    A.  Yes.

6    Q.  And did you lash out because you were upset about getting

7    suspended for two weeks?

8    A.  I was upset because I went right after the meeting.  I was

9    told, and of course, my pay is going to be held in abeyance, or

10   retroactive, trying to figure out how you are going to survive

11   for the next two weeks when you live on a monthly check.

12   Q.  Did anything about what happened to you influence any of

13   your testimony here today about these men?

14   A.  No.

15   Q.  And do you believe that you're unable to be fair and

16   impartial here today because of what happened to you in 2019?

17   A.  No.

18        MS. BUTLER:  Thank you, Mr. Templeton.  I have nothing

19   further.

20        THE COURT:  Let me ask the jurors, do you have any

21   questions for Mr. Templeton?

22        You may step down, sir.

23        THE WITNESS:  Thank you.

24        THE COURT:  Can we excuse this witness?

25        MS. BUTLER:  Yes, your Honor.

Currier - Direct

```
 1                THE COURT:  You are excused.

 2                Plaintiffs can call their next witness.

 3                MS. HALPERN:  Your Honor, the Plaintiffs would like to

 4     call Kevin Currier to the stand.

 5     KEVIN CURRIER,

 6        called as a witness by the Plaintiffs,

 7        having been duly sworn, testified as follows:

 8     DIRECT EXAMINATION

 9     BY MS. HALPERN:

10     Q.  Good afternoon, Mr. Currier.  I just want to ask you a

11     couple of really quick background questions to situate you with

12     the jury.

13                Where do you currently reside?

14     A.  I currently live in Elbert County.

15     Q.  Where did you grow up?

16     A.  I grew up in Westminster and surrounding areas.

17     Q.  Do you have any family here in Colorado?

18     A.  I do.  My mother and father.

19     Q.  Do you have a family of your own now?

20     A.  I do.

21     Q.  Could you let us know about that family?

22     A.  Well, I have -- I have been married for four years, I

23     believe.  I have three children biologically.  One is 27, lives

24     in Texas; 17-year-old daughter, a 14-year-old, nearly

25     15-year-old son, and a 15-year-old stepdaughter.
```

Currier - Direct                                                         263

1   Q.  And what do you currently do now?

2   A.  I am currently the division chief for the detective

3   division.

4   Q.  And where are you division chief?

5   A.  At the Adams County Sheriff's Office.

6   Q.  I want to ask you a little bit about your history at the

7   Adams County Sheriff's Office.

8        What was your high school attainment before you

9   entered into law enforcement?

10  A.  Before I entered in, it was solely high school.  And then,

11  at that time, we had to put ourselves through a police academy.

12  Q.  And what was the first position you held as a law

13  enforcement officer?

14  A.  So the first position I held was with the Sheriff's Office

15  in 1995.

16  Q.  And could you clarify which Sheriff's Office you are

17  referring to?

18  A.  It's the Adams County Sheriff's Office.

19  Q.  So you spent your whole entire career at the Adams County

20  Sheriff's Office, with the exception of after you were

21  terminated by Mr. Reigenborn?

22  A.  I have spent or had spent my entire professional career

23  there.  I started there when I was 22.

24  Q.  And could you walk us through your job progression when you

25  were at the Adams County Sheriff's Office?

Currier - Direct

1   A.  So in March of '95, I was hired and assigned to the jail.

2   During that time, we were required to typically put in two

3   years in the jail setting.  After about two and a half years,

4   in 1998, I transferred to the patrol division.  As Doug

5   Templeton said, he and I were in training together.

6            During my time in the patrol division, I worked

7   typical patrol duties.  I then became a field training officer,

8   did that for a little while.  And in March -- not March -- I

9   can't remember the month -- of 2001, I started with the SWAT

10  team.  I was a negotiator with the SWAT team, that occurred for

11  about one year.

12           And then I transferred, tested and transferred to the

13  tactical team.  I was on the tactical team until I retired from

14  SWAT in general in 2008.  My tenure in SWAT kind of overlapped

15  a few divisions.

16           In 2004, I transferred from patrol to detectives.  In

17  that position, I was a -- I started as a property detective.

18  We took care of all property crimes associated with a given

19  geographic area at that point.  During my time there, I started

20  to investigate sex crimes.  That continued on until 2010, when

21  I was promoted to sergeant, and I was assigned to the patrol

22  division.

23           I spent four months assigned to a shift on patrol, and

24  then was transferred to the community resource team, which was

25  a proactive team designed to assist the community members with

Currier - Direct

 1    things that they determined were affecting their community.  I

 2    did that for about one year.

 3            And then I was transferred to detectives, and I became

 4    a detective sergeant.  During that time, I was responsible for

 5    all of the property detectives.  We continued down that path

 6    until there was a split in the sergeant's duties, and I took a

 7    little bit of the persons crimes responsibilities on.  That

 8    occurred until 2015 when I was promoted to the commander of the

 9    detective division.  And then, ultimately, that continued until

10    I was terminated in 2019.

11    Q.  And where did you go work after that?

12    A.  So initially, I had searched for some employment outside of

13    law enforcement, and I found that that was not readily

14    available or easily attainable.  I then -- about 6 months after

15    my termination, I ended up working for the Arapahoe County

16    Sheriff's Office.

17    Q.  In what position were you required to hold there?

18    A.  In that position, I was a court security officer.  And I

19    held that position for two to two and a half years.

20    Q.  And what position did you hold after that?

21    A.  After that, I retired for 11 months.  And then the next

22    position that I had was division chief for the Adams County

23    Sheriff's Office.

24    Q.  And can you please describe -- I think you mentioned it

25    with some of the positions you held -- but could you please

Currier - Direct

 1    describe which ones of the positions that you held at the Adams

 2    County Sheriff's Office required a promotion?

 3    A.  Well, promotion, in terms of testing, I was required to

 4    test to become a detective, although it was not a promotion,

 5    per se.  It was a lateral move.  And then from detective to

 6    sergeant required a testing and promotion.  And then between

 7    sergeant and commander, there was a testing and promotion.  And

 8    I did engage in a testing for that, and I think it was prior to

 9    Sheriff McIntosh taking office.

10    Q.  And how many Sheriffs did you serve -- have you served

11    under at the Adams County Sheriff's Office?

12    A.  When I started in 1995, it was Bill Shearer for two terms,

13    and then Sheriff Doug Darr for three terms, and then Sheriff

14    Mike McIntosh for one term.

15    Q.  And today?

16    A.  And today, Sheriff Gene Claps.

17    Q.  And were you ever disciplined at the Adams County Sheriff's

18    Office during your tenure?

19    A.  Discipline, I received a letter of reprimand once for, I

20    think, not qualifying with a firearm because my rib was broken

21    during the qualification.  But other than that, no.

22    Q.  And how long ago was that?

23    A.  That was probably in the late 90s.

24    Q.  I want to ask you about some of the things that you are

25    most proud of from your time at the Adams County Sheriff's

Currier - Direct

 1  Office.

 2          Are there any one or two achievements that stand out

 3  to you?

 4  A.  So looking back on my career, much like Mr. Coates, it's

 5  fairly extensive, and we deal with the majority -- all of the

 6  things that we deal with are items that the public at large

 7  does not have to see or cannot comprehend.  I have dealt with

 8  baby crimes, deaths, police officers that I've had to put in

 9  prison, police officers that were arrested.  But out of all of

10  those events -- and I have been a police officer for 30 years

11  now -- out of all of those events, the ones that stand out to

12  me the most are the thank you cards that I have received.  And

13  there's, I think, three in particular.  And it's because people

14  take time out of their day when they're long gone from law

15  enforcement's reach and still find it necessary in their hearts

16  to send a thank you.

17          And they've ranged from changing a woman's tire, which

18  was kind of just my duty.  But she felt obligated to send a

19  thank you card after that.

20          An older woman that I found driving on the wrong side

21  of the road, and I stopped her and, ultimately, she told me she

22  was lost.  So I called her son, her son came and indicated that

23  she was just trying to get to a doctor's appointment and that

24  he would ensure that she got there.  Rather than just leave it

25  there, a few hours later, I called her son back just to make

Currier - Direct

```
 1   sure that his mother in fact did make it to her appointment.

 2   And she did.  And she then sent me a thank you card for that.

 3   Those types of things carry far more weight with me than

 4   anything else.

 5   Q.  And how were your annual evaluations at the ACSO,

 6   typically?

 7   A.  They were always stellar.  We can go back -- and they

 8   varied throughout the years.  When I started, they were old

 9   handwritten evaluations that had maybe two or three categories,

10   to the last evaluation that I received via the computer, and I

11   think it was a 4.64.

12   Q.  And those were the scoring system that was described

13   earlier?

14   A.  That is correct, the same scoring system that Mr. Coates

15   described as from 1 to 5.

16   Q.  And I want to ask you about some of your job duties,

17   particularly, as a commander.  Could you describe what your

18   central job duties were as a commander at the ACSO?

19   A.  In general, it was to oversee the day-to-day operations of

20   the detective division.  Occasionally, there would be some

21   assistance with budgetary items and overseeing the 17th

22   Judicial District Critical Incident Team.

23   Q.  Any other essential duties to your position when you were

24   commander?

25   A.  Not -- not that I would discuss specifically.
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

269
Currier - Direct

1   Q.  Did you have any role in creating policy when you were a

2   commander?

3   A.  We could, and I have in the past.

4   Q.  Could you describe that role?

5   A.  What had occurred, the one that stands out to me was a

6   missing and endangered child policy that -- I don't know if we

7   were -- there were some regulations involving DNA submissions,

8   so I was tasked with essentially gathering the information to

9   create the policy, which was not something I just came -- came

10  up with out of thin air.  I borrowed or stole the policy from

11  the Westminster Police Department, after their dealings with

12  the Jessica Ridgeway case.  They had a fairly robust policy.

13  So who better to speak with than the people that have had to

14  deal with that.  So I reached out to the Westminster Police

15  Department, they provided me their policy.  And I essentially

16  crafted that to mirror theirs with our agency name.

17  Q.  And after you crafted that policy, what were the next steps

18  that had to be taken before it became a policy of the Adams

19  County Sheriff's Office?

20  A.  Any policy would then have to go through the chain of

21  command.  So I would submit that policy to my division chief,

22  who at the time was Timothy Coates.  He would review it, make

23  sure that -- essentially, that I didn't pull anything out that

24  was totally abnormal, and then he would submit that to the

25  Undersheriff, and ultimately, the Sheriff for the Sheriff's

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Direct

1   approval.

2   Q.  Have you heard about Lexipol?

3   A.  I have.

4   Q.  What is Lexipol?

5   A.  Lexipol was a computer program that we utilized to maintain

6   our policies and procedures.  So it was a national database,

7   essentially, of policies and procedures, best practices that

8   were conglomerated within their system and then pushed out to

9   the agencies.

10  Q.  And did you ever have any role in reviewing any policies

11  from Lexipol before they were adopted?

12  A.  There was a committee that I was part of at the time, I

13  believe, Division Chief Rick Benson, and we would review the --

14  certain policies on any given day and essentially redline those

15  policies and determine what fit with our agency, what did not.

16  Q.  And were there any limitations on who could provide input

17  into a particular policy at the Adams County Sheriff's Office?

18  A.  There were no limitations.  Even as we sit here today, if a

19  line level employee had a thought that was beneficial and

20  necessary to be added to a policy, we would take it from there.

21  Q.  Did you have any role in implementing policies when you

22  were the commander at the ACSO?

23  A.  I did.

24  Q.  And what was that role?

25  A.  As the policies would -- once they were approved by the

Currier - Direct

1    Sheriff, they would be pushed out to every division.  And we

2    were responsible for ensuring that all of the staff in any

3    given division adhered to said policies.

4    Q.  And did you receive confidential information as a commander

5    when you were at the ACSO?

6    A.  I did on numerous occasions.

7    Q.  What types of confidential information?

8    A.  As a commander in the detective division, confidential

9    information could be personnel issues.  It could be lawsuit

10   information.  It could also include some of the criminal case

11   information from deputies within the Sheriff's Office.  We were

12   responsible in the detective division for investigating every

13   single criminal complaint from -- of Sheriff's Office

14   personnel.

15   Q.  Did other officers receive similar confidential information

16   as needed?

17   A.  As needed.

18   Q.  So it wasn't just limited to commanders, for example, or

19   division chiefs?

20   A.  That is correct.

21   Q.  And did you have a mentorship role as a commander?

22   A.  Yes, we all have mentorship roles.

23   Q.  Is that limited to being a commander?

24   A.  It is not.

25   Q.  Did you ever speak on behalf of the agency at community

Currier - Direct

1    events or to the media or interacting with other agencies?

2    A.  Yes, on occasion.

3    Q.  Could you describe some of those occasions?

4    A.  There was an occasion where I had to give an interview to,

5    I believe it was, Channel 9 regarding a homicide that we had

6    been investigating.  That is easily something that could have

7    been done by anyone with information on the case.  It was not

8    strictly limited to me.

9    Q.  And those kind of interactions that you are describing, is

10   that limited to the position of commander?

11   A.  It is not.

12   Q.  Or division chief?

13   A.  No.

14   Q.  Who else in the agency may have similar interactions as

15   those with agencies in the community or media?

16   A.  Well, the public information officer, for the majority of

17   my time there, has been a sergeant.  So sergeants routinely

18   deal with the media.

19        And as far as dealing with any outside law enforcement

20   agencies, the DA's office, that can be line level staff.  We

21   expect the detectives to deal with outside agencies, especially

22   on the critical incident team, they deal with the DA's office

23   on a routine basis.  The same could apply with deputies that

24   are assigned to patrol or the jail.

25   Q.  What role, if any, when you were a commander did you have

Currier - Direct

1    in personnel decisions, like discipline and discharge?

2    A.  So my role was limited.  If there was going to be an

3    employee discharged, that is not a decision that would be made

4    within the division.  Those were decisions that came from the

5    Sheriff and Undersheriff.

6    Q.  And how about promotions, did you have any roles in

7    promotions when you were commander at the ACSO?

8    A.  So my only role in promotions were to sit on the oral

9    boards, the oral interviews.  And as those things are

10   conducted, they are very clear in their scoring.  There could

11   be ten applicants and each one of the ten applicants will be

12   scored by three different panel members, could be 5, whatever

13   the panel consisted of.  And that was my involvement, sitting

14   on those panels.  Other than that, the scores kind of speak for

15   themselves.

16          MS. HALPERN:  Can we please pull up Defendant's

17   Exhibit A-1.  We would withdraw any objections we have, to the

18   extent we have any.  So I believe it would be stipulated.

19          MS. PRATT:  No objection.

20          MR. THAPA:  No objection.

21          MS. HALPERN:  Your Honor, may I move Exhibit A-1 into

22   evidence?

23          THE COURT:  Yes.

24      (Defendant's Exhibit A-1received in evidence)

25          MS. HALPERN:  Can we please publish to the jury.

Currier - Direct

1    BY MS. HALPERN:

2    Q.  Now, Mr. Currier, you saw me do this with Mr. Coates.  I

3    would just like to ask you, do you recognize the job duties

4    that are described here in Exhibit A-1?

5    A.  I do.

6    Q.  Can you review them and let me know if they seem to

7    accurately reflect the job duties that you had when you were a

8    commander at the Adams County Sheriff's Office.

9    A.  Yes, they appear to be.

10   Q.  Can you please go through these bullet points and let us

11   know which one of these duties was unique to the position of

12   commander and which ones applied more broadly.

13   A.  Well, if we were to go from the top, the adherence to

14   policy, procedures and post orders is every deputy.

15        Responsible for protection of life and property;

16   prevention of crime; apprehension of criminals.  That is every

17   deputy.

18        Answer calls for service, complete appropriate

19   paperwork is every deputy.

20        Prepare a variety of reports and comprehensive

21   documents.  Every deputy.

22        Enforce federal, state and local laws is every deputy.

23        Safely carry and handle firearms.  That is every

24   deputy.

25        Review and approve detailed reports and documents.

Currier - Direct

1    Could be every deputy, but at the lowest level, field training

2    officers and above.

3             Directly supervises employees.  Field training

4    officers and above.

5             Maintain inventory is a little -- is a very broad

6    statement, but that can be every deputy.

7             Assist in the preparation of the budget, monitor and

8    review budgetary expenditures.  That is specific to commander.

9             Review activities of assigned employees and complete

10    evaluations.  Field training officers and above.

11             The ability to schedule and deploy employees

12    effectively.  That is sergeant and above.

13             Train, supervise and review the work of supervisors

14    and sergeants, supervise daily operations of the assigned

15    division.  If it's specific to reviewing the work of the

16    sergeants and supervisors, that would apply to commanders.

17             Report to the chief obviously applies to commanders.

18             Attend various committees, operations and board

19    meetings applies to all deputies.

20             Initiate disciplinary actions and recommends

21    appropriate actions as required.  That could be sergeants and

22    above.

23             Maintain a thorough working knowledge of department

24    policies and procedures.  That's every deputy.

25             Develop and maintain working relationships with

Currier - Direct

1   members of the legal community.  That's every deputy.

2           Provide training and guidance to other members of the

3   Sheriff's Office, community, academy cadets and other law

4   enforcement agencies.  That's every deputy.

5           Participate and complete annual law enforcement

6   driving certification.  Every deputy.

7           Participate and complete 16 hours of annual training

8   in the area of pressure point control tactics.  That's every

9   deputy.

10          Participate in training for range qualification, PPCT,

11  Taser.  That is every deputy.

12          And perform other duties that are assigned.  Depending

13  on what the duties are, could be every deputy.

14  Q.  I just want to ask you a couple questions.

15          So you said budget was commander.  Did that also apply

16  above you?

17  A.  It absolutely does.

18  Q.  What was your role, in terms of any duties and

19  responsibilities towards the ACSO's budget?

20  A.  So my responsibility was to make any recommendations to my

21  division chief or ultimately to the Sheriff and Undersheriff

22  about any potential needs that we may have.  That was pretty

23  much it.

24  Q.  And you said train, supervise and review the work of

25  supervisors and sergeants.  So were supervisors and sergeants

Currier - Direct

1   your direct reports --

2   A.  They were.

3   Q.  -- when you were commander?

4   A.  Yes.

5   Q.  Did they oversee or supervise anyone below them?

6   A.  The sergeants and supervisors all oversee -- in the

7   detective division, they can oversee detectives, victim

8   advocates, criminalists.

9   Q.  And they would train, supervise and review the work of

10  those individuals?

11  A.  They would.

12  Q.  And initiate discipline, I wanted to ask about that.

13         Did you have any ability or role as a commander to

14  initiate disciplinary actions?

15  A.  Absolutely.

16  Q.  And could you please describe that?

17  A.  So if I received a complaint, I would take said complaint

18  and forward it up the chain.  If it was significant or

19  egregious enough, then an internal affairs investigation could

20  be started.  If it was somewhat informal, that information

21  would just be given to the division chief.

22  Q.  In your experience, did any of the duties that we just went

23  through, did they require personal loyalty to a political

24  candidate running for office?

25  A.  It did not.

Currier - Direct

1   Q.  And I want to ask you --

2           MS. HALPERN:  We can take that down.  Thank you.

3   Q.  I'm not going to do the exact same exercise with you, but I

4   want to ask you about Exhibit Y, since you are a division chief

5   today.

6           MS. HALPERN:  This was Defendant's Exhibit Y.

7           Your Honor, this has already been entered into

8   evidence, may I publish it.

9           THE COURT:  Yes.

10  BY MS. HALPERN:

11  Q.  Mr. Currier, I don't want to go through the exact same

12  exercise, like I said, but could you please review the job

13  duties for division chief and let me know if they're similar to

14  what you hold today.

15  A.  Those are similar to my responsibilities now.

16  Q.  Is there anything inaccurate about it or anything

17  significant that you would add?

18  A.  There is not.

19  Q.  And looking at this list, can you just identify, if any, if

20  there's any duties that are unique to just being a division

21  chief?

22  A.  The only one that would be even remotely questionable is

23  making formal recommendations in hiring, promotion, demotion,

24  transfer, reassignment and separation.

25  Q.  And what is your role today as a division chief, in terms

                SADIE L. HERBERT, RPR, RCR
        901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Direct

```
1    of recommendations on hiring, promotion, demotion, transfer,

2    reassignment and separations?

3    A.  I would be required and responsible to run that to my

4    direct supervisor, that being the Undersheriff and/or the

5    Sheriff of Adams County.

6    Q.  And who has final authority today to make the decisions on

7    what we're referring to, hiring, promotion, demotion, transfer,

8    reassignments and separations?

9    A.  That decision rests solely with the Sheriff.

10   Q.  And do any of the duties that you are seeing in Exhibit Y

11   for division chief, have you observed any of those require

12   personal loyalty to a political candidate who runs for the

13   position of Sheriff?

14   A.  They do not.

15        MS. HALPERN:  We can take that down.

16   Q.  And I want to just ask you about one or two small policies

17   and procedures.

18        When you were a commander at the ACSO, were you

19   familiar with the Sheriff Office's employee speech, expression

20   and social networking policy?

21   A.  Yes.

22        MS. HALPERN:  Can we please pull up Exhibit 59.  And

23   can we please go to Page 3 of Exhibit 59.

24   Q.  I'm referring to policy 1024.4.1.

25        Do you see that Mr. Currier?
```

Currier - Direct

1    A.  Yes.

2    Q.  Could you review that and let me know if that was the

3    policy that was in place when you were a commander at the ACSO

4    for unauthorized endorsements and advertisements.

5    A.  It is the same.

6         MS. HALPERN:  Your Honor, I would move to admit.  I'm

7    fine with just admitting Page 3 of Exhibit 59 into evidence.

8         THE COURT:  Any objections?

9         MR. THAPA:  No objection, your Honor.

10        THE COURT:  It's admitted, and we can publish Page 3

11   of 59.

12    (Plaintiff's Exhibit 59, Page 3 received in evidence)

13   BY MS. HALPERN:

14   Q.  Mr. Currier, I would like to draw your attention to the

15   bottom paragraph of policy 1024.4.1.

16        Do you see where it starts saying employees retain

17   their right to vote?

18   A.  Yes.

19        MS. HALPERN:  If you could please just highlight the

20   first, I guess, three and one-tenth of a sentence.

21   Q.  Employees, when you were commander at the ACSO, did they

22   retain their right to vote as they chose?

23   A.  Absolutely.

24   Q.  Did that include commanders?

25   A.  Yes.

Currier - Direct

1    Q.  Did that include division chiefs?

2    A.  Yes.

3    Q.  And when you were commander at the ACSO, were you free to

4    support candidates of your choice and express your opinions as

5    a private citizen?

6    A.  I was.

7    Q.  And was that the same for division chiefs?

8    A.  It was.

9    Q.  Were you free to support any political candidate or opine

10   on any political subjects while off duty?

11   A.  Yes.

12   Q.  And did that ever impact your ability to perform your

13   functions as a commander?

14   A.  It never did.

15   Q.  Did you ever observe anyone else on command staff, their

16   off-duty political activity or support of certain candidates

17   impacting their work at the Adams County Sheriff's Office?

18   A.  No.

19   Q.  And I want to switch topics and ask you about your prior

20   relationship with Richard Reigenborn.

21   A.  Okay.

22   Q.  Could you tell the jury when you first became acquainted

23   with Mr. Reigenborn?

24   A.  So I first met Mr. Reigenborn in 1998 when I transferred to

25   the patrol division.  We worked the same shift.  We were on the

Currier - Direct

1   same shift.  He worked in District 2.  I worked in District 1.

2   We covered each other routinely.  We ultimately were on the

3   SWAT team together.  We would fairly regularly go out with one

4   another in our off time.  And our relationship, over the course

5   of that time in patrol, rose to the level of -- he was in my

6   wedding.  He was part of the wedding party.

7          Then we separated.  He began working in the Metro Task

8   Force.  I worked in detectives.  So we did not run across each

9   other as frequently, but it still occurred from time to time.

10  Q.  And do you recall having any conflicts or difficulties

11  between the two of you when you were working together?

12  A.  No.

13  Q.  Did you consider Mr. Reigenborn your friend?

14  A.  I did.

15  Q.  And around what year did you stop working with

16  Mr. Reigenborn as directly?

17  A.  That would have probably been about 2007, 2008ish.

18  Q.  And did that precipitate any kind of falling out between

19  the two of you?

20  A.  No, it did not.

21  Q.  Were you still friends with Mr. Reigenborn when he first

22  ran for office in 2014?

23  A.  I was.

24  Q.  Did you spend any time with each other leading into the

25  campaign?

Currier - Direct

```
 1   A.  Not really.

 2   Q.  Why not?

 3   A.  We worked in different divisions.  I just did not see him

 4   very frequently.

 5   Q.  But did -- but you didn't have a fight or a falling out or

 6   anything, just a drifting apart?

 7   A.  Yes, we did not.

 8   Q.  And who did you support in 2014 during the elections for

 9   Sheriff?

10   A.  Michael McIntosh.

11   Q.  Can you explain why you supported Michael McIntosh even

12   though you considered yourself to be friends with

13   Mr. Reigenborn at that time?

14   A.  In 2014, I was still a sergeant.  And in looking at the

15   candidates, my choice, at least in my mind, was relatively

16   clear that the candidate with the most experience and tenure,

17   knowledge and ability was Michael McIntosh.

18   Q.  Was there anything else you considered about Mr. Reigenborn

19   or Mr. McIntosh when you made the decision to support

20   Mr. McIntosh?

21   A.  No.

22   Q.  Did you have any problems with Mr. Reigenborn's vision or

23   his management philosophies?

24   A.  No.  I didn't know what they were.

25   Q.  And what did you do, Mr. Currier, to support Mike
```

Currier - Direct
284

1    McIntosh's campaign in 2014?

2    A.  In 2014, I believe I donated about $100.

3    Q.  Was that the extent of your support in 2014, your public

4    support for Mr. McIntosh?

5    A.  Yes.

6    Q.  Do you remember anything particularly contentious about the

7    2014 election between Mike McIntosh and Mr. Reigenborn?

8    A.  I knew that there were some issues surrounding support for

9    the Fraternal Order of Police.  Oddly enough, at that point in

10   my life, I had completely separate issues that did not revolve

11   around the election with the Fraternal Order of Police.

12   Q.  Was anything else controversial that you recall from the

13   2014 election between Mr. McIntosh and Mr. Reigenborn?

14   A.  I believe it was around that time that a report from the

15   Brighton Police Department, I believe, indicating that his then

16   wife had been subject to a domestic dispute.

17        MR. THAPA:  Objection, your Honor, relevance, 403,

18   404, hearsay.

19        THE COURT:  Approach.

20        (Continued on next page)

21

22

23

24

25

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Direct

1      (At sidebar)

2           MS. HALPERN:  Your Honor, there's relevance on two

3      topics.  So one of them is that it goes to the fact that

4      Mr. Reigenborn believed that it was the command staff that was

5      supporting Michael McIntosh's campaign that leaked those, even

6      though it was not, so kind of held a grudge against them.  And

7      the second one is they brought up Mr. Morgansen, who brought up

8      those in the story where he said he retained his job.  He was

9      the one who said in the press that the voters are stupid for

10     supporting Reigenborn in the 2018 elections because of his

11     domestic violence convictions.  That's the story that they

12     opened the door for.

13          THE COURT:  I think they already brought up the --

14     with the first witness, I think it's already out there.  And

15     the objection came out after the answer was already out there.

16     Let me look at the question again.

17          I mean, the answer has already been given.  The

18     objection didn't occur before the question came out, so it's

19     untimely.

20          Overruled.

21          (Continued on next page)

22

23

24

25


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Direct

1      (In open court; jury present)

2    BY MS. HALPERN:

3    Q.  Mr. Currier, I think you were about to say that you were

4    describing another situation that was potentially controversial

5    during the 2014 campaign between Mr. McIntosh and

6    Mr. Reigenborn.  If you could please go ahead and continue.

7    A.  There was a report that surfaced.  I don't remember exactly

8    how it came to the public knowledge.  But there was a domestic

9    dispute that had occurred.  I believe the report was taken by

10   the Brighton Police Department.  I believe that is where he

11   lived at the time.  I had been to his house on one or two

12   occasions, but I do not remember specifically where he lived.

13   And I think that brought up some concerns by several people.

14   Q.  I'm sorry, concerns about what?

15   A.  His character, his integrity, decision-making.

16   Q.  Did you share any of those concerns?

17   A.  I did.

18   Q.  And what happened to -- and after the election, did you

19   reach out to Richard -- who won the election in 2014?

20   A.  It was Michael McIntosh.

21   Q.  Did you reach out to Richard Reigenborn at all after he

22   lost that election in 2014?

23   A.  No.

24   Q.  And did Richard Reigenborn continue to work at the Adams

25   County Sheriff's Office for part of 2015?

Currier - Direct

1    A.  He did.

2    Q.  Do you know why he left the Adams County Sheriff's Office?

3    A.  I had no contact with him, so I just understood that he was

4    retiring.

5            MR. THAPA:  Objection, your Honor, speculation.

6            THE COURT:  Sustained.

7    BY MS. HALPERN:

8    Q.  At some point in time you were aware that Mr. Reigenborn

9    did not continue to work at the Adams County Sheriff's Office;

10   is that right?

11   A.  That's correct.

12   Q.  Did you have any communications or interactions with

13   Mr. Reigenborn between 2015 and when he ran for office again in

14   2018?

15   A.  I did not.

16   Q.  And why is that?

17   A.  We didn't speak regularly before that.  There would be no

18   reason for it to ramp up at that point.

19   Q.  In the 2018 election, who did you end up supporting in that

20   election for Sheriff?

21   A.  Michael McIntosh.

22   Q.  And this time, in 2018, what efforts did you make to

23   support Michael McIntosh's campaign for Sheriff?

24   A.  So given my previous thoughts, I became part of Michael

25   McIntosh's campaign team and contributed roughly a thousand

Currier - Direct

1   dollars to his campaign.

2   Q.  And did you do anything else to support Mr. McIntosh in

3   2018?

4   A.  I would -- as part of the campaign team, routinely go to

5   fundraisers, parades, that sort of event.

6   Q.  And you made a reference to his campaign team, who else do

7   you know was on Mr. McIntosh's campaign team?

8   A.  It was Michael McIntosh, his wife, Harold Lawson and his

9   wife, Terrance O'Neill --

10  Q.  I'm sorry, did you say Harold?

11  A.  Harold, yes, Lawson.  Terrance O'Neill, Gene Claps,

12  Jennifer Bessler, Mark Osborne and myself.

13  Q.  And were you the only commander on the campaign team?

14  A.  I believe I was.

15  Q.  And could you describe what positions those other folks you

16  just mentioned, what positions they held in Adams County, if

17  they held one.

18  A.  Mike McIntosh was obviously the Sheriff.  Harold Lawson was

19  the Undersheriff.  Gene Claps was a division chief.  Terrance

20  O'Neill was a division chief.  Mark Osborne was a -- I don't

21  know his title, but he was the finance director, essentially.

22  And Jennifer Bessler, at that time, I believe, was an HR

23  supervisor.

24  Q.  HR supervisor, was that in the Adams County Sheriff's

25  Office or was that part of Adams County?

Currier - Direct

```
 1   A.  It was for the Sheriff's Office.

 2   Q.  And how did you know Ms. Bessler at that time?

 3   A.  At that time, we were in a relationship.

 4   Q.  And could you just explain what you mean by "a

 5   relationship?"

 6   A.  We were dating.

 7   Q.  And for how long had you been dating Ms. Bessler?

 8   A.  On and off for, at that point, a year, maybe two.

 9   Q.  Were both of you single at that time?

10   A.  We were.

11   Q.  And was your relationship known to everyone at the Adams

12   County Sheriff's Office?

13   A.  It was known to everyone.

14   Q.  And were there any policies that prohibited you from dating

15   Ms. Bessler at the Adams County Sheriff's Office?

16   A.  There were not.

17   Q.  And did anyone tell you that there was a problem with you

18   dating Ms. Bessler when you were working as a commander at the

19   ACSO?

20   A.  No, no one said that.

21   Q.  Ms. Bessler, she wasn't your subordinate or anything like

22   that; right?

23   A.  She was not.

24   Q.  So the two of you were both volunteering for Mr. McIntosh's

25   campaign at that time?
```

Currier - Direct

```
 1   A.  That is correct.

 2   Q.  And was both your participation publicly known?

 3   A.  It was.

 4   Q.  And who won the election in 2018?

 5   A.  That was Rick Reigenborn.

 6   Q.  And what were your thoughts about how he might be as a

 7   Sheriff after he won, what went through your mind?

 8   A.  Well, much like what went through my mind when I was

 9   determining who to put my support behind in 2014.  And having

10   been gone for four years and essentially out of law

11   enforcement, I was concerned that he did not have the same

12   knowledge, skills and abilities that I have come to expect from

13   Michael McIntosh.  That was about the extent of my thought

14   process about him.

15   Q.  And did you have any concerns about how many employees

16   Mr. Reigenborn had directly supervised in his experience?

17   A.  That was part of the knowledge, skills and ability portion

18   of it.  As a patrol sergeant, when he left the Adams County

19   Sheriff's Office, he was responsible for essentially

20   supervising 10 people.  And that, to my knowledge, was the

21   extent of his supervision capabilities.

22        After the election, he was going to be responsible for

23   ultimately supervising an agency of 5 to 600.

24   Q.  Did you have any other concerns about Mr. Reigenborn

25   becoming Sheriff?
```

Currier - Direct

 1  A.  I mean, I had personal reservations regarding him that were

 2  not directly work related.  They were more personality based.

 3  Obviously, we had extensive history, and I had known him to be

 4  infidelitous to -- I can't remember his wife's name at the

 5  time, but I had a problem with the conduct that resulted in

 6  that infidelity.

 7  Q.  And how did you know about Mr. Reigenborn's infidelities?

 8  A.  Well, to begin with, as we were working the streets

 9  together, ultimately, he -- maybe his third wife happened to be

10  an EMT that I would routinely see.  She worked in the same

11  geographic area on patrol.  But more specifically,

12  Mr. Reigenborn and I ran into each other at the mailboxes,

13  essentially, in the detective division, and he pulled out a

14  Cricket cellphone bill.  And I questioned, first of all, why a

15  Cricket cellphone bill would be delivered, but why to the

16  Sheriff's Office.  And he told me, it's so my wife doesn't

17  know.

18  Q.  And did you have any other concerns about Mr. Reigenborn

19  after he won the election in 2018 becoming Sheriff?

20  A.  That was about it.

21  Q.  Did you have any kind of specific performance deficiencies

22  in mind or any performance deficiencies?

23  A.  That I suffered or that --

24  Q.  No, that he suffered.  Was that any problem for you?

25  A.  Did not enter my mind.

Currier - Direct

1  Q.  And were you prepared to show respect for Mr. Reigenborn as

2  a leader after he was elected?

3  A.  Absolutely.

4  Q.  Now, I want to ask you what the next interaction you had

5  with Mr. Reigenborn after he won the election in 2018, what do

6  you recall?

7  A.  I believe the next interaction that I had with him was the

8  meet and greet, I believe, in December.

9  Q.  Is this December in 2018?

10 A.  That's correct.

11 Q.  And this was the first time you spoke with Richard

12 Reigenborn after the 2018 election; is that right?

13 A.  That's correct.

14 Q.  Who else did you meet with during these meet and greets at

15 the end of December in 2018?

16 A.  Also present was Tommie McLallan.

17 Q.  Had you met Tommie McLallan before the end of December in

18 2018?

19 A.  I had not.

20 Q.  Did you know anything about Tommie McLallan when you first

21 met him?

22 A.  At that point, I don't believe I did.

23 Q.  Did you have any thoughts about Tommie McLallan before you

24 met him at the end of December 2018?

25 A.  So I did do some research as to who this person was.  I

                              293
                        Currier - Direct

1    don't recall at what point that research was done, whether it

2    was before this meeting or after.  But given that research, I

3    had definite concerns about him on a personal and professional

4    level.

5    Q.  And what were those concerns?

6    A.  Well, I know that he had been involved in a lawsuit of some

7    sort with the Pueblo Sheriff's Office.  I was born in Pueblo,

8    so it still held a special place in my heart.  And I don't

9    recall exactly what that lawsuit entailed, but I do recall that

10   he ultimately transferred, I believe it was, from there to the

11   Walsenburg Police Department and was the Chief of Police in the

12   Walsenburg Police Department.  And the City Council in

13   Walsenburg had essentially said, actually, we're going to

14   disband the police department and have the, I believe it was,

15   the Pueblo County Sheriff's Office at the time take over the

16   responsibility for that area.  And at that time, to my

17   knowledge, that had not happened before.

18   Q.  Any other concerns about Tommie McLallan before you met him

19   at the end of December in 2018?

20   A.  No.

21   Q.  And prior to your meeting in December of 2018 with

22   Mr. McLallan and Mr. Reigenborn, were you at all concerned

23   about being replaced as command staff, as a commander?

24   A.  I was not.

25   Q.  Had you heard anything about any employees that


                    SADIE L. HERBERT, RPR, RCR
        901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Direct

 1    Mr. Reigenborn or Mr. McLallan had wanted to bring with them

 2    when they took office?

 3    A.  I had heard the name Micki Bethel floated.  I wasn't clear

 4    what the intended position for Mr. Bethel was, but that was

 5    another name that I then had to research and find out who this

 6    person was.

 7    Q.  Did you find out who Micki Bethel was?

 8    A.  I did.  And I developed many of the same concerns that I

 9    had previously, in that I believe he was party to a -- an issue

10    in the Rocky Ford Police Department, where there was an

11    allegation that he had contacted a burglary suspect regarding a

12    sex tape with his wife, and I believe there was an intimidation

13    of a witness charge levied against him.

14    Q.  Did you hear about any other individuals that Mr. McLallan

15    or Mr. Reigenborn were planning on bringing with them when they

16    started as Sheriff?

17    A.  No.

18    Q.  What was your understanding of the meet and greet's purpose

19    in December of 2018?

20    A.  It was my understanding that it was for the Undersheriff to

21    get to know who the supervisors and above in the agency were

22    because he had no experience with the agency.

23    Q.  And who scheduled those meet and greets with all of you?

24    A.  I would guess that was Judy Najera.  I do not remember

25    specifically.


                    SADIE L. HERBERT, RPR, RCR
        901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Direct

1    Q.  Can you describe to the jury what happened during your meet

2    and greet, what do you recall from that?

3    A.  The ultimate intent behind it, it was a fairly short

4    meeting, but we discussed my contributions to the Sheriff's

5    Office, what I had done throughout my career.  And I think, at

6    that point, it had been roughly 24 years.  So what I had

7    achieved and given back to not only the agency, but the

8    citizens in those 24 years.

9           After that fairly brief portion of our meeting, which

10   was maybe half of the totality, we discussed personal items.

11   Rick Reigenborn showed me some pictures on his phone of a rifle

12   that he was building or he purchased for some -- I don't

13   remember exactly what it was.  And then I showed him some

14   pictures of my -- an older car that I have.  And then after we

15   got done discussing those two items, I believe I was the last

16   interview of the night.  And the Undersheriff, Tommie McLallan,

17   was preparing to drive back home to Pueblo, and there was some

18   discussion and I told him the best way to get back down to

19   Pueblo from where we were was.

20   Q.  And how long did this meet and greet take?

21   A.  I would guess, 20 minutes.

22   Q.  And do you recall what you were wearing during this meet

23   and greet?

24   A.  I was working, so I would assume I was dressed similar to

25   what I'm wearing now.

Currier - Direct

1    Q.  How did you feel when you left the meet and greet?  Did you

2    have any concerns about your job security?

3    A.  I did not.

4    Q.  What's the next thing that you remember happening after the

5    meet and greet?

6    A.  After the meet and greet, I attended his swearing in

7    ceremony.  And I was up there for a very brief time.  And that

8    was on the 8th, January 8th, I believe.  And I went up to him

9    to shake his hand.  I went to essentially hug his wife, and

10   that was not accepted.  So I left that function.  And my next

11   encounter was when I received the termination letter.

12   Q.  And what do you mean by "that was not accepted?"

13   A.  She, for lack of a better term, rebuffed.  It was almost as

14   if a -- what do you think you're doing hugging me.

15   Q.  Did that give you any pause for concern at all?

16   A.  I thought it was odd.

17   Q.  Did you know Mr. Reigenborn's wife?

18   A.  I did.  That was the same EMT that had -- I mean, there was

19   an occasion that she took care of me while I was sick at work

20   and nauseous, so we had had several encounters with one

21   another.

22   Q.  And is there anything else you recall about interacting

23   with Mr. Reigenborn on the day that he was sworn in?

24   A.  No.

25   Q.  And what do you recall about the following day?

Currier - Direct

1   A.  The following day, I was working as usual, and I received a

2   phone call from Commander Nielsen, this had been going on for

3   quite some time, to respond up to headquarters at a given time.

4   I don't remember exactly the time.

5   Q.  And had you received an email earlier that day rescinding

6   all of the ACSO's policies?

7   A.  I did.

8   Q.  What do you recall thinking when you opened that email?

9   A.  It seemed like a -- first of all, I thought it was strange.

10  I had never, in my 24 years, seen an email from any Sheriff

11  indicating that, at the outset of their term, that was their

12  first order of business was to rescind every policy that we

13  had.  So I thought it was very, very strange.

14  Q.  At that point in time, did you have any concerns about

15  losing your job as a commander?

16  A.  I still did not.

17  Q.  And you were just saying that you were called to

18  headquarters by, is it, Sue Nielsen?

19  A.  That is correct.

20  Q.  And what happened after that?

21  A.  I was given a letter indicating my termination.  I was then

22  put on administrative leave in the Undersheriff's office.

23  Again, I did not live anywhere near Brighton, which is where

24  this was.  And having served for 24 years prior, the car that I

25  drove to work was the car that I drove every day that I went to

Currier - Direct

 1    work.  And -- excuse me -- my badge was taken, my ID.  I was --

 2    I had gone from essentially being somebody that could be

 3    trusted with sensitive information one minute to now being

 4    treated like an untrusted, unwelcomed guest.  And then my car

 5    keys were taken, and I was sent out to the parking lot and told

 6    to find my way home.

 7              MS. HALPERN:  Can we please pull up Exhibit 32.

 8              Your Honor, this exhibit has been stipulated to, so I

 9    move for admission.

10              THE COURT:  Any objection?

11              MR. THAPA:  No objection, your Honor.

12              THE COURT:  Okay.

13         (Plaintiff's Exhibit 32 received in evidence)

14              MS. HALPERN:  Can I please publish to the jury.

15              THE COURT:  Yes.

16    BY MS. HALPERN:

17    Q.  Mr. Currier, can you please look at Exhibit 32 and view it

18    and let us know if this was the letter that you are referring

19    to that you received on January 9th.

20    A.  It is the letter.

21    Q.  What jumped out at you or struck you when you read this

22    letter, when you received it on January 9th, 2019?

23    A.  What struck me -- again, 24 years in this profession, and I

24    started here when I was 22.  I had never run across anything

25    like this.  So to receive a letter that my termination was

Currier - Direct

1    anticipated was shocking, to say the least.  The reason that I

2    had not assumed or concerned myself with it, in anything

3    leading up to it, is because I had not done anything wrong.

4    Q.  And did you still consider yourself to be on good terms

5    with Sheriff Reigenborn when you received this letter?

6    A.  As far as I knew.

7    Q.  And were you surprised when you received this letter?

8    A.  I was surprised, shocked, scared, a lot of feelings ran

9    through immediately following this.

10   Q.  Did you have any kind of understanding that you could

11   retain your job after receiving this letter on January 9th,

12   2019?

13   A.  No, it -- as far as I was concerned, when this letter was

14   handed to me, I was already terminated.

15          MS. HALPERN:  I would like to introduce Exhibit 50.

16   If we could swap, take this down and put up Exhibit 50.

17          Your Honor, I believe that this exhibit is also

18   stipulated to, so I would move for admission into evidence.

19          THE COURT:  Any objection on 50?

20          MR. THAPA:  No objection, your Honor.

21          THE COURT:  It's admitted.

22   (Plaintiff's Exhibit 50 received in evidence)

23          MS. HALPERN:  If we could please publish to the jury.

24   BY MS. HALPERN:

25   Q.  Mr. Currier, if you could take a look at Exhibit 50, at the

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

300
Currier - Direct

1   names there.  And let me know if any of these other individuals

2   received the same letter as you did on January 9th, 2019?

3   A.  They all did.  There was one additional that is not on

4   there, but everybody that is on that list did indeed.

5   Q.  And do you know if all of these individuals -- who they

6   supported in the 2018 Sheriff's election?

7   A.  They all supported Mike McIntosh.

8   Q.  And I'm going to walk through and ask you a couple

9   questions about each one of these individuals.

10          Terrance O'Neill, who was Terrance O'Neill?  What

11  position did Terrance O'Neill hold in 2018, at the time -- '19,

12  at the time that you all received these termination letters?

13  A.  Terrance O'Neill was the division chief in patrol.

14  Q.  And do you know what ultimately happened to Mr. O'Neill

15  after he received a termination letter?

16  A.  Ultimately, he was demoted and placed in a commander spot,

17  I believe, at headquarters.

18  Q.  And Gene Claps, I think we know.  T.J. Coates, I think we

19  know.

20          Jim Gerdeman, what position did he hold, if you

21  recall?

22  A.  Jim Gerdeman, I believe, was a commander at the jail.

23  Q.  And after receiving a termination letter similar to yours,

24  do you know what happened to Mr. Gerdeman?

25  A.  Mr. Gerdeman was demoted to sergeant, I believe, in, I want

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

301
Currier - Direct

 1   to say, patrol, but I'm not sure.

 2   Q.  And same set of questions for Manuel Carillo.  Do you know

 3   what position he was holding January 9th, 2019 when he received

 4   the termination letter?

 5   A.  Manuel was a commander at the jail, I believe.  And he --

 6   he was actually demoted two levels.  So he was demoted to

 7   detective.  And then a short time later -- I don't recall the

 8   time frame -- he was promoted again to sergeant.

 9   Q.  One moment.  So Manuel Carillo, you said he was demoted to

10   what position?

11   A.  He was a detective.

12   Q.  And then after that, it was sergeant.  What position did he

13   hold originally, did you say?

14   A.  He was a commander in the jail.

15   Q.  And there's your name.

16        Mr. Gregory, Paul Gregory, what position did he hold

17   in -- on January 9th, 2019 when you received the termination

18   letters?

19   A.  Paul Gregory, at that time, was a commander in patrol, I

20   believe.  Upon the completion of the meeting, he was demoted to

21   a sergeant's position.  I do not recall where, though.

22   Q.  And do you recall interacting with Mr. Gregory on the day

23   that you received the termination notices -- and it says here

24   January 10th, 2009, but did you receive those letters on the

25   19th -- on the 9th, I'm sorry?

Currier - Direct

1   A.   The 9th, yes.

2   Q.   And this was a memo that got sent out to the Sheriff's

3   Office after you were all escorted from the property?

4   A.   Correct.

5   Q.   And did you have any interactions on January 9th, 2019 with

6   Mr. Gregory?

7   A.   I recall -- these meetings were all conducted at

8   headquarters in Brighton.  And I recall walking in there and

9   seeing Mr. Gregory crying because of the -- I'm assuming he

10  received the same or similar news that I was going to receive

11  shortly thereafter.

12  Q.   Go ahead.  Sorry.

13  A.   He has several -- at that time, several smaller children,

14  much like I did.  And being thrown into a situation where you

15  don't know how you're going to provide for your children is

16  scary.

17  Q.   And Sam Thede -- am I saying that right?

18  A.   Thede.

19  Q.   -- do you know what position he held when you received

20  these termination letters on January 9th, 2019?

21  A.   He was a commander in the jail.

22  Q.   And what happened to him?

23  A.   I believe he was demoted to sergeant.  I couldn't tell you

24  where, though.

25  Q.   Mr. Mitchell is here with us.

Currier - Direct                                    303

 1              And you said there was someone else who was also --

 2      who is not on this list who you are aware of that received a

 3      similar termination letter as you?

 4      A.  That's correct.  That's Rick McNair.

 5      Q.  And what happened to Mr. McNair?

 6      A.  Mr. McNair was a captain in the jail, and I believe he was

 7      going to be demoted to a sergeant's position.  I do not know

 8      where.  And he chose to retire rather than take a sergeant's

 9      position because of the effect it would have on his retirement.

10      Q.  And was Mr. McNair also a McIntosh supporter?

11      A.  He was.

12      Q.  Now, Mr. Currier, can you tell me what you recall about the

13      conversation you had at headquarters after you received --

14              MS. HALPERN:  And you can take this down.

15      Q.  -- after you received your notice of termination?

16      A.  The conversation that I had was -- I was still in a state

17      of -- I was almost delusional.  I wasn't sure what was

18      occurring.  I -- I had never anticipated anything like this

19      happening.  I have led my life, especially in my professional

20      career, in a degree or a way that would preclude anything like

21      this happening.  So when I was called in to essentially justify

22      my professional existence, I was shocked.

23              And I had just reached a special early retirement age,

24      which is the rule of 70 at that time.  I didn't remember that I

25      reached it.  It's a milestone for a lot of people.  The reason

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Direct

1    I knew about it is because Mark Mitchell told me about it when

2    we were at lunch one day.  I don't know why Mark Mitchell knew

3    and I didn't, but he did.  So I was in a position where I was

4    two weeks into the ability to retire.  But I was at such a

5    strange age that I was too old to start over, too young to just

6    retire and stay home and didn't have the funding to do that

7    anyway.

8    Q.  How old were you when you received your termination notice?

9    A.  I want to say I was 47.

10   Q.  And who did you meet or speak with at headquarters?  I know

11   you described the situation a little bit, but who was there?

12   A.  It was Sheriff Reigenborn, Undersheriff McLallan, Kasandra

13   Carleton --

14   Q.  No, I'm sorry, when you got the notice of termination.

15   A.  Oh, the letters?

16   Q.  Yes.

17   A.  That was just Undersheriff McLallan.

18   Q.  And did he say anything to you when he gave you the letter?

19   A.  To be honest with you, I -- I don't remember.

20   Q.  Do you recall if you said anything to him?

21   A.  I probably questioned the fact that you're telling me to

22   get home to, at that time, southeast Aurora from Brighton, but

23   I don't have a car.  Okay, I guess I'll figure it out.

24   Q.  And do you recall if Mr. -- did you speak with Mr. McLallan

25   at all about Mr. Gregory?

Currier - Direct

1    A.  No -- well, I take it back.  There -- excuse me.  It's not

2    like an official conversation.  But when you are -- when you

3    witness certain things and you are put in a similar position

4    and you look at someone and say, you're firing good people,

5    because that is what was happening, we were -- we were trusted

6    employees, and there was a list, obviously, of people that were

7    no longer trusted and couldn't be in there.  And for

8    Mr. Gregory to be in that list, for any of us to be in that

9    list was shocking.

10   Q.  Did anyone on January 9th indicate to you that you had any

11   ability to continue to keep working at the ACSO or retain your

12   job?

13   A.  I was told that I had to schedule a hearing with the

14   Sheriff.

15   Q.  And did you do that?

16   A.  I did.

17   Q.  And is there anything else you remember about your

18   conversation on January 9th, 2019?

19   A.  Not that one.

20        MS. HALPERN:  Your Honor, I'm about to start a new

21   unit.  I don't know if you want to take a break now before we

22   go into the termination hearings because that might take a bit

23   of time.

24        THE COURT:  Why don't we do that.

25        Members of the jury, we'll take our afternoon break a

Currier - Direct

1    little early today.  If you could be back and ready to go by 5

2    to 3, that would be great.

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1      (In open court; jury not present)

 2           THE COURT:  Anything we need to take up?

 3           MS. HALPERN:  No, your Honor.  I just knew we were

 4   going to be playing audio.

 5           THE COURT:  That's fine.  It's a few minutes early,

 6   but it's not a big deal.  And we'll see how the afternoon goes.

 7   Depending on breaking point, we may break a little bit early.

 8   It's hot in here, and I hate the jury going more than an hour

 9   and a half.

10           (Recess)

11           THE COURT:  Bring in the jury.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury present)

2            THE COURT:  Just a reminder that you are still under

3    oath.

4            THE WITNESS:  Yes, sir.

5    BY MS. HALPERN:

6    Q.  Mr. Currier, are you prepared to continue?

7    A.  Yes, ma'am.

8    Q.  Right before the break, we had finished talking about the

9    day that you received your notice of termination.  I want to

10   ask you about the day of your meeting with Sheriff Reigenborn

11   pursuant to the letter and the meeting that you requested.

12           Do you recall the day of your termination meeting with

13   Mr. Reigenborn?

14   A.  I do.

15   Q.  Do you remember what day that was?

16   A.  Day of the week or the -- I want to say it was the 15th.

17   Q.  Of January, 2019?

18   A.  Correct.

19   Q.  And were you angry when you went into that meeting?

20   A.  No.

21   Q.  What were you feeling?

22   A.  Confused and scared.

23   Q.  Did you record that meeting?

24   A.  I did.

25           MS. HALPERN:  Your Honor, we have synced the two, the

309

1   video and the transcript.  May I move to enter Exhibit 19 and

2   Exhibit 55, which are the original recording -- I'll do it one

3   at a time -- original recording of the hearing.

4           THE COURT:  Any objection?

5           MR. THAPA:  No objection, your Honor.

6           THE COURT:  Yes, they are both admitted.

7       (Plaintiff's Exhibit 19 received in evidence)

8           MS. HALPERN:  And then I would like to move to enter

9   into evidence Exhibit 55, which is a transcript of that

10  hearing.  It is also stipulated to.

11          MR. THAPA:  No objection, your Honor.

12          THE COURT:  That's admitted also.

13      (Plaintiff's Exhibit 55 received in evidence)

14          MS. HALPERN:  And the wonderful tech people have

15  figured out a way to sync the two to deal with the audio

16  problems that might exist.  So Plaintiff would request to

17  introduce what we are going to be labeling 19-A, which is the

18  synthesis of Exhibit 19 and Exhibit 55.  We would like to enter

19  that into evidence, if there's no objection.

20          THE COURT:  Any objection?

21          MR. THAPA:  No objection, your Honor.

22          THE COURT:  It is admitted, then.

23      (Plaintiff's Exhibit 19-A received in evidence)

24          MS. HALPERN:  If we could please play Exhibit 19-A and

25  publish that to the jury and play the audio.

1      (Media played)

2          MS. HALPERN:  We can take it down.

3    BY MS. HALPERN:

4    Q.  Mr. Currier, do you know why the audio recording ended at

5    that point in time?

6    A.  I have no idea.

7    Q.  And what happened, do you recall, from your memory after

8    the recording that we have here?

9    A.  I believe that was essentially nearly the very end of the

10   conversation, and I left the office.

11   Q.  And were you -- when were you provided a copy of a

12   severance agreement?  Was it now or at a later date?

13   A.  It was at the meeting.

14          MS. HALPERN:  Can you pull up Exhibit 31, please.

15   It's already been admitted into evidence.  And if we can

16   publish for the jury.

17   Q.  Is this the settlement agreement that was referred to in

18   the audio recording?

19   A.  Yes, it is.

20   Q.  And it was handed to you at that time?

21   A.  Correct.

22          MS. HALPERN:  If we go to the final page of

23   Exhibit 31.

24   Q.  It looks like it was pre-signed by the county's attorney's

25   office?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1   A.  That's correct.

2   Q.  At any point in time during the meeting do you recall

3   anybody telling you there was any ability for you to retain

4   your job at the Adams County Sheriff's Office?

5   A.  No.

6           MS. HALPERN:  We can take that down.

7   Q.  I have a couple questions.

8           You said you get it a number of times during that

9   conversation.  Could you tell us what you're referring to?

10          And if we need to bring the transcript back up, we

11  can.  It's on the record.

12  A.  No, I remember it quite distinctly.  I understood the

13  position that I was in at that time, right, that I was being

14  fired.

15  Q.  And you mentioned that you were in a unique position

16  because luckily you can retire.  What do you mean by that?

17  A.  As I described earlier, that rule of 70, the special early

18  retirement, I just barely hit that.  And to boil 24 years of

19  service, ultimately now 30, down to I just barely crossed the

20  wire by two weeks to get the bare minimum was not where I

21  anticipated being.

22  Q.  Can you explain what you mean by "bare minimum?"

23  A.  So special early retirement, as it was figured, takes your

24  age, years of service.  If they equal a preset amount -- in

25  this case, it was 70 -- then with the multipliers in the

1    retirement, it tells you with your years of service how much

2    you are eligible to receive.  And at two weeks, that is the

3    bare minimum.  You cannot get any lower than that, at least in

4    my case.

5    Q.  And did you actually want to retire on January 9th, 2019?

6    A.  I did not.

7    Q.  So why did you ask to retire in that meeting?

8    A.  Well, it was either retire or be fired.

9    Q.  Were there any other concerns you had at that meeting that

10   made you ask to retire?

11   A.  The -- there was some questioning as to -- I assumed that I

12   had already been fired and having never been in a position like

13   that, never having to worry about someone looking at you and

14   saying, you have not done what you were supposed to do,

15   therefore, we're not going to continue your employment, that's

16   what it felt like.  And ultimately, I -- I was under the

17   assumption that if I were fired, I would not be able to

18   withdraw any retirement, so...

19   Q.  And by retirement, you mean pension?

20   A.  The pension.

21   Q.  Have you, in your entire time at the ACSO, have you ever

22   witnessed officers being terminated in a similar process to the

23   one that you went through?

24   A.  No.

25   Q.  Have you ever found an officer who was terminated without

 1  cause?

 2  A.  I have never seen that.

 3  Q.  What was the typical practice that you observed before an

 4  officer was terminated?

 5  A.  Typically, an allegation or complaint would be made.  The

 6  case would then be investigated, usually by internal affairs,

 7  and a determination would be arrived at based on the

 8  investigation as to whether there was cause to terminate

 9  someone.

10  Q.  How did you feel after that final termination meeting?

11  A.  So I was concerned and scared.  And the reason is, I have

12  very -- at that time, small children.  I was providing for

13  their medical care.  I am a diabetic.  I have been diabetic for

14  40 some years, since I was 13, I believe, and I also know that

15  I cannot be without medical care.  So the removal of everything

16  that I knew in that instant and to be thrown aside and

17  essentially have to figure it out on my own was frightening.

18  Q.  And Mr. Reigenborn, I believe, referenced downsizing.

19  Since you have come back to the ACSO, are you aware of any

20  downsizing that occurred in 2009[sic] at the ACSO?

21  A.  I am not.

22  Q.  Was there any downsizing at that time?

23  A.  No, there was not.

24  Q.  And what impact did getting terminated have on your life?

25  A.  Well, the -- the stress that came from the uncertainty of

314

1    what was going to happen with my children, what was going to

2    happen with myself, my mortgage, how I was going to find a job.

3    I was not in the position where I could just not work.  My

4    pension was barely enough to cover my mortgage payment, so I

5    had to work.  And after 24 years of dedicating your life to a

6    given career and being summarily removed from that and told to

7    go find something else to do, it's not very easy to find

8    something else to do.  And it's nearly impossible to find

9    something else to do of similar -- that's similar in nature.  I

10   could not find another commander's job.

11   Q.  How did getting fired make you feel?

12   A.  Sad, concerned, just shocking.  I had never anticipated

13   anything like that happening.

14   Q.  What was it like being back on the job market?

15   A.  That was a rude awakening.  And everything that I had heard

16   or had been kind of telling some other folks that were

17   preparing for retirement is that -- what I discovered is that

18   the skills that I had developed over the course of 24 years

19   does not and did not translate to the private sector.  Either

20   there was a misunderstanding or people in the private sector

21   just said, we don't -- we don't want to deal with that.

22   Q.  What do you mean "we don't want to deal with that," I'm

23   sorry?

24   A.  Trying to determine how one set of skills relates to

25   another set of skills that may be solely viewed in the private

315

 1   sector as, well, this skill equals this job or this title, and

 2   we don't know how to quantify what a commander in a law

 3   enforcement agency is in comparison to what we currently have.

 4   Q.  And what efforts did you make to look for work after you

 5   were fired from the ACSO?

 6   A.  Well, I as well applied for the commander's job at the

 7   Northglenn Police Department.  I applied for private -- like

 8   the Wells Fargo, the Jefferson County DA's office, Charles

 9   Schwab, Cherry Creek School District.  There were several

10   application attempts.  And then, ultimately, I knew the

11   Undersheriff at the Arapahoe County Sheriff's Office, who

12   offered me a patrol job, which I politely declined only

13   because, at 47, I was not prepared with two small children -- I

14   was not prepared to work weekends, holidays.  And then I was

15   ultimately told of another job with the Arapahoe County

16   Sheriff's Office in the court security section, and I took that

17   one.

18   Q.  How long did it take for you to get back into law

19   enforcement?

20   A.  I think it was about a six-month process.

21   Q.  And how did you feel not being a police officer during

22   those six months?

23   A.  When you spend a quarter of a century devoting your life to

24   something and it is removed without a second thought, the idea

25   that -- I've never told people that I am my profession or I am

1   my job, however, that job, profession, I believe, is a calling

2   and to be removed from that and not have the impact that you

3   used to have is stressful.

4   Q.  And did you attempt to run for office at any point in time?

5   A.  I did.

6   Q.  What campaign was that?

7   A.  I ran for Sheriff in Elbert County.

8   Q.  And how did that turn out?

9   A.  I lost that election.

10  Q.  And what year was that?

11  A.  That was the election for 20 -- is it '23, '22 -- the

12  election would have been in '22.

13  Q.  What position did you have in Arapahoe.  You said it was in

14  the -- in the courts, but what level position did you have?

15  A.  I was a line level officer.  I was responsible for taking

16  inmates out of their cells and transporting them to court,

17  taking care of the court process and paperwork and transporting

18  them back to the jail.

19  Q.  So how did it feel to you going back to being a line level

20  employee when you were a commander at the ACSO?  How did you

21  emotionally respond to that?

22  A.  I was happy to have the ability to provide for my family,

23  while at the same time being somewhat disillusioned because I

24  knew I could not -- I could not work long enough to retire from

25  there, nor did I want to start all over at closing in on 50

1   years old.

2   Q.  When did you start working again at the ACSO?

3   A.  It was in 2023.

4   Q.  And I would like to talk to you about your damages.  We're

5   going to try to streamline it and get it to go a little faster.

6        MS. HALPERN:  May I approach the witness to give them

7   kind of a worksheet, your Honor.  And I have one for you as

8   well.

9        THE COURT:  Any objection?

10        MR. THAPA:  No objection, your Honor.

11        THE COURT:  Yes.

12   BY MS. HALPERN:

13   Q.  Mr. Currier, can we please call up what is designated as

14   Exhibit 36.

15        MS. HALPERN:  Your Honor, Exhibit 36 has been

16   stipulated, so I move for admission.

17        And may I publish to the jury.

18        MR. THAPA:  No objection, your Honor.

19        THE COURT:  That's admitted and may be published.

20     (Plaintiff's Exhibit 36 received in evidence)

21   BY MS. HALPERN:

22   Q.  Mr. Currier, what is Exhibit 36?

23   A.  That is a statement from the county branch of the Adams

24   County government indicating my pay.

25   Q.  And what was your -- what was your pay grade at the time

1    that you were discharged from the ACSO?

2    A.   Pay grade or total pay?

3    Q.   I'm sorry, your annual salary?

4    A.   My annual salary was $125,112 and some change.

5    Q.   And what does the percent change under that refer to?

6    A.   The -- oh, I see.  That is the -- for my evaluation score.

7    Q.   So you got a perfect score for your evaluation that year?

8    A.   I got a -- the rating was 4.64, and that fell within the

9    5 percent category.  As was described earlier, it ranged from a

10   1 to a 5 in the performance rating.  And the percentage or the

11   performance pool is funded at a certain percentage.  And based

12   on my performance rating, I was given a 5 percent raise.

13   Q.   And is that 5 percent raise the $6,255.61?

14   A.   That is correct.

15   Q.   And you were also at the top of your pay grade, so you were

16   paid out in lump sum bonuses instead of it going towards your

17   base salary?

18   A.   That's correct.

19   Q.   So let's talk about your expected base wages in 2019.  Was

20   that $125,112.36?

21   A.   That's correct.

22   Q.   And did you receive any cost -- typically, did you receive

23   any cost of living adjustments when you were at the Adams

24   County Sheriff's Office?

25   A.   Typically.

1    Q.   What typically was the cost of living adjustment?

2    A.   That's around 5 percent.

3    Q.   So in 2020, with the 5 percent cost of living adjustment,

4    would that with $131,367.99?

5    A.   Yes.

6    Q.   And the following year, with the COLA, in 2021, would that

7    have been $137,936.39?

8    A.   Yes.

9    Q.   And your expected base salary in 2022 would have been

10   $144,833.21?

11   A.   Correct.

12   Q.   And based on the same calculation, assuming a percent

13   change of 5 percent, would you have anticipated that your bonus

14   in 2019 would have been $6,255.62?

15   A.   Yes.

16   Q.   And in 2020, it would have been $6,568.40?

17   A.   Yes.

18   Q.   And in 2021, it would have been $6,896.82?

19   A.   Yes.

20   Q.   And in 2022, it would have been $7,241.66?

21   A.   Yes.

22   Q.   Did you pick up any additional healthcare costs once you

23   lost your job at the ACSO in 2019?

24   A.   I did.

25   Q.   Why?

320

1    A.  So when I left the Sheriff's Office, there was a standing

2    rule during retirement that if you elected not to maintain the

3    county insurance coverage, you could never get back on it.

4    Having been diabetic since I was a child, I cannot be without

5    healthcare, so I chose to stay on that plan.  I could not cover

6    my children as I was before.  I didn't have the funds to do

7    that.  So for just me in the retirement plan was roughly $700 a

8    month.  And previously, I had been paying $400 a month,

9    roughly, for myself and my two children.

10   Q.  And so, in 2019, did the increase in your personal

11   expenditures for healthcare benefits equal approximately

12   $4,200?

13   A.  Yes.

14   Q.  Is that the same amount $4,200 that you also had to

15   increase on healthcare spending in 2020?

16   A.  That's correct.

17   Q.  And the same amount, $4,200 you had to expend additionally

18   on healthcare coverage in 2021?

19   A.  Yes.

20   Q.  And the same amount, 4,200 you had to expend in 2022?

21   A.  Correct.

22   Q.  And how much did you earn at your time at Arapahoe County

23   Sheriff's Office, approximately?

24   A.  During my entire employment there, I would guess around

25   130,000.

Currier - Cross

1  Q.  So calculating all of that together with your total

2  economic loss, which is everything you would have been owed if

3  you worked at ACSO, minus your subsequent wages, would that

4  have been approximately $453,012.45?

5  A.  That's correct.

6       MS. HALPERN:  Mr. Currier, I do not have any further

7  questions for you, but -- I don't know who is actually going to

8  be doing your cross -- defense counsel will have some questions

9  for you.

10      THE COURT:  Cross-examination.

11      MR. THAPA:  Yes, your Honor.

12 CROSS-EXAMINATION

13 BY MR. THAPA:

14 Q.  Good afternoon, Mr. Currier.

15 A.  Good afternoon, sir.

16 Q.  You testified on direct that you and Mr. Reigenborn were

17 friends; correct?

18 A.  Yes.

19 Q.  You were friends back in -- during the 2014 election?

20 A.  Yes.

21 Q.  But you don't recall Mr. Reigenborn ever asking you to

22 support him in the 2014 election, do you?

23 A.  No.

24 Q.  And moving on to after he lost the 2014 election, you don't

25 recall any specific conversations you had with him after he

                                                                    322
                         Currier - Cross

1    lost the 2014 election?

2    A.  No.

3    Q.  And you don't have any communications with Mr. Reigenborn

4    after he left the Sheriff's Office in 2015 until you met he and

5    Tommie McLallan in December of 2018; is that correct?

6    A.  Yes, I believe so.

7    Q.  And you and Mr. Reigenborn never discussed your role in

8    Sheriff McIntosh's campaign, did you?

9    A.  No.

10   Q.  And your involvement in Mr. McIntosh's 2014 campaign for

11   Sheriff was limited to making donations; correct?

12   A.  That's correct.

13   Q.  In 2018, you mentioned you were part of his campaign team,

14   but you did not host any campaign events; correct?

15   A.  That's correct.

16   Q.  And you did not actively solicit donations, did you?

17   A.  That's correct.

18   Q.  And I believe you mentioned you started working at the

19   Adams County Sheriff's Office in 1995; is that correct?

20   A.  That is correct.

21   Q.  So in all of your years at the Adams County Sheriff's

22   Office before you left in 2019, you didn't know of anyone at

23   the commander level or above that did not openly support the

24   sitting Sheriff in elections; correct?

25   A.  I had no idea who anyone supported.


                    SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Cross

 1    Q.  Because to your knowledge --

 2    A.  That's correct.

 3    Q.  Okay.  When you left the Adams County Sheriff's Office in

 4    2019, you held the position of commander of the detectives

 5    division?

 6    A.  Correct.

 7    Q.  And a commander is part of the Sheriff's command staff;

 8    correct?

 9    A.  Correct.

10    Q.  You agree that it's important for command staff to show

11    loyalty to the Sheriff, don't you?

12    A.  Yes.

13            MR. THAPA:  If you could please pull up Plaintiff's

14    Exhibit 87.  It's a stipulated exhibit.  Permission to publish,

15    your Honor.

16            THE COURT:  I think this one is already in, isn't it?

17            MR. THAPA:  Yes, it's already been admitted.

18            THE COURT:  Yes, you may.

19            MR. THAPA:  Sorry, forgot to mention that.

20    BY MR. THAPA:

21    Q.  Do you see Plaintiff's Exhibit 87 in front of you?

22    A.  I do.

23            MR. THAPA:  And if we could zoom toward kind of the

24    left side of this where Mr. Currier's name is under there.

25    Perfect.

                                                                                    324
                                Currier - Cross

 1   Q.  So do you see your last name there, over the title of

 2   commander?

 3   A.  I do.

 4   Q.  So it's right below Mr. Coates' name; correct?

 5   A.  That's correct.

 6        MR. THAPA:  We can zoom out a little bit as well.

 7   Q.  There was some questioning during your direct examination

 8   about a list of nine people on that email that you were

 9   questioned about.

10        Do you recall that?

11   A.  Yes.

12   Q.  Now, the command staff for the McIntosh administration

13   consisted of more commanders than just the people on that list;

14   correct?

15   A.  That's correct.

16        MR. THAPA:  You can take that down.  Thank you.

17   Q.  As a commander, you supervised sergeants and below in your

18   chain of command?

19   A.  That is correct.

20   Q.  As a commander, you determined assignments and priority of

21   work for the detectives division; is that right?

22   A.  No.

23   Q.  So let me try and understand.  As a commander, you did not

24   determine the assignments or priority of work for the

25   detectives division?

Currier - Cross

1  A.  No.  I relied on the sergeants to do that.

2  Q.  Do you recall being deposed in this case back in August of

3  2021?

4  A.  Yes.

5  Q.  Do you recall taking an oath to tell the truth, much like

6  you did here today?

7  A.  Yes.

8  Q.  Do you have the deposition folder up there with you?

9  A.  I do not.

10       MR. THAPA:  Thank you.

11 A.  I'm assuming I'm looking for my name.

12 Q.  Correct.  I believe that's how it's organized there.

13 A.  Okay.

14 Q.  You are there?

15 A.  Yes.

16 Q.  If you could please turn to Page 71, and let me know once

17 you're there, please.

18 A.  Okay.

19 Q.  Page 71, Line 2, the question was:  "I assume this is

20 obvious, but did you determine assignments and priority of work

21 for the detectives division?"

22       Your answer:  "I did."

23       Did I read that correctly?

24 A.  Yes, sir.

25 Q.  You can put that aside.

Currier - Cross

```
 1              Now, a sergeant also has some supervisory authority;

 2   is that right?

 3   A.  That's correct.

 4   Q.  But a commander supervises more people than a sergeant;

 5   correct?

 6   A.  That's oversimplifying it, but yes.

 7   Q.  Commanders have more responsibility than sergeants?

 8   A.  Sure.

 9   Q.  When you were a commander under Sheriff McIntosh,

10   Mr. Coates was your division chief; that's correct?

11   A.  That's correct.

12   Q.  He was your supervisor?

13   A.  Yes.

14   Q.  And there was no captain position in between you and

15   Mr. Coates; is that right?

16   A.  That is correct.

17   Q.  So you were the next highest ranking officer in the

18   detectives division?

19   A.  Correct.

20   Q.  And if Mr. Coates had been gone for some reason, you would

21   have had to step in as acting chief in his place?

22   A.  Take over his responsibilities, yes.  Yes, I would.

23   Q.  So in his absence, you would have been in charge of the

24   division; correct?

25   A.  Correct.
```

Currier - Cross

1  Q.  Mr. Currier, do you agree that commanders are supposed to

2  be leaders?

3  A.  Yes.

4  Q.  And as a commander, you were responsible for implementing

5  the Sheriff's Office's policies?

6  A.  Correct.

7  Q.  You were also responsible for conveying the Sheriff's

8  priorities and goals to your subordinates?

9  A.  That's correct.

10  Q.  And you were also entrusted with highly confidential

11  information; correct?

12  A.  Yes.

13  Q.  And it would have been inappropriate for you to share that

14  information with employees beneath you; right?

15  A.  That's correct.

16  Q.  I want to move on to your first meeting with Mr. McLallan

17  and Mr. Reigenborn after he won the election.

18       During your meeting in 2018 with Mr. Reigenborn and

19  Mr. McLallan before they took office, you didn't ask them any

20  questions about what they had planned for the Sheriff's Office,

21  did you?

22  A.  I did not.

23  Q.  You didn't say anything about what you wanted to see happen

24  with the Sheriff's Office moving forward; correct?

25  A.  I don't believe I did.

Currier - Cross

1    Q.  We saw that letter during your direct examination.  In the

2    letter, Mr. Reigenborn gave you the opportunity to meet with

3    him on January 15, 2019; correct?

4    A.  Correct.

5    Q.  And before you went in for that meeting, you weren't

6    absolutely certain that you were going to be terminated, were

7    you?

8    A.  So if I went via the -- what the letter said, yes, I was

9    going to be terminated.

10   Q.  So your understanding was the -- well, did you know that

11   the plan was that you were going to be terminated for certain

12   before you went to that meeting?

13   A.  I didn't know what his plan was.

14   Q.  We heard the audio from that meeting, but you agree that

15   Mr. Reigenborn gave you the opportunity to give him your

16   thoughts when he said, the table is yours and opened it up to

17   you; correct?

18   A.  That's correct.

19   Q.  And before that point, he didn't mention retirement at all,

20   did he?

21   A.  No.

22   Q.  And in fact, after he said that, that's when you mentioned,

23   luckily or not, I can retire; correct?

24   A.  That is correct.

25   Q.  And during that meeting, at no point did you ask

Currier - Cross

1    Mr. Reigenborn to keep you on in any other position, did you?

2    A.  Did I ask him that, no.

3    Q.  And you also didn't ask him whether he could put you in any

4    other position; correct?

5    A.  No.

6    Q.  So after you left the Adams County Sheriff's Office, I

7    believe you mentioned you applied for a position at the

8    Arapahoe County Sheriff's Office; is that right?

9    A.  That's correct.

10   Q.  You started working at Arapahoe County Sheriff's Office in

11   June of 2019?

12   A.  That's correct.

13   Q.  And you worked there until April of 2021?

14   A.  That sounds about right, yes.

15   Q.  And you left that position to campaign for Sheriff of

16   Elbert County; is that right?

17   A.  That's correct.

18   Q.  You campaigned until March of 2022?

19   A.  Correct.

20   Q.  And during the time you were campaigning from April 2021 to

21   March 2022, you weren't employed; right?

22   A.  That is correct.

23   Q.  You were hired back at the Adams County Sheriff's Office in

24   January of 2023; correct?

25   A.  Correct.

Currier - Cross

1    Q.  From when you stopped campaigning in March of 2022 until

2    you were hired back at the Adams County Sheriff's Office in

3    January of 2023, you weren't employed anywhere; correct?

4    A.  That is correct.

5    Q.  And you did not look for any employment after you ended

6    your campaign for Sheriff in March of 2022?

7    A.  That is correct.

8    Q.  You're currently the division chief of the detectives

9    division of the Adams County Sheriff's Office?

10   A.  Yes, sir.

11   Q.  And Sheriff Claps appointed you to that position when he

12   took office in January of 2023; correct?

13   A.  That's correct.

14   Q.  Before Sheriff Claps became the Sheriff, you would still

15   consider him as a friend; correct?

16   A.  Yes.

17   Q.  You would also consider Mr. Mitchell a friend?

18   A.  I would.

19   Q.  And Mr. Coates was a mentor to you; is that right?

20   A.  Yes.

21   Q.  Do you recall mention of the name Little Suzie this morning

22   during Mr. Coates' examination; right?

23   A.  Yes.

24   Q.  You have seen Little Suzie; right?

25   A.  Yes.

                                    331
                            Currier - Redirect

1    Q.  And you have seen it in Mr. Coates' office; correct?

2    A.  Yes.

3    Q.  I forgot to ask you this earlier, but what was your salary

4    per year at the Adams County Sheriff's Office?

5    A.  My salary per year?

6    Q.  Yes.

7    A.  At the end of my --

8    Q.  I'm sorry, I misspoke.  At the Arapahoe County Sheriff's

9    Office.

10   A.  Oh, okay.  So that one was -- it's difficult to come to a

11   definitive answer, because when I was hired, there had never

12   been a hiring from outside of the agency.  So not only was I

13   hired from the outside -- outside the agency, but I had

14   significantly more experience than they were used to.  And I

15   think, in that first year, I think I had three different

16   salaries.  So my -- I was hired somewhere in the $70,000 range.

17   And I think, when I left, I was in the probably $90,000 range,

18   maybe a little less.

19           MR. THAPA:  No further questions.  Thank you.

20           THE COURT:  Redirect?

21   REDIRECT EXAMINATION

22   BY MS. HALPERN:

23   Q.  Hi, Mr. Currier.  Just a couple questions following

24   Mr. Thapa's questioning to you.

25           So I believe he asked you if loyalty is required, if

Currier - Redirect

 1    you are a commander, if loyalty to the Sheriff is required.

 2            Do you recall that?

 3    A.  Yes.

 4    Q.  Is that the same as loyalty to a particular candidate

 5    running for office?

 6    A.  No.

 7    Q.  What is the difference, in your mind, between loyalty to

 8    the Sheriff versus loyalty to a particular candidate running

 9    for office?

10    A.  So in my mind, when you say loyalty to the Sheriff, what

11    you are asking is does loyalty exist between you and the entity

12    in question or the office of the Sheriff.  It can be any

13    person, but do you have loyalty to that office, whomever

14    happens to occupy that office.

15    Q.  And I believe Mr. Thapa also asked you about command staff

16    support of Mr. McIntosh in 2018.

17            Do you recall that line of questioning?

18    A.  Yes.

19    Q.  And you said you were not aware of anyone's support for

20    Reigenborn.  What did you mean by that?

21    A.  I mean, I didn't ask anybody.  I was not -- not something I

22    was concerned about.

23    Q.  And he also asked you if you understood that -- if you

24    believed that most of the command staff supported Mr. McIntosh.

25            Do you recall that?

Currier - Redirect

1   A.  Yes.

2   Q.  Did they all do so as publicly as you did?

3        MR. THAPA:  Objection, foundation, your Honor.

4        MS. HALPERN:  Your Honor, the idea is that there might

5   have been support, but if they weren't public, Mr. Reigenborn

6   wasn't necessarily going to know about that.

7        THE COURT:  If he knows, he can answer.  Overruled.

8        THE WITNESS:  So were they as public with their

9   support?

10       MS. HALPERN:  Yes.

11       THE WITNESS:  As I was, no.

12  BY MS. HALPERN:

13  Q.  And were they all equally as active or involved in his

14  campaign?

15  A.  No.

16  Q.  And I believe Mr. Thapa asked you a question about if

17  commanders had more management responsibilities, I believe,

18  than, I think he said, a sergeant.

19       Do you remember that?  Am I getting that right?

20  A.  Yes.

21  Q.  And you said he was oversimplifying it.

22       What do you mean by that?

23  A.  Well, I believe what he asked me was do I supervise more

24  people.  And in that situation, my direct reports would have

25  been 3, the 3 sergeants.  Those are my direct reports.

334
Currier - Redirect

1         So am I ultimately responsible for the 10 to 15

2    detectives that are below that?  Ultimately, yes.  But they're

3    supervised by sergeants.  So 5 detectives are direct reports to

4    a sergeant, and that goes along the lines of every sergeant.

5    And then the sergeants would have been my direct reports.

6         So do I ultimately have more managerial

7    responsibility?  Yes.  But my direct reports were roughly the

8    same.

9    Q.  And Mr. Thapa was asking you about your beliefs going into

10   the termination meeting with Mr. Reigenborn.

11        Do you recall that line of questioning?

12   A.  Yes.

13   Q.  Now, did you believe you were going to be fired as you went

14   into that meeting?

15   A.  Yes.

16   Q.  Why didn't you ask Mr. Reigenborn to put you into another

17   position during the meeting?

18   A.  I didn't realize, first of all, that that was my

19   obligation.  And it didn't even cross my mind.  It was never

20   brought up as a potential.

21   Q.  And why didn't you ask him if there was the potential that

22   he could put you into another position at the ACSO?

23   A.  It was something that never crossed my mind.

24   Q.  Do you remember when Mr. Thapa was asking you if you have

25   seen Little Suzie?

Currier - Redirect

1    A.  Yes.

2    Q.  Can you describe what Little Suzie looks like?

3    A.  Little Suzie is a figurine about three inches tall.  It

4    looks like one of the stress ball kind of squishy dolls that

5    our victim advocates give out.  And it's something that was

6    left in the desk.  I know it was fully clothed.  It was not a

7    nude Barbie doll.

8         MS. HALPERN:  That's all the questions that I have.

9    Thank you.

10        THE COURT:  Let me ask the jury, do you have any

11   questions for the witness?

12        You can step down.

13        THE WITNESS:  Thank you, your Honor.

14        THE COURT:  Are Plaintiffs prepared to call your next

15   witness?

16        MR. BOHNET-GOMEZ:  Your Honor, our next witness was

17   going to be Mr. Reigenborn.  He's subpoenaed for tomorrow

18   morning.  It would be our preference to keep that.  If the

19   Court would prefer, though, we can put Mr. Mitchell on.

20        THE COURT:  Let me ask you, I'm assuming because of --

21   because he was scheduled for tomorrow morning that we are ahead

22   of schedule for the 7 days for completing within 7 days.

23        MR. BOHNET-GOMEZ:  Yes, I think we're about an hour

24   ahead of schedule.

25        THE COURT:  All right.  Then, members of the jury, as

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Currier - Redirect

1   you heard, there's a witness who is scheduled for tomorrow.

2   Because we're ahead of schedule right now, that witness isn't

3   here for today.  Rather than taking a witness out of turn, I

4   will instead end a little bit early, let you guys go a little

5   bit early today.  As I said, this isn't a bad thing, we're a

6   little ahead of schedule, so it's actually a good thing.

7         If you could be back again tomorrow a little before

8   8:30 a.m. with the idea that we'll be ready to go right at the

9   8:30 a.m. time.

10         Once again, don't discuss the case with anybody,

11   including amongst yourselves and don't look up anything.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

337

```
 1      (In open court; jury not present)

 2          THE COURT:  Anything we need to take up before

 3   tomorrow?

 4          MS. HALPERN:  I don't think so.

 5          THE COURT:  All right.  If you all could be here at

 6   8:15 a.m. just in case something arises overnight that we need

 7   to take up.  Otherwise, we will see everybody tomorrow.

 8          We're in recess.

 9          (Adjourned to January 23, 2025 at 8:30 a.m.)

10                              *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF EXAMINATION

2    Examination  of:                          Page

3    TIMOTHY JAMES COATES

4    Continued Direct By Ms. Halpern . . . . . . . 144

5    Cross By Ms. Pratt . . . . . . . . . . . . . 197

6    Redirect By Ms. Halpern . . . . . . . . . . 222

7    DOUGLAS TEMPLETON

8    Direct By Ms. Butler . . . . . . . . . . . . 230

9    Cross By Ms. Redmond . . . . . . . . . . . . 257

10   Redirect By Ms. Butler . . . . . . . . . . . 260

11   KEVIN CURRIER

12   Direct By Ms. Halpern . . . . . . . . . . . 262

13   Cross By Mr. Thapa . . . . . . . . . . . . . 321

14   Redirect By Ms. Halpern . . . . . . . . . . 331

15                    PLAINTIFF EXHIBITS

16   Exhibit No.                            Received

17   49, Pages 2 and 3  . . . . . . . . . . . . . 161

18   49, Pages 2 through 5  . . . . . . . . . . . 162

19   72  . . . . . . . . . . . . . . . . . . . . 165

20   22  . . . . . . . . . . . . . . . . . . . . 169

21   31  . . . . . . . . . . . . . . . . . . . . 179

22   54  . . . . . . . . . . . . . . . . . . . . 180

23   8  . . . . . . . . . . . . . . . . . . . . . 188

24   87  . . . . . . . . . . . . . . . . . . . . 202

25   59, Page 3  . . . . . . . . . . . . . . . . 280

1    32    . . . . . . . . . . . . . . . 298

2    50    . . . . . . . . . . . . . . . 299

3    19    . . . . . . . . . . . . . . . 309

4    55    . . . . . . . . . . . . . . . 309

5    19-A    . . . . . . . . . . . . . . 309

6    36    . . . . . . . . . . . . . . . 317

7                    DEFENDANT EXHIBITS

8    Exhibit No.                    Received

9    E    . . . . . . . . . . . . . . . . 183

10    A-13    . . . . . . . . . . . . . . 218

11    A-1    . . . . . . . . . . . . . . . 273

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes.


*Sadie L. Herbert*
Official Court Reporter
U.S. District Court