1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-01936-STV

4    TIMOTHY JAMES COATES, et al.,

5           Plaintiffs,

6           vs.

7    BOARD OF COUNTY COMMISSIONS FOR THE COUNTY OF ADAMS,

8           Defendant.

9    --------------------------------------------------------------

10                   REPORTER'S TRANSCRIPT

11                    Trial, Vol. III

12   --------------------------------------------------------------

13          Proceedings before the HONORABLE SCOTT T. VARHOLAK,
     Magistrate Judge, United States District Court for the District
14   of Colorado, commencing on the 23rd day of January, 2025, in
     Courtroom A402, United States Courthouse, Denver, Colorado.
15

16                      APPEARANCES
     For the Plaintiffs:
17   IRIS HALPERN, FELIPE S. BOHNET-GOMEZ, VIRGINIA BUTLER and
     SIDDHARTHA RATHOD, Rathod Mohamedbhai LLC, 2701 Lawrence
18   Street, Suite 100, Denver, Colorado 80205

19

20   For the Defendant:
     KATHERINE PRATT, CHRISTY REDMOND and SAUGAT THAPA, Thompson Coe
21   Cousins & Irons LLP, 1700 Broadway, Suite 900, Denver, Colorado
     80290
22

23
     Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street,
24   Denver, CO 80294, (303)335-2105

25

20-cv-01936-STV   Trial, Vol. III   January 23, 2025

```
 1                   P R O C E E D I N G S

 2        (Proceedings commenced at 8:36 a.m.)

 3        (In open court; jury not present)

 4             THE COURT:  Are we ready to bring in the jury?

 5             (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Reigenborn - Direct

```
 1      (In open court; jury present)

 2          THE COURT:  Plaintiffs can call their next witness.

 3          MR. BOHNET-GOMEZ:  Your Honor, the Plaintiffs call

 4   Richard Reigenborn.

 5   RICHARD REIGENBORN,

 6      called as a witness by the Plaintiffs,

 7      having been duly sworn, testified as follows:

 8   DIRECT EXAMINATION

 9   BY MR. BOHNET-GOMEZ:

10   Q.  Good morning, Mr. Reigenborn.

11   A.  Good morning.

12   Q.  Let's begin by talking about the 2014 election for Adams

13   County Sheriff.

14          In 2014, you ran for Adams County Sheriff?

15   A.  Correct.

16   Q.  The 2014 election was between you and Michael McIntosh?

17   A.  Correct.

18   Q.  And during your 2014 campaign, T.J. Coates, Mark Mitchell

19   and Kevin Currier had conversations with you about the

20   campaign?

21   A.  Correct.

22   Q.  At first, you believed that at least Mark Mitchell and

23   Kevin Currier were supporting your campaign?

24   A.  Correct.

25   Q.  Before the election, you changed your mind and decided that
```

Reigenborn - Direct

1    they were not supporting you after all?

2    A.  Correct.

3    Q.  You felt that Mr. Coates, Mr. Mitchell and Mr. Currier and

4    Mr. Claps treated you contentiously during the 2014 campaign?

5    A.  Correct.

6    Q.  You lost the 2014 election to Mr. McIntosh?

7    A.  Yes.

8    Q.  And after that, you called Mr. McIntosh to congratulate

9    him?

10    A.  Yes.

11    Q.  And you told him, I would appreciate it if you would let me

12    stay?

13    A.  Correct.

14    Q.  And he told you, I look forward to working with you?

15    A.  Correct.

16    Q.  But you then retired from the Sheriff's Office in

17    March 2015?

18    A.  Correct.

19    Q.  You resigned because, after the 2014 election, you felt

20    very positive that T.J. Coates and Mark Mitchell and some of

21    the other folks were going to target you and terminate you?

22    A.  Correct.

23    Q.  One reason was because T.J. Coates told you you shouldn't

24    run for Sheriff?

25    A.  Correct.

Reigenborn - Direct

1    Q.  Another reason you retired is your claim that Mr. Coates

2    and Mr. Mitchell called you a loser after you lost the

3    election?

4    A.  It was more than that, but yes.

5    Q.  And you believe that Mr. Coates and Mr. Mitchell and some

6    of the others would make up false allegations against you and

7    get you fired for your election activities?

8    A.  Correct.

9    Q.  And you were concerned about protecting your POST

10   certification?

11   A.  Correct.

12   Q.  POST certification refers to the certification issued by

13   the Colorado Peace Officer Standards and Training Board?

14   A.  Correct.

15   Q.  Sitting here today, you no longer have your POST

16   certification?

17   A.  Correct.

18   Q.  And we'll talk more later about why you lost your POST

19   certification.  But you can no longer serve as a law

20   enforcement officer anywhere in Colorado; correct?

21   A.  Correct.

22   Q.  Now, let's talk about what you did after you retired from

23   the Sheriff's Office.

24            After losing the 2014 election for Adams County

25   Sheriff, you retired?

Reigenborn - Direct

1    A.  Correct.

2    Q.  And after retiring from the Sheriff's Office, you worked

3    for a couple of weeks at a private business in Virginia?

4    A.  Correct.

5    Q.  And then you came back to Colorado and took a temp job at a

6    driving school?

7    A.  Correct.

8    Q.  And then, in late 2016 or 2017, you took a position as a

9    part-time detective at the Mountain View Police Department?

10    A.  Correct.

11    Q.  And that was not a supervisory role?

12    A.  No.

13    Q.  The Mountain View Police Department has less than ten

14    officers?

15    A.  Correct.

16    Q.  And between leaving the Sheriff's Office in March of 2015

17    and taking office as Sheriff again in 2019, you didn't really

18    stay in touch with anybody at the Sheriff's Office?

19    A.  No.

20    Q.  Correct, you didn't stay in touch with them?

21    A.  Correct.

22    Q.  Sometimes you would run into someone from the agency and

23    engage in small talk?

24    A.  Correct.

25    Q.  But you didn't have any substantive discussions with anyone

Reigenborn - Direct

1    at the Sheriff's Office from March 2015 to when you took

2    office?

3    A.  Correct.

4    Q.  When you retired from the Sheriff's Office, you lost

5    contact with a lot of people?

6    A.  Correct.

7    Q.  Now, let's talk about the 2018 campaign.

8          You decided to run again for Sheriff in 2018?

9    A.  I did.

10   Q.  And the 2018 election was again against Mike McIntosh?

11   A.  Correct.

12   Q.  Bill Dunning was a volunteer for your 2018 campaign?

13   A.  Correct.

14   Q.  And in 2018, Mr. Dunning worked at an RV dealership?

15   A.  He did.

16   Q.  And after you won the 2018 election, you hired Mr. Dunning

17   as your chief of staff?

18   A.  Not correct.  Hired him as a commander initially.

19   Q.  And then he became your chief of staff?

20   A.  He promoted to chief.

21   Q.  Chris Laws' wife, Pam, made your campaign website for your

22   2018 campaign?

23   A.  She did.

24   Q.  And Ms. Laws also made your campaign website for your 2014

25   campaign?

Reigenborn - Direct

1    A.  Correct.

2         MR. BOHNET-GOMEZ:  If we could pull up Exhibit 99,

3    please.

4    Q.  Mr. Reigenborn, can you see Exhibit 99 on your screen?

5    A.  Yes.

6    Q.  Is this an email chain between you and Ms. Laws where you

7    discussed the campaign websites for your campaigns?

8    A.  It is.

9         MR. BOHNET-GOMEZ:  Your Honor, we move to admit

10   Exhibit 99 into evidence.

11        THE COURT:  Any objection?

12        MS. PRATT:  No objection.

13        THE COURT:  It's admitted.

14   (Plaintiff's Exhibit 99 received in evidence)

15        MR. BOHNET-GOMEZ:  We can publish it to the jury.

16   BY MR. BOHNET-GOMEZ:

17   Q.  After you won the 2019 election, you hired Mr. Laws as

18   division chief?

19   A.  Correct.

20        MR. BOHNET-GOMEZ:  We can take that down.

21   Q.  I want to direct your attention now to campaign

22   contributions.

23        During the 2018 election, you were aware that the

24   campaign donations are published on the Colorado Secretary of

25   State's website?

 1   A.  Correct.

 2   Q.  And those donations are published in a database called

 3   Tracer?

 4   A.  Correct.

 5   Q.  And you had been monitoring the tracer database for

 6   donations to McIntosh's campaign?

 7   A.  I would look at it occasionally.

 8   Q.  So you monitored the Tracer database for donations to

 9   Mr. McIntosh's campaign?

10   A.  I looked at it occasionally.  I answered your question.  I

11   looked at it occasionally.

12   Q.  So it's true that you looked at the campaign donations to

13   Mike McIntosh's campaign?

14   A.  I did.

15   Q.  So you knew which Sheriff's Office command staff was making

16   donations to Mr. McIntosh?

17   A.  Correct.

18   Q.  Now, let's talk about the conclusion of the 2018 election.

19        You won the 2018 election?

20   A.  I did.

21   Q.  That election was on November 6th, 2018?

22   A.  Correct.

23   Q.  And on November 9th, 2018, you gave an interview to Denver

24   Channel 7 News?

25   A.  I did.

Reigenborn - Direct

1   Q.  And you stated in your interview that it is the command

2   staff that wants to continue to be loyal to Sheriff McIntosh?

3   A.  Correct.

4   Q.  I want to talk now about the meetings you had between the

5   Sheriff's election and taking office.

6           After you were elected, you selected Tommie McLallan

7   as your undersheriff?

8   A.  I did.

9   Q.  Did you and Tommie McLallan have meetings with everyone at

10  the Sheriff's Office who was a sergeant and above in December

11  2018?

12  A.  We gave everybody an opportunity to meet with us if they

13  wished.  It wasn't mandatory.

14  Q.  And those meetings were scheduled for about 30 minutes?

15  A.  I believe that's what the undersheriff at the time had

16  scheduled them for.

17  Q.  So that's correct, that they were about 30 minutes?

18  A.  To the best of my memory.

19  Q.  And you don't know how they were advertised?

20  A.  I don't.

21  Q.  No one was asked to prepare anything for the meetings?

22  A.  No.

23  Q.  The meetings were very informal?

24  A.  Correct.

25  Q.  It was okay to show up in jeans and a T-shirt?

Reigenborn - Direct

1   A.   Correct.

2   Q.   And as you mentioned, they weren't mandatory?

3   A.   Correct.

4   Q.   They didn't have to show up if they didn't want to?

5   A.   Correct.

6   Q.   And during those meetings, you asked almost everybody if

7   they could be loyal to the office?

8   A.   Correct.

9   Q.   You asked people if they could be loyal to whoever sits in

10  the chair of the Adams County Sheriff?

11  A.   Correct.

12  Q.   And you asked everyone whether they can be loyal to the

13  office, including the Plaintiffs in this case?

14  A.   I did.

15  Q.   And T.J. Coates told you, of course I can be loyal to you?

16  A.   He did.

17  Q.   And Mark Mitchell told you he would be loyal to the office?

18  A.   I believe he did.

19  Q.   Kevin Currier told that to you?

20  A.   Yes.

21  Q.   And Gene Claps told that to you?

22  A.   Yes.

23  Q.   But you were concerned about the loyalty of the Plaintiffs

24  in this case because they had supported Mike McIntosh in the

25  2014 and 2018 elections?

Reigenborn - Direct

1   A.   That's not entirely true.

2   Q.   This isn't the first time you have testified about this, is

3   it, Mr. Reigenborn?

4   A.   It's not.

5   Q.   Do you recall having your deposition taken in this case?

6   A.   I do.

7   Q.   You came to my office?

8   A.   I did.

9   Q.   And I asked you a series of questions?

10  A.   Yup.

11  Q.   And you were under oath?

12  A.   Yes.

13  Q.   The same oath that you just took this morning?

14  A.   Yes.

15  Q.   And you understood you had an obligation to tell the truth?

16  A.   Yes.

17       MR. BOHNET-GOMEZ:  Let's pull up for the witness and

18  the parties Page 204 of Mr. Reigenborn's deposition.

19  Q.   I'm going to direct your attention to Line 14 and the

20  remainder of that page.

21       MR. BOHNET-GOMEZ:  Your Honor, given that

22  Mr. Reigenborn is a party opponent, under Rule 32, I would ask

23  permission to publish the transcript.

24       THE COURT:  Any objection?

25       MS. PRATT:  Yes, I do object to publication to the

Reigenborn - Direct

1    jury on the basis that Mr. Reigenborn is not a party opponent

2    in this matter.

3              THE COURT:  Overruled.

4              MR. BOHNET-GOMEZ:  So if we could publish that for the

5    jury so they can follow along.

6    BY MR. BOHNET-GOMEZ:

7    Q.  Mr. Reigenborn, beginning on Line 14, I asked you question:

8    "So you were concerned about his loyalty because he supported

9    Sheriff McIntosh in the 2018 election, correct?"

10             And your answer:  "Both elections.  2014 and '18."

11             Did I read that correctly?

12   A.  Correct.

13   Q.  And then I asked you:  "Right.  So you were concerned about

14   his loyalty?"

15             Answer:  "Correct."

16             Did I read that right?

17   A.  You did.

18   Q.  And then I asked you, question:  "But he put in your

19   concerns at ease because of what he said at the meeting?"

20             Your answer:  "Correct."

21             Did I read that right?

22   A.  You did.

23   Q.  And then I continued asking you, question:  "And you were

24   also concerned about the loyalty of the Plaintiffs in this case

25   for the same reason?"

Reigenborn - Direct

1          MR. BOHNET-GOMEZ:  And then if we could flip to the

2     following page.

3     Q.  Do you see your answer there at the top?

4     A.  I do.

5     Q.  And it's "correct;" right?

6     A.  Correct.

7     Q.  So you were concerned -- your testimony then was that you

8     were concerned about the loyalty of the Plaintiffs in this case

9     because they had supported Mike McIntosh in the 2014 and 2018

10    elections?

11    A.  That, amongst other things.

12    Q.  One way the Plaintiffs could have addressed your concerns

13    is if they had reached out to you and said, yeah, I supported

14    McIntosh, but I'm going to get behind you 100 percent?

15    A.  I suppose.

16    Q.  And even after meeting with the Plaintiffs, you remained

17    concerned about their loyalty due to having supported Mike

18    McIntosh?

19    A.  Again, not in its entirety.

20    Q.  Again, this isn't the first time you have testified about

21    this, is it?

22    A.  Correct.

23          MR. BOHNET-GOMEZ:  Let's pull up Page 205 of the

24    deposition transcript, please.

25    Q.  Let me direct your attention, Mr. Reigenborn, to Line 7

Reigenborn - Direct

1    through 10.

2              I asked you at your deposition, question:  "You

3    remained concerned about their loyalty for having supported

4    Sheriff McIntosh after meeting with them?"

5              Answer:  "Correct."

6              Did I read that right?

7    A.  You did.

8              MR. BOHNET-GOMEZ:  We can take that down.

9    Q.  Now, let's talk about some of the other things you did to

10   prepare for office.

11             Your testimony in this case is that you did not make

12   any formal job offers before taking office?

13   A.  Correct.

14   Q.  And your testimony is also that you did not make any

15   informal job offers before taking office?

16   A.  Correct.

17   Q.  And you did not take office as Adams County Sheriff until

18   January 8th, 2019?

19   A.  Correct.

20   Q.  On December 1st, 2018, you sent a text message to Tommie

21   McLallan saying, Chris Laws said he will still take the jail

22   chief spot?

23   A.  Correct.

24             MR. BOHNET-GOMEZ:  If we could pull up Exhibit 61,

25   please.

Reigenborn - Direct

1  Q.  Mr. Reigenborn, do you see Exhibit 61 on your screen?

2  A.  I do.

3  Q.  And is this the text message chain with you and Tommie

4  McLallan where you say to him, Chris Laws said he will still

5  take the jail chief spot, on December 1st, 2018?

6  A.  Correct.

7       MR. BOHNET-GOMEZ:  Your Honor, I move to admit

8  Exhibit 61 into evidence.

9       THE COURT:  Any objection?

10      MS. PRATT:  No objection.

11      THE COURT:  That's admitted.

12      (Plaintiff's Exhibit 61 received in evidence)

13      MR. BOHNET-GOMEZ:  If we could publish that, please.

14  BY MR. BOHNET-GOMEZ:

15  Q.  Just to be clear, December 1st, 2018 is before you took

16  office as Sheriff?

17  A.  Correct.

18  Q.  According to your deposition testimony in this case,

19  offering the jail chief position to Chris Laws was just a

20  backup plan --

21  A.  Correct.

22  Q.  -- in case Gene Claps left?

23  A.  Correct.

24  Q.  On January 1st, 2019, you wrote to Tommie McLallan, I want

25  to announce who is leaving?

Reigenborn - Direct

 1  A.  I don't recall.

 2        MR. BOHNET-GOMEZ:  Let's show Mr. Reigenborn and the

 3  parties only Exhibit 64.

 4  Q.  Mr. Reigenborn, do you see your text message there?

 5  A.  I do.

 6  Q.  If you could read it to yourself and see if it refreshes

 7  your recollection of whether or not you wrote to Mr. McLallan,

 8  I want to announce who is leaving.

 9        That's what it says; right?

10  A.  Correct.

11  Q.  And January 1st, 2019 is also before you took office as

12  Sheriff?

13  A.  Correct.

14        MR. BOHNET-GOMEZ:  We can take that down.

15  Q.  And on January 4th, also before taking office, you sent

16  Mr. McLallan a list of names of people you wanted to terminate?

17  A.  People that we wanted to issue letters to, not necessarily

18  terminate.

19        MR. BOHNET-GOMEZ:  Let's pull up Exhibit 65, please.

20  Q.  Mr. Reigenborn, do you see Exhibit 65 on your screen?

21  A.  I do.

22  Q.  And is it a January 4th, 2019 text message from you to

23  Tommie McLallan?

24  A.  Correct.

25        MR. BOHNET-GOMEZ:  Your Honor, we move to admit

Reigenborn - Direct

1   Exhibit 65 into evidence.

2            THE COURT:  Any objection?

3            MS. PRATT:  No objection.

4            THE COURT:  It's admitted.

5       (Plaintiff's Exhibit 65 received in evidence)

6            MR. BOHNET-GOMEZ:  If we could publish that to the

7   jury.  And if we could zoom in on the bottom half there.

8   BY MR. BOHNET-GOMEZ:

9   Q.  Mr. Reigenborn on January 4th, 2019, you sent this text

10  message to Mr. McLallan saying "terminations so far?"

11  A.  Correct.

12  Q.  And there's a list of names there?

13  A.  Correct.

14  Q.  And it includes the Plaintiffs in this case?

15  A.  It does.

16  Q.  And none of the people you have listed there supported your

17  campaign?

18  A.  I'm not sure.

19  Q.  You're not aware of any of these individuals supporting

20  your campaign?

21  A.  They could have.  I'm not entirely sure.  There could be

22  one or two in there that did support my campaign.  I'm not

23  sure.

24  Q.  And the rest supported Mike McIntosh?

25  A.  Correct.

Reigenborn - Direct

1   Q.  Your testimony is you are not sure who supported you?

2   A.  I'm not sure if any of them supported me.

3          MR. BOHNET-GOMEZ:  You can take that down.

4   Q.  Let's talk about the policies you rescinded when you came

5   into office.

6          You were sworn in January 8th, 2019?

7   A.  Correct.

8   Q.  And that same day, you issued a notice to all Sheriff's

9   Office employees rescinding all of the office's employment and

10  personnel policies?

11  A.  Employment and personnel, correct.

12         MR. BOHNET-GOMEZ:  Let's pull up Exhibit 49, which has

13  previously been admitted.  And if we could publish that.

14  Q.  Mr. Reigenborn, this is the notice you sent on January 8th

15  rescinding all employment and personnel policies; is that fair?

16  A.  I believe it is.

17  Q.  And it states that you -- in the first sentence there, you

18  rescinded any policy regarding -- excuse me, the second

19  sentence -- any policy regarding recruitment and hiring,

20  discipline of employees, termination of employees and

21  promotional processes; correct?

22  A.  Correct.

23  Q.  Those previous policies were no longer valid?

24  A.  Correct.

25  Q.  And that included -- you then list out some, and that

Reigenborn - Direct

1   includes the internal investigations policies?

2   A.  It does.

3   Q.  And it includes the Sheriff's Office's nepotism policy?

4   A.  It does.

5   Q.  And on January 8th, in place of all the policies you

6   rescinded, you put into place four of your own policies?

7   A.  I did.

8   Q.  And those are also on this exhibit; right?

9   A.  I'm not sure.  I can only see the one page.

10   Q.  We just scrolled through it briefly.  Those were the four

11   policies?

12   A.  They are.

13         MR. BOHNET-GOMEZ:  Let's go back to Page 3 of the

14   exhibit, please.

15   Q.  The first policy that you issued was the at will employment

16   policy?

17   A.  It is.

18   Q.  And that policy stated -- if we can highlight the bottom

19   sentence of the page -- in the event an employee is terminated,

20   the Sheriff will follow applicable state law.

21         Do you see that?

22   A.  I do.

23   Q.  That was the policy in part?

24   A.  It is.

25   Q.  And then on the second page, that included providing

Reigenborn - Direct

1   notification to the employee of the proposed termination and

2   reason for the termination?

3   A.  It does.

4   Q.  So your policy was to notify employees of the reason for

5   their termination?

6   A.  It does.

7   Q.  Correct?

8   A.  Correct.

9   Q.  Let's turn to policy number two.  That's the recruitment

10  and promotion policy?

11  A.  It is.

12  Q.  And that policy stated in the second sentence there,

13  "Hiring will be solely at the discretion of the Sheriff and

14  there is no policy with regard to the recruitment or

15  promotional process?"

16  A.  Correct.

17  Q.  That was your policy?

18  A.  It is.

19  Q.  And then in the second sentence of the second paragraph,

20  your policy was that promotions and the selection of managers

21  and command staff will be solely at the Sheriff's discretion,

22  and there is no policy with regard to the promotional or

23  appointment process?

24  A.  Correct.

25  Q.  That was your promotion policy?

Reigenborn - Direct

1    A.  Correct.

2    Q.  Let's turn to policy number three, the discipline policies.

3         Your policy was, there in the second sentence of the

4    policy, that there are no policies or procedures applicable to

5    the disciplinary process?

6    A.  Correct.

7    Q.  That was your discipline policy?

8    A.  It was initially, yes.

9    Q.  And when you issued these policies, you wanted the

10   Sheriff's Office employees to understand that the employment

11   policies were gone and you would do what you saw fit?

12   A.  Correct.

13        MR. BOHNET-GOMEZ:  We can take that down.

14   Q.  Now, let's talk about your first full day in office.  That

15   was January 9th, 2019; correct?

16   A.  Correct.

17   Q.  And on that day, you started handing out letters to certain

18   employees?

19   A.  Correct.

20   Q.  And you issued termination letters to 11 individuals?

21   A.  We did.

22   Q.  And those 11 individuals were on the list that you texted

23   Tommie McLallan the week before?

24   A.  Correct.

25        MR. BOHNET-GOMEZ:  If we could republish Exhibit 65,

Reigenborn - Direct

1   please.

2   Q.  These were the individuals who got letters?

3   A.  Correct.

4   Q.  Gene Claps, Mark Mitchell, T.J. Coates and Kevin Currier

5   each received a letter notifying them of their termination?

6   A.  They did.

7          MR. BOHNET-GOMEZ:  We can take that down, please.

8          And let's look at Exhibit 74.  I believe it's been

9   admitted, so if we can go ahead and publish it.

10         THE COURT:  I don't think it has yet.

11  BY MR. BOHNET-GOMEZ:

12  Q.  Mr. Reigenborn, Exhibit 74, is this the termination letter

13  you issued to Gene Claps on January 9, 2019?

14  A.  I believe it is.

15         MR. BOHNET-GOMEZ:  Your Honor, I move Exhibit 74 into

16  evidence.

17         THE COURT:  Any objection?

18         MS. PRATT:  No objection.

19         THE COURT:  It's admitted.

20      (Plaintiff's Exhibit 74 received in evidence)

21         MR. BOHNET-GOMEZ:  If we can publish it now.

22  BY MR. BOHNET-GOMEZ:

23  Q.  So let's take a look at this one.  This is the letter for

24  Gene Claps; right?

25  A.  It is.

Reigenborn - Direct                363

1   Q.  And this is representative of the letters everyone

2   received?

3   A.  Correct.

4   Q.  These were form letters?

5   A.  Correct.

6   Q.  They used the same language?

7   A.  Correct.

8   Q.  And each letter stated, I do not believe retaining you is

9   in the best interest of the organization?

10  A.  Correct.

11  Q.  Each letter said you intended to revoke their appointment

12  with the Adams County Sheriff's Office?

13  A.  Correct.

14  Q.  And once you revoke someone's appointment, they no longer

15  work at the Sheriff's Office?

16  A.  Correct.

17  Q.  And you told them that their termination would be effective

18  at 8:00 a.m. January 11th if they didn't request a meeting with

19  you?

20  A.  Correct.

21  Q.  At the end, you wish them well in their future endeavors?

22  A.  I did.

23  Q.  And when you handed them these letters, they had to turn in

24  their badges?

25  A.  They did.

Reigenborn - Direct

1    Q.  And their guns?

2    A.  Not their gun.  They purchased their own weapon.

3    Q.  They handed in their credentials?

4    A.  They did.

5    Q.  Their vehicles were taken?

6    A.  Correct.

7    Q.  And they were no longer permitted on Sheriff's Office

8    property?

9    A.  Correct.

10   Q.  And you escorted them out of the building?

11   A.  Someone did.  I didn't.

12   Q.  You had them escorted out of the building?

13   A.  Correct.

14   Q.  So where in this letter, in Exhibit 74, does it state the

15   reason you were terminating Gene Claps?

16   A.  It doesn't.

17   Q.  And similarly, the termination letters for T.J. Coates,

18   Mark Mitchell and Kevin Currier did not contain a reason?

19   A.  Correct.

20   Q.  Not one person who received these letters had supported

21   your campaign for Sheriff?

22   A.  I'm not sure.

23   Q.  No one had donated to your campaign?

24   A.  Correct.

25   Q.  Everyone who received the letters had supported McIntosh?

Reigenborn - Direct

1   A.  I'm not sure.

2   Q.  Again, this isn't the first time you have testified about

3   that?

4   A.  Correct.

5          MR. BOHNET-GOMEZ:  Let's pull down 74 and put up

6   Page 158 of the deposition transcript.

7   Q.  Let me draw your attention to Line 5.

8          MR. BOHNET-GOMEZ:  And if we can publish that.

9   Q.  I asked you at your deposition:  "So other than Van Zandt,

10  all of McIntosh's command staff supported him in the 2018

11  election?"

12         Your answer was:  "Correct."

13         Did I read that right?

14  A.  You did.

15         MR. BOHNET-GOMEZ:  Now, if we can go back to

16  Exhibit 65.

17  Q.  Everyone on that list at the bottom of the page was in the

18  command staff, as you define it?

19  A.  They were.

20  Q.  If everybody on Mike McIntosh's command staff supported him

21  and if all of these individuals are on the command staff, then

22  all of these individuals supported Mike McIntosh in the

23  campaign; correct?

24  A.  Correct.

25         MR. BOHNET-GOMEZ:  We can take that down.

Reigenborn - Direct

1    Q.  Let's talk about what you didn't consider before sending

2    these termination letters out.

3            So the fact that the Plaintiffs in this case didn't

4    reach out to you between the election and when you took office

5    was not a factor that went into your decision-making?

6    A.  No.

7    Q.  Correct, it was not a factor?

8    A.  Correct.

9    Q.  And you hadn't worked with Gene Claps, T.J. Coates, Mark

10   Mitchell or Kevin Currier in almost four years?

11   A.  Correct.

12   Q.  You hadn't reviewed any of their personnel files before

13   issuing these letters?

14   A.  Correct.

15   Q.  You hadn't conducted any internal investigation into Gene

16   Claps, T.J. Coates, Mark Mitchell or Kevin Currier's

17   performance?

18   A.  Correct.

19   Q.  In fact, you handed out these letters before Gene Claps,

20   T.J. Coates, Mark Mitchell and Kevin Currier had worked a

21   single day under your command?

22   A.  Correct.

23   Q.  Now, let's talk about what you did consider in your

24   decision-making, you testified that you believe there were some

25   people in the command staff you felt were going to continue to

                                                          367
Reigenborn - Direct

1    be loyal to Mike McIntosh after the election?

2    A.  Correct.

3    Q.  And you knew, from looking at their political donations,

4    that nearly all the command staff had donated to Mike McIntosh?

5    A.  Correct.

6    Q.  But you felt that some of them were forced to do it,

7    whereas others genuinely supported Mike McIntosh?

8    A.  Correct.

9    Q.  And it was your belief that you needed to figure out which

10   was which?

11   A.  Correct.

12   Q.  Who genuinely supported Mike McIntosh and who didn't?

13   A.  I'm not really sure.

14   Q.  That's what you were trying to figure out?

15   A.  Correct.

16   Q.  And once you knew who genuinely supported Mike McIntosh and

17   who didn't, you would use that knowledge to decide what

18   position they were going to be in if they were retained?

19   A.  Amongst other things, yeah.

20   Q.  That was one of the things you were considering?

21   A.  I was.

22   Q.  Now, let's talk about some of the claims you have made

23   about your decision-making.

24         So you claim that the 11 termination letters you sent

25   were about reallocating those individuals' positions; right?

Reigenborn - Direct

1   A.  Correct.

2   Q.  What you really wanted was to hear from these individuals

3   that they wanted to stay with the agency?

4   A.  Correct.

5   Q.  So that you could find them a position?

6   A.  Correct.

7   Q.  It is your testimony in this case that, even though the

8   termination letters said you were proposing terminating them,

9   you had every intention of finding a position for them if they

10  wanted to stay?

11  A.  I did.

12  Q.  And you weren't able to decide on who would be in the

13  positions until taking office?

14  A.  Correct.

15  Q.  And you weren't able to decide who would be in those

16  positions because it was possible that the current folks would

17  remain?

18  A.  Correct.

19  Q.  So your testimony in this trial is that whether the 11

20  individuals who got termination letters kept their positions

21  was going to depend on what they said to you when they came to

22  speak with you about their terminations and what their behavior

23  was like?

24  A.  Correct.

25  Q.  You believed how they responded to being terminated would

Reigenborn - Direct

1  show how these individuals would handle a crisis --

2  A.  Correct.

3  Q.  -- of an officer involved shooting?

4  A.  Correct.

5  Q.  And their behavior when they met with you about their

6  terminations was the determining factor in whether you would

7  retain each of the Plaintiffs?

8  A.  Correct.

9  Q.  You never told any of the Plaintiffs that you were in fact

10 considering retaining them?

11 A.  I did not.

12 Q.  Now, let's talk about the first one of those termination

13 meetings with Gene Claps.

14      You met with Gene Claps about his proposed termination

15 at approximately 10:00 a.m. on January 15th?

16 A.  Okay.  I'll take your word for it.  I don't remember the

17 dates and the times.

18      MR. BOHNET-GOMEZ:  Let's pull up Exhibit G for the

19 witness and parties.

20 Q.  Mr. Reigenborn, do you see Exhibit G?

21 A.  I do.

22 Q.  And these are the notes you had your assistant take of the

23 meetings; right?

24 A.  It is.

25 Q.  And these are the notes of the meeting with Gene Claps and

Reigenborn - Direct

1    you on January 15th, 2019?

2    A.  It's the first time I've seen them.  I haven't had time to

3    review them, so I'm not -- it appears, but I haven't had a

4    chance to review those.  I haven't seen them.

5    Q.  But you do see where it says meeting started at 10:03 a.m.?

6    A.  Mm-hmm.

7         MR. BOHNET-GOMEZ:  We can take that down.

8    Q.  And in this litigation, you have referred to those meetings

9    as an opportunity to be heard?

10   A.  Correct.

11   Q.  You claim that Gene Claps was condescending and

12   disrespectful to you at the January 15th meeting?

13   A.  Correct.

14   Q.  And you claim that at this meeting on January 15th, Gene

15   Claps refused your direct order to turn in his badge and said,

16   it's mine, I bought it?

17   A.  He did say that.

18   Q.  At the January 15th meeting?

19   A.  I would have to review the notes.  I know that he has said

20   that.

21   Q.  Let's pull up Exhibit 60 for you.  It should be the

22   interrogatory responses.

23         Mr. Reigenborn, do you see Exhibit 60 on your screen?

24   A.  I do.

25   Q.  And do you recognize these as the interrogatory

Reigenborn - Direct

 1   responses --

 2   A.  I do.

 3   Q.  -- you submitted in this case?

 4   A.  I do.

 5   Q.  And these were your answers?

 6   A.  Correct.

 7   Q.  And you submitted them under penalty of perjury?

 8   A.  I did.

 9   Q.  Much like your testimony here today?

10   A.  Yes.

11   Q.  And you knew they would be a part of this lawsuit?

12   A.  Yes.

13   Q.  Let me show you Page 5.  In the last two sentences of the

14   first full paragraph --

15            MR. BOHNET-GOMEZ:  If you could highlight that for

16   Mr. Reigenborn.  I need the line above.

17   Q.  So in these sworn written answers, you wrote that when Gene

18   Claps was, quote, again asked to turn in his badge at the

19   OTBH -- and that's an acronym for opportunity to be heard?

20   A.  Correct.

21   Q.  And that's referring to the January 15th meeting?

22   A.  Correct.

23   Q.  You continue that Gene Claps, quote, replied it's mine, I

24   bought it, refusing the direct order to return it.  This

25   deliberate refusal was a further act of disrespect towards me

Reigenborn - Direct

1    personally, for the chain of command and for the ACSO.

2    A.  Correct.

3    Q.  So your claim was that at his opportunity to be heard

4    meeting on January 15th, Gene Claps refused your direct order

5    to turn in his badge and said, it's mine, I bought it?

6    A.  Again, without reading the notes from that, but I believe

7    he did say it was his badge, he purchased it and he was keeping

8    it.

9    Q.  These were your answers that you prepared with the

10   assistance of your attorneys in this case?

11   A.  Correct.

12        MR. BOHNET-GOMEZ:  We can pull that down.

13        Let's listen to that meeting.  So we have created a

14   combined exhibit with the audio and transcript.  But

15   preliminarily, Plaintiffs would move to admit Exhibits 18 and

16   53 into evidence, which have been stipulated.

17        THE COURT:  Any objection?

18        MS. PRATT:  No objection.

19        THE COURT:  They're admitted.

20    (Plaintiff's Exhibits 18 and 53 received in evidence)

21        MR. BOHNET-GOMEZ:  And then if we could pull up the

22   combined exhibit, the Claps.  And if we could mark that 18A and

23   move to admit that one as well.

24        THE COURT:  Any objection?

25        MS. PRATT:  No objection.

Reigenborn - Direct

1            THE COURT:  18A is admitted.

2       (Plaintiff's Exhibit 18A received in evidence)

3   BY MR. BOHNET-GOMEZ:

4   Q.  Mr. Reigenborn, we're going to play 18A for you and the

5   jury.  And if you could raise your hand when we get to the part

6   where Mr. Claps refuses your direct order to return his badge

7   and says, it's mine, I bought it, okay.

8   A.  Okay.

9       (Media played)

10  BY MR. BOHNET-GOMEZ:

11  Q.  Mr. Reigenborn, this was the meeting that was the

12  determining factor in whether you would retain Gene Claps?

13  A.  Correct.

14  Q.  This was the meeting where you claim you had no opportunity

15  to tell him why you were terminating him?

16  A.  Yes, I did tell him.  We were taking the Sheriff's Office

17  in a different direction and we didn't think that he would be

18  able to make the changes that we were looking for.

19  Q.  This isn't the first time that you have testified about

20  that; right?

21  A.  Correct.

22            MR. BOHNET-GOMEZ:  If we could pull up Page 268 of the

23  deposition transcript, please.

24  Q.  Actually, you claim you did tell him the reasons why you

25  were terminating him?


            SADIE L. HERBERT, RPR, RCR
     901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Direct

1   A.  Correct.

2   Q.  And you claim that Gene Claps cut you off and demanded to

3   retire?

4   A.  I believe that when I was filling out the interrogatory.

5   Obviously, listening to this I was confused.  I did a lot of

6   interviews that day.  I obviously had some confused.

7   Q.  So that's not correct, if you stated that he cut you off

8   and demanded to retire?

9   A.  Correct.

10        MR. BOHNET-GOMEZ:  Mr. Heeter, can we play clip number

11   10 of Mr. Reigenborn's videotaped deposition beginning at

12   Page 268, Line 14.

13        (Media played)

14        MR. BOHNET-GOMEZ:  Your Honor, I would ask permission

15   to play for the jury some of Mr. Reigenborn's videotaped

16   deposition.

17        THE COURT:  Any objection?

18        MS. PRATT:  No objection.

19        MR. BOHNET-GOMEZ:  If we could start that over and

20   publish it to the jury before it plays.

21        THE DEPUTY CLERK:  Your Honor, it's on my end.  Our

22   panel is not working to unblank the jury's screen at the

23   moment.  We need to contact IT.

24        THE COURT:  Let's do this, then, let's take an early

25   slightly longer morning recess and get IT up here to get that

Reigenborn - Direct

 1    fixed.

 2            So if the jury could plan to be back by 5 till 10:00,

 3    then hopefully we'll have this glitch fixed and move forward

 4    from there.

 5            (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  We'll get IT up here and hopefully get

3     this fixed.

4          (Recess)

5          THE COURT:  So we got the technology working again.

6     It's my understanding there's one issue the Plaintiff wanted to

7     raise.

8          MR. BOHNET-GOMEZ:  No, your Honor.  We had just gotten

9     word that you wanted anytime the deposition was mentioned to

10    compile a list of those.

11         THE COURT:  Are you seeking to send it back for

12    deliberations or are you just looking to publish it to the

13    jury?

14         MR. BOHNET-GOMEZ:  I was just looking to publish.

15         THE COURT:  Okay.  Then we don't need to keep track.

16         MR. BOHNET-GOMEZ:  Just so they could follow along.

17         THE COURT:  That's fine.  I just wanted to make sure

18    that that's all you were doing.  If you were seeking to send it

19    back, then we need to keep track.  But if you are just seeking

20    to publish it, that's fine.

21         Let's bring in our jury.

22         (Continued on next page)

23

24

25

Reigenborn - Direct

```
 1        (In open court; jury present)
 2             THE COURT:  Just a reminder, you are still under oath.
 3             THE WITNESS:  Thank you.
 4   BY MR. BOHNET-GOMEZ:
 5   Q.  Mr. Reigenborn, before we took our break, I had played for
 6   you the audio recording of your January 15th meeting with Gene
 7   Claps?
 8   A.  Correct.
 9   Q.  And I had asked you some questions about that?
10   A.  Correct.
11   Q.  I asked you to raise your hand when you heard Gene Claps
12   refuse your direct order to turn in his badge and say, it's
13   mine, I bought it.
14             Do you recall that?
15   A.  I do.
16   Q.  I noticed you didn't raise your hand; is that right?
17   A.  Correct.
18   Q.  And that's because he didn't say that?
19   A.  Correct.
20   Q.  I had asked you if you claim Mr. Claps was condescending
21   and disrespectful to you at that meeting.
22             Do you recall that?
23   A.  I do.
24   Q.  And you said he was?
25   A.  Yes.
```

Reigenborn - Direct

1    Q.  Is that still your testimony?

2    A.  Again, I was going off of memory.  Listening to the audio,

3    I don't hear it on there, so I may have confused that with one

4    of the others.

5    Q.  And then I was going to play a clip of your video

6    deposition, and that caused some technical issues, but I think

7    we have it figured out now.

8         MR. BOHNET-GOMEZ:  So if we could go ahead and play

9    clip number 10, please.

10        (Media played)

11   BY MR. BOHNET-GOMEZ:

12   Q.  Mr. Reigenborn, Gene Claps, during his January 15th meeting

13   with you specifically asked to stay with the agency; correct?

14   A.  He did.

15   Q.  Now, let's talk about what your reason was for terminating

16   Gene Claps.  You were asked in your deposition why you

17   terminated Gene Claps.

18        Do you recall that?

19   A.  I remember the question.  I don't remember my answer.

20   Q.  Your testimony was that you didn't necessarily know that

21   you would have terminated Gene Claps.

22        Do you recall that?

23   A.  I don't recall it.

24   Q.  Is that your testimony today?

25   A.  My testimony that I don't recall what I said two years ago,

Reigenborn - Direct

1    correct.

2    Q.   No.   That you don't know -- you don't necessarily know that

3    you would have terminated Gene Claps before the January 15th

4    meeting?

5    A.   I'm not sure.   I don't remember what I was thinking six

6    years ago.

7         MR. BOHNET-GOMEZ:   If we could pull up Page 251 of the

8    deposition.

9    Q.   If I could draw your attention to Line 7.

10        MR. BOHNET-GOMEZ:   And if we could publish that,

11   please.

12   Q.   I asked you:   "Okay.   Gene Claps, what are the reasons you

13   would have terminated Gene Claps had he not retired?"

14        Answer:   "I don't know that I necessarily would have,

15   but there were some behavior that was indicative."

16        Did I read that right?

17   A.   You did.

18        MR. BOHNET-GOMEZ:   You can take that down.

19        Can we pull up Exhibit 66, please.

20   Q.   Mr. Reigenborn, do you see Exhibit 66 --

21   A.   I do.

22   Q.   -- on the screen?

23        Is this a text message that you sent to Mr. McLallan

24   on January 10th, 2019?

25   A.   It is.

1          MR. BOHNET-GOMEZ:  Your Honor, we would move to admit

2     Exhibit 66 into evidence.

3          THE COURT:  Any objection?

4          MS. PRATT:  No objection.

5          THE COURT:  It's admitted.

6     (Plaintiff's Exhibit 66 received in evidence)

7          MR. BOHNET-GOMEZ:  If we could please publish that to

8     the jury.  If we could scroll down so the full text is on the

9     screen.  Maybe put both pages side by side.

10    BY MR. BOHNET-GOMEZ:

11    Q.  Mr. Reigenborn on January 10th, 2019, you sent this text

12    message to Tommie McLallan?

13    A.  Correct.

14    Q.  It's a picture of you and Gene Claps?

15    A.  It is.

16    Q.  And it has the superimposed text, "ba bye, asshole?"

17    A.  Correct.

18    Q.  And you sent that picture to Mr. McLallan several days

19    before the January 15th meeting you said would be the

20    determining factor in whether you retained Gene Claps?

21    A.  Correct.

22    Q.  Now, I want to talk with you about your second termination

23    meeting with Kevin Currier.

24          You met with Mr. Currier about his proposed

25    termination at about noon on January 15th, 2019?

Reigenborn - Direct

1    A.  Okay.

2    Q.  Yes?

3    A.  Again, I don't know.

4         MR. BOHNET-GOMEZ:  If we could show Exhibit F to

5    Mr. Reigenborn.

6    Q.  Mr. Reigenborn, do you see Exhibit F in front of you?

7    A.  I do.

8    Q.  These are the notes you had taken of the meeting with

9    Mr. Currier?

10   A.  It appears so.

11   Q.  And do you see when it says the meeting started, the time?

12   A.  I do.

13        MR. BOHNET-GOMEZ:  If we could take that down.

14   Q.  Does that refresh your recollection on when the meeting

15   started?

16   A.  It does.

17   Q.  It started at noon?

18   A.  Correct.

19   Q.  Now, you testified that you sent Mr. Currier a letter

20   proposing his termination because your plan was to demote him

21   to a sergeant?

22   A.  Correct.

23   Q.  You never told him about that plan?

24   A.  Correct.

25   Q.  You were preparing to move him into a different position,

Reigenborn - Direct

1    but when he met with you on January 15th, 2019, he came in and

2    resigned?

3    A.  Correct.

4    Q.  You weren't going to fire him, so nothing you told him at

5    the January 15th meeting was a reason for terminating him or

6    anyone else?

7    A.  Correct.

8    Q.  Let's take a look at what you did tell him.

9         MR. BOHNET-GOMEZ:  If we could pull up 19A, which was

10   previously admitted.

11        THE COURT:  Correct.

12        MR. BOHNET-GOMEZ:  My apologies.  Exhibit 55.  And if

13   we could publish that to the jury.

14   Q.  Mr. Reigenborn, we're looking at a transcript of your

15   termination hearing with Mr. Currier; correct?

16   A.  I believe so.  I'm just looking at a face sheet.

17        MR. BOHNET-GOMEZ:  Let's turn to Page 2 -- Page 3, I

18   suppose.

19   Q.  I want to draw your attention to Line 2 of the transcript.

20        The first thing you told Mr. Currier is, we're here

21   for the final hearing; right?

22   A.  Correct.

23        MR. BOHNET-GOMEZ:  If we could turn to Page 8 of the

24   exhibit.

25   Q.  I want to draw your attention to Line 2 on this page -- I'm

Reigenborn - Direct

1    sorry, Page 8 of the exhibit, Page 7 of the transcript.

2    Q.  You told him, so here's the part that I hate?

3    A.  Correct.

4    Q.  And then later, in Line 8, you told him, we're downsizing?

5    A.  Correct.

6    Q.  And then in Line 22, you told him, if I don't get an email

7    from you by tomorrow at 5, then I'm going to have to terminate

8    you?

9    A.  There's some conversation between there, but yes.

10        MR. BOHNET-GOMEZ:  We can take that down.

11   Q.  Now, let's talk about the reasons you claim you fired Mark

12   Mitchell.

13   A.  Okay.

14   Q.  You met with Mr. Mitchell about his proposed termination at

15   approximately 2:00 p.m. on January 15th?

16   A.  Okay.

17   Q.  In this lawsuit, you have given several reasons for why you

18   terminated Mr. Mitchell?

19   A.  Correct.

20   Q.  You claim you terminated him because he belittled you in a

21   staff meeting about daily field activity reports?

22   A.  Correct.

23   Q.  You claim that you terminated him because, in 2012, during

24   the Aurora theater shooting, Mr. Mitchell was the SWAT team

25   commander and radioed out something wildly inappropriate over

                                                                          384
                       Reigenborn - Direct

1    the police dispatch?

2    A.  Correct.

3    Q.  You claim his statement was, quote, We're geared up and

4    ready to go.  If they don't want us, we'll take our toys and go

5    home.

6    A.  Correct.

7    Q.  You claim that there have been rumors for years of his

8    extramarital affairs with employees at the agency?

9    A.  Correct.

10   Q.  The history of engaging in romantic relationships is a

11   rumor that you heard at an FOP conference in Nashville?

12   A.  Correct.

13   Q.  You didn't do anything to investigate the rumor?

14   A.  I wasn't working at the time.

15   Q.  Because you heard it in 2016?

16   A.  Correct.

17   Q.  And when you took office, you didn't do anything to

18   investigate it?

19   A.  Correct.

20   Q.  Now, you yourself had a sexual relationship with a

21   dispatcher at the agency?

22        MS. PRATT:  Objection, your Honor, 403.

23        THE COURT:  Approach.

24   (Continued on next page)

25

Reigenborn - Direct

1        (At sidebar)

2            THE COURT:  It's already been testified to without

3   objection.  And I think the relevance of it is, if he's saying

4   I'm terminating people because they're having extramarital

5   affairs and he himself is having an extramarital affair, it's

6   prejudicial, but it's prejudicial because it's a bad fact for

7   you.

8            MS. PRATT:  I think it creates more of a sideshow,

9   your Honor.

10           THE COURT:  Again, it wasn't objected to yesterday.

11  But now that there's testimony, he testified that the reason he

12  fired one of -- one of the reasons he fired one of the

13  Plaintiffs is because of rumors of an extramarital affair when

14  he's having his own extramarital affair, it's really damaging

15  to his credibility.  It's a bad fact.

16           MR. BOHNET-GOMEZ:  It's a little bit more, because he

17  has publicly stated that this affair does not make him a poor

18  leader, so he's firing Mr. Mitchell for conduct -- that's

19  directly to credibility.

20           THE COURT:  It's a bad fact, but that doesn't make it

21  inadmissible.

22           MS. PRATT:  It certainly, at a bare minimum, has

23  opened to cross-examination on Mr. Mitchell on similar grounds,

24  there would be no basis to object to that.

25           THE COURT:  We will take up Mitchell's.  He terminated

Reigenborn - Direct

1    this person because of a rumored extramarital affair, he's

2    having his own extramarital affair, it puts into question his

3    rationale for terminating people, so the objection is

4    overruled.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reigenborn - Direct

1      (In open court; jury present)

2    BY MR. BOHNET-GOMEZ:

3    Q.  Mr. Reigenborn, I was asking you whether you yourself had a

4    sexual relationship with a dispatcher at the agency?

5    A.  The dispatcher didn't work at the agency.  It was in 1992.

6    Q.  You had a sexual relationship with a dispatcher that worked

7    with the agency?

8    A.  She worked for an -- as a dispatcher, not for the agency,

9    but yeah, I had a relationship with a dispatcher in 1992.

10   Q.  In 1992?

11   A.  Correct.

12   Q.  And you stated that doesn't make you a poor leader?

13   A.  Correct.

14   Q.  You also claim -- and you were married at the time?

15   A.  I was separated.

16   Q.  You also claim you fired Mark Mitchell because he was

17   argumentative, disrespectful and tried to intimidate you during

18   the January 15th meeting?

19   A.  Correct.

20   Q.  When you met with Mark Mitchell on January 15th, you didn't

21   give him any of the reasons you later gave in this lawsuit?

22   A.  Correct.

23   Q.  Let's see what you did tell him.

24        MR. BOHNET-GOMEZ:  If we could pull up Exhibit 56,

25   please.  I don't believe this is in evidence.

                              Reigenborn - Direct

1          THE COURT:  It's not yet.

2          MR. BOHNET-GOMEZ:  It's stipulated, so we would move

3    to admit it.

4          THE COURT:  Any objection?

5          MS. PRATT:  No objection.

6          THE COURT:  It's admitted.

7      (Plaintiff's Exhibit 56 received in evidence)

8    BY MR. BOHNET-GOMEZ:

9    Q.  Mr. Reigenborn, I'm showing you a transcript of the

10   January 15th meeting with Mr. Mitchell.

11         MR. BOHNET-GOMEZ:  If we could go to Page 12.

12   Q.  And on Line 10, you told Mr. Mitchell at that meeting,

13   we're going a different direction, we don't think you fit where

14   we're going; is that right?

15   A.  Correct.

16   Q.  And when Mark Mitchell asked you to explain that direction,

17   you told him, on Line 15, I just did?

18   A.  Correct.

19         MR. BOHNET-GOMEZ:  If we could go to Page 13.

20   Q.  You also told Mr. Mitchell, I don't need to tell you the

21   direction?

22   A.  Correct.

23         MR. BOHNET-GOMEZ:  We can take that down.

24   Q.  Now, let's talk about the reasons you claim you fired T.J.

25   Coates.

Reigenborn - Direct

1             You met with T.J. Coates about his proposed

2    termination at about 5:00 p.m. on January 15th?

3    A.  Okay.

4    Q.  And in this lawsuit, you have given a number of reasons for

5    why you terminated Mr. Coates?

6    A.  Correct.

7    Q.  You claim that, in a situation involving a barricaded man,

8    he disrespected you and disregarded best practices for handling

9    the situation and the preservation of potential evidence?

10   A.  Correct.

11   Q.  You claim that you terminated him because he was known to

12   keep a naked Barbie doll in his desk drawer?

13   A.  Correct.

14   Q.  And you claim you terminated him because, after the 2014

15   election, he called you a loser?

16   A.  Correct.

17   Q.  And you claim you fired him because he cleaned out his

18   office before the January 15th meeting?

19   A.  That wasn't a reason for firing him.

20            MR. BOHNET-GOMEZ:  Let's pull up Exhibit 60 for

21   Mr. Reigenborn, please.  If we could flip to Page 4 -- or

22   Page 3.

23   Q.  Mr. Reigenborn, we're looking at the interrogatory

24   responses that you submitted in this case; correct?

25   A.  Yes.

Reigenborn - Direct

1  Q.  And these were your sworn answers in this case?

2  A.  Correct.

3  Q.  And do you see Interrogatory Number 5 asking you to

4  describe with particularity each material reason that you

5  decided to revoke the appointments and/or end the employment of

6  each of Gene Claps, Timothy James Coates, Mark Mitchell and

7  Kevin Currier?

8  A.  Correct.

9  Q.  So you were asked to tell us every reason that you fired

10 him; right?

11 A.  Correct.

12      MR. BOHNET-GOMEZ:  Now, let's go to Page 5.

13 Q.  And here, on Page 5, you are telling us the reasons that

14 you fired Mr. Coates; right?

15 A.  Correct.

16      MR. BOHNET-GOMEZ:  And then let's go to the next page.

17 Q.  At the top of the page, here, these are all still reasons

18 that you fired Mr. Coates; right?

19 A.  Correct.

20 Q.  In the very last sentence, before the paragraph starting

21 with Mark Mitchell, states that Mr. Coates had cleaned out his

22 office prior to his OTBH?

23 A.  Correct.

24 Q.  So the fact that Mr. Coates had cleaned out his office

25 prior to his opportunity to be heard meeting with you on

Reigenborn - Direct

1    January 15th was a reason that you fired him?

2    A.  I don't believe it was a reason.  It was just another added

3    to the list of things.

4    Q.  It's a reason that you provided us in this lawsuit as for

5    why you fired Mr. Coates?

6    A.  It's one of them.

7          MR. BOHNET-GOMEZ:  Let's take that down.

8    Q.  When you met with Mr. Coates on January 15th, 2019, you

9    didn't give him any of the reasons that you later gave in this

10   lawsuit?

11   A.  Correct.

12   Q.  You never investigated any claims?

13   A.  I witnessed that stuff, I'm sorry, I didn't need to

14   investigate it.  I witnessed it.

15   Q.  You didn't investigate it?

16   A.  I witnessed it.

17   Q.  So you didn't investigate it?

18   A.  There was no need for an investigation.  I witnessed it.

19   Q.  So you didn't do an investigation?

20   A.  Correct.

21   Q.  And you never documented any issues?

22   A.  Correct.

23   Q.  And you never looked at his personnel file?

24   A.  No.

25   Q.  And you never gave him a chance to respond to any of these

Reigenborn - Direct

1  claims?

2  A.  Correct.

3  Q.  All you told him was you were taking the agency in a

4  different direction?

5  A.  Correct.

6  Q.  I want to change gears a bit and talk about the Plaintiffs'

7  job duties.

8        All the significant duties fur the Plaintiffs'

9  positions are in their job descriptions?

10 A.  I believe so, yes.

11       MR. BOHNET-GOMEZ:  If we could pull up Exhibit Y,

12 please.  And if we could publish.

13 Q.  Mr. Reigenborn, Exhibit Y, do you see that in front of you?

14 A.  I do.

15 Q.  This is the job description that you approved for chief of

16 the jail division?

17 A.  Correct.

18       MR. BOHNET-GOMEZ:  And is there -- if we could go to

19 the next page of the exhibit, and the page after that.

20 Q.  This is the job description of the patrol division chief?

21 A.  Correct.

22 Q.  And this is also a job description that you approved?

23 A.  Correct.

24 Q.  And they both have identical duties and responsibilities

25 listed?

Reigenborn - Direct

1   A.   Okay.

2            MR. BOHNET-GOMEZ:  If we could put Pages 1 and 3 side

3   by side.

4   Q.   Take a look at those, Mr. Reigenborn.  Those are both

5   identical; correct?

6   A.   It appears so.

7   Q.   And none of these job duties require political affiliation

8   with the incoming Sheriff?

9   A.   Correct.

10            MR. BOHNET-GOMEZ:  Let's pull down this exhibit and

11   put up Exhibit A1, please.

12   Q.   Mr. Reigenborn, Exhibit A1 is a job description for a

13   commander in the detective division?

14   A.   Correct.

15            MR. BOHNET-GOMEZ:  Could we please publish it.

16   Q.   This is the job description for a commander in the

17   detective division; correct?

18   A.   Correct.

19   Q.   And you approved this job description?

20   A.   I did.

21   Q.   Do you see the duties and responsibilities listed for the

22   job?

23   A.   I do.

24   Q.   And none of those duties require political affiliation with

25   the incoming Sheriff?

                                                                            394
Reigenborn - Direct

1   A.  Correct.

2         MR. BOHNET-GOMEZ:  Let's pull that down.

3   Q.  So none of the job descriptions for Plaintiffs' ranks and

4   positions, which you yourself approved, list any duties for

5   which political affiliation or loyalty is required?

6   A.  Correct.

7   Q.  Now, let's talk briefly about Mark Toth.

8         You hired Mark Toth as a division chief in 2019?

9   A.  Correct.

10  Q.  And you hired Mark Toth, because his previous job involved

11  responsibilities that were much greater than those of a typical

12  chief position at the Adams County Sheriff's Office?

13  A.  Correct.

14  Q.  His previous job was chief of the Mountain View Police

15  Department?

16  A.  Correct.

17  Q.  And that's where you worked after retiring?

18  A.  Correct.

19  Q.  And the entire town of Mountain View is six blocks wide and

20  two blocks tall?

21  A.  Correct.

22  Q.  The entire town of Mountain View has about 530 residents?

23  A.  Correct.

24  Q.  Now, let's talk about how the Sheriff's Office is

25  structured, briefly.

Reigenborn - Direct

1          As the Sheriff, you run the entire agency?

2     A.  Correct.

3     Q.  You have the final say in every decision at the agency?

4     A.  Within some reason.

5     Q.  There's not any decision in the agency that you could not

6     overrule?

7     A.  There's plenty that would happen that you couldn't

8     overrule.

9          MR. BOHNET-GOMEZ:  Let's pull up Page 20 of

10    Mr. Reigenborn's deposition, please.  If we could publish this

11    and highlight Lines 9 through 13.

12    Q.  I asked you:  "Do you have final say in every decision at

13    the agency?"

14         And you answered:  "If it gets to me, yes, I have the

15    say.  Sometimes there's decisions that are made that don't make

16    it all the way to me."

17         Did I read that right?

18    A.  Correct.

19         MR. BOHNET-GOMEZ:  You can take that down.

20    Q.  Let's talk about your views on political loyalty.

21         You believe it would be wrong to fire a commander

22    solely because of him being a Republican or a Democrat or

23    independent?

24    A.  Correct.

25    Q.  And it would not be appropriate, in your view, to terminate

Reigenborn - Direct

 1   or discipline an employee solely because of their political

 2   affiliation?

 3   A.  Correct.

 4   Q.  And it was not your expectation in your administration that

 5   commanders and above support you politically?

 6   A.  Correct.

 7   Q.  There's no difference in your mind between being loyal to

 8   you personally, as opposed to being loyal to the Sheriff's

 9   Office?

10   A.  Correct.

11   Q.  And despite these statements, it was your belief that if

12   someone supported your opponent in the election, that would

13   cause concern about whether they were loyal to you?

14   A.  Correct.

15   Q.  Let's talk more about political loyalty, Mr. Reigenborn.

16          In this case, you have previously testified that

17   commanders are policymakers, who require loyalty to the

18   Sheriff?

19   A.  Correct.

20   Q.  And you have testified that commanders and lieutenants have

21   always been policymakers within the Adams County Sheriff's

22   Office under every administration?

23   A.  Correct.

24   Q.  And just to be clear, the position of commander was

25   formerly called lieutenant?

Reigenborn - Direct

1    A.  Correct.

2    Q.  But they're substantially the same?

3    A.  Correct.

4    Q.  It was just a change in name?

5    A.  Correct.

6           MR. BOHNET-GOMEZ:  Let's pull up Exhibit 116 for

7    Mr. Reigenborn, please.

8    Q.  Mr. Reigenborn, I'm showing you what's been marked as

9    Exhibit 116.

10   A.  Correct.

11   Q.  This is an exhibit -- excuse me -- this is an affidavit

12   that you signed under oath in a previous lawsuit?

13   A.  Correct.

14   Q.  That's your signature at the bottom of the page?

15   A.  It is.

16   Q.  And above your signature, you swore that these statements

17   were true?

18   A.  Correct.

19          MR. BOHNET-GOMEZ:  Your Honor, move to admit

20   Exhibit 116 into evidence.

21          THE COURT:  Any objection?

22          MS. PRATT:  No objection.

23          THE COURT:  It's admitted.

24   (Plaintiff's Exhibit 116 received in evidence)

25          MR. BOHNET-GOMEZ:  If we could publish it, please.

Reigenborn - Direct

1    BY MR. BOHNET-GOMEZ:

2    Q.  Let me direct your attention to Paragraph 2 of your

3    affidavit.

4    A.  Okay.

5    Q.  You stated under oath that the position of lieutenant or

6    deputy sheriff does not and has never required political

7    loyalty?

8    A.  Correct.  Meaning they don't have to belong to a political

9    party.  They don't have to be a Democrat or Republican or

10   independent.  They can belong to whatever they want.  There is

11   no requirement for them to belong to the same political party

12   as the Sheriff or not.  They can belong to anything.  And

13   that's why it says, from deputy sheriff to lieutenant or

14   lieutenant -- or deputy sheriff.  Deputy sheriffs aren't

15   required to have any party affiliation.  They're not required

16   to live within the county.  They're not required to vote a

17   certain way.

18   Q.  And at the Sheriff's Office, there is the Sheriff, the

19   undersheriff, and everyone else, under law, is a deputy

20   sheriff?

21   A.  Correct.

22   Q.  And in Paragraph 2 of your affidavit, you swore that the

23   position of lieutenant or deputy sheriff does not and has never

24   required political loyalty?

25   A.  Correct.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Direct

1   Q.  Now, let me draw your attention to Paragraph 3.

2        In Paragraph 3, you swore that the position of

3   lieutenant or deputy sheriff does not set or create policy

4   pursuant to the duties and responsibilities of those positions?

5   A.  At that time, they did not.

6   Q.  So that's why you swore that in your affidavit?

7   A.  Correct.  At that time, when that case was going on under

8   Doug Darr, lieutenants did not.

9   Q.  You just told us the position of commander and lieutenant

10  were the same other than name, that was your testimony a minute

11  ago?

12  A.  I think you've taken it out a little bit.  But over time,

13  it has progressed, what they didn't do and what they did do now

14  has changed.  So back then, they didn't write policies.  They

15  didn't.  As time has progressed, they do.

16  Q.  Let's move on.  Let's talk about the policies you kept as

17  Sheriff.

18       MR. BOHNET-GOMEZ:  If we could pull up Exhibit 59,

19  please.  And publish it to the jury, please.

20  Q.  Mr. Reigenborn, Exhibit 59 is the Adams County Sheriff's

21  Office employee speech, expression and social networking

22  policy?

23  A.  Correct.

24  Q.  That policy was in place when you took office?

25  A.  Correct.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Direct

1    Q.  And it remained in effect?

2    A.  I believe it did.

3    Q.  This policy applies to all employees?

4    A.  Correct.

5    Q.  From deputies through division chiefs?

6    A.  Correct.

7           THE COURT:  Counsel, I'm going to interrupt you for a

8    moment.  I believe that only Page 3 of this so far has been

9    admitted and published.  That's my record.

10          So any objection to the entirety of the exhibit being

11   admitted?

12          MS. PRATT:  In light of the Court's prior ruling, I

13   will not object.  Although, under ordinary circumstances, I

14   would have renewed that objection.

15          THE COURT:  You can put it back up.  It has been

16   admitted in its entirety.

17     (Plaintiff's Exhibit 59 received in evidence)

18          MR. BOHNET-GOMEZ:  So now that it's been admitted,

19   let's take a look at that Page 3.

20   BY MR. BOHNET-GOMEZ:

21   Q.  If I can draw your attention to that final paragraph on

22   Page 3.

23          So the policy states that employees retain their right

24   to vote as they choose, to support candidates of their choice

25   and to express opinions as private citizens on political

Reigenborn - Direct

1    subjects and candidates at all times while off duty?

2    A.  Correct.

3            MR. BOHNET-GOMEZ:  We can take this one down.

4            And let's put up Exhibit 98, please.  Publish it to

5    the jury, please.

6            THE COURT:  98 has yet to be -- it's stipulated, but

7    it has not been admitted yet.

8            Are you moving to admit it?

9            MR. BOHNET-GOMEZ:  My apologies, your Honor.  We would

10   move to admit Exhibit 98.

11           THE COURT:  Any objection?

12           MS. PRATT:  No objection.

13           THE COURT:  It's admitted.  It can be published.

14       (Plaintiff's Exhibit 98 received in evidence)

15   BY MR. BOHNET-GOMEZ:

16   Q.  Mr. Reigenborn, this is the Adams County Sheriff's Office's

17   standards of conduct policy?

18   A.  Correct.

19   Q.  And this policy was also in place when you took office?

20   A.  Correct.

21   Q.  And you didn't rescind it, it remained in effect?

22   A.  Correct.

23   Q.  And this policy also applies to all employees?

24   A.  Correct.

25   Q.  From deputies through division chiefs?

Reigenborn - Direct

1    A.  Correct.

2         MR. BOHNET-GOMEZ:  If we could turn to Page 7 of the

3    policy.

4    Q.  I want to draw your attention to the subpart on political

5    activity at the bottom.

6         The policy states that Sheriff's employees may

7    participate in any federal, state, county or local political

8    campaign; correct?

9    A.  Correct.

10        MR. BOHNET-GOMEZ:  Let's take that down.

11   Q.  Let's talk about Terrance O'Neill.

12        You have testified that you were concerned about

13   Terrance O'Neill's loyalty and the Plaintiffs' loyalty due to

14   their close affiliation with Sheriff McIntosh?

15   A.  Correct.

16   Q.  When you met with him before taking office, Mr. O'Neill

17   conveyed to you that he had considered running for Sheriff?

18   A.  Correct.

19   Q.  In fact, you knew that Mr. O'Neill and Mr. Claps had both

20   said they were going to run for Sheriff in 2022 --

21   A.  Correct.

22   Q.  -- after Mike McIntosh retired?

23   A.  Correct.

24   Q.  In the December 2018 meetings, Mr. O'Neill told you he

25   would only run for Sheriff to prevent Mr. Claps from running

Reigenborn - Direct

1    for Sheriff?

2    A.  Correct.

3    Q.  And he told that to you again at his termination meeting on

4    January 15th, 2019?

5    A.  I believe so.

6    Q.  And at your deposition in September 2021, you testified

7    that Mr. O'Neill was a mediocre commander who does the bare

8    minimum?

9    A.  Correct.

10   Q.  When you took office, you weren't sure how loyal he could

11   be, but he was able to come in and convince you otherwise?

12   A.  Correct.

13   Q.  You believe that Mr. O'Neill's exact words to you were, I'm

14   loyal to the Sheriff himself and I'll do what he wants?

15   A.  Correct.

16   Q.  You told him you weren't opposed to him running for Sheriff

17   if he waited until you had run your terms?

18   A.  Correct.

19   Q.  Now, let's talk about what happened when you heard rumors

20   about Mr. O'Neill running for Sheriff.

21        In June 2020, you heard a rumor that Mr. O'Neill was

22   running for Sheriff?

23   A.  Correct.

24   Q.  And ultimately, Chris Laws, your division chief, told you

25   he spoke with Mr. O'Neill and that Mr. O'Neill was not planning

Reigenborn - Direct

1   on running for Sheriff?

2   A.  Correct.

3   Q.  There were also rumors that other employees were supporting

4   Mr. O'Neill's run for Sheriff?

5   A.  Correct.

6        MR. BOHNET-GOMEZ:  If we could pull up Exhibit 67,

7   please.  And if we could flip through it a bit for

8   Mr. Reigenborn.

9   Q.  Mr. Reigenborn, these are your text messages about those

10  rumors?

11  A.  Correct.

12       MR. BOHNET-GOMEZ:  Your Honor, I would move to admit

13  67 into evidence.

14       THE COURT:  Any objection?

15       MS. PRATT:  No objection.

16       THE COURT:  It's admitted.

17    (Plaintiff's Exhibit 67 received in evidence)

18  BY MR. BOHNET-GOMEZ:

19  Q.  So on this first page, you are texting Tommie McLallan and

20  some others about the rumors; correct?

21  A.  Correct.

22       MR. BOHNET-GOMEZ:  Let's move on to the second page.

23  Q.  Again, you are texting Mr. McLallan and others on the text

24  chain about Mr. O'Neill and others planning their political

25  activities?

                        Reigenborn - Direct

 1    A.  Correct.

 2            MR. BOHNET-GOMEZ:  Let's move on to Page 3.  Let's

 3    flip one more page.

 4    Q.  Again, more texts about the rumors of these employees'

 5    political activities?

 6    A.  Correct.

 7            MR. BOHNET-GOMEZ:  Let's go to Page 5 and 6.

 8    Q.  Mr. Dunning asks you in the middle of the page, "If there's

 9    any truth to this, why keep them?"

10    A.  Correct.

11    Q.  And your response in blue was, "If we can prove it, we

12    won't?"

13    A.  Right.

14            MR. BOHNET-GOMEZ:  Let's flip to Page 7, please.

15    Q.  Mr. Dunning texts you, "We don't need foxes in the hen

16    house," and "they're either with you or they're against you?"

17    A.  Correct.

18    Q.  Let's zoom in on your response below.

19            Your response was that "The problem is a couple of

20    these bad ones can certainly infect quite a few of our staff.

21    Hindsight is 2020 and we should have let some of these people

22    start over from scratch.  Now, I would prefer to do an IA and

23    have their posts removed from them."

24            Did I read that right?

25    A.  You did.

Reigenborn - Direct

1   Q.  That was your response --

2   A.  Correct.

3   Q.  -- to Mr. Dunning?

4           MR. BOHNET-GOMEZ:  Now, let's zoom back out and go to

5   Page 8.

6   Q.  This is a different text message chain, also dated

7   June 6th, 2020 with Mr. McLallan?

8   A.  Okay.

9   Q.  Do you recognize Mr. McLallan's phone number?

10  A.  I don't.

11          MR. BOHNET-GOMEZ:  Let's zoom in on the middle of the

12  page.

13  Q.  Well, Mr. McLallan texts you, "Are we to the point of just

14  walking them out?"

15          Do you see that?

16  A.  I do.

17  Q.  And your response below was, "I'm really close to cleaning

18  house."

19          Do you see that?

20  A.  I do.

21  Q.  That was your response?

22  A.  Mm-hmm.

23  Q.  And that was about the rumors of these employees running

24  for Sheriff?

25  A.  And their behavior, correct.

Reigenborn - Direct

1   Q.  Now, let's zoom back out and focus on your texts at the

2   bottom, on June 6th, 2020, do you see that date?

3   A.  I do.

4   Q.  You sent the message, "I'll need to talk with Kasandra.  I

5   imagine we'll be walking several of them out next week, all of

6   them pending IA."

7   A.  Correct.

8   Q.  Now, IA is short for internal affairs?

9   A.  Correct.

10  Q.  And we needed to talk with Kasandra first?

11  A.  Correct.

12  Q.  And Kasandra is an attorney with the county attorney's

13  office?

14  A.  Correct.

15          MR. BOHNET-GOMEZ:  We can take this down.

16  Q.  Let's talk about your campaign platform.

17          Your 2014 campaign platform was about having

18  character, integrity and transparency?

19  A.  Correct.

20  Q.  And your 2018 campaign platform was also about having

21  character, integrity and transparency?

22  A.  Correct.

23  Q.  And that was your vision for the Sheriff's Office?

24  A.  It was.

25  Q.  Let's talk about your disciplinary history.

Reigenborn - Direct

 1          In your career at the Adams County Sheriff's Office,

 2    you have been the subject of multiple internal affairs

 3    investigations; correct?

 4    A.  Correct.

 5    Q.  The district attorney's office filed seven excessive force

 6    complaints against you?

 7    A.  Correct.

 8    Q.  And during the 2014 campaign, you were also investigated

 9    for allegations of domestic violence?

10    A.  Correct.

11    Q.  And you had a sustained finding of mishandling evidence?

12    A.  Correct.

13    Q.  Now, let's talk about the crimes you committed while in

14    office.

15          Last year you were convicted of three crimes?

16    A.  Correct.

17    Q.  You pleaded guilty to forgery of a public record?

18    A.  Correct.

19    Q.  And that's a felony?

20    A.  Correct.

21    Q.  And you pleaded guilty to fiscal misconduct?

22    A.  Correct.

23    Q.  And you pleaded guilty to second degree forgery?

24    A.  Correct.

25    Q.  And you committed these crimes while serving as Sheriff of

Reigenborn - Cross

1   Adams County?

2   A.  Correct.

3   Q.  And you believe that your behavior stained the reputation

4   of the Adams County Sheriff's Office?

5   A.  I do.

6          MR. BOHNET-GOMEZ:  No further questions.

7          THE COURT:  Thank you.

8          Cross-examination.

9          MS. PRATT:  Yes, your Honor.  Thank you.

10  CROSS-EXAMINATION

11  BY MS. PRATT:

12  Q.  Good morning, Mr. Reigenborn.

13  A.  Good morning.

14  Q.  When you ran for Sheriff in the year 2018, which political

15  party were you affiliated with?

16  A.  Democratic.

17  Q.  Did you run for re-election in 2022?

18  A.  I did.

19  Q.  On which parties' ticket?

20  A.  Democratic.

21  Q.  Who was your opponent in the democratic primary in 2022?

22  A.  Gene Claps.

23  Q.  And what happened during that primary election?

24  A.  Gene Claps won the primary.

25  Q.  What happened after that?

Reigenborn - Cross

1    A.  I finished my term in office.  He proceeded through the

2    election process and won the election in November against the

3    Republican, Mike McIntosh.

4    Q.  So just to be clear, you and Mr. Claps were of the same

5    political party at the time that you faced off in the 2022

6    election; correct?

7    A.  Correct.

8         MS. PRATT:  Your Honor, yesterday we had some

9    discussion about Exhibit 58.  And I move to withdraw my

10   objection as to playing the entirety of the video clip set

11   forth in Exhibit 58, and I would like to play that for the jury

12   now.

13        THE COURT:  Any objection?

14        MR. BOHNET-GOMEZ:  Yes, your Honor, hearsay.

15        MS. PRATT:  Your Honor, rule of completeness,

16   Rule 106.

17        THE COURT:  Give me a moment.

18        MR. BOHNET-GOMEZ:  Your Honor, there's multiple

19   hearsay statements in this clip and many of them are not

20   relevant at all.

21        THE COURT:  Why don't you approach.

22        (Continued on next page)

23

24

25

Reigenborn - Cross

1        (At sidebar)

2        MS. PRATT:  Your Honor, just yesterday they were

3    seeking to submit this entire video clip.  Now they're seeking

4    to change their position on the fly.

5        It provides additional context to Mr. Reigenborn's

6    brief statement that was admitted yesterday.  I think, under

7    Rule 106, the jury is entitled to hear the entirety of the

8    contextual statements surrounding that.

9        THE COURT:  I obviously don't -- I can't pull up the

10   video of it without the jury hearing it.  Is it the rest of his

11   statement or is it somebody else's statement?

12       MS. PRATT:  It's the contextualization of why he was

13   being interviewed with regard to the statement made that was

14   already admitted into evidence yesterday.

15       MR. BOHNET-GOMEZ:  It's the statement of the

16   journalists and other people.  He can testify about it.  We

17   sought to admit only his words as party statements.

18       THE COURT:  Is he responding to a question from a

19   journalist; is that --

20       MS. PRATT:  No.  The clip that was played yesterday is

21   not responding to the question of a journalist.

22       I would point out that yesterday they did want to

23   admit the entire clip.

24       THE COURT:  I know, but they're objecting to it now.

25       What is the remainder of 58?  What are you seeking

Reigenborn - Cross

1    to -- like I said, I don't have a transcript of it, and if I

2    play it here --

3              MS. HALPERN:  Would you like us to pull up the actual

4    news article?

5              So it's a series, it's like a whole entire four-minute

6    newscast that interviews multiple people plus has a journalist

7    talking and editorializing, et cetera.

8              MS. PRATT:  Your Honor, I would suggest that we take a

9    brief recess so the Court can review the entire video.

10             THE COURT:  How long do you -- I'm wondering if we can

11   delay this to the lunch hour.  If you are going to go through

12   the lunch hour with him, can we skip on this and then we can

13   take it up?

14             MS. PRATT:  We can come back to it.  Is that all

15   right?

16             THE COURT:  Yes.

17             THE DEPUTY CLERK:  Your Honor, a juror needs to go to

18   the restroom.

19             (Continued on next page)

20

21

22

23

24

25

Reigenborn - Cross

1        (In open court; jury present)

2            THE COURT:  Counsel, it's been brought to my attention

3    that one of the jurors needs to use the restroom.  This is

4    probably a good time to take up the issue we just had.

5            So why don't we give the jurors a recess until 10

6    after 11, and then we'll go another 45 minutes or so and take

7    the longer lunch recess.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Can we play the entirety of 58 so --

3          MS. HALPERN:  Your Honor, 58 is the article, but I had

4    teed up his phone call on the video, so that was submitted as

5    58A, I believe.

6          THE COURT:  It was.

7          MS. HALPERN:  So the whole entire video is not on the

8    record.  We can play it.  We would have to get it off the

9    internet, basically.

10         THE COURT:  And what is counsel seeking to introduce,

11   the entirety of the recording or --

12         MS. PRATT:  Well, the entirety of the video clip that

13   is embedded in Exhibit 58.

14         THE COURT:  So the recording, as opposed to the

15   written article?

16         MS. PRATT:  Yes, your Honor.

17         THE COURT:  Let me hear the entirety of the recording.

18       (Media played)

19         THE COURT:  So are you looking to play the entirety of

20   it or simply the question that the Sheriff was responding to?

21         Because I certainly think you get to introduce the

22   question that's -- it's not directly asked, but it's clear from

23   the context what he's responding to.  I certainly think you get

24   to play that.

25         Are you just looking to play that or the entirety of

1    the clip?

2         Because my concern -- I don't think you're seeking to

3    admit the entirety of the clip for the truth of the various

4    things; Morgen said this or somebody else said this.  My only

5    concern with all of that is the discussion of the protective

6    orders in it, because that's arguably presenting his facts.  I

7    just don't want to get into a sideshow on the protective order

8    issues.

9         MS. PRATT:  I understand, your Honor.  But he was just

10   asked on cross-examination about domestic violence matters, and

11   he responded to that and the witness can also respond.  I think

12   it's perfectly fair to allow the jury to hear the entirety of

13   Mr. Reigenborn's statements and not just that one isolated clip

14   about loyalty.

15        You are absolutely right, your Honor, this goes to the

16   effect on the listener.  We're not offering it for the truth of

17   the matter asserted.

18        MR. BOHNET-GOMEZ:  Your Honor, we withdraw our

19   objection to the entirety of the clip.

20        THE COURT:  Okay.  We'll play the entirety of the clip

21   then.

22        I'll take a brief recess.

23        (Recess)

24        THE COURT:  Let's go get the jury.

25        Just so we're clear, we're going to play 58B because

1    58 is technically the written portion.  We are going to play

2    what we just watched.

3            MS. PRATT:  We'll mark that as 58B so it's clear on

4    the record.

5            THE COURT:  And 58A is encompassed within 58B.

6            MS. PRATT:  Correct.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reigenborn - Cross

```
 1      (In open court; jury present)

 2           THE COURT:  Sir, just a reminder, you are still under

 3    oath.

 4           THE WITNESS:  Thank you.

 5           THE COURT:  Counsel.

 6           MS. PRATT:  Your Honor, given the withdrawal of the

 7    objection, I would like to move for the admission of

 8    Exhibit 58B, which is the video that we were just discussing.

 9           THE COURT:  It is admitted and can be published.

10      (Plaintiff's Exhibit 58B received in evidence)

11           MS. PRATT:  May we publish.

12           THE COURT:  Yes.

13           MS. PRATT:  If we could please play Exhibit 58B.

14      (Media played)

15    BY MS. PRATT:

16    Q.  Mr. Reigenborn, having now reviewed the entirety of

17    Exhibit 58B, I'd like to ask you to explain, what did you mean

18    by the command staff wants to be loyal to McIntosh or the words

19    to that effect that you just heard?

20    A.  There were rumors going around about how they weren't going

21    to assist us with the transition, how they weren't going to

22    help us with the goals that we wanted to reach or even with our

23    mission statements that we were putting forward.

24    Q.  So when you refer to loyalty, who were you referring to?

25    A.  Referring to the Sheriff's position as the elected office.
```

Reigenborn - Cross

1    Q.  Now, there was also some mention in this news story about a

2    couple of restraining orders and there was some context given

3    there.  Can you please explain to the jury what the basis of

4    those restraining orders were and what happened to them.

5    A.  Okay.  One of the restraining orders was initiated by me

6    first.  I initiated it against my ex-wife.  I was married to

7    her at the time.

8         Three days later, she went into another county, got a

9    restraining order, had that placed on me.  During the course of

10   that divorce, that restraining order was dropped.

11        Another one was a female that I was dating.  Her and

12   her ex-husband decided they were going to get back together.

13   She got a restraining order against me.  Seven days later

14   dropped that restraining order.

15   Q.  And we heard some further context about Mr. Morgen's

16   statements about the voters of Adams County.

17        What happened with Mr. Morgen's employment?

18   A.  He continued to be employed as a sergeant with the

19   Sheriff's Office.

20   Q.  Why did you make that decision?

21   A.  There were several reasons.  He had called me, he

22   apologized, he said he made a mistake, that he had posted some

23   of that stuff after an evening of drinking and he regretted

24   doing that.  And so he seemed genuine in his response to me,

25   stated he would assist us in carrying forward our mission and

Reigenborn - Cross

1    carrying forward what we were wanting to accomplish with the

2    agency.  And I told him that under no circumstances would he

3    remain as the PIO because that is the face of the agency.  He

4    understood that.  And we reassigned him to patrol division.

5    Q.  Just for clarity, what does PIO stand for?

6    A.  Public information officer.  That's who the media goes to

7    to gather any information on any events going on at the

8    Sheriff's Office.

9    Q.  So you moved him out of that position?

10   A.  Correct.

11   Q.  And he ended up where?

12   A.  He went to patrol division.  I believe he was an

13   administrative sergeant doing something down there.

14   Q.  Also, during your discussion with Plaintiffs' counsel,

15   there were a number of exhibits that were discussed with you.

16   I would like to go ahead and address some of those first.

17        MS. PRATT:  If we could please pull up Exhibit 61,

18   which I believe has already been admitted into evidence.  And

19   may I publish this to the jury, your Honor.

20        THE COURT:  Yes.

21        MS. PRATT:  Jon, if you wouldn't mind blowing up the

22   bottom portion of that first page of Exhibit 61.

23   BY MS. PRATT:

24   Q.  Mr. Reigenborn, is this a text message that you sent?

25   A.  Yes.

Reigenborn - Cross

1   Q.   Sorry, is this a text message that you received, pardon me?

2   A.   It is received, correct.

3   Q.   Who is speaking to who?

4        And if you would like to review the entire exhibit,

5   that's fine.  But who is speaking to who in Exhibit 61?

6   A.   I'm not really sure.  I would assume it was Tommie

7   McLallan, but I'm not really sure.

8   Q.   Look up at the top there in the blue box?

9   A.   Correct.

10  Q.   Do you see Mr. McLallan's name?

11  A.   Correct.

12  Q.   And so the blue boxes, as I understand it, are

13  Mr. McLallan's text messages?

14  A.   Correct.

15  Q.   And yours are the gray boxes?

16  A.   Correct.

17  Q.   Going back to the gray box at the bottom of Exhibit 61, you

18  wrote, "Chris Laws said he will still take the jail chief spot.

19  We are good there."

20  A.   Correct.

21  Q.   What did you mean by that?

22  A.   I had talked to Chris because he had worked at the

23  Sheriff's Office prior and he was receiving his retirement from

24  the county.  And so we had had some conversation, and I wanted

25  to be prepared in the event that some of these chiefs left or

Reigenborn - Cross

```
 1    were -- the chiefs were demoted, and so I would have these
 2    chiefs positions that were going to be open.  And he said, if
 3    we needed him, he would be available.  So it wasn't that we
 4    were offering him a position at the time.  It was just, hey, if
 5    this comes about, would you be available, would you have an
 6    interest in it, or is it going to completely screw up your
 7    retirement.  Because coming back to work can absolutely screw
 8    up your retirement, because you have taken out so many years of
 9    your pension that it takes too many years to make up what you
10    have received out of it.
11    Q.  I see.
12         MS. PRATT:  If we can take down Exhibit 61.  And Jon,
13    if would kindly bring up Exhibit 64, also already admitted into
14    evidence.
15         THE COURT:  I don't have 64 as being admitted.
16         MR. BOHNET-GOMEZ:  It is not admitted.  And we object
17    on hearsay grounds.
18         MS. PRATT:  We'll just skip over Exhibit 64, that's
19    fine.
20    BY MS. PRATT:
21    Q.  Do you recall being asked a line of questions about
22    statements to the effect that you made about I want to announce
23    who is leaving?
24    A.  Correct.
25    Q.  What did you mean by that?
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Cross

 1   A.  It was kind of that frustration point, that it would be

 2   nice if we just said who we wanted to have potentially leave

 3   the agency or consider having them retire, again, because it

 4   affects their retirement.  And so part of that was just out of

 5   frustration of hearing the rumors of people saying, I'm not

 6   going to help him get his mission, no matter what he says,

 7   we're not going to do what he tells us.  So there were just a

 8   bunch of rumors going around prior to us even taking office.

 9   And it's frustrating at times, when you are trying to

10   reorganize an organization and trying to make sure you are

11   going to be starting off on the best foot.

12            MS. PRATT:  Jon, could we bring up Exhibit 65, please.

13            Your Honor, I would ask to move this into evidence, if

14   it isn't already otherwise.

15            THE COURT:  65 is in.

16            MS. PRATT:  Thank you.  May we publish this to the

17   jury.

18            THE COURT:  Yes.

19   BY MS. PRATT:

20   Q.  Mr. Reigenborn, Exhibit 65, there was a list of people

21   under the caption there, "Terminations so far."

22            Do you see that list?

23   A.  I do.

24   Q.  What happened to the employment of each of the people on

25   this list?

Reigenborn - Cross

```
 1              And let's just take them one at a time.  What happened
 2    to Gene Claps' employment?
 3    A.  He retired.
 4    Q.  What happened to James Gerdeman?
 5    A.  Gerdeman was demoted and retained.  I don't remember what
 6    position he took.
 7    Q.  What happened to Kevin Currier's employment?
 8    A.  He retired.
 9    Q.  What happened to Kirstin Thede's employment?
10    A.  He remained.  He was demoted to a sergeant for a short
11    period of time, and then we realized we still had a commander
12    position we needed to fill, so he had no lapse in pay.  And he
13    was retained as a commander at the jail.
14    Q.  This Kristin Thede, is that person also known as Sam Thede?
15    A.  It is.
16    Q.  What about Manuel Carillo?
17    A.  He was demoted to sergeant.
18    Q.  Mark Mitchell?
19    A.  He retired.
20    Q.  Paul Gregory?
21    A.  He was demoted.  I believe we demoted him to sergeant.
22    He -- shortly thereafter, he tested for and was promoted to
23    commander.  He later tested for and was promoted to division
24    chief.  And in the last year of my administration, he was my
25    undersheriff.
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Cross

1    Q.  And what about Ricky McNair?

2    A.  He retired.

3    Q.  Robert Nanney?

4    A.  He never got a letter, and he was retained in his position.

5    Q.  Terrance O'Neill?

6    A.  He was retained, and he was demoted to sergeant -- or no,

7    he was a division chief, and he was demoted to commander.

8    Q.  And T.J. Coates?

9    A.  He retired.

10   Q.  Now, when Plaintiffs' counsel was asking you questions

11   about this particular exhibit, he asked you whether all of

12   these people supported your opponent in the election, then

13   Sheriff McIntosh; correct?

14   A.  Correct.

15   Q.  And you answered that you weren't sure?

16   A.  Correct.

17   Q.  But in any event, you have now just explained to the jury

18   which of these people were retained and which were not;

19   correct?

20   A.  Correct.

21       MS. PRATT:  We can take Exhibit 65 down.  Thank you.

22   Q.  Now, there was some testimony earlier from you today,

23   Mr. Reigenborn, about certain policies that were rescinded.

24   Can you please explain to the jury which policies were

25   rescinded and which were not.

Reigenborn - Cross

1    A.  The majority of our policies were retained.  We did rescind

2    the hiring, firing, termination and recruitment policies,

3    because we weren't sure what policies the prior administration

4    had or if they had issued out memos or memorandums or other

5    directives.  And so not knowing what was already out there, on

6    day one, walking in the office, we just suspended them all.

7    Q.  And was that because, in part -- well, why was it that you

8    didn't have access to all of the existing policies when you

9    first took office?

10   A.  I wasn't allowed in the building until after I was sworn

11   in.  I believe it was on the 8th.  And even then, I couldn't

12   get in the building because where headquarters is located, I

13   couldn't get in until 8:00 a.m. in the morning.  I didn't have

14   keys.  I didn't have access cards.  I didn't have any way to

15   enter into the building.

16   Q.  You worked at the Adams County Sheriff's Office for a long

17   time; correct?

18   A.  Correct.

19   Q.  What is your experience about the hiring and firing

20   authority of the Sheriff, regardless of who the Sheriff is?

21   A.  The Sheriff has the ability to hire, fire as they see fit.

22   Q.  Has that always been the case?

23   A.  Yeah.  I mean, the laws have changed a little bit over

24   time.  But the Sheriff has always been the one that signs their

25   commission card, gives them their appointment and carries the

Reigenborn - Cross

1   liability for them.

2   Q.  You were also asked some questions about some of your

3   deposition testimony and specifically -- now, this, I

4   understand is not going to be published to the jury -- but I

5   would like to bring back up Mr. Reigenborn's deposition

6   testimony, specifically Page 251.

7          MR. BOHNET-GOMEZ:  Your Honor, I object.  This is

8   direct examination, and he's not a party opponent for them.

9          THE COURT:  Didn't you cross-examine on this

10  particular area of the deposition?

11         MR. BOHNET-GOMEZ:  Yes.  But to bring it up and

12  publish it.

13         THE COURT:  I don't think she is publishing it.  She's

14  just asking.

15         MS. PRATT:  I'm not publishing it.

16         THE COURT:  Go ahead, counsel.

17         MS. PRATT:  Yes, I understand.

18  BY MS. PRATT:

19  Q.  Just to set some context here, Mr. Reigenborn, could you

20  just read just to yourself at this point the question at

21  Line 7.

22  A.  Okay.

23  Q.  What was the nature of the question that you were asked

24  during your deposition that you're just referring to here?

25  A.  Why I would have fired Gene Claps.

Reigenborn - Cross

1    Q.   And what were the reasons given?

2    A.   Gene Claps had a reputation and had actually told me that

3    he was a self-appointed hatchetman and that his job was to get

4    rid of people.  I don't know if he was a sergeant or a

5    commander at the time when he made those statements to me.

6         But on January 9th, I was receiving multiple text

7    messages and phone calls from individuals at the jail

8    complaining about then Chief Claps' behavior towards them,

9    degrading them, berating them, talking down to them, just in

10   general making it very uncomfortable for them to be there and

11   was wondering if we were aware of it or what we were planning

12   on doing with that.

13        MS. PRATT:  We can take this down off the screen.

14   Thank you.

15   Q.   Now, during your termination meetings with the Plaintiffs,

16   on at least a couple of occasions, you referenced the personal

17   versus the professional.  Can you explain to the jury what you

18   mean by that.

19   A.   Several of these individuals I had been friends with for

20   many years.  Some of them I had gone to high school with.  And

21   so that's kind of the personal relationship that you have with

22   them.  But when you look at what they've done professionally, I

23   didn't want that behavior to continue, I didn't want it to

24   influence the culture at the Sheriff's Office.

25   Q.   Counsel also asked you some questions about several IAs

Reigenborn - Cross

 1    that you were involved in during your time at the Adams County

 2    Sheriff's Office.

 3              What were the results of those internal affairs

 4    investigations?

 5    A.  They were all unsustained, except for the one of

 6    mishandling of evidence.

 7    Q.  What was the context in which that event happened?

 8    A.  That was a pot pipe that I had taken from an arrestee.  I

 9    was taking him up to jail on a warrant.  Explained to him I

10    could charge him with possession of paraphernalia or I could

11    throw it in the Platte River.  They said, please throw it in

12    the Platte River.  I did.  Booked them into jail.

13              A day or two later I was asked about that.  And I

14    said, yeah, I threw the pot pipe into the river.  And I had a

15    sustained IA for mishandling of evidence.

16    Q.  Do you regret your actions in that regard?

17    A.  Of course.

18    Q.  Mr. Reigenborn let's go back in time a little bit and talk

19    some about your law enforcement background, if we could.

20              When did you first become involved in law enforcement?

21    A.  I began my law enforcement career in 1987 as a reserve for

22    the City of Brighton.

23    Q.  Was that a paid position?

24    A.  It was not.

25    Q.  Were you a volunteer?

Reigenborn - Cross

1   A.  I was a volunteer police officer.

2   Q.  Where did you next work?

3   A.  After that, I went to the Adams County Sheriff's Office,

4   where I was a full-time employee.

5   Q.  What made you decide to get into the field of law

6   enforcement?

7   A.  I had a friend who was in law enforcement, and he worked

8   with the Brighton Police Department.  I had done a few ride

9   alongs with him.  It was work that I thoroughly enjoyed doing.

10  The ride along kind of opened my eyes.  And it was -- it was a

11  job that I thought I would be good at and actually enjoyed

12  doing it.

13  Q.  When did you join the Adams County Sheriff's Office?

14  A.  January of '91.

15  Q.  What position did you first hold with the Adams County

16  Sheriff's Office?

17  A.  I was hired as a deputy sheriff working in the jail.

18  Q.  Is that typical, at the time?

19  A.  It was typical at the time.

20  Q.  At any point did you move to any other positions?

21  A.  Yeah, several times.

22  Q.  Please just describe your work history, if you would.

23  A.  I worked at the jail for a few years, worked in booking

24  where new inmates are brought and released.

25          Transferred to patrol at some point, probably late

Reigenborn - Cross

1    '92, early '93.  Worked patrol division a number of years.

2         Applied for a detective position as an undercover

3    narcotics detective.  Worked undercover for several years.

4         Went back to patrol division.  Typically, the Sheriff

5    at that time would only allow you to stay in those undercover

6    specialty units for a period of three years.  Went back to

7    patrol.

8         Worked another special assignment.  We called them

9    PDOs, primary district officers, which meant I was to meet with

10   community leaders, help find problems and solutions for those

11   problems.  Did that for a short period of time.

12        North Metro opened back up, and I reapplied as a

13   detective for North Metro.  Went back into narcotics division.

14        Tested for sergeant.  Was promoted to sergeant in

15   2005.  Went back to the jail as a jail sergeant, because the

16   Sheriff made those decisions as to what division you are

17   working at as a sergeant.  I worked the jail for one year as a

18   sergeant.

19        Then I was transferred to narcotics unit as a sergeant

20   for three years.  Again, the Sheriff at the time would only

21   allow people to stay there three years.

22        And I was moved to patrol.  And I finished out that

23   portion of my career as a patrol sergeant.

24   Q.  Who was the Sheriff of Adams County when you first got

25   hired on?

Reigenborn - Cross

1    A.   That was Ed Camp.

2    Q.   And who succeeded him in office, after Mr. Camp was no

3    longer there?

4    A.   Sheriff Bill Shearer.

5    Q.   Who came after Sheriff Shearer?

6    A.   Sheriff Doug Darr.

7    Q.   Who was after Doug Darr?

8    A.   Mike McIntosh.

9    Q.   Who was after Mike McIntosh?

10   A.   I was.

11   Q.   And who was after you?

12   A.   Gene Claps.

13   Q.   Now, in your time working as a deputy for the Adams County

14   Sheriff's Office, did you ever receive any awards?

15   A.   I did.

16   Q.   Which ones?

17   A.   I received distinguished service twice and medal of valor

18   once and letter of commendation for Columbine.

19   Q.   What were the distinguished service awards for?

20   A.   Both of my distinguished service awards for domestic

21   violences that both had weapons involved in them.  One of them

22   ended in the suspect being killed.

23   Q.   What about the -- is it medal of honor?

24   A.   Medal of valor.

25   Q.   Medal of valor, pardon me.  What was that for?

Reigenborn - Cross

1    A.  Medal of valor is the highest medal you can receive at the

2    Sheriff's Office.  And I received that for going into a burning

3    building and dragging three or four people out of a structure

4    fire.

5    Q.  When did you first decide to run for Sheriff of Adams

6    County?

7    A.  Back in 2014.

8    Q.  Why did you decide to run?

9    A.  Mike McIntosh was a division chief at the time and he had

10   made some decisions that I didn't necessarily agree with.  And

11   so I put my name in the hat because I didn't agree with some of

12   the -- some of his ideology.  And I felt like it was going to

13   be a continuation of what we had with Sheriff Darr and there

14   wasn't going to be much change.

15   Q.  What decisions did you disagree with?

16   A.  One of the biggest decisions that I disagreed with was he

17   sat on my retirement board.  They made a decision that affected

18   all of our employees and our retirement.  We had a different

19   rule back then, a rule of 70.  All employees, with your years

20   of service plus your age, when that reached 70, you could

21   retire out.  And there was a percentage that we could get, and

22   they looked at the last three highest years of your service.

23        Mike McIntosh had told me he didn't agree with the

24   change, but he wanted there to be solidarity and that they were

25   all going to vote the same way and that -- our retirement

Reigenborn - Cross

1    changed, that they were now looking at your retirement from the

2    day you were hired to the day you retired, and you get in the

3    median.

4            And I said, so you mean to tell me that an employee

5    that's worked here 20 years is going to get what they got 10

6    years into their -- and only a percentage, not the whole

7    amount.  He said, correct.

8            And I completely disagreed with that because it

9    doesn't really seem fair to me that how do you take somebody

10   that's going to stick around there for 25, 30 years and tell

11   them, you are going to make what you made at year 17.

12   Q.  So you first decided to run for Sheriff in 2014; correct?

13   A.  Correct.

14   Q.  Who was your opponent in 2014?

15   A.  Mike McIntosh.

16   Q.  And you were elected; correct?

17   A.  I was --

18   Q.  I'm sorry, you were not elected in 2014.

19   A.  I was not.

20   Q.  I'm sorry, I'm getting ahead of myself.

21           So Mike McIntosh won that election; correct?

22   A.  He did.

23   Q.  Did you go back to work after the election?

24   A.  I did.

25   Q.  How did your colleagues at the Adams County Sheriff's

Reigenborn - Cross

1    Office react to you after the 2014 election?

2    A.  Some of them were really decent, didn't have any issues

3    with them.  There were a few that made comments that made it

4    rough to be there.

5    Q.  Who were the people who made comments that made it rough to

6    be there?

7    A.  T.J. Coates and Mark Mitchell.

8    Q.  What did they say to you?

9    A.  One day when I was coming in so I could work swing shift,

10    they walked out of the chief's office as I walked past, and

11    they were walking behind me.  Both of them at the same time

12    were like, hey, you fucking loser, what are you going to do

13    now, you fucked this all up, you fucking loser.  And that

14    continued.  They turned into a breakroom, and I continued up

15    the hall and turned into the briefing room -- or a patrol room.

16    Q.  Did you react in any way to their statements to you?

17    A.  No.  I figured it would just stir the pot even more.

18    Q.  What was your rank at the time of those statements made to

19    you by two of the Plaintiffs?

20    A.  I was a sergeant.

21    Q.  What were their ranks?

22    A.  Commander and division chief.

23    Q.  What happened after that?

24    A.  I retired shortly thereafter.

25    Q.  What did you think of their behavior?

Reigenborn - Cross

1    A.  Didn't think that was an appropriate behavior for people

2    that are supposed to be command staff.  In my sense, it was no

3    different than had I tried to test for commander.  I just

4    tested for a different spot, and I didn't get that spot.  Not

5    everybody gets to be picked or selected as a commander or a

6    division chief.  And so you kind of go through that process.

7    Just because you didn't get it doesn't mean that you are a

8    loser.

9    Q.  So then you retired?

10   A.  I did.

11   Q.  Did you work in law enforcement between 2015 and 2018?

12   A.  I did.

13   Q.  Where did you work?

14   A.  I went to Mountain View Police Department in about 2016,

15   and I worked as a part-time detective there.

16   Q.  What were your main responsibilities as a detective?

17   A.  Filing cases, doing investigations.  If there's an

18   unattended death, of course, I would go to those things.  Just

19   anything that needed detective work done or follow-up done.

20   Q.  Who did you work for at Mountain View Police Department?

21   A.  Mark Toth.

22   Q.  What position did he hold?

23   A.  He was the chief.

24   Q.  Did you know him prior to working at Mountain View?

25   A.  A little bit.  We had crossed paths.  He worked at

Reigenborn - Cross

1   Westminster Police Department as a sergeant, so we had crossed

2   paths because part of the district that I worked, City of

3   Westminster kind of circled around portions of it, and so we

4   would work together at times.

5   Q.  Why did you decide to take that job at Mountain View?

6   A.  Well, I was missing law enforcement, obviously.  And I

7   didn't think I was really ready to be retired.  And I also

8   wanted to hold onto my POST certification at the time.

9   Q.  How long did you hold that job at Mountain View?

10  A.  Almost three years.

11  Q.  At some point, did you decide to run again for Adams County

12  Sheriff?

13  A.  I did, in 2018.

14  Q.  Why did you decide to run again?

15  A.  There was an officer-involved shooting where the officer

16  was fatally wounded, Heath Gumm, and I didn't necessarily agree

17  with the way that McIntosh was handling that death, that line

18  of duty death.  And so that was one of the reasons -- that was

19  the main reason I would say.  I just didn't feel that he

20  handled that correctly.

21  Q.  How so?

22  A.  There were several days that went by after Deputy Gumm's

23  death and there wasn't a whole lot of information being

24  released.  It was almost as if they were trying to hide some

25  information.  There were issues that I saw with the

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Cross

1    investigation, where I thought that Adams County should have

2    stepped away from their own officer line of duty death and let

3    another agency do the investigation so it would be really

4    impartial and that the best evidence could be laid out.

5    Q.  In your experience, when there is a death in the line of

6    duty, is that typical for an outside agency to conduct the

7    investigation?

8    A.  It is.

9    Q.  So you decided to run for the 2018 Sheriff's race; correct?

10   A.  Correct.

11   Q.  What was the result of that election?

12   A.  I won the election.

13   Q.  And when did you actually take office?

14   A.  January of 2019.

15   Q.  Now, Mr. Reigenborn, counsel asked you some questions about

16   your criminal conviction.

17          Do you recall that line of questioning?

18   A.  I do.

19   Q.  First off, you don't contest that you were in fact

20   convicted of the charges that were filed against you; correct?

21   A.  Correct.

22   Q.  What happened to lead to those criminal charges?  If you

23   could just give us the context, please.

24   A.  It resulted from a training day.  I went out to the

25   Flatrock training facility.  I did my driving training.  I came

Reigenborn - Cross

1    inside.  The arrest control instructor was sitting there.  We

2    were having some small conversation.  I asked him if we could

3    go do my arrest control portion.  There was a gentleman that

4    was standing there, I said, you can use Calvin as my student,

5    show you that I'm proficient in all of these things.  And he

6    said, no, you're good.

7            I guess I misunderstood him.  I had been an instructor

8    trainer, and I had trained that instructor as an instructor

9    trainer.  So up until 2014, I had been an instructor trainer,

10   so I assumed he was confident in my skills for arrest control,

11   was kind of just saying, you're good to go.  I signed the

12   roster for the arrest control.  There's 16 hours that need to

13   be completed every year; I had 15.  And by signing that, I had

14   gotten the extra hour of training that I needed.  And in

15   theory, I didn't complete it.  I did, in fact -- I screwed up.

16   Q.  And because of that mistake, you were held accountable;

17   correct?

18   A.  Correct.

19   Q.  Did you apologize for your actions?

20   A.  I did.

21   Q.  To whom?

22   A.  To the POST, to the State, to the voters of Adams County,

23   to the employees of the Sheriff's Office.  As part of my plea

24   agreement, I had to write a letter.  And I wrote that letter

25   and gave it to the courts.  And I guess everybody that wanted a

Reigenborn - Cross

1    copy of that letter, it was made available.

2    Q.  And just briefly, what was the nature of your apology?

3    A.  Just that I was sorry that I brought any embarrassment to

4    the agency, that I used poor judgment.  It was just being lazy

5    on my part, and I just apologized for not doing the correct

6    thing.

7    Q.  We have heard a little bit of testimony during my

8    colleague's questioning about a man named Mr. Micki Bethel.

9    Who is Micki Bethel?

10   A.  Micki Bethel was a chief of police down at Rocky Ford.  I

11   eventually hired him, brought him on as division chief.  He

12   worked a short period of time in detective division.  And then

13   I later moved him over to Flatrock as a training chief.

14   Q.  And who is Tommie McLallan?

15   A.  Tommie McLallan is a friend of mine who I have known for a

16   number of years.  He had been a chief at several different

17   agencies.  I believe Walsenburg was the last one.  And I hired

18   him to be my undersheriff.

19          THE COURT:  Counsel, so you know, it's about 10 to

20   noon, so whenever your next sort of natural break is.

21          MS. PRATT:  Yes, your Honor.  I have a little more in

22   this segment, and then I think it would be a good time to

23   break.

24          THE COURT:  I just wanted to give you a heads up on

25   it.

Reigenborn - Cross

1              MS. PRATT:  Appreciate that.  Thank you.

2    BY MS. PRATT:

3    Q.  So you hired both Mr. Bethel and Mr. McLallan; correct?

4    A.  Correct.

5    Q.  What happened to Mr. Bethel and Mr. McLallan's employment,

6    just briefly?

7    A.  I was either going to terminate them -- I was preparing to

8    terminate them, and they both retired.

9    Q.  Why?

10   A.  Tommie had -- the undersheriff had given Bethel a phone

11   call.  He was short on his training hours.  He ordered Bethel

12   to do whatever it took to get him his training hours.

13           Bethel went online -- there's an online portal that

14   you can go to -- Bethel went online, completed those hours for

15   Tommie and submitted those hours as Tommie's training hours.

16           When I became aware of that, shortly thereafter, I

17   terminated them.

18           MS. PRATT:  Your Honor, I think this is a good time to

19   take a break.

20           THE COURT:  Ladies and gentlemen of the jury, we'll

21   take our lunch break.  If you'll be back by 1:00 o'clock, that

22   would be great.

23           (Continued on next page)

24

25


                    SADIE L. HERBERT, RPR, RCR
        901 19th Street, Denver, CO 80294  (303)335-2105

1        (In open court; jury not present)

2              THE COURT:  Anything we need to take up?

3              MS. PRATT:  Not at this time, your Honor.

4              THE COURT:  Thanks, everybody.

5              We'll be in recess.

6              (Lunch recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         AFTERNOON SESSION

 2                            1:07 p.m.

 3         (In open court; jury not present)

 4             THE COURT:  Let's bring in the jury.

 5             (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Reigenborn - Cross

1      (In open court; jury present)

2          THE COURT:  Just a reminder that you are still under

3   oath.

4          THE WITNESS:  Thank you.

5   BY MS. PRATT:

6   Q.  Good afternoon, Mr. Reigenborn.  Before we took our break,

7   we were talking about a couple of subjects and now I want to

8   shift gears here and talk some about who you did not retain in

9   your administration and who you did.

10         So first off, how many people, roughly, were employed

11  by the Adams County Sheriff's Office when you took office?

12  A.  A little over 600.

13  Q.  And are you aware that there are any people that you

14  retained after you took office that actually supported your

15  opponent, Mr. McIntosh?

16  A.  I'm sure there were.

17  Q.  How do you know that?

18  A.  Just the sheer number of folks.  And I knew there were

19  deputies and sergeants that supported McIntosh and not me.  So

20  it wasn't -- it's just sheer numbers, there had to be.

21  Q.  What about the then existing command staff, do you know

22  anything about whether the command staff also supported your

23  opponent?

24  A.  I believe most of them did.

25  Q.  How do you know that?

Reigenborn - Cross

1    A.  Well, I would see them at different functions, whether it

2    was a parade or a social event that we were going to, so I

3    would see them at different functions that we would go to,

4    whether it be a debate or whatever.  There were several that I

5    knew that were openly supporting them.

6    Q.  Did that play any factor whatsoever in your decision making

7    about who to retain or who not to retain?

8    A.  No.

9         MS. PRATT:  If you could pull up Exhibit 87.  And I

10   believe this is already in evidence.

11        Your Honor, I'm sorry, has Exhibit 87 been admitted?

12        THE COURT:  I apologize.  Let me check.

13        MR. BOHNET-GOMEZ:  I believe it's been admitted, your

14   Honor.

15        THE COURT:  It has been, okay.

16        MS. PRATT:  May I publish to the jury.

17        THE COURT:  Yes.

18   BY MS. PRATT:

19   Q.  Mr. Reigenborn, can you see Exhibit 87 on your screen?

20   A.  I do.

21   Q.  What is it?

22   A.  It is the command structure under Sheriff Mike McIntosh.

23        MS. PRATT:  Jon, if you could please focus in on, say,

24   the top half of Exhibit 87.  Please enlarge that.  I know it's

25   a little small.

Reigenborn - Cross

1    Q.  So Mr. Reigenborn, who is Terrance O'Neill?

2    A.  He's patrol chief.

3    Q.  And just so we're clear on this, this is the org chart from

4    the McIntosh administration; right?

5    A.  Correct.

6    Q.  And who did Mr. O'Neill support in the 2018 election?

7    A.  Mike McIntosh.

8    Q.  We talked a little bit this morning about Jim Morgen.  We

9    saw that video.  Who did Mr. Morgen support in the 2018

10   election?

11   A.  He supported Mike McIntosh.

12   Q.  Did you retain him?

13   A.  I did.

14   Q.  And did you also retain Mr. O'Neill?

15   A.  I did.

16   Q.  What about John Bitterman, who is he?

17   A.  He's a commander in the patrol division.

18   Q.  Who did Mr. Bitterman support in the election, if you know?

19   A.  I don't know.

20   Q.  Did you retain him regardless of --

21   A.  I did.

22   Q.  -- whether you knew or not?

23   A.  Correct, I did.

24   Q.  Who is Shane Heiter?

25   A.  Shane Heiter is a commander in the detectives division.

                          Reigenborn - Cross                    446

1    Q.  Was he a McIntosh supporter?

2    A.  I don't know.

3    Q.  Did you retain him?

4    A.  I did.

5    Q.  Regardless of the fact that you didn't know who he

6    supported?

7    A.  Correct.

8    Q.  And who is Alex Kondos?

9    A.  He was a commander.  I just don't know where he was at.

10   Commander in patrol.

11   Q.  Do you know whether Mr. Kondos was a McIntosh supporter?

12   A.  I do not.

13   Q.  You retained him nevertheless?

14   A.  Right.

15   Q.  Who is John Bungartz?

16   A.  John Bungartz is a commander.  I am trying to see where

17   he's at on the list.  I believe he's at the jail, but I'm not a

18   hundred percent positive.  I don't see it on there.  Scroll

19   down.  Yeah, he was at the jail.

20   Q.  What position did he hold at the jail?

21   A.  Commander.

22   Q.  Do you know whether Mr. Bungartz was a McIntosh supporter?

23   A.  He was.

24   Q.  You retained him?

25   A.  I did.

Reigenborn - Cross

1    Q.   Who is Robert Nanney?

2    A.   He's a patrol commander.

3    Q.   Did he support McIntosh?

4    A.   He did.

5    Q.   Did you keep him?

6    A.   I did.

7    Q.   Who is Carl Smalley?

8    A.   Carl Smalley is a commander out east.

9    Q.   What does out east refer to?

10   A.   It's out east of Hayesmount Road, so it's a very plain --

11   the plains section is what we call it a lot of times, because

12   it's very rural out there.  Bennett, Strasberg, Watkins, very

13   small communities.  But then there's just a lot of farm land as

14   well.

15   Q.   And do you know who Mr. Smalley supported?

16   A.   I don't know.

17   Q.   Did you retain him?

18   A.   I did.

19   Q.   Who is Sam Thede?

20   A.   Sam Thede is a commander at the jail.

21   Q.   Was he a McIntosh supporter?

22   A.   I believe I saw him at some of the functions.  I'm not a

23   hundred percent positive.

24   Q.   Did you keep Mr. Thede?

25   A.   I did.

Reigenborn - Cross

 1         MS. PRATT:  And we can take this exhibit down.

 2         And Jon, if you can please pull up Exhibit 96.  And

 3  this one I am confident is already in evidence.

 4         And may I publish it, your Honor.

 5         THE COURT:  Yes.

 6  BY MS. PRATT:

 7  Q.  Mr. Reigenborn, do you recognize Plaintiff's Exhibit 96?

 8  A.  I do.

 9  Q.  What is it?

10  A.  It is the org chart when I was Sheriff.

11  Q.  So we just talked about some of the folks that you kept

12  from the prior administration.  If you can take a moment,

13  review your org chart, and tell me what position did John

14  Bitterman have in your administration.

15         THE COURT:  Counsel, I want to double check.  I didn't

16  have 96 as in yet.

17         MS. PRATT:  I apologize.

18         THE COURT:  Any objection to 96?

19         MR. BOHNET-GOMEZ:  No objection.

20         MS. PRATT:  Sorry about that.  I thought it was in.

21         THE COURT:  That's why I keep this.

22         96 is admitted and can be published now.

23     (Plaintiff's Exhibit 9 received in evidence)

24         MS. PRATT:  Thank you.

25  BY MS. PRATT:


                SADIE L. HERBERT, RPR, RCR
        901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Cross

1    Q.   Take a moment and review 96.

2         What position did Mr. Bitterman have in your

3    administration?

4    A.   Commander of patrol.

5    Q.   And what position did Shane Heiter have in your

6    administration?

7    A.   He was a commander at the lab.

8    Q.   What about Alex Kondos?

9    A.   Kondos was moved over to the training facility as a

10   commander.

11   Q.   And Flatrock, that just refers to the location of the

12   training facility?

13   A.   It's the name of the facility.  It's what Sheriff Darr

14   named it was Flatrock training facility.

15   Q.   And tell me, what position did Mr. Bungartz hold in your

16   administration?

17   A.   He was a patrol commander in charge of SWAT.

18   Q.   How about Mr. Nanney?

19   A.   Nanney was at the jail as a commander.

20   Q.   And Mr. Smalley?

21   A.   Smalley was a commander out east still.

22   Q.   So he stayed right in his same position?

23   A.   He did.

24   Q.   And what about Mr. Thede, what position did he hold in your

25   administration?

Reigenborn - Cross

 1    A.  Thede early on was in the jail.  He later moved in patrol.

 2    I actually moved him out east in the plains division because it

 3    was busy enough that we needed two commanders.

 4    Q.  Were all of these positions that we have highlighted here

 5    on Exhibit 96, were they all leadership positions?

 6    A.  They are.

 7    Q.  Are they all policymaking positions?

 8    A.  They are.

 9    Q.  In what way?

10    A.  I wouldn't know all of the policies that need to happen,

11    like Flatrock and things that need to be done out there to have

12    the training academy go smoothly.  I certainly don't know some

13    of the needs and unique demands of the out east job duties and

14    things that they would need out there.  And again, when you

15    talk about the lab, I have no idea how to run a lab.  I know

16    how to get the funding for the lab.

17    Q.  Why did you decide to keep these individuals from the

18    McIntosh administration in your administration?

19    A.  Some of them are just very valuable to the organization.

20    They had unique skills that -- we knew they possessed the

21    ability to carry forward what we were trying to accomplish and

22    that they would work good no matter what -- those people would

23    just say they're loyal to whoever is sitting behind the desk.

24    They didn't care what happened before.  They were going to come

25    in, and we had hoped that they would follow through with

Reigenborn - Cross

1    everything that we had asked them to do.  And the vast majority

2    of them did.

3    Q.  Now, Plaintiffs' counsel asked you some questions about

4    other individuals whose appointments you considered revoking,

5    but ultimately did not.  And I just want to go back through

6    some of those names again to refresh everybody's memory.

7            There was Mr. O'Neill.  Why did you decide to retain

8    Mr. O'Neill in your administration?

9    A.  He had come to me and said that he really wanted to stay.

10   He was going to be loyal to whoever the Sheriff is.  He would

11   take a demotion, he would go wherever we asked him to go, do

12   whatever we asked him and would carry forward -- he made it

13   pretty clear that he would carry forward our desires.  And by

14   that I mean, if we wanted to change from a blue shirt to a

15   black shirt, he was a hundred percent on board and he would

16   sell that in a positive light, not be negative, saying the old

17   man wants this, so that's what we're going to do.  More of,

18   hey, this is the reason.  And he would make sure that he was

19   carrying forward those wishes in a positive manner for us.

20   Q.  And what about Mr. Gerdeman, that was another person that

21   maybe you considered moving out of the organization, but

22   ultimately retained?

23   A.  We did.

24   Q.  Why was that?

25   A.  He was a -- he was a good, strong person, had some pretty

Reigenborn - Cross

1    good leadership qualities.  We just didn't have enough

2    commander positions, the way we were reorganizing things.  We

3    did demote him to a sergeant's position.  I don't remember

4    where he went, but we did retain him as a sergeant.

5    Q.  And what about Mr. Carillo?

6    A.  Mr. Carillo, we kept him.  He was demoted to a sergeant as

7    well.  And he bounced around in different assignments, because

8    he was pretty flexible with taking different assignments.  At

9    one point he oversaw the SROs, school resource officers.

10   Q.  And I think we talked about Mr. Gregory.  But again, you

11   retained Mr. Gregory; correct?

12   A.  I did.

13   Q.  Why was that?

14   A.  Well, he showed a desire to stay there.  He had a lot of

15   good qualities.  He was a good teacher, as far as he was an

16   instructor out at the academy, he taught firearms, Taser and

17   some other things.  And we were pretty confident that he could

18   carry forward our mission.

19        He was one of those folks that -- him and O'Neill were

20   some of those folks that, even when I would see them out there,

21   when we were campaigning, we were kind of on opposite sides;

22   they were working for a Republican, trying to keep him in

23   office, I'm a Democrat trying to come into office, and we still

24   had the ability to walk up to each other and just shake hands,

25   hey, how are you doing, have a conversation and we could still

Reigenborn - Cross

1   be friendly with each other and not adversarial.  They wouldn't

2   turn their backs and we could actually have conversations.

3          So when they told me that they would be able to stick

4   around and do what we needed, I believed them, because they had

5   shown through their character that this over here is work, work

6   has kind of shifted now that I was elected, and they would

7   follow through with my desires.

8   Q.  And why did you decide to retain Mr. Thede?

9   A.  Again, another good, strong individual, had a lot of

10  experience.  He had SWAT he was taking care of.  I believe he

11  was on JSOC, which is a jail special operations something, it's

12  kind of like a SWAT team inside the jail, but we also use them

13  for mobile field force and different things.  He just had a lot

14  of good qualities.  And he could have those difficult

15  discussions with folks, myself included, and said, here is what

16  is going on and what we need to fix.

17         And so again, he was one of those individuals that I

18  believed -- we initially demoted him for sergeant.  I think he

19  was a sergeant for less than a week.  It didn't effect his pay.

20  When we were reorganizing, we realized we were a position short

21  for commander, called him back in and see if he would take a

22  commander position, and he did.

23  Q.  Did you also retain a person named Tony Carvallo[ph]?

24  A.  Tony Carvallo was Sheriff McIntosh's brother-in-law.

25  Q.  Did Mr. Mitchell's daughter also work at the Adams County

Reigenborn - Cross

1    Sheriff's Office at the time you were elected?

2    A.  She did.  She worked in the lab.

3    Q.  Did you retain her?

4    A.  I did.

5    Q.  We have already looked here some at the organizational

6    structure, and the topic has come up about some reorganization

7    you were doing.  Could you please describe for the jury what

8    the nature of reorganization was that you were hoping to

9    accomplish.

10   A.  Sure.  When I took office, the McIntosh administration had

11   created two new positions in that four years, and that was

12   captain positions; one at the jail and one at patrol.  So it

13   went from division chief and then down to captain.  And then

14   the captains would oversee commanders.  And there were a number

15   of commander positions, who then would oversee the sergeants.

16   And so there were, at times, you had a division chief

17   overseeing one person being captain.  That captain would

18   oversee -- like patrol division, that captain oversaw, I

19   believe it was, six commanders.  I'd have to look at the org

20   chart to get the number.  When we looked at that, that was

21   putting the commanders overseeing about one and a half

22   sergeants, so 1.5.

23          And we were like, that's just a horrible waste of

24   resources that we have.  We have one and a half sergeants

25   reporting to a commander, who reports to a captain, who

Reigenborn - Cross

1    reports -- there were just a lot of singular layers there.  And

2    we were trying to eliminate that.

3           Because what we knew early on was patrol division had

4    six sergeants; three on one end of the week, three on the other

5    end of the week.  So Sunday through Wednesday had three

6    sergeants.  Wednesday through Saturday had three sergeants.

7    And so we knew that that wasn't enough sergeants because one

8    critical incident, that sergeant is tied up, we couldn't

9    resource another sergeant, that's it.

10          And so when I came in, I took some of those commander

11   positions, reallocated those into sergeant positions and put

12   two sergeants on every shift, so that meant there were six

13   sergeants on each end of the week.  And those six sergeants

14   reported to one commander who reported directly to the division

15   chief.  We took out a few layers in there, and information

16   flowed a little easier, I think, that way.

17   Q.  Did you find that structure to be more efficient?

18   A.  It was quite a bit more efficient.  Under the other

19   structure, when patrol sergeants would take vacation time, the

20   other two sergeants would be forced to work 12-hour shifts to

21   cover the gap, because they didn't want there not to be a time

22   without a sergeant on duty.  So it was a financial cost,

23   because we're paying the overtime.  But then it was also that

24   burnout, because the sergeants were working so many hours that

25   sergeants were actually making almost the same amount of pay

Reigenborn - Cross

1   with their overtime that a commander was making.

2   Q.  And also, could you explain what effect it has on line

3   level deputies to have greater coverage with a sergeant?

4   A.  Well, the sergeant is able to answer their questions a

5   little bit better.  If the sergeant is already tied up -- and

6   there's numerous times where we'll have several critical

7   incidences going at the same time -- we have the resources that

8   we can put a sergeant on each scene, give them some direction,

9   making sure that we were doing things correct and answering any

10  questions that they had.  So it's just a resource for the

11  deputies.

12          I don't remember what the number was for years of

13  service for our patrol division, but it was extremely young.

14  They didn't have a lot of experience.  And so you take a

15  patrolman that has 10 or 15 years of experience, but then you

16  had several more that only had a year or 18 months of

17  experience, and so they're still kind of learning, they're

18  still kind of a rookie, where you have an older veteran there.

19  It made it problematic, these younger folks just weren't making

20  real good decisions at times and didn't have good resources to

21  give them the information they need.

22  Q.  So was part of the solution to that to have more sergeants

23  available?

24  A.  Correct.

25  Q.  Let's turn back to Exhibit 96 again.  And I just want to

Reigenborn - Cross

1   focus on your division chiefs.  Starting with Division Chief

2   Dirk Budd in the detective division, why did you think Mr. Budd

3   would make a good chief in the detective division?

4   A.  Chief Budd had prior experience in New York as a detectives

5   lieutenant.  And so he was looking to somewhat advance his

6   career somewhat and was looking to relocate here in Colorado.

7   I interviewed him, and I liked the things that he was able to

8   relay, kind of bringing some of the ideas of, hey, in New York,

9   this was how we would handle some of these cases, this is how

10  we would do case management, different things like that he was

11  able to bring forward.  He had some other ideas he wanted to

12  get implemented, as far as let's get the crime lab up and

13  running a little more efficient, let's work on caseload between

14  the detectives and stuff.  So he just brought a lot of

15  experience at a higher rank level that I thought we needed.

16  Q.  Who did he replace?

17  A.  He replaced T.J. Coates.

18  Q.  Why did you think it was necessary to replace T.J. Coates?

19  A.  I felt that the detective division was kind of, for lack of

20  better words, being bullied.  There had been a wall built

21  between the detectives and the division chief and commanders.

22  Q.  A physical wall?

23  A.  A physical wall that was built separating the two of them.

24  Q.  Go ahead.

25  A.  It kind of made that division saying, we're over here,

Reigenborn - Cross

 1   you're over there.  There were -- when we tore that wall down,

 2   there were different pictures that were found in there saying,

 3   Chief Coates, please tear down this wall and different things

 4   like that.  So it pretty clear to us that the detective

 5   division probably felt that physical barrier as well.  So I --

 6   the other part of that was we just thought it was time for some

 7   new ideas.  We had been dealing with the same thought process

 8   and not making much advance with it under Coates being division

 9   chief.

10   Q.  Did Mr. Coates' support for Mr. McIntosh during the

11   election have anything to do with your decision-making?

12   A.  No.

13   Q.  Let's talk about Chris Laws.

14        You named Chris Laws to be the chief of the jail

15   division; is that right?

16   A.  Correct.

17   Q.  Why did you believe that Mr. Laws would make a good chief

18   in the jail division?

19   A.  Prior to me leaving in 2015, Chief Laws had been a

20   commander at the jail.  He was one of those individuals that

21   started as a maintenance man at the jail and worked every

22   single position there was at the jail.  So he knew the jail

23   inside and out.  He knew the contracts, whether that be the

24   food for the inmates, the laundry, where we got their uniforms,

25   the inmate clothing.  He was just very knowledgeable in every

Reigenborn - Cross

1    aspect of the jail.  And so it was important for me to have

2    somebody that had that knowledge to come in, because that's

3    kind of a unique position.

4    Q.  Who did he replace?

5    A.  He replaced Gene Claps.

6    Q.  Why did you believe it was necessary to replace Mr. Claps

7    at the jail division?

8    A.  Again, a lot of the staff at the jail felt that Mr. Claps

9    was extremely negative and hostile towards them, belittling

10   them, talking down to them, not really caring about daily

11   operations or how things should be or how employees felt.

12   Q.  And did at the time Mr. and now Sheriff Claps, did his

13   support for Mr. McIntosh during that election, did that have

14   anything to do with your decision?

15   A.  No.

16   Q.  Now, let's took at the chief of the patrol division.  I

17   believe that's Mark Toth; correct?

18   A.  Correct.

19   Q.  Why did you believe that Mr. Toth would make a good chief

20   at the patrol division?

21   A.  I had seen Toth at Mountain View Police Department and when

22   he worked at Westminster Police Department as a sergeant, and

23   he had pretty good people skills, employee-wise, he had a

24   genuine interest in making sure his employees were taken care

25   of, they have the resources that they need, whether that be

Reigenborn - Cross

1    jacks, spare tires, new report forms.  I mean, he really was

2    pretty in tune with a lot of that stuff.  So he was pretty

3    instrumental, I felt, to bring over, making sure patrol

4    division had everything they needed going forward.

5           There were just a lot of deficiencies that we kind of

6    felt just needed to be addressed.  One of those being we wanted

7    to move our patrol cars from all white patrol car into a black

8    and white so they would be more visible.  Certainly, after

9    starting out -- we certainly couldn't do all of our cars in

10   black and white, so as the new fleet was coming in, we were

11   marking those in black and white.  And we found, as soon as

12   those black and whites were hitting the streets, we were

13   getting calls saying, hey, thanks for being in our

14   neighborhood, we haven't seen you in forever.  So I think

15   people just become colorblind to an all white patrol car going

16   through their area.  And with a new design, they were able to

17   see the black and whites.

18   Q.  And Mr. Toth, I know you previously testified that you

19   worked with him at Mountain View; correct?

20   A.  Correct.

21   Q.  What size of a department is Mountain View?

22   A.  It's very small.  It's a sneeze of a town.

23   Q.  And I think you just mentioned that Mr. Toth also worked at

24   Westminster?

25   A.  Correct.

Reigenborn - Cross

1   Q.  What's your understanding of his experience at Westminster?

2   A.  Well, I know he was a patrol sergeant at one time.  That's

3   where I had most of my associations with him.  But he worked

4   special units, a team called Scat, where they targeted problem

5   areas and they were responsible for making some of those

6   problem areas -- they were doing directed patrols, targeting

7   that particularly, those areas.

8   Q.  Who did he replace, Mr. Toth?

9   A.  I don't remember.

10  Q.  Let's go back to Plaintiff's Exhibit 87.

11  A.  I believe it was O'Neill.

12  Q.  If we can just --

13  A.  It was O'Neill.

14       MS. PRATT:  Jon, if you can blow that up right in the

15  middle there.  Thank you.

16  Q.  Who is Mr. Toth replace?

17  A.  He replaced Terrance O'Neill.

18       MS. PRATT:  And now, let's go back to 96, please.

19  Q.  You did retain Mr. O'Neill?

20  A.  I did.

21  Q.  Where did he move to, again?

22  A.  He went to -- he did a short stint at headquarters as a

23  commander, and then I believe he moved over to the jail.

24  Q.  Now, at some point, Mr. Toth didn't work out for the Adams

25  County Sheriff's Office; is that right?

Reigenborn - Cross

1    A.  Correct.

2    Q.  Can you just briefly explain what happened?

3    A.  We -- Toth and I just started not seeing eye to eye

4    anymore, he wasn't really carrying out the wishes that we

5    needed done.

6         One of the complaints that I was getting from patrol

7    division was the overwhelming amount of memorial items for

8    Heath Gumm.  And so in the patrol briefing room, there were

9    four walls, and they were all covered with memorial stuff for

10   Heath Gumm.  Going down the main hallway, there was a bunch of

11   memorial stuff for Heath Gumm.  In the locker room, there was a

12   locker that was dedicated to Heath Gumm.  And so some of the

13   stuff had been up for over two years.

14        I asked him if he would just centralize that in one

15   area, maybe into the training area.  Because I had people that

16   were complaining about, look, I didn't know Heath Gumm, I

17   didn't know anything about him, I come into briefing, it kind

18   of sets a negative tone for me starting my shift, because I'm

19   seeing this memorial to somebody who passed away.  In the

20   locker room, I had several folks saying, look, I'm not using

21   the locker room, I'm not using the equipment room issued to me,

22   I don't change here because I'm in close proximity to this

23   memorial, can we just take it down, please.  It's been two

24   years.

25        Toth was having a hard time doing that.  When I

Reigenborn - Cross

1    finally confronted him about it, he came in one day and just

2    took everything down.  And I said, that's not what I asked you

3    to do.  He wasn't following my direction.

4             He was trying to have meetings with the other division

5    chiefs, where they were going to tell me how I was going to run

6    the division because I'm the division chief.  I said, that's

7    not how it works, you still answer to me.

8             So I think Toth had a little bit of difficulty

9    transitioning from me working for him to him working for me.  I

10   think there was a little difficulty there, so I just asked him

11   to resign.

12   Q.  Now, under your administration, the captain position was

13   eliminated; is that right?

14   A.  Correct.  We eliminated captains.

15   Q.  What position did Mark Mitchell hold in the prior

16   administration?

17   A.  He was a captain of patrol.

18   Q.  Why did you believe it was necessary not to retain

19   Mr. Mitchell?

20   A.  Mr. Mitchell had some sort of beef with me.  And he made it

21   pretty clear early on, in years prior, that there was some rub

22   between the two of us.  And I knew that he wouldn't follow with

23   any direction that I would give him.  It was going to be

24   contentious regardless of what I asked him to do.

25   Q.  Do you have any idea what the beef was about?

Reigenborn - Cross

 1   A.  I have no idea.

 2   Q.  Now, counsel asked you some questions about the opportunity

 3   to be heard meetings that you had with each one of the

 4   Plaintiffs.  Do you remember that line of questioning from this

 5   morning?

 6   A.  I do.

 7   Q.  When each of the four Plaintiffs came in to meet with you,

 8   had you made up your mind in a final way right before those

 9   meetings or not?

10   A.  Some of them no, I hadn't.  And --

11   Q.  Explain.

12   A.  Well, there was an incident with T.J. Coates.  He had come

13   in on the 9th.  I was in my office, which was across the way,

14   there was some distance between my office and the

15   undersheriff's office.  He came in, he was being verbal.  I

16   couldn't hear what the words were being said, I could just hear

17   the loud, raised voices, slamming on the desk and stuff.

18           And when I came out of my office, he was in the

19   undersheriff's office and just being loud and disruptive.  He

20   hadn't been served his paperwork yet saying that he was going

21   to have an opportunity to be heard.  He showed up at the

22   Sheriff's headquarters unannounced, uninvited, unsolicited,

23   throwing his keys on the table.  It was a glass tabletop,

24   almost like he was trying to break the glass tabletop, from

25   what it was described to me.  Saying, hey, I need some

Reigenborn - Cross

1    witnesses, I'm not going to let these -- whatever -- fire me --

2    I don't remember all the verbiage that was being used.  And I

3    could hear doors being slammed as he was walking out of

4    headquarters.

5    Q.  Anyone else, as far as the four Plaintiffs, whether or not

6    you had made up your mind to terminate their employment or not?

7    A.  I was probably hedging more towards letting Mitchell go,

8    but I suppose he probably could have came in and said something

9    to say, hey, I want to stay.  But I was more hedging towards,

10   let's just let him go because he's not going to -- after his

11   comments following me down the hallway, calling me a fucking

12   loser, I didn't really think that was going to work out.  But

13   you know, I didn't think Jim Morgen would work out either, and

14   he did.

15   Q.  What about Mr. Claps?

16   A.  Hadn't really made up my mind one way or the other.  But

17   like I had said even in the deposition, there wasn't much time

18   between him coming in, having his opportunity to be heard,

19   there's a short pause in there.  And then he says, and if I'm

20   going to retire, these are my demands.

21        So I kind of felt like, if you're going to come in,

22   you're going to have your opportunity to be heard.  I ask the

23   undersheriff if he has anything, and before I can come back and

24   say, here's what I'm thinking, I would like to retire, here's

25   what I need for retirement.  I'm paraphrasing.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Cross

1    Q.  And finally, Mr. Currier, had you made up your mind about

2    his employment?

3    A.  Not at all.

4    Q.  How so?

5    A.  I had actually intended on keeping Mr. Currier.  He and I

6    had a pretty good friendship through the years.  And I was kind

7    of waiting for him to just say, hey, I want to stay here.  Part

8    of following legal counsel, they were saying, you know, give

9    them the opportunity to hear the severance package, so if they

10   want to leave, they can take the severance package.  So that

11   was early on.  And so that was why we're letting him have that

12   opportunity.  It didn't really seem like he wanted to stick

13   around, like he was okay with leaving.  He even said, he said

14   at one point, it's okay, I understand, or something to that

15   effect.

16   Q.  Did Mr. Claps' support for then Sheriff McIntosh in the

17   election have anything to do with your decision-making?

18   A.  No.

19   Q.  Did Mr. Currier's support for then Sheriff McIntosh in the

20   election have anything at all to do with your decision-making?

21   A.  No.

22          MS. PRATT:  We can take down Exhibit 96.  Thank you.

23   Q.  Do you know a person named Doug Templeton?

24   A.  I do.

25   Q.  Who is he?

Reigenborn - Cross

1    A.  He was a sergeant that worked at the Sheriff's Office when

2    I was there.

3    Q.  Was he employed under your administration?

4    A.  He was.

5    Q.  Do you recall what division he was a sergeant in?

6    A.  I don't.

7    Q.  What happened with Mr. Templeton's employment?

8    A.  Ultimately, we severed employment with him.  There was a

9    series of events that just continued, and so I thought it best

10   to just sever our working relationship.

11   Q.  Describe that series of events, if you would, please.

12   A.  Sure.  He was an instructor out at Flatrock training

13   academy.  Flatrock, there's cadets that come from all over,

14   from other agencies.  There are some of our own cadets in

15   there, and then we fill the rest of those spots with people

16   from Thornton PD or La Junta or Arapahoe County, just whoever

17   has the need to get people certified.

18        He was out there teaching one day.  And during that

19   teaching, he said, who in here is not from this country.  And a

20   kid from -- sitting up in -- close to the front row from

21   Thornton PD raised his hand and he said, me, sir, I immigrated

22   from Mexico.  Templeton replied, you're the reason why we need

23   to build the wall.

24        Commander Kondos pulled him aside and said, we don't

25   make those kind of comments.  Don't do it again.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Cross

 1          A little while later, during more conversation,

 2     Templeton asked, who is the fastest runner in here.  That same

 3     kid raised his hand again and said, me, sir.  Templeton looked

 4     at him and said, guess it wouldn't matter if we built the wall,

 5     you would just run around it anyhow.

 6          With that, Commander Kondos asked Templeton to leave

 7     the facility.  So there was an IA on that.

 8          That process went through the undersheriff.  It never

 9     made it to me.  I didn't have that decision, because it never

10     came to me.

11     Q.  What was the result of the IA?

12     A.  He was found guilty.  I don't remember what the charges

13     were.  Probably unprofessional conduct.  He was suspended, so

14     he gave his badge and commission card to then Division Chief

15     Chris Laws that was held over at the jail.  I believe the

16     undersheriff gave him a two-week suspension.  And since he had

17     already been off work for two weeks, it was your two weeks will

18     be up on whatever day, go over to the jail, pick up your

19     equipment so you can go back to work.

20          He went over to the jail to pick up his badge and

21     commission card.  He was making small talk with -- I don't

22     remember her name -- one of the admin assistants over there.

23     And she said, how's your day going.  And he made a comment to

24     the effect of, just give me my shit so I can get the fuck out

25     of Adams County.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Cross

1          So again, unprofessional conduct that you just came

2     off of a two-week suspension from.  So I issued him an

3     opportunity to be heard.  He came in.  And I terminated him.

4     Q.  Now, during that IA into the racially charged comments that

5     Mr. Templeton made in the training class, did anyone suggest

6     adding any additional charges to that IA?

7     A.  Yes.  The IA commander, Susan Nielsen.

8     Q.  And what was the nature of the additional charges that

9     Commander Nielsen suggested?

10    A.  She wanted to charge him with truthfulness.

11    Q.  On what basis?

12    A.  At some point during his interview, I don't know -- I

13    didn't sit in on the interviews -- he had made some comment of,

14    I don't know what the issue is, I supported Rick, I'm a

15    registered democrat.  She did some investigative work and found

16    out that he didn't live in Adams County and he was a registered

17    Republican.  And so she felt that he lied about his party

18    affiliation, that he should be charged.  And I told her,

19    there's no way I'm going to add that in on the charges.

20    Q.  So that never even became part of the IA at all?

21    A.  Not that I'm aware of, no.

22    Q.  Did Mr. Templeton's political affiliation have any bearing

23    on your decision-making with regard to his employment?

24    A.  No.

25    Q.  Let's shift gears again and remind the jury, who was the

Reigenborn - Cross

 1   Sheriff of Adams County right before you came into office?

 2   A.  Mike McIntosh.

 3   Q.  Did Sheriff McIntosh, when he was in office, did he make

 4   changes to his command staff from time to time?

 5   A.  He did.

 6   Q.  Who was the Sheriff before McIntosh?

 7   A.  Sheriff Darr.

 8   Q.  And did Sheriff Darr also make changes to his command staff

 9   from time to time?

10   A.  He did, several times.

11   Q.  And you were aware of this because you were present and

12   working there?

13   A.  Correct.

14   Q.  Who was the Sheriff before Sheriff Darr?

15   A.  Sheriff Shearer.

16   Q.  Did Sheriff Shearer make changes to his command staff from

17   time to time?

18   A.  He did.

19   Q.  And how are you in a position to know that?

20   A.  I worked there as well, under Sheriff Shearer.

21   Q.  In total -- I know you had a break in your employment

22   between 2015 and when you took office in early 2019, but in

23   total, how many years did you work for the Adams County

24   Sheriff's Office?

25   A.  Just a little over 28 years.

Reigenborn - Cross

1   Q.  During your time working for Adams County Sheriff's Office,

2   before you became the Sheriff, how would you describe the

3   culture?

4   A.  It was very much the good old boys.  If you were a friend

5   of a friend, you were very well taken care of.  If you were

6   well liked, you were very well taken care of.  Testing

7   processes didn't seem very fair at all.

8        It was -- at times, people would be walking up for a

9   commander interview, they're still a sergeant, and you hear

10  them address them, hey, commander, how are you.  And they're

11  not even through the process.  And lo and behold, they become

12  the next commanders.

13  Q.  Did you feel like sometimes the testing process for

14  promotions was pre-ordained?

15  A.  Yeah, it was more of kissing the ring.  It wasn't anything

16  that was somewhat formal, other than putting your letter of

17  interest in and your résumé, which at the Sheriff's Office your

18  résumé really doesn't change a whole lot from year to year,

19  unless you are picking up additional training.

20  Q.  Did you have a personal experience with this in your time

21  working at the Adams County Sheriff's Office?

22  A.  I did.

23  Q.  Can you explain what that was?

24  A.  I had tested for sergeant a couple of times, and then even

25  after that, I had tested -- once I promoted to sergeant, I

Reigenborn - Cross

1    tested for commander.  And it was just very difficult to -- the

2    commander test, there was no written portion of that, it was

3    all just an oral board, very subjective.  And even if you --

4    it's just hard to say if you answered the -- if you answered

5    the question correctly, because you don't know what answer

6    they're looking for.

7    Q.  Did you ever apply to be on the SWAT team?

8    A.  I did.

9    Q.  Tell us about that application process, how that went for

10   you.

11   A.  I applied for the SWAT team a total of three times before

12   being allowed on the SWAT team.  The first time I applied, it

13   was myself and another individual.  We were the only two that

14   completed every portion of that testing, to include the

15   physical fitness portion of it, which was a mile and a half

16   run, situps, push-ups, dummy drags and all that stuff.  We were

17   the only two who completed every single phase.

18          And other individuals that could not pass the physical

19   fitness portion of it were selected, put on the SWAT team,

20   given six months probation to come in compliance.  When they

21   didn't, that opened up the SWAT testing again.

22          Tested again the second time.  Same thing happened.

23   We had passed everything, myself and another person, we passed

24   everything.  Other individuals were selected.

25          And the third time, as we were testing, I went and

                                                                          473
                         Reigenborn - Cross

1    spoke with Sheriff Darr.  I said, this ain't fair.  You got two

2    guys that are passing everything.  You have wasted an entire

3    year of training on folks that cannot meet the requirements of

4    the SWAT team, when you have two individuals that can, and you

5    are telling me this is fair.  And I was placed on the SWAT team

6    on my third try.

7    Q.  When you took office in early 2019, what about the culture

8    at the Adams County Sheriff's Office did you want to see

9    changed?

10   A.  Well, testing was one of those things that I wanted to see

11   changed.  I certainly didn't feel like that was fair by any

12   means.  Some of the disciplinary processes I wanted to see

13   changed.  And during some of that promotional process, I wanted

14   to add in some more formalized requirements so that it made it

15   a little more clear for people that wanted to advance their

16   careers.

17   Q.  Sorry, go ahead.

18   A.  I lost my train of thought.

19   Q.  All right.  What were some of the specific things that you

20   did in order to try to change the culture at the ACSO after you

21   took office?

22   A.  Well, part of that was restructuring some of the command

23   staff, doing away with some of the -- what I felt were unneeded

24   positions and bringing in some new leadership and trying to get

25   folks to get motivated again.

Reigenborn - Cross

1              People could kind of bring back that family atmosphere

2       type feeling that -- you know, they say it's a brotherhood of

3       blue, but if your kid was sick, it doesn't matter, you need to

4       be at work because I'm going to be shorthanded.  And for me, I

5       kind of had a different aspect.  If your kid is sick, you

6       probably ought to stay home, we'll figure this out.

7              We'll handle calls if we need to.  If it's in the

8       jail, we'll take care of things as we need to.  If that means

9       we lock it down -- the jail, at that time, was working a lot of

10      overtime, mandatory overtime.  We had folks that were taking

11      home pagers.  And if the pager went off, they had a set time

12      they had to report back to work or come in on their days off

13      and report for work because they were so shorthanded.

14             I had given Chris Laws a directive that I wanted the

15      pagers thrown away.  If you are short, figure it out.  But let

16      these folks have their days off.

17             I tried to be respectful of folks' time off, because

18      it's a tough job and it's tougher when you start getting

19      burnout and don't have any personal time to take care of your

20      family.  It's different if they are making the choice and

21      signing up for the overtime and wanting the money, as opposed

22      to being forced to do it.

23      Q.  In your mind, did each of the Plaintiffs contribute to the

24      negative culture at the Adams County Sheriff's Office?

25      A.  Absolutely.

475
Reigenborn - Cross

1    Q.  Let's take it one at a time.

2          How did Mr. Claps contribute to that negative culture?

3    A.  It was just with him kind of boasting to folks saying that

4    he's the hatchetman, I think that kind of made folks uneasy.

5    But then his demeanor towards folks, when he would talk down to

6    them, just really didn't have any empathy towards anything that

7    they could be going through, just kind of being nasty.

8    Q.  And what about Mr. Coates, what about his behavior

9    contributed to the negative culture at ACSO?

10   A.  Coates was just -- he was a bully.  I think we have all

11   been around those folks that are bullies.  Sometimes it's not

12   what you say, it's how you say it.  It's more of, well, or you

13   know, the way you are projecting your voice.  So there were

14   times when he could -- he was definitely kind of that bully.

15   And he would, at times, try to interject humor into it.  But

16   the problem is you're a division chief and people don't receive

17   that well.

18          I remember being a young deputy and, you know, a

19   lieutenant or a commander walked down the hallway, and I was

20   like, oh, my goodness, what are they doing here, because

21   obviously something was wrong.  And I think that's just

22   probably in law enforcement, that when you are in those

23   positions, you are no longer one of them.  You're the ivory

24   tower.  You are something completely different.  And if you

25   come in that workspace with them, it's very threatening.  So I

Reigenborn - Cross

1    think you have to address it differently.  And Coates didn't

2    realize he was no longer the patrolman that he could talk to

3    the troops the same way he did when he was line staff.  He was

4    no longer line staff.

5    Q.  Do you remember anything about an incident with Mr. Coates

6    during a command staff meeting?

7    A.  I do.

8    Q.  What can you tell us about that?

9    A.  We were at a staff meeting, so it was sergeants and above.

10   We were at the jail.  Mr. Coates was standing at the back of

11   the room.  Sheriff Darr was at the front of the room.  Coates

12   could be kind of loud at times and condescending or disruptive,

13   and he was at the back of the room making comments about

14   Sheriff Darr.  I was sitting two rows from the very back and he

15   was standing up at the back.

16          It got so disruptive that the Sheriff actually stopped

17   and said, do you have something you need to contribute.  And

18   Coates said, I don't.  With that, Coates was very quiet.  But

19   it was certainly disruptive to those of us that were trying to

20   sit in the meeting and listen to what the Sheriff had to say.

21   Q.  Do you also have any recollection of a call that you

22   responded to that involved a man who was in a barricade

23   situation and he had a gun?

24   A.  I do.

25   Q.  Tell us about that incident.

Reigenborn - Cross

1  A.  We had a man that was with a gun, I believe the general

2  area was 70th and Santa Fe.  We had dealt with this individual

3  before.  It was somebody we had dealt with numerous times, and

4  so we kind of knew that he was trying to put us in a situation

5  that was suicide by cop.  He would come out with weapons and

6  try and get us to shoot him, kill him, hurt him, whatever.

7  Q.  I'm sorry to interject, but what position were you in at

8  the time of this incident?

9  A.  I was a patrol sergeant.

10  Q.  Please go ahead.

11  A.  So we've got trainees riding with their field training

12  officers, we've got several of us out there trying to deal with

13  the situation, trying to do it safely, trying to make sure we

14  don't hurt this individual if we don't have to.  T.J. Coates

15  rolled up, jumps out of his patrol car, grabs a shotgun in one

16  hand and says, I got it.  Racks the shotgun and goes walking

17  past everybody into the backyard.  Now everybody is trying to

18  leave cover, giving up our positions of safety to follow the

19  division chief into the backyard to deal with a man with a gun,

20  which could have resulted in the person being shot.  We were

21  forcing an issue that didn't need to be forced.

22  Q.  Could that also have resulted in that individual shooting

23  at police officers?

24  A.  Correct, it could have.

25  Q.  An officer could have been injured or killed; correct?

Reigenborn - Cross

1   A.  Correct.

2   Q.  What did that behavior indicate to you?

3   A.  Well, it certainly went against everything we were trying

4   to teach the trainees about trying to remain safe, trying to

5   make sure we don't hurt the civilian, the party as much as we

6   can, right.  So it went against all of the training, to say

7   this isn't what we -- we're not leaving our position of cover.

8   We were at that point where we should have been what we call a

9   call out, we're calling the guy to us, we're trying to

10  negotiate with him.

11        I believe I had a negotiator on the way.  I had a

12  negotiator that worked on my shift, so when we had issues like

13  that, I would call that SWAT negotiator.  Even though it wasn't

14  a SWAT call out, she had the additional training, so it's, hey,

15  I need you to come over and negotiate with these folks and try

16  to get them to put down whatever they're going to do.  And she

17  was quite successful at that.  And so I believe I had Sarah

18  Hanson, at the time, on her way over to negotiate with this

19  gentleman when that happened.

20        And so I had to go to Coates' division chief, I went

21  to my commander and I said, you've got to do something with

22  Coates, this is just out of control, somebody is going to get

23  hurt.  We can't keep doing this stuff.  It goes against

24  everything that we're trained.

25  Q.  In your view, did Mr. Coates engage in what you considered

Reigenborn - Cross

1   to be inappropriate behavior in the workplace?

2   A.  I did.

3   Q.  How so?

4   A.  Mr. Coates had a Barbie doll, a naked Barbie doll he called

5   Little Suzie that he kept in his top drawer of his desk.

6   Q.  How are you aware of that?

7   A.  He pulled it out while I was there several times.

8   Q.  And did he say anything or make any gestures with this

9   Little Suzie doll?

10  A.  He did.  He would always make inappropriate comments, you

11  know, grab it on the breast or in the vagina area and say, oh,

12  Little Suzie and making comments about it.

13  Q.  Are you aware of any other types of inappropriate behaviors

14  by Mr. Coates?

15  A.  Mr. Coates kept in the bottom drawer of his desk, he kept

16  essentially a hit file.  And that was any deputies that he

17  wanted to target, he was building a case on each and every one

18  of them.  And the one name I remember seeing in that file when

19  he pulled it open was a deputy that used to work here by the

20  name of Jeff Stovall[ph].  I don't know what his beef was with

21  him.

22          But there were several files.  And I assume they were

23  all different people that he targeted.

24          At one point, he said, if you got elected Sheriff,

25  would you be willing to have files like this and document

Reigenborn - Cross

```
1   everything you can and get rid of these people.  Paraphrasing.

2   It's not exactly his words.

3   Q.  Understood.

4         And these are files outside the normal personnel

5   system; am I understanding you correctly?

6   A.  Correct.  There was another room that had personnel files,

7   plus headquarters had personnel files.  The patrol division had

8   a special room.  Those files were locked inside a locked room.

9   Q.  Are you aware of any other inappropriate behavior by

10  Mr. Coates?

11  A.  There was just so much.  I didn't -- I'm struggling to

12  remember everything.

13  Q.  Fair enough.

14        What about Mr. Mitchell, how long have you known

15  Mr. Mitchell?

16  A.  I have known Mitchell since high school.  We went to high

17  school together.

18  Q.  And have you had ample opportunity to observe his behavior

19  and demeanor while employed at the Adams County Sheriff's

20  Office?

21  A.  I have.

22  Q.  Have you ever observed Mr. Mitchell engaged in any sort of

23  inappropriate behavior, in your view?

24  A.  Yeah.

25  Q.  How so?
```

Reigenborn - Cross

1    A.  There was a rumor going around that he was having a

2    relationship with one of the female deputies when he was a

3    commander, sitting with her in his patrol car several times.  I

4    certainly wouldn't think that if you knew those rumors were

5    floating about you and you're a commander, you wouldn't have

6    that person in your patrol car with you.

7    Q.  Do you recall anything about an incident with Mr. Mitchell

8    after you made a suggestion about a certain type of report?

9    A.  I do.

10   Q.  What can you tell us about that?

11   A.  We were meeting because we keep what's called a DFAR, daily

12   field activity report.  Patrol always kept those.  And so we

13   were looking to see how we could make that report that we

14   did -- and it was just the times of your call, location of your

15   call and the nature of the call and how you cleared it, so how

16   many minutes you spent on there.  And so we were trying to

17   figure out, how can we go from just, here's my 10-hour shift,

18   now I'm in overtime, how do we get this to relay over.

19        Because if you are out on a major crime seen and it

20   started three quarters of the way through your shift and you

21   are now held over, how do we start that second DFAR.  And so it

22   got pretty contentious at some point when we were having those

23   conversation.

24   Q.  Do you remember anything about what he said to you about

25   that?

Reigenborn - Cross

1   A.  I do.

2   Q.  What did he say?

3   A.  Well, I was trying to make the suggestion of this could be

4   DFAR schedule one, your primary duty.  We could switch that

5   over to schedule two, whatever number, A, B, whatever,

6   designate it some way like that and have it continue on.  You

7   start a new form, but it would just end here, start there.

8        Mitchell, at some point -- the room was filled with

9   folks from -- deputies that were FTOs, usually, is what most of

10  them were, FTOs --

11  Q.  What's an FTO?

12  A.  Field training officer.

13  Q.  Go ahead.

14  A.  The IT department was there because they were trying to

15  explain how they could do the forms in there.  At some point, I

16  guess Mitchell became frustrated with me, and he's like, well,

17  Rick, that's not how we're going to do things, Rick.  And if

18  you don't like it, Rick.  And he just kept that line of -- it

19  wasn't even conversation.  It was just verbal bashing towards

20  me.

21  Q.  That was in front of how many people?

22  A.  The room was fairly full.  There was probably 18, 20 of us

23  in the room.

24  Q.  What about that, in your view, was inappropriate?

25  A.  Well, at a commander's level, you would expect him to be a

Reigenborn - Cross

1  little more professional than that.  I was there trying to

2  help.  I was trying to be part of the solution, not trying to

3  be obstinate.  I was truly there trying to make things better.

4         As a sergeant, I didn't have to the fill out DFARs, so

5  it really didn't affect me a whole lot, other than, at the end

6  of the day when I needed to start approving those forms as they

7  come in.

8  Q.  Do you also have any knowledge about an incident involving

9  Mr. Mitchell during the Aurora theater shooting response?

10  A.  I do.

11  Q.  What do you know about that?

12  A.  I was working as a patrol sergeant that night.  And the

13  Aurora shooting happened.  Our SWAT team was activated.  And we

14  could -- since they're on our channel, they're using our

15  channel to talk to dispatch, ADCOM's -- Adams County

16  Communication Center, they're using -- the SWAT team are using

17  our radio to say, hey, where does Aurora want us, where do they

18  need us to set up, where do we need to respond to.  And so

19  these questions are coming in, but Aurora is fairly busy.

20  Dispatch is trying to get the information of where they want

21  the SWAT truck to go, where they want the bearcat.  And at some

22  point, it was pretty apparent, because Mitchell gets on the

23  radio and says, check with Aurora, see where they want us.  If

24  they don't need us, we're going to take our toys and we're

25  going to go home.

Reigenborn - Cross

 1              Again, that's not an appropriate response when you are

 2     dealing with a mass casualty like that.  You know that's going

 3     to be probably aired at some point.

 4              And so I tried to keep our radio traffic always pretty

 5     consistent, that -- if we were to have a homicide, what I want

 6     five minutes before that homicide on the radio, I don't want

 7     people screwing around on the radio.  I want it to be

 8     professional the whole time and nobody screwing around.

 9              So this wasn't very professional.  And I know Aurora

10     didn't hear it, but I feared that that would have gotten out at

11     some point.

12     Q.  And just on the off chance that anyone in this room does

13     not know what happened at the Aurora theater shooting, just

14     brief description of how serious an event that was.

15     A.  That was the shooting where an individual went into a movie

16     theater and started -- opened fire.  I don't remember how many

17     victims there were on that, but there were a number of victims,

18     both fatally and wounded.

19     Q.  Now, after you were elected Sheriff in November of 2018, we

20     have heard some testimony, I believe you have already talked

21     about some meet and greet meetings that you had with various

22     staff members.  Did you have one of those meet and greet

23     meetings with Mr. Mitchell?

24     A.  I did.

25     Q.  What happened at that meeting?

Reigenborn - Cross

1    A.  Obviously, I knew Mitchell.  Undersheriff McLallan did not

2    know Mark at the time.  When he came in, he makes -- I don't

3    remember exactly how it was worded, but something to the effect

4    of, hey, Tommie, how are you.  You know, Rick always wanted to

5    bang my sister in high school.  And I thought that was kind of

6    inappropriate.  We're talking about something -- we haven't

7    been in high school in over 40 years.  It kind of just seemed

8    odd to bring that up.

9    Q.  How long have you known Kevin Currier?

10   A.  I knew Currier when he came to patrol.  I really don't know

11   what year.  I would be guessing.  Probably '95, '96, somewhere

12   in there.  We became friends working on the same shift.

13   Q.  So fair to say, 20 years or more?

14   A.  Yes.

15   Q.  Did you have any opportunity to observe Mr. Currier's

16   behavior during your employment at Adams County Sheriff's

17   Office?

18   A.  Yes, I did.

19   Q.  What specifically did you observe about Mr. Currier's

20   behavior?

21   A.  Kevin would -- he was assigned to detective division.  I

22   don't remember if he was a sergeant or a commander, but he

23   would come down and he would be complaining to Chief Coates

24   about how patrol screwed this up, how they screwed that up.

25   But he wouldn't give us the -- he wouldn't give us, being the

486
Reigenborn - Cross

1    sergeants, a chance to address any of the issues that he's

2    bringing up.  He'd bring it to Coates.

3            Coates would get all fired up and start ranting and

4    raving at patrol sergeants, because you guys all know better,

5    this shouldn't happen.  And some of it was just trivial stuff.

6    Why are you yelling at us over somebody didn't go knock on a

7    door three doors down, four doors down at 2 in the morning.

8            So Kevin was kind of -- I always referred to him as

9    being that shit stirrer.  So he would kind of just stir

10    problems.  And when I confronted him once about it, he's like,

11    you know I don't mean anything about it, it's just kind of if I

12    can get Coates stirred up.

13    Q.  What did you think of that?

14    A.  I didn't like it, because I was on the receiving end of

15    Coates being stirred up.

16    Q.  In your view, did Mr. Currier's behavior have any impact on

17    morale?

18    A.  Oh, of course.

19    Q.  How so?

20    A.  Well, because patrol deputies don't like being yelled at by

21    a division chief either.  And certainly, some of that stuff is

22    kind of trivial.  It's -- detectives can go back and do some of

23    that follow up.  It doesn't have to happen that night at 2 in

24    the morning or whatever time it would happen to be.

25            There were times where the deputies would say, hey, we

487

Reigenborn - Cross

1    tried.  It is just didn't work out the way that they wanted it

2    to work out.

3    Q.  Do you recall an incident in which Mr. Currier and

4    Mr. Coates responded to the scene of a suicide?

5    A.  I do.

6    Q.  Were you also present at that scene?

7    A.  I was.

8    Q.  What happened?

9    A.  That was shortly after the election in 2018[sic].  And they

10   pulled up to a suicide, and I told them that the scene was

11   secured, there's nothing really to see in there.  They weren't

12   listening to me at all.  They just walked right past me and

13   into the crime scene.  And so I just instructed the deputy that

14   was running the crime scene log, I'm like, make sure you log

15   them into the crime scene because they're contaminating it.

16   Typically, you don't do that.  Typically, the commander or the

17   division chief stay out of that area and let the detectives or

18   the crime lab come in and gather that evidence.

19   Q.  How would you describe your working relationship with

20   Mr. Currier?

21   A.  It just depends.  There were times where it was pretty

22   good, and then there's other times where, because he's stirring

23   the pot, I would just avoid him because I didn't want the wrath

24   of other people being irritated.

25   Q.  Why did you believe that Mr. Currier could be retained in

Reigenborn - Cross

1    your administration, but maybe not?  I mean, if you could

2    clarify that some.

3    A.  Yeah, I thought if I had the conversation with him, if he

4    wanted to stick around -- but it certainly didn't feel like he

5    wanted to stick around -- I thought I could explain to him,

6    that kind of behavior of stirring the pot is just not

7    acceptable.  Let's go back to the way things should be of, you

8    have an issue with somebody, go approach them and take care of

9    the issue, instead of stirring the pot and causing more

10   problems for somebody else.

11   Q.  Did you also have one of those meet and greet meetings with

12   Mr. Currier after you were elected?

13   A.  I did.

14   Q.  Did anything notable happen at that meeting?

15   A.  Nothing that sticks out in my head.

16   Q.  Overall, what were you trying to accomplish with respect to

17   changing the culture at the Adams County Sheriff's Office?

18   A.  I really wanted us to get away from the good old boys and

19   taking care of our friends.  I wanted there to be fair testing

20   processes.  I want people to be treated fairly.  I wanted

21   people to be treated with respect and not have fear and

22   intimidation ruling how they operated.

23        I didn't want people walking the floor of the jail or

24   patrol walking the streets wondering, does my administration

25   have my back if something goes bad.  I just -- I wanted them to

Reigenborn - Cross

1    know that this administration was there to support them, they

2    were there to give them the tools that they needed.  They could

3    actually have a voice and not fear retaliation from having a

4    voice.

5    Q.  Do you think that the Plaintiffs in this case -- Mr. Claps,

6    Mr. Coates, Mr. Mitchell, Mr. Currier -- would they have

7    supported you in that vision for the Adams County Sheriff's

8    Office?

9    A.  I don't believe they would.

10   Q.  Have we talked about the nature of the behavior problems

11   that led you to that conclusion?

12   A.  Yes.

13   Q.  Are we missing anything?

14   A.  Not that I'm aware of.

15   Q.  And did any of the Plaintiffs' political affiliation or

16   support for your opponent in the election have any bearing at

17   all on your decision-making?

18   A.  No.

19   Q.  You didn't conduct any internal investigations into the

20   Plaintiffs' behavior; correct?

21   A.  Correct.

22   Q.  Why did you decide not to conduct internal affairs

23   investigations?

24   A.  I've known all these individuals 10 plus years.  I knew

25   what their behavior was.  I knew their behavior wasn't likely

Reigenborn - Cross

1  to change.

2  Q.  Now, after you took office and started to try to implement

3  some of these changes, as we have discussed, what did you

4  observe about morale within the department?

5  A.  I thought morale was getting better.  I had several people

6  tell me they enjoyed coming to work.  People seemed to be a

7  little more relaxed.

8       I had a fairly loose open door policy.  I can tell you

9  that quite often my day would be interrupted with folks just

10  dropping in to say hi and chitchat.  And not always work, there

11  were times people were just chitchatting about life in general.

12       I've got pictures of guys that would come in, and they

13  would sit at my desk when I wasn't there, put their feet up on

14  the desk, snap a picture.  And they would send me those

15  pictures and say, hey, I was here and you weren't.

16  Q.  What did you take that to mean?

17  A.  It was kind of that razzing, that they didn't think I was

18  working and they were.

19  Q.  I see.

20       When you took office, how many vacant positions were

21  there at the Adams County Sheriff's Office?

22  A.  I don't remember the hard numbers.  I believe it was over

23  60 positions that were vacant.  And that did not include what

24  the county commissioners call overhire.  So that meant that we

25  were allocated, I believe, 620 or 618, and they would allow us

Reigenborn - Cross

1    to go over that number by 50 without really balking a whole

2    lot, because they knew, just through normal attrition, that

3    folks would leave for retirements and different issues that

4    would come up.

5    Q.  Is understaffing a problem for law enforcement agencies?

6    A.  It is.

7    Q.  How so?

8    A.  Well, it makes it difficult to staff the streets or staff

9    the jail or courthouses when we don't have the personnel.  Some

10   of those things you can slow down a little bit.  So the jail,

11   you can kind of slow that down a little bit, you can kind of

12   lock the inmates up and keep them in their cells a little bit

13   more.

14        But when it comes to patrol division, that's one of

15   those critical things of you don't -- you can't slow down the

16   calls for service.  You can prioritize them.  There are some

17   that you are probably just not going to get to, much like on

18   the 4th of July, you're not going to get to every fireworks

19   complaint.

20        So it's a safety issue, regardless of what division

21   that is, short of detective division, because detective

22   division doesn't -- if they're not there, we'll just set

23   somebody on the crime scene and let it sit.

24   Q.  Does understaffing -- I think you have touched on this, but

25   it sounds like what you are saying is understaffing can impact


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Cross

1    both safety and the community at large.  Can you describe a

2    little bit more about what that means, in practical terms.

3    A.  It affects the safety of the community, and it affects the

4    safety of the officers, because you may not have enough

5    officers to send to a call.

6            Domestic violence is a routine, two officer response.

7    If you don't have two officers to send, do you just say, tough,

8    and let them just figure it out until you can get a car over

9    there or two?  So it becomes safety for the citizens.  Whether

10   it's an armed robbery at a business, an alarm, a burglar alarm

11   or whatever, bar fights.  You've got to have the resources

12   available.

13           And when you start mandatorily holding folks over and

14   not giving them a choice, they kind of get tired after a while

15   of working six days out of a seven-day week with one day off.

16   And they're probably not their sharpest that they need to be to

17   pay attention to the things going on around them or their

18   partners.

19   Q.  Within the first two years of your administration, what

20   happened to the number of vacancies?

21   A.  At one point, we were fully staffed, with the exception of

22   the overhires.  We were using those overhires to fill cadet

23   positions at the academy.  But we were fully staffed at one

24   point.

25   Q.  Is that also something that you wanted to accomplish for

Reigenborn - Cross

1    the ACSO?

2    A.  It was.

3         MS. PRATT:  Jon, if you could please pull up

4    Defendant's Exhibit W.

5    Q.  Mr. Reigenborn, do you recognize Exhibit W?

6         There's two pages.  Certainly, Jon can scroll for you.

7    A.  I do.

8    Q.  Who is the author of Exhibit W?

9    A.  I was.

10   Q.  Was it part of your duties as Sheriff to communicate with

11   the employees of the ACSO?

12   A.  It was.

13   Q.  Did you regularly create memoranda like this to communicate

14   with other employees at the ACSO?

15   A.  Yeah.  Sometimes it was easier to put a memo out or an

16   email out because of the different shift work that everybody

17   did.

18   Q.  And was this memorandum something that was kept in the

19   regular course of your duties as Sheriff?

20   A.  It was.

21        MS. PRATT:  Your Honor, I move for admission of

22   Exhibit W.

23        THE COURT:  Any objection?

24        MR. BOHNET-GOMEZ:  Yes, your Honor.  It's hearsay.

25   It's not a business record.  It's a bespoke letter.  And

                              494
                    Reigenborn - Cross

 1    there's been no foundation on business records.

 2              MS. PRATT:  Your Honor, may we approach.  I have a

 3    couple of other points.

 4              THE COURT:  Please.

 5         (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reigenborn - Cross

1      (At sidebar)

2           THE COURT:  He drafted it.  What is your --

3           MR. BOHNET-GOMEZ:  For it to be a business record and

4   qualify for that exception, there needs to be regular

5   procedures of making these records.  This is just a letter he

6   wrote.

7           THE COURT:  What is the purpose of admitting it?

8           MS. PRATT:  The purpose of admitting the letter is it

9   rehabilitates his credibility, which has been attacked on

10  several grounds during his examination, because it is a

11  memorandum written close in time explaining his thought

12  process.  So it also comes in under 803(3) as a present sense

13  impression.

14          Finally, if not that, I think it's nonhearsay, because

15  it's being used to rehabilitate his credibility that's been

16  attacked on another basis, that would be 801(d)(2).

17          MR. BOHNET-GOMEZ:  It's extrinsic evidence being used

18  to bolster credibility.  This is extrinsic evidence that

19  counsel said is going to be used to rehabilitate his

20  credibility.  It's inadmissible under 806(b).

21          The letter is hearsay and extrinsic evidence in order

22  to bolster credibility.

23          MS. PRATT:  It's not to bolster.  His credibility has

24  been attacked, in which case I get to rehabilitate it.

25          MR. BOHNET-GOMEZ:  Not with extrinsic evidence.

1          THE COURT:  Let's give the jury a 10-minute break.

2          (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reigenborn - Cross

 1       (In open court; jury present)

 2           THE COURT:  Members of the jury, this is one of those

 3   times that I mentioned in preliminary instructions where

 4   things -- an issue has arisen that I think will be more

 5   efficiently dealt with here in open court, but outside the

 6   presence of the jury.

 7           It's not quite time for our afternoon break, but why

 8   don't we nevertheless take a 15-minute break until 2:35 so I

 9   can take this up.  And then, if we can make it the rest of the

10   day without another break, that's great.  If I start to feel or

11   you start to feel you need another break, we can certainly take

12   another one.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury not present)

2            THE COURT:  Give me just a moment to read it so I have

3    a better sense of what exactly it says.

4            MS. PRATT:  Your Honor, if I may address a couple of

5    additional points.

6            THE COURT:  Yes, go ahead.

7            First, what's the purpose of admitting this document?

8            MS. PRATT:  Well, Plaintiffs have argued throughout

9    this case that then Sheriff Reigenborn terminated their

10   employment specifically because of their political support of

11   his opponent.  And in my view, his prior consistent statement

12   should come in as nonhearsay under 801(d)(2).  The rule states,

13   a statement that meets the following conditions is not hearsay:

14   The declarant testifies and is subject to cross-examination

15   about a prior statement and the statement is consistent with

16   the declarant's testimony and is offered to rehabilitate the

17   declarant's credibility as a witness when attacked on another

18   ground.

19           They have obviously attacked Mr. Reigenborn's

20   credibility on a number of grounds, including that his stated

21   reasons for why he terminated their employment were not true

22   and that it was all politically motivated.  So I think this

23   rehabilitates him, because it is a prior consistent statement

24   made close in time to these events.  This memo is dated

25   January 29th, 2019, shortly after he took office.  And the

1    content of the memo speaks to the consistency with his position

2    here today at trial.

3         MR. BOHNET-GOMEZ:  Your Honor, it's not a prior

4    statement.  It's an after-the-fact statement.  These gentleman

5    were terminated at least as of January 15th.

6         MS. PRATT:  Your Honor, a prior consistent statement

7    means prior to today's testimony.  It doesn't mean that it

8    predates the underlying action.

9         THE COURT:  Well, it says it's to rebut an express or

10   implied charge that declarant recently fabricated it or acted

11   from a recent improper influence or motive in so testifying.

12   That's not the allegation here.  It's not that he's

13   fabricated --

14        MS. PRATT:  Your Honor, the Plaintiffs have taken the

15   position that Mr. Reigenborn came up with this, that their bad

16   behavior was the reason for their termination expressly as part

17   of this litigation.  That has been part of the accusation in

18   this case.  So I do think this comes under 801(d)(1)(B)(2).

19        THE COURT:  Well, are you arguing (b)(2) or (b)(1)?

20   (b)(2) is to rehabilitate the declarant's credibility as a

21   witness.

22        MS. PRATT:  Both.

23        THE COURT:  What is the other ground that his

24   credibility has been attacked that this would rehabilitate?

25        MS. PRATT:  Well, they have attacked his credibility

500

1   on a number of grounds, of course, including based on criminal

2   conviction, based on -- they have essentially tried to paint

3   Mr. Reigenborn as a liar, just at large, based on personal

4   conduct, based on the alleged forgery charge.  Obviously,

5   forgery has an inherent dishonesty element to it, in which case

6   I think this memo comes in under either one of those purposes.

7           THE COURT:  How does it rehabilitate anything having

8   to do with forgery or any other grounds that he has been

9   attacked on?

10          MS. PRATT:  I'll withdraw that.

11          I think it does come in, though, to rebut the express

12  or implied charge that he recently fabricated this

13  justification.

14          THE COURT:  I'm going to take -- while the jury is

15  already out, I'm going to take a brief recess too, five or ten

16  minutes worth of research on this.  And then when I come back

17  out, before we bring the jury in, I'll issue a ruling

18  beforehand.

19          MS. PRATT:  Thank you.

20          (Recess)

21          THE COURT:  The Supreme Court addressed

22  801(d)(1)(B)(1) in Tome v. United States, 513 US 150.  In

23  there, the Supreme Court said, as follows -- and this is at

24  157 -- Rule 801 defines prior consistent statements as

25  nonhearsay only if they are offered to rebut a charge of recent

 1    fabrication or improper influence or motive.  And then it says,

 2    admissibility under the rules is confined to those statements

 3    offered to rebut a charge of recent fabrication or improper

 4    influence or motive, the same phrase used by the advisory

 5    committee in its description of the judicial common law of

 6    evidence, which was the background against which was drafted.

 7    Prior consistent statements may not be admitted to counter all

 8    forms of impeachment or to bolster the witness merely because

 9    she has been discredited.  It goes on to say, the limitation is

10    instructive not only to establish the preconditions of

11    admissibility, but also to reenforce the significance of the

12    requirement that the consistent statements must have been made

13    before the alleged influence or motive to fabricate arose.

14    That is to say, the forms of impeachment within the rule's

15    coverage are the ones in which the temporal requirement makes

16    the most sense.  Impeachment by charging with the testimony

17    that a recent fabrication or results from an improper influence

18    or motive is, as a general rule, capable of direct and forceful

19    reputation through introduction of out-of-court statements that

20    predate the alleged fabrication, influence or motive.  A

21    consistent statement that predates the motive is a square

22    rebuttal of the charge that the testimony was contrived as a

23    consequence of that motive.  By contrast, prior consistent

24    statements carry little rebuttal force when most other types of

25    impeachment are involved.

1          Here, the allegation of improper motive or influence

2    is made at the time of the firing, the -- Sheriff Reigenborn

3    had the improper motive or influence.  The statement that is

4    attempting to be introduced is dated January 29th, which is two

5    to three weeks after that termination.  And so therefore, this

6    does not fall within Rule 801(d)(1)(B)(1), and therefore, I

7    sustain the objection to this exhibit.

8          Let's get our jury back in, and hopefully not have to

9    take another break moving forward.

10          About how much longer do you have with Sheriff

11   Reigenborn?

12          MS. PRATT:  Five minutes, maybe ten.

13          THE COURT:  Okay.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Reigenborn - Cross

```
 1        (In open court; jury present)

 2             THE COURT:  Just a reminder that you are still under

 3   oath.

 4             THE WITNESS:  Thank you.

 5   BY MS. PRATT:

 6   Q.  Mr. Reigenborn, you have in front of you Exhibit W on the

 7   screen; correct?

 8   A.  Correct.

 9   Q.  Now, you took office in early January of 2019; correct?

10   A.  Correct.

11   Q.  What was the date you were sworn in?

12   A.  I believe it was January 8th.

13   Q.  Fair to say that, shortly thereafter, you made some major

14   changes to the structure and command staff of the Adams County

15   Sheriff's Office?

16   A.  Correct.

17             MR. BOHNET-GOMEZ:  Your Honor, I object to having the

18   exhibit in front of the witness.  There's been no foundation

19   for refreshing recollection.

20             THE COURT:  Sustained.

21             MS. PRATT:  We can take it down.

22   BY MS. PRATT:

23   Q.  After you were elected and made some of these changes, was

24   there ever a time that came that you wanted to explain the

25   basis for your decisions to the Adams County Sheriff's Office
```

                                                                        504
                          Reigenborn - Cross

1   employees?

2   A.   There was, yes.

3   Q.   How did that come about?

4   A.   I just felt like the employees didn't have a clear sense of

5   where we were going, what we were -- the changes that were

6   being made.  And some of them were concerned.  And so I drafted

7   a letter and sent it out agency-wide explaining how we were

8   moving -- we called it ELT, executive leader team -- how we

9   were moving the ELT and who was going to be in what positions

10  and what they could expect for -- what the new changes were

11  going to be.  And some of those changed later on.  But

12  initially, that was how things were going to lay out for a

13  little bit.

14  Q.   What was your purpose in trying to explain that to all of

15  the employees of the Adams County Sheriff's Office?

16  A.   Just to calm some of that anxiety.  Not knowing who their

17  boss is.  Some of these folks had never met some of the ELT,

18  didn't know them.  Example, Dirk Budd coming from New York, I

19  certainly didn't know him very well.  He was somebody that I

20  interviewed for that position, hadn't worked with him before or

21  anything, just -- he had expressed an interest, and I liked

22  what his résumé said, and then doing an interview with him, so

23  I knew him a little bit better than they did.  But just trying

24  to put people's concerns at ease.

25  Q.   Did you convey any other general messages to the employees

Reigenborn - Cross

1    of the Adams County Sheriff's Office in this memo?

2    A.  It was basically just telling them where these folks were

3    going to go, some of the reassignments that were going to

4    happen.  Some of those were familiar faces, and I knew that --

5    some of the deputies or civilian staff would know that they

6    could go to some of those people that had been reassigned and

7    kind of still have a familiar face there.

8    Q.  We talked earlier about an open door policy that you had.

9    What were you trying to convey to your employees about -- by

10   having this open door policy?

11   A.  That their opinions were valued with me, that I wanted them

12   to have input.  I certainly wasn't the guy that could make

13   every widget.  So not knowing every aspect of every single job,

14   it's kind of nice to have somebody that does something come and

15   say, that's great, but it doesn't work in these circumstances.

16   We found that quite helpful in moving forward drafting

17   policies.  Because while I worked in booking 25 years ago, I

18   don't know what the requirements and needs are now.  It's kind

19   of nice to have somebody that I know on a level that can say,

20   hey, that worked great back then, that won't work now.  So it

21   was -- we found that to help.  And it seemed to boost morale a

22   little bit and ease people's -- and it also conveyed our

23   mission.  We wanted to show we were trying to be as much of

24   character, integrity and transparency as we could be.  We were

25   trying to be transparent in everything that we were doing.

506

Reigenborn - Cross

1    Q.  Did you have any other overarching goals?  I think earlier

2    you mentioned something about family.

3    A.  Correct.

4    Q.  Can you describe that a little bit more, please.

5    A.  We had several employees during my tenure there, even prior

6    to me being Sheriff that had gotten sick.  Prior

7    administration, some of those folks got sick and within a short

8    period of time, they were placed on unpaid leave, which meant

9    their health insurance would stop.  And so for me, it was like,

10   look, if you are sick -- one of the individuals under my

11   administration had cancer and he was sick and was going out for

12   treatment because of the chemotherapy and different treatments

13   that he was receiving.  He couldn't come in and work a full

14   day, he just didn't have the strength to do that.  And I ended

15   up placing him on administrative leave out of the detective

16   division, get healthy, we'll help you through your insurance.

17   He became one of our most dedicated employees when he came back

18   from remission of cancer.  Hardworking, dedicated individual,

19   and just very much still a strong supporter to say, look, I

20   know I was sick and I know I didn't carry my own load for a few

21   months down that line, but I meant it when I said family comes

22   first.

23   Q.  Did that also help morale at the ACSO?

24   A.  It did.

25   Q.  How so?

Reigenborn - Cross

1    A.  Because people just knew that I was sincere about what I

2    was saying when I said that your family comes first, that we do

3    have the open door policy, that you can come in and vent.

4    There's an appropriate place and time to do it.

5           Certainly, all employee meetings are not that place

6    where you can stand up and vent.  But if you wanted to come in

7    my office and say, hey, I think you're screwing up and here are

8    some ideas to fix it, and we had the opportunity to do that

9    numerous times.

10   Q.  Were you concerned primarily with the people of the Adams

11   County Sheriff's Office?

12   A.  I'm not following your question.

13   Q.  Sure.  What was your main focus after you took office, in

14   terms of trying to rehabilitate the Adams County Sheriff's

15   Office?

16   A.  So my goals were trying to get people back in positive,

17   good working morale.  I think going through Sheriffs back to

18   back can kind of be stressful for them, and that uncertainty

19   and the different rumors that go around.  So we were just

20   trying to ensure that people were put at ease, knew what their

21   chain of command was going to be, at least temporarily, knew

22   that these were our goals and visions, as far as what we

23   were -- the direction we were headed, who was going to be

24   heading up those different divisions within the agency.

25   Q.  Were any of your decisions driven by politics?


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Redirect

```
 1   A.  No.

 2           MS. PRATT:  Thank you.  I don't have anything further.

 3           THE WITNESS:  Thank you.

 4           MS. PRATT:  They may have some more for you, though.

 5           THE COURT:  Redirect.

 6   REDIRECT EXAMINATION

 7   BY MR. BOHNET-GOMEZ:

 8   Q.  Mr. Reigenborn, on direct, counsel began by asking you

 9   about Jim Morgen.

10           Do you recall that testimony?

11   A.  I do.

12   Q.  The jury watched a news interview with you about

13   Mr. Morgen?

14   A.  Correct.

15   Q.  And your testimony was that, in the interview, you were

16   talking about Mr. Morgen specifically when you said that

17   command staff just wants to be loyal to Mike McIntosh?

18   A.  Well, I think there was -- there were other individuals

19   that wanted to be loyal to Mike McIntosh, but yeah.

20   Q.  Right.  It wasn't just Jim Morgen, was it?

21   A.  Correct.

22   Q.  And Mr. Morgen was a sergeant?

23   A.  He was.

24   Q.  And he was the PIO?

25   A.  Correct.
```

Reigenborn - Redirect

```
 1   Q.  The face of the Sheriff's Office?

 2   A.  Correct.

 3   Q.  And you removed him from that position?

 4   A.  Correct.

 5   Q.  You heard rumors that people weren't going to help you

 6   achieve your mission before you took office?

 7   A.  Correct.

 8   Q.  And that's what you were referring to when you said that

 9   some people in the command staff wanted to be loyal to Mike

10   McIntosh?

11   A.  Correct.

12   Q.  You didn't investigate any of these rumors?

13   A.  I didn't have any way to investigate.

14   Q.  You testified on direct about Manuel Carillo?

15   A.  Mm-hmm.

16   Q.  Do you recall that?

17   A.  I do.

18   Q.  You testified he was demoted to sergeant?

19   A.  Correct.

20   Q.  But first you demoted him to deputy?

21   A.  I don't -- I don't recall.

22   Q.  You testified about Rick McNair.

23       Do you recall that testimony?

24   A.  I do.

25   Q.  Mark Mitchell was a captain in the Sheriff's Office?
```

Reigenborn - Redirect

1   A.  Correct.

2   Q.  And Mr. McNair was the other captain?

3   A.  Correct.

4   Q.  And you issued a termination letter to Mr. McNair?

5   A.  Correct.

6   Q.  But he retired before you had decided whether you would

7   keep him employed?

8   A.  I never had an interview with him.

9   Q.  So he retired before you made a decision --

10  A.  Correct.

11  Q.  -- one way or the other?

12  A.  Correct.

13  Q.  Counsel asked you about Tony Carvallo on direct?

14  A.  Correct.

15  Q.  Do you recall that?

16  A.  I do.

17  Q.  What was his rank?

18  A.  Deputy.

19  Q.  Counsel asked you about Mark Mitchell's daughter on direct.

20       Do you recall that?

21  A.  I do.

22  Q.  What was her rank?

23  A.  I'm not sure what her rank was.  She worked in the lab.  I

24  don't know if she was a civilian or commissioned.

25  Q.  She would either be a civilian or a deputy?

Reigenborn - Redirect

 1   A.  Correct.

 2   Q.  Now, one of the reasons you testified that you opposed Mike

 3   McIntosh was because you believed that he operated the

 4   Sheriff's Office as a good old boys system?

 5   A.  Correct.

 6   Q.  Where you had to know the right people to be promoted?

 7   A.  Correct.

 8   Q.  And you yourself testified that you were passed over for

 9   promotion several times?

10   A.  Correct.

11   Q.  I want to talk a little bit about the people that you did

12   hire when you became Sheriff.

13          You hired Chris Laws; right?

14   A.  Correct.

15   Q.  And his wife had made the campaign website for both of your

16   campaigns?

17   A.  Correct.

18   Q.  And you hired Dirk Budd?

19   A.  Correct.

20   Q.  He replaced T.J. Coates?

21   A.  Correct.

22   Q.  You said you hired him because you thought it was time for

23   new ideas?

24   A.  Correct.

25   Q.  But you actually came across Dirk Budd because he applied

Reigenborn - Redirect                                    512

1   for Mike Toth's position as Mountain View police chief; right?

2   A.  I didn't know that until afterwards.

3   Q.  So Mr. Toth referred him to you?

4   A.  Right.

5   Q.  And you hired him in May of 2019?

6   A.  I'll take your word for it.  I don't know off the top of my

7   head.

8   Q.  The position that T.J. Coates held as division chief of the

9   detective division was vacant for several months?

10  A.  Not correct.

11  Q.  Did you have an acting person in there?

12  A.  I did.

13  Q.  But there was no permanent division chief of the detectives

14  division until you hired Mr. Budd in May of 2019?

15  A.  Chief Bethel was working in that position.  Chief Bethel

16  then moved out to Flatrock.

17  Q.  And at that time, there was a shortage of chiefs that you

18  didn't fill until May of 2019; correct?

19  A.  Correct.

20  Q.  When you hired Mr. Budd and Mr. Dunning?

21  A.  Correct.

22  Q.  Speaking of Mr. Bethel, he was hired as a division chief

23  shortly after you took office?

24  A.  Correct.

25  Q.  And he was someone Tommie McLallan knew?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

513
Reigenborn - Redirect

 1   A.  Correct.

 2   Q.  And Mark Toth was also hired?

 3   A.  Correct.

 4   Q.  And he was your former boss at Mountain View?

 5   A.  Correct.

 6   Q.  And he came to your election night party?

 7   A.  I believe so.  I don't remember.

 8   Q.  You testified Mountain View is a sneeze of a town?

 9   A.  Correct.

10   Q.  But you also knew Mr. Toth from Westminster?

11   A.  Correct.

12   Q.  So you must have known that Mr. Toth went to Mountain View

13   because he got fired from Westminster due to criminal charges

14   filed against him?

15   A.  I remember the case vaguely.

16   Q.  And again, you hired Mr. Toth because his job at Mountain

17   View involved responsibilities that were much greater than the

18   chiefs at the Sheriff's Office?

19   A.  Correct.

20   Q.  I want to ask you a little bit about Gene Claps who you

21   testified about.

22        You never worked with Gene Claps, did you?

23   A.  We always had different assignments.  We never worked the

24   same shifts together.

25   Q.  You never worked together?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

                          Reigenborn - Redirect

 1   A.  Correct.

 2   Q.  When you took office, you hadn't been with the Sheriff's

 3   Office for four years?

 4   A.  Correct.

 5   Q.  And you testified on direct that a lot of people were

 6   texting you about Gene Claps' behavior on January 9th, 2019?

 7   A.  Correct.

 8   Q.  And you didn't investigate the texts before terminating his

 9   employment?

10   A.  Correct.

11   Q.  Now, you have turned over text messages in this case;

12   correct?

13   A.  That's correct.

14   Q.  In fact, you were asked to turn over all your text messages

15   discussing or referring to Gene Claps?

16   A.  Correct.  You guys did a digital download on my entire

17   phones.

18   Q.  And you never turned over any alleged text messages

19   concerning any complaints about Gene Claps?

20   A.  I couldn't tell you what was in my phone.  Everything was

21   downloaded and given forensically to you folks.  I'm not sure.

22   Q.  Let's talk about Mark Mitchell.

23         You testified one of the reasons you fired him was

24   rumors about inappropriate relationships; correct?

25   A.  That, amongst other things.


                   SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Redirect

1  Q.  And those inappropriate relationships, those were all

2  rumors; correct?

3  A.  Correct.

4  Q.  And when you testified that you witnessed him with an

5  employee he was rumored to be romantically involved with, what

6  you actually saw was them driving in a patrol car together?

7  A.  Correct.

8  Q.  You testified about the Aurora theater shooting?

9  A.  Correct.

10  Q.  And Mr. Mitchell's alleged comments?

11  A.  Correct.

12  Q.  Now, Mr. Mitchell was a SWAT team commander during the

13  Aurora theater shooting; correct?

14  A.  Correct.

15  Q.  And you weren't on the SWAT team at that point?

16  A.  Correct.

17  Q.  And you testified regarding Mr. Currier on direct.

18       Do you recall that?

19  A.  I do.

20  Q.  You testified about a crime scene incident involving

21  Mr. Currier.

22       Do you recall that?

23  A.  I do.

24  Q.  And your testimony was that it occurred after the 2018

25  election; right?

Reigenborn - Redirect

1    A.   I believe it did.

2    Q.   But you weren't even at the agency, were you?

3    A.   In 2015?

4    Q.   2018.

5    A.   I guess I misunderstood the question, then.  Because it was

6    in 2015, when I still worked there.

7    Q.   Right.  You were at Mountain View in 2018?

8    A.   Correct.  And I'm talking about 2015.  So I may have

9    misunderstood the question, but I was talking about 2015.

10   Q.   Now, the jury saw a video of you making a public statement

11   that having restraining orders helps you to be Sheriff;

12   correct?

13   A.   Correct.

14   Q.   And you also said publicly that having a workplace affair

15   doesn't make you a poor leader; right?

16   A.   I don't know that I ever said that.

17   Q.   Do you recall giving an interview with CPR News where you

18   said that?

19   A.   I do.

20   Q.   So you do recall saying that now?

21   A.   I remember giving them an interview.  I don't recall saying

22   that.

23        MR. BOHNET-GOMEZ:  Your Honor, we have an audio clip

24   that we would like to admit.  It's, I believe, audio of the

25   story disclosed at Exhibit 105, and we would like to play it.

Reigenborn - Redirect

1                THE COURT:  Any objections?

2                MS. PRATT:  No objection.

3                MR. BOHNET-GOMEZ:  Mr. Heeter, if you could play that

4    clip.

5                THE COURT:  And just so that we're clear, as we have

6    done with the other audio clips, you would mark this as 105A.

7                MR. BOHNET-GOMEZ:  That sounds good, your Honor.

8         (Plaintiff's Exhibit 105A received in evidence)

9         (Media played)

10   BY MR. BOHNET-GOMEZ:

11   Q.  You testified on direct that the Sheriff can hire and fire

12   at will?

13   A.  Correct.

14   Q.  You agree that the Sheriff cannot fire someone for an

15   illegal reason?

16   A.  Say that again.  I didn't --

17   Q.  You would agree that the Sheriff can't fire someone for an

18   illegal reason?

19   A.  Correct.

20   Q.  Now, you also testified on direct that their support of

21   McIntosh played no role whatsoever in your decisions?

22   A.  Correct.

23   Q.  But you have testified that you would use the knowledge of

24   who genuinely supported Mike McIntosh and who didn't to make

25   personnel decisions; isn't that true?

Reigenborn - Redirect

1  A.  I think it comes into play, yes.

2  Q.  So it did come into play?

3  A.  You're gathering all the information, you're trying to do

4  as much of an investigation as you can.

5  Q.  So when you testified it played no role whatsoever, that

6  was not correct?

7  A.  I guess we're getting into semantics.  It -- I've worked

8  with these folks for over 10 years, I knew their behavior.

9      MR. BOHNET-GOMEZ:  Can we play for the jury clip

10  number 3 of Mr. Reigenborn's videotaped deposition.

11  (Media played)

12      MR. BOHNET-GOMEZ:  I'm sorry.  And publish it to the

13  jury and restart it, please.

14      THE DEPUTY CLERK:  Your Honor, is it admitted yet?

15      THE COURT:  The deposition testimony has been.

16  (Media played)

17      MR. BOHNET-GOMEZ:  We can take that down.

18  BY MR. BOHNET-GOMEZ:

19  Q.  You talked a lot on direct about the culture of the

20  Sheriff's Office.

21      Do you recall that?

22  A.  I do.

23  Q.  And you made a lot of claims about the Plaintiffs'

24  behavior?

25  A.  Correct.

Reigenborn - Redirect

```
 1   Q.  You accused them of affairs and having a naked Barbie doll?

 2   A.  Correct.

 3   Q.  You accused them of calling you a loser?

 4   A.  Correct.

 5   Q.  Now, the Sheriff's Office has policies about inappropriate

 6   behavior?

 7   A.  Correct.

 8   Q.  And you had every right to make a complaint under those

 9   policies if you wished?

10   A.  I could.

11   Q.  And you didn't do that?

12   A.  Command staff was aware of it.  People higher ranking than

13   me were aware of it.  And I know that because they were in the

14   room when some of that behavior was going on.  So I certainly

15   didn't want to be retaliated against.

16   Q.  You never made any complaint?

17   A.  I didn't want to be retaliated against.

18   Q.  So you didn't make any complaint?

19   A.  Correct.

20   Q.  And you didn't complain to HR?

21   A.  I complained to my supervisor, and it went nowhere.

22   Q.  What supervisor did you complain to?

23   A.  Harold Lawson.

24   Q.  And this was the undersheriff at the time?

25   A.  No.  He was my commander at the time.  He was my -- he was
```

Reigenborn - Redirect

1    the undersheriff from January till March of 2015 when I worked

2    there.

3    Q.  The policies you put in place after rescinding the ACSO's

4    existing employment policies said you would tell employees the

5    reason why they were being terminated; right?

6    A.  Correct.

7    Q.  That's actually required by state law, isn't it?

8    A.  It is.

9    Q.  But you never told the Plaintiffs any of the reasons that

10   you testified to on direct?

11   A.  Correct.

12   Q.  And in spite of your testimony that it was their

13   behavior -- in spite of your testimony about their behavior,

14   you have testified that it was their behavior when they met

15   with you on January 15th that was the determining factor in

16   whether you would keep them?

17   A.  That was the final determining factor.

18   Q.  We have talked a lot about the culture of the Sheriff's

19   Office, but you also testified on direct that your biggest

20   disagreement with Mike McIntosh in the 2014 election was

21   regarding retirement benefits?

22   A.  Correct.

23   Q.  And those retirement benefits aren't up to the Sheriff, are

24   they?

25   A.  He sat on the board.  They're not up to the Sheriff.

521

Reigenborn - Redirect

1   Q.  They're up to the county pension board?

2   A.  Correct.  But he sat on that pension board.  And if he's

3   going to make those kind of decisions, how is he going to make

4   decisions for the agency.

5   Q.  You testified the main reason you ran in 2018 was the

6   investigation into the Heath Gumm shooting?

7   A.  Not just the investigation, but the way the Sheriff himself

8   handled it.

9   Q.  So the handling of the 2018 Heath Gumm investigation was

10  the main reason you ran for Sheriff?

11  A.  So you are saying investigation.  I'm telling you, the

12  totality of the whole thing.  The way that the officer funeral

13  went, all of the -- the totality from day one to the end.

14  Q.  That was the main reason you ran in 2018?

15  A.  Correct.

16        The investigation wasn't completed when I announced

17  that I was running.

18  Q.  And in fact, you weren't even at the agency when that

19  investigation began?

20  A.  Correct.

21  Q.  So you weren't privy to the details of the investigation?

22  A.  I was aware that Adams County Sheriff's Office was

23  investigating an officer homicide, an officer that was slain in

24  the line of duty.  And all investigations prior to that that

25  I'm aware of -- maybe there's probably some out there that

Reigenborn - Redirect

1    don't fall into that category -- but typically, another agency

2    handles that investigation so that when it goes to court

3    there's no question that the agency was doing the right thing.

4    Q.  You testified on direct that there were 60 vacant positions

5    when you took over as Sheriff?

6    A.  Approximately.

7    Q.  And you testified about understaffing and how much of a

8    problem that is?

9    A.  Correct.

10   Q.  Yet, you told Mr. Currier the agency was downsizing;

11   correct?

12   A.  Downsizing command staff positions.

13   Q.  You told him the agency was downsizing, that's what you

14   told him?

15   A.  I was referencing command staff positions.

16   Q.  But what you told him was the agency was downsizing;

17   correct?

18          MS. PRATT:  Objection, asked and answered.

19          THE COURT:  Overruled.

20          MR. BOHNET-GOMEZ:  If we could pull up Exhibit 55.

21   And let's publish it to the jury, please.

22          And if I could, flip to Page 8 of the exhibit, which

23   is Page 7 of the transcript.  If we could highlight Line 8.

24   BY MR. BOHNET-GOMEZ:

25   Q.  This is what you told Mr. Currier; right?

Reigenborn - Redirect

1    A.  Correct.

2    Q.  And you told him, "and so we're downsizing?"

3    A.  Correct.

4        MR. BOHNET-GOMEZ:  We can take that down.

5    Q.  And there were over a hundred vacancies by the end of your

6    term as Sheriff; correct?

7    A.  I don't know.

8    Q.  I want to talk about your criminal charges relating to your

9    conduct in office.

10       Do you recall your testimony on direct about that?

11   A.  I don't recall.

12   Q.  You were testifying that it was a misunderstanding about an

13   arrest control training?

14   A.  Correct.

15   Q.  Now, you're required by law to complete 24 hours of

16   training per year?

17   A.  16 hours.

18   Q.  And that's necessary to keep your certification current?

19   A.  Correct.

20   Q.  Without which you can't be a law enforcement officer?

21   A.  Correct.

22   Q.  And that certification goes to the State?

23   A.  Correct.

24   Q.  And you mentioned that Tommie McLallan also falsified

25   training records?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Redirect

1    A.  He did.

2    Q.  And he's pleaded guilty to forgery and official misconduct?

3    A.  I'm not sure what he pled to.

4    Q.  And Micki Bethel also was involved in falsifying training

5    records?

6    A.  Correct.

7    Q.  And he was the division chief of the training division?

8    A.  Correct.

9    Q.  That you hired?

10   A.  Correct.

11   Q.  And he also pleaded guilty in connection with those crimes?

12   A.  He did take a plea.  I'm not sure what.

13   Q.  And you admitted every element of each crime that you pled

14   guilty to?

15   A.  Correct.

16   Q.  So you admitted that you acted with the intent to defraud?

17   A.  Correct.

18   Q.  It wasn't just a misunderstanding, it was intentional?

19   A.  I admitted that, yes.

20   Q.  And it wasn't Gene Claps that prosecuted you; right?

21   A.  Correct.

22   Q.  It wasn't another Sheriff's office?

23   A.  Correct.

24   Q.  It was the Colorado Attorney General's Office?

25   A.  Correct.

Reigenborn - Redirect

1  Q.  And you are familiar with the indictment that was brought

2  against you?

3  A.  I'm not aware of an indictment.

4  Q.  Or the charges that were brought against you?

5  A.  I am.

6  Q.  And you were charged with a criminal conspiracy to engage

7  in forgery; right?

8  A.  I don't know.  I'd have to have the court paperwork in

9  front of me.  I'm not sure.  I believe so.

10  Q.  It wasn't just one class, was it?

11  A.  Again, I would have to have that paperwork in front of me.

12  I'm not sure.  A lot of that was dismissed during the plea

13  agreement.

14  Q.  You haven't told us all the facts about your criminal

15  conviction, have you?

16      MS. PRATT:  Objection, your Honor, 403.

17      MR. BOHNET-GOMEZ:  Your Honor, they opened the door to

18  this when they had him testify to it.

19      THE COURT:  Overruled.

20      THE WITNESS:  I don't -- can you restate your

21  question.

22  BY MR. BOHNET-GOMEZ:

23  Q.  My question is:  You haven't told us all the facts about

24  your criminal conviction, have you?

25  A.  I believe I have.

1              MR. BOHNET-GOMEZ:  No further questions.

2              MS. PRATT:  Your Honor, one question on redirect,

3     please.

4              THE COURT:  Approach just briefly.

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reigenborn - Redirect

1        (At sidebar)

2            THE COURT:  Normally I only permit redirect.  In this

3    case, cross, whatever, redirect and then cross, redirect.  But

4    since we decided to take all of these witnesses as one and, in

5    theory, we could recall him in your case.  But if you don't

6    intend to recall him in your case, I would allow you one

7    question and you one follow-up question after that.

8            MS. PRATT:  This is based strictly on the deposition

9    testimony that was just replayed.

10           THE COURT:  Okay.  Good.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reigenborn - Recross

1        (In open court; jury present)

2            THE COURT:  Go ahead, counsel.

3    RECROSS EXAMINATION

4    BY MS. PRATT:

5    Q.  Mr. Reigenborn, there was some deposition testimony that

6    was just played to you a moment ago by counsel?

7    A.  Correct.

8    Q.  How did you mean the word "loyal" in that testimony?

9    A.  That they were going to be loyal to the agency, they would

10   carry forward my wishes, even if they disagreed with that,

11   that -- you know, the example I gave is if we were changing

12   from blue shirts to black shirts, that they would go out and

13   push that message out in a positive manner and not be

14   undermining the administration and the things we were trying to

15   accomplish.

16           MS. PRATT:  Thank you.  That's all I have.

17           THE COURT:  Thank you.

18           MR. BOHNET-GOMEZ:  No further cross.

19           THE COURT:  Do any of our jurors have questions for

20   this witness?

21           Write it down, and then my courtroom deputy will come

22   and take it from you.

23           Counsel.

24       (Continued on next page)

25

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Reigenborn - Recross

1        (At sidebar)

2            THE COURT:  So the first question is:  What are the

3    details of your criminal conviction?  This is already answered.

4    He answered that.

5            The second is:  You stated that you replaced

6    employment policies, but did you mention if they had been

7    amended?  Did you know for certain that other types of policies

8    had not also been amended and is that why you did not replace

9    those policy groups?  If you weren't certain, why only replace

10   the employment policies?  I think that one is fine.

11           MS. PRATT:  No objection.

12           THE COURT:  The second half of that question.  The

13   first half leads to the second half.

14           And then this one is interesting.  Did you use a

15   Cricket mobile phone to conduct an affair.

16           MS. PRATT:  What's the relevance of this?  He's

17   already stated it wasn't an affair.

18           THE COURT:  I'm inclined to agree.  We've been down

19   that --

20           MR. BOHNET-GOMEZ:  One different thing about this is

21   it's getting at whether he did.

22           THE COURT:  I still think it's too far a stretch.  I'm

23   going to deny this one.

24           But I will ask the other one.  Okay.

25           (Continued on next page)

 1      (In open court; jury present)

 2          THE COURT:  Mr. Reigenborn, you stated that you

 3   replaced the employment policies because you were not sure if

 4   they had been amended via memo or in another way.  Do you know

 5   for certain that other types of policies had not also been

 6   amended, and is that why you did not replace those policy

 7   groups?

 8          THE WITNESS:  I wasn't sure if the other policies had

 9   been amended or not, but some of those policies weren't really

10   our focus in the first 60 days, 90 days.  It was the employment

11   portion of it.

12          The pursuit policy we could change very easy, the --

13   some of the policies at the jail, we could change those fairly

14   easy.

15          This one seemed to be a more complex and difficult

16   policy that we needed to change and make sure that the

17   employees knew early on the direction we were headed.

18          THE COURT:  And there's a follow-up.  I think you have

19   just answered that, but if not, I'll give you the opportunity

20   to do so.  And that is:  If you weren't certain, why only

21   replace the employment policies?

22          THE WITNESS:  It was on recommendation of legal

23   counsel at the time.

24          THE COURT:  All right.  Can we excuse Mr. Reigenborn?

25          MR. BOHNET-GOMEZ:  Yes, your Honor.

Mitchell - Direct

 1          MS. PRATT:  Yes, your Honor.

 2          THE COURT:  You're excused.

 3          THE WITNESS:  Thank you, your Honor.

 4          THE COURT:  Plaintiffs, call your next witness.

 5          MR. BOHNET-GOMEZ:  Your Honor, Plaintiffs call Mark

 6  Mitchell.

 7  MARK MITCHELL,

 8      called as a witness by the Plaintiffs,

 9      having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. BOHNET-GOMEZ:

12  Q.  Good afternoon, Mr. Mitchell.  Could you please introduce

13  yourself to the jury.

14  A.  Introduce myself as far as?

15  Q.  Just very briefly.

16          Let's start with how old you are.

17  A.  I am 60 years old.

18  Q.  And where do you currently live?

19  A.  I live in -- just south of Brighton.  It's technically

20  Commerce City.

21  Q.  Where did you grow up?

22  A.  I grew up in Brighton.

23  Q.  What do you do for work now?

24  A.  I am currently a commander with the Adams County Sheriff's

25  Office.

Mitchell - Direct

1   Q.   And in what division?

2   A.   I work -- my assignment is the court security unit.

3   Q.   I want to start by going over your employment history with

4   the agency.

5   A.   Okay.

6   Q.   When did you start -- when did you first start working with

7   the Adams County Sheriff's Office?

8   A.   I started in February of 1990.  I was looking for a job and

9   a help wanted ad was posted in the Brighton Blade.  And I

10   answered that ad and went to the Sheriff's Office and filled

11   out an application.  It was for a civilian position in the

12   jail.

13          And I went through the testing process.  This was in

14   November of '89.  And I went through the testing process in

15   December, first part of January, and started on February 5th,

16   1990.

17          I worked in the jail for 18 months.  To be honest, I

18   had taken the job because, you know, I was -- prior to my

19   employment, I was in broadcasting.  And our radio station went

20   out of business, and I was looking for something until I could

21   find another radio gig, to be honest with you.

22   Q.   Why did you decide to stay?

23   A.   I worked at the Sheriff's Office.  And as I progressed

24   through my training as a civilian and working closely with the

25   deputies on the floor, it kind of rekindled some things from my

Mitchell - Direct

1   childhood.  My grandfather was a Deputy Sheriff, a Sheriff and

2   Town Marshal in Wisconsin.  And listening to some of the

3   stories that my mom would tell us about that, it kind of

4   rekindled some of that.  And seeing what these guys were doing

5   and how they conducted themselves, I started getting kind of

6   interested in maybe this would be a career and put that radio

7   thing aside.

8   Q.  And can you just walk us through your career progression

9   after you were hired on as a deputy.

10  A.  So I worked up in the towers and watched the deputies and,

11  you know, did data entry and made sure that the counts were

12  right and watched inmates.  And I did that for about 18 months.

13  And I tested for a deputy position.  There was an opening in

14  the jail, several openings.

15          And I went through the testing process in the spring

16  of 1991.  And I was commissioned a deputy in June of 1991.  And

17  I spent several years in the jail working in booking, in the

18  modules with the inmates and the medical unit.

19          And in 1994, the State of Colorado changed the

20  requirements for being a level one peace officer.  And at that

21  time, you did not have to be a level one peace officer to be

22  working in the jail and -- but that law changed effective

23  January 1st, 1995.

24          So in 1994, I went through the police academy that was

25  sponsored by the Sheriff's Office through Aurora Community

Mitchell - Direct

1    College.  We had three days off, three days on, three days off.

2    We would give up one of those three days off to go to the

3    academy.  And it took about ten months to get through.  And I

4    graduated.

5            While I was going through the academy, I said, you

6    know, jail is fine, but I think I need to go to patrol.  So I

7    put in for patrol to transfer to patrol.  And I was number one

8    on the list, and I transferred to patrol in March of 1995.

9            I worked in patrol as a deputy for nine years.  And

10   during that nine years, my first special assignment or

11   additional assignment was -- I believe it was '99, I put in for

12   field training officer, and I trained officers that were new

13   into the division.  And I also put in for SWAT at that time,

14   and I didn't make it.  I -- you know, I didn't -- I didn't get

15   on the team.

16           And so I focused on the FTO program.  I focused on

17   teaching and getting myself in better shape and learning more.

18           And I tested again in 2001, I believe, and was

19   selected to the SWAT team.  I spent five years as a SWAT

20   operator, while I was also working patrol, while I was also

21   teaching as an FTO.

22           In 2003, I tested for sergeant.  And I went through

23   all the testing process, oral boards, the written test.  The

24   oral board was fun.  And I was placed on the list.  I was

25   number five out of twenty.  And so I, you know, continued my

Mitchell - Direct

1    duties on patrol until January 2004 when I was promoted to

2    sergeant and assigned to the jail division.

3           I worked in the jail division as a sergeant, shift

4    sergeant through 1994, and just prior -- or in February of

5    1995, I was transferred from the jail to the patrol division to

6    be a patrol sergeant.  And just prior to my transfer, one of my

7    last duties in the jail was to train Mr. Reigenborn on how to

8    be a sergeant.

9           And I left and went to the patrol division.  I worked

10   patrol as a sergeant.  I stayed on the SWAT team and was a team

11   leader.  So I went from operator to the team leader.  I did

12   that for approximately five years, and then -- from 2005

13   through 2009.

14          In the summer of 2008, there was a commander that was

15   demoted, and Sheriff Darr selected me to be an acting

16   lieutenant.  And since I had just left the jail previously

17   within a reasonable amount of time, I was sent up to the jail

18   to take over those duties in an acting capacity, as it was

19   described earlier, as on-the-job training.  And I worked with

20   T.J. Coates.  He was on the opposite side of the week.

21          And during that career development period, I tested

22   for lieutenant.  And I scored number two behind Chris Laws.

23          In the spring of 2009 -- and so this happened right

24   before the DNC in the summer of 2008.  And I spent from August

25   of 2008 up at the jail as an acting until the end of March,

Mitchell - Direct

1    first part of April.

2            And in the first week of May, Doug Darr came to me and

3    asked, you're next on the list, we have an opening, I want to

4    promote you and I want to send you back to the jail.  So I went

5    back to patrol as a sergeant for a cup of coffee and ended up

6    having to go straight back.  And as a matter of fact, I took

7    over T.J. Coates' platoon because he was being transferred to

8    patrol.

9            I stayed up at the jail.  During the time at the jail,

10   I introduced the jail K-9 program, based off of a patrol K-9

11   program, but exclusively for the jail.  I wrote a proposal for

12   that and submitted, you know, budgetary items that I think we

13   would need for that, presented that to my division chief, the

14   captain at the time.  And it was presented to Doug Darr, and

15   that proposal was accepted.

16           I also attended Northwestern School of Police Command

17   and Staffing.  It's a ten-week college level command school.

18   And I attended that.  And we would go two weeks to class, go

19   back to work for two weeks; two weeks on, two weeks off.  And

20   this started in August of 2010.  And I graduated in December of

21   2010.

22           While I was at Northwestern, I was transferred from

23   the jail to the patrol division, as the administrative

24   lieutenant working closely with the captain of the division.

25   And when Terry Tomas retired in March of 2011, I took over his

Mitchell - Direct

1    platoon of deputies and the responsibilities of the SWAT team

2    commander, the overall commander.  I fulfilled those duties all

3    the way through 2016, when I interviewed with Sheriff McIntosh,

4    Harold Lawson concerning the captain's position and that they

5    were going to implement.  They wanted to implement a captain's

6    position because the division chief just had so much going on

7    with 125 employees, 11 different units, he needed a little help

8    with the operations, the day-to-day operations.  And I did that

9    from February of 2016 until I was relieved of my duties in

10   January of 2019.

11        THE COURT:  Counsel, I just want to check with our

12   jury.  If somebody needs to take another break, this would be a

13   good opportunity to do so.

14        Is there anybody who needs to take a 10 or 15-minute

15   break, or are you prepared to move forward?  If anybody needs a

16   break, just raise your hand.  Otherwise, we'll move forward.

17        Yes?

18        Okay.  Why don't we do.  That, we'll break until

19   3:55 p.m., and then we'll pick that up again.

20        (Continued on next page)

21

22

23

24

25

 1        (In open court; jury not present)

 2             THE COURT:  Let me ask, because I'm thinking we're

 3    falling a bit behind here, because I doubt we'll get through

 4    this witness today, you also had McIntosh and Gallegos.

 5             MR. BOHNET-GOMEZ:  So as we mentioned to counsel some

 6    time ago, we're not calling McIntosh.  And we have decided not

 7    to call Jason Gallegos either.

 8             MS. HALPERN:  Your Honor, we released him from his

 9    subpoena.  He was here.  We let him go.

10             MR. BOHNET-GOMEZ:  I think, if we're behind, it's not

11    by very much.

12             THE COURT:  Let me ask you, the other ones that I have

13    on that list are Dunning, McLallan, O'Neill and Claps.  Either

14    of Dunning or O'Neill you are intending to call?

15             MR. BOHNET-GOMEZ:  We intend to call them both.

16             THE COURT:  Okay.  And then for the Defendants, just

17    so we get through, anybody from this list, Jarmin, Argo,

18    Gregory, Najera, Manzanares, Laws, Hanson or Toth that you know

19    you're not going to call?

20             MS. PRATT:  Yes, you Honor.  We are not calling Judy

21    Najera.  We are not calling Sarah Manzanares.  We are not

22    calling Sara Hanson, and we have conveyed that to Plaintiffs'

23    counsel.

24             THE COURT:  Okay.

25             MS. PRATT:  We'll make any other final decisions when

 1   we can.

 2        THE COURT:  I think we are okay, then, because we have

 3   eliminated some witnesses that we anticipated coming in.  And

 4   I'm guessing that at least some of the five witnesses listed by

 5   the Defendant are going to be somewhat short.  Maybe I'm

 6   guessing wrong, but that's my -- given that I haven't heard

 7   their names once, if at all at this point, I'm guessing.  We

 8   can re-evaluate again tomorrow, but I wanted to get a sense of

 9   where we were.

10        We're in recess.

11        (Recess)

12        THE COURT:  Let's bring our jury back in.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Mitchell - Direct

```
 1      (In open court; jury present)

 2           THE COURT:  Just a reminder that you are still under

 3    oath.

 4           THE WITNESS:  Yes, sir.

 5           THE COURT:  Counsel.

 6    BY MR. BOHNET-GOMEZ:

 7    Q.  Mr. Mitchell, before we took a break, we were talking about

 8    your career at the Sheriff's Office.  And you mentioned you

 9    were promoted to lieutenant in 2009.

10           Can you describe how the lieutenant position compares

11    with the commander position?

12    A.  It's just a name change.  They're identical duties.

13    Q.  And that was true from 2009 through today?

14    A.  Yes.

15    Q.  The jury heard some testimony about Mr. Reigenborn testing

16    for SWAT.  Can you describe what that testing process looks

17    like?

18    A.  He described it pretty well.  First, there's a physical

19    assessment, push-ups, situps, at the time pullups, and at the

20    time it was a mile run.  Then we had to do an obstacle course

21    that was timed with a dummy drag.  And then there's an oral

22    board, where the team leaders, the sergeant and the commander,

23    would sit in and ask some general tactical questions, SWAT

24    questions, law questions.  And since then, since I tested for

25    SWAT, we added the component of firearms, shooting with a long
```

541

Mitchell - Direct

 1   gun.

 2   Q.  Now, you mentioned you went to Northwestern School of

 3   Police Command?

 4   A.  That's correct.  I also went to SWAT commander school.  It

 5   was sponsored by the National Tactical Officers Association.

 6   And it's a weeklong course that's into everything from the

 7   legal aspects and to tactics, to selection processes and all of

 8   that stuff.  And I did that.  I kind of omitted that when we

 9   were talking earlier.

10   Q.  And how many people at the agency get these kinds of

11   certifications?

12   A.  The Northwestern certification is -- there's usually

13   limited spots that are offered because it's kind of -- a lot of

14   agencies are from around the metro area, so you are allotted

15   two, three slots, maybe five, depending on how large the class

16   is, and then you submit a letter to the Sheriff.  And the

17   Sheriff selects people that he feels are or the command staff

18   feels has risen to the level to take that next step.  And this

19   Northwestern is a -- it's a very intense preparatory type of

20   command staffing and decision-making stuff.

21   Q.  Now, I want to talk a little bit more about your employment

22   record, so to speak.

23         During your 29-year career at the Sheriff's Office,

24   were you ever disciplined?

25   A.  Yes.

Mitchell - Direct

1    Q.  Can you tell us about that?

2    A.  There was one incident when I was a young deputy in the

3    jail that we were horse playing and some property got damaged,

4    and we had to pay for the property.  And then, when I first

5    went to patrol, there was a use of force issue that was brought

6    up that -- as a matter of fact, Rick Reigenborn was one of my

7    witnesses as a PPTC instructor that the force I used was not

8    excessive, but it was determined that I could have used other

9    alternatives.  And I was given a day suspension for that.

10   Q.  What year was that discipline?

11   A.  1996.

12   Q.  And you said it was a one-day suspension?

13   A.  I believe so.

14   Q.  Any other discipline after that date?

15   A.  Until I left?

16   Q.  Yes.

17   A.  No, sir.

18   Q.  I want to ask you about some of the accolades and awards

19   you received along the way.

20        Can you describe some of those that come to mind?

21   A.  I received several letters of commendation.  One of them

22   was I represented the Sheriff's Office on a national television

23   program about a little girl that called 911 for her mom.

24        I received a meritorious service plaque for a large

25   quantity of drugs and guns that my partner and I discovered

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Mitchell - Direct

1   during a routine noise complaint in an apartment.

2          I received a lifesaving medal for stopping a man from

3   committing suicide in his garage with his car running.

4          And I received a unit citation, the whole SWAT team

5   received a unit citation for the professional handling of a

6   SWAT call that we had.

7   Q.  And how were your annual evaluations at the Sheriff's

8   Office?

9   A.  I would say they were above average.  They were in the, you

10  know, the 4 to 5 point range.

11  Q.  And how are those scored?  What's the parameters?

12  A.  They have changed over the years, but pretty much, you

13  know, there's certain categories that you are scored on.  I

14  believe there's nine.  And everything from communications

15  ability, leadership ability, decision-making ability and your

16  supervisor, who has observed you over your -- this period would

17  fill out an evaluation and using the anchors would score

18  anywhere from 1 to 5.

19  Q.  And can you tell us about a career accomplishment that you

20  are particularly proud of?

21  A.  I really enjoyed being an FTO.  I like to see the people

22  that I gave the basic knowledge to to be a street officer grow

23  in their career.  A lot of the people that I helped train went

24  on to be detectives and sergeants and commanders and some -- a

25  lot of them are still there.

544
Mitchell - Direct

1        Very proud of my 15 years on SWAT.  We grew the SWAT

2    team, how we improved the equipment.  When I first got on SWAT,

3    it was about running and shooting.  And while that's a part of

4    it, we also incorporated the law.  We incorporated -- we went

5    through a period of time of police militarization, and how do

6    we handle our mission, looking like we're repelling out of

7    helicopters and stuff.  So we did a lot of training on that.

8        Along with some commendations and accolades from my

9    coworkers.  Like I said, I enjoyed teaching.  A lot of people I

10   mentored that would come to me when they were ready to test for

11   sergeant and ask me how to go through that process.  And that's

12   what I'm proud of.

13   Q.  Now, I want to switch gears and talk a little bit more

14   about your actual job duties as a captain in the agency.

15   A.  Okay.

16   Q.  So as captain of the patrol division, as of January 8th,

17   2019, who did you report to?

18   A.  I'm sorry, January 8th, 2019?

19   Q.  Yes, sir.

20   A.  I reported to Terrance O'Neill.  He was the division chief

21   of patrol.

22   Q.  And you said you had been captain since 2016?

23   A.  February of 2016.

24   Q.  When you became captain, how was that role explained to

25   you?

Mitchell - Direct

1   A.  The job description was created by the Sheriff and

2   Undersheriff, and I assume input from the chiefs.  But it

3   was -- you were basically the operations manager.  You looked

4   over the day-to-day operations.  Everything from making sure

5   that guys had cars and equipment to dealing with issues so that

6   the division chiefs could be freed up to do -- work on more

7   personnel type issues and other projects that the Sheriff had.

8   Q.  And what were your main responsibilities, in terms of those

9   day-to-day operations?

10  A.  Day-to-day operations, I reviewed a lot of use of force

11  reports.  I reviewed chase reports.  I made sure people had

12  equipment.  I represented the division at some meetings.  I was

13  a part of the police task force at ADCOM.  That task force is

14  comprised of all the agencies that utilizes the ADCOM services,

15  and that meeting -- that group met with the ADCOM people so

16  that we were all on the same page and we were working together.

17  I work closely with the fair people, like I worked with fleet.

18  Basically, when the phone rang, I -- there was an issue that

19  needed to be taken care of, I jumped on it and I -- I did hold

20  the reputation that I took care of business.

21  Q.  Did you have any authority over the division budget?

22  A.  No.  I -- like everybody else, we could make suggestions,

23  especially on capital improvements, if something needed to be,

24  you know, built or repaired or, you know, new camera system or

25  something, as had been explained earlier.  We would make a

546
Mitchell - Direct

1    proposal, and we would provide our justification for that, and

2    then pass it up, and it would be determined.  But most of the

3    budget is, as described earlier, it's pretty set; personnel

4    costs and reoccurring items, maintenance items and stuff like

5    that.  Those are -- those are fixed.

6    Q.  And did you have any authority to create or change

7    policies?

8    A.  I never did.  The only policy I ever reviewed was when we

9    first went to Lexipol, and that was the SWAT policy.

10   Q.  Can you describe your role in that?

11   A.  It was because Lexipol has, you know, like was discussed

12   earlier, if -- it was the best practices, put together and does

13   this fit with our operations, is this going to fit.  And I

14   didn't -- if I remember right, I don't think I changed anything

15   in it.

16   Q.  And what if you disagreed with a policy of the Sheriff's?

17   A.  That's one of the questions on the oral board, when I

18   tested for sergeant.  It is our responsibility to enforce and

19   basically sell the policies of the Sheriff and ensure that our

20   subordinates, our direct reports understand it and adhere to

21   it.

22   Q.  And you mentioned that that was also the case when you were

23   a sergeant?

24   A.  It started when I was a field training officer, because you

25   have to explain all of that to the new trainee.  But yeah, that

547
Mitchell - Direct

1   responsibility carried all the way throughout until I was a

2   captain.

3   Q.   And as a captain, what independent authority did you have

4   to hire and fire?

5   A.   None.

6   Q.   Can you describe which parts of the job, if any, the

7   division chief could not direct or order you to do in a

8   particular way?

9   A.   No, I took my direction from the division chief.

10  Q.   I want to ask you a little bit more about the actual job

11  description.

12        MR. BOHNET-GOMEZ:  If we can pull up Exhibit Z,

13  please.

14  Q.   Mr. Mitchell, do you see Exhibit Z in front of you?

15  A.   I do.

16  Q.   What is it?

17  A.   This is a job description for the position of captain.  I'm

18  trying to make sure it is the patrol division.  No, it says

19  jail or patrol, so they're the same.

20  Q.   And this was the job description while you were in that

21  role?

22  A.   That's correct.  I'm reading through it real quick, but

23  yes, sir.

24        MR. BOHNET-GOMEZ:  Your Honor, we would move to admit

25  Exhibit Z into evidence.

Mitchell - Direct

 1            THE COURT:  Any objection?

 2            MS. PRATT:  No objection.

 3            THE COURT:  It's admitted.

 4     (Defendant's Exhibit Z received in evidence)

 5            MR. BOHNET-GOMEZ:  May we publish it to the jury,

 6     please.

 7     BY MR. BOHNET-GOMEZ:

 8     Q.  Mr. Mitchell, may I direct your attention to the first box

 9     of text where it says, position purpose there.

10            MR. BOHNET-GOMEZ:  If we can call that out.

11     Q.  And that last sentence in the box says, This is an

12     appointed position that works at the pleasure of the Sheriff.

13            What does that mean, Mr. Mitchell?

14     A.  Basically, all of the positions within the Sheriff's Office

15     are appointed positions.  Like I said, I -- I tested for this,

16     I spoke with Sheriff McIntosh and Undersheriff Lawson.  And I

17     believe he interviewed several other people for this position.

18     Q.  And then it says, This class is distinguished from the

19     position of commander by the added administrative and

20     supervisory responsibilities for daily operations of the

21     assigned division.

22            Can you explain what that means?

23     A.  Commanders, you know, they check the -- so sergeants check

24     the work of their deputies and commanders check the work of the

25     sergeants.  I check the work of the commander.  And like I

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Mitchell - Direct

1    said, I review their reports, use of force reports, chase

2    reports, appraisals, I would read their appraisals on their

3    people.  And the administrative duties were to, you know,

4    report this and keep records on it.

5            MR. BOHNET-GOMEZ:  And if we could zoom out.

6    Q.  And have you look at the list of duties themselves,

7    Mr. Mitchell.

8            Can you go through this list and tell us which of the

9    duties are unique to the captain position, as compared to

10   commander or any other rank?

11   A.  Well, bullet point number two, acts as second in command

12   and serves as acting division chief in his or her absence,

13   that's pretty much the reason the position was created.

14   Q.  Any others?

15   A.  I'm reading as fast as an old man can go.

16           From what I am seeing, that is it that is exclusive to

17   a captain.

18   Q.  In your experience, did any of the list of duties here

19   require personal loyalty to a political candidate running for

20   Sheriff?

21   A.  No, they did not.

22   Q.  And did they require any personal loyalty to any particular

23   individual?

24   A.  To an individual, no.

25           MR. BOHNET-GOMEZ:  Let's take that down.

Mitchell - Direct

1    Q.  I want to ask you a little bit about the 2014 election.

2            What was your involvement in the 2014 election?

3    A.  Well, we have to back up to the prior election.  And there

4    was a lot of contention between Sheriff Darr and Mark Nicastle.

5    And during that four-year period, after Darr won that election,

6    that contention inside of the department, there were people

7    that supported Mark, there were people that supported Doug

8    Darr.

9            And then, here we come again in 2014, we have a

10   primary, and Mark Nicastle and Mike McIntosh are running

11   against each other in the primary.  And Rick Reigenborn and, I

12   believe, Deputy Medina were running in the Democrat primary.

13   And Reigenborn won the primary on the Democratic side.  And

14   McIntosh won the primary on the Republican side.

15   Q.  And who did you support, if anyone?

16   A.  I supported McIntosh.

17   Q.  And how did you support Mr. McIntosh?

18   A.  I contributed money to him.  I placed out some signs.  I

19   had a sign in my yard.  I placed a sign -- I talked to my

20   barber, who has a pretty good corner lot that has a lot of

21   traffic, and asked her if I could place some of McIntosh's yard

22   signs out in front of her building.  I went to a -- I

23   participated in the fundraiser at T.J. Coates' house.  And I --

24   I think I went to -- when he announced that McIntosh was

25   running prior to the primary.

Mitchell - Direct

1    Q.  And do you recall attending a Fraternal Order of Police

2    forum during the 2014 campaign?

3    A.  I do.

4    Q.  Will you tell us about that?

5    A.  So this is a forum.  This is a -- this is after the

6    primaries, so this forum was between the candidates of Rick

7    Reigenborn and Mark Nicastle.  And there was a forum at the FOP

8    lodge.  And there was a lot of people there.  And from what I

9    understand, there was -- this forum was to hear from the

10   candidates so that you, as an individual, could make a

11   determination on who the -- who you would vote for for the

12   lodge to support.

13   Q.  And did you have any conversations with Mr. Reigenborn

14   after that forum?

15   A.  I did.

16           During the forum, Mark Nicastle was there.  And Mark

17   Nicastle stood up and made some very demeaning remarks against

18   Mike McIntosh.  And I remember he was sitting in front of me.

19   And as soon as he stood up and made those remarks, he was out

20   the door.  And that kind of irked me, because I like Mark, I

21   like Mac, and I like Rick.  And because of the previous four

22   years of this contention, of this back and forth, I stood up

23   and I said, Why are we dividing the department?  They're both

24   members in good standing.  And at that point, I was told to sit

25   down and that this was a forum to decide who the lodge was

552
Mitchell - Direct

1   going to support.

2          After the meeting was over, I went up to Rick

3   Reigenborn and I asked him why he was, you know, kind of

4   pitting one side against the other.  I knew he needed -- you

5   know, campaign funds are attached to the endorsement.  And his

6   response to me was he was running against Mac because Mac was a

7   Darr boy and so are you.  And I was like, what are you talking

8   about?

9          I had many conversations prior to that with Rick

10  Reigenborn about things going on in the department, things like

11  sergeant rotation.  He was worried about being rotated out of

12  his position.  And physical fitness, and he was not real happy

13  with physical fitness program that Darr had installed, and we

14  had talked about that.  And I was shocked that he would -- that

15  he would make that comment to me.

16  Q.  Let's back up a little bit.

17         Can you tell us how you first became acquainted with

18  Mr. Reigenborn?

19  A.  Rick and I, as he said, we met in high school, ninth grade.

20  Technically, we were in ninth grade.  We didn't technically

21  start high school until tenth grade.  We were considered

22  freshman.  We had several classes together.

23         One of the things that Rick and I joked about --

24  wasn't joking about -- but Rick had -- he had an eye on my

25  older sister.  And I did not want Rick Reigenborn dating my

Mitchell - Direct

1   older sister.

2           And we were roommates in some school activity trips;

3   one in Estes Park and one in Phoenix, Arizona.  And through the

4   years, again, we stayed in communication through high school.

5   But then we went our separate ways.

6           His wife, Carmen Pierce, worked at the bank that I

7   frequented, that I utilized.  And I would ask her about Rick.

8   But I didn't really have a lot of contact with him from high

9   school, when we graduated, '83, until he arrived at the

10  Sheriff's Office in '91.

11  Q.  And did you ever work with Mr. Reigenborn directly at the

12  Sheriff's Office?

13  A.  In the jail, we worked -- in 1993, I worked in booking in

14  the jail, and he was -- I want to say he was in booking, but on

15  the other side of the week.  And he would come in and work

16  overtime or something like that.  But the only real time that

17  we worked together was when we were on the SWAT team together.

18  Q.  And what years was that?

19  A.  I was -- I got on the SWAT team in 2001, just before 9/11.

20  And he, I want to say, left two or three years later.

21  Q.  And did you work with him in any other capacity, other than

22  the jail and those two, three years on the SWAT team?

23  A.  The next time, like I said -- he was a field training

24  officer, but he wasn't as active as I was.  I did a lot of

25  teaching in our Phase 1 and a lot of that is on your days off,

Mitchell - Direct

1   and I don't believe Rick participated a whole lot.  We might

2   have, you know, during that field training officer period

3   worked.  But to work together as partners or anything like

4   that, no.

5   Q.  So you might have taught a training or two together?

6   A.  Yeah, certainly.

7   Q.  Can you describe what your working relationship with

8   Mr. Reigenborn was?

9   A.  He was fine.  We worked at the jail, you know, I -- I went

10  out socially with him once or twice to the Cactus Marine Bar.

11  And I went to his apartment once after he separated, but I -- I

12  think we had a good relationship.  I didn't see anything wrong.

13  And he would continually ask me about my sister constantly.

14  Q.  Now, the jury heard Mr. Reigenborn testify about a

15  confrontation between you and him regarding daily field action

16  reports?

17  A.  Yeah.  I was --

18  Q.  Can you explain what those were and the confrontation?

19  A.  Mr. Reigenborn's recollection was not quite accurate.  This

20  was a sergeants meeting.  This was a sergeants meeting with all

21  of the sergeants and the two commanders.  I believe his

22  commander, Harold Lawson, was there.  I can't remember

23  specifically.  But I was there with my sergeants, their

24  sergeants, the other sergeants in the division.  And the reason

25  for this meeting is T.J. Coates, there was a lot of

Mitchell - Direct

1    inconsistencies between how this side of the week worked, this

2    side of the week worked.  And the biggest contention was this

3    daily activity report.

4            A daily activity report shows what the deputies are

5    doing on a daily basis, how many traffic stops they make, how

6    many arrest reports or site actions that they make.  And one of

7    the responsibilities as the shift sergeant is to review that at

8    the end of shift, which means you have to stay over a little

9    bit to review your people's work.

10           Rick's suggestion was that we have ADCOM, Adams County

11   Communication, keep track of this pretty vital statistical data

12   because, you know, you got to click the mic and they know it.

13   Well, officers don't always click the mic to go out and talk to

14   somebody or to go into a business and make sure everything is

15   okay.  But it's an activity that should be documented on their

16   DFAR.

17           And Rick continued to push that we should let ADCOM

18   keep our stats.  And the chief said, that is not what the chief

19   wants, Rick.  And he continued to push this idea that ADCOM

20   should be doing that.  And one of the things that surprised me

21   this morning, we still use the same DFAR.  He had the

22   opportunity for four years as Sheriff to change it.  And if he

23   was that adamant about it, why didn't he change it?

24   Q.  Did you insult Mr. Reigenborn during this meeting?

25   A.  I did not.  But I can be a very blunt, direct person.  And

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Mitchell - Direct

 1  Mr. Reigenborn continued to press this point.  And I said,

 2  we're done talking about this.  We're done.  This is what the

 3  chief wants, we're going to do it, and he wants consistency on

 4  how you fill out these DFARes.

 5  Q.  And you were higher rank than he was at the time?

 6  A.  I was commander at the time, yes.

 7  Q.  Let's switch and talk about what happened after the 2014

 8  election.

 9       Did you have any interactions with Mr. Reigenborn

10  after he lost the 2014 election?

11  A.  No, I did not.

12  Q.  Did you and Mr. Coates call Mr. Reigenborn a loser after

13  the 2014 election?

14  A.  No, I did not.

15  Q.  How did you learn that Mr. Reigenborn had retired from the

16  Sheriff's Office?

17  A.  I didn't know he did.  I mean, he -- he retired, in, I'm

18  going to say, March or April of '15.  He didn't work for me, he

19  wasn't one of my sergeants, and I wasn't paying attention to

20  that.  And you know, we get a -- they would send out an email

21  about this person, you know, leaving the department or

22  retiring.  And it's also listed in the Shooting Star internal

23  newsletter.  I think that's how I learned about it.

24  Q.  And what interaction did you have with Mr. Reigenborn

25  between the 2014 election and the 2018 election?

Mitchell - Direct

1    A.  I had no interaction, zero.

2    Q.  Let's talk about that 2018 election.

3    A.  Okay.

4    Q.  Who did you support for Sheriff?

5    A.  Mike McIntosh.

6    Q.  And can you describe in what ways you supported him?

7    A.  Well, I had worked with Mike.  Again, Mike and I went to

8    high school together as well.  And I had watched Mike McIntosh

9    progress through his career, where he had learned, the classes

10   that he went to, his education.  I believe he went to the FBI

11   academy, he did Northwestern, he worked in just about every

12   division in our department.  He learned, grasped all the

13   aspects of the department.

14        I worked with him when he was on the SWAT team with

15   us, and he was a good decision-maker.  He's cool and calm under

16   pressure.

17        And you know, one of the things that I valued with

18   Mike was you could talk to Mike.  You could offer a suggestion,

19   however stupid it might be, and Mike would at least listen to

20   you.  And prior to that, that's why I supported him, and I just

21   saw that when he was the Sheriff from '14 to '18 just build and

22   grow.

23   Q.  And what did you do to support him in that election?

24   A.  Pretty much the same that I did in the first election.  I

25   put out some yard signs, I probably put out a little more yard

Mitchell - Direct                                            558

 1    signs, and I contributed a little bit more money to Mike.  And

 2    I went to a fundraiser at the Grisley Rose nightclub in Denver

 3    and, you know, listened to his philosophy and speech.

 4    Q.  After Mr. Reigenborn won the election, did you reach out to

 5    him?

 6    A.  I did.  I reached out to Rick when the vote tally was

 7    confirmed, that he had won.  I sent him a text saying,

 8    congratulations, look forward to working with you.

 9    Q.  And what was Mr. Reigenborn's response?

10    A.  I'm still waiting for one.

11    Q.  Were you prepared to work for Mr. Reigenborn as the Sheriff

12    after he was elected?

13    A.  I didn't see that there would be a problem.  I had worked

14    for four previous Sheriffs and never had any issue; two

15    Democrats, two Republicans, and politics never came into play.

16    Q.  Were you prepared to show respect for Mr. Reigenborn as the

17    leader?

18    A.  I didn't have any reason not to.

19    Q.  Were you prepared to implement his policies?

20    A.  I have implemented policies from, like I said, four

21    different sheriffs.  It wasn't going to change.  I was loyal

22    and dedicated to the Adams County Sheriff's Office pretty much

23    my entire adult life.  It's a way of life.  It's like the

24    military, you know.  You do what you are told, and you might

25    not like it, but you do it.


                      SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Mitchell - Direct

1    Q.  Now, let's talk about the meetings that you had with

2    Mr. Reigenborn and Mr. McLallan in December 2018.

3            Did you meet with Mr. Reigenborn before he took

4    office.

5    A.  I did.  It was -- I want to say it was the week before

6    Christmas in '18, in that time frame.

7    Q.  And who was in that meeting?

8    A.  It was just McLallan and Reigenborn.

9    Q.  Can you describe that meeting for us?

10   A.  Well, Rick came out.  And the first thing he said -- and

11   this is what I had to clinch my jaw about -- the first thing he

12   said, as I have said before, it's this banter over the years

13   about my sister, and he asked me how my sister is.  And I said,

14   no.  And for him to describe that I would walk into a room with

15   somebody I've never met, never seen and use a derogatory term

16   against my sister, I had to clinch my jaw on that one.

17   Q.  What do you recall actually saying?

18   A.  No.  He's the one that brought up the conversation.  He's

19   the one that asked me about my sister, and I said, the answer

20   is no, and that was the end of the conversation.  And that's

21   when he came out to get me and bring me into the meeting.

22           I sat in the meeting with him and McLallan.  McLallan

23   did all of the talking.  Very little came from Rick.  And I

24   assumed by the way this meeting was set up that it was a meet

25   and greet for Tommie.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Mitchell - Direct

 1   Q.  About how long was the meeting?

 2   A.  It was about 15 minutes.

 3       I thought it was a very cordial meeting.  Tommie, you

 4   know, complimented me on my uniform and my service stripes and

 5   my decorations.  And I got a very good vibe coming out of that

 6   meeting.

 7   Q.  Did you express your interest in staying --

 8   A.  I did.

 9   Q.  -- with the Sheriff's Office?

10   A.  I did.

11   Q.  How did you do that?

12   A.  I told him, I said, you know, I don't want to retire.  I've

13   still got a lot of gas in my tank, basically.  And I want to

14   retire in 8, 10 years hopefully.  I was 54 at the time.  And

15   you know, wherever you need me.

16   Q.  And you said you got a good vibe.  Why did you get a good

17   vibe?

18   A.  It was a conversation.  It wasn't an interview.  It wasn't

19   a -- it wasn't a, you know -- it was -- it was a talk.  It was

20   back and forth, like I said, a greet and meet -- meet and greet

21   with Tommie.

22   Q.  Let's talk a little bit about what happened after that meet

23   and greet.

24       Did you attend Mr. Reigenborn's swearing in on

25   January 8th?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Mitchell - Direct

 1   A.  I did.  And I ran into Mr. Reigenborn prior to him taking

 2   the oath.  I reached out and shook his hand, and I says, I'd

 3   like to talk to you.  And he said, we'll talk later.

 4          I was at the swearing in.  He was sworn in along with,

 5   you know, new commissioners and some judges and stuff like

 6   that.  And I was hoping to have a couple of minutes with Rick

 7   before I went home.  And as I was leaving, I observed him in a

 8   side room, and he was swearing in Tommie McLallan.  And I

 9   didn't think that that was the time to go in and talk to him.

10   Q.  When did you first learn your job might be at risk?

11   A.  When I received that letter.

12   Q.  And can you describe receiving the letter?

13   A.  Well, first of all, we received those policies in the

14   morning, and I was like, wow, this is new.  And I went to

15   lunch, T.J. and Kevin and I went to lunch, and we had heard

16   some -- we had got some texts and phone calls that Reigenborn

17   is starting to fire people.  And I was like, what?

18          And went back to work, received a telephone call from

19   Commander Sue Nielsen of the internal affairs unit that I was

20   to report to headquarters and meet with Tommie McLallan at 2,

21   2:15 p.m., something like that, in the afternoon.  And I drove

22   up there, and they have a little waiting room out by the

23   office.  And there was several people there; myself, I believe

24   Kevin was there by that point.  I saw Mike McKinney[ph].  And

25   as we were kind of talking, the door to Tommie McLallan's

562
Mitchell - Direct

1   office opened and Paul Gregory came out crying.

2   Q.  And what did you do after receiving the termination letter?

3   A.  I was shocked.  You know, when you read something like that

4   and there are things -- the thing that really stuck out was

5   termination.  I don't know how many times it's in there,

6   terminate, revoke your commission.  I was -- I was stunned when

7   I first got the letter.

8        And then Tommie started to talk, I need your badge, I

9   need your gun -- or your credentials and your car keys.  And as

10  I was giving him that, I told him, you know, you just fired a

11  bunch of good people, including that guy that just walked out

12  of here.  He's the sole supporter of three kids and a wife, and

13  he's gone.  And Tommie did not respond to that.

14       And as I was leaving, just before I left the office, I

15  turned back to Tommie, I says, we all know -- excuse my

16  French -- we all know this is bullshit, it's politics.  And I

17  left.

18  Q.  Did you have any other interactions with Mr. McLallan that

19  day?

20  A.  No.  I was escorted out to the back parking lot, and I

21  stood there and I called my wife.  And luckily, she was coming

22  home early from work, and she said she would come and get me.

23  And I stood out in that back parking lot for, gosh, a good

24  45 minutes, maybe an hour waiting for her because she works in

25  Arvada at the time, and just waited.

Mitchell - Direct

 1                And by then, Kevin Currier came out.  And then T.J.

 2    Coates came out.

 3    Q.  How did it make you feel to be escorted out of the

 4    building?

 5    A.  It's degrading, you know.  It was described earlier, we

 6    were -- we were trusted with a lot of things.  We were trusted

 7    with making good decisions and life and death decisions,

 8    especially when I was on the SWAT team.  And it was a gut

 9    punch.  You know, everybody at headquarters is, you know, kind

10    of looking as you are being escorted out.  I had done nothing

11    wrong.  And I'm being treated like I'm the worst employee in

12    the world.  And that was my first reaction.  And it was -- and

13    just standing there twiddling your thumbs.

14    Q.  And did you ever learn whether your counterpart at the jail

15    captain's position received a letter?

16    A.  While we were at lunch, Ricky McNair, my counterpart

17    captain at the jail, we had started to get some texts that

18    something is going on at the jail.  And I called Ricky.  And he

19    said, yeah, I was given a letter.  I have the option of being a

20    sergeant or retiring, and I'm not going to be a sergeant, it

21    will affect my retirement.

22    Q.  So you learned that Mr. McNair was offered a sergeant

23    position?

24    A.  That's correct.

25    Q.  Let's talk about the actual termination meeting that you

564
Mitchell - Direct

1    had with Sheriff Reigenborn.

2            Now, you requested that meeting?

3    A.  I did.

4    Q.  Who was at that meeting?

5    A.  It was Sheriff Reigenborn and the Undersheriff, McLallan,

6    and Sarah Manzanares and Kasandra Carleton from the county

7    attorney's office.

8            MR. BOHNET-GOMEZ:  And I don't think these have been

9    admitted yet, but we would move to admit Exhibits 20, 21 and

10   56, which I believe are stipulated.

11           THE COURT:  20, 21 and 56, you said?

12           MR. BOHNET-GOMEZ:  Yes.

13           THE COURT:  Any objection?

14           MS. PRATT:  No, your Honor.  Those are stipulated.

15           THE COURT:  They're admitted.

16      (Plaintiff's Exhibits 20, 21 and 56 received in evidence)

17           MR. BOHNET-GOMEZ:  And then we have the combined

18   exhibit, which we'll designate as 20A, and move to admit that.

19           THE COURT:  Any objection?

20           MS. PRATT:  No objection.

21           THE COURT:  It's admitted.

22      (Plaintiff's Exhibit 20A received in evidence)

23           MR. BOHNET-GOMEZ:  Let's listen to your meeting on

24   January 15th.

25           Can we pull up the Mitchell exhibit, 20A.

565
Mitchell - Direct

1      (Media played)

2          THE COURT:  Counsel, just so you know, we're about

3      five minutes to 5:00 p.m., so just whenever you are ready.

4          MR. BOHNET-GOMEZ:  I just have a few more questions on

5      this topic, and then we can wrap up for the day.

6      BY MR. BOHNET-GOMEZ:

7      Q.  Mr. Mitchell what was going through your mind while you sat

8      through this meeting?

9      A.  I was being fired.  I had no other -- no other reason to

10     think otherwise.  And I was -- I was a little testy, as I said,

11     in this recording, you know, at the snap of a finger, something

12     that I dedicated my -- just about my entire adult life to was

13     taken away without an explanation.

14     Q.  You were upset?

15     A.  I was upset, yes.

16     Q.  Did you try to intimidate Mr. Reigenborn?

17     A.  In what way?

18          I mean, we had a conversation and, you know, there's

19     no pounding on the desk or anything like that.  I don't know

20     what he means by intimidation.

21     Q.  And you heard Mr. Reigenborn testify about a number of

22     allegations about your behavior; correct?

23     A.  Correct.

24     Q.  Did he ever raise any of these with you before the

25     January 15th meeting?

566
Mitchell - Direct

1    A.  No.

2    Q.  And did he raise them at the meeting?

3    A.  No.

4              MR. BOHNET-GOMEZ:  Your Honor, this is probably a good

5    time to break for the day.

6              THE COURT:  Let's excuse our jury.

7              Members of the jury, just one reminder, no discussions

8    about this case, that even includes amongst yourselves.  You

9    are not permitted to discuss the case until after we give it to

10   you at the end of the case.  No discussion with anybody else

11   and no independent research on anything.

12             We'll be in recess.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
1         (In open court; jury not present)

2              THE COURT:  So just so I can try to keep us on track,

3    just to try to get some sense from Defendants, because you

4    didn't put in the witness list, I was looking at how long for

5    each of these witnesses.  So again, not holding anybody to the

6    times, but Jarmin, about how long do you anticipate?

7              MS. PRATT:  Oh, goodness, your Honor, I anticipate

8    perhaps 30 to 45 minutes, give or take, not terribly long.

9              THE COURT:  And Argo?

10             MS. PRATT:  We are still considering whether to call

11   her.

12             What would you say, Christy?

13             About 45, if we do.

14             THE COURT:  Gregory?

15             MS. PRATT:  What do you think?

16             Short.  Maybe 5, 10 minutes.

17             THE COURT:  Laws?

18             MS. PRATT:  Laws, I would say, probably an hour.

19             THE COURT:  And then Toth?

20             MS. PRATT:  Probably an hour, give or take.

21             THE COURT:  We should easily get Jarmin, Argo and

22   Gregory done, assuming Plaintiff wraps up tomorrow -- that may

23   not happen -- we should be able to get to Jarmin, Argo and

24   Gregory within a day, depending how this all breaks down, which

25   would put us, absent any rebuttal testimony, would put us
```

1   Tuesday done at the latest, which is 6 days, which would give

2   closings on Wednesday, closings and instructions on Wednesday.

3   We may move quicker than that, but I don't think we would move

4   slower than that.  And then to the jury by Wednesday, and

5   that's our 7-day time.  I don't know how long they will

6   deliberate.

7           MR. BOHNET-GOMEZ:  Your Honor, you mentioned rebuttal

8   witnesses.  We intend to call one.  We intend to call Harold

9   Lawson.

10          MR. RATHOD:  It would be an impeachment witness, so we

11  wouldn't call him at the end of the case.  We would call him

12  after Mr. Mitchell is done.  It wouldn't be a rebuttal witness.

13  It would be for Mr. Reigenborn's testimony, to impeach

14  something that Mr. Reigenborn testified to.  It should be five

15  minutes, actually.

16          THE COURT:  He wasn't listed on your witness list.

17          MR. RATHOD:  He wasn't listed.  He's only being called

18  as impeachment, your Honor.  Mr. Reigenborn -- and we have

19  notified counsel -- Mr. Reigenborn testified that he made a

20  verbal complaint to his supervisor, Mr. Lawson, about these

21  officers.  We contacted Mr. Lawson and asked him to come to

22  court to testify about whether that complaint ever happened.

23          MS. PRATT:  Your Honor, I would object to this.  I

24  think this is a late disclosure of a witness.  And I don't

25  really see the point of calling a witness to impeach

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

569

1  Mr. Reigenborn's testimony on this point, when they have not

2  been disclosed at any stage of this trial.

3          THE COURT:  I'm going to need some briefing on it.

4  And unfortunately, given the time, I'm going to need it by

5  tomorrow morning.  So why don't you file something tonight or

6  tomorrow morning, and I will take a look at it and make a call

7  on that.

8          MR. RATHOD:  Yes, your Honor.  We will file that

9  briefing.

10          We also didn't know that Mr. Reigenborn would make a

11  false statement on the stand.

12          THE COURT:  Well, I don't know that we're going to

13  prove that it's a false statement, because if Mr. Lawson says I

14  don't recall that or he didn't say that, then we just have

15  another factual dispute.

16          MS. PRATT:  Your Honor, I have to raise, again, I have

17  a problem with this.  There's been a sequestration order in

18  this case, so the fact they have contacted a witness that they

19  want to call up to the stand and made a representation of what

20  was going on in court at the time, I think violates the Court's

21  sequestration order.

22          MR. RATHOD:  We did not make a representation of what

23  went on in the courtroom.  We simply asked the witness, did

24  Mr. Reigenborn ever make a complaint to you about any of these

25  four individuals, and he answered no.

1          We asked, would you be willing to come to court

2    tomorrow to testify to that singular point; he said yes.

3          That is absolutely appropriate.  That is exactly what

4    impeachment is, and we will brief it tonight and have it for

5    the Court.

6          THE COURT:  I want a brief on it, and I will take it

7    up.

8          (Adjourned to January 24, 2025 at 8:30 a.m.)

9                              *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination  of:                        Page

 3   RICHARD REIGENBORN

 4   Direct By Mr. Bohnet-Gomez . . . . . . . . . . 342

 5   Cross By Ms. Pratt . . . . . . . . . . . . . 409

 6   Redirect By Mr. Bohnet-Gomez . . . . . . . . 508

 7   Recross By Ms. Pratt . . . . . . . . . . . . 528

 8   MARK MITCHELL

 9   Direct By Mr. Bohnet-Gomez . . . . . . . . . 531

10                    PLAINTIFF EXHIBITS

11   Exhibit No.                            Received

12    99    . . . . . . . . . . . . . . . . . . . 347

13    61    . . . . . . . . . . . . . . . . . . . 355

14    65    . . . . . . . . . . . . . . . . . . . 357

15    74    . . . . . . . . . . . . . . . . . . . 362

16    18 and 53 . . . . . . . . . . . . . . . . . 372

17    18A   . . . . . . . . . . . . . . . . . . . 373

18    66    . . . . . . . . . . . . . . . . . . . 380

19    56    . . . . . . . . . . . . . . . . . . . 388

20    116   . . . . . . . . . . . . . . . . . . . 397

21    59    . . . . . . . . . . . . . . . . . . . 400

22    98    . . . . . . . . . . . . . . . . . . . 401

23    67    . . . . . . . . . . . . . . . . . . . 404

24    58B   . . . . . . . . . . . . . . . . . . . 417

25    9     . . . . . . . . . . . . . . . . . . . 448
</pre>

1    105A    . . . . . . . . . . . . . . . . . 517

2    20, 21 and 56    . . . . . . . . . . . . . 564

3    20A    . . . . . . . . . . . . . . . . . 564

4                        DEFENDANT EXHIBITS

5    Exhibit No.                              Received

6    Z    . . . . . . . . . . . . . . . . . . 548

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I hereby certify that the foregoing is a true and accurate

transcript, to the best of my skill and ability, from my

stenographic notes.




                        *Sadie L. Herbert*
                        Official Court Reporter
                        U.S. District Court