```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3    Civil Action No. 20-cv-01936-STV

 4    TIMOTHY JAMES COATES, et al.,

 5         Plaintiffs,

 6         vs.

 7    BOARD OF COUNTY COMMISSIONS FOR THE COUNTY OF ADAMS,

 8         Defendant.

 9    --------------------------------------------------------------

10                     REPORTER'S TRANSCRIPT

11                      Trial, Vol. IV

12    --------------------------------------------------------------

13         Proceedings before the HONORABLE SCOTT T. VARHOLAK,
      Magistrate Judge, United States District Court for the District
14    of Colorado, commencing on the 24th day of January, 2025, in
      Courtroom A402, United States Courthouse, Denver, Colorado.
15

16                         APPEARANCES
      For the Plaintiffs:
17    IRIS HALPERN, FELIPE S. BOHNET-GOMEZ, VIRGINIA BUTLER and
      SIDDHARTHA RATHOD, Rathod Mohamedbhai LLC, 2701 Lawrence
18    Street, Suite 100, Denver, Colorado 80205

19

20    For the Defendant:
      KATHERINE PRATT, CHRISTY REDMOND and SAUGAT THAPA, Thompson Coe
21    Cousins & Irons LLP, 1700 Broadway, Suite 900, Denver, Colorado
      80290
22

23
      Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street,
24    Denver, CO 80294, (303)335-2105

25
```

```
 1              P R O C E E D I N G S

 2        (Proceedings commenced at 8:28 a.m.)

 3        (In open court; jury not present)

 4        THE COURT:  Before we bring the jury in, I'm prepared

 5   to rule on Mr. Lawson's testimony.  I'm not permitting it.

 6        Mr. Lawson was not disclosed as a witness in this

 7   matter.  The defense has indicated in their brief and cited to

 8   testimony from Mr. Reigenborn's deposition that Mr. Reigenborn

 9   in his deposition basically said the same thing that he

10   testified to at trial, which is that he brought a complaint to

11   Mr. Lawson and said, you need to do this.

12        So Plaintiffs have been well aware that this testimony

13   may come out and yet did not disclose Mr. Lawson at the time.

14        Moreover, this is a minor point.  There was plenty to

15   impeach Mr. Reigenborn with during his testimony.  And to the

16   extent that Plaintiffs are unhappy with that testimony or with

17   the impeachment, we're past that point.  I don't see the need

18   to bring Mr. Lawson in for what is a very minor point, which is

19   whether or not Mr. Reigenborn complained to Mr. Lawson about

20   one of the Plaintiffs' conduct back before any of the incidents

21   that give rise to this case occurred.  It's essentially a very

22   minor point with a previously undisclosed witness that I don't

23   think there's a need to get into here today.  And so as a

24   result, I am not permitting the testimony of Mr. Lawson.

25        Anything else we need to bring up?
```

20-cv-01936-STV    Trial, Vol. IV    January 24, 2025

1          Go ahead.

2          MS. PRATT:  Yes, your Honor.

3          Yesterday, during cross-examination of Mr. Reigenborn,

4    the issue of conspiracy came up.  And I don't know if the Court

5    is aware of this or not, but Mr. Reigenborn was never convicted

6    of any conspiracy, nor did he plead guilty to any conspiracy.

7          I objected on 403 grounds.  The Court overruled that

8    objection, and some cross-examination was allowed as to that

9    point.

10         We believe that it is likely that that will come up

11   again with Mr. McLallan during his cross-examination testimony,

12   and we would like to ask the Court to preclude any questioning

13   along that line, because Mr. McLallan, like Mr. Reigenborn, was

14   never convicted of any conspiracy.  It would be improper

15   impeachment under 609.

16         They can obviously ask him about his actual guilty

17   plea, but not any charges or other matters that he did not

18   plead guilty to.

19         THE COURT:  I don't even recall testimony on a

20   conspiracy.  I remember briefly questioning on his conviction.

21         MS. PRATT:  It was on recross, your Honor.  It was

22   after my direct.

23         THE COURT:  I don't even recall that, so I doubt it

24   had a significant impact on the jury, because I don't even

25   recall the questioning on it.

1        MS. PRATT:  I just would ask the Court to instruct the

2    Plaintiffs not to bring this up again with Mr. McLallan, given

3    that I think if the jury hears it twice, that would be improper

4    impeachment under 609.  And I think there is a real danger that

5    that causes a mistrial.

6        THE COURT:  I think all the questioning was that

7    Mr. Reigenborn had pled guilty to this offense.  Mr. McLallan

8    had pled guilty to this offense.  And I think one other

9    individual pled guilty to this offense.  But I don't recall the

10   term conspiracy being used, but --

11       MS. PRATT:  Your Honor, it certainly was used.  There

12   was a question or two about whether he had been charged with a

13   civil conspiracy.

14       THE COURT:  Go ahead.

15       MS. HALPERN:  Your Honor, if I may, I believe they

16   opened the door by having Mr. Reigenborn describe it as a

17   completely separate incident.  What actually happened, if you

18   look at it, was that there was a pattern of behavior that all

19   three of them kind of colluded on for multiple scenarios, and

20   so I don't think -- the way he described it was -- well, the

21   Plaintiff should be able to rebut how he described it, which

22   was like, I had this separate incident and it wasn't really

23   related to what the other two did, when they were all charged.

24       THE COURT:  I agree.  I mean his description of the

25   incident, he went into great detail as to what he said

20-cv-01936-STV    Trial, Vol. IV    January 24, 2025

1    happened, which frankly was not all that credible.  And to the

2    extent that they wish to impeach that testimony -- I mean, it's

3    an important point to his credibility that he was convicted of

4    an offense of essentially lying under oath.  He attempted to

5    minimize that to a great extent on the stand.  They're free to

6    try to explain to the jury that it wasn't -- I mean, he

7    described it as an accident.  I don't know what the jury's view

8    of it, you know, that's ultimately their determination as to

9    how credible that is, but they're free to explore whether or

10   not this was an accidental -- oh, my trainer told me that I was

11   good to go and oopsy, it was my mistake, versus an

12   intentional -- which is what he pled guilty to, an intent to

13   mislead.  They're free to explore that.

14       MS. PRATT:  I understand that with regard to

15   Mr. Reigenborn.

16       But with regard to Mr. McLallan, I think the issue

17   remains that if Mr. McLallan is not asked any such questions,

18   then I don't think they are free to explore those issues.

19       THE COURT:  But if, in the end, all of them were

20   involved in something much bigger than what Mr. Reigenborn

21   testified to, they're free to explore that.  I'm going to allow

22   some testimony into that.

23       MS. PRATT:  And your Honor, I would just also state

24   for the record, given that there was never any conviction of

25   any sort of conspiracy, I think that also is -- last I checked,

20-cv-01936-STV    Trial, Vol. IV    January 24, 2025

1    people are innocent until proven guilty.  They pled guilty to

2    certain crimes, but not others.  And I don't think that that's

3    a proper area of impeachment.

4         I understand the Court's ruling.  I just wanted to

5    state, over my objection.  Correct?

6         THE COURT:  Yes.

7         And I'll take each question as it's asked.  But if the

8    question goes to what Mr. Reigenborn was involved in, given his

9    testimony yesterday that attempted to minimize what exactly he

10   did -- I mean, he essentially testified on the stand that he

11   didn't do what he pled guilty to.  To the extent they want to

12   explore that more, I'll allow them to.

13        To the extent it doesn't go to that issue, then you

14   can object, and I'll take each objection as it comes.

15        MS. PRATT:  Okay.

16        THE COURT:  Let's bring our jury in.

17        (Continued on next page)

18

19

20

21

22

23

24

25

Mitchell - Direct

1     (In open court; jury present)

2          THE COURT:  I'll remind you, you are still under oath.

3          THE WITNESS:  Yes, sir.

4     MARK MITCHELL,

5          having been previously duly sworn, testified as follows:

6          THE COURT:  Counsel, you may continue.

7     DIRECT EXAMINATION(continued)

8     BY MR. BOHNET-GOMEZ:

9     Q.  Good morning, Mr. Mitchell.

10    A.  Good morning.

11    Q.  Yesterday, we heard some testimony about the Aurora theater

12    shooting.

13         Can you describe your role in that event?

14    A.  I was the SWAT team commander at the time, and I received a

15    telephone call that -- requesting the assistance of the Adams

16    County Sheriff's Office SWAT team.  It was about 11:00 o'clock

17    at night, my head had just hit the pillow.

18         And I activated our team.  We reported to the

19    substation so we could gear up.  While I was at the substation,

20    I was in contact with ADCOM, Adams County Communications

21    Center.  I think I made one or two broadcasts, where do we need

22    to be.  And I was also on the phone with my counterpart with

23    the Aurora SWAT team, a fellow by the name of Mike Daly[ph].

24    And I believe I was also on the phone with Chief Coates trying

25    to coordinate where we needed to be.

Mitchell - Direct

1    Q.  And ADCOM is the police dispatch essentially?

2    A.  Yeah, that's the agency we use to dispatch.

3    Q.  And you also heard Mr. Reigenborn testify yesterday about

4    comments you allegedly made on dispatch?

5    A.  I did.

6    Q.  Can you describe what you remember --

7    A.  I don't recall -- I don't recall making that.  But if I

8    had, you know, we commonly refer to our equipment as toys.  So

9    that's the vernacular, you know, I have -- you know, I have 30

10   SWAT operators ready to go, they're -- a lot of them, like me,

11   worked all day long.  If we're not needed, I'll go ahead and

12   send them home.  And that was what we were in communication

13   with Aurora with.

14   Q.  Do you recall what ended up happening after the situation

15   you described where you weren't sure if you were going to be

16   deployed?

17   A.  We were requested.  It was about 45 minutes after we had

18   assembled at the substation.  And we reported to the Aurora

19   mall.

20          I had our team in our vehicles stand by while I went

21   to the command post.  At the time, Chief Coates was already in

22   the command post.  The situation had already stabilized.  But

23   there was other issues that were being discussed, such as

24   clearing the entire mall.

25          And then, while we were sitting there, we were

Mitchell - Direct

1    notified that there was possibly a booby trap bomb situation at

2    the suspect's apartment.  And Mike Daly and his command staff,

3    being short of staff, asked me if I would deploy my team to the

4    apartment, waiting on the bomb squad, secure the apartment.

5    And we immediately responded to the apartment.  We secured the

6    entire apartment building, did some evacuations, and secured

7    that location waiting for the bomb squad.

8    Q.  I want to switch gears a little bit and talk again about

9    January 15th when you met with Mr. Reigenborn --

10   A.  Okay.

11   Q.  -- about your employment.

12          Was January 15th, 2019 the last day you worked at the

13   Adams County Sheriff's Office?

14   A.  Yes.

15   Q.  And did you get a retirement party after that?

16   A.  No.

17   Q.  Did anyone from the Sheriff's Office do anything for you to

18   thank you for your service?

19   A.  No.  We -- we found out later there was a retirement party

20   with a lot of people on there, and our name was honorable

21   mention.  And I received a plaque in the mail.  And I went up

22   to get my CCW.  At which time, I received my retirement badge

23   and my CCW at headquarters.

24   Q.  Were you invited to the retirement party?

25   A.  I was not.

582
Mitchell - Direct

1   Q.  After you left the Sheriff's Office that day, on

2   January 15th, 2019, how did you explain what happened to your

3   family?

4   A.  I was devastated.  It was a gut punch.  You know, I -- I

5   was used to being -- having purpose.  I would get up every

6   morning, there was things for me to do, and going in and

7   solving problems and taking care of issues.  And you know, I

8   enjoyed the work.  I enjoyed interacting with the people.  And

9   literally, at the snap of a finger, that was gone.  I was lost,

10  devastated.  I remember many days just literally sitting in

11  front of the TV going, what next.  I had never -- I hadn't

12  planned on retiring.

13  Q.  And can you describe what the impact of that sense of loss

14  was on your life?

15  A.  I went through a rollercoaster of emotions, from depression

16  to sadness to anger and -- because I didn't -- I didn't do

17  anything wrong.  I didn't -- I don't know why I'm sitting in

18  front of the TV watching SportsCenter all day.

19  Q.  And was there a time when you decided to go back to look

20  for work?

21  A.  I did.  My wife convinced me that I needed -- I needed to

22  get out of the house, you got too much energy to just sit here,

23  you have a lot left in the tank.  So I started to apply.

24          And I think I referred to when I applied to the

25  Sheriff's Office, I actually answered an ad in the newspaper

                                    583
                        Mitchell - Direct

1    and went in and filled out an application.  Well, that's all

2    gone, and you have to be on websites and hiring sites and all

3    of this stuff.  And I didn't know how to do any of that.  I had

4    never anticipated having to look for another job.

5    Q.  Can you describe what you did to look for another job?

6    A.  Well, I was on NEOGOV, which is the government jobs site.

7    I was -- Indeed, you know, filled out all the requirements for

8    Indeed.  I did get some inquiries.  I ended up applying for,

9    during that four-year period, probably 200 jobs, most of them

10   in operations, like safety manager or operations manager.  I

11   applied for a job at Waste Management to be an operations

12   manager for a landfill, a safety manager at Royal Crest Dairy,

13   hoping that some of my experience operating the patrol

14   division, that that would translate.  And I found out very

15   quickly that private employers were not lined up around the

16   block for a 54-year-old ex-cop.

17   Q.  About how many interviewed did you --

18   A.  I probably -- I'm sorry.  I probably had 40 or 50

19   interviews.  Most of them were Zoom interviews, which was new

20   to me.  But I had a lot of in-person interviews.  I interviewed

21   in person at the Boulder Sheriff's Office to be the records

22   manager.  Again, Waste Management, Royal Crest.  I tested for a

23   commander's position, which is a rarity that comes up, at the

24   Louisville Police Department and went through the testing

25   process and lost out the job to Mike McIntosh.


                    SADIE L. HERBERT, RPR, RCR
            901 19th Street, Denver, CO 80294  (303)335-2105

Mitchell - Direct

1    Q.  You described the commander's position at Louisville that

2    you lost out to former Sheriff McIntosh as a rarity.

3           Can you describe why that is?

4    A.  Well, like it was described earlier, most agencies promote

5    from within.  They know their people, they know what they can

6    do, they have seen them work, they have seen them interact with

7    the employees.  And smaller agencies, because of limited staff

8    or not having enough qualified people, will occasionally, like

9    Northglenn or Louisville, will announce a command position.

10          And you have to have certain requirements.  You have

11   to have been a commander.  This one included having to attend

12   either the FBI academy and/or Northwestern.  So it wasn't just

13   anybody in law enforcement that could apply.

14   Q.  And can you walk us through the employment that you were

15   able to obtain during that period between leaving the Sheriff's

16   Office in 2019 and returning in 2023?

17   A.  So the first job I took was a program manager for HSS

18   Security, Hospital Shared Services.  It was an operations

19   manager, security, providing security for all of the Denver

20   municipal buildings; the courts, the water plant, the dog

21   pound, so there's like 13 or 14 different areas.  And I did

22   that for about two months.  It was not a good fit for me.

23   There was way too much trying to please Allied, and then the

24   customer and there's -- it just -- it wasn't a good fit.

25          After I left there, I had to have surgery on my

Mitchell - Direct

1    shoulder.  I had replacement surgery.  So I had that in

2    February of 2020.  And as I was recovering, I was offered a

3    position with Allied Security to oversee the security at the

4    Southlands mall.

5              And even though I had a sour taste in my mouth from

6    HSS, I thought, just this one location, dealing with these

7    would be a little better.  And so I took that position.  And

8    this is during COVID.

9              I had applied for a supervisor's position in the

10   Colorado Information and Analysis Center, and they had called

11   me to set up an interview.  But then they postponed all of that

12   because of COVID.  And so I worked at Allied from March until

13   June of 2020.

14             And then I got a call from the CIAC asking if I was

15   still interested.  And I went in and I interviewed, and they

16   hired me at the Colorado Information and Analysis Center.  I

17   worked there for 13 months.

18             And left there and took some time off.  And during

19   that time, coming up on my expiration of my POST -- so if

20   you're not in law enforcement, you get -- you've got three

21   years, and if you are not in law enforcement, you will lose

22   your POST.  And you have to challenge that so that you can

23   continue having the POST, you know, being a certified law

24   enforcement officer.  So during the winter months of '21 and

25   '22, I challenged post.  And I had to test out with PPCT,

Mitchell - Direct

1    firearms, driving, first aid, and then, of course, a written

2    test.  So I did that, and I challenged POST in February of

3    2022.

4    Q.  Can I interrupt you, Mr. Mitchell, just to make sure

5    everyone understands.

6         What is POST?

7    A.  It is the Colorado Police Officer Standards and Training

8    that every officer has to be certified with.  And usually, you

9    go to an academy, and then you get POST certified.  And as long

10   as you are in law enforcement, you meet their requirements, you

11   maintain your POST.

12        Well, if you are not in law enforcement, you can't

13   really do that.  So they give you three years to get back into

14   law enforcement, or you lose your certification.

15   Q.  And the reason you had to retest is because none of the

16   positions that you were describing were law enforcement

17   positions?

18   A.  That's correct.

19   Q.  So you were able to recertify?

20   A.  Yes, sir.  I certified the first week of February of 2022.

21        I applied for other jobs.  And a part-time position

22   with the Westminster Police Department's Municipal Court came

23   open.  It was a noncertified civilian, basically security

24   guard.  But it allowed me to get back into law enforcement and

25   become active.  And I worked 20 hours a week.  And I started

                           587
                   Mitchell - Direct

1    there in June of 2022 and worked until the end of December of

2    2022.

3    Q.  How long were you planning to work at the Adams County

4    Sheriff's Office before Mr. Reigenborn discharged you?

5    A.  I was 54 years old, and I anticipated working there at

6    least until 62.  But in the back of my mind, at least until

7    full retirement age of 65.  So another 10 or 11 years.

8    Q.  Let's talk a little bit about your economic losses --

9    A.  Okay.

10   Q.  -- resulting from that termination.

11          MR. BOHNET-GOMEZ:  Can we pull up Exhibit 12, please.

12   Q.  Mr. Mitchell, what is Exhibit 12?

13   A.  This is a form that describes what my salary would be in

14   the year of 2019, which included a raise and a lump sum based

15   on the evaluation.

16   Q.  You said 2019 or 2018?

17   A.  I believe that this is the -- no, this is -- we receive

18   these at the first of the year in 2019.  We were still with the

19   Sheriff's Office, and we receive these.  I believe that that's

20   what this is.  I'm trying to scroll down to see a date or

21   something.

22          Oh, no.  Yes, this -- 2018.  I'm sorry.

23          MR. BOHNET-GOMEZ:  We would move this into evidence.

24          THE COURT:  Any objection?

25          MS. PRATT:  No objection.

588

Mitchell - Direct

 1          THE COURT:  It's admitted.

 2      (Plaintiff's Exhibit 12 received in evidence)

 3          MR. BOHNET-GOMEZ:  Publish that to the jury, please.

 4  BY MR. BOHNET-GOMEZ:

 5  Q.  So the effective date of this is in 2018?

 6  A.  Yes.  I'm sorry, I was thinking something else.

 7  Q.  But you get one of these every year; is that what you are

 8  saying?

 9  A.  Yes, the first of the year.

10  Q.  Can you explain what the lump sum amount that's highlighted

11  there refers to?

12  A.  As it was explained earlier by Chief Coates and Mr. Currier

13  is the lump sum is the merit increase that you would receive

14  based on your score of your appraisal.  And since I was topped

15  out in the pay raise, you get a lump sum.

16  Q.  And why did you receive a 5 percent lump sum bonus this

17  year?

18  A.  Because my appraisal, as reflected on this form, shows that

19  I had a performance rating of a 4.73, which rises into that

20  exceptional rating.

21  Q.  And that scale, the rating scale is out of 5?

22  A.  1 to 5, yes, sir.

23          MR. BOHNET-GOMEZ:  We can take that down.

24          And if we could pull up Exhibit 38, please.

25  Q.  Mr. Mitchell, what is Exhibit 38?

Mitchell - Direct

1  A.  This is what I was thinking earlier.  This is what we

2  received the first part of January that would reflect what my

3  pay would be in 2019.

4          MR. BOHNET-GOMEZ:  Your Honor, we move Exhibit 38 into

5  evidence.

6          THE COURT:  Any objection?

7          MS. PRATT:  No objection.

8          THE COURT:  It's in.

9      (Plaintiff's Exhibit 38 received in evidence)

10         MR. BOHNET-GOMEZ:  And if we could publish, please.

11  BY MR. BOHNET-GOMEZ:

12  Q.  So this is the 2019 salary information?

13  A.  That's correct.

14  Q.  And what was your annual salary at the time you were

15  discharged from the Sheriff's Office?

16  A.  $131,319.46.

17  Q.  And this is before the lump sum bonuses you were

18  describing?

19  A.  That's correct.

20  Q.  And do you see where it says there's a 5.5 percent increase

21  for your pay?

22  A.  Yes.

23  Q.  What does that refer to?

24  A.  That's a market adjustment.  That's cost of living and the

25  market adjustment of the positions.

                                                                    590
                              Mitchell - Direct

1    Q.  And do you typically receive those adjustments while

2    working at the Sheriff's Office?

3    A.  Yes, in that range.

4    Q.  Around 5 percent?

5    A.  Around 5 percent, yes.

6    Q.  And just to be clear, your base salary is typically

7    adjusted upwards by about 5 percent each year, and then on top

8    of that you get a merit base lump sum bonus?

9    A.  Correct, based on my job performance.

10   Q.  And how much is that lump sum bonus as a percentage,

11   typically, for you?

12   A.  It's usually 5 percent.

13            MR. BOHNET-GOMEZ:  We can take this down.

14   Q.  Would it help you -- I'd like to go through kind of what

15   you would have expected to earn in future years.  Would it help

16   you to have the calculations of that?

17   A.  Sure.

18            MR. BOHNET-GOMEZ:  Your Honor, I would ask permission

19   to give Mr. Mitchell his notes.

20            THE COURT:  Any objection?

21            MS. PRATT:  No objection, as long as it is not

22   presented to the jury.

23            THE COURT:  Okay.

24            MR. BOHNET-GOMEZ:  Would you like one, your Honor?

25            THE COURT:  No, that's fine.


                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

591
Mitchell - Direct

1    BY MR. BOHNET-GOMEZ:

2    Q.  So Mr. Mitchell, based on the salary information we just

3    looked at and your history working at the Sheriff's Office,

4    what was your expected 2019 base salary?

5    A.  My base salary would have been the $131,319.46.

6    Q.  And if you had gotten your expected 5 percent lump sum

7    bonus that year, what amount would that be?

8    A.  $6,565.97.

9    Q.  And what would your total compensation be for the 2019

10   year?

11   A.  $137,885.43.

12   Q.  And so for 2020, if you had gotten the typical 5 percent

13   cost of living adjustment, what would your expected salary be

14   for 2020?

15   A.  $137,885.43.

16   Q.  And then again, for that year, 2020, if you had gotten a

17   5 percent lump sum bonus, what would that amount be?

18   A.  $6,894.27.

19   Q.  And what would your total compensation be in 2020?

20   A.  $144,779.70.

21   Q.  And then, going to 2021, if you had continued to receive

22   the typical 5 percent cost of living adjustment, what would

23   your base salary be expected to be in 2021?

24   A.  $144,779.70.

25   Q.  And for the 2021 year, what would your expected lump sum

Mitchell - Direct

1   bonus be?

2   A.  $7,238.99.

3   Q.  And what would the total compensation you would have

4   expected in 2021 be?

5   A.  $152,018.69.

6   Q.  And then, for the 2022 year, if you had continued to

7   receive the bonuses as expected, what would your base wage be

8   in 2022?

9   A.  $152,018.69.

10  Q.  And if you had, again, received a 5 percent lump sum bonus

11  for the 2022 year, what would that amount be?

12  A.  $7,600.93.

13  Q.  And what would that total compensation be for 2022 that you

14  would expect?

15  A.  $159,619.62.

16  Q.  Let me ask you, for those four years, did you have any

17  increased health insurance expenses due to being off the

18  County's plan?

19  A.  I did, but it was -- it was slight.  It was about $2,500

20  over the course of the four years.  I was a little more

21  fortunate than my peers because I could get on my wife's health

22  insurance at the time.

23  Q.  And was that amount -- were your increased expenses in fact

24  $2,400 -- $2,454?

25  A.  Yes.  I rounded it up a little bit.

                                          593
                            Mitchell - Direct

 1   Q.  Over four years?

 2   A.  Yeah, over four years.

 3   Q.  And how much did you earn from all of the employment that

 4   you described between 2019 and 2022?

 5   A.  I believe it was $131,649, roughly.

 6   Q.  And if you sum up all of the expected salaries for 2019,

 7   2020, 2021, 2022, the $2,454 in increased healthcare costs and

 8   subtract out the amount that you earned from other employment,

 9   what is your total economic loss from 2019 through 2022?

10   A.  $465,108.45.

11   Q.  Now, Mr. Mitchell, you have sat through this entire trial;

12   correct?

13   A.  Yes, sir.

14   Q.  And you have heard -- well, you have been accused of

15   various inappropriate behaviors, including having inappropriate

16   relationships with subordinates.

17           Do you recall that?

18   A.  I do.

19   Q.  How does it make you feel to be accused of that?

20   A.  Pretty angry.  I was -- it didn't happen.  I didn't have

21   any inappropriate affairs, relationships.  And to sit here and

22   listen to Mr. Reigenborn say he heard a rumor and now it's fact

23   and that was one of his deciding factors in terminating me --

24   of course, he never said anything prior to this.  And the

25   comment that he attributes to me about my sister was, again,


                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Mitchell - Cross

1   I -- it's probably a good thing I had a good night's sleep.

2   Q.  Were there ever any internal affairs complaints against you

3   for relationships with other employees at the agency?

4   A.  No.

5   Q.  Any HR complaints?

6   A.  No.

7           MR. BOHNET-GOMEZ:  Nothing further on direct.

8           THE COURT:  Thank you.

9           Cross-exam.

10          MS. PRATT:  Yes, your Honor.

11  CROSS-EXAMINATION

12  BY MS. PRATT:

13  Q.  Mr. McIntosh, good morning.

14          You have been here through the entire trial, as your

15  counsel just stated, and you heard Mr. Coates testify that

16  Mr. Reigenborn in fact retained a number of McIntosh supporters

17  in his administration; correct?

18  A.  Yes.  And my name is Mitchell.

19  Q.  I apologize.  It's already a long morning.

20          You heard Mr. Reigenborn's testimony about that, and

21  you heard Mr. Coates' testimony about that, that many McIntosh

22  supporters were retained in Mr. Reigenborn's administration;

23  correct?

24  A.  Correct.

25  Q.  And you don't dispute that, do you?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

                          Mitchell - Cross

 1   A.  No.

 2          MS. PRATT:  Could you please pull up Exhibit Z,

 3   please.  I believe this was already admitted in evidence

 4   yesterday.

 5          And Jon, if you would please highlight and enlarge the

 6   section under position purpose, please.

 7   Q.  Mr. Mitchell, you see that line in the second paragraph

 8   that says this is an appointed position that works at the

 9   pleasure of the Sheriff?

10   A.  Yes.

11   Q.  Did I read that correctly?

12   A.  Yes.

13   Q.  And that's what Colorado law provides; correct?

14   A.  Yes.

15   Q.  That deputies work at the pleasure of the Sheriff; correct?

16   A.  Correct.

17          MS. PRATT:  Thanks.  We can take that down.

18   Q.  Now, your allegation in this case is that you supported

19   former Sheriff McIntosh in the 2014 and 2018 elections and that

20   that was the reason that Mr. Reigenborn terminated your

21   employment; correct?

22   A.  Yes.

23   Q.  The conversations that you actually had about your support

24   for Sheriff McIntosh were just private conversations with your

25   friends; isn't that right?

596
Mitchell - Cross

1    A.    That's correct.

2    Q.    You weren't out there drum beating on behalf of Sheriff

3    McIntosh; correct?

4    A.    Correct.

5    Q.    You weren't standing on a soap box for any candidate?

6    A.    No.

7    Q.    And any comments that you may have made about

8    Mr. Reigenborn's qualifications to be Sheriff, those were also

9    private conversations; right?

10   A.    Correct.

11   Q.    We have also heard some testimony that you met with then

12   Sheriff Elect Reigenborn and his proposed Undersheriff,

13   Mr. McLallan in or about December of 2018, prior to their

14   taking office; right?

15   A.    Correct.

16   Q.    And that was the meet and greet meeting; correct?

17   A.    Yes, ma'am.

18   Q.    So that you could have an opportunity to speak with

19   Mr. McLallan; correct?

20   A.    Correct.

21   Q.    And during that meeting, you didn't discuss anything with

22   either Mr. Reigenborn or Mr. McLallan about any role you may

23   have had in Mr. McIntosh's campaign; correct?

24   A.    It was not brought up.

25   Q.    That subject just wasn't discussed; right?

Mitchell - Cross

 1   A.  Correct.

 2   Q.  Now, shifting gears a little bit.

 3       You worked at the Adams County Sheriff's Office during

 4   the transition between Sheriff Camp to Sheriff Shearer;

 5   correct?

 6   A.  Yes.

 7   Q.  And that transition was pretty contentious?

 8   A.  Yes.

 9   Q.  Some people were fired by Sheriff Shearer when he took

10   office?

11   A.  Yes.

12   Q.  And others were demoted?

13   A.  Yes.

14   Q.  Now, from the transition from Shearer to Darr, it wasn't as

15   contentious; right?

16   A.  That's correct.

17   Q.  And that was because Sheriff Shearer supported Sheriff

18   Darr, wanted him to be elected; correct?

19   A.  I wouldn't know.  I wasn't active in the politics.  I

20   was -- you know, I was a deputy and I was just doing my job, so

21   I don't know what Darr and Shearer's relationship was.

22   Q.  Do you remember being deposed in this action?

23   A.  Yes.

24   Q.  Having your deposition taken?

25   A.  Yes.

598

Mitchell - Cross

1   Q.  And you swore an oath to tell the truth --

2   A.  I did.

3   Q.  -- at that deposition; right?

4          MS. PRATT:  Your Honor, I would like to have the

5   witness review a portion of his deposition.  I believe we have

6   a binder that has all of the deposition transcripts in them.

7   May the clerk hand that to the witness, please.

8          THE COURT:  Yes.

9   BY MS. PRATT:

10  Q.  And Mr. Mitchell, if you would find the tab with your name

11  on it, please, and specifically go to Page 30, if you would.

12  A.  Okay.

13  Q.  I'll direct your attention to Line 15.

14         You were asked the following question during your

15  under oath deposition:  "And again, I think we know this, but

16  for the sake of the record, Darr was supported by Shearer as

17  his successor; is that your memory?"

18         Answer:  "I believe so, yes."

19         That was your testimony at the time; correct?

20  A.  Yes.

21  Q.  And you don't dispute that now?

22  A.  I don't.

23  Q.  And then, likewise, the transition between Darr and

24  McIntosh also wasn't as contentious as the previous transition

25  from Camp to Shearer; correct?

Mitchell - Cross

1    A.  Correct.

2    Q.  And that was also because Darr supported McIntosh; right?

3    A.  Correct.

4    Q.  At the time that you separated from the Adams County

5    Sheriff's Office, you held the rank of captain; correct?

6    A.  That's correct.

7         MS. PRATT:  Could we please bring up Plaintiff's

8    Exhibit 87.  And that is also already in evidence.  Thanks.

9    Q.  So Mr. Mitchell, do you see on the screen in front of you

10   Plaintiff's Exhibit 87?

11   A.  I do.

12   Q.  And that is the organizational chart that we have seen a

13   few times already in this case from the McIntosh

14   administration; correct?

15   A.  Correct.

16        MS. PRATT:  And Jon, if you would please zoom in a bit

17   to the middle of the page there, under Division Chief O'Neill's

18   name.

19   Q.  Mr. Mitchell, that reference is to you as division captain

20   under Terrance O'Neill; correct?

21   A.  Correct.

22   Q.  And in your prior testimony, you stated that you engaged in

23   various give and take with the division chiefs that you worked

24   with; correct?

25   A.  Correct.

Mitchell - Cross

```
 1   Q.  You could make suggestions to them?

 2   A.  Absolutely.

 3   Q.  You were involved in internal affairs investigations, to

 4   the extent they arose; right?

 5   A.  I didn't investigate.  I reviewed.

 6   Q.  Sure.  But you had a role in reviewing the internal affairs

 7   investigation of people under your command; correct?

 8   A.  Correct.

 9   Q.  And that meant you had knowledge about specific incidents

10   and investigations that happened in the patrol division; right?

11   A.  To some extent, yes.

12   Q.  And that would be the type of information that would not be

13   generally disseminated to people within the patrol division;

14   correct?

15   A.  Again, to some extent.  It depends on what it is.

16   Q.  Well, results of --

17   A.  Sergeants and above.

18   Q.  Results of internal affairs investigations are not just

19   widely disseminated to the troops; right?

20   A.  No, they are not.

21   Q.  And you were also responsible, in your role as division

22   captain, for ensuring that subordinates were following the

23   Sheriff's policies; right?

24   A.  That's correct.

25   Q.  You had contact with the public in your role as division
```

601
Mitchell - Cross

1  captain?

2  A.  Yes.

3  Q.  And you had at least some authority to spend money on

4  behalf of the division; right?

5  A.  I had limited authority to sign off on purchasing orders

6  for small items or things like that, yes.

7  Q.  And you anticipated my next question, that you could sign

8  off on certain purchase orders; correct?

9  A.  That's correct.

10  Q.  And as a captain, you also had discretion to respond to a

11  call for assistance from another jurisdiction; right?

12  A.  Yes.

13        MS. PRATT:  We can take down Exhibit 87.  Thank you.

14  Q.  We heard you testify on direct about other positions that

15  you sought and obtained after you separated from the Adams

16  County Sheriff's Office.

17        Do you remember that line of questioning?

18  A.  Yes, ma'am.

19  Q.  Now, at one point, after you went to work for Allied

20  Security, you took a position to work at the Colorado

21  Information Analysis Center; right?

22  A.  That's correct.

23  Q.  And you got bored with that position and resigned; right?

24  A.  It was -- yes.  I thought it was more law enforcement

25  centric, and it was not.

Mitchell - Cross

1    Q.  That was in, roughly, July of 2021; correct?

2    A.  Correct.

3    Q.  And after that, Mr. Currier ran for Sheriff of Elbert

4    County; right?

5    A.  Yes.

6    Q.  And you agreed to work for him as his undersheriff if he

7    were to win the election; right?

8    A.  I did.  I said that I would be available to him if he

9    wanted me.

10   Q.  But he lost that election?

11   A.  Correct.

12   Q.  So you never became Undersheriff of Elbert County; right?

13   A.  No.

14   Q.  But when Mr. Claps ran for Sheriff of Adams County in the

15   November 2022 election cycle, he was successful and he took

16   office as Sheriff; correct?

17   A.  Correct.

18   Q.  And you went back to work for Mr. Claps -- now, Sheriff

19   Claps' administration at the Adams County Sheriff's Office; is

20   that right?

21   A.  Correct.

22   Q.  Originally, you came back into the Adams County Sheriff's

23   Office, at the prior rank that you held previously, division

24   chief; right?

25   A.  I was a captain previously.  I came back as division chief,

Mitchell - Cross

1    yes.

2    Q.  So you even got a promotion?

3    A.  Yes.

4    Q.  Currently, though, you hold the position of commander;

5    correct?

6    A.  Correct.

7    Q.  And that is down two notches from division chief; right?

8    A.  Correct.

9    Q.  Assuming there was a captain position in between; right?

10    A.  Yes.

11    Q.  Now, you testified during your direct testimony that, prior

12    to separating from the Adams County Sheriff's Office, you had

13    two instances of discipline; is that right?

14    A.  Yes.

15    Q.  After you returned to the Adams County Sheriff's Office --

16          MR. BOHNET-GOMEZ:  Objection, your Honor, relevance

17    and 404(b).

18          THE COURT:  Response?

19          MS. PRATT:  Your Honor, they have put their character

20    directly in issue in this case by saying that they were

21    exemplary officers that did everything by the book.

22    Mr. Mitchell testified yesterday I think specifically to those

23    words, in which case I do believe it's admissible.

24          THE COURT:  Overruled.

25    BY MS. PRATT:

Mitchell - Cross

604

1    Q.   Now, Mr. Mitchell, after you returned to the Adams County

2    Sheriff's Office under Sheriff Claps, you were investigated for

3    mishandling a weapon; correct?

4    A.   Yeah.  Yes, I was.

5    Q.   And that weapon was an AR-15 style weapon; right?

6    A.   It was an unloaded AR-15, and I was horse playing and, you

7    know, I -- I was wrong.

8    Q.   Right.  And you understand, though, that in gun safety

9    handling, you never point the barrel of a gun toward anything

10   that you are not intending to shoot; correct?

11   A.   That's correct.

12   Q.   Regardless of whether the weapon is loaded or not; correct?

13   A.   Correct.

14   Q.   And you pointed that gun at your colleagues; correct?

15   A.   It was playful with Mr. Currier.

16   Q.   Your testimony is that pointing an AR-15 style weapon at

17   colleagues was playful?

18   A.   It's the context of what I was doing.  It was more the

19   flashlight that was on the end of the weapon.  Unfortunately,

20   it's attached to the weapon, and I was lighting up Mr. Currier.

21   Q.   Nevertheless, you were investigated for that incident;

22   correct?

23   A.   That's correct.  I took full responsibility.

24   Q.   You were disciplined?

25   A.   I was.

Mitchell - Redirect

1    Q.  Were you demoted as a result of that incident?

2    A.  No.

3         MS. PRATT:  Thank you.  I don't have anything further

4    for you.

5         THE COURT:  Redirect.

6    REDIRECT EXAMINATION

7    BY MR. BOHNET-GOMEZ:

8    Q.  Mr. Mitchell, you were asked on cross-examination about

9    whether McIntosh supporters were retained by Mr. Reigenborn?

10   A.  Correct.

11   Q.  Mr. Mitchell, the McIntosh supporters were, for the most

12   part, demoted or forced to retire; isn't that right?

13   A.  Yes.

14   Q.  And you were asked about the transition between Sheriffs

15   Camp and Shearer.

16        Do you recall that?

17   A.  Yes, I do.

18   Q.  When was that?

19   A.  I was working in the jail.  It was the 1994 election, so

20   Bill Shearer would have taken office in 1995, January '95.

21   Q.  And are you aware of what happened with the contentious

22   dispute that you testified about?

23   A.  You know, the department was divided.  And when Bill

24   Shearer came in, 11 people were either dismissed or demoted.

25   Q.  And do you know what happened with those employees?

Dunning - Direct

1    A.  I know they filed a lawsuit.

2    Q.  And are you aware of what occurred with that lawsuit?

3    A.  They were successful.

4            MR. BOHNET-GOMEZ:  Nothing further.

5            THE COURT:  Do our jurors have any questions for this

6    witness?

7            You are excused.

8            THE WITNESS:  Thank you.

9            THE COURT:  Plaintiffs may call their next witness.

10           MR. BOHNET-GOMEZ:  Your Honor, if we could have a

11   minute to maybe see which witnesses are actually available.

12           THE COURT:  Sure, sure.  Take a moment.

13           MR. BOHNET-GOMEZ:  Your Honor, Plaintiffs call Bill

14   Dunning.

15   WILLIAM DUNNING,

16       called as a witness by the Plaintiffs,

17       having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. BOHNET-GOMEZ:

20   Q.  Good morning, Mr. Dunning.

21   A.  Good morning.

22   Q.  Can you tell us where you are presently employed?

23   A.  Presently employed at the Adams County Sheriff's Office.

24   Q.  In what position?

25   A.  Division chief over the jail operations and court security

Dunning - Direct

1    operations.

2    Q.   Mr. Dunning, let's back up.

3         Can you tell us how you got into law enforcement

4    initially?

5    A.   Sure.  I grew up in a law enforcement family.  My father

6    retired from Jefferson County.  Like most sons, I thought my

7    father was a hero.  He had a great influence in my desire to

8    join law enforcement.  And so for about four years in my

9    teenage years, I volunteered with the Jefferson County

10   Sheriff's Office in their youth division programs.  That's

11   before those programs are now called the explorer programs.

12   Essentially, it's just a preparatory, volunteer organization,

13   where you learn a little bit about law enforcement.

14        When I turned 18, I joined the Army as an MP.  That

15   was short lived.  They sent me down to Alabama.  And being a

16   kid that grew up in the dry climate in Colorado, I had no idea

17   I had asthma and things like that.  But that occurred when I

18   went down there, and I received an honorable medical discharge

19   from the Army.

20        I came back to Colorado kind of with my tail between

21   my legs.  That was my plan, to be an MP for three years, and

22   then come back and be a certified peace officer.  So I occupied

23   my time over the next couple years going to Arapahoe Community

24   College trying to get an associate's degree in criminal

25   justice.  And I believe I have it all, I just didn't put it all

Dunning - Direct

 1   together.

 2          When I turned 21, I was hired with Adams Community

 3   Corrections, it's a community corrections organization inside

 4   Adams County.  I was employed as a corrections officer.  I

 5   spent about four and a half years with Adams Community

 6   Corrections and rose to a supervisor position there.

 7          And then I was hired with the Adams County Sheriff's

 8   Office in May of 1989 as a civilian.  We called them a

 9   community service officer, at that time.  I believe we call

10   them detention specialists now.  They were in charge of

11   noncontact areas with the inmates, control booths, things like

12   that.  They open doors, answer phones.

13          I was promoted pretty rapidly to deputy sheriff in

14   January of 1990.  And then I spent the next five years with the

15   Sheriff's Office in various positions inside the jail; booking,

16   transport, court security.  I had a short stint down in patrol,

17   that was right when the new Sheriff took over, made some

18   adjustments to assignments.  And I didn't take that very well,

19   and I left law enforcement.

20          I left law enforcement for about 22 years, went into

21   the corporate world, into the automotive and RV industry, where

22   I started as a mechanic, transferred to a service writer, then

23   assistance service manager, and a service manager and then

24   ultimately a director of parts and service for most of the 22

25   years was that; 17 years of the 22 years, I was director level.

Dunning - Direct

1          I left the retail side of the RV business and went

2     into the manufacturing side of the RV business for about a year

3     and a half before I took the job with the Adams County

4     Sheriff's Office as the civilian chief of staff in May of 2019.

5     Q.  And I'll ask you more about that in a bit, but I want to

6     talk first about your relationship with Rick Reigenborn?

7     A.  Sure.

8     Q.  How did you meet Mr. Reigenborn?

9     A.  I believe he started a couple years after I did with the

10    Sheriff's Office.  I think he started in '91.  He was assigned

11    to the same platoon, the same shift that I was on.  We would

12    often work in the same areas of the jail together.  And so we

13    formed a friendly coworker relationship.

14    Q.  And did you stay in touch with Mr. Reigenborn after you

15    left the Sheriff's Office in 1995?

16    A.  Yeah, in 1995, you have to remember, there was no social

17    media back then.  So in 1995, when I left, I went off and

18    raised my family, he raised his family.  There was really no

19    contact until social media came around.  At that point, we kind

20    of found each other on Facebook and, you know, just said hi and

21    exchanged jokes, but really didn't do anything formal until he

22    had announced that he was going to run for Sheriff in 2014, I

23    believe, was the campaign year.

24    Q.  Let's talk about that 2014 campaign for Adams County

25    Sheriff.

610
Dunning - Direct

 1   A.   Yup.

 2   Q.   Did you support Mr. Reigenborn --

 3   A.   I did.

 4   Q.   -- in that campaign?

 5   A.   I did.

 6   Q.   And what did you do to support him?

 7   A.   Well, when he had announced that, I mean, I saw it on

 8   Facebook that he was going to run for Sheriff.  And I was

 9   thinking to myself, how cool is that, someone who I worked with

10   previously has now risen up to the level that he could run for

11   Sheriff.

12        We had contacted each other.  And I can't remember if

13   he reached out to me or I reached out to him, but the

14   conversation got into how I could participate and help in the

15   campaign.  And so essentially, what we did was I was off on

16   Sundays and Mondays, and so we met on Sundays and Mondays and

17   we would walk through neighborhoods, pass out brochures, you

18   know, the ones you get on your door all the time, stand on

19   corners and wave campaign flags and things like that.  That was

20   really the gist of that.

21   Q.   Were you with Mr. Reigenborn when the election results came

22   in?

23   A.   I was.  He did invite me to the election night results.  We

24   saw those results come in.  It was pretty obvious that he did

25   not win that first election.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Dunning - Direct

 1           Separated after that night and really, I think I saw

 2    him maybe twice throughout the next three to four years, until

 3    he announced that he was going to run again.

 4           He had a small utility trailer, and that was my

 5    business, that he needed to refurbish.  I was trying to save

 6    him some money, and I said, just give to to me, and I will do

 7    it in the garage.  So I refurbished this trailer for him,

 8    returned it to him, and I think we went out to dinner once, and

 9    really never saw him again until he announced he was going to

10    run again.  And then did essentially the same thing, helped him

11    pass out brochures and go to events.

12    Q.  How did Mr. Reigenborn respond to losing the 2014 election?

13    A.  Not well.  You know, I don't think anybody would be happy

14    if they put their heart and soul into something and weren't

15    successful.

16    Q.  And let's talk about that 2018 campaign.

17           You said you were helping with the campaign as well?

18    A.  Yes.

19    Q.  With kind of involvement with the committee?

20    A.  Yes.

21    Q.  Did you also donate to the 2018 campaign?

22    A.  I did, yeah.  I felt like it was necessary to have a little

23    bit more involvement this time, since he did not get elected

24    the first time.  And I was in a better position financially, so

25    I did donate, I believe, $2,500 to his campaign.

Dunning - Direct

1  Q.  Now, at the time of the 2018 election, were you actively

2  looking to go back to the Sheriff's Office?

3  A.  No.  We didn't really talk about that.

4        This job that I had taken in the manufacturing side of

5  the RV business was a breath of fresh air for me.  The retail

6  side of it, the corporate side of it, I was working 55, 60

7  hours a week, and then had to come home and finish everything

8  at the house.  It was very taxing on myself and my family.

9  When I got the job at the manufacturing facility, it was really

10  a 40-hour a week job, when the whistle blows, everybody goes

11  home.  While it was a significantly less amount of

12  compensation, it was 10 minutes from my house.  And I had

13  achieved a level of financial independence at that point in my

14  life where I could afford to do that.  And I had anticipated

15  that I was going to retire from that manufacturing facility.

16  Q.  And let's talk now about your return to the Sheriff's

17  Office.

18  A.  Okay.

19  Q.  Can you tell us how you ended up being hired back by

20  Mr. Reigenborn?

21  A.  Yeah.  Obviously, we had contact during the campaign events

22  and passing out the brochures.  There was really never any

23  discussion about me coming back.  I was no longer a certified

24  peace officer.  My certification, once you leave, expired after

25  3 years.  And so after 22 years, mine had long been expired, so

Dunning - Direct

 1    there was really no talk about me coming back to the agency at

 2    that point.

 3            Right around Christmas, after he had won the election,

 4    I called him to wish him a merry Christmas and a happy new

 5    year.  And in that conversation, we talked about what he was

 6    doing.  And at that time, he was going through and doing

 7    interviews with all of the current staff, finding out where

 8    they were assigned, what their skill set was, what their résumé

 9    said.  And I'm assuming he was using that information to decide

10    how he was going to assign those people once he took office.

11            And he made a statement to me in that phone call,

12    after I told him, wow, that must be a daunting task, having to

13    go through all of that.  He said, yeah, it really is, and I

14    wish you were here to help me.  And I didn't really think

15    anything of that when he said it and we didn't have any further

16    conversation about it.

17            And I saw him at the inauguration in June -- or in

18    January, after that phone call.  I kind of stayed in the back,

19    stayed out of the way, ran into a few people that I had met

20    from my previous times at the Sheriff's Office and, you know,

21    waited for my time to congratulate him.  I congratulated him,

22    and I left.

23            Sometime around Februaryish, he called me and said,

24    hey, if you are interested, I think I have a position that you

25    might be qualified for and might be interested in.  And I said,

Dunning - Direct

1    well, what is it?

2         And he told me it was a civilian position, chief of

3    staff over the professional standards division.  The person

4    that had held that position had left to a similar position at

5    the county level, where they were no longer tied to an elected

6    official.  And so that's how the position became vacated.  And

7    I said, I don't know, Rick, send over the job description, let

8    me look at it.  This is really where the first phone call

9    happened about an interest in me coming back.

10        I looked at the job description that night.  I kind of

11   sat down, did some pros and cons.  And as I looked at the job

12   description, a lot of what was on the responsibilities for that

13   position correlated to pretty much any executive level

14   leadership position.  It was about managing budgets and

15   managing an HR unit and managing an IT unit and leadership

16   stuff that I had learned and experienced in the corporate side

17   of my experience.

18        And so I met with my financial consultant.  And I

19   asked specifically the question, what would happen if Sheriff

20   Reigenborn did not get elected in three and a half years if I

21   took this position, am I in a position financially to where I

22   could retire.  Because I didn't want to take the job for three

23   and a half years, be out of a job and then be looking for a job

24   at my age.  And she assured me that I was in a good financial

25   position, that I would be able to transition into retirement if

Dunning - Direct

 1    that happened, and so I accepted that position.

 2    Q.   That position you were describing was chief of staff?

 3    A.   Correct.

 4    Q.   And that was a newly created position by Mr. Reigenborn?

 5    A.   I think the title was different than the title of the

 6    previous employee that vacated it.  I believe it was called

 7    director of professional standards prior to me taking it.

 8    Q.   Are you referring to the finance director?

 9    A.   Correct.

10    Q.   So the chief of staff position took over or the duties that

11    you were doing were the duties of the finance director who had

12    moved to the County?

13    A.   Yeah.  And other duties as well.

14    Q.   And did you ever get your POST certification?

15    A.   I did.  So in coming back to -- in coming back to law

16    enforcement, having spent most of my life in law enforcement or

17    corrections or chasing that dream in school and college and the

18    military, I just had a -- kind of a mantra of my own.  Once a

19    cop, always a cop.  So I felt like I needed to be recertified.

20          So I got with some of the subject matter experts at

21    the Sheriff's Office, learned from POST that I could challenge

22    the written test and the skills test and become recertified.

23    And so over the course of the next few months, on my own time,

24    I did that.  And I took the test, and I passed it.  And I took

25    all the skills tests, and I passed those.  And my job had then

Dunning - Direct

 1   been reclassified from chief of staff to division chief.

 2   Q.  So you switched roles?

 3   A.  Correct.

 4   Q.  Let's talk about the personnel decisions Mr. Reigenborn

 5   made when he took office.

 6        You weren't there during that time?

 7   A.  I was not.

 8   Q.  And you don't have any firsthand knowledge --

 9   A.  No.

10   Q.  -- of those decisions?

11        Mr. Reigenborn did not consult with you about that?

12   A.  No.

13   Q.  I want to switch gears and talk about Terrance O'Neill --

14   A.  Okay.

15   Q.  -- running for Sheriff.

16        Do you recall being told by Mr. Reigenborn that

17   Commander O'Neill was running for Sheriff?

18   A.  Yes.

19   Q.  What was Mr. Reigenborn's reaction to that news?

20   A.  He was upset and felt betrayed that someone on his command

21   staff would be running against him.

22   Q.  Did Mr. Reigenborn believe the position required political

23   loyalty?

24   A.  I believe so.

25        MS. REDMOND:  Objection, speculation.

Dunning - Direct

```
 1            THE COURT:  Response?

 2            MR. BOHNET-GOMEZ:  He's had conversations with

 3   Mr. Reigenborn.

 4            THE COURT:  Why don't you rephrase.

 5            MR. BOHNET-GOMEZ:  Okay.

 6   BY MR. BOHNET-GOMEZ:

 7   Q.  Based on your -- I understand you worked in an office next

 8   to Mr. Reigenborn for several years?

 9   A.  Correct.

10   Q.  And you had conversations, many conversations about rumors

11   of Mr. O'Neill and others running for Sheriff?

12   A.  I wouldn't say many conversations, but I was aware of the

13   conversation -- that he was going to have a one-on-one

14   conversation with Terrance O'Neill about the rumor that he was

15   running for Sheriff.

16   Q.  So Mr. Reigenborn told you that he was intending to meet

17   with Mr. O'Neill --

18   A.  He did.

19   Q.  -- one-on-one to address his candidacy for Sheriff?

20   A.  He did.

21   Q.  And you observed Mr. Reigenborn over a period of several

22   years?

23   A.  Sure.

24   Q.  And based on the conversations you had and your

25   observations of Mr. Reigenborn, do you believe that
```

Dunning - Direct

1    Mr. Reigenborn thought that these positions required political

2    loyalty to him?

3            MS. REDMOND:  Objection, your Honor.

4            THE COURT:  Sustained.

5            MR. BOHNET-GOMEZ:  I'll move on.

6    BY MR. BOHNET-GOMEZ:

7    Q.  Let's talk about the 2022 campaign for Adams County

8    Sheriff.

9            Who did you support in that campaign?

10   A.  I supported Rick Reigenborn until he lost the primary.  And

11   then I had approached Sheriff Gene Claps and told him, since

12   Sheriff Reigenborn was no longer in the running, I would

13   support Sheriff Gene Claps.

14   Q.  Did you donate money to Mr. Reigenborn's campaign?

15   A.  I did.

16   Q.  And did your wife or other family members donate to his

17   campaign?

18   A.  She did.

19   Q.  And by "she," you're referring to your wife?

20   A.  Correct.

21   Q.  Now, let's talk about what happened after Gene Claps won

22   the '22 election.

23           You testified you are presently division chief --

24   A.  Right.

25   Q.  -- at the Sheriff's Office under Sheriff Claps?

Dunning - Direct

 1   A.   Correct.

 2   Q.   You were able to retain a position?

 3   A.   That's correct.

 4   Q.   And now that you have worked under both the leadership of

 5   Mr. Reigenborn, Sheriff Claps, have you had a chance to observe

 6   their respective leadership styles?

 7   A.   Yes.

 8   Q.   Can you describe what your observations are on that topic?

 9   A.   Yes.  There was a stark difference in the ability and

10   preparation, the education, preparedness for that position

11   between the two sheriffs.

12        Sheriff Claps, I had recognized from doing the same

13   thing in the corporate world of coming up through the ranks of,

14   you know, a line person, a supervisor, a manager, a director, I

15   have done all those things in the corporate world, so I

16   recognized immediately that Sheriff Claps also shared those

17   same experience in the law enforcement world.

18        Whereas, with Sheriff Reigenborn, he was elected

19   Sheriff and his position that he vacated to be the Sheriff was

20   a sergeant.  And it was clear to me that he had missed some

21   steps in his career progression, things that are essential to

22   be prepared for the position of Sheriff.  After I had met

23   Sheriff Claps, that became glaringly obvious, that he was more

24   prepared for the position than Sheriff Reigenborn was.

25        MR. BOHNET-GOMEZ:  Nothing further on direct, your

Dunning - Cross

 1    Honor.

 2              THE COURT:  Cross-examination.

 3              MS. REDMOND:  Yes, your Honor.

 4    CROSS-EXAMINATION

 5    BY MS. REDMOND:

 6    Q.  Good morning, Mr. Dunning.

 7    A.  Good morning.

 8    Q.  You are familiar with the employment policies of the Adams

 9    County Sheriff's Office; correct?

10    A.  Correct.

11    Q.  You were familiar with the employment policies in place

12    once Sheriff Reigenborn took office in 2019 when you came on

13    the force; correct?

14    A.  From May of 2019 forward, yes.

15    Q.  In particular, you were familiar with the at will

16    employment policy of the Adams County Sheriff's Office?

17    A.  Correct.

18    Q.  There were no changes to the at will employment policy

19    between the McIntosh administration and the Reigenborn

20    administration; correct?

21              MR. BOHNET-GOMEZ:  Objection, 601.  He wasn't there.

22              THE COURT:  Sustained.  But you can -- unless you can

23    build other basis for his knowledge.

24              MS. REDMOND:  I can ask another question, your Honor.

25              THE COURT:  Okay.

Dunning - Cross

1  BY MS. REDMOND:

2  Q.  You testified that, during your time away from the Adams

3  County Sheriff's Office, you were in the corporate world;

4  correct?

5  A.  Correct.

6  Q.  So you know that Colorado is an at will employment state;

7  right?

8  A.  Correct.

9  Q.  You testified on direct examination, you were hired, I

10  believe it was, May of 2019; is that right?

11  A.  That's correct.  The second time.

12  Q.  Yes, the second time.

13  A.  Yes.

14  Q.  After Sheriff Reigenborn took office?

15  A.  Yes.

16  Q.  Thank you for the clarification.

17      MS. REDMOND:  If we can pull up Exhibit 96,

18  Plaintiff's Exhibit 96.  And I believe this has already been

19  admitted into evidence.

20      THE COURT:  Yes, it has been.

21      MS. REDMOND:  Wonderful.

22  BY MS. REDMOND:

23  Q.  Do you recognize Exhibit 96, Mr. Dunning?

24  A.  I do.

25  Q.  And what is it?

Dunning - Cross

1    A.  It's an organizational chart for the Adams County Sheriff's

2    Office.

3    Q.  And looking at Exhibit 96, who was Sheriff in this

4    organizational chart, at that time?

5    A.  So it looks like this specific form is dated February 6th

6    of 2020, and the form indicates Sheriff Richard Reigenborn.

7    Q.  And continuing to look at the exhibit that we're on, who

8    was the division chief of the detective division in that

9    administration?

10   A.  That would have been Division Chief Dirk Budd.

11   Q.  And who was the division chief of the jail division in that

12   administration?

13   A.  That would have been Division Chief Chris Laws.  However,

14   in November, December and January of 2020 through 2021, I was

15   reassigned to the jail as the jail division chief while

16   Division Chief Laws was recovering from a medical procedure.

17   Q.  And once Division Chief Laws recovered, did he return to

18   that position?

19   A.  He did.

20   Q.  Continuing to look at the form, who was the division chief

21   of the patrol division in that administration?

22   A.  That would have been Division Chief Mark Toth.

23   Q.  And who was the division chief of the training division at

24   that time?

25   A.  That would have been Division Chief Micki Bethel.

Dunning - Cross

1    Q.  Who was the division chief of the administrative division

2    at that time?

3    A.  That would have been me.

4    Q.  You testified that you are currently employed at the Adams

5    County Sheriff's Office?

6    A.  That's correct.

7    Q.  I believe you said that is in the position of division

8    chief?

9    A.  Correct.

10   Q.  What division is that?

11   A.  The jail division.

12   Q.  And you have been continuously employed by the Adams County

13   Sheriff's Office from the time that former Sheriff Reigenborn

14   hired you in May of 2019 throughout when Sheriff Claps came

15   into office in early 2023; correct?

16   A.  That's correct.

17   Q.  You spoke on direct examination about meeting with your

18   financial advisor before you agreed to join the -- or rejoin

19   the Adams County Sheriff's Office after Mr. Reigenborn asked

20   you if you were interested in the position; correct?

21   A.  That's correct.

22   Q.  And what you said, if I recall correctly, was that you were

23   concerned that you wanted to be financial secure in the event

24   Mr. Reigenborn did not win re-election in three and a half

25   years; is that right?

624
Dunning - Cross

 1   A.  That's correct.

 2   Q.  Is that because, as you understand it, if he did not win

 3   the Sheriff's election, then there was a chance that you would

 4   not be retained as a division chief?

 5   A.  That's absolutely correct, especially based off of what had

 6   happened five months before I came on board.

 7   Q.  Sheriffs, they have the right to bring in their own command

 8   staff; right?

 9   A.  I believe they have the right to appoint deputies.  I don't

10   believe the statute goes into command staff.  But they are

11   deputies, so yes.

12   Q.  Mr. Dunning, who is currently the Undersheriff in Sheriff

13   Claps' administration?

14   A.  Paul Gregory.

15   Q.  And who is the division chief of the professional standards

16   division in Sheriff Claps' division?

17   A.  Mike McKinney.

18   Q.  Who is the division chief of the patrol division in Sheriff

19   Claps' administration?

20   A.  John Bungartz.

21   Q.  Who was it before John Bungartz?

22   A.  It actually changed a couple of times.  So this

23   organizational chart was in 2020.  I'm not sure of the actual

24   separation date for Division Chief Mark Toth.  But after Mark

25   Toth, it became Paul Gregory.  And then after Paul Gregory, I

Dunning - Cross

 1    want to say, John Bitterman took it over for a short period of

 2    time.

 3    Q.  Who is the division chief of the detective division in

 4    Sheriff Claps' administration?

 5    A.  Kevin Currier.

 6    Q.  Who is the division chief of the jail division in Sheriff

 7    Claps' administration?

 8    A.  That's me.

 9    Q.  Who is the division chief of the training division in

10    Sheriff Claps' administration?

11    A.  That's Shane Heiter.

12              MS. REDMOND:  We can take that exhibit down.

13              And if we can pull up Plaintiff's Exhibit 69 just for

14    the witness and counsel.

15    Q.  Mr. Dunning, do you recognize the document in front of you?

16    A.  I do.

17    Q.  How do you recognize that document?

18    A.  It is a document that was created and drafted under the

19    professional standards division when I was a division chief at

20    professional standards.

21    Q.  Is creating a discipline policy a regular practice in the

22    Sheriff's Office?

23    A.  I couldn't speak to that.

24    Q.  But you are familiar with the document, yes?

25    A.  I am familiar with this document.

Dunning - Cross

1   Q.  And you said that it was outlining the discipline policy;

2   is that right?

3   A.  This is the form that outlines the disciplinary matrix,

4   which gives a division chief or, at the time, a commander or

5   sergeant the ability to recognize what policy violation had

6   occurred and what the presumptive sanction should be for the

7   employee, what a minimum sanction could possibly be for the

8   employee and what the maximum sanction could possibly be for a

9   policy violation.

10  Q.  With respect to that discipline matrix, ultimately, all

11  discipline is at the prerogative of the Sheriff who can deviate

12  from that matrix; correct?

13  A.  It was not during this period.

14  Q.  It was not during that period?

15  A.  No.  Informal discipline, suspensions up to -- I might

16  misstate this -- but I believe it was suspensions up to about

17  30 hours were at the purview of sergeants and above.

18  Q.  So sergeants and above?

19  A.  Correct.

20  Q.  Mr. Dunning, if you will just look at the top of that

21  document, perhaps that will refresh your memory about the

22  question I just asked you and the specific language indicated

23  there in white.  Take a moment and look at that.

24  A.  Yeah, I can see it says that.  But I also know that the

25  informal discipline happened without the Sheriff's knowledge at

Dunning - Cross

1    those levels that have been previously stated.

2    Q.  But ultimately, the discipline was at the prerogative of

3    the Sheriff, who could deviate from that matrix?

4           MR. BOHNET-GOMEZ:  Your Honor, I'm not sure what the

5    document is being used for.  I'm not sure we're laying

6    foundation anymore, and there's no foundation for refreshing

7    recollection.

8           THE COURT:  Response?

9           MS. REDMOND:  Yes, your Honor.  Mr. Dunning testified

10   that discipline was not at the prerogative of the Sheriff, who

11   could deviate from the matrix, which is my specific question

12   this document, which he testified that he was familiar with and

13   it was in place at the time that he was in the position

14   regarding professional standards in May of 2019, in the

15   Reigenborn administration, he knows what is on the document, so

16   I was going through with him to refresh his recollection, he

17   testified in opposite to what is reflected on the document, so

18   now it is being used for impeachment.

19          THE COURT:  I'll allow one more question on it, then

20   let's move forward.

21          MS. REDMOND:  Yes, your Honor.

22   BY MS. REDMOND:

23   Q.  And I apologize, Mr. Dunning, so the discipline is the

24   ultimate prerogative of the Sheriff, who can deviate from that

25   matrix; correct?

1   A.  That is what is stated at the top of the form, yes.

2        MS. REDMOND:  We can take that down.

3   Q.  The ultimate decision-maker with respect to demotions and

4   terminations at the Adams County Sheriff's Office is the

5   Sheriff; correct?

6   A.  That is correct.

7        MS. REDMOND:  No further questions, your Honor.

8        THE COURT:  Redirect.

9   REDIRECT EXAMINATION

10  BY MR. BOHNET-GOMEZ:

11  Q.  Mr. Dunning, I just have a couple questions for you on

12  redirect.

13       You were asked about your knowledge, based on your

14  experience in the corporate world, of at will employment.

15       Do you recall that?

16  A.  I do.

17  Q.  And based on that knowledge, would you agree that an at

18  will employee cannot be fired for an illegal reason?

19  A.  Can you restate.

20  Q.  At will employment doesn't mean that an employer can fire

21  an employee for an illegal reason?

22  A.  I don't believe I can answer that based off of my

23  experience in the corporate world.

24  Q.  Can you answer it based on your experience at the Sheriff's

25  Office?

                                                               629
                          Dunning - Redirect

1    A.   Yes.

2    Q.   What's your answer?

3    A.   If they're found in violation of a policy in conformance to

4    law, they can absolutely be terminated.

5    Q.   And if they are not found to have violated a policy?

6    A.   Yeah, then they wouldn't have any discipline.

7    Q.   And you would agree that a sheriff cannot fire or demote an

8    employee because they supported a different political

9    candidate?

10            MS. REDMOND:  Objection, leading, your Honor.

11            THE COURT:  Sustained.

12            MR. BOHNET-GOMEZ:  Your Honor --

13            THE COURT:  Sustained.

14            Rephrase it.

15   BY MR. BOHNET-GOMEZ:

16   Q.   Can the Sheriff fire an employee for supporting a different

17   candidate for an election?

18   A.   I don't believe he should, but I suppose it's possible that

19   he can.

20   Q.   You testified on cross-examination about your concern when

21   you took the position at the Sheriff's Office in 2019 that you

22   might be out of a job after the next election?

23   A.   Correct.  I was -- that was a concern.

24   Q.   And you were concerned about the -- why were you concerned

25   about that?

Dunning - Redirect

1   A.  Because after my reentry into law enforcement in 2019, I

2   became aware of the terminations that had taken place in

3   January of 2019 where tenured employees were removed from

4   office at will.

5   Q.  Based on the election?

6           MS. REDMOND:  Objection, your Honor, speculation.

7           THE COURT:  Lay the foundation for it.

8           MR. BOHNET-GOMEZ:  I'll move on.

9   BY MR. BOHNET-GOMEZ:

10  Q.  You were asked some questions about Exhibit 69.

11          MR. BOHNET-GOMEZ:  If we could pull that up.

12          And since it was used for impeachment, I would move to

13  admit the exhibit.

14          THE COURT:  Any objection?

15          MS. REDMOND:  No objection, your Honor.

16          THE COURT:  It's admitted.

17      (Plaintiff's Exhibit 69 received in evidence)

18          MR. BOHNET-GOMEZ:  And let's go and publish it.

19  BY MR. BOHNET-GOMEZ:

20  Q.  So Chief Dunning, this is a discipline policy put into

21  place by Sheriff Reigenborn; is that correct?

22  A.  Correct.

23  Q.  Do you recall when this became the discipline policy of the

24  Sheriff's Office?

25  A.  I believe it was some time around October or August is my

Dunning - Redirect

1   recollection, of 2019.

2   Q.  And between that date and the beginning of Mr. Reigenborn's

3   term, are you familiar with what, if any, discipline policy

4   there was?

5   A.  Essentially, all discipline was run through the Sheriff at

6   that time.

7   Q.  So did that policy have this level of guidelines and

8   details?

9   A.  No, not that I'm aware of.

10          MR. BOHNET-GOMEZ:  And if we could call out the bottom

11   third.

12   Q.  Is it correct that this policy provides that, in the bottom

13   column, for example, if a deputy causes serious bodily injury

14   or death, the presumptive sanction is demotion or leave without

15   pay?

16   A.  That's correct.

17   Q.  The presumptive sanction for causing a death is not

18   termination under this policy?

19   A.  Not by this matrix.  However, if you refer to the bottom

20   left, the bottom left section, you'll see in bold, must be

21   assigned to internal affairs.  So those cases would then go

22   through the internal affairs process and wind up -- because of

23   the suggestion of termination or demotion would wind up at the

24   Sheriff's level.

25   Q.  Are you aware, Chief Dunning, of whether Mr. Reigenborn

Dunning - Redirect

1  followed this policy or any sort of internal affairs policy

2  when terminating the Plaintiffs in this case?

3          MS. REDMOND:  Objection, your Honor, lack of personal

4  knowledge.

5          MR. BOHNET-GOMEZ:  I'm laying the foundation.

6          THE COURT:  Sustained.

7          Again, you need to lay the foundation for what you're

8  asking.

9  BY MR. BOHNET-GOMEZ:

10  Q.  Do you know whether Mr. Reigenborn followed this policy or

11  any internal affairs policy when terminating the Plaintiffs in

12  this case?

13  A.  I don't --

14          MS. REDMOND:  Same objection, your Honor.  Mr. Dunning

15  has --

16          THE COURT:  He's asking -- overruled.

17          THE WITNESS:  I don't, because I'm not present during

18  the termination hearing.

19          MR. BOHNET-GOMEZ:  No further questions.  Thank you,

20  Mr. Dunning.

21          THE COURT:  Let me ask, any questions from our jurors?

22          Okay.  I think this is probably a good place, then, to

23  pause for our mid-morning break.  So I'll excuse the jury.

24          (Continued on next page)

25

633

1          (In open court; jury not present)

2          THE COURT:  I believe my law clerk handed out to each

3    of you today draft jury instructions.  Obviously, we're not

4    going to take that up today, we'll take that up probably

5    Monday, I'm thinking, after --

6          MS. REDMOND:  Your Honor, Mr. Dunning, if he can step

7    down.

8          THE COURT:  Yes.

9          THE WITNESS:  Thank you.

10         THE COURT:  I'm thinking probably Monday after court

11   we'll take that up.  As you can tell from that draft, there are

12   two instructions, and they are 15 -- well, actually, currently,

13   14 and 15, in which we will still want argument from the

14   parties on.  So in particular, we'll get those as we move

15   forward.

16         Again, we wanted to hand these out to you so you can

17   take the weekend to look at it, address any arguments that the

18   parties have and take that up Monday after court, given that I

19   am hoping that this will go to -- I give instructions before

20   closing, and I'm hoping to give those instructions either

21   Tuesday or, at the latest, Wednesday morning.  But we are

22   moving fairly quick here today, so hopefully Tuesday.  If we

23   can take this up Monday after the jury leaves, that would be

24   great.

25         MS. BUTLER:  Your Honor, would it be possible to get

1    an electronic copy of these instructions.

2              THE COURT:  Sure.  We can email those.

3              We'll be in recess.

4              (Recess)

5              THE COURT:  Please bring in the jury.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

McLallan - Direct

1    (In open court; jury present)

2         THE COURT:  Plaintiffs may call their next witness.

3         MS. HALPERN:  Your Honor, Plaintiffs would like to

4    call Tommie McLallan.

5    THOMAS MCLALLAN,

6         called as a witness by the Plaintiffs,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. HALPERN:

10   Q.  Good morning, Mr. McLallan.

11   A.  Good morning.

12   Q.  I want to ask you a couple of questions about a criminal

13   conviction you have as a result of actions you took while you

14   were in the office of the Adams County Sheriff's Office.

15   A.  Okay.

16   Q.  Last year, you pled guilty to two crimes.  Did you plead

17   guilty to two crimes?

18   A.  I did.

19   Q.  And you pled guilty to these two crimes after the Attorney

20   General of the State of Colorado initiated three criminal

21   prosecutions on September 27th, 2023 against you, Richard

22   Reigenborn and Micki Bethel; is that right?

23   A.  It is.

24   Q.  And the basis of those prosecutions was that the Attorney

25   General's Office believed that you --

McLallan - Direct

```
 1              MR. THAPA:  Objection, your Honor, speculation, 403,

 2   609.

 3              MS. HALPERN:  Your Honor --

 4              MR. THAPA:  As far as the basis of the prosecution.

 5              MS. HALPERN:  Your Honor, I think he knows the basis

 6   of what he was prosecuted for.

 7              THE COURT:  Overruled.

 8   BY MS. HALPERN:

 9   Q.  And the basis of those prosecutions was that the Attorney

10   General's Office believed that you, Mr. Reigenborn and

11   Mr. Bethel engaged in a scheme to falsify records over the

12   course of four years?

13   A.  I would be speculating on what the Attorney General's

14   thought process was.

15   Q.  What was your understanding of the basis of the allegations

16   against you?

17   A.  There was -- it was based on an investigation that was --

18   it was done and kind of thrown at the wall, and whatever stuck,

19   stuck.  We all three got hit with the same charges, but it --

20   it was more nuanced than that.

21   Q.  And one of the crimes you pled guilty to was official

22   misconduct?

23   A.  Correct.

24   Q.  And the other crime you pled guilty to was forgery?

25   A.  I believe so, yes.
```

McLallan - Direct

1    Q.  And before you pled guilty to these two crimes, you had to

2    swear under penalty of perjury knowing the elements of those

3    crimes?

4    A.  Correct.

5    Q.  And the elements of first degree official misconduct is

6    that you committed a crime.  It was not committed by someone

7    else; right?

8    A.  Yes, ma'am.

9    Q.  And it was done in the State of Colorado?

10   A.  Correct.

11   Q.  The crime was committed in the State of Colorado?

12   A.  Yes, ma'am.

13   Q.  And you were a public servant?

14   A.  Yes.

15   Q.  With the intent?

16   A.  Yes.

17   Q.  To obtain a benefit for yourself or another or maliciously

18   cause harm to another?

19   A.  Correct.

20   Q.  Knowingly?

21   A.  If these are questions, yes, ma'am.

22   Q.  Yes, they are all questions.

23   A.  All of -- yes, ma'am.

24   Q.  And you committed an act relating to your office, but

25   constituting unauthorized exercise of your official function?

McLallan - Direct

 1   A.  Correct.

 2   Q.  And elements of forgery are that the crime was committed by

 3   you, not by someone else using your name?

 4   A.  Correct.

 5   Q.  In the State of Colorado?

 6   A.  Yes.

 7   Q.  With intent?

 8   A.  Correct.

 9   Q.  To defraud?

10   A.  Correct.

11   Q.  Falsely made, completed, altered and uttered in a written

12   instrument?

13   A.  Correct.

14   Q.  Both of those crimes require intent; correct?

15   A.  Correct.

16   Q.  And after you pled guilty to those two crimes, you sent an

17   apology letter out to all of the employees of the Adams County

18   Sheriff's Office admitting as much; is that right?

19   A.  Correct.

20        MS. HALPERN:  Can we please pull up Exhibit 109.

21   Q.  Mr. McLallan, Jon has just pulled up for you what has been

22   designated as Exhibit 109.

23        Have you seen Exhibit 109 before?

24   A.  Correct, yes, I have.

25   Q.  And is that the apology letter that you sent to the Adams

McLallan - Direct

 1    County Sheriff's Office?

 2    A.  It is.

 3           MS. HALPERN:  Your Honor, I would move to admit into

 4    evidence and publish.

 5           THE COURT:  Any objections?

 6           MR. THAPA:  Yes, your Honor, on relevance, 403,

 7    prejudice, cumulative and also hearsay.

 8           THE COURT:  Let's have counsel approach.

 9        (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

McLallan - Direct

1    (At sidebar)

2         THE COURT:  What's the relevance?

3         MS. HALPERN:  Yes, your Honor.  I wanted to focus on

4    the fact that he said it was an administrative practice done by

5    the whole entire administrative function.  The arguments that

6    were made earlier, this wasn't something he did.  This was that

7    Reigenborn systemically did those are words in the letter.

8         THE COURT:  What the letter says is he apologizes for

9    the lack of training.  It doesn't go to the reason of the

10   conviction of Reigenborn.  And for this witness, it goes to the

11   credibility -- this apology letter doesn't go to credibility.

12   It talks about a lack of training.

13        MS. HALPERN:  It goes to Mr. Reigenborn's credibility,

14   because he has continuously -- I'm going to ask him questions

15   about the fact that it was an administration-wide practice.  It

16   wasn't just him.

17        So this is the earlier conversation that we had about

18   the fact that it's not credible that Mr. Reigenborn was saying

19   that his was like a one-off accident versus, in this apology

20   letter, they're talking about a systemic practice that happened

21   across the administration.

22        MR. THAPA:  They're not talking about it.  He is.

23        MS. HALPERN:  Mr. McLallan is talking about it.

24        THE COURT:  I'm going to sustain the objection.  I

25   don't think this letter is relevant.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

McLallan - Direct

 1              I'll allow you to ask some questions related to if he

 2     knows that Mr. Reigenborn's misconduct was something deeper

 3     than what Mr. Reigenborn testified to, because I think that

 4     goes to impeachment of Mr. Reigenborn's credibility.  You can

 5     certainly ask this witness about anything that goes to his

 6     credibility.  But if we're getting into improper training on

 7     something that has nothing to do with the First Amendment

 8     issues in this case, we're too far afield.

 9              MS. HALPERN:  This isn't an improper training letter.

10     It was a letter he had to do as part of the settlement.

11              THE COURT:  I know.  But what this letter talks about

12     is training.

13              I'll allow you to ask questions that go into his

14     knowledge of what Mr. Reigenborn did, his knowledge of any

15     improper actions he took that would go to his credibility, but

16     I'm not allowing the admission of this letter.

17              (Continued on next page)

18

19

20

21

22

23

24

25

McLallan - Direct

1      (In open court; jury present)

2    BY MS. HALPERN:

3    Q.  Mr. McLallan, we were talking about a letter that you sent

4    out?

5    A.  Yes, ma'am.

6    Q.  And in that letter, you expressed a deep regret about how

7    the administration --

8         MR. THAPA:  Objection, your Honor.

9         THE COURT:  Sustained.

10   BY MS. HALPERN:

11   Q.  And as part of your apology, you --

12        MR. THAPA:  Objection, your Honor.

13        MS. HALPERN:  I'm not even going to be referring to

14   that letter, your Honor.  We can take it down, if you would

15   like.

16        THE COURT:  Go ahead.  You can ask your question.

17        MS. HALPERN:  Okay.

18   BY MS. HALPERN:

19   Q.  And you would agree that the Reigenborn administration

20   violated the ACSO's employees' trust?

21   A.  At some point, yes.

22   Q.  And you expressed that to the Adams County Sheriff's Office

23   employees?

24   A.  I think I -- I don't -- I would have to look at it again,

25   if I may.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

643
McLallan - Direct

1    Q.  Yes, to refresh recollection.

2             MS. HALPERN:  If that's permissible.

3             THE COURT:  Yes.

4             MS. HALPERN:  If we could pull up 109.

5             THE WITNESS:  I apologized for any stress or confusion

6    that my actions caused.

7    BY MS. HALPERN:

8    Q.  And you also discuss the administration?

9    A.  I think I refer to it in the beginning of the second

10   paragraph, yes.

11   Q.  And you acknowledge that the administration violated the

12   employees' trust?

13   A.  I don't think I ever said that.

14   Q.  To refresh recollection, if you look at the middle of that

15   paragraph.

16   A.  Oh, okay, I apologize.  I misread that.

17   Q.  And you indicated that the problems were systemic with

18   training in the Adams County Sheriff's Office?

19   A.  I refer to --

20             MR. THAPA:  Objection, your Honor, relevance.

21             THE COURT:  Sustained.

22             MS. HALPERN:  We can take that exhibit down.

23   BY MS. HALPERN:

24   Q.  The conduct that you pled guilty to, it wasn't just a

25   misunderstanding about one training; is that right?

644
McLallan - Direct

1    A.  I believe that that's a correct statement.

2    Q.  And you observed a pattern or conduct across the Reigenborn

3    administration that wasn't just about a misunderstanding about

4    one arrest control training?

5    A.  Can you re- -- just ask the question, I apologize.

6    Q.  Sure.  Let me try to rephrase that.

7            And you are aware of other individuals in the

8    administration who also engaged in similar violations as yours?

9    A.  I was made aware, but yes, after charges were pressed.

10   Q.  And you collaborated with some of those individuals as part

11   of your violations of forgery and abuse of office?

12           MR. THAPA:  Objection, your Honor.

13           THE COURT:  Basis?

14           MR. THAPA:  609.  And it's also ambiguous.

15           THE COURT:  I'll sustain it as ambiguous.

16           Do you want to rephrase?

17           MS. HALPERN:  Sure, your Honor.

18   BY MS. HALPERN:

19   Q.  And you -- the basis for your two pleas was falsifying

20   training documents; is that right?

21   A.  I'd be speculating on what the AG's office basis was.

22   Q.  No, your basis for agreeing to the plea, for pleaing to

23   those two crimes.

24   A.  There was a lot that went into the agreement to taking the

25   plea, yes, ma'am.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

McLallan - Direct

1   Q.  And you're aware that Mr. Reigenborn also pled guilty to

2   similar crimes as yours?

3   A.  I was made aware of it, yes.

4   Q.  And so did Micki Bethel?

5   A.  I was also made aware of that.

6   Q.  And I want to switch topics quickly to some events that

7   happened to you prior to you joining the Adams County Sheriff's

8   Office; okay?

9   A.  Okay.

10  Q.  You worked as a sergeant at the Pueblo Sheriff's Office

11  before you were terminated; is that right?

12  A.  Before I was terminated from what, I apologize.

13  Q.  The Pueblo Sheriff's Office.

14  A.  Correct.

15  Q.  And you were terminated from your employment with the

16  Pueblo Sheriff's Office on June 25th, 2009?

17  A.  That's correct.

18  Q.  And you believe the reason given by the Pueblo Sheriff's

19  Office was not the real reason you were terminated?

20  A.  That was the real reason I was terminated.  That's found by

21  federal jury.

22  Q.  The reason that they gave.

23  A.  Oh, the reason that they gave, no, I didn't believe the

24  reason they gave.

25  Q.  And the Pueblo Sheriff's Office provided you with a laundry

McLallan - Direct

1    list of reasons for your termination?

2    A.  I believe so, yeah.

3    Q.  So many of them, you can't even remember how many items

4    were on that laundry list that --

5    A.  If I remember correctly, the packet was some 460 pages

6    long.

7    Q.  And you said it's all started with a fight in a bar between

8    a jail deputy and medical staff?

9         MR. THAPA:  Objection, your Honor, relevance.

10        THE COURT:  Approach, please.

11    (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

McLallan - Direct

1        (At sidebar)

2            THE COURT:  At this point, I have no idea why this

3   witness is being called.  All we have had so far is impeachment

4   of this witness.  I don't know why we're impeaching him because

5   I don't know what any relevance to this witness is.  There's

6   testimony that he's the Undersheriff, but so what?

7            Why is this witness up here?

8            What is he going to testify about?

9            MS. HALPERN:  So, your Honor, he filed a First

10  Amendment lawsuit that he won.  I'm trying to establish that he

11  was fired for false reasons just like now.

12           THE COURT:  What's the relevance of that?

13           MS. HALPERN:  Because it's not true that just because

14  an employer is saying an individual is fired that there

15  wasn't --

16           THE COURT:  Sustained.  If that's the only reason you

17  were calling this witness, sustained.

18           MS. HALPERN:  That's not the only reason.

19           THE COURT:  What is the reason this witness is called

20  for?

21           MS. HALPERN:  The Undersheriff.

22           THE COURT:  Yes.

23           MS. HALPERN:  We're calling him about some of the

24  events that happened at the Adams County Sheriff's Office.

25           THE COURT:  Well, why don't you ask that, and then

McLallan - Direct

1    I'll determine whether the evidence is relevant.  So far you

2    have called this witness to impeach the witness, which is fine,

3    you can impeach a witness, but only when some testimony is --

4    so far there's been no testimony that has any relevancy

5    whatsoever to any evidence in this case.  And the mere fact he

6    filed some other case against some other entity has zero

7    relevance to this case.  The same way I'm not allowing

8    testimony from the 1997 lawsuit in Adams County.  It's a

9    different entity.  It's not relevant.  It's irrelevant.  So if

10   you have some relevant testimony to elicit with respect to this

11   case -- if not, then this witness is --

12        MS. HALPERN:  Well, it wasn't intended to be

13   impeachment.  I'll move on from this chapter.  It was intended

14   that he knew how to create kind of a paper trail, as they did,

15   and that the reasons that an employer gives are not necessarily

16   true.

17        THE COURT:  It's a trial within a trial, whether his

18   prior firing was proper or improper, so I'm sustaining the

19   objection.

20        (Continued on next page)

21

22

23

24

25

McLallan - Direct

1      (In open court; jury present)

2   BY MS. HALPERN:

3   Q.  Mr. McLallan, I'm going to move on to a different topic.

4          I want to ask you about the time that you were

5   volunteering for Mr. Reigenborn's campaigns.

6   A.  Which one?

7   Q.  I'm going to be asking you about the 2014 one.

8   A.  Okay.

9   Q.  And first, I want to know, how did you first meet

10  Mr. Reigenborn?

11  A.  I believe it was from a training class where we were

12  briefly introduced and then about a year or so later, it was

13  through the FOP.

14  Q.  And the FOP is the Fraternal Order of Police?

15  A.  Correct.

16  Q.  And you met in the state office in Westminster about 2007?

17  A.  I don't remember if it was the state office or if Rick came

18  down to the Sheriff's Office when they gave their presentation.

19  I don't remember for sure which one it was.

20  Q.  And at the time that you met, he was the Lodge 1 president

21  of the FOP?

22  A.  I believe so, yes, ma'am.

23  Q.  And you didn't really interact with Mr. Reigenborn in any

24  other capacity, other than through the FOP, until he ran for

25  Sheriff in 2014?

McLallan - Direct

1  A.  Not entirely true, but it was infrequent.

2  Q.  And the first time Rick Reigenborn ran for office, you went

3  to a couple of campaign functions with him and helped him with

4  some --

5  A.  Correct.

6  Q.  And you and your wife went to his campaign kickoff?

7  A.  Yes.

8  Q.  And you donated to the campaign?

9  A.  Yes.

10 Q.  And you posted on social media about his campaign?

11 A.  Yes.

12 Q.  And your wife and you took the children to one or two

13 functions that were festivals?

14 A.  I believe so, yes, ma'am.

15 Q.  And you walked with him for a couple hours on the doors

16 canvassing?

17 A.  Correct.

18 Q.  And in 2018, you also supported Mr. Reigenborn?

19 A.  Yes, ma'am.

20 Q.  And you attended several activities with him?

21 A.  I don't remember the exact number.  Yes, ma'am.

22 Q.  And you wore a pair of shoes down in a few days handing out

23 literature at doors with him?

24 A.  Yeah, he drove a hard bargain.

25 Q.  And you walked in a few parades?

                           McLallan - Direct

 1   A.  Yes, ma'am.

 2   Q.  You went to several community events, carnivals, things

 3   like that?

 4   A.  Yes.

 5   Q.  And you went back and forth from Pueblo up to Adams County

 6   frequently?

 7   A.  Frequently is relative, I suppose.

 8   Q.  While you were volunteering for Mr. Reigenborn's campaign

 9   in 2018, he spoke with you about potentially working at the

10   Adams County Sheriff's Office?

11   A.  He did.

12   Q.  And after he won in 2018, he hired you as his Undersheriff?

13   A.  He did.

14   Q.  And you have -- and you and Mr. Reigenborn sometimes spoke

15   about fair discipline policies as one of the reasons he was

16   running for Sheriff in Adams County?

17   A.  That's correct.

18   Q.  And you said Mr. Reigenborn wanted to make sure there was a

19   process in place so that there were steps that leadership had

20   to follow?

21   A.  Right.

22   Q.  And from your perspective, you think that when there's an

23   allegation of wrong against an employee that there should at

24   least -- there is at least someone looking at the facts

25   surrounding that from a supervisor's standpoint, that would be


                    SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

McLallan - Direct

 1  ideal?

 2  A.  Yes, ma'am.

 3  Q.  And if there's an allegation that a deputy committed some

 4  act, the supervisor should go and talk around to people, find

 5  out if that deputy did what was alleged he had done and get

 6  their best summary of events?

 7  A.  Yes, ma'am.

 8  Q.  And the supervisor should be sitting down and talking to

 9  that person to find out that person's rationale and if it

10  happened?

11  A.  Correct.

12  Q.  And a sergeant should have the ability to say, don't do

13  that, listen, that's bad, give a slap on the wrist, but then

14  allow that person to go forward and prosper?

15  A.  It's a bit more nuanced than that, but yes.

16  Q.  Unless the conduct they engaged in needed to go a little

17  further?

18  A.  Correct.

19  Q.  And the sergeant -- and then you think the sergeant needs

20  to be held account for the discipline that they handle?

21  A.  Right.

22  Q.  And the sergeant needs to be taking that up to their uppers

23  and informing them what is going on?

24  A.  Correct.

25  Q.  And the sergeant needs to make sure that he's following

McLallan - Direct

 1    procedures the right way and he's to follow it all the way up

 2    to the top?

 3    A.  Yes, ma'am.

 4    Q.  And there needs to be checks and balances to make sure that

 5    one is following a set procedure when significant discipline is

 6    imposed on an employee?

 7    A.  Agreed.

 8    Q.  I want to switch topics a little bit and ask you some of

 9    the experience you had when you took over the Walsenburg Police

10    Department.

11    A.  Okay.

12    Q.  And you took over at the Walsenburg Police Office after the

13    end of your employment at the Pueblo Sheriff's Office; is that

14    right?

15    A.  No.

16    Q.  I'm sorry, go ahead.  When did that occur?

17    A.  When did which occur?

18    Q.  After -- when did you -- when were you brought into the

19    Walsenburg Police Department?

20    A.  April of 2013.

21    Q.  And that was after you had left employment at the Pueblo

22    Sheriff's Office?

23    A.  Quite a bit after, yes, ma'am.

24    Q.  That's what I was referring to.  Sorry if that was unclear.

25            And one of the reasons Richard Reigenborn gave for

McLallan - Direct

1   wanting to run for office in 2014 was to reform the good old

2   boys club in law enforcement; is that right?

3   A.  Yes.

4            Can I make a correction?

5   Q.  Sure.

6   A.  I don't know if it's just not there, maybe it's not

7   important, but between 2010 and 2013, I was somewhere else.

8   Q.  You were at another police department; is that right?

9   A.  Correct.

10  Q.  But after that, you were brought into reform the Walsenburg

11  Police Department?

12  A.  Yes, ma'am.

13  Q.  And Mr. Reigenborn, I think we were just saying, had wanted

14  to reform the good old boys club in law enforcement?

15  A.  He had said that a few times, sure.

16  Q.  And he wanted promotions to be done on merit?

17  A.  I believe that was a conversation, yes.

18  Q.  And you shared with him this example of when you tried to

19  reform the Walsenburg Police Department?

20  A.  I'm sure I did.

21  Q.  Which you were hired to do by the city manager?

22  A.  I'm sorry?

23  Q.  The city manager?

24  A.  Can you just repeat the question, I apologize.

25  Q.  You were hired to -- you were hired by the city manager to


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

                              McLallan - Direct

 1    tear down or fix the Walsenburg Police Department; is that

 2    right?

 3    A.  I don't think those were his exact words, but yeah, a

 4    change agent.

 5    Q.  And because the culture in the Walsenburg Police Department

 6    was a mixed bag of entitlement, arrogance and just overall go

 7    along to get along?

 8    A.  Correct.

 9    Q.  And you spent six weeks doing nothing but observing?

10    A.  Approximately.

11    Q.  You rode with people?

12    A.  Yes.

13    Q.  You went through reports?

14    A.  I did.

15    Q.  You looked at the processes?

16    A.  I did.

17    Q.  You looked at the systems?

18    A.  Yes, ma'am.

19    Q.  You looked at the policy manual?

20    A.  Sure.  That's what they called it.  Yes, ma'am.

21    Q.  They called it something else, but it was the policies of

22    the department?

23    A.  It was about seven pages of stuff that I don't know if

24    they -- how they got away with calling it policy, but yes.

25    Q.  And you observed everything you needed to observe to find

McLallan - Direct

```
 1   out why things were the way they were?

 2   A.  Mm-hmm.

 3   Q.  Why the belief systems were the foundation of the way the

 4   work was going on there?

 5   A.  Yes, ma'am.

 6   Q.  And then you tried to put together a formula that could

 7   change that, while keeping people that were there, if possible?

 8   A.  Yes.

 9   Q.  And the reasons you observed the Walsenburg Police

10   Department for six weeks were several?

11   A.  Say that again.  I'm sorry.  My ears are plugged up, so I'm

12   sorry.  I apologize.

13   Q.  That's okay.

14          You had several reasons for wanting to observe the

15   Walsenburg Police Department before you took any actions?

16   A.  Yes, ma'am.

17   Q.  You had to see how they were working?

18   A.  Yes.

19   Q.  What they were doing?

20   A.  Yes.

21   Q.  Why they were doing what they're doing, because when

22   someone takes over in a role where people don't know that

23   person, there's a process of trying to get to know that person

24   because everyone is afraid that person is going to come in and

25   just wipe everything out, and so you wanted to just calm things
```

McLallan - Direct

1    down a little bit?

2    A.  Correct.

3    Q.  And it was a -- you consider that to be a leadership trait?

4    A.  I do, yes.

5    Q.  And you don't think it's good for someone to just walk into

6    a department and start wielding a broom before one really

7    understands how everything functions?

8    A.  That's my perspective, yes, ma'am.

9    Q.  And you made the decision early on before you even started

10   at Walsenburg Police Department that you were just going to

11   watch and observe things?

12   A.  I did.

13   Q.  And you were going to make it that you were -- make sure

14   that you were seeing what the city manager had described to

15   you?

16   A.  Correct.

17   Q.  And you didn't want to alter anything and come in and

18   really disrupt things too much initially?

19   A.  That's how it began, yes, ma'am.

20   Q.  And you didn't terminate anyone to create a cultural change

21   in the office?

22   A.  I did not.

23   Q.  And we were talking a little bit about Reigenborn's

24   campaign in 2014, and I want to ask you about the night that

25   the results came in in 2014.

                                                                658
                          McLallan - Direct

 1              Now, you were at Rick Reigenborn's watch party in 2014

 2      when he lost the election to Mike McIntosh?

 3      A.  I was.

 4      Q.  Right?

 5      A.  Yes, ma'am.

 6      Q.  And you observed that he was devastated by the way the

 7      results came in?

 8      A.  He was.

 9      Q.  And you could tell by his facial expression, his body

10      language and his voice?

11      A.  Correct.

12      Q.  That he was very hurt?

13      A.  He was.

14      Q.  And the campaign in 2014 had been contentious because there

15      was mudslinging?

16      A.  A little bit, yes, ma'am.

17      Q.  Somebody had alleged -- you don't know who -- that

18      Mr. Reigenborn was a woman abuser that had been involved in

19      domestic violence with his former wife?

20      A.  I heard that, yes.

21      Q.  And you don't know where that came from, but internal

22      documents from the Sheriff's Office were released?

23      A.  Correct.

24      Q.  And Mr. Reigenborn thought it was somebody close to Mike

25      McIntosh who did it to help him win the campaign?

McLallan - Direct

 1   A.  I believe that's what he said, yes, ma'am.

 2   Q.  And Mr. Reigenborn also felt like someone had moved him

 3   improperly, that he was a sergeant who was assigned to a

 4   specific shift and he felt that command staff had messed with

 5   his schedule a little bit to prevent him from doing things?

 6   A.  That was his belief, yes, ma'am.

 7   Q.  But he couldn't prove that, he just felt it?

 8   A.  I don't believe he ever offered any proof towards it, not

 9   in my conversations with him, no.

10   Q.  And Mr. Reigenborn said that he felt his schedule was

11   manipulated by command staff to prevent him from attending

12   certain functions and doing certain campaign events?

13   A.  Yes, ma'am.

14   Q.  But he never pinpointed to you anyone that he thought did

15   that?

16   A.  I don't recall him ever saying a name, no.

17        MS. HALPERN:  If we could please pull up Exhibit 52.

18   Q.  Mr. McLallan, have you seen Exhibit 52 before?

19   A.  Yes.

20   Q.  Is this an email from you -- at the bottom, from you, and

21   then a response from Mr. Reigenborn?

22   A.  Yes.

23        MS. HALPERN:  And it might help to blow up the part

24   under his name just because it's a little small, the bottom

25   part.

                        McLallan - Direct

 1          And so this is a message that you are communicating to

 2   Mr. Reigenborn about sending a potential email out to ACSO

 3   staff; is that right?

 4          You can review it.

 5   A.  Yes, I wrote that.

 6          MS. HALPERN:  Your Honor, we would like to introduce

 7   Exhibit 52 into evidence.

 8          THE COURT:  Any objection?

 9          MR. THAPA:  No objection, your Honor.

10          THE COURT:  It's admitted.

11     (Plaintiff's Exhibit 52 received in evidence)

12          MS. HALPERN:  Please publish to the jury.

13   BY MS. HALPERN:

14   Q.  Mr. McLallan, I would like to draw your attention to ask

15   you about a couple references in this email that you sent to

16   Mr. Reigenborn.

17   A.  Okay.

18   Q.  And in this email, you are discussing drafting emails from

19   nontraceable and untraceable accounts with Mr. Reigenborn.  So

20   the nontraceable is kind of on the third --

21   A.  I see that, yes.

22   Q.  And then at the bottom, it says, untraceable towards the

23   end?

24   A.  Yup.

25   Q.  And you were talking about nontraceable and untraceable

McLallan - Direct

1   emails so that nobody at ACSO could be pinned with where the

2   emails came from; is that right?

3   A.  Yes, ma'am.

4   Q.  Because you and Mr. Reigenborn believe that anyone trying

5   to send an email in support of Mr. Reigenborn to ACSO email

6   accounts would get retaliated against?

7   A.  I believe that, based on information he had provided, yes.

8   Q.  But you didn't know about any retaliation, you just didn't

9   want somebody being accused of providing this information to

10  those email addresses and then having them be in trouble for

11  it?

12  A.  Correct.

13  Q.  But you and Mr. Reigenborn nevertheless believed that

14  either the Sheriff or his appointed staff would do so to

15  retaliate?

16  A.  Say that one more time.

17          MR. THAPA:  Objection, your Honor, speculation.

18          MS. HALPERN:  Your Honor, I asked about his belief.

19          THE COURT:  Overruled.

20          THE WITNESS:  Can you repeat that, I apologize.

21  BY MS. HALPERN:

22  Q.  Sure.  But you and Mr. Reigenborn nevertheless believed

23  that either the Sheriff or his appointed staff would do so,

24  would retaliate?

25  A.  Which Sheriff?  I guess I'm --

McLallan - Direct

1   Q.  McIntosh?

2   A.  That he would do it?

3   Q.  That you believed that either Mr. McIntosh or his appointed

4   staff would retaliate?

5   A.  Rick believed that 100 percent, and that was all the

6   information I had to go off of.

7   Q.  Okay.  And you also wanted to email everyone because you

8   and Mr. Reigenborn suspected someone in Mr. McIntosh's command

9   staff were telling sergeants that, if Mr. Reigenborn won the

10  election, he was going to wipe out all of the sergeants?

11  A.  I believe that was the conversation, yes, ma'am.

12  Q.  And he was going to wipe out all of the command staff?

13  A.  I think that got talked about.  I don't remember

14  specifically.

15  Q.  And the rumor was that he was going to basically clean

16  house within the management supervisory staff?

17  A.  That was the rumor that was going around internally in the

18  agency that he was hearing.

19  Q.  You felt there was a buzz campaign and a whispering

20  campaign that if Reigenborn won, he would wipe everyone out?

21  A.  That's what I believe, yes.

22  Q.  And he would make all line level employees reapply for

23  their jobs?

24  A.  I don't remember when he brought that to my attention, but

25  he had said he had heard that, yes.

McLallan - Direct

1   Q.  And Mr. Reigenborn, though, never did figure out who

2   actually may be starting those rumors?

3        MR. THAPA:  Objection, speculation.

4   Q.  He never shared that information?

5        THE COURT:  Overruled.

6   Q.  And in your heart, you don't believe that information was

7   being spread by the McIntosh campaign, you thought it was some

8   of the folks on the command staff?

9   A.  Based on the way that he was telling me it was coming,

10  that's what I thought it was, that was something that I

11  concluded as a possibility, yes.

12       MS. HALPERN:  We can take this exhibit down.

13  Q.  And I'm going to ask you about some conversations you had

14  with Mr. Reigenborn about any terminations that you maybe --

15  that he had maybe mentioned to you in the -- during that 2018

16  campaign, okay.

17       And we just looked at Exhibit 52, Mr. McLallan, and --

18       MS. HALPERN:  I'm sorry, we should probably pull

19  Exhibit 52 back up.  My apologies.  Publish to the jury.

20  Q.  You mention about partway through the email, Exhibit 52,

21  that command staff will be cut drastically.

22       Do you see that?

23  A.  Yes.

24  Q.  But you maintain you didn't have any discussions about

25  actual terminations when this email went out?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

McLallan - Direct

1   A.  Like specific terminations, correct.

2   Q.  Like specific individuals?

3   A.  Correct.

4          MS. HALPERN:  We can take down Exhibit 52.

5   A.  Before you do that, can I ask the date on that?  I didn't

6   see the date.

7   Q.  Sure.  October 11th, 2018.

8   A.  Thank you.

9   Q.  And you don't remember anyone that Sheriff Reigenborn

10  talked to about that he wanted to terminate before you took

11  office?

12  A.  That -- I'm sorry, I guess I don't understand what you are

13  asking.

14  Q.  He didn't identify anyone who he was going to terminate

15  before he took office?

16  A.  No, I -- I don't remember exactly.  I know there were names

17  that were -- he had thrown a lot of names out about potential

18  moves, demotions.  It was never about terminations at that

19  point.

20  Q.  But you said, Rick is a passionate person, and he's very

21  emotional sometimes?

22  A.  Yes.

23  Q.  And like sometimes he had to get rid of all the mud and

24  junk to get to the clean parts?

25  A.  I think that was my estimation of what he needed to do,

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

McLallan - Direct

1    yes, ma'am.

2    Q.  And sometimes he would just kind of vomit out what he was

3    thinking?

4    A.  Oh, yeah.

5    Q.  And he would let it all out, say what he was thinking,

6    feeling, whatever, and then come back to it?

7    A.  Correct.

8    Q.  And you had many of those moments in the 2018 campaign?

9    A.  Yes.

10   Q.  So there was sometimes that he did throw up the term fire

11   them?

12   A.  Correct.

13   Q.  There were a couple folks he even used vulgarities about?

14   A.  Yes.

15   Q.  But when it came down to it, you looked at what you

16   believed was going to be the right direction and, to the best

17   of your recollection, everybody's professional work was going

18   to be considered?

19   A.  Yes, it -- yes.

20   Q.  And you did not, as you said, discuss any specific

21   terminations, because Mr. Reigenborn wanted to talk with these

22   people to find out, first off, if they could work with him, and

23   second off, are they willing to stay and work with him?

24   A.  Partially, yes.

25   Q.  And also, that their demeanor would definitely play a role?

McLallan - Direct

1   A.  If that was said, I don't know.  So that's a possibility,

2   yes.

3           MS. HALPERN:  Could we --

4   Q.  Just to refresh recollection --

5   A.  Sure.

6           MS. HALPERN:  Could we pull up the transcript from

7   Mr. McLallan, go from 197, 3 to 12, Lines 3 to 12.

8   A.  Okay, yeah, all right.  I guess I didn't recall that.  I

9   apologize.

10  Q.  That's okay.

11  A.  This was a couple weeks back.

12  Q.  And so, in addition to their -- so Mr. Reigenborn wanted to

13  talk to these people first and find out, could they work for

14  him and are they willing to stay and work with him; is that

15  right?

16  A.  I don't think it started out that way.  It was just kind of

17  a work in progress.  When the meeting and talking came up, it

18  was a joint decision that I didn't know any of these people,

19  not -- not coming from this agency, and so it was a chance for

20  me to get to meet them, first impressions, and then for Rick

21  to, again, be able to decide is this something that they're

22  able to do.

23          MS. HALPERN:  Maybe if you zoom out a little bit to

24  include Lines 13 through 15 on this page.

25  Q.  But the meetings that he was referring to were meetings

McLallan - Direct

```
 1   that were going to take place after he officially took the role
 2   of Sheriff?
 3   A.  I don't remember which meeting that refers to, and this
 4   isn't refreshing, so I apologize.  Because there was a few
 5   meetings that happened.
 6   Q.  There were the meet and greets --
 7   A.  Correct.
 8   Q.  -- that happened at the end of December?
 9   A.  Yes, ma'am.
10   Q.  And then there were termination meetings that happened in
11   January of 2019?
12   A.  Yes.
13   Q.  And Mr. Reigenborn did not want to make decisions before he
14   officially took the official role of Sheriff; is that right?
15   A.  For many reasons, yes.
16   Q.  And that was because he would not commit to any decision
17   until he had been sworn in, taken the oath and sat down and
18   were able to look at all these things?
19   A.  Correct.
20       MS. HALPERN:  And can we please pull up Exhibit 64.
21   Q.  Mr. McLallan, do you recognize Exhibit 64 as some texts
22   between you and Mr. Reigenborn?
23   A.  Yes.
24       MS. HALPERN:  Your Honor, we would move this into
25   evidence.
```

McLallan - Direct

1          THE COURT:  Any objection?

2          MR. THAPA:  No objection, your Honor.

3          THE COURT:  It's admitted.

4     (Plaintiff's Exhibit 64 received in evidence)

5          MS. HALPERN:  Could we please publish to the jury.

6          THE COURT:  Yes.

7  BY MS. HALPERN:

8  Q.  So Mr. McLallan, before -- these text messages were on

9  January 1st, 2019; is that right?

10  A.  That's the date provided, yes, ma'am.

11  Q.  And that's before Mr. Reigenborn took office?

12  A.  Yes.

13  Q.  And you indicate in the first line of your text message

14  that you think you already have a good idea as to who you have

15  leaving?

16  A.  I did, yes, based on our conversations.  But he hadn't, at

17  that point, said out loud.

18  Q.  And the following -- the second paragraph of your text

19  messages, that first sentence, it says, next Tuesday after the

20  swearing in and reception stuff, I'm going to go and start

21  prepping for Wednesday morning when the letters will be handed

22  out, and that in and of itself will likely bring a huge sigh of

23  relief not only from you, but from the majority of the agency.

24          Did I read that right?

25  A.  I believe so, yes, ma'am.

McLallan - Direct

1          MS. HALPERN:  We can take that down.

2    Q.  And I want to talk to you about those meet and greets that

3    you brought up in December of 2018; okay?

4    A.  Okay.

5    Q.  You had meetings with supervisory staff before you ended up

6    taking office?

7    A.  That's correct.

8    Q.  And Undersheriff Lawson coordinated those for you?

9    A.  I'm sorry?

10   Q.  And Undersheriff Lawson coordinated those for you?

11   A.  Yeah, we worked together, and he helped us.  I apologize,

12   my ears just really --

13   Q.  That's okay.  I have a very loud voice, so I'm happy to

14   project.

15          And before those meetings, you had not made any hiring

16   decisions for the new administration; is that right?

17   A.  Correct.  That's right.

18          MS. HALPERN:  Can we please pull up Exhibit 62.

19   Q.  Mr. McLallan, can you please take a look at Exhibit 62.

20   A.  Yes, ma'am.

21   Q.  And if you need it blown up a little bit, you can let me

22   know.  It's a little hard to read.

23          Are these text messages between you and

24   Mr. Reigenborn?

25   A.  Yes, ma'am.

McLallan - Direct

1   Q.  At the beginning of December, 2018?

2   A.  Yes.

3         MS. HALPERN:  Your Honor, I would like to move

4   Exhibit 62 into evidence.

5         THE COURT:  Any objection?

6         MR. THAPA:  No objection, your Honor.

7         THE COURT:  It's admitted.

8   (Plaintiff's Exhibit 62 received in evidence)

9         MS. HALPERN:  Publish to the jury.

10        THE COURT:  Yes.

11  BY MS. HALPERN:

12  Q.  In your middle text message, Mr. McLallan, you ask whether

13  Toth will be available to sit in on the meetings on the 27th;

14  is that right?

15  A.  Yes.

16  Q.  Now, are you referring to Mark Toth?

17  A.  Yes, ma'am.

18  Q.  And you are asking if Mark Toth could fill in for you if

19  you could not make an interview?

20  A.  I don't remember if that was -- what the context of asking

21  if he would be available, whether it would be to sit in for me

22  or to come in and meet with me.  I don't remember which one it

23  was.

24  Q.  But in any even, you did ask will Toth be available?

25  A.  Yes.

McLallan - Direct

 1    Q.  And will Toth -- sorry, is it Mark Toth?

 2    A.  It's Mark Toth.

 3    Q.  Mark Toth was hired by Mr. Reigenborn; is that right?

 4    A.  It is.

 5         MS. HALPERN:  And we can take that down.

 6         Actually, can you please pull that up.  And can you

 7    please blow up the comment from Mr. Reigenborn.

 8    Q.  And you and Mr. Reigenborn were afraid of getting sued; is

 9    that right?

10    A.  I wasn't, no.

11    Q.  Mr. Reigenborn was?

12    A.  He was.

13         MS. HALPERN:  If we can take that down, please.

14    Q.  And during these meet and greets, you met with each of the

15    gentleman sitting at the table in court today?

16    A.  Yes, sir -- yes, ma'am, except for the attorneys,

17    obviously.

18    Q.  Except for the attorneys, the four Plaintiffs in this case.

19         And you didn't form an opinion one way or the other

20    after you met with Mark Mitchell?

21    A.  Can you elaborate on what you mean by that exactly.

22    Q.  You thought that he had an impressive career?

23    A.  Correct.

24    Q.  And he didn't come across as super cocky to you or

25    extremely -- just extremely confident?

McLallan - Direct

1   A.  Sure.

2   Q.  If it would help --

3        MS. HALPERN:  Can we please bring up Mr. McLallan's

4   deposition transcripts.  Go to Page 182.

5   A.  Appreciate that, thank you.  I believe your assessment was

6   correct, though, I just don't remember 100 percent what I had

7   stated in deposition.

8   Q.  Lines 1 through 9.

9   A.  Yeah, that --

10  Q.  Does that refresh your recollection?

11  A.  Yes, ma'am.

12  Q.  Okay.  So you met with Mark Mitchell during these meet and

13  greets?

14  A.  Correct.

15  Q.  And you didn't form an opinion, he didn't stand out to you

16  in any --

17  A.  I formulated an opinion.  I always formulated an opinion.

18  I didn't formulate something to me that said that he couldn't

19  do the job.

20  Q.  And you said, maybe he oversold himself a bit, but you

21  didn't have an opinion about his personality after that

22  meeting?

23  A.  Other than the confidence, no.

24  Q.  Which wasn't cockiness?

25  A.  I didn't take it as such, no, ma'am.

McLallan - Direct

1   Q.  And you also met with Kevin Currier; is that right?

2   A.  Yes.

3   Q.  And that meeting was uneventful?

4   A.  Very much so.

5   Q.  He came across as confident, but there was nothing

6   spectacular, either good or bad in his interview?

7   A.  I mean, for a gentleman with his career -- was decorated,

8   it was okay.

9   Q.  And --

10  A.  If I may, it was okay on paper.  I hadn't seen him operate.

11  Q.  When -- but after meeting with him, nothing stood out that

12  was either good or bad?

13  A.  No, ma'am.

14  Q.  These meet and greets in December of 2018, none of them

15  really stood out to you as going particularly poorly?

16  A.  I think that's subjective.  I mean, not overall.

17         MS. HALPERN:  If we could bring up Mr. McLallan's

18  deposition transcript, it's 183 to 184, I guess you can put

19  them side by side.

20  Q.  Mr. McLallan, you -- if you would look at Lines 183, 24

21  through 184, 1.

22  A.  I wouldn't call it poorly.  I --

23  Q.  Does that refresh your recollection?

24  A.  It definitely does.  Yes, ma'am.

25  Q.  So none of those meetings stood out as going particularly

McLallan - Direct

1    poorly to you?

2    A.  Correct.

3    Q.  There's a few you thought would have probably -- you would

4    have presented differently?

5    A.  I would have.

6    Q.  And one that struck you that way was your meeting with

7    Mr. Claps?

8    A.  Correct.

9    Q.  Because he wasn't put together uniform-wise?

10   A.  The uniform was lackluster, and it was pretty relaxed.

11   Q.  And you felt he wasn't taking the interview seriously?

12   A.  I think, overall, that was the impression that I got.

13   Q.  And you felt that he talked down to you?

14   A.  That was my own personal opinion.  I don't know what the

15   Sheriff -- what Rick had thought at that point.

16   Q.  And the Sheriff was there with you the entire time?

17   A.  For --

18   Q.  For the meet and greet with Mr. Claps?

19   A.  I believe so, yes.

20   Q.  And you remember nothing else about that meeting?

21   A.  Nothing that stands out.

22   Q.  And you don't remember having a conversation about

23   Mr. Claps with Mr. Reigenborn about that meeting?

24   A.  Other than a generic two or three-minute back and forth of

25   him asking me what I thought after they left, before the next

McLallan - Direct

1   person showed up.  It wasn't -- I'm sorry.

2   Q.  Go ahead.  Go ahead.

3   A.  It wasn't anything like, okay, this one is cut, this one is

4   not.  It was, what is your impression.

5   Q.  But you don't remember the actual conversation you had with

6   Mr. Reigenborn about Mr. Claps?

7   A.  I do not.

8   Q.  And another meeting that you recall was a meeting with T.J.

9   Coates?

10  A.  Correct.

11  Q.  And you recall that because Mr. Coates came in and sat

12  down, kicked his feet back and put his arms on the table?

13  A.  Yeah, it -- it was just very lackadaisical.

14  Q.  And he may have had a stick or a toothpick in --

15  A.  I think he had a toothpick.  It might have been, you know,

16  a lollipop.  I don't know for sure.

17  Q.  And you believed he was dismissive of some of the questions

18  and his answers were condescending?

19  A.  A few, yes.

20  Q.  And he got stuck in a loop at one point talking about

21  accountability?

22  A.  Yes.

23  Q.  And he said accountability two or three dozen times in the

24  matter of a minute and a half to a minute to answer a question?

25  A.  I think a dozen times is probably a bit of an exaggeration,

McLallan - Direct

 1  it was just several times said.

 2  Q.  And you felt like he just didn't seem to be taking the

 3  meeting seriously?

 4  A.  That was my initial impression.

 5  Q.  And that's all you recall about the meeting?

 6  A.  I think so, yes, ma'am.

 7  Q.  But you were extremely careful about the questions you were

 8  asking during these meet and greets as well, because you were

 9  afraid that some of the interviewees had hired attorneys and

10  were planning a lawsuit?

11  A.  I believe that's why I printed out the list of questions

12  and tried my best to stick to the questions.  It wasn't to

13  just -- it wasn't because I was afraid of it, I just understand

14  how litigious things sometimes work, and I wanted to make sure

15  we were asking everybody the same things.

16  Q.  But you and Mr. Reigenborn, before these meet and greets,

17  specifically discussed the potential that some of the

18  interviewees were planning for a lawsuit?

19  A.  Potentially, I believe so, yes, ma'am.

20          MS. HALPERN:  Can you please pull up Exhibit 63.  I

21  think that's 62.  63.

22  Q.  Mr. McLallan, if you need these blown up a little bit, just

23  let me know.

24          These are text messages between you and Mr. Reigenborn

25  talking about the interview questions you were going to ask

McLallan - Direct

1   during these meet and greets; is that right?

2   A.  I don't recall if the interview questions were already

3   written and this falls into that same line of topic.

4          MS. HALPERN:  Your Honor, we would ask to move Exhibit

5   63 into evidence.

6          THE COURT:  Any objection?

7          MR. THAPA:  No objections, your Honor.

8          THE COURT:  It's admitted.

9      (Plaintiff's Exhibit 63 received in evidence)

10         MS. HALPERN:  Publish to the jury, please.

11  BY MS. HALPERN:

12  Q.  In the first text message, Mr. Reigenborn is talking about

13  the fact that he's heard that some of the interviewees have

14  hired attorneys and are planning for a lawsuit; is that right?

15  A.  That's what it says, yes, ma'am.

16  Q.  And that's why he says that you both will not be answering

17  questions posed by the individuals who you are interviewing?

18  A.  Correct.

19  Q.  And you state that you have been very generic in your

20  questioning to -- in the next text bubble -- very generic in

21  what you have been saying?

22  A.  Right.

23  Q.  And you specifically note that you believe that T.J. Coates

24  and Mark Mitchell were planning full blown presentations to

25  prove their qualifications so that if they're fired they'll be

McLallan - Direct

1   able to sue?

2   A.  I didn't believe that.  I had heard that.

3   Q.  But you were tracking rumors on these individuals before

4   going into the interviews?

5   A.  I wasn't tracking individual interviews -- or rumors.

6   Rumors tend to just flow all of a sudden out of nowhere.

7   Q.  And you state they apparently don't understand the concept

8   of being in a command position; is that right?

9   A.  I don't recall what the context was, but I did say that.

10  Q.  And rick Reigenborn said that they should be answering your

11  questions and not doing presentations about their background or

12  skills?

13  A.  Correct.

14  Q.  And qualifications?

15  A.  Yes, that's what he said.  Sorry.

16  Q.  And you also mention, Claps is very fast approaching list

17  of things coming at us?

18  A.  Yeah, I don't remember what that was in reference to.  I'm

19  sure you probably have it on the next page, I hope.

20  Q.  We don't, but --

21  A.  I'm not sure what that one is referring to.  But I know

22  that I --

23          MS. HALPERN:  If you zoom out, that might assist.

24  Q.  I mean --

25  A.  At this point in time when these text messages are coming,


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

McLallan - Direct

1   there's so much happening.

2   Q.  And after you say that, Rick Reigenborn just gives you a

3   thumb up emoji?

4   A.  And I apologize, I don't remember what the context was for

5   that.

6   Q.  And you had been asking generic questions to the

7   interviewees during these meet and greets; is that right?

8   A.  Correct.

9   Q.  And you didn't have an audio recording in any of these

10  meetings?

11  A.  I don't believe I did, no, ma'am.

12  Q.  But you did take handwritten notes during those meetings?

13  A.  I did.

14  Q.  Which you later said you got rid of afterwards?

15  A.  Correct.

16          MS. HALPERN:  We can take that exhibit down.

17  Q.  And now, Mr. McLallan, I want to ask you about some

18  termination letters that you handed out on January 9th, 2019.

19  Do you remember those?

20  A.  On January 9th?

21  Q.  9th, 2019, the day after you took office.

22  A.  I believe the 9th was the day we took office, so the 10th

23  would have been when the letters would have been delivered, I

24  believe.  I may be wrong, but I felt like that was how I recall

25  it.

McLallan - Direct

1    Q.  Do you remember right after taking your oath that you were

2    called in by Mr. Reigenborn to his office and were handed a

3    stack of envelopes to deliver?

4    A.  First assignment I received, yes, ma'am.

5    Q.  And these were the letters that placed a number of

6    individuals on paid administrative leave?

7    A.  Correct.

8    Q.  And indicated to them that they were being terminated?

9    A.  Negative.

10   Q.  That their positions were being revoked, that their

11   positions were being revoked?

12   A.  That their commissions were being revoked, yes, ma'am.

13   Q.  Right.

14   A.  Temporarily, until the meeting with the Sheriff.

15        MS. HALPERN:  Can we please call up Exhibit 70.

16   Q.  Mr. McLallan, do you see Exhibit 70 before you?

17   A.  I do.

18   Q.  Where have you seen Exhibit 70 before?

19   A.  Probably in my deposition.  I imagine I saw it in a couple

20   of files.

21        MS. HALPERN:  And I believe this exhibit is stipulated

22   to.

23        MR. THAPA:  Yes.

24        MS. HALPERN:  Your Honor, we would ask to move

25   Exhibit 70 into evidence.

McLallan - Direct

```
 1              THE COURT:  It is admitted.

 2         (Plaintiff's Exhibit 70 received in evidence)

 3              MS. HALPERN:  And publish to the jury, please.

 4              THE COURT:  Yes.

 5    BY MS. HALPERN:

 6    Q.  Mr. McLallan, you refer to the attempt to revoke the

 7    employment by the Adams County Sheriff's Office in that first

 8    paragraph; is that right?  Is that what --

 9    A.  The last sentence, is that what you are referring to?

10    Q.  Right.

11    A.  Yes, I see that.

12    Q.  Also, in this letter, it says, I am informing you of the

13    anticipated termination of your employment in the second

14    paragraph.

15              Do you see that?

16    A.  I do see that, yeah.

17    Q.  And it also says, you have the opportunity to meet prior to

18    your termination; is that right?

19    A.  Correct.

20    Q.  And nowhere in this the letter does it say that there's any

21    ability to maintain employment at the Adams County Sheriff's

22    Office; is that right?

23    A.  Does not appear to be, yes, ma'am.

24    Q.  And these were -- this is a version of the letters that you

25    handed out as your first assignment at the Adams County
```

McLallan - Direct

1   Sheriff's Office; right?

2   A.  Yes.

3   Q.  And everyone who received one of these letters, you met

4   with them at headquarters and took their guns and keys,

5   et cetera?

6   A.  I don't believe we took guns, but yeah.

7   Q.  Their keys, their car keys?

8   A.  Yes.

9   Q.  And that would include the four gentleman who are sitting

10  here?

11  A.  Correct.

12  Q.  But you didn't recommend any of the people that day be put

13  on leave?

14  A.  I don't believe I did.  I don't -- the Sheriff -- I was --

15  I got to be the conferrer.  He was the one that made the

16  ultimate decisions.

17          MS. HALPERN:  If we could take this down and bring up

18  Mr. McLallan's deposition.

19  A.  I do have -- I have to go back.  Now, I recall.

20          I think there was two that I said I would have a tough

21  time working with.

22  Q.  Okay.  You gave feedback after the meet and greets?

23  A.  No, I gave feedback after -- after the letters were

24  delivered.

25  Q.  Okay, after the letters were delivered.

McLallan - Direct

```
 1            Before the letters were delivered, though, you didn't
 2   recommend any of the people that they be put on leave?
 3   A.  I don't think my recommendation was.  He asked me what my
 4   opinion was, and I told him who I thought would be a little
 5   more difficult to work with.
 6            MS. HALPERN:  If we could please pull up
 7   Mr. McLallan's deposition transcript and go to Page 217.
 8   Q.  And Mr. McLallan, you remember taking your deposition?  I
 9   was the one who took it with you.
10   A.  I do.  I believe it was about three and a half years ago.
11   So I apologize for --
12   Q.  It was about four years ago.
13            Mr. McLallan, you recall coming into our office and
14   taking your deposition?
15   A.  Yes.
16   Q.  And you were under oath at that time?
17   A.  Yes.
18   Q.  If you would look at Lines 15 through 19.
19   A.  Okay.
20   Q.  I asked you:  "Which of those individuals that you just
21   named did you make a recommendation, if any, to put on leave?"
22   A.  Correct.
23   Q.  And your answer was:  "I didn't recommend any of them be
24   put on leave."
25            Did I read that right?
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

McLallan - Cross

1    A.  You did.

2    Q.  Okay.  And you didn't make any recommendations at the time

3    that these letters were delivered on whether they would stay

4    with the agency or not either; is that right?

5    A.  Not with these particular folks, no.

6           MS. HALPERN:  I have no further questions.  Thank you,

7    Mr. McLallan.

8           THE WITNESS:  Thank you.

9           THE COURT:  Cross-examination.

10          MR. THAPA:  Yes, your Honor.

11   CROSS-EXAMINATION

12   BY MR. THAPA:

13   Q.  Good morning, Mr. McLallan.

14   A.  Good morning.

15   Q.  You were asked some questions on direct examination about

16   the Walsenburg Police Department.

17          Do you recall that?

18   A.  I do.

19   Q.  I believe the questioning was, you wanted to take some time

20   to observe people in the department before you took over as

21   chief of police there; is that right?

22   A.  I wanted to observe it.  I had already been given the title

23   without the opportunity to observe, but yes, that was --

24   Q.  So you already had the title of chief of police?

25   A.  Correct.

McLallan - Cross

1  Q.  To your knowledge, did Mr. Reigenborn already know the

2  Plaintiffs in this case before he got elected as the Adams

3  County Sheriff?

4  A.  I believe so.

5  Q.  So this was different from you taking over the Walsenburg

6  Police Department where you had never worked before; right?

7  A.  Correct.

8  Q.  You were asked, I believe, about some rumors that

9  Mr. Reigenborn had heard from people within the Adams County

10  Sheriff's Office during the McIntosh administration, and these

11  were rumors, as I understood it, that people thought he would

12  come in and terminate line level employees; is that right?

13  A.  That's correct.

14  Q.  That didn't happen; right?  The rumors were incorrect?

15  A.  They were rumors.  They were incorrect.

16  Q.  When Mr. Reigenborn -- so the rumors were that

17  Mr. Reigenborn would do that, but that did not happen; is that

18  correct?

19  A.  Yes, sir.

20  Q.  You were asked a number of questions about these meet and

21  greets that you had with the McIntosh administration command

22  staff in December of 2018.

23       Do you recall those questions?

24  A.  Yes.  It was more than just command staff.  It was all

25  supervisory staff and above.

McLallan - Cross

1    Q.  And in setting up those meet and greets, you coordinated

2    with the McIntosh administration; isn't that right?

3    A.  Yes.

4    Q.  So you weren't doing anything improper by contacting these

5    folks?

6    A.  No, I was not.

7    Q.  I believe there was a reference to a statement you made

8    about, apparently they don't understand how the command staff

9    works.

10          Do you recall that?

11   A.  I'm sorry, repeat.

12   Q.  There was a statement that you made that -- I believe it

13   was to the effect of, apparently they don't understand how the

14   command staff works.

15          Do you recall that?

16   A.  I saw that, yes.

17   Q.  What did you mean by that?

18   A.  I don't remember the exact context of the conversation and

19   where it came up.  But all the information that I was getting

20   was literally coming from Rick Reigenborn at that point.  I

21   wasn't speaking with anybody -- well, when that text message

22   came on, of course, I was getting a lot of contact, but I

23   wasn't getting the information that he was getting from other

24   people.  So I hadn't heard it anywhere directly, other than

25   him.

McLallan - Cross

1   Q.  What was your understanding from working at the Pueblo

2   County Sheriff's Office as to how the command staff works?

3   A.  Each agency is going to set up their own command staff

4   structure, whether they're going to have, you know, corporals

5   or not, whether they're going to have lieutenants or

6   commanders, and it -- it just depends on who the agency head

7   is.

8            Based on the information that I had heard, again, from

9   Rick, was that they just -- they, as a whole collective --

10  there was -- there was a lot of heaviness at the top, and it

11  created some vacuums where people just didn't have necessarily

12  jobs that they were doing or efficiently doing.  And I think

13  when I made the statement that I had to have been referring to

14  something, they don't understand that the Sheriff is the one

15  that gets to make those decisions.

16  Q.  I think you mentioned heaviness at the top.  What do you

17  mean by that?

18  A.  There were a lot of commanders when we -- when we came into

19  office.  The difficult thing in walking towards that day of

20  swearing in -- which I see was January 8th, so I apologize for

21  that -- we didn't know what the organizational chart looked

22  like.  You know, we had people giving us something, but it

23  certainly wasn't concrete.

24            And then when we got in, we found out that things had

25  been really changed quite a bit.  And we saw that there was a

McLallan - Cross

 1   lot of excess that we felt we could use by eliminating, whether

 2   it was true attrition or otherwise, to create more boots on the

 3   street.

 4   Q.  And then part of that restructuring also included taking

 5   out the captain position?

 6   A.  Correct.

 7   Q.  I want to talk about -- we were talking about some of the

 8   rumors earlier, that you moved -- after Mr. Reigenborn was

 9   elected, did you hear from any people about what was going on

10   in the agency before you took over?

11   A.  Yes.

12   Q.  What did you hear?

13   A.  I --

14         MS. HALPERN:  Objection, hearsay.

15         THE COURT:  Sustained.

16         MR. THAPA:  I'll move on, your Honor.

17   BY MR. THAPA:

18   Q.  After you and Sheriff Reigenborn came into office, how

19   closely did you work with the command staff?

20   A.  After the Sheriff was sworn in?

21   Q.  Yes, after the administration began.

22   A.  I mean, it's a daily thing.

23   Q.  Okay.  Did you have chief meetings?

24   A.  We had weekly chiefs meetings, yes, sir.

25   Q.  How often did you have commander meetings?

McLallan - Cross

1    A.  I believe they were every two or three months.  I don't

2    remember exactly.

3    Q.  And was part of Mr. Reigenborn's campaign, before taking

4    office, did that include giving voice to line level employees?

5    A.  He had talked about that a lot, and he asked me to develop

6    something that would give, you know, line level staff an

7    opportunity to be heard.

8    Q.  Did you implement anything to set up meetings or to that

9    effect with the line level employees to get that --

10   A.  I did.  It took a little bit, but we got it off the ground.

11          MR. THAPA:  I have no further questions.  Thank you.

12          THE COURT:  Redirect.

13          MS. HALPERN:  We don't have any further questions.

14          THE COURT:  You're excused.

15          Plaintiffs may call their next witness.

16          MS. BUTLER:  Thank you, your Honor.  I'll just go grab

17   the witness.

18          Your Honor, I believe the witness was here earlier,

19   but right now, we don't know where he is, so if you could give

20   me a couple minutes.

21          THE COURT:  Sure.

22          MS. BUTLER:  He is here, your Honor.  He is coming.

23          Plaintiffs call Terrance O'Neill.

24   TERRANCE O'NEILL,

25          called as a witness by the Plaintiffs,

                          O'Neill - Direct

1          having been duly sworn, testified as follows:

2    DIRECT EXAMINATION

3    BY MS. BUTLER:

4    Q.  Good morning, Mr. O'Neill.

5    A.  Good morning.

6    Q.  Mr. O'Neill, you started with the Adams County Sheriff's

7    Office in 1999?

8    A.  Correct.

9    Q.  And if I use the abbreviation ACSO, is that one you'll

10   understand to mean the Sheriff's Office?

11   A.  Yes.

12   Q.  And you ended with the Sheriff's Office in 2023; is that

13   correct?

14   A.  February of 2024, I retired.

15   Q.  So you were with the Sheriff's Office for around 25 years?

16   A.  Correct.

17   Q.  And I want to talk about the period of time from 1999 to

18   2018 for these questions.

19          In that period of time, you met and worked with each

20   of the Plaintiffs in this lawsuit during your career?

21   A.  Correct.

22   Q.  I want to start with Gene Claps.

23          You have known Mr. Claps since you started in the jail

24   back in 1999?

25   A.  Yes.


                  SADIE L. HERBERT, RPR, RCR
        901 19th Street, Denver, CO 80294  (303)335-2105

O'Neill - Direct

1  Q.  And you enjoyed a good working relationship with Mr. Claps

2  from 1999 through 2018; correct?

3  A.  We didn't really work a whole lot together.

4        MS. BUTLER:  Jon, could you bring up Mr. O'Neill's

5  deposition, please, Page 52.

6  Q.  Mr. O'Neill, do you remember having your deposition taken

7  in this lawsuit?

8  A.  I do.

9  Q.  And as part of that deposition, were you asked about your

10  working relationship with Mr. Claps?

11  A.  I believe I was, yes.

12        MS. BUTLER:  Sorry, could you go to Page 53, Lines 12

13  through 15, please.

14  Q.  Do you see Lines 12 through 15, Mr. O'Neill?

15  A.  Yes, I do.

16  Q.  Does that refresh your recollection about having a good

17  working relationship with Mr. Claps throughout your career?

18  A.  It says we worked together fine.

19  Q.  Throughout your career, did you observe Mr. Claps to be a

20  hard worker?

21  A.  He was functional.  He worked well.

22  Q.  And throughout your career, from 1999 to 2018, you believed

23  Mr. Claps was a respected colleague at the Sheriff's Office?

24        MS. REDMOND:  Objection, leading.

25        THE COURT:  Response?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

O'Neill - Direct

 1          MS. BUTLER:  Your Honor, may I approach.

 2          THE COURT:  Yes.

 3      (Continued on next page)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              693
                    O'Neill - Direct

```
 1          (At sidebar)

 2          THE COURT:  I don't know this officer's current role,

 3   so is he an adverse witness?

 4          MS. BUTLER:  Your Honor, Mr. O'Neill's deposition is

 5   dated 2021 where he was an employee of the Sheriff's Office and

 6   represented by the county's office.  He's currently retired.

 7   But at his deposition, he was represented by the county

 8   attorney's office.

 9          THE COURT:  Response?

10          MS. REDMOND:  Yes, your Honor.  That was a different

11   situation, where the parties were vastly different.  There,

12   Sheriff Reigenborn was being named in his official capacity and

13   the Board of County Commissioners was not.  And they chose to

14   designate Mr. O'Neill to testify as direct examination.  It is

15   improper leading.

16          THE COURT:  Let's step back.  When was he employed by

17   Adams County, back in 90 whatever?

18          MS. BUTLER:  He was employed from 1999 to 2024, I

19   believe.

20          THE COURT:  And what was his role -- was he in a

21   supervisory position at any point?

22          MS. REDMOND:  He was, I believe, a captain under the

23   McIntosh administration.

24          THE COURT:  Where was he as part of the Reigenborn

25   administration?
```

O'Neill - Direct

 1              MS. REDMOND:  Reigenborn, he was demoted to a

 2   commander.

 3              THE COURT:  He was still in a supervisory position?

 4              MS. REDMOND:  He was.

 5              MS. BUTLER:  He was.

 6              THE COURT:  I'm going to allow some leading questions,

 7   then.

 8              (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                           O'Neill - Direct

 1        (In open court; jury present)

 2            THE COURT:  Go ahead, Counsel.

 3    BY MS. BUTLER:

 4    Q.  Mr. O'Neill, let's pick up where we left off.

 5            We were talking about Mr. Claps.  And you believed

 6    Mr. Claps was a respected colleague at the Sheriff's Office

 7    from 2019[sic] to 2018; correct?

 8    A.  He was respected by most of the command staff, yes, to be

 9    in the position that he was in.

10    Q.  And let's talk about Mr. Coates.

11            You have known Mr. Coates since you all were on

12    patrol?

13    A.  Yes.

14    Q.  And approximately, what year would that have been?

15    A.  I believe I went to patrol division in 2002, when I came

16    back from active duty from 9/11.

17    Q.  And you worked well with Mr. Coates?

18    A.  We worked well together, yes.

19    Q.  You believed Mr. Coates was a hard worker?

20    A.  Yes.

21            MS. BUTLER:  You can take the deposition down.

22    Q.  You believe Mr. Coates was respected within the Sheriff's

23    Office?

24    A.  Same answer.  He was respected by the command staff to be

25    in the position that he was in, yes.

O'Neill - Direct

1   Q.  Let's talk about Mark Mitchell.

2        You have known Mr. Mitchell since you were on SWAT?

3   A.  Correct.

4   Q.  And he was your supervisor on SWAT?

5   A.  Correct.

6   Q.  And you believed he was an effective SWAT supervisor?

7   A.  Yes.

8   Q.  And you believed he respected the deputies on SWAT?

9   A.  Yes.

10  Q.  And he treated you with respect when he was your

11  supervisor?

12  A.  He did.

13  Q.  And when you were a sergeant in the jail, Mr. Mitchell was

14  your commander?

15  A.  Correct.

16  Q.  And he was an effective supervisor at that time as well?

17  A.  Yes.

18  Q.  And he was respectful to the other employees at the jail?

19  A.  I couldn't answer that.  I'm not other employees.  He was

20  respectful to me at the time.

21  Q.  Understood.

22        Let's talk about Kevin Currier.

23        You have known Mr. Currier since you were on SWAT

24  together as well?

25  A.  Correct.

O'Neill - Direct

 1   Q.  And you believe he's respectful to his colleagues?

 2   A.  Yes.

 3   Q.  And you found that he was a serious worker?

 4   A.  In what aspect?

 5   Q.  Does Mr. Currier have a sense of humor?

 6   A.  Yes.

 7   Q.  But when there's a task to be accomplished, have you found

 8   him to be focused on the task at hand?

 9   A.  Yes.

10   Q.  And you and Mr. Currier had a good working relationship as

11   detectives?

12   A.  Yes.

13   Q.  And you observed him being very professional with his

14   direct reports?

15   A.  Yes.

16   Q.  I want to switch gears, Mr. O'Neill, and talk about your

17   thoughts about running for Sheriff.

18            When did you first start thinking about running for

19   Sheriff?

20   A.  That would have been when Michael McIntosh became Sheriff.

21   Q.  And that was 2014?

22   A.  At the very end of 2014, correct.

23   Q.  So when Mr. McIntosh was Sheriff, you were thinking about

24   running for Sheriff in the future?

25   A.  Correct.

O'Neill - Direct

1   Q.  So by 2018, you had been thinking of running for Sheriff

2   for a couple of years?

3   A.  Yes.

4   Q.  And in 2018, your reasons for wanting to be Sheriff were

5   because you liked the direction the agency was going under

6   Sheriff McIntosh?

7   A.  Correct.

8   Q.  But you had never ended up running for Sheriff yourself,

9   have you?

10  A.  No.

11  Q.  Let's talk about the 2018 Sheriff's election at the Adams

12  County Sheriff's Office.

13          After Mr. Reigenborn won the 2018 election, you had a

14  meeting with him in December of 2018?

15  A.  Correct.

16  Q.  And December of 2018 was prior to Mr. Reigenborn being

17  sworn in as Sheriff, but it was after he had won the election?

18  A.  Correct.

19  Q.  And Mr. McLallan was also present at that meeting?

20  A.  I believe so, yes.

21  Q.  But it was just the two of them and you?

22  A.  As I recall, yes.

23  Q.  And during this meeting, you discussed that you were

24  considering running for Sheriff in 2022?

25  A.  I believe I may have, yes.  I would have to review a lot of

O'Neill - Direct

1    five years ago memory.

2            MS. BUTLER:  Jon, could you bring up Mr. O'Neill's

3    deposition, Page 81.

4    Q.  Mr. O'Neill, could you read Lines 8 through 17 to yourself,

5    please.

6            Does this refresh your recollection, Mr. O'Neill?

7    A.  Somewhat, yes.

8    Q.  And do you remember talking with Mr. McLallan and

9    Mr. Reigenborn that you were considering running for Sheriff in

10   2022 during your December 2018 meeting with them?

11   A.  I must have, because that was my recollection back then and

12   that was a lot more fresh than today.

13   Q.  Understandable.

14           And you talked about Mr. Claps possibly running for

15   Sheriff at that meeting as well; right?

16   A.  Probably.

17   Q.  Because you didn't bring up unprompted that you were

18   thinking of running for Sheriff in four years at that meeting?

19   A.  Correct.  By the verbiage here, that I had discussed

20   earlier, that something had obviously come up that I was

21   preempted to discuss that in some manner.

22   Q.  And at that meeting, you told Mr. McLallan and

23   Mr. Reigenborn that you were thinking of running for Sheriff

24   because you thought word would get around to them, and you

25   wanted them to hear it from you instead of someone else?


            SADIE L. HERBERT, RPR, RCR
     901 19th Street, Denver, CO 80294  (303)335-2105

O'Neill - Direct

1   A.  That sounds about right, yes.

2   Q.  And you were worried that if you didn't tell Mr. Reigenborn

3   you were thinking about running for Sheriff, he would think you

4   were deceiving him?

5   A.  I would have to go back to that mindset five years ago and

6   be in that same place, but I can't really answer that right

7   now.  I can't recall exactly what my mindset was.

8       MS. BUTLER:  Jon, can you go to Pages 84 and 85 side

9   by side, please.

10  Q.  Mr. O'Neill, could you read the end of Page 84 into

11  Page 85, and let me know if that refreshes your recollection.

12  A.  I have 85 and 86 on the screen.

13  Q.  The deposition Page 84 and 85 are the ones that are

14  displayed.  I understand they look different on your screen.

15  A.  You want me to read Line 22?

16  Q.  Yes, through the end of your testimony on Page 85, please.

17  Just the end of your answer to that question, not all of

18  Page 85.

19      So Mr. O'Neill, you were worried that if you didn't

20  tell Mr. Reigenborn you were thinking about running for Sheriff

21  he would think that you were deceiving him?

22  A.  Correct.

23  Q.  Thank you.

24      MS. BUTLER:  You can take that down.

25  Q.  Mr. O'Neill, I want to talk about your next meeting that

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

 1   you had with Mr. Reigenborn and Mr. O'Neill.

 2          After Mr. Reigenborn was sworn in, did you receive a

 3   termination letter?

 4   A.  I did.

 5   Q.  And did you request a hearing pursuant to that termination

 6   letter?

 7   A.  I did.

 8   Q.  And did you have a meeting with Mr. Reigenborn pursuant to

 9   that termination letter?

10   A.  Yes.

11   Q.  And at this meeting, it wasn't just Mr. Reigenborn and

12   Mr. McLallan; right?

13   A.  Correct.

14   Q.  There was also the administrative assistant, Sara

15   Manzanares?

16   A.  Correct.

17   Q.  And Kasandra Carleton?

18   A.  Correct.

19   Q.  And who was Kasandra Carleton?

20   A.  She was the Sheriff's Office legal counsel.

21   Q.  And in this meeting, you started off by explaining what you

22   had to offer the Sheriff's Office?

23   A.  Correct.

24   Q.  And why did you do that?

25   A.  I felt it was important to lay out the merits, the history,

O'Neill - Direct

```
 1   the knowledge, experience that I had and that I possessed to be

 2   able to further assist the Adams County Sheriff's Office to

 3   succeed.

 4   Q.  And after you did that, Undersheriff McLallan stated that

 5   he gained a lot of respect for you when you told him in your

 6   meeting in December of 2018 that you were thinking of running

 7   for Sheriff?

 8   A.  Correct.

 9   Q.  And then he asked you if you were retained, if that was

10   something that you would still be thinking about?

11   A.  Correct.

12   Q.  And what happened right after that -- after McLallan --

13   what happened after Mr. McLallan asked you if you were retained

14   if you would still think about running for Sheriff?

15   A.  Kasandra immediately stopped the meeting and asked me to

16   leave the room while they discussed, I guess, why he would ask

17   that.

18   Q.  And did you then leave the room?

19   A.  Yes.

20   Q.  And then after a couple of minutes, you were asked to come

21   back into the room?

22   A.  Correct.

23   Q.  And at that point, you were asked if you could be loyal to

24   the Sheriff?

25   A.  Correct.
```

O'Neill - Direct

 1    Q.  What did you answer to that?

 2    A.  I believe I was -- again, I would have to review.  But what

 3    I recall today is that I said I would be loyal to the Sheriff's

 4    Office and, regardless of who was sitting in each Sheriff's

 5    seat, that I would still want to help that agency succeed.

 6    Q.  And at the end of the meeting, did you leave thinking that

 7    you still had a job with the Sheriff's Office?

 8    A.  I wasn't completely sure.  There was a lot of different

 9    things that happened in between when I went actually back to

10    work and when I left that meeting.  And I can't recall, again,

11    if I was told at that -- end of that meeting that I would be

12    able to come back or not or if that was a later -- at a later

13    time.

14    Q.  When you went into that meeting, you thought you were

15    fired?

16    A.  Correct.

17    Q.  And then at the end of the meeting, you didn't know if you

18    were fired or you might still have a job?

19    A.  Correct.

20    Q.  And what was your understanding about why you didn't get

21    fired in that meeting?

22    A.  I don't know that I had an understanding.  My belief was

23    that the Undersheriff at the time, Thomas McLallan, had made an

24    error and stated something that may be -- that they felt would

25    probably not be in their favor.

O'Neill - Direct

 1           MS. REDMOND:  Objection, your Honor, speculation.

 2           THE COURT:  Sustained.

 3   BY MS. BUTLER:

 4   Q.  If we go through the timeline of this, Mr. O'Neill, at the

 5   beginning of the meeting, you didn't know if you had a job?

 6   A.  Correct.

 7   Q.  You sold yourself as best as you could in the meeting?

 8   A.  Sure.

 9   Q.  Mr. McLallan asked you -- started saying that he had gained

10   respect for you by -- when you told him you were thinking of

11   running for Sheriff?

12           MS. REDMOND:  Objection, asked and answered.

13           THE COURT:  Overruled.

14   BY MS. BUTLER:

15   Q.  Then he said that he wanted to know if you would continue

16   to think about running for Sheriff if you were retained?

17   A.  I can't remember the exact wording used, but the question

18   was asked if I would still be -- have ambition or desire to run

19   for Sheriff if I was retained.

20   Q.  And then the attorney immediately stopped him?

21   A.  Correct.

22   Q.  And then you were asked to leave the room?

23   A.  Correct.

24   Q.  And then, when you came back, you were not terminated?

25   A.  I don't believe so.  Again, I can't remember the events in

                                                                    705
                         O'Neill - Direct

 1    a timeline exactly as they went.

 2    Q.  Let's talk about your time working for Mr. Reigenborn when

 3    he was Sheriff.

 4         So you ended up getting demoted from chief to

 5    commander?

 6    A.  Yes.

 7    Q.  And first, you were a commander in headquarters?

 8    A.  Yes.

 9    Q.  What was that position?

10    A.  They needed somebody to come in -- I'm not sure what the

11    actual title of the position was.  I'm not sure that I had one

12    during that time frame.  But basically, they needed somebody

13    with the knowledge and experience to take over an awards

14    banquet that was coming up.  And they also needed somebody to

15    head -- facilitate and mobilize a group for the fallen

16    officer's memorial in May.

17    Q.  And your first position after being demoted as a commander

18    in headquarters, you didn't have any direct reports, did you?

19    A.  No.

20    Q.  And that wasn't a position you had ever held before?

21    A.  No.

22    Q.  And are you aware of anyone holding that position since?

23    A.  No.

24    Q.  At a certain point, were you transferred over to the jail?

25    A.  Yes.

O'Neill - Direct

1    Q.  And in 2020, were you a commander in the jail?

2    A.  I believe so, yes.

3    Q.  And who was the division chief of the jail at that time?

4    A.  Chris Laws.

5    Q.  On June 15th, 2020, you had a conversation with Mr. Laws

6    about your interest in running for Sheriff?

7    A.  Okay.

8    Q.  Would it help to refresh your recollection?

9    A.  Yes.

10         MS. BUTLER:  Jon, could you bring up Mr. O'Neill's

11   deposition, Page 125.

12         THE COURT:  Counsel, while that's being brought up, we

13   have about 10 minutes to noon.  So find the next convenient

14   place to pause.

15         MS. BUTLER:  Could you go to the next page, please,

16   Jon.

17   BY MS. BUTLER:

18   Q.  Could you please read Page 126 to yourself, Mr. O'Neill.

19         Have you read it, Mr. O'Neill?

20   A.  Yes.  That continues onto the next page, but I don't have

21   that here.

22   Q.  Would you like to read the next page to refresh your

23   recollection?

24   A.  Please.

25         MS. BUTLER:  Could you go to the next page.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

O'Neill - Direct

1    A.  I recall this, yes.

2            MS. BUTLER:  You can take that down.

3    BY MS. BUTLER:

4    Q.  So Mr. O'Neill, on June 15th, 2020, you had a conversation

5    with Mr. Laws, the jail chief, about running for Sheriff?

6    A.  Correct.

7    Q.  And the reason you know that exact date is because the

8    conversation stood out to you enough to write it down?

9    A.  Correct.

10   Q.  And why did you write it down?

11   A.  To protect myself, in case I needed to go through a lawsuit

12   if I was without cause fired or removed from the Sheriff's

13   Office.

14   Q.  So you thought this conversation might be relevant if you

15   were fired for no reason from the Sheriff's Office?

16   A.  Yes.

17   Q.  Could you please describe the conversation you had with

18   Division Chief Laws on June 15th, 2020?

19   A.  With the assistance of what I read to refresh my memory,

20   yes.  He had come in in the morning, after a chief's meeting,

21   probably that night before, and had told me that he was just

22   going to come out with it and asked -- well, that they were

23   discussing me in particular and if I was still actively seeking

24   a position as a Sheriff over the Adams County Sheriff's Office,

25   something in that essence.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

O'Neill - Direct

1            And I had asked him, well, no, what if I still was,

2    were they going to try to get rid of me at that point.  And he

3    kind of hem and hawed a little bit and said, yeah, probably.

4    Q.  So Mr. Laws asked you if you were considering running for

5    the Sheriff's Office still?

6    A.  He asked me on their behalf, yes.

7    Q.  And when you answered no, you asked what would happen if

8    you were?

9    A.  Correct.

10   Q.  And he told you that you would probably be fired if you

11   were?

12   A.  He didn't say it in those words.  I think he said they

13   would probably -- I asked, what if I was, were they trying

14   to -- were they going to try to get rid of me.  And he said,

15   probably, yeah.

16           MS. BUTLER:  Your Honor, no further questions on

17   direct.

18           THE COURT:  Thank you.

19           This is a good point, then, for us to take our break

20   for lunch.  If the jury could be back by, say, 1:05 and be

21   ready to go at that point, that would be great.

22           (Continued on next page)

23

24

25

```
 1            (In open court; jury not present)

 2                THE COURT:  If we could have counsel back by

 3    1:00 o'clock, and we'll be ready to go by 1:05 with the jury.

 4                We'll be in recess.

 5                (Lunch recess)

 6                (Continued on next page)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

    1                    AFTERNOON SESSION

    2                       1:08 p.m.

    3        (In open court; jury not present)

    4            THE COURT:  Let's bring the jury in.

    5            (Continued on next page)

    6

    7

    8

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25

```
 1        (In open court; jury present)

 2            THE COURT:  Do we have the witness?  Where is the

 3   witness?

 4            Just a reminder, you are still under oath.

 5            THE WITNESS:  Thank you.

 6   CROSS-EXAMINATION

 7   BY MS. REDMOND:

 8   Q.  Good afternoon, Mr. O'Neill.

 9   A.  Good afternoon.

10   Q.  I'd like to speak with you about the 2014 election for

11   Adams County Sheriff between Michael McIntosh and Richard

12   Reigenborn.

13   A.  Okay.

14   Q.  You supported Mr. McIntosh for Sheriff when he ran in 2014?

15   A.  Correct.

16   Q.  You went to fundraising events of his?

17   A.  Correct.

18   Q.  You were part of his campaign team?

19   A.  Yes.

20   Q.  You donated money for his campaign?

21   A.  Yes.

22   Q.  You hosted a fundraising event for him at your home?

23   A.  Yes.

24   Q.  And Mr. McIntosh won the Sheriff's election in 2014?

25   A.  Yes.
```

O'Neill - Cross

1    Q.   Now, switching to the 2018 election, you supported

2    Mr. McIntosh again when he ran in 2018?

3    A.   Yes.

4    Q.   And he ran against Richard Reigenborn?

5    A.   Yes.

6    Q.   You were, again, part of his campaign team?

7    A.   Yes.

8    Q.   Again, you donated money to his campaign?

9    A.   Yes.

10   Q.   You, again, hosted a fundraising event at your home for

11   him?

12   A.   Yes.

13   Q.   Mr. Reigenborn won the race for Sheriff that year?

14   A.   Yes.

15   Q.   You would agree that Colorado is an at will employment

16   state; right?

17   A.   Yes.

18   Q.   Meaning that the Sheriff could retain or terminate whoever

19   he chooses to?

20   A.   With limitations, is my understanding.

21   Q.   With -- so long as it's not an illegal termination; fair?

22   A.   Correct.

23   Q.   Now, after Mr. Reigenborn won the race in 2018 for Sheriff,

24   you testified on direct examination that you met with

25   Mr. Reigenborn and Tommie McLallan in December of 2018;

O'Neill - Cross

1    correct?

2    A.  Correct.

3    Q.  They asked you, during that meeting, about your leadership

4    style?

5    A.  Correct.

6    Q.  They also asked you what your beliefs were about how others

7    should be treated?

8    A.  I believe so, yes.

9    Q.  And then, during this meeting, you testified that you

10   talked to them about the fact that you were considering running

11   for Sheriff in the next election?

12   A.  Correct.

13   Q.  And that would have been the 2022 election?

14   A.  Yes.

15   Q.  Now, you testified on direct examination that they prompted

16   you to discuss your intention to run for Sheriff; correct?

17   A.  As I recall, I don't remember how -- something had gotten

18   brought up that prompted me to express that.

19   Q.  And you recall giving your deposition testimony in this

20   case previously?

21   A.  I mean, I recall doing a deposition, but I don't recall

22   everything that I said.  It was several years ago.

23   Q.  Of course.  And I was about to ask, would it assist you to

24   see that deposition testimony?

25   A.  Yes, thank you.

714

O'Neill - Cross

 1  Q.  Absolutely.

 2       MS. REDMOND:  If we could have the clerk, your Honor,

 3  give Mr. O'Neill the binder of deposition transcripts.

 4  Q.  If you turn to the tab with your name on it, Mr. O'Neill.

 5       I would direct you to Page 83, looking at Lines 6

 6  through 10.

 7  A.  83?

 8  Q.  Page 83, and Lines 6 through 10.

 9  A.  Okay.

10  Q.  Does that refresh your memory, Mr. O'Neill?

11  A.  It says, I believe I brought up the issue back then, yes.

12  Q.  So you were not prompted to bring up the issue?

13  A.  Obviously, I was not at that time, yes.

14  Q.  And if you could close that?

15  A.  All right.

16  Q.  Thank you very much.

17       You would agree that Sheriffs have the ability to

18  bring in their own command staff; correct?

19  A.  I haven't reviewed that law in a long time, but that's my

20  understanding, yes.

21  Q.  And that's what you testified to previously, yes?

22  A.  Yes.

23  Q.  The day after Mr. Reigenborn was sworn into office, you

24  received a letter placing you administrative leave?

25  A.  Yes.

O'Neill - Cross

 1    Q.  You were notified of your anticipated termination?

 2    A.  Yes.

 3    Q.  And that was an January 9th, 2019?

 4    A.  I don't know the timeline.  At some point, yes, I received

 5    a letter stating I would be terminated, yes.

 6    Q.  Fair enough.

 7         Now, after you received that letter, you had the

 8    opportunity to meet with Sheriff Reigenborn?

 9    A.  Yes.

10    Q.  And you met with Sheriff Reigenborn on January 15th of

11    2019; right?

12    A.  I believe that's the right date, yes.

13    Q.  During that meeting, he asked you why they should retain

14    you at the Adams County Sheriff's Office?

15    A.  Yes.

16    Q.  You explained your background to them?

17    A.  Yes.

18    Q.  You explained the positions you had held during the course

19    of your career?

20    A.  Correct.

21    Q.  And the training that you had undergone?

22    A.  Correct.

23    Q.  During that meeting, Mr. Reigenborn asked you if you could

24    be loyal to the Adams County Sheriff's Office?

25    A.  Correct.

O'Neill - Cross

1    Q.  You responded by stating, absolutely, I'll be loyal to the

2    Sheriff's Office?

3    A.  Correct.

4    Q.  Following this meeting, you were demoted from a chief

5    position to a commander position; correct?

6    A.  At some point, yes.

7    Q.  Commander is still part of the command staff for the

8    Sheriff; correct?

9    A.  Yes.  It's kind of a middle management or upper middle

10   management position.  We had gone through several different

11   changes of rank and structure throughout several years, so...

12   Q.  I would like to talk to you a little bit about that

13   commander role when you were initially retained, that you

14   worked at headquarters; right?

15   A.  I was at headquarters, yes.

16   Q.  On that role, you related to tasks related to Police Week

17   initially?

18   A.  Correct.

19   Q.  That was not a surprise to you, because you were already

20   involved with Police Week previously?

21   A.  No.  I had gone to Police Week the year before with a

22   contingency group in anticipation of being there the next year.

23   Q.  And so --

24   A.  With a different administration.

25   Q.  Of course.  Thank you for the clarification.

                        O'Neill - Cross

 1           So fair to say, that you were familiar with Police

 2   Week?

 3   A.  Yes.

 4   Q.  I'd like to speak with you about the conversation you had

 5   that you testified to with Mr. Laws on June 15th of 2020.

 6           You testified that Mr. Laws approached you and said,

 7   they were concerned and asked if you were planning to run for

 8   Sheriff; correct?

 9   A.  Correct.

10   Q.  Mr. Laws did not identify who "they" were in that sentence,

11   did he?

12   A.  No.

13   Q.  Mr. Laws did not say that Mr. Reigenborn was concerned

14   during that conversation, did he?

15   A.  No.

16   Q.  And when Mr. Laws asked you if you were running for

17   Sheriff, you initially responded by stating, no, I am not;

18   correct?

19   A.  Correct.

20   Q.  This was the last time that the topic of your possibly

21   running for Sheriff's Office came up during the Reigenborn

22   administration; correct?

23   A.  I don't believe so.  I believe there was another time that

24   it was brought up, or it might have been before that time.  But

25   I think there was at least two times that it was asked or


                SADIE L. HERBERT, RPR, RCR
       901 19th Street, Denver, CO 80294  (303)335-2105

O'Neill - Cross

1   brought up.

2   Q.  And you recall giving your deposition testimony, yes?

3   A.  Not all of it.  So I can refresh my memory, if you direct

4   me.

5   Q.  Absolutely.  If you would, again, grab the binder and turn

6   to the tab with your name.

7           And directing you to Page 128.  And if you would like

8   a little additional context, you could start on Page 127,

9   Line 8 and read through 128, Line 14.  And let me know when you

10  are done.

11  A.  Okay.

12  Q.  So that June 15th, 2020 meeting was the last time the topic

13  of you possibly running for Sheriff came up; correct?

14  A.  At the time of this deposition, yes.

15  Q.  And this deposition, just so we're clear, was March 10,

16  2021?

17  A.  Okay.

18  Q.  Is that correct?

19  A.  Yes.

20  Q.  It's dated at the top?

21  A.  I see it now, yes.

22  Q.  Now, I'd like to speak with you briefly about -- or excuse

23  me.

24          Now, after the topic of your running for Sheriff came

25  up, June 15th of 2020, you remained employed at the Adams

O'Neill - Cross

```
 1   County Sheriff's Office; correct?

 2   A.  Yes.

 3   Q.  And that was up until your retirement in February of 2024?

 4   A.  Correct.

 5   Q.  I'd like to speak with you briefly about your reason for

 6   not running for Sheriff.

 7         Do you recall giving testimony about that during your

 8   deposition?

 9   A.  I would need to refresh again.

10   Q.  I thought that might be the case.  I'm happy to direct you

11   to that.

12         If you would go to Page 164, looking at Lines 13, 165,

13   Line 16.

14   A.  Okay.

15   Q.  Did that refresh your memory?

16   A.  Yes.

17   Q.  So one of the reasons you gave was because you felt like

18   the environment of the state was going against your core

19   values; correct?

20   A.  Correct.

21   Q.  The other reason you gave was family reasons?

22   A.  Correct.

23   Q.  So you did not give any other reasons for your choice not

24   to run for Sheriff?

25   A.  Correct.
```

                                                                          720
                              Claps - Direct

1              MS. REDMOND:  I have no further questions, your Honor.

2              THE COURT:  Redirect.

3              MS. BUTLER:  Nothing from Plaintiffs, your Honor.

4              THE COURT:  Do the jurors have any questions?

5              You're excused.

6              THE WITNESS:  Thank you, your Honor.

7              THE COURT:  Plaintiffs may call your next witness.

8              MS. BUTLER:  Your Honor, Plaintiffs call Gene Claps.

9    GENE CLAPS,

10        called as a witness by the Plaintiffs,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MS. BUTLER:

14   Q.  Good afternoon, Mr. Claps.  Could you please introduce

15   yourself to the jury?

16   A.  Well, I am, like I said, Gene Claps.  I was born and raised

17   in Adams County, Colorado.  Been married for -- I'm going to

18   get in trouble if I get this wrong -- but about 45 yearsish,

19   have three children.  And have been a lifelong, like I said,

20   resident of the county, a business owner, and then a public

21   servant with the Adams County Sheriff's Office.

22   Q.  Sheriff Claps, can you tell the jury why you are here

23   today?

24   A.  I am here along with the others because of violation of our

25   Constitutional rights and what occurred in 2019.


                     SADIE L. HERBERT, RPR, RCR
            901 19th Street, Denver, CO 80294  (303)335-2105

721
Claps - Direct

1    Q.  Sheriff Claps, why are you here taking time away from your

2    duties as Sheriff of Adams County?

3    A.  Well, I think this is important.  And it not only has

4    affected us and this group, but it has affected the whole

5    agency and other agencies across the state where items and

6    things like this occur.  And it's detrimental to law

7    enforcement services.  It affects not only the agencies, which

8    ultimately affects our policing and policing abilities, but

9    also the various different cultures and actions within that

10   community and society as a whole.

11   Q.  Sheriff Claps, I want to talk about when you started in law

12   enforcement and a little bit before there.

13          So when did you start working in law enforcement?

14   A.  I started in 1995 as a volunteer.  I was, at that time,

15   vice president and manager of a very large corporation, a

16   construction equipment rental company, but I was waiting for

17   the transition of us selling that particular business.  And I

18   was going to transition into law enforcement eventually.  So I

19   started as a volunteer, where I volunteered for not only the

20   Sheriff's Office, but the Posse, which is a horseback patrol,

21   where we would do livestock roundup, I would horse at crowd and

22   traffic control, at various different functions.  And we also

23   worked a lot at our fairgrounds.  We worked on trails and park

24   systems throughout the county, while also I was accepted and

25   was attending the police academy through the Community College

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Direct

 1    of Aurora.

 2    Q.  And Sheriff Claps, why did you decide to join law

 3    enforcement?

 4    A.  Law enforcement was a very important component to not only

 5    me personally, but I had been affected by different crimes

 6    throughout the course of my life, where I was very intrigued by

 7    law enforcement.  And there was a calling to be able to assist

 8    and help those people in the community that could not help

 9    themselves.

10    Q.  And let's talk about that career that started with you as a

11    volunteer at the Adams County Sheriff's Office.

12          How long did you volunteer?

13    A.  Well, I started in 1995, and I volunteered until I was --

14    well, actually, that's not completely accurate, because I still

15    volunteered even after I was certified and sworn in as an

16    officer -- but I was considered as that volunteer status until

17    the fall of 1997, when I called then Sheriff Bill Shearer and I

18    explained to him that we were selling our business and that I

19    would like to get on the list of applicants to be hired.  And

20    he explained to me that it would probably be about four or five

21    months before that list got to the point where I could be

22    hired.  Little beknownst to me, I think it was the following

23    day, the Sheriff called me up and he said, can you start

24    tomorrow.  I said no, I need at least two weeks to complete

25    this transition.  And the rest is history from there.

Claps - Direct

1    Q.  So Sheriff Claps, can you walk me through your career at

2    the Adams County Sheriff's Office?  Can you walk me through the

3    positions you held and their various years, from when you

4    started as a paid employee in 1997 until your termination in

5    2019?

6    A.  Well, in 1997, I started.  My first job assignment was in

7    our jail division, which primarily is where everyone started at

8    that point in time.  Through the time there, I put in and

9    tested to become an FTO.  That --

10   Q.  Sheriff Claps, what is an FTO?

11   A.  That is a field training officer.  We're responsible for

12   training new officers and officers that were either recruited

13   or new to the agency, or in some cases, in some type of a

14   remedial training.  I actually was promoted to that position

15   within four or five months of me actually starting with the

16   agency.  I continued that role and ultimately tested for our

17   patrol division, where I was successful and then was

18   transitioned to our patrol division, I believe, in 2000, still

19   as a deputy, a deputy sheriff.

20   Q.  And how long did you stay in the patrol division as a

21   deputy sheriff?

22   A.  The patrol division, I was in as a deputy for about four

23   years, I'm guessing, pretty close to that.  Because of my

24   history, my knowledge and also, when I was in reserve, I spent

25   many, many hours working with our patrol division, working as a

Claps - Direct

1    second unit in a patrol car, I excelled fairly quickly in our

2    patrol division, as I did in the jail division.

3            I quickly became an FTO again.  Because the -- every

4    transition, you have to be the expert in that field and for

5    what you are doing.  So at one point in time, I was an FTO and

6    an expert in the jail division.  Moving to patrol, I then was

7    qualified as that expert to be able to teach and be an

8    instructor with our patrol division.  I did that until about

9    2004, if I remember correctly.

10           I was very active from the time I started -- and even

11   that period of time, I was a firearms instructor, a lead

12   firearms instructor.  We taught asp, OC spray, various

13   different weapons, less lethal weapons that I was an instructor

14   in, along with lethal force.  So that helped me excel and

15   really move forward.

16           In 2004, I tested for our detective division and was

17   successful in that testing process and moved upstairs into our

18   detective division until approximately 2011, 2012, somewhere in

19   there.

20   Q.  And what happened in 2011, 2012?  What was your next

21   position?

22   A.  Well, from there, I really was -- time to leave, I was --

23   while I was in detective division, I was a homicide, robbery

24   and a domestic violence detective.  I was very active, very

25   busy.  I was also part of the critical incident team, which is

Claps - Direct

 1    a multi jurisdiction team that worked on officer-involved

 2    shootings.

 3              I think there was some testimony the other day, every

 4    time there's an officer-involved shooting or excessive force or

 5    use of force that results in serious injury or death, the

 6    critical incident team is involved.

 7              I had numerous homicide investigations throughout my

 8    career, some very complex and very lengthy, that would

 9    literally take years to complete and to investigate.

10              So at that point in time, 2011, 2012, I was ready to

11    move on.  I was also encouraged by some command staff that I

12    needed to be moving forward throughout my career, because a lot

13    of them had already known my goals and where I expected and

14    planned to be over my career path.  So I tested for sergeant

15    and was successful in that process.

16    Q.  And when you were promoted to sergeant, what division were

17    you a sergeant in?

18    A.  The first part of the promotion, because there was so

19    many -- there was a list that was already in effect, and then I

20    was on the new list for the sergeants, they put in some acting

21    positions.  So I was originally placed as an acting sergeant in

22    our jail division.  I was there for maybe a couple weeks,

23    something like that.  It was not very long enough to even let

24    the dust settle.

25              From there, I moved down to our patrol division, where

Claps - Direct

 1    I was in charge of our SRO program, which is our school

 2    resource program.  It's a community function that actually does

 3    set Ted testing and things like that, very in depth, complex

 4    crime prevention unit that I was in charge of.  I was also in

 5    charge of our off-duty program for the agency for officers and

 6    deputies to be able to sign up for off-duty work on top of

 7    their original program.  I was in that capacity for maybe two

 8    weeks.

 9             And I was then transferred to our traffic unit.  The

10    traffic unit, it was explained to me, that was in a little

11    disarray.  It had a lengthy history of issues.  It was not

12    functioning very well.  It was not very successful.  We were

13    not pursuing and receiving the grants that we should be

14    receiving.  It was not producing.  Some of the enforcement that

15    we should be required and are required really to get out there

16    and concentrate on supporting our community and the community's

17    needs for DUI enforcement, speed enforcement, so I was put into

18    that unit to really take a look at what was happening, what was

19    occurring and to fix it organizationally so it was a

20    functioning unit.

21    Q.  And you were a sergeant at this point in time?

22    A.  I was a sergeant at that time.

23    Q.  And what was your next position after you were the sergeant

24    in charge of fixing the traffic unit?

25    A.  After the traffic unit, that was approximately five

Claps - Direct

1    years -- I'm kind of rounding a little bit, I'm trying to

2    remember, but about five years -- I was then tested and -- for

3    commander and was successful in that process, where I was then

4    on the commander list.  I -- go ahead.

5    Q.  No, continue, please.

6    A.  From there, I was selected and I was actually called out by

7    our Undersheriff and Sheriff and directed to go up to our jail

8    division as a commander and really focus on some of our

9    contractual obligations that we had with the Sheriff's Office.

10   We were also having problems with our FTO program.  We were

11   having extreme amounts of excessive force.  And the goal or the

12   request of me was to go up to our jail division and focus on

13   some of those issues and, again, correct those and get us

14   moving in a proper direction, not only to reduce our liability

15   with our inmate and our public, but to also be a servant and

16   really focus on trying to hone in some of those contracts and

17   those contracts that were not fulfilling their needs and

18   obligations to be able to reduce some of the costs that we were

19   spending.

20   Q.  And how long were you a commander in the jail?

21   A.  It was several years.  It was maybe three or four years.

22   Q.  What was your next position after you were a commander in

23   the jail?

24   A.  The next position, I knew that there was an opening and a

25   new position that came up from commander, and that was the

Claps - Direct

 1    captain's position.  There was an announcement that came out

 2    that the captain's position had just been formed for some of

 3    the larger divisions that we had in the Sheriff's Office, and

 4    partially because the chiefs or, at that time, was captains and

 5    then made chiefs, were overwhelmed with the amount of work that

 6    they had to do on a daily basis.  And the delegation of some of

 7    those responsibilities was going to fall on the captains to be

 8    able to support the chiefs and run the particular divisions

 9    that they were in.

10          Unknown to me, and I think this was a pretty common

11    thing for this particular testing -- I have to laugh, because

12    one day I had the Undersheriff came into my office unannounced,

13    spent a very unusual amount of time in my office, asking me

14    probably 50, 75 questions that seemed to last hours, where I

15    finally got to a point in time where I said, look, sir, you're

16    going to have to leave, I have too many things to do and you're

17    really infringing on what I have to accomplish for today.

18          He was a little disheartened.  He got up.  He left.

19    Three days later, we were notified that that was the -- the

20    oral board process for testing for the captain's position,

21    which apparently I was successful and received one of those

22    positions.

23    Q.  How long were you the captain in the jail?

24    A.  At least two years, where I was the captain of our jail

25    division.

Claps - Direct

1    Q.   And who was the chief at that time?

2    A.   The chief was Roger Kelly.

3    Q.   And what was your next position after you were captain in

4    the jail?

5    A.   Next position was similar, and that was a chief, a division

6    chief.  Where, again, it was based on an oral board conducted

7    by the Undersheriff and the Sheriff, where they made a

8    selection process of who would next be the next chief in our

9    Sheriff's Office.

10   Q.   And what years were you the division chief of the jail?

11   A.   2018 to 2019.

12   Q.   And were you the division chief in the jail when you were

13   terminated by Mr. Reigenborn?

14   A.   I was.

15   Q.   Sheriff Claps, before you were terminated in 2018, in your

16   20 plus year career, had you ever been disciplined?

17   A.   No.  I had -- it -- in 1997, 1998, I had some type of a

18   verbal counseling.  But disciplined, no, there was no formal or

19   informal discipline process.

20   Q.   Did you receive any written reprimand for this incident in

21   the 1990s?

22   A.   Not that I'm aware of.

23   Q.   Sheriff Claps, can you describe your annual evaluations

24   over the years?

25   A.   Well, they always fluctuated, and they should.  But

Claps - Direct

1    typically, I really tried to be a high achiever and to be

2    accomplished in what I was doing and really set my goals high.

3    My professional standards are very high, and I hold myself to a

4    very high standard of accountability.

5          Typically, they ran anywhere from -- back, early on, I

6    think we only got to like a 3, I don't think it went to 5 early

7    on.  Later, they kind of evolved with different processes, and

8    then I would typically run in the mid to high 4s.  Never being

9    perfect, because nobody is perfect.

10   Q.  And when you say they were in the -- around the 3, do you

11   mean the scale was the 3?

12   A.  The scale only, I think, went to 3 originally.  And then

13   later, it became a 1 to 5.

14         And where you would see that fluctuation is because,

15   as I moved through my career, in your different career paths,

16   you are always learning.  So you didn't go into a particular

17   division or a job title or a job function and be a hundred

18   percent on track and know exactly what you are doing.  So there

19   should be, typically, some movement.  And there used to be some

20   movement in that.

21   Q.  So would your annual evaluations typically get higher each

22   continual year you were in a position?

23   A.  Yes.  And they should, they should continue to increase as

24   you develop your knowledge and experience in that role and

25   capacity.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Direct

1    Q.  But in general, they were always in the 4 to 5 range?

2    A.  Typically, yes, that's what I recall.

3    Q.  Sheriff Claps, you have had a long career with the Adams

4    County Sheriff's Office.  Can you please describe to the jury

5    some of the accolades you received during your tenure and some

6    of the things you are most proud of about your career?

7    A.  There has been many, many more than I can even remember.

8    I'm not typically someone who wears what I have won over the

9    years.  I am not somebody who brags about the stuff that I have

10   achieved.  But there's been times that I was honored for a

11   meritorious achievement award, one of our Martinez awards.  I

12   have gotten numerous accolades from not only the State, the

13   Colorado State Patrol, for different things that we have

14   accomplished and some of our accomplishments as an individual

15   and as a part of a team, not to mention some of the things that

16   I was also in charge of while I was in traffic.  I was also

17   responsible for our K-9 unit on patrol, which we had a lot of

18   accomplishments during that period of time.  Various different

19   groups that I have received different accolades and awards from

20   over the years of service that I had with the Adams County

21   Sheriff's Office.

22   Q.  Sheriff Claps, how many Sheriffs did you serve under?  And

23   maybe, if you could list their names.

24   A.  Well, when I first came on, it was at the very beginning of

25   Bill Shearer's term in office.  And then from there, it was

Claps - Direct

1   Doug Darr, and then Mike McIntosh.

2   Q.  And do you know the political parties that these Sheriffs

3   belonged to?

4   A.  If I remember correctly, Doug Darr was a Democrat.  Mike

5   McIntosh was a Republican.  And Bill Shearer was a Democrat.

6   Q.  And how many of these three Sheriffs that you served under

7   promoted you?

8   A.  Two.

9   Q.  And which Sheriffs are those?

10  A.  That was Doug Darr and Mike McIntosh.

11  Q.  What role did belonging to a different political party from

12  the Sheriff play in your ability to perform your duties

13  throughout your career at the Sheriff's Office?

14  A.  Absolutely none.

15  Q.  Sheriff Claps, I want to talk about the last position you

16  held, chief of the jail division, and some of your duties in

17  that position.

18        Did you consider your promotion to chief to be one of

19  a leadership position?

20  A.  It is and does fall under the executive leadership team,

21  because chief, the Undersheriff and the Sheriff is part of that

22  team, that group.

23  Q.  Had you been in leadership positions with the Sheriff's

24  Office before being promoted to chief?

25  A.  Since I was a deputy.

733
Claps - Direct

 1   Q.  Are there both formal and informal leaders of the Sheriff's

 2   Office?

 3   A.  Absolutely.

 4        Being an FTO, or a field training officer, is an

 5   informal leader.  That, I had been almost my entire career,

 6   within months of me coming to this agency.

 7        As a detective, you are responsible for a lot of

 8   direction and guidance, where you are also an informal leader,

 9   where you are coming to crime scenes and different events that

10   you are then taking charge.  You are that formal -- informal

11   leader that's guiding and giving direction for what needs to be

12   done and how things need to be accomplished.

13   Q.  And what formal leadership positions had you held before

14   becoming chief?

15   A.  Formal leadership?

16   Q.  Is a sergeant a leader?

17   A.  Yes.

18   Q.  Is a commander a leader?

19   A.  Yes.

20        I would even go back as far as just an FTO is a

21   leader.  It's not per se a certified leader, but you are a

22   leader, even at that level.

23   Q.  I want to bring up your job duties as jail chief.

24        MS. BUTLER:  Could you bring up Exhibit Y, please, for

25   the parties and the witness.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

734
Claps - Direct

1           Your Honor, this has been admitted.  I move to publish

2    it.

3           THE COURT:  Which number is it, again?

4           MS. BUTLER:  Exhibit Y.

5           THE COURT:  Yes.

6    BY MS. BUTLER:

7    Q.  Sheriff, do you recognize this exhibit?

8    A.  I do.

9    Q.  And could you describe what it is, please.

10   A.  Well, this particular paper here is the chief's position of

11   patrol division, which is the job duties for that particular

12   position.

13          MS. BUTLER:  One moment.  Jon, could you go to page Y,

14   please.

15   Q.  Sheriff Claps, are these the job duties for the jail

16   division chief?

17   A.  They are.  They're actually -- both of those, if I remember

18   correctly, are probably verbatim, pretty close, across the

19   board.

20   Q.  I want to talk about some of your responsibilities.

21          Do you see where it says at the very top, adhere to

22   policy procedures and post orders?

23   A.  I do.

24   Q.  What role did you have in policy making throughout your

25   career?

Claps - Direct

 1   A.  Well, throughout my career, policy making is -- that's a

 2   very good question, by the way -- you really start at any level

 3   where you can craft, design and have input to policy for our --

 4   for the office.  It really comes down to leadership and who is

 5   in that leadership role.  And every leader that I have worked

 6   for is -- has been open and very receptive to inputs and to be

 7   able to better our agency as we move forward.

 8          I think it really came into play from FTO, from

 9   detectives, from sergeants, then on up.  Where you have an

10   opportunity to not only, at times, craft policies for review --

11   not to be accepted, but for review -- to make changes, to

12   address best practices or current laws, if it changes,

13   especially if you are an expert in that particular field.  It

14   is heavily relied on for those individuals, whether it be a K-9

15   handler, whether it be a traffic sergeant or a traffic officer,

16   whether it be an SRO, whether it be somebody in our training

17   division, it is really important for those experts in those

18   areas to have their inputs to be able to craft and design the

19   possibility of future policies to be approved by the Sheriff.

20   Q.  In your 22-year career at the Sheriff's Office, did you

21   ever disagree with the policy?

22   A.  Oh, yeah.

23   Q.  What did you do if you disagreed with the policy?

24   A.  We -- there's not everything in life that you can agree

25   with.  There's things that sometimes you have to question.  But

Claps - Direct

 1   a lot of times, it really comes down to individuals that are

 2   not agreeable or do not agree, really sometimes don't

 3   understand the caliber of what that policy is about and what it

 4   is really trying to do.  As you develop yourself and as you

 5   move through the command structure and you become a leader and

 6   you continue to go up through the chain of command, you really

 7   have that understanding of why policies are crafted and why

 8   they're designed, not only to protect yourself, to protect the

 9   employees, but to protect our community and our citizens of

10   Adams County.

11           Our job as supervisors, as leaders of any particular

12   role, to include FTOs up, is to enable others to not only

13   understand and to know the why of why this policy is in effect,

14   but to make sure that people adhere to it to be able to protect

15   themselves and others.

16   Q.  And did you fulfill that role even for policies you

17   disagreed with?

18   A.  Yes.

19   Q.  I want to move down to the bullet point, maybe six down,

20   that says assist in the preparation of the budget.

21           Do you see that?

22   A.  I do.

23   Q.  Could you describe the role that you had in the budget for

24   the jail division?

25   A.  The jail division budget preparation was quite complex.  I

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Direct

1    actually -- even from a sergeant's position, I was involved in
2    budgetary requests, grants, other things.  The jail division
3    was our biggest division, in our Sheriff's Office still is,
4    with the most employees and the largest budget out of the
5    Sheriff's Office and at that time the County.  But it was a
6    huge role in budget preparation, understanding the budget.
7          Part of the reason why I was sent up there to begin
8    with is to really breakdown some of the complex contracts we
9    were dealing with and know where we were spending money and
10   what we needed to spend money on.  So it really took, in
11   preparation, typically, I would have folks working with me on
12   that for about six months before the budget was actually
13   finalized to complete a budget cycle.
14   Q.  And did you ever have the ability to approve a budget?
15   A.  No.
16   Q.  When you were chief of the jail division, what discretion
17   did you have for the budget?
18   A.  You have very limited discretion.  Most everything is under
19   line items and it has already been accounted for in every
20   division, because it could be for cars, it could be for gas, it
21   could be for staffing, it could be for an x-ray machine, it
22   could be for less lethal ammunition.  So we budget these line
23   items, and those are already accounted for throughout the
24   budget, that has no discretion.
25         Where discretion comes into play is if you have --

Claps - Direct

1   originally, you thought you were going to order 15 -- I'll just

2   make it really easy -- 15 particular books, and you only ended

3   up buying 11, because you didn't have 15 people and you only

4   purchased 11.  You have some discretion in making some minor

5   changes.  And then you also have some discretion whether --

6   with approval, of course, through the Sheriff, the division

7   chiefs, Undersheriff -- to be able to utilize that other monies

8   to be able to spend on other things similar to what you had as

9   that line item that you had under your purchase power.

10  Q.  And what role does the Board of County Commissioners play

11  in the budget?

12  A.  They are the law.  They are our purse strings as to what we

13  do and how we function in any county.

14  Q.  But before any budget gets to the board, what role does the

15  Sheriff have?

16  A.  The budget, it goes through multiple phases.  The Sheriff

17  not only is compiling all the information, has to do multiple

18  presentations to the finance department and through finance.

19  Then it goes into a different budgetary process where finance,

20  the commissioners, the county manager all meet and start

21  redlining things that you have been asking for, whether it be

22  capital improvements, various different processes throughout

23  the course of the year.

24          We can also bring to the county commissioners if we

25  have changes in the contract or amendments in the contract

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Direct

1  throughout the course of the year.  Providing that we have

2  filed it had in advance, gone through finance, we can bring it

3  in front of the commissioners at various different times to get

4  approval for contract amount changes or any discrepancies that

5  may have occurred.

6  Q.  Moving on to personnel decisions.

7       Do you see the line five or six down that says, makes

8  formal recommendations, to include hiring promotion, demotion,

9  transfer, reassignments and separations?

10 A.  I do.

11 Q.  When you were chief, what role did you have in personnel

12 decisions?

13 A.  As chief, you have exactly what is there.  You make formal

14 recommendations through the hiring process or oral boards that

15 are conducted.

16      Through the disciplinary process, you also have the

17 ability to review and have a very direct approach of

18 disciplinary process, as far as disciplining and/or demoting --

19 a recommendation for demoting.  Because we don't actually have

20 the ability to do it, it's just a recommendation.  But we have

21 the ability to make recommendations through internal affairs

22 investigations processes.

23      Within our own divisions, we have the ability to move

24 people freely.  So we can move a deputy from the jail to the

25 courthouse.  Or in patrol's division, you can move them from

Claps - Direct

1    patrol to an SRO position.  As long as it's within your

2    division, you have discretion and the ability to move people

3    within that division.

4    Q.  Were any of these responsibilities for making formal

5    recommendations new to you when you became chief?

6    A.  No.

7    Q.  Can you describe that, please.

8    A.  It's something that I had been involved in for a long time,

9    very familiar with throughout my different roles.  I have sat

10   on oral boards as an FTO.  I have sat on oral boards as a

11   detective, a sergeant.  Some of this really came into play when

12   I became a supervisor.  And from my history and my experience,

13   I also was tasked with a lot of very in depth, complex

14   investigations, criminal, at times, on employees and throughout

15   the disciplinary process, where I had to review, I had to

16   investigate, and then forward those up through my chain of

17   command with, at times -- depending on what level I was at --

18   with opinions on where I thought this case should be going or

19   what should occur to them.

20   Q.  Sheriff Claps, earlier, throughout this trial, did you see

21   Mr. Coates go through every one of these same descriptions?

22   A.  I do.

23   Q.  And instead of going through the exact same procedure, to

24   be a little bit more efficient, could you read through these

25   and identify any of the listed duties that were unique to

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

741
Claps - Direct

1   chief.

2           MS. BUTLER:  And if you could remove the highlighting,

3   please.

4   A.  As you go through this list, it really mirrors a lot of

5   roles and responsibilities through our agency.  And again, when

6   I talk about even preparation of the budget, sometimes your

7   involvement comes from lower level to help prepare chiefs and

8   the Undersheriff to be able to present the information to the

9   Board of County Commissioners.

10          So when you go through this, you can make an argument

11  that commands, plans and has administrative responsibilities of

12  their respective divisions is probably really one of the only

13  ones that stands out to me.

14  Q.  Sheriff Claps, did any of these duties require personal

15  loyalty to a particular candidate?

16  A.  No.

17  Q.  Did they require personal loyalty to any individual?

18  A.  No.

19  Q.  Thank you.

20          MS. BUTLER:  We can take that down.

21  Q.  Let's talk about Mr. Reigenborn.

22          When did you meet Mr. Reigenborn?

23  A.  I think really officially would have probably been in the

24  early 2000s when I went to our patrol division.  But that

25  doesn't mean I didn't come across him or say hi to him from the

Claps - Direct

1    mid 1990s on.

2    Q.  Can you describe your interactions with Mr. Reigenborn over

3    the years at the Sheriff's Office?

4    A.  Very minimal.  It was always very cordial.  And I hardly

5    interacted at all with him.

6    Q.  Did you ever supervise Mr. Reigenborn?

7    A.  I did not.

8    Q.  Let's talk about the 2014 Sheriff's election.

9            Who was running for Sheriff in 2014?

10   A.  In the end, for the general election, it was Mike McIntosh

11   and Rick Reigenborn.

12   Q.  Who did you support in this election?

13   A.  Mike McIntosh.

14   Q.  Why did you support Mr. McIntosh?

15   A.  I supported Mike McIntosh because of his experience, his

16   abilities, his education and his career path, where I felt that

17   he was the better candidate to be more knowledgeable and to

18   successfully lead our agency in a positive and proactive

19   manner.

20           I was very concerned that the lack of experience and

21   coming -- I'll give you an example.  It's kind of like making

22   the cleat supervisor of the football team the head coach.  They

23   have the experience in that area that they're in, but they

24   don't know the whole bigger picture.

25           And for somebody running for Sheriff, we needed

Claps - Direct

1    somebody who had the much broader, bigger picture to run the

2    organization in a positive manner.

3    Q.  How did you support Mr. McIntosh in his run for Sheriff in

4    2014?

5    A.  I think, during that campaign cycle, it was very minimal.

6    I think I worked with him a little bit.  I put some signs up.

7    I can't remember, I think I may have made some donations.  I

8    attended some meetings.  But it was, for the most part, pretty

9    uneventful.

10   Q.  Did you donate any money to Mr. McIntosh in 2014?

11   A.  I believe I did.

12   Q.  And who won that election?

13   A.  Mike McIntosh.

14   Q.  Let's move on to the 2018 Sheriff's election.

15        Who was running for Sheriff in 2018?

16   A.  That, again, was Mike McIntosh and Rick Reigenborn.

17   Q.  And who did you support in the 2018 election?

18   A.  Mike McIntosh.

19   Q.  And why did you support Mr. McIntosh again in 2018?

20   A.  For all the same reasons I mentioned earlier.  But it also

21   gave me an opportunity that I didn't have through the rest of

22   my career.  Through the rest of my career, I had worked at

23   various times with Mike McIntosh, I had knowledge and

24   experience with him.  But having seen him in that position, I

25   knew, at that point in time, that he was capable of running the

Claps - Direct

```
 1   agency appropriately, and in a direction that we typically
 2   didn't see.  It, again, was the same, the same type of scenario
 3   that I -- he was truly the better candidate to be selected.
 4   Q.  In the 2018 Sheriff's election, how did you support
 5   Mr. McIntosh?
 6   A.  That was a little more aggressive because I was concerned
 7   that some of the societal issues that we had been seeing that
 8   could have affected us as an agency, that could have affected
 9   not only our Sheriff's office, but what was being provided to
10   our community and the service that we were providing, and I was
11   concerned to have leadership in there that was unqualified and
12   not capable was very concerning to me.
13        So I donated a considerable amount of money, I think
14   somewhere in the $3,000 plus area.  I also donated about
15   300 pounds of pork for some events, some private fundraising
16   events.  And attended numerous different functions and spoke
17   publicly at those functions about my support for Mike McIntosh.
18   Q.  And where was that fundraiser that you donated those
19   300 pounds of pork butts?
20   A.  That was -- that particular one was at the Grisley Rose.  I
21   also attended an event at the Ranch.  And I attended an event
22   at C.B. & Potts.  There was numerous events.  And I would bring
23   and do different things for each event.
24   Q.  Did you place any signs in your yard in 2018 in support of
25   Mr. McIntosh?
```

                                                                        745
                                Claps - Direct

 1   A.  I can't remember.  I don't live in an area that's traveled,

 2   that has cars driving down it.  I may have, but I -- I don't

 3   remember the fact of that.

 4   Q.  And who won the 2018 election?

 5   A.  That was Rick Reigenborn.

 6   Q.  Let's talk about what happened after Mr. Reigenborn won the

 7   2018 election.

 8        Did you meet with Mr. Reigenborn after he was elected,

 9   but before he took office in January of 2019?

10   A.  We did.

11        And actually, from my recollection, I was requested

12   by, at the time, Undersheriff Harold Lawson, and then received

13   a call from Tommie McLallan to actually set those interviews up

14   for the employees down to sergeant to attend those interviews.

15   I was a little confused of what they were, because McLallan

16   would call them, at one time, an interview.  The next time, he

17   would call them a meet and greet.

18        Originally, it was a starting point of about

19   20 minutes.  And then, when we were discussing this over the

20   phone of setting some of these interviews up, I had that

21   discussion with him, and I felt that 20 minutes was not long

22   enough for a proper presentation from individuals that were at

23   a higher rank with more responsibility and bigger divisions and

24   units.

25   Q.  How long did those interviews end up being for the higher


                    SADIE L. HERBERT, RPR, RCR
            901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Direct

1   ranking individuals?

2   A.  Chiefs were supposed to be an hour.  I think commanders

3   were about 40 to 45 minutes.  And I think sergeants were 20 to

4   30 minutes.

5   Q.  And did you have one of these meetings?

6   A.  I did.

7   Q.  What was your understanding of the purpose of this meeting

8   that you attended?

9   A.  Well, again, it was a little confusing of how it was

10  conveyed because it would change.  It would go from a meet and

11  greet to an interview.

12          I really focused on being able to go in, because of my

13  lack of involvement with Rick Reigenborn and having no

14  knowledge of Tommie McLallan, prepared myself to go in and give

15  a full blown presentation of not only myself and some of the

16  roles and responsibilities of our jail division and some of the

17  very important projects and liability cases that we had been

18  working on in recent times.

19  Q.  What questions were you asked during that meeting?

20  A.  It was very limited.  I think the -- the first thing that

21  occurred, obviously, was the introduction of Rick Reigenborn,

22  Tommie McLallan, and I introduced myself.  I think they gave a

23  broad overview of what could be asked.  The first question that

24  was asked of me was to talk about my career and what I have

25  done throughout my career.

Claps - Direct

1   Q.  And how did you answer that question?

2   A.  Similar to what we just did today, because I'm talking to

3   somebody that I have never met before.  And I did a brief

4   overview of my career path and history and accomplishments and

5   abilities to be able to bring to the Sheriff's Office moving

6   forward.

7   Q.  What was the next question you were asked in this meeting?

8   A.  I honestly can't remember.  The meeting was very broken up.

9   It was broken up by telephone calls that Sheriff Elect

10  Reigenborn was getting, where he would leave the room for

11  lengthy periods of time.  Where then Tommie McLallan would

12  start to communicate and talk to me about how long it took you

13  to drive from Pueblo to the government center or to Adams

14  County.  He talked in great detail about himself, about what he

15  did and some of his accomplishments.

16          I think, overall, my meeting lasted maybe 20 to 25

17  minutes total.  But the only time that I actually had to

18  communicate and relay information pertaining to myself and the

19  Sheriff's Office was probably about 8 to 10 or 8 to 12 minutes,

20  is all the time that I was afforded to be able to even speak.

21  Q.  Did you and Mr. McLallan talk about anything of substance

22  related to the Sheriff's Office when Mr. Reigenborn stepped out

23  to take his phone calls?

24  A.  I do not remember any.

25  Q.  And what was your impression regarding your position as

Claps - Direct

1   jail chief after that meeting?

2   A.  That it was at risk.

3   Q.  Why was that your impression?

4   A.  I left that meeting wondering what just happened, because

5   it really wasn't structured in any format that I had ever seen

6   before.  Because of my career and the things that I have been

7   allowed to be involved in and were involved in, I have never

8   seen anything quite as unorganized or interruptive, where the

9   telephone calls were coming in.  I know they did talk for 5 to

10  7 minutes about having to pick something up down in Southern

11  Colorado and transport it up to Brighton.  It really didn't

12  pertain to us having a meeting.  It was everything other than

13  that.

14  Q.  Did you feel like you had had a chance to demonstrate your

15  abilities and what you brought to the Sheriff's Office during

16  this meeting?

17  A.  No.

18  Q.  Let's move on and talk about your termination, Sheriff

19  Claps.

20          What was the first indication that you received that

21  you might be fired after Mr. Reigenborn was elected Sheriff?

22  A.  Well, that goes back a little bit.  I actually received a

23  telephone call from a very good friend of mine who was a

24  sergeant, worked for the Broomfield Police Department, that

25  called me and said, hey --

Claps - Direct

```
 1            MS. PRATT:  Objection, your Honor, hearsay.

 2            MS. BUTLER:  Your Honor, it's relevant for the effect

 3    on the listener and his state of mind regarding

 4    Mr. Reigenborn's plans for him.

 5            THE COURT:  Overruled.

 6    BY MS. BUTLER:

 7    Q.  You may continue, Mr. Claps.

 8    A.  This sergeant, when we called me up, he says, hey, I just

 9    got information that you no longer have a job.  And I quickly

10    said, what are you talking about?

11            And I think this was in October, could have even been

12    a little earlier.  I'm thinking October.  That Chris Laws, at

13    that time, was retired from the Sheriff's Office, working as a

14    school security officer in Broomfield, for the City and County

15    of Broomfield, had resigned his position and went into the oral

16    boards, because they allowed him to be part of that selection

17    process to replace him in his position, and stated to the oral

18    board panel of five or six individuals that were in that room,

19    along with the sergeant that was calling me, who stated that I

20    am not going to continue working here, I have been offered a

21    job at the Adams County Sheriff's Office, and I will be taking

22    over the jail division.

23    Q.  So you received this call indicating to you that Chris Laws

24    had told others that he was going to be the jail division

25    chief?
```

Claps - Direct

1    A.   Yes.

2    Q.   And when was this?

3    A.   It was in October, if I remember correctly.  It could have

4    even been September, but I'm thinking October.

5    Q.   What was your next indication that you might be fired after

6    Mr. Reigenborn was elected?

7    A.   That was during the inauguration, where I was working at

8    the jail division, and I was preparing to go to the swearing

9    in.  And we ended up having a critical incident that occurred

10   in our jail.

11        And through that critical incident, I quickly realized

12   that there was no supervisors there.  We had no sergeants, we

13   had no command staff, we did not have anybody.  So I directed

14   and worked through that with the folks that were there and we

15   resolved the critical incident.

16        And when that overheld and held me in the jail

17   division, to the point where I missed the inauguration.  When

18   one of my jail commanders came back from that, I said, what

19   just happened today and why was there no supervision in this

20   jail.  He said that he would find out.  And that was Jim

21   Gerdeman.

22        Jim Gerdeman came back to me and said he was told by

23   the sergeant, Scott Jarmin, and some other sergeants that they

24   did not have to listen to me, that they have a new boss.  And

25   they were directed by their new boss, Chris Laws, to attend the

Claps - Direct

1    inauguration.

2    Q.  After hearing these conversations, the inauguration was on

3    January 8th, 2019; is that correct?

4    A.  Correct.

5    Q.  On January 9th, 2019, did you receive a termination letter?

6    A.  I did.

7    Q.  Could you describe receiving that letter, please.

8    A.  I had not received any phone calls or had knowledge of

9    anybody coming over, which had -- one way or the other does not

10   matter.  But I had a meeting that I went to outside of the

11   building.  And when I came back into the building, I crossed

12   paths and was again very cordial with the Sheriff then, Rick

13   Reigenborn, in the hallway.  I think we all saw a picture of

14   that the other day.  Where I said, hi, congratulations.

15        And it was very odd, because I was expecting to have a

16   conversation, as a division chief, where the new Sheriff would

17   like to talk and have conversations with the chiefs and start

18   setting up his game plan of what he expected from the agency.

19   I didn't get anything.  I think I did get a hi, and he passed

20   me, and then left the building.

21        I went into my office, sat down, quickly realized that

22   I had been locked out of my computer, had no access to any data

23   in my computer.  And about at that point in time, then

24   Undersheriff Tommie McLallan came in -- you have to understand

25   my desk was probably about three and half foot wide, maybe

Claps - Direct

1    four-foot wide, kind of stood off of the corner of my desk and

2    threw and slid an envelope across my desk, and he turned around

3    and he walked out.  And I'm thinking, okay, I don't know what's

4    happening right now.  Kind of pushed the envelope aside, and I

5    continued to work on the paperwork that I had in front of me at

6    that time.

7           When he returned in about, I don't know, 40 seconds,

8    maybe a minute, he returned back to my office and said, I need

9    all of your stuff.  And that's when I responded and said, I

10   don't know what you are talking about.

11          He says, did you read the letter?

12          I said, what letter?

13          He said, the envelope I gave you.

14          I said, no.

15          So I opened the envelope and read the letter.

16          He said, I need your keys, your badge, your county ID.

17   And you are going to either, one, be given a ride home or find

18   a ride home.  You are going to be escorted out.  You are going

19   to need to leave, and you are gone was the words that he used.

20          From that point, I relinquished the items that I had

21   available that I could give him and packed up the rest of my

22   office.

23          Sue Nielsen was a commander at that time at

24   headquarters that -- there was a harem that was following the

25   Undersheriff, Tommie McLallan, which consisted of my deputies

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Direct

```
 1   in that division and some sergeants that were there to escort

 2   me out of the building like I was a criminal being charged with

 3   some type of a heinous crime and being removed from my

 4   services.

 5          MS. BUTLER:  Could we bring up Exhibit 74, please.

 6   Your Honor, Exhibit 74 has been admitted, and I move to

 7   publish.

 8          THE COURT:  You may.

 9          MS. BUTLER:  Could you zoom in on the text, please.

10   BY MS. BUTLER:

11   Q.  Sheriff Claps, is this the letter that you received on

12   January 9th, 2019?

13   A.  It is.

14   Q.  And is this the letter that Undersheriff McLallan came in

15   and told you that you were gone following his delivery of it?

16   A.  Yes.

17          MS. BUTLER:  You can take that down.

18   Q.  What was your reaction when this happened?

19   A.  I was in shock.  I didn't expect this to be coming.  Even

20   though I heard the information pertaining to Chris Laws and him

21   being my replacement, I did not expect a termination letter,

22   especially with my years of dedication and service to the

23   agency.

24          I think I truly was the first stop on their list.  And

25   I think that started a trickle effect.
```

Claps - Direct

1          While I was packing, the Undersheriff, Tommie

2     McLallan, delivered other letters to my command staff that were

3     on the second floor and did the same thing to every single

4     commander and up in the whole agency.

5     Q.  What, if any, changes had you made to your office after

6     Mr. Reigenborn was elected?

7     A.  It was very minimal.  I did put papers away.  I did a bunch

8     of filing so it was organized.  I had pictures that my wife

9     purchased me that never got put up that were still sitting in

10    the same place.  It was picked up and cleaned in case what I

11    was hearing about Chris Laws was true and accurate.  It was not

12    packed up.  I still had boxes of material, books and personal

13    items within the office, not to mention my car with firearms,

14    munitions, personal property and everything that was in my car

15    that I also had to relinquish at that time.

16    Q.  And did you think there was a chance that you might be

17    transferred to a different division?

18    A.  I was hopeful before the letter was delivered.  After the

19    letter was delivered, my gut was no.

20    Q.  Let me rephrase.

21         Before the letter was delivered, did you think that

22    you were -- there was the potential that you might be

23    transferred, and did that play any role in your decision to

24    clean up your desk?

25    A.  Absolutely.

Claps - Direct

1   Q.  How did you get home on January 9th, 2019?

2   A.  Well, that's a -- I attempted to contact my wife to come

3   and pick me up.  I was unsuccessful.  I think she was tied up

4   and busy with her own clients.

5           After about an hour, hour and a half, Commander Jim

6   Gerdeman came downstairs and said, I'm going to give you a ride

7   home.  And I said, absolutely not.  If it affects your career,

8   if it affects you personally, I will find a way home.  He

9   insisted, and then ultimately gave me a ride home.

10  Q.  What was your next conversation with Mr. Reigenborn and

11  Mr. McLallan?

12  A.  Well, the next conversation didn't come until later when we

13  had our final hearing.

14  Q.  Let's talk about your final hearing.

15          What day was that?

16  A.  I've heard it a hundred times in here, and I can't

17  remember.  It was later in January.

18  Q.  Does January 15th sound correct?

19  A.  Yes.

20          MS. BUTLER:  Your Honor, Plaintiffs move to admit

21  Exhibits 18 and 53, both of which have been stipulated to.

22          THE COURT:  Any objections?

23          MS. PRATT:  No objection.

24      (Plaintiff's Exhibits 18 and 53 received in evidence)

25          MS. BUTLER:  And your Honor, as we have done for the

Claps - Direct

 1   other audio and transcripts, Jon has created 18A, an exhibit

 2   which is a sync of the two of them, which I move to admit.

 3          THE COURT:  I think it already had been.  That may

 4   have already been played.

 5          MS. BUTLER:  I forgot that 18A had already been

 6   admitted.

 7          If we could you please bring that up.

 8   BY MS. BUTLER:

 9   Q.  Sheriff Claps, I want to walk through this audio and

10   transcript, and I'm going to stop it at various points and ask

11   you questions.

12          MS. BUTLER:  But for now, if you could play the audio,

13   and I'll let you know when to stop.

14   (Media played)

15          MS. BUTLER:  Could you please stop the audio.

16   BY MS. BUTLER:

17   Q.  Sheriff Claps, why did you say that you had worked for many

18   administrations and had been faithful and true to all of them?

19   A.  In the context of that, apparently I did have that

20   conversation with them in December that I forgot.  And it was

21   true, that I worked for many different administrations that had

22   different philosophies, different ideas of running the agency

23   in different directions and have always -- willing to work

24   through that.  Because the commitment level for career law

25   enforcement officers is not about the individual, it's about

Claps - Direct

 1    the agency and the community they serve.

 2              MS. BUTLER:  Could you please play the video.

 3         (Media played)

 4              MS. BUTLER:  Please stop the video.

 5    BY MS. BUTLER:

 6    Q.  Sheriff Claps, what did you mean by saying you wanted the

 7    opportunity to retain some type of position?

 8    A.  That I offered that I'd be willing to work in any capacity,

 9    any position with the Sheriff's Office and would be able to

10    follow the guidelines and rules set forth by the Sheriff.

11    Q.  Why were you willing to stay at the Sheriff's Office in any

12    position?

13    A.  Well, it's very difficult.  The older you get, the harder

14    it is, obviously, to find work.  But I was a dedicated employee

15    that really put many years into service in Adams County.  I had

16    a lot of abilities and resources within the community to be

17    able to work with the community well.  And to provide for my

18    family and provide for my retirement moving forward to stay

19    with the same agency and be able to finish out my career

20    successfully with dignity.  Because that really comes into play

21    later, at the time of a termination or at the time of having to

22    do paperwork at a later time and explain that you left an

23    agency before you were terminated, you lose all sense of

24    dignity, where there's a brown cloud that is over the top of

25    your head for the rest of your life and career, while you try


              SADIE L. HERBERT, RPR, RCR
      901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Direct

1   to stay in that field for law enforcement.

2          MS. BUTLER:  And you can continue the video.

3      (Media played)

4          MS. BUTLER:  Please stop the audio.

5   BY MS. BUTLER:

6   Q.  Sheriff Claps, why did you start talking about retirement?

7   A.  The writing was on the wall of the direction that this was

8   going, and the retirement was really if I was not retained.  I

9   did not offer up retirement.  But if I was not retained, we

10  had -- I had legal counsel that advised me to request certain

11  things on the conclusion of that, if I was going to be

12  terminated, especially for -- without cause moving forward.  I

13  was also asked that I bring in my clothing that day, which was

14  another red flag and indicator that, along with you're gone,

15  along with my position already being fulfilled with -- by

16  apparently Chris Laws, there was a lot of red flags that have

17  been raised before I got to this point in time.  And like the

18  early interview in December, this was very formatted.  It was

19  very regimented, where it was directed in a specific way and a

20  specific manner just to shut everything down and move him

21  through the process in a quicker speed.

22          MS. BUTLER:  And please continue the audio.

23      (Media played)

24          MS. BUTLER:  Can you stop it right there.

25  BY MS. BUTLER:

Claps - Direct

1    Q.  Sheriff Claps, why did you ask -- why did you say, I'm not

2    offered any other position?

3    A.  I was still in disbelief that this was the direction it was

4    going.  First, I never actually said I chose to retire.  I just

5    said, if I am not retained, and then the path started from

6    Sheriff Reigenborn of the direction of, you are going to

7    retire.  Still trying to maintain a position with the Sheriff's

8    Office and employed with Adams County.

9    Q.  Sheriff Claps, do you remember listening to the rest of

10   this video earlier in this trial?

11   A.  I do.

12          MS. BUTLER:  You can take that down.

13   Q.  Sheriff Claps, did you hear Mr. Reigenborn testify

14   yesterday about the reasons he gave for firing you?

15   A.  I did.

16   Q.  Did Mr. Reigenborn ever tell you any of these reasons?

17   A.  No.

18   Q.  Did he ever bring them up in your December meeting?

19   A.  No.

20   Q.  Did he bring them up in your January meeting?

21   A.  No.  And that's obvious from what we just listened to.

22   Q.  Did you hear Mr. Reigenborn testify about you being the

23   so-called hatchetman?

24   A.  I heard him say that.

25   Q.  Did you ever call yourself the hatchetman?

Claps - Direct

1    A.  I never did.

2    Q.  Did you ever hear anyone call you the hatchetman?

3    A.  I did.

4    Q.  What was your reaction when you heard that?

5    A.  To verbally discipline them for their behavior and

6    inappropriate comments to not only me, but they were -- I found

7    them to be very derogatory and unjust and uncalled for, and

8    they were given verbal counseling to not ever say that again

9    because, again, it was very inappropriate.

10   Q.  Why was the hatchetman inappropriate?

11   A.  I didn't like it.  It was a term that somebody within the

12   agency came up with, apparently on their own, but I did not

13   consider myself that.  I never called myself that.  I worked

14   during my career and I was very accomplished and did the jobs

15   that were assigned to me, whether it be investigation, an

16   internal investigation, a criminal investigation against

17   employees.  And I always conducted myself in the highest regard

18   with professional manner and was very professional with every

19   interaction I was ever involved in.

20   Q.  Throughout your career, have you been involved in many

21   internal affairs investigations?

22   A.  Many.

23   Q.  And have you ever had to recommend termination for Adams

24   County Sheriff's Office employees throughout your career?

25   A.  I have recommended termination.

Claps - Direct

1    Q.  And can you talk about why you were involved in internal

2    affairs investigations throughout your career?

3    A.  I think it really came down to people that were able to be

4    thorough, thorough through the investigation, thorough through

5    the process where not only could they decipher the information

6    they were reading, seeing, but can also disseminate and write

7    reports in an appropriate manner, that conveyed the outcome in

8    the investigation to be able to push that through the chain of

9    command, where others could then review it and make their

10   findings, all the way up to the Sheriff, where he would make

11   the ultimate decision of what was going to occur.

12   Q.  Did you take -- excuse me.

13        Did you take recommending termination seriously when

14   you were doing internal affairs investigations?

15   A.  Absolutely.  I still do.

16   Q.  And why would you still recommend termination if you knew

17   this was such a serious recommendation?

18   A.  Can you repeat that one more time.

19   Q.  Were there -- despite knowing that this is a serious

20   recommendation, were there times when you still felt that it

21   was appropriate to recommend termination for an individual?

22   A.  Absolutely.  Termination recommendations are not made

23   lightly.  There is a lot of reflection, there is a lot of work

24   that goes into the complete process.  And you are ending

25   someone's career.  In some cases, it not only ends their

Claps - Direct

```
 1   career, it also is part of -- then, later of a criminal process
 2   that we have to take serious.  And I hold not only myself to
 3   that high standard, but I hold our employees to that standard
 4   also, where we are representatives of our community and Adams
 5   County, and we have to fulfill our obligations.
 6   Q.  Did you feel like part of serving the Adams County
 7   community was making recommendations if it was in the best
 8   interest of the community for an employee to be terminated?
 9   A.  If I had to, yes.
10   Q.  Sheriff Claps, did you ever talk down to people at the
11   Sheriff's Office?
12   A.  No.
13   Q.  Sheriff Claps, do you hold yourself to a high standard as
14   an employee of the Adams County Sheriff's Office and as the
15   Sheriff today?
16   A.  I do.
17   Q.  Do you hold those who are around you at the Sheriff's
18   Office to a high standard?
19   A.  I do.
20   Q.  Why do you hold yourself and those around you to a high
21   standard?
22   A.  As leaders in the agency, we are looked up to.  We are
23   mimmicked.  We are really the guiding light and the direction
24   for our employees and our staff.  And we have to hold ourselves
25   to that higher standard and to reflect what not only are we
```

Claps - Direct

1    asking, but to be a role model and an example to develop them.

2    Because eventually, they're going to be replacing us.  And

3    those are our future leaders that we depend on.  As a lifetime

4    Adams County resident and employee of the county, that is

5    number one priority.

6    Q.  Sheriff Claps, I want to talk about the impact that getting

7    fired had on you and your family.

8         How did you feel when you were fired?

9    A.  It was traumatic.

10   Q.  Could you explain that a little bit, please.

11   A.  You know, I have limited careers that I have had throughout

12   the course of my life.  But having said that, the first time

13   ever being terminated from a job for doing a good job, for

14   being a professional and fulfilling the obligations of the

15   office, very disheartening, very difficult physically,

16   emotionally.  It's tough, tough to overcome.

17   Q.  How did your termination impact your family?

18   A.  It, again, was very hard.  When your kids are depending on

19   you to be the provider of a house over their head, food on the

20   table, insurance.  We have an at-risk child that has a

21   handicap, that -- it's not something that you can take lightly,

22   that one day for no cause and for an unjust reason, for being

23   targeted for this type of an offense that you not only lose

24   everything that you have ever worked your way up for, but you

25   have nothing at the end of the day.

Claps - Direct

1   Q.  How did your termination impact your sense of self?

2   A.  It took a lot of reflection of not only what I was going to

3   do, how I was going to continue to move forward in a successful

4   manner and to be able to provide for my family and to really

5   get my feet back underneath me to start moving in a positive

6   direction.

7   Q.  What job did you take after you were jail division chief at

8   the Adams County Sheriff's Office and a 22-year career there?

9   A.  Well, the first job was not an intentional job.  But the

10  director of the parks department and one of the managers

11  reached out to me from Adams County Parks and Recreation and

12  explained to me -- they knew that I do some farming, have

13  livestock, I'm familiar with equipment and tractors and

14  machinery, they called me up and said that there was an opening

15  that they were going to post for a minimal paid position with

16  the county parks department part time that they thought I would

17  be a good fit for to -- you know, they felt bad of what

18  happened and conveyed that they were sorry to hear what

19  occurred with the Sheriff's Office and the command staff and

20  the commanders and chiefs that were there, and asked if I would

21  be interested and would put in for this position.

22          And after thinking about it for a couple days, I did

23  put in for this position and was successfully awarded that

24  position as a part-time tractor operator, where I drove about a

25  120-horsepower 4-wheel drive John Deere tractor with about a

765
Claps - Direct

1    16-foot mower on it.  And I would mow literally thousands of

2    acres in Adams County that Adams County owns that was not

3    maintained very well, where I was able to go out and spend 8 to

4    12 hours a day, on a part-time basis, and reflect and really do

5    some thinking of how I was going to move forward.

6    Q.  How did it feel to go from being division chief at the

7    Sheriff's Office to being a seasonal lawn mower?

8    A.  It was brutal.

9    Q.  What passes through your mind now, when you think about

10   your termination?

11   A.  The frustration, I think, still is on the forefront that

12   this individual was able to target folks unlawfully for their

13   political affiliation and involvement is frustrating and still

14   I have problems swallowing that, that it's accepted even at

15   different levels throughout the Adams County government, that

16   it's okay to do.  And it's not okay, so that's part of what

17   we're doing here today.

18   Q.  You mentioned that you used those hours to reflect when you

19   were mowing lawn.  What was going through your mind when you

20   were spending those long days reflecting?

21   A.  Well, my mind never stops.  So it obviously was processing

22   what other jobs were out there, what I could do, what other

23   directions I could possibly go.  Again, this was a part-time

24   job.  It did not affect my whole week, so I was able to put in

25   job applications and work on other employment opportunities.

Claps - Direct

 1            But more than anything, it just kind of separated me

 2    from everyone.  When you are engaged as many years as we were

 3    with law enforcement and that collaboration with not only your

 4    peers, your mentors, other stakeholders and community members

 5    every single day and have that up ended, it was actually

 6    pretty -- it gave me a chance to unwind and not to be so angry

 7    and frustrated and work, moving forward, to do something

 8    different.

 9    Q.  Did you experience anger when you were terminated?

10    A.  Oh, absolutely.

11    Q.  You mentioned that you were looking at other positions

12    while you were mowing Adams County property.  I want to talk

13    about some of those other positions you were looking for and

14    the other positions you held after you were terminated.

15            Had you started looking for a job prior to getting a

16    call about this lawn mowing opportunity?

17    A.  It was kind of all about the same time.

18    Q.  And so when did you start looking for a job after getting

19    fired?

20    A.  It was maybe within a month or two.  I think, within the

21    first month, I was already looking.  It's just a matter of

22    finding what's available.  There was a lot of positions

23    available.  But obviously, I'm not going to drive across the

24    state.  I can't relocate my family.

25            And it really took some time and detail to be able to

Claps - Direct

 1   identify particular agencies.  Ideally, what I wanted to do was

 2   continue to provide services to the folks in Adams County where

 3   my commitment has been my entire life.

 4   Q.  And what did you do to start looking for another job apart

 5   from this lawn mowing opportunity?

 6   A.  Well, there was obviously job searches through the

 7   internet, completing applications, submitting applications to

 8   various different agencies and departments.

 9   Q.  Did you apply to any other law enforcement positions?

10   A.  I did.

11   Q.  What positions did you apply to?

12   A.  I put in applications for the Thornton Police Department as

13   an officer.  I put in an application for the Commerce City

14   Police Department sergeant's position in charge of the traffic

15   division, which I thought I was very much capable of

16   completing, especially since I had such an in-depth knowledge

17   of the traffic units for five years; grant writing, DUI

18   enforcement, and managing probably one of the largest at that

19   time traffic units in the Adams County community.  I put in an

20   application for the Broomfield Police Department for an entry

21   level position.  I put in an application for a sergeant's

22   position at the Northglenn Police Department.  And I also put

23   in an application for a commander or lieutenant's position at

24   the Northglenn Police Department.  And then, as far as paid

25   jobs, I think the last law enforcement paid job that I put in

Claps - Direct

 1   for was with the Town of Severance as a sergeant at their

 2   police department.

 3   Q.  How did the rank of the positions you applied for compare

 4   to the rank that you had when you were fired?

 5   A.  Much lower, and in some cases, entry level.

 6   Q.  Did you receive any interviews for any of these positions

 7   you applied for?

 8   A.  I did.

 9   Q.  Where did you receive interviews?

10   A.  I received -- I went through about a six-month process with

11   the Broomfield Police Department, that it took about six months

12   to go through the interview process, the psychological

13   evaluation, their physical fitness portion.  Obviously, I had a

14   written test.  There was -- again, it was like six or seven

15   months through that process for entry level officer's position

16   for the City and County of Broomfield.

17   Q.  Did you have interviews with any of the other

18   municipalities you had applied for?

19   A.  I did.  I had an interview with the City of Thornton.  I

20   had interviews canceled with the City of Northglenn.  I had an

21   interview canceled with the City of Commerce City.  I did full

22   interviews -- now, backtracking a little bit.  Through the City

23   and County of Broomfield, I actually went through that complete

24   process as the number one candidate through that entire process

25   and was unconditionally hired by their -- one of their HR

Claps - Direct

1    people.

2              Through the Town of Severance, I went through that

3    full process for their sergeant's position.  That, again, took

4    probably six months, maybe five months, where I went through

5    the testing process, the written test, the oral boards, a very

6    lengthy oral board, and was the number one candidate for the

7    Town of Severance in that sergeant's position for their PD.

8              THE COURT:  Counsel, I don't mean to interrupt, but

9    we're getting close to that break time.  About how much more

10   time do you think you have with this witness?

11             MS. BUTLER:  Mr. Claps, I would estimate about a half

12   hour.

13             THE COURT:  Why don't we take our break now, then.

14             We will excuse our jury.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1      (In open court; jury not present)

 2          THE COURT:  I know it's just a guesstimate, how much

 3    time do you think you'll have with him on cross?

 4          MS. PRATT:  It won't be long, your Honor.  It will be

 5    kind of similar to the other Plaintiffs.

 6          THE COURT:  You think we'll wrap up Mr. Claps today?

 7          MS. PRATT:  Oh, I certainly expect to, yes.

 8          THE COURT:  And then this is your last witness that

 9    you have.  So Plaintiffs will then rest.  I'm not going to

10    begin the defense case today.  If we can get done and get them

11    out a little bit early, we can do so, take up anything that we

12    need to take up before the Defendant's case.

13          MS. PRATT:  Correct, your Honor.  We will have an oral

14    Rule 50 motion to present to the Court.

15          THE COURT:  That's fine.  We can either -- see what

16    time it is.  I don't want to stay past 5 here today, nor do the

17    people downstairs want me to keep you all past 5.  If we need

18    to, we can get here a little early on Monday to deal with that.

19    Let's see how the testimony goes.

20          MS. PRATT:  Your Honor, if I could propose, I think

21    things might be more orderly and organized if we were to take

22    up the Rule 50 motion on Monday morning.

23          THE COURT:  Let's do that.  I can come in early or

24    have the jury come in a little later on Monday.  Based upon

25    what you said, as far as your witnesses yesterday, I'm

1    anticipating a day to a day and a half of testimony on the

2    defense side of things.  And so that will give it to the jury

3    by Tuesday or Wednesday morning at the latest and gives them a

4    full day to deliberate, and they're still within their seven

5    days I told them.  And they can stay later.  I have nothing

6    Thursday or Friday, so they can stay as long as they need to.

7               We'll go from there.

8          (Recess)

9          THE COURT:  Let's bring our jury in.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Claps - Direct

 1      (In open court; jury present)

 2           THE COURT:  Just a reminder that you remain under

 3      oath.

 4           THE WITNESS:  Yes, sir.

 5           THE COURT:  Go ahead.

 6      BY MS. BUTLER:

 7      Q.  Sheriff Claps, before we broke for the afternoon break, you

 8      talked about some interviews that you had.

 9           Did you end up working for any of these law

10      enforcement agencies?

11      A.  No, I did not.

12      Q.  So was your lawn mowing position the only new employment

13      income that you had between when you were fired and when you

14      became Sheriff in 2023?

15      A.  That's correct.  I did mowing for the Adams County Parks

16      Department in 2019 and 2020 again.

17           MS. BUTLER:  And could we please bring up Exhibit 37.

18           Your Honor, this exhibit has been stipulated, and I

19      move for its admission.

20           THE COURT:  Any objection?

21           MS. PRATT:  No objection.

22           THE COURT:  It's admitted, and you may publish.

23      (Plaintiff's Exhibit 37 received in evidence)

24           MS. BUTLER:  Your Honor, I have a damages chart

25      similar to the 1s we have used for the other Plaintiffs.

Claps - Direct

 1          THE COURT:  Sure.

 2    BY MS. BUTLER:

 3    Q.  Sheriff Claps, what was your base salary in 2019 expected

 4    to be?

 5    A.  My base salary at the beginning of January of 2019 was

 6    $136,297.36.

 7    Q.  And did that place you as being topped out in the pay

 8    range?

 9    A.  It did.

10    Q.  So did you receive a lump sum bonus because you were topped

11    out in the pay range?

12    A.  I did.

13    Q.  And what was that lump sum?

14    A.  Lump sum of $1,794.49.

15    Q.  And Mr. Claps, in your experience, is there a market

16    adjustment on an annual basis at the Sheriff's Office?

17    A.  Yes.

18    Q.  And is that market adjustment typically 5 percent?

19    A.  Most of the time, yes.

20    Q.  And given a 5 percent increase, what would you have

21    expected your base salary to be in 2020?

22    A.  Based on that percentage, it would be $143,112.23.

23    Q.  And what would your lump sum bonus in 2020 have been, then?

24    A.  $7,155.61.

25    Q.  And is that because you received -- you typically received

Claps - Direct

1    a performance rating high enough to receive a 5 percent merit

2    increase?

3    A.  Correct.  Anywhere from a 4 to a 5, you receive a certain

4    amount.

5    Q.  And what was your performance rating in 2019 -- reflected

6    on this 2019 pay document?

7    A.  4.82.

8    Q.  And Sheriff Claps, what would you have expected your 2021

9    base salary to be with the 5 percent merit increase?

10   A.  $150,267.84.

11   Q.  And what would your lump sum payment have been?

12   A.  $7,513.39.

13   Q.  Sheriff Claps, what would you have expected your salary to

14   be in 2020, your base salary?

15   A.  In 2020 again?

16   Q.  Excuse me, 2022.

17   A.  In 2022, it would be $157,781.23.

18   Q.  And what would your lump sum bonus have been if you

19   continued to have a 5 percent merit bonus?

20   A.  $7,889.06.

21   Q.  You talked about some of the increases in your healthcare

22   benefits that you required because of your termination?

23   A.  Correct.

24   Q.  And why did you have such significant healthcare increases?

25   A.  The policy because of -- that we have had over the years

Claps - Direct

1   and the pre-existing conditions, we were really limited to what

2   we did.  I chose to stay under the County plan, which is not a

3   cheap plan, but it provided us the coverage that we need.

4   However, even based on these numbers, we could not cover my son

5   with the pre-existing conditions because it would have been

6   much higher than what we had to pay already.  So we had to get

7   him a separate policy under his own name and work through that

8   a little differently.

9   Q.  What were your increased healthcare expenditures in 2019?

10  A.  It increased by $11,877.

11  Q.  And was that about the same in 2020 and 2021?

12  A.  Yes.

13  Q.  And what were your increased healthcare expenditures in

14  2022?

15  A.  In 2022, we actually had a slight increase because of the

16  Adams County plan, it went down to $9,877 more than what we

17  typically paid.

18  Q.  So how much, between 2019 and 2022, did your healthcare

19  expenditures increase?

20  A.  $45,508.

21  Q.  And if you add your healthcare expenditures to your

22  anticipated base wages and lump sum bonuses for 2019 to 2022,

23  how much was that?

24  A.  $657,319.21.

25  Q.  And how much money did you make from your lawn mowing job?

Claps - Direct

1    A.   Total between the two years was $18,419.

2    Q.   And if you take the $657,319.21, which is what your

3    increased expenditures were plus your anticipated income, and

4    you subtract out what you actually made, what is the total

5    economic loss that you suffered from being fired?

6    A.   $638,900.21.

7    Q.   Thank you, Mr. Claps.  You can put that away.

8         MS. BUTLER:  And you can take down the exhibit.

9    Q.   Sheriff Claps, I want to talk about you running for

10   Sheriff.

11        When did you decide to run for Sheriff?

12   A.   It was in -- I think I announced in December, the

13   beginning, first quarter of 2021.

14   Q.   And Sheriff Claps, excuse me, just to go back one moment.

15        You testified you didn't work any of the law

16   enforcement jobs you interviewed for; is that correct?

17   A.   I did not.

18   Q.   Is that because you weren't offered any of those positions?

19   A.   Initially, I was, but they were retracted before the actual

20   start dates.

21   Q.   And then, going back to what we were talking about.

22        Why did you decide to run for Sheriff?

23   A.   I decided to run for Sheriff for multiple reasons.  One,

24   being an Adams County resident and committed to our county, I

25   had found and heard and was told over and over and over of some

Claps - Direct

 1    of the internal issues that we were facing and seeing within

 2    the Adams County Sheriff's Office.  And my goal and my platform

 3    was to be able to bring and provide safer communities and

 4    stronger leadership to Adams County to be able to refocus on

 5    our organization and move us forward in a positive manner to be

 6    productive and to be able to collaborate and work with the

 7    communities at a better degree than what we were.

 8    Q.  Let's talk about your time after you won the Sheriff's

 9    election.

10          First, I want to talk about some policies of the

11    Sheriff's Office.

12          MS. BUTLER:  Could you please bring up Exhibit 59,

13    which has already been admitted.  And I move to publish, your

14    Honor.

15          THE COURT:  Yes, you may.

16    BY MS. BUTLER:

17    Q.  Are you familiar with this document, Sheriff Claps?

18    A.  I am.

19    Q.  And what is it?

20    A.  That is a -- I have to put my glasses back on -- that is a

21    policy that was from 2019 concerning employee speech,

22    expression and social networking.  The policy number was based

23    out of the policies of 1024.

24    Q.  And had a policy similar to this or the same been in effect

25    throughout your tenure at the Sheriff's Office?

778
Claps - Direct

1   A.  It has -- it has been, and although it has evolved over

2   years with some best practices.  But yes, the answer to your

3   question is yes.

4   Q.  And does the Sheriff's Office have a similar policy in

5   place now with you as the Sheriff?

6   A.  We do.  And I believe the current policy is 1000 -- maybe

7   25 or 26, I'm not exactly sure -- but I think the policy number

8   actually changed because of renumbering or categorizing.

9   Q.  Why does the Sheriff's Office currently have this policy in

10  place?

11  A.  To protect our employees and our staff within the Sheriff's

12  Office and the agency.

13  Q.  And how does this policy protect them?

14  A.  It protects them and outlines the expectations of what they

15  can and can't do and gives them that protected class of how

16  they can be able to have employee speech and expression and

17  social networking without violating any department policies or

18  procedures.

19  Q.  Thank you.

20          MS. BUTLER:  Could we please bring up Exhibit 98,

21  which has been admitted, your Honor.  And I move to publish.

22          THE COURT:  You may.

23          MS. BUTLER:  Your Honor, may I proceed.

24          THE COURT:  Yes.

25  BY MS. BUTLER:

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Direct

1    Q.  Sheriff Claps, are you familiar with this document?

2    A.  I am.

3    Q.  What is it?

4    A.  This is the Adams County policy from 2018, policy number

5    201, which contains standards of conduct.

6    Q.  And did the Sheriff's Office have a similar policy in

7    effect under you as Sheriff?

8    A.  We do.

9    Q.  And why does the Sheriff's Office have this policy in

10   effect?

11   A.  Again, it is to outline the expectations of our employees

12   and also provides them protection and allows them the

13   opportunity to know what is expected of them.

14   Q.  And was this policy or something similar in effect

15   throughout your career with the Sheriff's Office?

16   A.  Yes.

17   Q.  Switching gears a little bit, Sheriff Claps, I want to talk

18   about your selection process, the process you had for selecting

19   personnel when you were coming in as Sheriff.

20        How did you go about selecting personnel for the

21   Sheriff's Office after you were elected as Sheriff?

22   A.  We went through a very lengthy process.  I originally

23   gathered some groups independently that we worked on mission,

24   vision and values.  And then moved forward after that, where we

25   were able to get some space at the Adams County government

Claps - Direct

 1    center through our attorney's office, conducted interviews with

 2    all of the candidates from commander and up through an

 3    interview process for the positions available.

 4    Q.  What criteria did you use in this interview process?

 5    A.  Well, the criteria, because we followed the laws in the

 6    State of Colorado, every position was posted through the NEOGOV

 7    and given everyone ample opportunity.  I think it's three days

 8    minimum that we were going to be providing this testing to

 9    eliminate nepotism and unfair hiring practices.  We -- myself

10    and, at that time, the only position that was announced was the

11    Undersheriff.

12            We compiled a testing process.  I think it consisted

13    of, I think it was, 15 questions.  We allotted all of the

14    candidates a minimum of an hour.  And we did oral boards with

15    all of the candidates to fulfill our roles that we were looking

16    for.

17    Q.  And who did you select as your Undersheriff?

18    A.  Paul Gregory.

19    Q.  And had he been the Undersheriff under Mr. Reigenborn?

20    A.  He was for about five or six months prior to my

21    transitioning into office.

22    Q.  You talked about these questions you had in your

23    interviews.

24            What sort of scoring process did you and Mr. Gregory

25    have for candidates in their interviews?

Claps - Direct

```
 1   A.  All of them were based on past history and knowledge from

 2   our involvement through literally hundreds of testing processes

 3   with our HR department, where we compiled these questions and

 4   scored and rated on 1 to 10 and had a total score, and then

 5   divided by the number to give an average.

 6   Q.  And did you use this criteria to make your decisions about

 7   who to select for what positions?

 8   A.  We did.

 9   Q.  Did you ever consider if the candidate had voted for you

10   when you made personnel decisions?

11   A.  Never.

12   Q.  What type of loyalty was important to you in the people you

13   selected to be commanders and chiefs?

14   A.  The loyalty to Adams County and our community that we

15   serve.

16   Q.  Were you aware of any commander or chief who had worked for

17   Mr. Reigenborn who supported you in the 2022 election?

18   A.  I did not follow it at all.  I did see people out, but I

19   didn't know what involvement or support they were providing.

20   Q.  And had anyone, to your knowledge, supported you in that

21   election of the commanders and chiefs under Mr. Reigenborn?

22   A.  No.

23   Q.  I want to walk through some of the employment decisions you

24   made based on these interviews.

25              First off, did you fire anyone who had worked for
```

Claps - Direct

1   Mr. Reigenborn?

2   A.  I didn't fire anybody.

3   Q.  Let's talk about each of the chiefs of the Sheriff's Office

4   when you came in.

5           Who was the division chief of the jail?

6   A.  Are you saying when I came in or prior to or after?

7   Q.  I'll clarify.

8           What employment decision did you make for Chris Laws?

9   A.  Through that interview process and the interview that we

10  conducted, it was determined that Chris Laws would be moved

11  from division chief of the jail division to a commander

12  position in our patrol division.  We felt, at that time, that

13  he was not the suitable candidate for that particular role and

14  to provide him an opportunity to be successful and to then

15  hopefully advance in the future and get him redirected with a

16  different division, to help give him more knowledge and

17  experience.

18  Q.  What employment decision did you make for Terrance O'Neill?

19  A.  Terrance O'Neill, when I conducted these interviews and

20  when I took office, was an acting chief in our detective

21  division.  He was a commander in that acting capacity.  So he

22  maintained that same level of commander, and I thought it

23  was -- through this interview process, that it was best for

24  Commander O'Neill to be assigned to our jail division, to be

25  able to work on some of the training issues and concerns that

Claps - Direct

1    we had there.

2    Q.  Why did you feel Mr. O'Neill was suited to the training

3    issues in the jail?

4    A.  A lot of the issues that we were seeing had to do with

5    excessive force, and it also had to do with our JSOC response

6    team or jail response team.  And because of his tactical

7    knowledge and experience, I thought it would be a good place

8    for him to start and get some of that training out and

9    fine-tuned to the folks that needed it.

10    Q.  What employment decision did you make for John Bitterman?

11    A.  John Bitterman was the chief of our patrol division.  After

12    the interview process, we deemed that he was demoted to

13    commander and put in the command staff position of our North

14    Metro Drug Task Force because of his past experience.  We felt,

15    at that time, he did not have some of the skill sets necessary

16    to be able to be the chief of our patrol division in such a

17    high functioning unit that really provides a lot of liability

18    to Adams County as a whole.

19    Q.  And just to back up, you were making these decisions with

20    Paul Gregory, who had been the Undersheriff for a couple of

21    months prior to when you became Sheriff?

22    A.  Correct.

23    Q.  What employment decision did you make regarding Bill

24    Dunning?

25    A.  Bill Dunning was the division chief in our professional

784
Claps - Direct

 1    standards at headquarters.  After the interview process, it was

 2    determined that he would be best suited for our jail division

 3    chief's position, with his ability to really oversee some of

 4    the projects that we have been working on and his -- some of

 5    his skill sets, we thought it would be best for him to fulfill

 6    that role.

 7    Q.  What employment decision did you make regarding John

 8    Bungartz?

 9    A.  John Bungartz was originally at our Flatrock training

10    facility.  Through the interview process, John Bungartz, with

11    some of the concerns and issues that we were having with our

12    Flatrock training facility very early on, it was decided that

13    John Bungartz would stay in that position until we got through

14    some of the processes that we had to overcome.

15    Q.  What employment decision did you make for the director of

16    human resources?

17    A.  The director of human resources was Tina Jachetta.  She was

18    unknown to me.  When I interviewed her, she was a transfer

19    during the past administration from the DA's office to the

20    Sheriff's Office.  She provided a very thorough and in-depth

21    interview.  It was decided that she would maintain and stay in

22    that position.

23    Q.  How many chiefs were there at the Sheriff's Office when you

24    were sworn in as Sheriff?

25    A.  Five -- well, there was an acting, so there was --

Claps - Direct

 1    Q.  Let me rephrase.

 2         How many chief positions were there at the Sheriff's

 3    Office when you were sworn in?

 4    A.  Five.

 5    Q.  And --

 6    A.  And one director, which is equivalent to a chief.

 7    Q.  How many of these people did you fire?

 8    A.  None.

 9    Q.  Did you fire any commanders?

10    A.  No.

11    Q.  Did you demote any commanders?

12    A.  No.

13    Q.  What role did political loyalty, to you, play in any of the

14    commander and chiefs' abilities to perform their job?

15    A.  Absolutely none.

16    Q.  Did you ever look at where Sheriff's Office employees had

17    donated to in the election?

18    A.  No.

19    Q.  Why not?

20    A.  It was not something that crossed my mind.

21    Q.  Has the fact that you kept people on that did not support

22    you politically impacted your ability to effectively run the

23    Adams County Sheriff's Office?

24    A.  No.  Because you need -- and even early on, in some of my

25    early meetings, we had those discussions that I and the

Claps - Direct

1    Sheriff's Office do not want just a bunch of yes people, not a

2    bunch of yes men.  People that are capable of making

3    independent thoughts for themselves, they're critical thinkers

4    and are capable of analyzing problems that we deal with.  We

5    cannot have a bunch of yes men that work in just one direction.

6    We have to be very fluid and -- to overcome the issues that we

7    see in the Sheriff's Office, and it is driven by not only

8    social, but political events that have no bearing.  We have a

9    job to do, and it doesn't matter if you are a D or an R or an

10   independent, it doesn't matter what you are.  But we fulfill

11   our capacity and provide the services to our community.

12   Q.  Let's talk about some of the things that were going on at

13   the Sheriff's Office when you were sworn in as Sheriff.

14        And before we get into that too much, now that you

15   have been Sheriff, can you talk about the chain of command at

16   the Sheriff's Office?

17   A.  It is structured the same as it has been for many, many

18   years.  It's based off of a paramilitary organization.  So

19   it's -- everything works from the top down.  The Sheriff being

20   in charge, and then it trickles down.  And then, also in the

21   other direction, it trickles up.  So there's a chain of

22   command, not only with the certified staff, but also the

23   professional staff that also follow the same chain of command

24   through their supervisors and managers and directors, just

25   being a different name versus a sergeant, a commander and a

Claps - Direct

1  chief.

2  Q.  How essential is the chain of command to the function of

3  the Sheriff's Office?

4  A.  Well, it's very essential.  We truly can't function without

5  some type of an organization base, that we follow this chain of

6  command.  Otherwise, we have a bunch of dysfunctional units

7  that become their own individual entities and go different

8  directions that are swaying from the path of Constitutional

9  law, of our directives, our Colorado state and federal laws.

10  And we really have to focus on staying uniform and all doing

11  the same thing for the same reason.

12  Q.  When you were sworn in as Sheriff, how many empty positions

13  were there at the Sheriff's Office?

14  A.  Over a hundred.

15  Q.  How does understaffing affect the Sheriff's ability to

16  serve its citizens?

17  A.  It is crucial.  Without having proper staffing, without

18  having proper structure, it becomes very difficult to provide

19  the services, whether it be in a statutory required service,

20  like our jail and our courts and our civil unit, for process

21  serving.  Manpower and staffing is the essential element that

22  we function off of.  And if we don't have the staffing, we have

23  some serious problems to be able to provide those services, to

24  provide the safety and security to, not only our inmate

25  population, but to the community that we serve.

788
Claps - Direct

1   Q.  I want to talk about Flatrock.

2        Can you describe for the jury what Flatrock is?

3   A.  Flatrock is a regional training facility that we developed

4   under Doug Darr.  I actually was part of the original team that

5   helped establish that as a firearms instructor and one of our

6   instructors for academics.  We developed that facility to not

7   only facilitate our own recruits and/or cadets for law

8   enforcement training, but to also provide services for other

9   agencies across the state that are hiring and need individual

10  organizations to be able to provide that Police Officer

11  Standards and Training, that POST requirement to -- so they can

12  become certified in the State of Colorado.

13       We also, at Flatrock, provide all of our in-service

14  training for our staff.  So Flatrock training facility is a

15  crucial element and part of our Adams County Sheriff's Office.

16  Q.  When you started as Sheriff, were there any inquiries going

17  on at Flatrock?

18  A.  There was a bunch.  It started from an investigation that

19  was conducted by the Attorney General's Office and the

20  allegations that we have already heard about here with

21  Reigenborn, McLallan and Bethel and their wrongdoing.  And

22  through that investigation, it opened up some other cases of

23  excessive training, injuring of cadets, of inappropriate

24  behavior -- and I'm not talking sexually, but I'm talking about

25  physically hurting people -- that stemmed from 2018 until

789
Claps - Direct

1    January or February of 2023.  So POST and their investigatory

2    outlet, which would be the Attorney General's Office and CBI,

3    the Colorado Bureau of Investigation, while looking into the

4    criminal allegations of our past administration, opened up

5    these other issues that created a huge issue for the Sheriff's

6    Office and our professionalism that we are here to provide.

7            And that's part of the reason why I left Chief

8    Bungartz in that position.  When I came into office, it wasn't

9    that he was there for a very long amount of time.  I think he

10   was only there for a month or two, so he was fairly new out

11   there as a replacement for Micki Bethel, who either quit or was

12   fired during the criminal investigation through the Attorney

13   General's Office.

14   Q.  How important is the training that takes place at Flatrock?

15   A.  It's crucial.  It is how we function.  It is not only a

16   requirement dictated by the State for us to continue to train a

17   certain amount of hours per year, but it's essential for us to

18   be able to teach our law enforcement critical thinking skills

19   and deescalation skills, driving skills, shooting skills, less

20   lethal skills, arrest control tactics, so that we're a

21   functioning agency to provide the services that you require.

22   Q.  Thank you, Sheriff Claps.  I just have one final question.

23           How have Mr. Reigenborn's actions affected you?

24   A.  That -- it's been huge.  The effects from Rick Reigenborn

25   and the political termination of the positions has affected our

Claps - Direct

 1   Sheriff's Office so greatly that, not only did we lose

 2   literally thousands of years of experience, if you look at

 3   combined experience of people that retired or left, even if

 4   they couldn't retire, that just packed up and left because of

 5   his leadership skills.

 6         We have a lot to overcome as an agency.  This is not

 7   about me or the folks at the table.  This is truly about the

 8   community and the services that we provide to the community.

 9         It's played a huge effect on even our promotional

10   process, since I have been back into the Sheriff's Office, that

11   we have put out attempting to promote sergeants, commanders,

12   captains, chiefs, where we had zero to very minimal involvement

13   because of the fear of retaliation and the fear of the

14   administration leading with an iron fist, like in the past

15   administration, that we have had a lot to overcome to be able

16   to get to the point where we are now, where I can actually say,

17   in the next couple months, we will be a hundred percent staffed

18   in our certified staff, which will be the first time since my

19   career that I can ever remember us being a hundred percent

20   staffed for law enforcement.

21         So we have had a lot to overcome.  We have

22   accomplished a lot.  We are moving in a better direction,

23   without that political retaliation, without the -- I think it

24   was explained to us earlier this week, the narcissist that

25   individual brought, that ruling with that iron fist of threats,

                                   791
                              Claps - Cross

 1   fear and intimidation on a daily basis, has started to finally

 2   improve our agency in a positive direction.

 3           MS. BUTLER:  Thank you, Sheriff Claps.  Nothing

 4   further.

 5           THE COURT:  Cross-examination.

 6           MS. PRATT:  Yes, your Honor.

 7   CROSS-EXAMINATION

 8   BY MS. PRATT:

 9   Q.  Good afternoon, Sheriff Claps.

10           So you just testified that this case is about

11   community; right?

12   A.  Partially, yes.

13   Q.  And you are the Sheriff of Adams County; correct?

14   A.  Correct.

15   Q.  And you are suing the County; correct?

16   A.  Correct.

17   Q.  Your position in this case is that you were fired due to

18   your political affiliation with Michael McIntosh; correct?

19   A.  In violation of the Constitution, yeah.

20   Q.  Right, I understand.  That's the legal claim that the jury

21   is going to assess after the judge instructs them on the law.

22           You understand that; right?

23   A.  Absolutely.

24   Q.  Okay.  And you have been in the courtroom all week, and you

25   have heard multiple witnesses testify about the fact that


                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Cross

1    Mr. Reigenborn in fact retained a number of McIntosh supporters

2    in his administration; correct?

3    A.  I think there was a little bit of question to some of what

4    is considered retained.  I think there was many of them, to

5    include the first day, there was --

6    Q.  Sheriff, that's not my question.

7         My question is simply:  You have been in the

8    courtroom, you have heard witnesses testify that Mr. Reigenborn

9    retained a number of McIntosh supporters; correct?

10        It's a simple question.

11   A.  Eventually, yes.

12   Q.  Okay.  You don't dispute the fact that Mr. Reigenborn

13   indeed retained a number of McIntosh supporters; correct?

14   A.  He did eventually.

15   Q.  Paul Gregory, your Undersheriff, he's a prime example of

16   that; right?

17   A.  Correct.

18   Q.  And in fact, you just recent -- you just testified a moment

19   ago on direct that you didn't fire anyone from the prior

20   administration; right?

21   A.  That's correct.

22   Q.  But you did demote Chris Laws; correct?

23   A.  That's correct.

24   Q.  And you also demoted John Bitterman; right?

25   A.  That's correct.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Cross

1   Q.  Now, just to be perfectly clear about this, when you ran

2   for Sheriff in 2022, you were running on the Democratic ticket;

3   correct?

4   A.  That's correct.

5   Q.  And so was Mr. Reigenborn; right?

6   A.  Yes.

7   Q.  And you defeated him in the primary; correct?

8   A.  Yes.

9   Q.  So you and Mr. Reigenborn were members of the same party;

10  correct?

11  A.  Correct.

12  Q.  Now, you mentioned also some training issues that you said

13  you were seeing.  And your testimony just a moment ago on

14  direct examination was that those training issues arose in the

15  year 2018.  Do you recall that line of testimony just moments

16  ago?

17  A.  The investigation opened on to issues based from 2018 until

18  the beginning of 2023.

19  Q.  And in 2018, Mike McIntosh was the Sheriff of Adams County;

20  correct?

21  A.  Correct.

22  Q.  Now, Sheriff Claps, you also testified just a bit ago,

23  closer to the beginning of your direct testimony, that you

24  always treated your fellow employees at the ACSO with respect;

25  correct?

Claps - Cross

1   A.  That's correct.

2   Q.  You described for the jury the day that you were walked out

3   of the jail; right?

4   A.  I did.

5   Q.  And you were -- you said you were escorted out?

6   A.  Yes.

7   Q.  You testified that a harem walked you out of the jail;

8   correct?

9   A.  I don't know if I said harem, but there was a group of

10  individuals, yes.

11  Q.  Well, the record is going to reflect that, but I heard the

12  word harem in your testimony.

13          And that group of individuals was led by Commander Sue

14  Nielsen; correct?

15  A.  Yes.

16  Q.  And Sue Nielsen, just to be clear, this is a female

17  commander; correct?

18  A.  Yes.

19  Q.  And a harem is a synonym for a whore house; right?

20          MS. HALPERN:  Objection.

21          THE COURT:  Sustained.

22          MS. PRATT:  I'll just move on.

23  BY MS. PRATT:

24  Q.  Sheriff Claps, you would agree that the command staff

25  includes commanders, captains, division chiefs and the

Claps - Cross

1    Undersheriff; right?

2    A.  Not completely, but you are close.

3    Q.  Well, we can certainly take a look at your deposition

4    testimony, if you'd like, to help refresh your memory about

5    what you have previously testified to in this case.  Would you

6    like to do that?

7    A.  Command staff, to be accurate, really includes managers,

8    directors, commanders, captains and chiefs and the Undersheriff

9    and myself.

10   Q.  Managers and directors, those are civilian roles; correct?

11   A.  Correct.

12   Q.  At least as far as the certified staff, it would include

13   commanders, captains, division chiefs and the Undersheriff;

14   correct?

15   A.  Correct.

16   Q.  So that clearly means that, in the year 2018, you,

17   Mr. Coates, Mr. Currier and Mr. Mitchell were all members of

18   the command staff; right?

19   A.  Correct.

20   Q.  And you would agree with me that, as you move up through

21   the ranks, you have increased responsibilities in your job;

22   right?

23   A.  Absolutely.

24   Q.  And those responsibilities include things like engaging

25   with the community; correct?

Claps - Cross

 1   A.  Yes.

 2   Q.  Things like ensuring that training is happening in an

 3   appropriate way; correct?

 4   A.  Some.

 5   Q.  Mentoring?

 6   A.  Yes.

 7   Q.  Dealing with some financial issues, at least to some

 8   extent?

 9   A.  I don't understand what you mean by "some financial

10   issues," it's -- the whole thing is a very financially

11   motivated organization.

12   Q.  Sure.  I mean, you testified on direct that, in essence,

13   the Sheriff's Office is able to create a budget that is then

14   given to the Board of County Commissioners, and there's some

15   back and forth discussion about what ultimately is going to get

16   approved; right?

17   A.  Correct.

18   Q.  So as a division chief, you had some role in that budgeting

19   process; correct?

20   A.  Some, yes.

21   Q.  When you were the division chief over the jail, you also

22   advised the Sheriff and the Undersheriff about policies for the

23   jail; correct?

24   A.  Some, yes.

25   Q.  And the higher up that you are in the organization, the

Claps - Cross

 1   more involvement you had in all of these various issues that I

 2   have just asked you about?

 3   A.  It goes up through the chain of command, depending on where

 4   it starts.

 5   Q.  And as a division chief, that's pretty high up in the chain

 6   of command; correct?

 7   A.  Correct.

 8   Q.  And so in your position as division chief when you were

 9   over the jail, you had the ultimate say on all of the

10   day-to-day operations within the jail; would that be fair?

11   A.  For the most part.

12   Q.  Okay.  Also, as division chief, you would have had access

13   to high level information that other employees wouldn't have

14   been privy to; correct?

15   A.  Some.

16   Q.  You also determined work assignments in the jail; right?

17   A.  Yes.

18   Q.  You made some -- you would make, at least to some extent,

19   some personnel decisions in the jail; is that right?

20   A.  As far as work assignments, yes.

21   Q.  I understand that, as the division chief, you didn't have

22   the ultimate authority to hire and fire; correct?

23   A.  Correct.

24   Q.  That belongs to the Sheriff; right?

25   A.  Correct.


                    SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Cross

1   Q.  But you would make recommendations about potential

2   discipline or termination when those issues came up; right?

3   A.  If it was part of an IA process, yes.

4   Q.  But you would become involved in that process; correct?

5   A.  At times.  Sometimes it would bypass that particular

6   division and go to a different division.

7   Q.  I certainly understand that.

8           But when it was in your division and it could rise up

9   to your level, you would participate in the internal affairs

10  investigations; right?

11  A.  Yes.

12  Q.  So you have already testified at length that you supported

13  former Sheriff McIntosh in both 2014 and 2018; correct?

14  A.  Yes.

15  Q.  You participated in some fundraisers, you made donations,

16  things to that effect; correct?

17  A.  Yes.

18  Q.  But you never had any conversations with Mr. Reigenborn

19  about your support for Sheriff McIntosh; correct?

20  A.  No.

21  Q.  No, you did not?

22  A.  You asked me a yes-or-no question.  That was a no.

23  Q.  Okay, right.

24          Just to be sure that we're clear on the record here,

25  sir.  You didn't speak with then Mr. Reigenborn about your

Claps - Cross

1    support for Mr. McIntosh; correct?

2    A.  The answer is still no.

3    Q.  And it's still a little unclear.

4         The point being, you never had any discussions with

5    Mr. Reigenborn about your support of Sheriff McIntosh; right?

6    A.  No.

7    Q.  No, you did not have discussions?

8    A.  No, I did not have a discussion with Rick Reigenborn about

9    my support to Michael McIntosh.

10   Q.  Thanks.  Thanks for helping me clarify that.

11        So one other thing I wanted to touch on is,

12   Mr. Reigenborn didn't have the power to interfere with the

13   county pension upon your retirement; correct?

14   A.  You're going to have to state that again.

15   Q.  Sure.  My question is just simply that you understood that

16   Mr. Reigenborn didn't -- when he was Sheriff -- didn't have any

17   ability to interfere with your county retirement pension;

18   right?

19   A.  I would disagree with that.

20   Q.  I'm going to ask that we take a look at your deposition

21   testimony, because you have already testified on this subject.

22        MS. PRATT:  So if the clerk could kindly hand the

23   witness that deposition binder, that would be great.

24   A.  Because I have heard this, I assume it's under my tab.

25   Q.  You are absolutely right, yes.  Please look for your name.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Cross

1   A.  What page?

2   Q.  Turn to Page 75, please, sir.

3   A.  Okay.

4   Q.  And at Line 8, you were asked the following question:  "But

5   just to clarify, you didn't believe that Rick Reigenborn could

6   somehow interfere in your county retirement pension?"

7           That was the question you were asked; correct?

8   A.  That particular question I was asked.

9   Q.  Right.  And at Line 12, you responded:  "Not that I was

10  aware of."

11          Correct?

12  A.  Correct.

13  Q.  Now, on direct examination, you testified that the chain of

14  command is essential within the Sheriff's Office; right?

15  A.  Yes.

16  Q.  And you would agree that command staff has an obligation to

17  support the Sheriff's policies; correct?

18  A.  We support anybody's, any Sheriff's policy, correct.

19  Q.  And I'm not suggesting that that would be -- that that

20  should differ from Sheriff to Sheriff.

21          My point is simply that the command staff needs to be

22  supportive of whatever directives the then sitting Sheriff is

23  giving them; right?

24  A.  You are correct.

25  Q.  And the Sheriff has the ultimate say over the policies of

Claps - Redirect

1    the office; correct?

2    A.  Correct.

3    Q.  And command staff, you would agree with me, also has an

4    obligation to support those policies in a public way with the

5    employees that they supervise; correct?

6    A.  Absolutely.

7            MS. PRATT:  I have nothing further for you.  Thank

8    you.

9            THE WITNESS:  Thank you.

10           THE COURT:  Redirect.

11   REDIRECT EXAMINATION

12   BY MS. BUTLER:

13   Q.  Sheriff Claps, you started this lawsuit before you were

14   elected Sheriff; right?

15   A.  Yes.

16   Q.  Ms. Pratt just went through some responsibilities that you

17   had when you were chief.

18           Do you remember that?

19   A.  Yes.

20   Q.  I'm going to list some of those.  And I want you to tell me

21   if those were responsibilities that you also had throughout the

22   rest of your career in your positions that weren't chief.

23           Engaging with the community?

24   A.  Since I had been a deputy.

25   Q.  Mentoring other deputies and other employees?

Claps - Redirect

1    A.   Since I became an FTO, and a deputy.  I think it really

2    started even before that.

3    Q.   The budget, making recommendations on the budget?

4    A.   Budget recommendations, for me, really started at the role

5    of sergeant on.

6    Q.   Making recommendations on policies?

7    A.   FTO up.

8    Q.   And Ms. Pratt just asked you about some testimony in your

9    deposition about your pension?

10   A.   Correct.

11   Q.   Did firing you interfere with your pension?

12   A.   Yes.

13        MS. BUTLER:  Thank you, your Honor.  A moment to

14   confer.

15        (Conferring)

16        MS. BUTLER:  Nothing further.

17        THE COURT:  Thank you.

18        Let me ask our jurors, do you have any questions for

19   this witness?

20        Counsel.

21        (Continued on next page)

22

23

24

25

Claps - Redirect

1        (At sidebar)

2             THE COURT:  There's three.  I'll let you all look at

3    them.

4             MS. HALPERN:  He didn't try to reply, so it's got a

5    bit of a false premise in it.  He remained retired.

6             THE COURT:  I think he can answer that.  If I ask it,

7    I think he's going to --

8             MS. HALPERN:  We cut him off at the same time anyway.

9    I think it --

10            THE COURT:  I don't think there's any harm in asking

11   that one.

12            MS. PRATT:  I have no objection to that one.

13            That one I think is irrelevant.

14            MS. HALPERN:  Which is the party registration?

15            THE COURT:  I don't think it's relevant.

16            MS. HALPERN:  And then I have a few questions about

17   this that we never addressed.  Before the trial, we had

18   mentioned bifurcating the issue on the pension because the plan

19   has changed two or three times since they've left, and I know

20   it's changing again, so we don't have like discovery on the

21   pension.  We can ask it, but we had asked to maybe have a

22   hearing afterwards, depending on the result of the trial.  It's

23   a long time ago, it's changed like three or four times.  We

24   just don't have information on it.  So I don't know if I have a

25   problem with it, other than that we haven't sought those

                                                                          804
                              Claps - Redirect

 1    damages because we asked the Court that we might have to have

 2    an evidentiary hearing on that to do a --

 3              MS. PRATT:  At this juncture, it's going to confuse

 4    the jury.

 5              THE COURT:  Okay.  Thank you.

 6              (Continued on next page)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Claps - Redirect

1        (In open court; jury present)

2            THE COURT:  Mr. Claps, why did you not rehire

3    Mr. Coates upon becoming Sheriff?

4            THE WITNESS:  Everyone that went through our hiring

5    process was eligible to put in the letter of interest, résumé,

6    and to go through the process, which is required for the hiring

7    standards, not only for Adams County, but for the State of

8    Colorado, to have that fair and equal process.  So we never

9    received any letter of interest or résumé from him.

10           THE COURT:  Thank you.  You are excused.

11           Any further witnesses from Plaintiffs or evidence?

12           MS. HALPERN:  I think there were two questions; right?

13           THE COURT:  One permitted.

14           MS. BUTLER:  Your Honor, Plaintiffs rest their case.

15           THE COURT:  Members of the jury, the Plaintiffs have

16   now rested their case.

17           As I had indicated to you at the beginning of the

18   trial, Defendant, should they choose to do so, may introduce

19   evidence in this case.  We're not going to begin that process

20   here today.  I'll let you out, you all out a little bit early,

21   to begin again on Monday.

22           But because there may still be evidence presented by

23   the Defendant, if they choose to do so, you are still under the

24   same instructions, not to discuss the case even amongst

25   yourselves or to look up any independent research.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Claps - Redirect

1           There's a matter we're going to have to take up

2    outside of the jury on Monday morning, so why don't I have you

3    all plan to report a few minutes before 9:00 o'clock with the

4    idea being that we'll start at 9:00 o'clock with any evidence

5    the Defendant seeks to introduce at that point.

6           Have a good weekend, and we will see you all bright

7    and early on Monday.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury not present)

2            THE COURT:  I know we'll take up the halftime motion

3    Monday morning.

4            Anything else that you all are anticipating now that

5    we can take up that's going to arise Monday, that we can take

6    up now or can I let everybody out early and enjoy the weekend?

7            MS. HALPERN:  Your Honor, what time would you like us

8    here on Monday?

9            THE COURT:  Why don't you plan on being here at 8:15

10   on Monday.  I can't imagine the halftime motion to be too long.

11   I want to start at 9:00 with the testimony.

12           MS. PRATT:  Absolutely, your Honor.  We don't intend

13   to belabor the issue.  We just want to make sure we made our

14   record.  Certainly, 8:15 is fine.

15           And I don't think we have anything further to raise

16   right now.

17           THE COURT:  And I will likely defer a ruling on that.

18   The general preferred practice is to defer the ruling on

19   halftime until after you present evidence.  I'm assuming that

20   you are likely going to, I presume you would, but I don't like

21   to tell the jury.

22           We will see everybody at 8:15 on Monday, then.  Thanks

23   everyone.

24           (Adjourned to January 27, 2025 at 8:15 a.m.)

25                             *  *  *

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    MARK MITCHELL

4    Direct By Mr. Bohnet-Gomez . . . . . . . . . . 579

5    Cross By Ms. Pratt . . . . . . . . . . . . . . 594

6    Redirect By Mr. Bohnet-Gomez . . . . . . . . . 605

7    WILLIAM DUNNING

8    Direct By Mr. Bohnet-Gomez . . . . . . . . . . 606

9    Cross By Ms. Redmond . . . . . . . . . . . . . 620

10   Redirect By Mr. Bohnet-Gomez . . . . . . . . . 628

11   THOMAS MCLALLAN

12   Direct By Ms. Halpern . . . . . . . . . . . . 635

13   Cross By Mr. Thapa . . . . . . . . . . . . . . 684

14   TERRANCE O'NEILL

15   Direct By Ms. Butler . . . . . . . . . . . . . 690

16   Cross By Ms. Redmond . . . . . . . . . . . . . 711

17   GENE CLAPS

18   Direct By Ms. Butler . . . . . . . . . . . . . 720

19   Cross By Ms. Pratt . . . . . . . . . . . . . . 791

20   Redirect By Ms. Butler . . . . . . . . . . . . 801

21                          PLAINTIFF EXHIBITS

22   Exhibit No.                              Received

23    12   . . . . . . . . . . . . . . . . . . . . 588

24    38   . . . . . . . . . . . . . . . . . . . . 589

25    69   . . . . . . . . . . . . . . . . . . . . 630

1    52    . . . . . . . . . . . . . . . 660

2    64    . . . . . . . . . . . . . . . 668

3    62    . . . . . . . . . . . . . . . 670

4    63    . . . . . . . . . . . . . . . 677

5    70    . . . . . . . . . . . . . . . 681

6    18 and 53    . . . . . . . . . . . . . 755

7    37    . . . . . . . . . . . . . . . 772

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes.

*Sadie L. Herbert*
Official Court Reporter
U.S. District Court