1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-01936-STV

4    TIMOTHY JAMES COATES, et al.,

5            Plaintiffs,

6            vs.

7    BOARD OF COUNTY COMMISSIONS FOR THE COUNTY OF ADAMS,

8            Defendant.

9    --------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT

11                      Trial, Vol. V

12   --------------------------------------------------------------

13           Proceedings before the HONORABLE SCOTT T. VARHOLAK,
     Magistrate Judge, United States District Court for the District
14   of Colorado, commencing on the 27th day of January, 2025, in
     Courtroom A402, United States Courthouse, Denver, Colorado.
15

16                       APPEARANCES
     For the Plaintiffs:
17   IRIS HALPERN, FELIPE S. BOHNET-GOMEZ, VIRGINIA BUTLER and
     SIDDHARTHA RATHOD, Rathod Mohamedbhai LLC, 2701 Lawrence
18   Street, Suite 100, Denver, Colorado 80205

19

20   For the Defendant:
     KATHERINE PRATT, CHRISTY REDMOND and SAUGAT THAPA, Thompson Coe
21   Cousins & Irons LLP, 1700 Broadway, Suite 900, Denver, Colorado
     80290
22

23
     Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street,
24   Denver, CO 80294, (303)335-2105

25

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

 1                    P R O C E E D I N G S

 2         (Proceedings commenced at 8:22 a.m.)

 3         (In open court; jury not present)

 4         THE COURT:  We will take up Defendant's halftime

 5    motion.

 6         MS. REDMOND:  Good morning, your Honor.  So first,

 7    Defendant has essentially four points that we're making in our

 8    halftime motion.  The first is we raise the proper party issue.

 9         Defendant continues to contend it is not the proper

10    party defendant in this.  That is based on Tungut v. Board,

11    County Commissioners, 992 P.2d 650, Colorado appellate decision

12    from 1999, as well as Dodge v. Padilla, the citation for that

13    is 537 P.3d 409, which is a Colorado Appellate Court decision,

14    2023, confirming that the Sheriff in his official capacity is a

15    separate public entity from the county board of commissioners.

16         With respect to factual support in the record, Sheriff

17    Claps testified that the county sets the budget for the

18    Sheriff, but the Sheriff initiates budget requests.

19         Furthermore --

20         THE COURT:  Let me ask you, does every one of the

21    meetings had a county representative there, and the county

22    representative said that they would be involved in making

23    decisions as to what severance and everything else would be.

24         You have made your record on this.  I'm not going to

25    grant the motion on this issue.

1           MS. REDMOND:  I understand, your Honor.

2           And we have three additional points to address as

3    well.

4           First is with respect to the Rule 50(a) motion, the

5    standard being that Plaintiffs must present sufficient evidence

6    in their case-in-chief by which a reasonable jury could find in

7    favor of them on their First Amendment retaliation freedom of

8    association claim.  They have to prove that they engaged in

9    protected political beliefs, activities or association and that

10   their political activities, belief or association was a

11   motivating factor in Mr. Reigenborn's decision to terminate

12   them.

13          With respect to their support of former Sheriff

14   McIntosh, Plaintiffs have not presented sufficient evidence

15   from which a reasonable jury could find that their political

16   support of Mr. McIntosh was a motivating factor in

17   Mr. Reigenborn's termination decision.  Though Defendant

18   contends that the proper standard is substantial motivating

19   factor pursuant to the Mt. Healthy case found at 429 US 274.

20   We understand your Honor's opening jury instructions on that

21   matter.

22          Next, with respect to opposition to the FOP or

23   Fraternal Order of Police and collective bargaining, it seems

24   that Plaintiffs have withdrawn this argument, that their

25   opposition to the FOP and/or collective bargaining was a reason

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1    they were terminated.  However, to the extent that claim

2    remains a live issue, Plaintiffs have not presented any

3    evidence from which a reasonable jury can find that their

4    opposition to the FOP and/or collective bargaining was a

5    motivating factor in Mr. Reigenborn's decision to terminate

6    them.  There was no evidence during Plaintiffs' case-in-chief

7    in their opposition to collective bargaining another all.

8            Furthermore, the public concern requirement does apply

9    to freedom of association claims.  Cases on point for that are

10   Merrifield v. Board of County Commissioners, found at 654 F.3d

11   1073.  That is a Tenth Circuit opinion from 2011.  As well as

12   Coal Mountain v. Oregon Department of Corrections, found at

13   11-CV-6083-AA, 2013 WL 265856.  And that was a 2013 opinion.

14           There was no evidence presented during Plaintiffs'

15   case-in-chief that their personal disagreements or grievances

16   with the FOP rose to the matter of a public concern sufficient

17   to present the question to the jury of whether their opposition

18   to the FOP is a sufficient basis for First Amendment

19   retaliation for freedom of association.

20           The Defendant's final point is that Defendant has

21   proved its affirmative defense regarding political loyalties as

22   a matter of law.  An employer has the burden of proving that

23   political loyalty is an appropriate requirement for the

24   effective performance of the public office involved.  But here,

25   the question is not whether any political superior actually

1    took political loyalty into account, but whether the nature of

2    the position would appropriately permit him to do so.

3          If the job description and job duties performed are

4    undisputed, the Court may resolve this issue as a matter of

5    law.  The authority on that point is Poindexter v. Board of

6    County Commissioners, 548 F.3d 916.  That is a Tenth Circuit

7    opinion from 2008.  Factors that can be considered pursuant to

8    Poindexter are whether the position involves acting as an

9    advisor, forming any plans or policies for implementation of

10   broad goals in the Sheriff's Office, whether the position had

11   authority to exercise independent judgment or discretion in

12   carrying out their responsibilities, whether the position was a

13   supervisory position and had the authority to delegate

14   responsibilities or assignments, whether the position had

15   budgetary or spending authority, whether the position had input

16   into disciplinary proceedings and trainings, whether the

17   position had access to confidential information not generally

18   available to other employees at the Sheriff's Office.

19         Each of the Plaintiffs testified during the

20   case-in-chief that they had discretion in carrying out their

21   responsibilities in their respective divisions.  They testified

22   that prior to being terminated, they were in supervisory

23   positions and had the authority to delegate assignments in

24   their respective divisions.  Each Plaintiff testified that he

25   had some budgetary and spending authority in their positions.

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1    Each Plaintiff testified that they had input into disciplinary

2    proceedings.  And each Plaintiff testified that they had access

3    to information not generally available to other employees at

4    the Sheriff's Office.

5            Given the evidence presented, Defendants have proven

6    its affirmative defense as a matter of law and moves for

7    judgment in its favor.

8            THE COURT:  Thank you.

9            Response?

10           MS. BUTLER:  Thank you, your Honor.

11           Plaintiffs ask the Court to deny Defendant's motion.

12   The Court must view the evidence and the inferences in the

13   light most favorable to the nonmoving party, in this case

14   Plaintiffs.  And only if the evidence points one way and is

15   susceptible to no reasonable inferences supporting the

16   nonmoving party can the Court grant the motion and that's from

17   Wagner, a 2009 Tenth Circuit case.

18           Plaintiffs' free association claim has three elements.

19           The first is that Plaintiffs engaged in protected

20   political beliefs, activity or association.

21           The second is that Mr. Reigenborn, as then Adams

22   County Sheriff, took an adverse employment action.  And the

23   Court has already ruled on this as -- has already ruled that

24   that element is found.

25           And the third is that any of the Plaintiffs' political

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1    beliefs, activity or association were a motivating factor in

2    Mr. Reigenborn's decision to discharge the Plaintiff.

3           And I just briefly want to address the proper party

4    argument.  I know the Court has already ruled on this at the

5    trial preparation conference, and I do just want to also

6    address that, in the joint status report that the parties

7    filed, at Docket No. 169, Defendant represented that it was

8    unable to have Sheriff Claps participate in the defense if the

9    Sheriff's Office was substituted as the Defendant.  And the

10   Court has already ruled on this issue numerous times, as it

11   found at the trial preparation conference.

12          With respect to the elements of Plaintiffs' claim,

13   Plaintiffs engaged in protected political beliefs, activity or

14   association.  Mr. Coates testified that he supported

15   Mr. McIntosh in 2014 and 2018 campaigns.  He donated $1,225 in

16   2014.  Family members donated over $2,000.  He contacted a

17   friend to place a McIntosh billboard --

18          THE COURT:  I think it's clear they engaged in it.

19   What is the evidence that you are relying on that the decision

20   was based on political activity, as opposed to personal dislike

21   or different policies, views of how the Sheriff should be run?

22          MS. BUTLER:  With respect to the -- there's direct

23   evidence as well as pretextual evidence.  Direct evidence,

24   Mr. Reigenborn testified that he felt that each Plaintiff

25   treated him contentiously in the 2014 election.  He looked at

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1    Tracer to see who had donated to the McIntosh campaign in 2018.

2    He stated, three days after the election that, quote, it's the

3    command staff that wants to continue to be loyal to McIntosh.

4    He stated that he was concerned about Plaintiffs' loyalty

5    because they had supported McIntosh in 2014 and 2018.  He also

6    stated that, once he genuinely knew who supported Mr. McIntosh,

7    he would use that knowledge to decide what position they were

8    going to be in if they were retained.  He testified that who

9    supported -- who genuinely supported McIntosh came into play in

10   his employment decisions.

11           Mr. Templeton testified that Mr. Reigenborn told him

12   he was going to clean out McIntosh supporters, that Reigenborn

13   told Mr. Templeton that -- for each Plaintiff, he's gone;

14   Coates he's gone; Claps, he's gone; Currier, he's gone;

15   Mitchell, he's gone.  Mr. Reigenborn told Templeton he found a

16   loophole that would let him fire McIntosh supporters without

17   getting sued.  And Mr. Templeton's understanding was that

18   Mr. Reigenborn fired Plaintiffs because they were McIntosh

19   supporters.

20           As well as in terms of exhibit evidence, Exhibit 65 is

21   the list Mr. Reigenborn made of terminations so far that he

22   sent to Mr. McLallan on January 4th, 2019, all of whom were

23   McIntosh supporters.  Mr. Reigenborn testified that everyone on

24   the list was in McIntosh command staff and everyone in McIntosh

25   command staff supported Mr. McIntosh in the election.

1          Exhibit 66 was the text message that Mr. Reigenborn

2     sent to Mr. McLallan on January 10th with a picture of

3     Mr. Claps superimposed with the caption "bye bye asshole."

4          THE COURT:  I think there's a ton of evidence that

5     they don't like each other, but that's not political activity.

6     There's a ton of evidence that two of them -- they denied it --

7     but they made fun of Reigenborn after the election.  It's clear

8     that there's differences, that the two groups don't like each

9     other.  It has to be political.  That's my concern is what

10    evidence -- you brought out some, but that's my concern is, if

11    they just don't like each other, that's not a First Amendment

12    problem.

13         MS. BUTLER:  And I think, your Honor, this goes back

14    to Mr. Reigenborn's own words of direct evidence that once he

15    knew who genuinely supported McIntosh, he would use that

16    knowledge to decide their employment decisions.

17         As well as, there's abundant pretextual evidence.  The

18    temporal proximity, when he came into office and immediately

19    rescinded all employment policies and placed them on

20    administrative leave.  All of the personnel were on the list of

21    terminations so far were McIntosh supporters.  Plaintiffs have

22    put in evidence of their long careers and qualifications.  And

23    only McIntosh supporters received termination letters.

24         Defendant's reasons have changed over time.  Even the

25    reasons that Mr. Reigenborn gave in his interrogatory responses

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1    for Mr. Claps, he said it was because Mr. Claps refused a

2    direct order to return his badge and was condescending to him

3    in his meeting.  And Mr. Reigenborn sat there on the stand last

4    week and said, you're right, I don't see that in any of the

5    recording, it's not there, those reasons are wrong, the ones he

6    put in his interrogatories.

7         As well as his claim that he never even intended to

8    fire Mr. Currier.  When you listened to the transcript of

9    Mr. Currier's meeting, it's clear that there was no ability for

10   Mr. Currier to retain his job.

11        And Mr. Reigenborn claims that his decisions were not

12   made before any of these January 15th meetings, and the

13   January 15th meetings were the determining factors.  But

14   there's ample evidence that the decisions had already been made

15   so far.  Again, Exhibit 65, a list of terminations so far that

16   he sent on January 4th, well before the January 15th meetings.

17   That list all being McIntosh supporters.

18        Evidence that Chris Laws was selected well before

19   January to replace Mr. Claps.

20        And the jury listened to each recording and can

21   conclude that Plaintiffs gave no reason in any of them for

22   Mr. Reigenborn to terminate them based on those meetings.

23        And similarly, Mr. Reigenborn claims that he intended

24   to find a position for everyone that wanted to stay.  But the

25   evidence of the pre taking office termination list, the process

1    by which they were fired, plus the termination meeting belie

2    the notion that he was looking for a position for any of them.

3            As well as Mr. Reigenborn's credibility.

4    Mr. Reigenborn pled guilty to crimes of dishonesty, which the

5    jury may consider in determining his credibility.  And again,

6    he admitted that reasons that he put in his interrogatories

7    with respect to Mr. Claps were wrong, which he prepared with

8    the assistance of counsel.

9            For all of these reasons and the fact that the Court

10   must view all evidence in the light most favorable to Plaintiff

11   at this stage, this evidence is more than sufficient to meet

12   Plaintiffs' burden at this stage that any of Plaintiffs'

13   political activity was a motivating factor in Mr. Reigenborn's

14   decision to terminate each of them.

15           Turning to the Defendant's -- I just want to briefly

16   address the FOP point.  Plaintiffs are not moving for inclusion

17   of any of the FOP language in the jury instructions.  I believe

18   that point is moot.

19           THE COURT:  Okay.

20           MS. BUTLER:  And with respect to the political loyaly

21   affirmative defense, it is Defendant's burden to prove that

22   political loyalty is an appropriate requirement for the

23   effective performance of the public office involved.

24           There's ample evidence that there is no need and

25   indeed it's prohibited under Adams County policy for political

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

 1   loyalty to be a consideration for any of these positions.

 2   Mr. Coates testified that he had limited discretion in

 3   supervising the deputies in the division within the narrow

 4   lines of policy.

 5          We went through those -- the job descriptions of all

 6   of the Plaintiffs, and especially the chief ones, and only a

 7   couple, maybe one or two of these descriptions were applicable

 8   or unique to the chief position.

 9          And Mr. Coates testified that he had almost no role in

10   determining the budget, had limited discretion in line items.

11   And it was always authorized by finance and the Sheriff.

12          And he made internal affairs recommendations, but

13   again, these are only recommendations.

14          And each Plaintiff testified that they -- that none of

15   his job duties require personal loyalty to a particular

16   candidate or personal loyalty to any individual and that each

17   has served successfully under Democratic and Republican

18   Sheriffs.

19          Mr. Reigenborn testified that the Sheriff is the only

20   one with the authority to fire employees.  Mr. Reigenborn

21   testified that all significant duties were in the job

22   description, that none of the duties for Plaintiffs' positions,

23   which he approved, were prior political affiliation or loyalty

24   with the incoming Sheriff.  And Mr. Reigenborn testified that

25   none of these job descriptions state that political affiliation

1    or loyalty is required.

2         There's also no evidence that any job duties relate to

3    political or partisan concerns, as required by the Branti case.

4    Mr. Claps testified that everyone at the agency can make policy

5    suggestions, and the Sheriff is the one who ultimately approves

6    or makes the policies.  Sheriff Claps testified that chiefs

7    don't have the ability to approve the budget, they don't have

8    much budgetary discretion, they're constrained to a large

9    extent by line items.  The only discretion is making minor

10   changes with the Sheriff's approval.  Sheriff Claps testified

11   that the budget is set by county commissioners.  And before any

12   budget goes to the board, it goes through multiple phases of

13   approval or review by the Sheriff.  Sheriff Claps testified

14   that hiring and firing is solely at the Sheriff's authority.

15   Chiefs made recommendations, as well as others were involved in

16   internal affairs investigations, which many of the Plaintiffs

17   testified they had a role in internal affairs investigations

18   well before they rose to the final rank they held.

19        Again, Sheriff Claps testified that the chief job

20   duties from the job description don't require political or

21   personal loyalty, that he's worked in command positions with

22   many different administrations with different philosophies and

23   was always successful.

24        And the process that Sheriff Claps engaged in when he

25   became Sheriff shows that a merit based selection process that

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1    doesn't reward political loyalty had no impact, in fact,

2    promoted his ability to run the Sheriff's Office and testified

3    that retaining staff with different political affiliations has

4    not negatively impacted the performance of the Sheriff's

5    Office.  And Sheriff Claps testified that he didn't fire anyone

6    and he didn't consider political support in his personnel

7    decisions, and it has not impacted his ability to productively

8    run the Sheriff's Office.  As well as --

9         THE COURT:  He did demote people, though.  Let me ask

10   this question.  I'll ask it for both sides.  Ultimately, I

11   don't know that it's something I need to decide.

12        Let's say -- never mind, I don't think it's something

13   I need to decide.  I'm not going to complicate it any further.

14        Go ahead.

15        MS. BUTLER:  In terms of exhibit evidence, Exhibit 116

16   is the affidavit that Mr. Reigenborn signed in the Nicastle

17   lawsuit stating that the position of lieutenant, which is

18   equivalent to the position of commander, does not and never has

19   required political loyalty, as well as the position of

20   lieutenant or deputy sheriff does not set or create policy

21   pursuant to the duties and responsibilities of those positions.

22        Exhibit 59 is the Adams County Sheriff's Office Policy

23   1024, which states, quote, Employees retain their right to vote

24   as they choose, to support candidates of their choice and to

25   express their opinions as private citizens, including as

20-cv-01936-STV     Trial, Vol. V     January 27, 2025

1    authorized members of a recognized bargaining unit or deputy

2    association on political subjects and candidates at all times

3    while off duty.

4              Additionally, Exhibit 98 is Adams County Sheriff's

5    Office Policy 201, which states that Sheriff's employees may

6    participate in any federal, state, county or local political

7    campaign, provided such participation is conducted away from

8    any county office or court site, is not conducted during

9    working hours and the employee does not represent himself as an

10   employee of the Sheriff's Office.

11             Defendant cannot meet its burden to show that no

12   reasonable juror could find that it cannot meet its burden

13   under -- to prove its affirmative defense.  There's simply

14   no -- at this stage, it's Defendant's burden to prove this to

15   the Court, and they cannot do so.

16             For these reasons, Plaintiffs ask the Court to deny

17   Defendant's Rule 50 motion.

18             THE COURT:  Thank you.

19             I'm going to defer decision on this until after the

20   close of all evidence.

21             Let me ask, I had handed out on Friday the verdict

22   form and the proposed jury instructions.  We have about

23   15 minutes until the jury is in, are the parties prepared to

24   address that yet or do you want to just break for 15 minutes

25   and then take this up afterwards?

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1           MS. HALPERN:  Your Honor, if I may, I think we did

2    flag a couple smaller issues that may come in trial today, so

3    that may be a good use of the 15 minutes.

4           THE COURT:  Go ahead.

5           MS. HALPERN:  Your Honor, one issue we don't know if

6    it will come up or not, but we anticipate it will, it's an

7    exhibit with Defendant's witness Glover Scott Jarmin, and that

8    exhibit is A17.  We can maybe pull it up, if it helps for you

9    to see it.

10          THE COURT:  I can pull it up, here.  Just give me a

11   moment.

12          MS. HALPERN:  So we have a number of objections.  401,

13   403, 802, 805, but also attorney-client privilege.  During the

14   deposition, we can point you to the transcript when we were

15   asking about this exhibit, the attorneys -- the county

16   attorneys declared that it was subject to attorney-client so we

17   could not investigate the facts behind this.

18          Our understanding is that there was some charges that

19   were filed at the Equal Employment Opportunity Commission about

20   a year, year and a half later, and that Mr. Jarmin wrote that

21   as part of a different investigation that we don't have

22   information about and that wasn't specifically against Sheriff

23   Claps.

24          And so we're happy to point out the deposition

25   testimony, et cetera, but we think that this is hearsay.  It

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1    was provided to the attorneys in the process of preparing for

2    litigation in an unrelated case.  And we were unable to inquire

3    into the details because of attorney-client privilege.

4        THE COURT:  What is it?  I have it pulled up here, but

5    it's pages long.

6        MS. PRATT:  We don't intend to introduce it.

7        MS. HALPERN:  That will solve that problem.

8        MS. PRATT:  Easy.  I really do try to simplify things.

9        MS. HALPERN:  And then we did identify one additional

10   concern, and it may involve having to voir dire the witness,

11   and we might be able to just deal with it now.  One of our

12   issues with some testimony that we don't know if Defendant is

13   planning on eliciting, but we anticipate they will, given that

14   it was half a deposition that he was in, was that Mr. Toth was

15   hired and did not know anything, has no personal firsthand

16   knowledge of the termination of the aggrieved individuals, so

17   the Plaintiffs in this case.  So he was hired on, I guess,

18   January 14th.  In business deposition, he repeatedly said that

19   he has no firsthand information, does not know why they were

20   terminated.  And so we anticipate that that whole line of

21   questioning is going to lead to both hearsay and a FRE 602

22   problem for personal knowledge.

23       MS. REDMOND:  Yes, your Honor.  So Mr. Toth did

24   testify in his deposition that he was hired after the

25   Plaintiffs were terminated, that much is true.  However, with

20-cv-01936-STV   Trial, Vol. V   January 27, 2025

1  respect to his observations about the culture of specifically

2  the patrol division that he was made division chief of when he

3  began working at the Adams County Sheriff's Office, that is

4  based on his personal knowledge.

5        Furthermore, to the extent that he had any discussions

6  with his line level staff or his command staff in that division

7  about Plaintiffs' reputation and the work environment they

8  created, those conversations would fall within hearsay

9  exception 803(21) regarding reputation evidence amongst

10  colleagues in their field.

11        MS. HALPERN:  Your Honor, if I may.

12        THE COURT:  Sure.

13        MS. HALPERN:  Mr. Toth also specifically said that he

14  wasn't referring to any specific Plaintiff, has very vague

15  assertions.  He never identified a witness, so we have a Rule

16  26 issue.  He never identified in his deposition where these

17  concerns were, he just talked about general concerens.  Did not

18  identify witnesses, did not identify who they applied to.  And

19  those would be hearsay conversations, kind of unquestionably

20  hearsay conversations that we were unable to investigate

21  because no witnesses were ever disclosed.

22        THE COURT:  I'll take a look at it.  We will take that

23  up when we get there.

24        I think he can certainly testify to the culture that

25  he observed.  I think I'll look at it now, as far as -- I think

20-cv-01936-STV    Trial, Vol. V    January 27, 2025

1    you'll need to lay a foundation under 803(21).  I think if they

2    can lay the foundation, it could come in.

3         But I think you need to be specific as to each

4    individual, as to what that person's reputation and why he

5    believes he has a reputation.  I think a generic, I knew the

6    Plaintiffs or the Plaintiffs had this reputation, especially

7    since the four worked -- three of them worked in different

8    divisions, I think that, just generically, referring to

9    Plaintiffs have this reputation I think is improper.

10        I think if you can lay a foundation for each of them

11   and how he knew, then you could get into it.  And it may be

12   that you could with some, but not with others.

13        All right.  We'll be in recess, then, and then get the

14   jury in about 10 minutes.

15        (Recess)

16        THE COURT:  Let's bring in the jury.

17        (Continued on next page)

18

19

20

21

22

23

24

25

829
Jarmin - Direct

1    (In open court; jury present)

2         THE COURT:  Members of the jury, it's now the

3    Defendant's opportunity to present its evidence in this case.

4         Is the Defendant prepared to call its first witness?

5         MS. PRATT:  Yes, your Honor.  The Defendant calls

6    Glover Scott Jarmin.

7    GLOVER SCOTT JARMIN,

8         called as a witness by the Defendant,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MS. PRATT:

12   Q.  Good morning, Mr. Jarmin.  The first thing I would like to

13   do is go through some of your personal background and law

14   enforcement work.

15        Where did you grow up?

16   A.  I grew up in Brighton, Colorado.  Graduated in 1985.

17   Q.  Where did you attend high school?

18   A.  Brighton High School.

19   Q.  And are you married?

20   A.  Yes, I am.

21   Q.  After high school, what did you decide to do for work?

22   A.  After high school, I went to Ricks College in Idaho.  And I

23   ended up being in Helena, Montana.  And I was a volunteer

24   firefighter for the Sheriff's Office.  And they had a reserve

25   program, so I joined the reserves in 1988.

830
Jarmin - Direct

1    Q.   And is a reserve deputy, is that a paid or an unpaid

2    position?

3    A.   In Montana, a reserve deputy, at that time, was a voluntary

4    position.  But you could take paid shifts.  That's just the way

5    that they were structured.

6    Q.   So after working as a reserve deputy in Helena, Montana,

7    what did you do next?

8    A.   After I did reserve, I became a full-time detention officer

9    in their facility from like 1989 to 1991.

10        In 1992, I went to the Montana Law Enforcement Academy

11   as a full-time deputy sheriff for Lewis and Clark County.  And

12   I did that until 1999.  I was in patrol and a DARE officer.

13   Q.   What did you do in 1999 after your work in Montana?

14   A.   In 1999, I moved back to Colorado due to a family illness.

15   I worked for Division of Youth Corrections.  And then I got on

16   as a reserve with Brighton Police Department.  And in 2004, I

17   became a full-time police officer for Brighton.

18   Q.   For the City of Brighton?

19   A.   Yes.

20   Q.   How long did you work at the City of Brighton?

21   A.   I worked at the City of Brighton until -- actually, I

22   started with Adams County Sheriff's Office on 9/11/2008.

23   Q.   And what was your first position at Adams County Sheriff's

24   Office?

25   A.   I was a deputy sheriff in the jail in -- when I first got

Jarmin - Direct

1    hired.  And then, in 2010, I got moved to the administrative

2    sergeant's office in the detention division.

3    Q.  And what is the administrative sergeant's office?  What are

4    the job duties there?

5    A.  In the administrative sergeant's office, there's an

6    administrative sergeant who answers to jail division

7    administration.  I was his deputy.  And our jobs included

8    inventories in the jail, issuing radios and equipment,

9    facilitating trainings, the in-house academies, assisting our

10   medical vendor with their accreditation standards.  So if they

11   had to do certain drills and stuff to meet their accreditation

12   standards, we would facilitate those drills.  Plus lots of

13   other duties as assigned.

14   Q.  Did you stay in that position for your entire career at

15   Adams County Sheriff's Office?

16   A.  I started off as administrative deputy in that office.  In

17   2014, I became the administrative sergeant, so I just took the

18   seat of my sergeant.  He became a commander, or he -- he got

19   transferred out.  I ended up taking his seat.  And I was the

20   administrative sergeant until July of 2018.

21   Q.  I'm sorry, you said, July of 2022?

22   A.  No.  July of 2018 -- or yeah, July of 2018, I got moved to

23   shift work in the jail, I was a shift sergeant.  And then in

24   January of 2019, I became the administrative commander in the

25   jail division.

Jarmin - Direct

1    Q.  Just going back for a minute, what is the difference

2    between being the administrative sergeant and going back to

3    shift work?  What does that mean?

4    A.  So the administrative sergeant is a Monday through Friday

5    position.  You deal with contracts, maintenance contracts.  The

6    jail is a city within a city.  So you have food service,

7    laundry, the maintenance of the facility, maintenance of

8    different things.  So I would work with the administrative

9    sergeant on those things.  And when the administrative sergeant

10   couldn't attend like the Community Corrections Board -- it's

11   written in the statute somewhere that the Sheriff's Office has

12   a seat in the Community Corrections Board, so I would sit in on

13   that.  I was part of the screening committee for community

14   corrections, so -- if I'm answering the question or can you

15   repeat it.

16   Q.  Just to explain to the jury, you were doing those duties,

17   then I believe you mentioned you went back to doing shift work.

18   Can you explain what shift work is?

19   A.  So in July of 2018, I went to shift.  And in shift, you

20   would have, ideally, there might be 34 people on a shift.  You

21   would have a certain amount of deputies and a certain amount of

22   civilian staff.  And you would run a 12-hour shift.  And it

23   would either be from 6:45 a.m. to 7:00 p.m. or 6:45 p.m. to

24   7:00 a.m.  So you're running the day-to-day in the facility.

25   You are dealing with inmate grievances, making sure the inmates

Jarmin - Direct

1    are getting out to court, working with the court sergeant or

2    the transport sergeant, or you might have to talk with the

3    courthouse sergeants to work things out.  It's just dealing

4    with the day-to-day, plus personnel supervision.

5           As the sergeant in the administrative office, I

6    oversaw two supply technicians, two detectives, two K-9 and one

7    administrative deputy, my former position.  As a shift

8    sergeant, you would have those, ideally, the 34 positions that

9    you would oversee, plus the day-to-day working with the

10   contract personnel, the day-to-day functions within the

11   detention facility.

12   Q.  And Mr. Jarmin, you mentioned a moment ago that, at some

13   point, you were then appointed to be the administrative

14   commander; is that right?

15   A.  Yes.

16   Q.  What's the job of the administrative commander?

17   A.  The administrative commander oversees that administrative

18   sergeant's office and those personnel, but it's more of a hands

19   on role with the fiscal running of the jail.  Those contracts

20   that the administrative sergeant might be assisting with, the

21   administrative commander actually initiates those contracts,

22   renews those contracts, monitors the contracts, which might be

23   staffing issues with the contractor or maybe we're having a

24   background check problem so we might have to remove them from

25   the facility due to security issues, those day-to-day.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Jarmin - Direct

1            Plus, when I assumed that role, you're also keeping

2      track of budget items, where are we over, what are we doing,

3      why are we over.  Plus, when the budget would come up, you

4      would have to keep an eye on those things or put in budget

5      requests or extensions into it somehow to cover these expenses.

6      Q.  And how long were you in that role as the administrative

7      commander for Adams County Sheriff's Office?

8      A.  I was in that role from January of 2019 to roughly April of

9      '20, when I got a temporary assignment at headquarters.  And

10     that assignment was Sheriff Reigenborn, at the time, had hired

11     an individual to come in and work the policy manual.

12            So the Sheriff's Office has an operating policy

13     manual.  And the detention facility has a procedures manual.

14     So there's quite a few standards and stuff that need to be

15     followed.

16            And to work with this individual, it's a full-time

17     job.  You can't sit there and piecemeal policies.  You need to

18     dedicate a full-time person if you want to get it done in a

19     timely fashion.  So I was transferred to headquarters to work

20     with this individual that they hired and start going through

21     the policies.  The big thing is, if the policy says we do it, a

22     practice needs to be done that we are doing what the policy

23     says.

24     Q.  How long did you serve in that role?

25     A.  That was a temporary assignment.  And I believe it was fall

Jarmin - Direct
835

 1    of '20, I got sent back to the detention division on a

 2    personnel order transfer.  And then I was back in the jail

 3    division until, I believe it was, June of '21, when they

 4    transferred me to the full-time policy position at the

 5    professional standards division, which was at headquarters.  So

 6    then I got moved to a role where I was working policy

 7    full-time.  I was no longer part of the jail division.

 8    Q.  At some point, did you decide to leave your job at Adams

 9    County Sheriff's Office?

10    A.  Yes, I did.

11    Q.  When was that?

12    A.  I left Adams County Sheriff's Department, I took an early

13    retirement in January of '23.

14    Q.  Did you seek other employment after that time?

15    A.  Yes, I did.  I landed a position with the Brighton Police

16    Department as a police officer.  I worked a year in patrol,

17    which was the year of '23.  And in roughly March of '24, I got

18    transferred into an accreditation manager position as a police

19    officer.  And in October of '24, I was reclassified from a

20    police officer into a senior policy analyst.

21    Q.  Is that a civilian role, the senior policy analyst?

22    A.  Yes, it is.

23    Q.  And tell us about what the senior policy analyst does for

24    the City of Brighton Police Department?

25    A.  So the Chief of Police for Brighton is seeking to become

Jarmin - Direct

 1   accredited with the Commission of Accreditation for Law

 2   Enforcement Agencies, it's known as CALEA, C-A-L-E-A.  So under

 3   CALEA, it's one of the top for law enforcement agencies to

 4   become accredited.  They have a standards manual.

 5        So my task is to take our policies and look at them,

 6   make sure we're in sync with the CALEA standards.  But then we

 7   have got to work on the proofs.  So if I'm saying I'm doing it

 8   over here, how do I prove that we're doing it over here.  So

 9   that's the implementation of policies, implementation of

10   practices to get us in line with CALEA.

11        At this point, we have not started what they call the

12   clock with CALEA.  Once you officially join CALEA, you have

13   three years to do a self-evaluation and mock audits, which

14   we're going to start in '25.  So that clock will start ticking

15   for us.  And it is an endeavor for a police chief and executive

16   staff to take this on, because everything becomes very

17   transparent with what the agency does and it becomes part of

18   the national standards.

19   Q.  So it sounds like you have had a couple of different roles

20   in law enforcement that specifically involve looking at

21   policies and procedures; is that fair?

22   A.  Yes, that's correct.

23   Q.  Is part of your job -- was part of your job when you were

24   at the ACSO in that policy role to be aware of best practices

25   in dealing with policies and procedures in the law enforcement

Jarmin - Direct

1   context?

2   A.  Yes.  And more, especially, the jail division, at one time,

3   until 2010 was accredited by the American Correctional

4   Association.  So their policies -- their procedures in the jail

5   are set up along the lines with ACA.

6         In 2011 -- in 2010, we got a reaccredited.  After

7   that, Sheriff Darr was the Sheriff, and he no longer wanted to

8   practice ACA because there was some issues that shouldn't have

9   come out during the last audit.

10        So as the admin deputy in that position, I explored

11   other avenues.  Well, the State of Idaho has the Idaho

12   Sheriff's Association, and they do voluntary standards within

13   the State of Idaho to help them get insured by their state

14   insurer.  So we're following the practices and it helps with

15   insurance for the state.  Not all of them do it, but quite a

16   few do.  So they sent me their booklet, and I sat down with

17   their booklet and compared it had to CRS and Tenth Circuit --

18   Q.  And just what's -- I just want to interject -- what is CRS

19   and Tenth Circuit?  Just so the jury understands.

20   A.  CRS, Colorado Revised Statutes, like Title 30 for county,

21   the mandates that a Sheriff has for people that are in his

22   detention facility.

23        And then the Tenth Circuit Court of -- I don't know

24   how to say it right -- Tenth Circuit Court of Appeals, I'm not

25   sure.  So we're subject in Colorado to Tenth Circuit.

Jarmin - Direct

1   Q.  So Mr. Jarmin, what is your understanding of -- because

2   we -- I very much appreciate that background.  But what I want

3   to focus on is best practices about changing certain employment

4   policies.

5        If you have an understanding, what is your

6   understanding of best practices when a new chief executive

7   comes into office?

8        MS. HALPERN:  Your Honor, I'm going to object.  This

9   is improper expert testimony.  He was not disclosed as an

10  expert.  This isn't on personal knowledge.

11       THE COURT:  Response?

12       MS. PRATT:  This is not expert testimony.  He is

13  testifying based on his job history and his direct experience

14  working with policies at the ACSO.

15       THE COURT:  Approach.

16       (Continued on next page)

17

18

19

20

21

22

23

24

25

Jarmin - Direct

1      (At sidebar)

2          MS. PRATT:  What he's going to talk about is just

3   simply the revocation of the policies that he personally was --

4   saw and was involved in when Sheriff Reigenborn revoked those

5   employment policies.  He's not going to get into all of the

6   scope of what are the best practices, but specifically the

7   revocation memo.

8          MS. HALPERN:  Your Honor, if I may.  She just set him

9   up as an expert.  He was never disclosed this way.  He's not

10  talking about the particular decision then by Sheriff

11  Reigenborn to withdraw the policies.  He has no firsthand

12  knowledge of that.  He's talking about best practices, which is

13  an expert opinion.

14         THE COURT:  Why is this not specialized knowledge?

15         MS. PRATT:  Because I'm going to shift right now to

16  the actual memo that Mr. Reigenborn issued to remove those --

17  to remove the employment policies and reissue his own.

18         THE COURT:  Your question is:  What is your

19  understanding of the best practices.

20         MS. PRATT:  I can withdraw that question and just move

21  to the memo itself.

22         THE COURT:  I'll sustain the objection.

23         (Continued on next page)

24

25


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Jarmin - Direct

1      (In open court; jury present)

2   BY MS. PRATT:

3   Q.  Mr. Jarmin, let's have you look at an exhibit.  I think

4   that will help move things along.

5          MS. PRATT:  If we can pull up Plaintiff's Exhibit 49,

6   and I believe this has already been admitted into evidence.

7          MS. HALPERN:  Your Honor, I believe that the first

8   page wasn't because this -- I think I only put in the second

9   and third page, because I think the first page -- that was how

10  it was produced to us.  It was later emailed.

11         THE COURT:  Pages 2 through 5 have been admitted at

12  this point.

13         MS. PRATT:  I'm fine with just using 2 through 5.

14  That's fine.

15         So Joanna, if we could move to the next page, I

16  believe.  Yes, that's the one.

17  BY MS. PRATT:

18  Q.  Mr. Jarmin, do you see in front of you a document dated

19  January 8th, 2019?

20  A.  Yes.

21  Q.  It says at the top there, Notice to Sheriff's Office

22  employees?

23  A.  Yes.

24  Q.  Are you familiar with this document?

25  A.  Yes.

Jarmin - Direct

1    Q.  What is it?

2    A.  This was an email or attachment to an email sent out to the

3    agency -- that was the day he was sworn in or the day after he

4    was sworn in, I'm not sure.

5    Q.  Who is "he" in your sentence?

6    A.  Sheriff Reigenborn.

7    Q.  Were you one of the recipients of this document?

8    A.  Yes.

9    Q.  What is your understanding of what this document -- what

10   this document did for the Sheriff's Office policies?

11   A.  This document, with my experience working with CALEA, this,

12   under written standards, this would be what's called a bridging

13   document, where when an executive comes into an agency, they

14   create a bridging document to mandate or remand the current

15   policies.  In this policy here, it would appear that he's

16   remanding these policies that are numbered.

17          Is there something that I should read to you or --

18   Q.  No, not at all.  The jury has seen this document already.

19          So what do you mean by remand, what does that mean to

20   you?

21   A.  So as the executive coming in, he's saying that there's

22   policies that he will continue practicing as the new CEO, and

23   there's policies that he is inactivating or remanding.  And I

24   don't know if I can -- can I scroll down on this?

25   Q.  Joanna can do that if you want to see the next pages, sure.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Jarmin - Direct

1    A.  So these outline --

2          MS. HALPERN:  Your Honor, if I may object.  This is

3    speculation.  He didn't actually have a conversation with

4    Mr. Reigenborn.

5          MS. PRATT:  I'm asking him what his understanding of

6    this document is.

7          THE COURT:  Overruled.  The document has been

8    admitted.

9    BY MS. PRATT:

10   Q.  Mr. Jarmin, take a moment, review Exhibit 49, these several

11   pages, and then I'll have a question for you; okay?

12   A.  Okay.

13   Q.  So my question is, simply -- I think you started to say

14   this, I just want to make sure we're clear -- what was your

15   understanding of what this document meant when you received it?

16   A.  That there's certain policies within his manual that he's,

17   as the executive, terminating what the prior Sheriff wrote and

18   that he is taking himself, as the executive, to make this

19   decision and addressing these particular areas, yet he's

20   allowing the like operations manual and stuff, policies and

21   procedures, Sheriff's manual regarding operational standards,

22   the jail, post shall remain in effect.  So he's saying, certain

23   policies I'm taking, as the executive officer, and changing,

24   but these operating policies are staying the same.

25   Q.  Thanks.

Jarmin - Direct

```
 1          MS. PRATT:  We can take that exhibit down.
 2   Q.  Let's shift gears.  There's been testimony thus far that
 3   the Plaintiffs were not subject to any sort of internal affairs
 4   investigations prior to their termination.
 5          And my question for you is:  In your experience
 6   working in law enforcement, is that unusual?
 7   A.  No.  There was an occasion where -- when I was employed --
 8   we were employed with Sheriff Darr, he terminated a deputy who
 9   was placed under arrest and housed in another jail without any
10   anything.  And Sheriff McIntosh did the same with another
11   deputy.
12   Q.  Are you aware of any examples of Sheriffs terminating
13   deputies that don't deal with alleged wrongdoing?
14   A.  I'm sorry, would you rephrase that.
15   Q.  You know what, I'll withdraw the question.
16          The question I have for you is whether this was
17   unusual at a Sheriff's Office.
18          Why is it not unusual for sometimes deputies be
19   terminated even if -- even without an internal affairs
20   investigation?
21   A.  I believe that goes back to the at will statute.  I believe
22   it's 3010-506 where the Sheriff can hire or fire at will, as
23   long as they give notice and the ability for the person to be
24   heard to the Sheriff.
25   Q.  Let's shift gears again and talk a little bit about loyalty
```

Jarmin - Direct

 1    to the Sheriff.

 2              In your view, is loyalty important between the command

 3    staff and the sitting Sheriff?

 4    A.  I believe loyalty, especially when it comes to a Sheriff's

 5    command staff or like commander and above, the people that are

 6    closest to the Sheriff need to carry the message of the

 7    Sheriff.  I don't believe, in my personal opinion, that like

 8    mid management like sergeants who might deal with staff or if

 9    they're operational sergeants, that that would go into so much

10    effect, but the loyalty needs to be from the command staff and

11    above to carry the message of the sheriff, to be in tune with

12    the Sheriff and what his message is.

13    Q.  To you, does loyalty mean political loyalty?

14    A.  No, that's -- I've been in law enforcement for 30 plus

15    years and nobody has ever said anything to me, that you're only

16    loyal to me if you have the same political views as I.

17              Loyalty comes down to professionalism, courtesy, the

18    mission statement of the agency, the badge that you put on, the

19    oath that you took.  That's your loyalty to the citizens that

20    you serve, to the people that you arrest and their

21    Constitutional rights, the people for a Sheriff's Office that

22    are incarcerated in that detention center that you are

23    following their rights and that they get everything that they

24    need.  That's loyalty.

25              When I went to the Brighton Police Department, I swore

845
Jarmin - Direct

1    an oath.  And we have the same professionalism, loyalty,

2    courtesy.  Nobody ever came to me and said, hey, Jarmin, do you

3    have the same affiliation as me?  That doesn't matter in a

4    police department because a police chief is an employee like I

5    am.  No.

6    Q.  To be clear, you were working under the Reigenborn

7    administration; correct?

8    A.  Yes.

9    Q.  Your discussion of loyalty, does that definition hold true

10   during the Reigenborn administration, in your estimation?

11   A.  Yes, the same as I would have had under Sheriff McIntosh or

12   Sheriff Darr.

13   Q.  You mentioned a moment ago at will employment, and I just

14   want to follow up on a couple of things with you about that.

15          Remind the jury when it was that you started at the

16   Adams County Sheriff's Office.

17   A.  9/11/2008.

18   Q.  So roughly 10 years before Mr. Reigenborn took office; is

19   that right?

20   A.  Yes.

21   Q.  Was the Adams County Sheriff's Office an at will employer

22   at that time?

23   A.  Yes.  It's written into -- I don't believe it was written

24   into Sheriff Darr's manual.  It was written into Sheriff

25   McIntosh's.

Jarmin - Direct

1    Q.  I'm not sure if I heard you entirely.  You said it was

2    written into Sheriff McIntosh's manual, the at will policy?

3    A.  Yes.  It was in the Lexipol manual, the verbiage at will is

4    in there.

5    Q.  So that wasn't -- was there any sort of change in that at

6    will policy between the McIntosh administration and the

7    Reigenborn administration?

8    A.  No, I just believe it was more clearly outlined in that

9    memo.

10   Q.  Do you know Richard Reigenborn?

11   A.  I know him as an employer.  I'm not a personal friend of

12   his.

13   Q.  That was my next question.

14       Would you consider him to be a friend of yours?  It

15   sounds like no?

16   A.  No.  Just a friendly person I know.

17   Q.  Did you want Mr. Reigenborn to be elected the Sheriff of

18   Adams County?

19   A.  Yes, I did.

20   Q.  Why is that?

21   A.  Under Sheriff McIntosh, he did not want to hear about what

22   was going on in the jail under Sheriff Claps, who was the

23   division chief at the time.  Sheriff -- Division Chief Claps at

24   that time was a micromanager.  He had a reputation of putting

25   everybody into a blue team.

Jarmin - Direct

1    Q.  What's the blue team?

2    A.  Blue team is the IA software that's used by the Adams

3    County Sheriff's Office to create an IA and to take an employee

4    and put them through an investigative process.

5    Q.  Did that increase when Sheriff Claps -- now Sheriff

6    Claps -- became the division chief over the jail?

7    A.  It increased when he became the captain, prior to becoming

8    the division chief.

9    Q.  Was there any sort of a saying amongst jail staff about

10   blue team, and if so, what?

11   A.  You better be careful or you'll be blue teamed.

12   Q.  How would you -- let's just go back for a second.

13          How long did you actually work in the Adams County

14   Sheriff's Office in the jail division under now Sheriff Claps?

15   A.  He -- in January of 2016, he was promoted to the division

16   captain, which is one chair underneath the division chief.

17          In 2015, after McIntosh became Sheriff, he got

18   transferred to the jail division as a commander.  But I didn't

19   answer to him directly until, I believe it was, February of

20   2016, he became the captain.  And in May of 2016, the

21   administrative commander that I was under retired.  And the

22   administrative commander position got retired too, and it went

23   to the administrative captain or the captain of the jail

24   division.

25   Q.  So how long did you directly report to Sheriff Claps?

Jarmin - Direct

1   A.  It started in 2016 when he got transferred to the captain's

2   position until he left the facility -- or he left the Sheriff's

3   Office in January -- or January 8th or 9th or whatever day he

4   was sent home by Sheriff Reigenborn.

5   Q.  So at least a couple of years?

6   A.  Yes, ma'am.

7   Q.  How would you -- stepping back from Mr. Claps

8   specifically -- but how would you describe the culture of the

9   Adams County Sheriff's Office when you worked there?

10  A.  When I first started at the Sheriff's Office, we -- it was

11  a good place to work.  It was a friendly atmosphere.  Like any

12  other agency, it would have its problems.  But then, in 2016,

13  it became oppressive.

14  Q.  How so?

15  A.  Sheriff Claps, who was the division captain at the time was

16  putting everybody that he could into a blue team.  And he -- in

17  my personal experiences in working with him as the admin

18  sergeant, he was bullying.  He was demeaning.  He would take

19  actions where I have subordinates underneath me, I have the

20  detectives and I had the admin deputy, he would give

21  assignments to people and tell them not to tell me.  So he's

22  undermining my authority as their direct supervisor for them to

23  report to him.  That's not teamwork, that's not leadership.

24  That's a management and an oppression is what that is.

25          And then I personally witnessed him target two

Jarmin - Direct

1    individuals; one to the point that an individual quit, and the

2    other to the point something else happened.

3    Q.  So in your view, it sounds like you said -- you just said

4    something a moment ago, that that's not teamwork, or that's not

5    leadership or words to that effect.  In your view, did Sheriff

6    Claps help or hurt the jail division?

7    A.  He hurt the jail division.

8            The day he was walked out of the jail, I, as a shift

9    supervisor, had two deputies on my shift start crying because

10   of what they had been put through by the division chief and

11   through his IA processes and everything that it was -- it was

12   like a huge weight had been lifted when he was walked out of

13   the Sheriff's Office by Sheriff Reigenborn.

14   Q.  And speaking of when Sheriff Reigenborn took office, how

15   did Mr. Claps react, if you know?

16   A.  So I was a shift sergeant.  I was working nights the night

17   the election went through.  Sheriff Reigenborn won.  A close

18   friend of mine that I worked with when I was an admin sergeant

19   comes up to me and tells me that --

20           MS. HALPERN:  Objection, hearsay.

21           THE COURT:  Response?

22           MS. PRATT:  We'll withdraw that question.

23   BY MS. PRATT:

24   Q.  Without discussing what someone else told you, what I'm

25   asking you is if you know how Mr. Claps reacted to Sheriff

                                                                    850
                                  Jarmin - Direct

 1    Reigenborn being elected.

 2    A.  It would appear he was very angry.

 3    Q.  Why do you say that?

 4    A.  He's calling people traitors.

 5    Q.  And how did that make you feel?

 6    A.  This is a division chief, a person that every employee in

 7    that jail looks up to.  This is our leader.  And now our leader

 8    is calling people traitors.

 9            And the day after Reigenborn took his oath, so it's

10    his first day in, he sends out this policy probably.  I'm

11    sitting in the shift sergeant's office, it's a very large room

12    that has a bunch of desks, and my desk is closest to the front.

13    Division Chief Claps walks in, walks by my desk and sits right

14    behind me.  And when I say behind me, it's like this close

15    (indicating), so this desk is right behind me.  He sits at this

16    desk, and he comes in with Commander Miller, who was with him

17    that day.  He sits at this desk and very loudly to the back of

18    my head says, I can't stand the smell in here, I need to get

19    out of here, like yelling at the back of my head taunting

20    language.

21            Commander Miller says, now, Gene.  And they get up and

22    walk out of the room.

23            So I'm sitting in this room with another sergeant that

24    witnessed it, maybe it was a few other people too.  And I'm

25    like, what?  You know, this is our division chief acting like


                       SADIE L. HERBERT, RPR, RCR
              901 19th Street, Denver, CO 80294  (303)335-2105

Jarmin - Direct                                                        851

1    this towards us.

2            A division chief should be going around going, hey, we

3    have a new Sheriff coming in, let's clean up the jail, let's

4    get things in order.

5            It's the mission of the Sheriff's Office.  It's not

6    about us.  It's about the Sheriff's Office and the badge that

7    we wear and the uniform that we wear.

8            So then I get call from my staff members or the

9    deputies that are working that he's walking around the jail

10   being tyrannical towards them.

11           MS. HALPERN:  Objection, hearsay.

12           THE COURT:  Sustained.

13   BY MS. PRATT:

14   Q.  Mr. Jarmin, let's just move on from that.

15           It sounds like you have explained that Mr. Claps

16   didn't appear to be very happy with Mr. Reigenborn being

17   elected; fair?

18   A.  Yes.

19   Q.  When was the last time that you spoke to Mr. Reigenborn?

20   A.  I called him the day that I put in my resignation.

21   Q.  When was that?

22   A.  That would have been -- it was right -- it was probably the

23   day before or the day of Sheriff Claps getting sworn in because

24   I was going to leave that day.  And the Undersheriff -- after I

25   talked to Sheriff Reigenborn, he's like, let the Undersheriff

Jarmin - Direct

1  know.  I got ahold of the Undersheriff, and then he asked me to

2  stay like a week to train somebody, because I was going to

3  leave that day.

4  Q.  And what year was that?

5  A.  That was January of '23.

6  Q.  So roughly, two years ago?

7  A.  Yes.

8  Q.  Have you had any conversations with Mr. Reigenborn about

9  testifying in this trial today?

10  A.  No.

11  Q.  Mr. Jarmin, were you concerned to have to come here and

12  testify today?

13  A.  Yes, I'm very concerned to come here and testify today.

14  Q.  Why?

15  A.  I have seen Captain -- when he was the division chief --

16  Claps target people, target people that I might bring up in my

17  testimony, that if I bring up people's names that might have

18  been a witness or something like that, that they'll get

19  retaliated against.

20      And my wife works for the Adams County Sheriff's

21  Office.  And yes, I have a fear that she might be retaliated

22  against, and then she would lose our livelihood too.  So yes, I

23  have a great concern.

24      Plus, I left the Adams County Sheriff's Office

25  voluntarily, took an early retirement and got out of there to

Jarmin - Cross

1   get away from him.  I did that of my own volition.  I have had

2   nothing to do with this until the day somebody showed up on my

3   porch with a subpoena to be here for today.  Yes, I am having

4   to relive the situation that I removed myself from, and I am

5   very concerned.

6          MS. PRATT:  Well, thank you for your testimony today.

7   I don't have any further questions for you at this time, but

8   counsel might, okay.

9          THE COURT:  Cross-examination.

10  CROSS-EXAMINATION

11  BY MS. HALPERN:

12  Q.  Good morning, Mr. Jarmin.  I just have a couple questions

13  for you, okay.

14  A.  Yes, ma'am.

15  Q.  I want to talk to you a little bit about your campaign

16  volunteer activity in 2018.

17         Your were a Rick Reigenborn supporter in 2018; isn't

18  that right?

19  A.  Yes.

20  Q.  And Mr. Reigenborn came over to your house in late August

21  or early September of that year with lawn signs and door cards?

22  A.  Yes, ma'am.

23  Q.  And gave you 30 cards and 4 signs on the front porch of

24  your house; is that right?

25  A.  Somewhere in the area of that amount.

854
Jarmin - Cross

1   Q.  And you distributed the door cards to three of your

2   neighbors?

3   A.  The yard signs.  And then I put the door cards on houses.

4   Q.  You put those signs up in your neighborhood as well?

5   A.  Yes, ma'am.

6   Q.  And you testified that you served as a sergeant in the jail

7   under Sheriff McIntosh; isn't that right?

8   A.  Yes.

9   Q.  And you testified that just after Mr. Reigenborn took

10  office, you were promoted to commander in the jail, and

11  Mr. Laws was promoted to chief of the jail division, that's

12  what happened?

13  A.  Yes.

14  Q.  And you did not have to interview for that promotion?

15  A.  No.

16  Q.  And you didn't have to apply for the position?

17  A.  No.

18  Q.  And you did not have to interview for the position or sit

19  through an oral board?

20  A.  No.

21  Q.  In fact, you knew you were getting your promotion to

22  commander at the jail because Mr. Reigenborn and Mr. McLallan

23  confirmed as much at your meet and greet meeting with them in

24  December of 2018?

25  A.  Yes.

Jarmin - Cross

 1   Q.  At that meeting, Mr. Reigenborn asked you if you knew what

 2   his intention was after the election?

 3   A.  Yes.

 4   Q.  And you said yes?

 5   A.  That was the interview that was less than 30 days before he

 6   took office?

 7   Q.  Correct.  It was kind of a meet and greet with the

 8   Undersheriff, I think, at the end of December in 2018, if you

 9   recall that.

10   A.  Yes, ma'am.

11   Q.  And at that point, Mr. Reigenborn asked you if you knew

12   what his intention was after the election?

13   A.  Yes.

14   Q.  And you said yes?

15   A.  Yes.

16   Q.  You did know?

17   A.  Yes.

18   Q.  And your understanding of Mr. Reigenborn and Mr. McLallan's

19   intention was that they were going to make you an acting

20   commander and promote Mr. Laws to chief of the jail?

21   A.  Yes.

22   Q.  And you knew what their intention was because Mr. Laws told

23   you at Thanksgiving, the month before?

24   A.  Yes.

25           MS. PRATT:  Objection, hearsay.

Jarmin - Cross

1          MS. HALPERN:  This is an agent of the employer.

2          THE COURT:  Overruled.

3    BY MS. HALPERN:

4    Q.  Hence, you knew about your promotion before Mr. Reigenborn

5    took office?

6    A.  I knew it after the election.

7    Q.  But before Mr. Reigenborn actually swore in his oath of

8    office; right?

9    A.  Yes.

10   Q.  And you knew about Mr. Laws' promotion, okay.

11          And you became a commander on January 23rd, 2019?

12   A.  Yes.

13   Q.  And let me ask you about one more question about your

14   meeting with Mr. McLallan and Mr. Reigenborn.

15          You recalled it being nothing more than an informal

16   talk and meet the Undersheriff; isn't that right?

17   A.  Yes.

18   Q.  And let me ask you a little bit about some of the

19   conversation you had about loyalty just now with counsel for

20   the County, okay.

21          So notwithstanding all the duties you described to the

22   County's attorney just now, you agree that it is not important

23   that you share the political beliefs of the Sheriff?

24   A.  I believe it's not important, yes.

25   Q.  Right.  And when you said that commanders need to be loyal

Jarmin - Cross

1    to the Sheriff, you didn't mean loyal, as in political

2    affiliation or personal relationships, you meant a commander

3    has to be loyal to the Sheriff and that he's there to serve the

4    Sheriff and serve the people?

5    A.  Yes.

6    Q.  In that sense, a commander has to be loyal, but that

7    doesn't have anything to do with politics?

8    A.  Correct.

9    Q.  When you referred to loyalty, you meant a commander should

10   be doing his job?

11   A.  Yes.

12   Q.  And as a commander, none of your duties relate to partisan

13   political interests?

14   A.  No.

15   Q.  And you think a commander can be just as effective working

16   under a Sheriff whose politics he disagrees with, as a Sheriff

17   whose politics he agrees with?

18   A.  One more time, please.

19   Q.  Sure.

20        And you think a commander can be just as effective

21   working under a Sheriff whose politics he disagrees with as a

22   Sheriff whose politics he agrees with; isn't that right?

23   A.  Yes.

24   Q.  Because you don't have to be a Sheriff's lackey to be

25   effective working under a Sheriff; correct?

                                                                        858
                            Jarmin - Cross

1   A.  Correct.

2   Q.  And a commander can be effective, even if he actively

3   opposed the new Sheriff during an election?

4   A.  Yes.

5   Q.  And in fact, there are policies at the Sheriff's Office

6   protecting political activities, as long as they're done in

7   one's off time?

8   A.  Yes.

9   Q.  When you were at the Adams County Sheriff's Office?  Let me

10  clarify.

11  A.  Yes, I believe it's under the appearance standard or

12  policy.

13  Q.  And one can't go around -- but what you do on your off time

14  is on your off time?

15  A.  Correct.

16  Q.  And do you recall a time when Mr. Reigenborn called you and

17  asked if you had heard Terrance O'Neill was running for

18  Sheriff?

19  A.  Yes.

20  Q.  And you said you would be surprised if someone was

21  terminated because they were running for Sheriff?

22  A.  Yes.

23  Q.  And that's because you can have political affiliation, as

24  long as you're not doing it on work time?

25  A.  Yes.

Jarmin - Cross

1    Q.  And it would be inappropriate to fire someone because he

2    ran for Sheriff?

3    A.  I believe so, as long as it's not work related.

4    Q.  And I want to ask you about a couple terminations you

5    mentioned when Ms. Pratt was asking you questions about two

6    terminations you witnessed when you were at the Adams County

7    Sheriff's Office.

8    A.  Yeah.

9    Q.  Do you recall that part?

10   A.  Yes.

11   Q.  And you said you had been working there, I think, since

12   September of 2008?

13   A.  Yes.

14   Q.  And so you had worked for over a decade at the Adams County

15   Sheriff's Office?

16   A.  Yes.

17   Q.  And you can think of two times that deputies were fired

18   without an IA?

19   A.  With my knowledge.

20   Q.  To your knowledge?

21   A.  Yeah.  I'm not an IA person.  I wasn't in detectives.

22   Q.  But those are the two you know of?

23   A.  Yes.

24   Q.  And they both had criminal charges against them?

25   A.  I believe so.

Jarmin - Cross

1    Q.  So there was no need to do an IA, because they had criminal

2    charges against them?

3    A.  It seems like an IA still might stand.

4    Q.  It was in two cases where they were both charged

5    criminally?

6    A.  Yes.

7    Q.  And I want to ask you a little bit about some of the

8    testimony that you gave involving your concerns with Gene

9    Claps.

10          Do you recall that?

11   A.  Yes.

12   Q.  But you did not complain to Mr. Reigenborn at any time

13   about Mark Mitchell?

14   A.  No.  I don't have much knowledge of the other three.

15   Q.  And you did not complain to Mr. Reigenborn about T.J.

16   Coates?

17   A.  Not that I remember.

18   Q.  And you did not complain to Rick Reigenborn about Kevin

19   Currier?

20   A.  Not that I remember.

21   Q.  And I want to ask you a couple questions about some of the

22   testimony that you spoke about for at will employment.

23          Do you recall that?

24   A.  Mm-hmm, yes.

25   Q.  So you have experience with at will employment?

                              Jarmin - Redirect

 1    A.  I've been with a Sheriff's Office for the majority of my

 2    career.

 3    Q.  And so you would know that, notwithstanding the existence

 4    of at will employment, an employer cannot terminate an employee

 5    for an illegal or unconstitutional reason; isn't that right?

 6    A.  If you are telling me this, I would say probably.

 7              MS. HALPERN:  Okay.  I have no further questions.

 8    Thank you.

 9              THE COURT:  Redirect.

10              MS. PRATT:  Yes, just briefly.

11    REDIRECT EXAMINATION

12    BY MS. PRATT:

13    Q.  Mr. Jarmin, to your knowledge, did Sheriff Reigenborn fire

14    Mr. O'Neill?

15    A.  No, no.

16    Q.  He retained Mr. O'Neill, did he not?

17    A.  Yes.

18              MS. PRATT:  Nothing further.

19              THE COURT:  Let me ask our jurors, do you have any

20    questions for this witness?

21              Sir, you may be excused.

22              THE WITNESS:  Thank you.

23              THE COURT:  Defendants may call their next witness.

24              MS. REDMOND:  Defense calls Susan Argo.

25    SUSAN ARGO,


                       SADIE L. HERBERT, RPR, RCR
           901 19th Street, Denver, CO 80294  (303)335-2105

Argo - Direct

```
 1          called as a witness by the Defendant,

 2          having been duly sworn, testified as follows:

 3    DIRECT EXAMINATION

 4    BY MS. REDMOND:

 5    Q.  Good morning, Ms. Argo.

 6    A.  Good morning.

 7    Q.  I would like to speak with you about your experience at the

 8    Adams County Sheriff's Office.

 9          When did you begin working at the Adams County

10    Sheriff's Office?

11    A.  In March of 1988.

12    Q.  How long were you employed at the Adams County Sheriff's

13    Office?

14    A.  35 years.

15    Q.  And what was the highest position you held in the Adams

16    County Sheriff's Office during your employment?

17    A.  Detention manager.

18    Q.  And could you describe your job duties to the jury in the

19    role of detention manager?

20    A.  As the detention manager, I was responsible for the

21    noncertified areas of the jail, which were the civilian staff.

22    It included records, pretrial, pretrial release, jail programs,

23    classifications, work release, inmate labor, tracking jail

24    population trends.

25    Q.  Approximately, how many people did you oversee in your
```

Argo - Direct

1    position as detention manager?

2    A.  Approximately 60.

3    Q.  Your position as detention manager, was that a civilian

4    position?

5    A.  Yes.

6    Q.  What certified position was your position equivalent to?

7    A.  Commander.

8    Q.  Was your position as detention manager considered to be

9    part of the Sheriff's command staff?

10   A.  Yes.

11   Q.  Did you work directly with Gene Claps during your

12   employment at the Adams County Sheriff's Office?

13   A.  Yes.

14   Q.  During what years did you work directly with Mr. Claps?

15   A.  I worked with Mr. Claps throughout my career.  But most

16   recently, in 2015 to 2018, when he was assigned to the jail

17   division.  And then, again, in early 2023 when he was the

18   Sheriff.

19   Q.  And did you report directly to Mr. Claps during any of that

20   time?

21   A.  Yes.

22   Q.  How would you describe your working relationship with

23   Mr. Claps?

24   A.  I started directly reporting to him in 2016, and it started

25   out okay.  And then got, I would say, less than desirable.

Argo - Direct

1              It became difficult for me to work with him.  He

2      treated me different than he treated the commanders that

3      reported to him.  He often undermined me publicly and

4      questioned my authority and my knowledge.  He excluded me from

5      decisions and implementation processes that I should have had

6      input in.

7              He gave me a -- an evaluation that unfairly

8      represented my knowledge and my performance, which later was

9      changed.  He removed me from a number of committees and

10     meetings that I was intricately involved in.

11             He moved my office to an office that was much smaller

12     in size and more physically isolated from people than my

13     previous office was.

14     Q.  When you say that he undermined you publicly, what do you

15     mean by that?

16             MR. BOHNET-GOMEZ:  Objection, your Honor.  This is

17     404(b) evidence and never disclosed in discovery.

18             THE COURT:  Approach.

19         (Continued on next page)

20

21

22

23

24

25

Argo - Direct

1          (At sidebar)

2          THE COURT:  I'm not sure what discovery obligation

3     they would have to provide what potential testimony this

4     witness would --

5          MR. BOHNET-GOMEZ:  It's disclosed in their Rule 26

6     disclosures as having discoverable information regarding the

7     alleged claims and defenses in the action as evidenced by the

8     attached records.

9          Those attached records include all our clients'

10    personnel files, but not any complaints or discipline.  They

11    included the personnel -- excuse me, the policy memo that

12    Mr. Reigenborn sent out, and they included the meetings -- the

13    meeting notes with our four clients.

14         They did not include a single record for Ms. Argo.  We

15    had no opportunity to determine whether discovery should be had

16    into Ms. Argo.

17         Our clients have not -- Mr. Claps specifically has not

18    put character at issue.  He's testified that he held himself to

19    high professional standards.

20         This is improper character evidence under 404(b).

21         THE COURT:  What is she going to testify to?

22         MS. REDMOND:  Yes, your Honor.  Ms. Argo is speaking

23    specifically about her experience working directly under

24    Mr. Claps prior to the Reigenborn administration taking office.

25    She will speak to his treatment of her.

866
Argo - Direct

1          Mr. Claps specifically testified last week on Friday

2    that he was respectful of everyone he has worked with and

3    continues to be respectful of everyone he has worked with.

4    Thus, he has very much put his character at issue in this case.

5          Furthermore, Ms. Argo was disclosed as a potential

6    witness in this matter, and Plaintiffs went as far as to notice

7    her deposition, and they chose to cancel it.  That is their

8    decision.

9          THE COURT:  Let's do this.  Let's excuse our jury for

10   a morning break, and I'll take argument on this in open court.

11   I want to look at what Claps said too.  So let's take a recess.

12         MS. REDMOND:  Yes, your Honor.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Argo - Direct

 1        (In open court; jury present)

 2            THE COURT:  Members of the jury, I think this is going

 3   to take slightly longer than can be addressed simply in a

 4   sidebar, so let's take our morning recess a little bit early,

 5   here.  And then if you all could be ready to be back at 10:20,

 6   and then we'll move through to lunch at that point.

 7            (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  I mean, clearly at issue in this case is

3     the grounds that Reigenborn had for terminating --

4          MR. BOHNET-GOMEZ:  Your Honor --

5          MS. PRATT:  The witness.

6          MR. BOHNET-GOMEZ:  -- excuse the witness.

7          THE COURT:  Yes.

8          MS. PRATT:  Sorry.  Ms. Argo, if you would wait in the

9     hallway, please.  We'll come and get you.

10          THE COURT:  Clearly at issue in this case is

11     Mr. Reigenborn's basis for terminating the Plaintiffs.  And the

12     testimony in this case has been, by several witnesses, disputed

13     by Mr. Claps, that Mr. Claps was abusive to the individuals

14     below him.  So I think this is clearly relevant.  And I don't

15     think, given that we have had testimony back and forth both

16     ways on that issue, that it's a 404(b) issue.

17          My concern, though, is the sufficiency of the

18     disclosure.

19          So go over again what exactly was attached to -- or

20     maybe let me see -- why don't you just approach and let me see

21     what was attached.

22          MR. BOHNET-GOMEZ:  If I could bring my laptop up, that

23     would help me.

24          THE COURT:  Sure.

25          MR. BOHNET-GOMEZ:  So again, in Defendant's Rule 26

1  disclosures, Ms. Argo is described as having information and

2  knowledge regarding the alleged claims and defenses as

3  evidenced by the attached records.  And those records -- I will

4  pull them up for your Honor to take a look at.

5          MS. PRATT:  Your Honor, if we could just have one

6  moment to pull up the record so we can see it as well.  That

7  would be helpful.

8          THE COURT:  Yes.

9          MR. BOHNET-GOMEZ:  So those records included personnel

10  files for the four Plaintiffs, Bates labeled 1 through 1494.

11  The only connection this witness seems to have is with

12  Mr. Claps.  But none of Mr. Claps' personnel records relate to

13  any complaint or relate to Ms. Argo in any fashion.

14          Another record was the January 9th email, Exhibit 49,

15  I believe, with the policy, the policy rescission and new

16  policies.

17          And then the remaining four records that were provided

18  with those disclosures were the administrative assistant, Sarah

19  Manzanares' notes of the January 15th meeting with the four

20  Plaintiffs.

21          THE COURT:  I'm not going to be able to read a

22  thousand plus pages in 10 minutes.

23          Let's do this.  I'll give the Defendants until 10:18

24  or so to see if you can find anything in that disclosure that

25  would have put them on notice that this witness might be

1  testifying that Mr. Claps was abusive to subordinates.  Without

2  that, I get that she was subpoenaed, but they're not going to

3  depose her if they don't know that this might be a subject of

4  her testimony.

5      So again, I don't think it's a 404(b) problem.  But

6  there may be a disclosure problem.  So I'll give you the time

7  you need to flip through those documents.

8      MS. PRATT:  We'll take a look.  Thank you.

9      MR. BOHNET-GOMEZ:  If I can add one thing on the

10  404(b), just to make my record.  Mr. Reigenborn testified on

11  the stand about why -- what his decision-making with Mr. Claps

12  was.  He didn't mention Ms. Argo.  He only mentioned that he

13  received some complaints on January 9th about Mr. Claps and how

14  he was acting that day.  I believe that's what Mr. Jarmin

15  testified to.  There's been no connection between whatever

16  happened in 2016 through 2018 to Mr. Reigenborn's

17  decision-making.

18      THE COURT:  I believe Mr. Reigenborn testified about

19  Claps' actions to subordinates, in which case this would

20  support that testimony.  I mean, this is -- to some extent, the

21  heart of this case is, was it for political activity or because

22  of all this other stuff.

23      And so I'm inclined to let it in, if it was properly

24  disclosed.  If it wasn't properly disclosed, then I'm not going

25  to.

1              (Recess)

2              THE COURT:  Let me ask the Defendant, do you have

3     anything that indicates, that would have put them on notice

4     that this witness was going to testify to abusive behavior, for

5     lack of a better term?

6              MS. REDMOND:  Yes, your Honor.

7              In our final pretrial order, Document 120, filed

8     April 2, 2024, we specifically outlined that Ms. Argo -- this

9     is on Page 17, Paragraph 5 -- Ms. Argo is an employee of the

10    Sheriff's Office at Adams County detention facility.  Ms. Argo

11    may testify as to her experience working with Plaintiff Claps

12    and her observations of his leadership at the detention

13    facility.  It is expected she will testify in person.

14             THE COURT:  That was after the close of discovery in

15    this case.

16             MS. REDMOND:  My understanding is that it was.  But

17    the proper remedy would have been to ask to reopen discovery

18    for that brief purpose, as opposed to excluding a witness from

19    trial who was disclosed, even in 26(a)(1), and then

20    supplementary disclosed in our final pretrial order with

21    specificity.

22             THE COURT:  Response?

23             MR. BOHNET-GOMEZ:  Your Honor, the final pretrial

24    order does not cure the deficiency in Poitra v. School District

25    No. 1, in County of Denver, 311 FRD 659, District of Colorado

 1    2015, the Court excluded a witness who is not properly

 2    disclosed during the discovery period, even though the witness

 3    came up in depositions and then a party added the witness to

 4    the final pretrial order.

 5           THE COURT:  I think I agree there was not proper

 6    disclosure here.  At this point, it is too late to cure it.

 7           MS. REDMOND:  Your Honor, just briefly, if I may.  It

 8    will be very brief, I promise.

 9           THE COURT:  Go ahead.

10           MS. REDMOND:  In Acrey v. American Sheep Industries

11    Association, cite is 981 F.2d 1569, this is a Tenth Circuit

12    Court of Appeals case from 1992, a witness was not listed as a

13    witness initially in either -- in the pretrial witness list,

14    but appeared in supplemental lists received just four days

15    before trial as a possible rebuttal witness.  The Court allowed

16    this witness to testify as a rebuttal witness, understanding

17    the scope of her testimony would be limited to rebuttal.

18           THE COURT:  This isn't rebuttal.  I mean, we're not in

19    rebuttal testimony.  I think that the relevance of -- I think

20    there is some relevance to this testimony.  Ultimately,

21    however, this isn't an -- this isn't -- the issue is not

22    whether or not Sheriff Reigenborn made the proper decision in

23    terminating any of the Plaintiffs because they weren't good

24    employees.  The question -- and if that were the question, the

25    testimony would be more relevant, because the jury would be

1   asked to decide whether or not these Plaintiffs were employees

2   who deserved to be terminated.

3           But as the Tenth Circuit has made clear over and over

4   again, the Court's job in these cases is not to be a super

5   employment bureau that decides whether or not this was a good

6   decision or not a good decision.  The question ultimately is:

7   Was this the reason for Sheriff Reigenborn's decision?  And to

8   that, this testimony becomes less relevant.

9           We already have one witness who testified passionately

10  this morning about his view of Mr. Claps and how Mr. Claps

11  treated subordinates.  This testimony then becomes somewhat

12  cumulative of that.

13          As I indicated, if there wasn't a discovery issue, I

14  probably would allow it through this witness, though probably

15  no more.  But given the discovery violation here and given the

16  fact that this does become somewhat cumulative, this testimony,

17  and ultimately, again, the question is, was Mr. Reigenborn

18  telling the truth on the stand or was he lying.  As I said

19  during the pretrial proceeding, that's ultimately the question

20  that this jury is going to decide, and it's going to be his

21  testimony that's going to be the most important in this.

22          And so I'm going to sustain the objection to this line

23  of questioning.

24          Let's bring our jury in.

25          MR. BOHNET-GOMEZ:  Your Honor, in light of the Court's

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1    order, we would also request that Ms. Argo's testimony be

2    stricken and that the jury be instructed that it's not evidence

3    and they should not consider it.

4         THE COURT:  Let me see what she's testified to so far.

5         MS. REDMOND:  Your Honor, I would object.  That was an

6    untimely objection.  That testimony has already been elicited.

7         THE COURT:  Let me see what she's testified to.

8         I'm not going to strike it.  The question was:  How

9    would you describe your working relationship with Mr. Claps?

10        She then went on to provide a description of that.

11        And then, it was in the follow-up to that question

12   that the objection was first stated.  So to the testimony that

13   she's already testified to, the objection is untimely.  I'm not

14   going to strike as a result of that.

15        Let's get our jury.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Argo - Direct

```
1        (In open court; jury present)

2              THE COURT:  We can bring our witness back in.

3              Just a reminder, you are still under oath.

4              THE WITNESS:  Correct.

5              THE COURT:  Okay.

6    BY MS. REDMOND:

7    Q.  Ms. Argo, I just have a few more questions for you.

8              During your time at the Adams County Sheriff's Office,

9    which if I heard correctly, sounded like it was about 35 years;

10   is that right?

11   A.  Correct.

12   Q.  During your career at the Adams County Sheriff's Office,

13   how many Sheriffs did you serve under?

14   A.  Six.

15   Q.  In your experience, having served that number of years at

16   the Adams County Sheriff's Office, was it common for a new

17   Sheriff to bring in his own command staff?

18   A.  Yes.

19             MS. REDMOND:  No further questions, your Honor.

20             THE COURT:  Thank you.

21             Cross-examination.

22             MR. BOHNET-GOMEZ:  Nothing on cross, your Honor.

23             THE COURT:  Does our jury have any questions for this

24   witness?

25             Thank you.  We can excuse the witness.
```

Gregory - Direct

 1            THE COURT:  Defendants may call their next witness.

 2            MR. THAPA:  Defense calls Paul Gregory, your Honor.

 3    PAUL GREGORY,

 4        called as a witness by the Defendant,

 5        having been duly sworn, testified as follows:

 6    DIRECT EXAMINATION

 7    BY MR. THAPA:

 8    Q.  Good morning, Mr. Gregory.

 9    A.  Good morning.

10    Q.  Mr. Gregory, were you a member of former Sheriff Mike

11    McIntosh's command staff?

12    A.  Yes.

13    Q.  Did you support Mr. McIntosh in the 2014 election for Adams

14    County Sheriff against Rick Reigenborn?

15    A.  Yes.

16    Q.  Did you donate to Mr. McIntosh's 2014 campaign for Sheriff?

17    A.  Yes.

18    Q.  Did you also support Mr. McIntosh in the 2018 election for

19    Adams County Sheriff also against Rick Reigenborn?

20    A.  Yes.

21    Q.  And did you donate to Mr. McIntosh's 2018 campaign for

22    Sheriff?

23    A.  Yes.

24    Q.  And you also helped with multiple campaign events for

25    Mr. McIntosh?

Gregory - Direct

1    A.  Yes.

2    Q.  Things like fundraisers?

3    A.  Yes.

4    Q.  And you volunteered to help with Mr. McIntosh's campaign

5    kick off?

6    A.  Yes.

7    Q.  After Sheriff Reigenborn won the election in 2018, did he

8    keep you in his administration?

9    A.  No.

10   Q.  Were you not part of Sheriff Reigenborn's administration

11   after he took office?

12   A.  No.

13   Q.  You were still employed by the Adams County Sheriff's

14   Office; correct?

15   A.  Yes.

16   Q.  So he initially demoted you from commander to sergeant?

17   A.  Yes.

18   Q.  Is that what you meant by he did not keep you in his

19   administration?

20   A.  Yes.

21   Q.  So you were still working at the Adams County Sheriff's

22   Office, but you were at the rank of sergeant; is that correct?

23   A.  That's correct.

24   Q.  But in 2020, Sheriff Reigenborn promoted you to a commander

25   position; correct?

Gregory - Cross

 1    A.  Yes.

 2    Q.  And the commander position is part of the command staff?

 3    A.  Yes.

 4    Q.  And then, in 2021, he promoted you again to the position of

 5    division chief of patrol; is that right?

 6    A.  Yes.

 7    Q.  And then, in 2022, Sheriff Reigenborn promoted you to the

 8    position of his Undersheriff; is that correct?

 9    A.  Yes.

10    Q.  And the Undersheriff is the second in command of the

11    Sheriff's Office?

12    A.  Yes.

13            MR. THAPA:  I have no further questions.

14            THE COURT:  Cross-exam.

15    CROSS-EXAMINATION

16    BY MS. HALPERN:

17    Q.  Hello, Mr. Gregory.  Good morning.  I just have -- I want

18    to unpack a little bit about your history at the ACSO, since

19    you were asked about it.

20            When did you start working at the Adams County

21    Sheriff's Office?

22    A.  August 28th, 2001.

23    Q.  During that time, did you work with the four gentleman that

24    are sitting at this table?

25    A.  Yes.

Gregory - Cross

```
 1          MR. THAPA:  Objection, your Honor, outside the scope

 2   of direct.

 3          THE COURT:  Response?

 4          MS. HALPERN:  Your Honor, I believe that being outside

 5   the scope is okay as long as you are not asking leading

 6   questions.

 7          MR. THAPA:  I don't believe that's true, your Honor.

 8          THE COURT:  Sustained.

 9   BY MS. HALPERN:

10   Q.  Mr. Gregory, you were asked about your support for Mike

11   McIntosh.

12          Do you recall that?

13   A.  Yes.

14   Q.  And counsel for the County asked you what you did to

15   support Mr. McIntosh in 2014?

16   A.  I think he asked if I did.  Yes, I did.

17   Q.  And what did you do to support Mr. McIntosh in 2014?

18   A.  I was part of his -- prior to the election, I was part of

19   his campaign team, which is more or less a makeup of people who

20   would talk about strategy, about fundraising efforts, other

21   marketing things, like social media posts.  I contributed to

22   his campaign financially.  I walked in parades.  I believe I

23   called a couple of people, reposted and posted things on social

24   media.

25   Q.  And you were asked if you supported Michael McIntosh in
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Gregory - Cross                                    880

 1   2018 as well for Sheriff; is that right?

 2   A.  Yes.

 3   Q.  What did you do to support Mr. McIntosh in 2018?

 4   A.  Similar things.  Supported financially, walked in parades,

 5   wore McIntosh T-shirts, social media postings.

 6   Q.  Did you donate to him as well?

 7   A.  Yes.

 8   Q.  And attended fundraisers for Mr. McIntosh?

 9   A.  Yes.

10   Q.  You put up a large McIntosh sign right across from where

11   Mr. Reigenborn used to live?

12   A.  Yes.

13          MS. HALPERN:  I want to bring up what has been

14   designated as Exhibit 74, which I believe is already in

15   evidence.

16          MR. THAPA:  Objection, your Honor, outside the scope

17   of direct.

18          MS. HALPERN:  Your Honor, this is not outside of the

19   scope of direct.  He received a termination letter like

20   everyone else, and they implied that that did not happen.

21          THE COURT:  Overruled.

22          MS. HALPERN:  If we could please publish to the jury.

23   Thank you so much.

24   BY MS. HALPERN:

25   Q.  Now, Mr. Gregory, can you take a look at the letter in

Gregory - Cross

1   Exhibit 74 and let us know if you have seen something like this

2   yourself personally in the past?

3   A.  Yes, I have.

4   Q.  When did you see that in the past?

5   A.  I actually read it as early as this morning again.

6   Q.  How did you read it as early as this morning again?

7   A.  I have the letter still.

8   Q.  Did you receive a letter similar to the one in Exhibit 74?

9   A.  It's more or less verbatim.

10  Q.  And you received that letter on January 9th, 2019?

11  A.  Yes.

12  Q.  Tommie McLallan gave that to you?

13  A.  Yes.

14  Q.  And you were placed on immediate administrative leave and

15  made to leave the building?

16          MR. THAPA:  Objection, leading, your Honor.

17          MS. HALPERN:  Your Honor, it's cross.  They were

18  leading too.

19          THE COURT:  Sustained.

20          THE WITNESS:  Yes.

21          MS. HALPERN:  I'm sorry, sustained as to leading?

22          THE COURT:  I'm sorry.  Overruled.

23          MS. HALPERN:  Okay.

24  BY MS. HALPERN:

25  Q.  And you believed, after reading this letter, that you had

Gregory - Cross

1   been terminated?

2   A.  Yes.

3   Q.  And after that, did you seek legal advice with a number of

4   other officers who received a similar letter?

5   A.  Yes.

6   Q.  And what is it that you thought might have been the reason

7   that you received a letter like this?

8          MR. THAPA:  Objection, speculation, your Honor.

9          MS. HALPERN:  I said you.  I said, what do you think.

10  He's not speculating about someone else's --

11         THE COURT:  Why don't you form a foundation, and then

12  ask a question.

13         MS. HALPERN:  Okay.

14  BY MS. HALPERN:

15  Q.  Mr. Gregory, you received a letter similar to the one in

16  Exhibit 74; is that right?

17  A.  Yes.

18  Q.  And what were your thoughts when you received that letter?

19  A.  That I was being terminated, and I would have a notice to

20  be heard.

21  Q.  Was there a reason that you believed you might have been

22  terminated?

23  A.  Yes.

24  Q.  And what was that reason?

25  A.  At that time, I believed it was motivated by politics.

883
Gregory - Cross

1    Q.  What do you mean by that?

2    A.  I believe, at the time, that since I was helping on his

3    opponent's campaign that I was being asked to leave because of

4    that.

5    Q.  And can you tell us about that meeting that occurred on --

6    the notice to be heard meeting that you had with

7    Mr. Reigenborn?

8    A.  During that meeting, there were a number of people present.

9    I believe it was Sheriff Reigenborn, Undersheriff McLallan,

10   counsel was there for the County, I think it was Kasandra.

11   There was also an executive assistant present, I think it was

12   Sarah Manzanares.

13          And the meeting lasted maybe 15, 20 minutes.  I was

14   told by Sheriff Reigenborn, more or less, okay, this is your

15   time to be heard, what do you have to say.  And I spoke for 10

16   or 15 minutes about why I believed I should be retained as an

17   employee.

18          After I spoke -- there weren't many questions asked of

19   me during that time, but I was asked to leave the room after I

20   was done speaking.  I was outside of the room in the executive

21   assistant area for maybe 5 or 10 minutes.  I was asked to come

22   back in the room.

23          And I was then offered a job at the demoted rank to

24   sergeant as a public information officer and handed a piece of

25   paper by the Undersheriff, McLallan, that had a number of what

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Gregory - Cross

1    my new salary would be.  And if that was -- I was asked if I

2    wanted it.  I accepted it.  They said I could come back to work

3    on, I think it was, the 22nd of January.

4    Q.  And I want to talk to you about the history of your

5    employment after that demotion.  And you were asked about that

6    promotional history.

7            Do you recall that part of the questioning?

8    A.  Yes.

9    Q.  By the County attorneys just now?

10   A.  Yes.

11   Q.  So you remained a sergeant for approximately a year; is

12   that right?

13   A.  Yes.

14   Q.  And then you were promoted to commander, and you also

15   worked as a commander for a year?

16   A.  Yeah, about a year and a half, I think, as a commander.

17   Q.  Year and a half.

18           So what year do you recall being promoted to

19   commander?

20   A.  That was 2020, in January of 2020.

21   Q.  And then you were promoted to division chief?

22   A.  Yes.

23   Q.  What year was that?

24   A.  July of '21.

25   Q.  And so you were promoted to division chief approximately

Gregory - Cross

```
 1   two years or more after Mr. Reigenborn was first elected to

 2   office; is that right?

 3   A.  Yes.

 4   Q.  And when you were promoted from sergeant to commander, you

 5   had to submit your résumé and application; correct?

 6   A.  Yes.

 7   Q.  And you sat for a formal oral board?

 8   A.  Yes.

 9   Q.  And all the division chiefs were part of that oral board?

10   A.  Yes.

11   Q.  But the Undersheriff and Sheriff were not?

12   A.  Correct.

13   Q.  Mr. Reigenborn, at some point in time, asked you to be

14   Undersheriff, after you served an additional year or so as

15   division chief; is that right?

16   A.  Yes.

17   Q.  Why did the -- so that was already three years or so into

18   your tenure with him; is that right?

19   A.  He asked me in March of '22, I believe.

20   Q.  And what happened in March of '22 that the Undersheriff

21   position became available?

22   A.  Prior to that, I believe it was the year prior to that, the

23   Undersheriff and the training division chief were put on leave

24   and ultimately terminated for allegations of doctoring some

25   training logs.
```

Gregory - Cross

1    Q.  And did Mr. Reigenborn talk to you at all about why he

2    asked you to be Undersheriff?

3    A.  Yes.

4    Q.  Was there a lack of experienced leadership in the agency at

5    that time?

6    A.  That was one of the reasons why, yes.

7    Q.  And I want to ask you a little bit about some of those --

8    some of the lack of experience at the ACSO around that time.

9              MR. THAPA:  Objection, outside the scope of direct,

10   your Honor.

11             THE COURT:  Response?

12             MS. HALPERN:  Your Honor, it's the basis -- they're

13   implying that political affiliation had nothing to do with it,

14   we're countering that there was no experienced leadership and

15   that there had been significant changes at the Adams County

16   Sheriff's Office.

17             THE COURT:  Approach.

18       (Continued on next page)

19

20

21

22

23

24

25

Gregory - Cross

1       (At sidebar)

2           THE COURT:  How is this within the scope of this

3   witness' examination?

4           MS. HALPERN:  Because he asked about the promotion

5   history.

6           THE COURT:  That has nothing to do with the leadership

7   at Adams County Sheriff's Office.

8           MS. HALPERN:  What we're saying is he didn't really

9   have a choice.  There's no one left to do it.

10          THE COURT:  Sustained.

11          We're going really far afield here.  Purpose of this

12  testimony is really just -- it's getting into an attack on

13  how -- whether Reigenborn -- again, it's not -- the question in

14  this case is not was this a good decision or a bad decision.

15  It's was it a politically motivated decision, so I'm going to

16  sustain the objection.

17          (Continued on next page)

18

19

20

21

22

23

24

25

                              Gregory - Cross

         1         (In open court; jury present)

         2              MS. HALPERN:  Your Honor, can we approach the bench.

         3              THE COURT:  Yes.

         4         (Continued on next page)

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

Gregory - Cross

1        (At sidebar)

2            MS. HALPERN:  Given the scope of your ruling just now,

3    I think it's going to be difficult to -- I wonder if we have

4    permission to recall him for rebuttal.

5            MR. THAPA:  He wasn't listed, your Honor.

6            THE COURT:  Given my ruling that it's beyond the

7    scope?

8            MS. HALPERN:  The scope.

9            THE COURT:  We can take up whether or not he can be

10   recalled as a rebuttal witness or not.  I don't think we need

11   to do that now.  We can take that up during the lunch break.

12           MS. HALPERN:  Okay.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Gregory - Redirect

```
 1        (In open court; jury present)
 2             MS. HALPERN:  Mr. Gregory, I do not have any further
 3   questions for you now, but we would ask that you remain here
 4   under your subpoena in case we need to call you back.
 5             THE WITNESS:  Okay.
 6             THE COURT:  Any redirect?
 7             MR. THAPA:  Yes, your Honor.
 8             THE COURT:  Go ahead.
 9   REDIRECT EXAMINATION
10   BY MR. THAPA:
11   Q.  Mr. Gregory, you are currently the Undersheriff for Sheriff
12   Claps?
13   A.  One more time, I'm sorry.
14   Q.  You are the Undersheriff for Sheriff Claps currently; is
15   that correct?
16   A.  Yes.
17   Q.  And he's your current boss?
18   A.  One more time, I'm sorry.
19   Q.  He's your current boss?
20   A.  Yes.
21             MR. THAPA:  No further questions.
22             THE COURT:  Does the jury have any questions for this
23   witness?
24             You may be excused with the caveat that you may be
25   recalled.
```

Gregory - Redirect

1              MS. REDMOND:  Your Honor, defense calls Mark Toth.

2              THE COURT:  Before we begin, can I see counsel for

3     just one moment.

4              MS. REDMOND:  Yes, your Honor.

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gregory - Redirect

1        (At sidebar)

2            THE COURT:  Do you know -- the reason I ask this is

3    the order of your Defendants witnesses -- we had Laws before

4    Toth.  Are you intending to call Laws?

5            MS. PRATT:  Just scheduling, we had to switch.

6            THE COURT:  Okay.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Toth - Direct

```
 1        (In open court; jury present)

 2   MARK TOTH,

 3        called as a witness by the Defendant,

 4        having been duly sworn, testified as follows:

 5   DIRECT EXAMINATION

 6   BY MS. REDMOND:

 7   Q.  Good morning, Mr. Toth.

 8   A.  Good morning.

 9   Q.  I'd like to ask you just a few background questions before

10   we get into your testimony.

11             Where did you grow up?

12   A.  Born and raised in Denver.

13   Q.  Where do you live currently?

14   A.  Westminster.

15   Q.  Are you married?

16   A.  Yes.

17   Q.  Do you have children?

18   A.  I have three.

19   Q.  When did you begin working in law enforcement?

20   A.  1979.

21   Q.  Would you walk us through the positions you held in your

22   career as a law enforcement officer from the time you started

23   in 1979?

24   A.  The first job I had was with the Denver Sheriff's

25   Department.  It wasn't a certified position, but I got hired
```

                                                                          894
                                Toth - Direct

1    there.  I was in the testing process with the Westminster

2    Police Department at the time.  I was put on an eligibility

3    list, but I applied for Denver Sheriff's Department, got hired

4    and worked in the county jail for -- well, they had a

5    three-week academy, I went to that.  Out of that, they assigned

6    me to the county jail on a couple felony tiers, it was called 9

7    Baker and Charlie, to watch the prisoners there.  I was there

8    about 2 and a half months, when Westminster called me and

9    offered me a job with the police department.  That's what I

10   wanted to do, be a police officer, be a certified police

11   officer.

12           Got to Westminster, they immediately sent me to the

13   academy.  They sent me to Camp George West, went to the

14   academy.  Came back out, on patrol for 3 years.  Made training

15   officer, I was a training officer for 2 years.  Made detective,

16   that was a rotational position, was detective for 3 years.

17   Went back to patrol.  Went back to being a training officer.

18   Was training officer for 6, 7 years, I don't remember exactly

19   how long.  Then I made -- then I went to our SCAT unit, our

20   SCAT team, Special Crime Attack Team.  I was there for a 3-year

21   rotation.  Went back to patrol.  Went back to being a field

22   training officer.

23           And after that, I got promoted to sergeant.  And was a

24   field training sergeant for the shift that I was assigned to.

25   And I was there for about 3 or 4 years in that position.  When

                        SADIE L. HERBERT, RPR, RCR
            901 19th Street, Denver, CO 80294  (303)335-2105

Toth - Direct

1    a SCAT position opened, as far as the sergeant being in charge

2    of our SCAT unit, so I put in for that.  Got elected to that

3    position, and was at that position until I left.

4    Q.  And why did you leave the Westminster Police Department?

5    A.  I was terminated.

6    Q.  When were you terminated?

7    A.  The end of 2005.

8    Q.  Why were you terminated?

9    A.  Well, we were criminally charged.  There was four of us

10   that were criminally charged with third degree assault, false

11   reporting and official misconduct.  It had to do with an

12   incident that happened in Federal Heights and -- do you want

13   details?

14   Q.  If you could please just briefly describe the incident that

15   was the basis for the charges.

16   A.  Okay.  I'll make this as brief as possible.

17        Broomfield gets in a pursuit with a vehicle that came

18   into the Westminster area.  This is like on a Saturday sometime

19   between 4 and 5 o'clock in the afternoon.  And it was in

20   September, I believe.

21        And they lose the vehicle.  One of our traffic

22   officers finds the vehicle and starts chasing it.

23        This wasn't your typical pursuit where the guy is

24   running a hundred miles an hour and blowing stop signs all over

25   town.  He just wouldn't pull over, I'm not stopping for you

Toth - Direct

1    guys.

2              So he gets stuck at a light at 104th and Federal, the

3    guy that's running.  And I'm a SCAT sergeant, I'm driving a

4    car, I've got another officer with me, another SCAT officer,

5    because we always rode in pairs.  And we said, let's head that

6    way in case the guy stops and bails out or whatever.

7              So we catch up to it, we're not running lights or

8    sirens, we just catch up to it, because the guy is not really

9    driving all that fast.  He gets stuck at the light, and we tell

10   him that we're with the traffic officer.  The traffic sergeant

11   gets on the air and says -- tells the traffic officer to stop

12   the pursuit, we'll let SCAT pursue him.

13             So I'm driving, I told the officer with me, Norm, I

14   said, you get on the air and tell them we're not pursuing

15   anybody.  We're driving an unmarked car, which was a black

16   Nissan Maxima.  We're not in uniform.  We're just going to

17   follow this guy until he lands.  He has no idea we're behind

18   him.  So we do.

19             Long story short, he drives through Federal Heights,

20   across the street from Westminster, as far as the city.  I had

21   two other SCAT officers out, another car.  They managed to get

22   spike strips down in front of his car, and that stopped him.

23             So he pulls over in front of the Federal Heights city

24   shops, which is right off of 90th and Federal.

25             And so the traffic officer that was originally chasing

Toth - Direct

1    him shows up, there's two SCAT cars, I think two or three other

2    Westminster cars that show up at the end of this, a Federal

3    Heights officer and a Federal Heights lieutenant.

4            So when he pulls up -- and there's a couple things to

5    remember here, I'll get into that in a minute.

6            So he pulls up, we decide we're going to do a felony

7    stop on this, which is basically guns drawn, we're going to get

8    him out of the car that way.

9            So when we stop, we start to get out, we're behind

10   cover.  The Federal Heights officer, who is over here to my

11   right, everybody is pulling their -- this guy is at a fence,

12   his car is facing the fence, everybody is pulling their guns at

13   this guy, at the driver.  The Federal Heights officer who is a

14   rookie, he goes and stands in front of the guy's car.  He was

15   in the crossfire, because everybody is pointing their guns in

16   that direction.  So one of my SCAT officers dresses him down in

17   front of everybody in no uncertain terms, get out of there,

18   you're going to get yourself shot.  So he scampers out of there

19   because he made a mistake.  But number one, he's mad at us.

20           The long and short of it is we get the guy out of the

21   car, had him put his hands up and do a 360 to see if there's

22   anything obvious in his waistband.  Then the officer prones him

23   out, says, lay down, put your hands out to your side.  So he

24   does that.  I tell two of my SCAT officers, go up there and

25   hook him up, put the cuffs on him, we're done.

Toth - Direct                              898

1          So they go up to handcuff him, and when they get up

2    there, he takes his hands and -- he's laying on his stomach --

3    and buries them right in here, he's laying on them.  Right

4    away, you're thinking, why is he doing that, is he reaching for

5    a weapon or what's he trying to hide.  So they go up and try to

6    pull his hands out, they can't get them out.  So they deliver

7    some strikes to the back of his shoulder blade area and around

8    the base of his neck.

9          Our defensive tactics is called PPCT, which is

10   pressure point control techniques.  And all it is is it's

11   designed to attack your motor nerves.  And it's designed so if

12   you put your arm up and hit them in the right place, it affects

13   your motor nerve and you lose control.  It isn't long, but long

14   enough for somebody to pull your arms out.

15         So they both can't get his arms out.  They deliver

16   some PPCT strikes to the back where they're supposed to be, all

17   by what we're trained to do, they do that a couple times,

18   doesn't work.  So I went up there, helped them deliver a couple

19   more strikes.  Between the three of us, got his hands out from

20   underneath him, cuffed him up, that was the end of it.  Called

21   Broomfield, they came and got the guy.

22         Well, that was on a Saturday.  This was our -- we work

23   Wednesday through Saturday.  Sometime beginning of that next

24   week, the Federal Heights officer and lieutenant come in and

25   make a complaint that we used excessive force on this guy.  So

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

899
Toth - Direct

1    the two things that they said that made this go forward is,

2    number one, they said he never put his hands underneath him.

3    And number two, that we beat him for two minutes straight, the

4    three of us.  It's like all right.

5            Anyway, they did an investigation.  They went to the

6    Adams County critical incident team, they told the same story.

7    Went to a grand jury, they told the same story.  Went to

8    internal affairs, and they told them the same story.  They

9    indicted us.

10           So in most departments, stuff like that happens, they

11   put you on light duty until the criminal is over, and then they

12   do an internal affairs investigation.  Westminster put

13   everybody else that was involved in that, my two SCAT officers

14   and a traffic officer, there were four of us, we're all charged

15   with the same thing.  They're all misdemeanors, but they're all

16   the certifiers for your -- so you can no longer be a police

17   officer.  They put them on light duty, and they terminated me.

18   I was like, all right.

19           Well, it doesn't go to trial for a year.  So long and

20   short of it, we get into trial, it's a five-day jury trial.

21   And during this -- like I said, the things to remember are

22   those two things, he put his hands underneath him or he didn't

23   and we beat him for two minutes.  When went out on the

24   traffic stop or the stop, I should say, we all got in position.

25   The Westminster officer calls out to dispatch, we're on a

                          Toth - Direct

1    felony stop.  So that's the start of it.  He did not spin him

2    around, do all the things we said we did, pointed out he buries

3    his hands, strikes to the areas we're taught.  A Westminster

4    says at that time, got one in custody.

5            Dispatch time for that whole incident from felony stop

6    to in custody was 28 seconds, so that got brought out in the

7    trial.  The second thing is, when the Federal Heights officer,

8    who was a rookie, testified that those three other things or

9    gave a statement, he put himself behind a vehicle in three

10   different spots during all the times that he gave his

11   statement; during internal affairs, the Adams County critical

12   incident team and the grand jury.

13           So we reenacted the whole thing for the jury.  We put

14   somebody down as the suspect, put the officers where they were

15   supposed to be, and then we, you know, did the distance stuff

16   as far as where the car would be.  We put the Federal Heights

17   officer in all three spots where he said he was that he

18   observed this stuff.  And each time they did, they said, based

19   on where you are at, can you see the suspect's hands or his

20   arms?  No.  For all three spots, his answer was no.

21           The lieutenant who was on the scene, when he said he

22   was on this side, the guy is laying down like this

23   (indicating), and he comes up from behind, basically, so my

24   officers, their backs are to him.  He said in his original

25   statement he was 15 feet from where this was happening sitting


                 SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Toth - Direct

1    his car.  When we went back and reconstructed it, he was

2    45 feet back.  So we put him in the same position, so to speak,

3    as much as we could in a courtroom, and said, based on where

4    you are at, can you see the suspect's hands.  He said no.

5    Q.  Thank you.

6         And Mr. Toth, if I could interject just briefly.  You

7    talked about this case going to trial.

8         Were you convicted of any of the criminal charges that

9    you --

10   A.  No, that's what I was getting to.  No.

11        So that was the main things that came out in that

12   trial.  So the jury went in on the fifth day.  I think it was

13   29 pages of jury instructions.  An hour and a half later, they

14   came out, they acquitted us, all four of us of all charges.

15   Q.  Did you continue your career in law enforcement once you

16   were acquitted of those charges?

17   A.  Yes.

18   Q.  Where did you go?

19   A.  Mountain View.

20   Q.  Is that Mountain View Police Department?

21   A.  Yes, the Mountain View Police Department, sorry, yes.  It's

22   in Jefferson County between Wheat Ridge and Lakeside.

23   Q.  And about what year was it that you started your employment

24   at Mountain View?

25   A.  2007.

Toth - Direct

1   Q.  What positions did you hold while working at the Mountain

2   View Police Department?

3   A.  They hired me on just originall as an officer.  And shortly

4   thereafter, I don't know, it wasn't very long, the chief at the

5   time realized all my experience and the commander that was

6   there left to go to, I think it was, Thornton.  So he made me

7   the commander.  So I was a commander.  I was a commander for, I

8   don't know, 8 months, maybe, then he decided to leave.  And

9   during the time that he -- on his way out, they made me the

10  acting chief.  And then when he finally actually left, they had

11  a process, like police departments do, and I put in for the

12  process.  And the city council and mayor appointed me the

13  chief, full-time chief.

14  Q.  What did your responsibilities entail as chief of police at

15  Mountain View?

16  A.  Small department, it's everything; it's budgeting,

17  personnel, training.  I did all the scheduling.  I actually did

18  payroll for the whole town.  I mean, that's how backwards these

19  people were.  It was -- it was an interesting thing.

20        But I was the first line supervisor, because the only

21  other sergeant I had was assigned to DEA at the Front Range

22  Drug Task Force, so he was never around.  So I had to be the

23  chief and a front line supervisor.  So I did the scheduling, I

24  did the recruiting, I did the hiring, I did the firing, I did

25  everything.

Toth - Direct

1    Q.  Did you have to make changes, personnel changes to the

2    department once you became chief?

3    A.  Yes.

4    Q.  What sort of personnel changes did you have to make?

5    A.  When I first started, everybody except the chief was part

6    time.  And the chief before was just like -- he didn't care

7    what they did.  The weekends, he expected the officers to sit

8    in the office and watch TV.  I'm serious.  I said, that's not

9    going to happen.  You are getting paid to be cops, let's go out

10   and be proactive.  And they decided -- most of them decided

11   that's not what they wanted.  They were used to not doing

12   anything.  So a bunch of them quit.

13        So the ones that didn't, I put everything I wanted

14   them to do in writing and had them acknowledge it in writing.

15   So the ones that didn't, when they did that and didn't do what

16   they were told, I ended up firing most of them for disobeying

17   orders.  Well, I only fired three.

18   Q.  And how long --

19   A.  The rest quit.

20   Q.  Sorry, say that again?

21   A.  The rest of them had left, quit.

22   Q.  For how long did you hold the position of Chief at Mountain

23   View Police Department?

24   A.  Well, I was there a total of 12 years, so probably 11.  A

25   little over 11 years as the chief.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Toth - Direct

1    Q.  Where did you go when you left the Mountain View Police

2    Department?

3    A.  Adams County Sheriff's Department.

4    Q.  I'd like to switch topics a bit and talk to you about

5    Richard Reigenborn.

6            Do you know a man named Richard Reigenborn?

7    A.  Yes.

8    Q.  How did you meet him?

9    A.  I hired him at Mountain View.

10   Q.  About when was that?

11   A.  I think, around 2016.

12   Q.  How did you learn about Mr. Reigenborn such that you ended

13   up hiring him?

14   A.  The only part -- once I got there, got everything

15   established, the only part-time position I had left was a

16   detective position, because we didn't have enough crime to

17   justify having a full-time detective.

18           But the detective that I had was a retired guy from

19   Westminster that I knew, plus he was a VIN inspector.  So he

20   was doing my VIN inspections and the little bit of detective

21   work I had.  He left to go to DMV, so I needed somebody that

22   had the same experience.

23           And one of the officers told me that they knew a guy.

24   Which is -- one of the officers said, hey, I know somebody.

25   Well, tell him to put in an app.  He put in an app.  He had the

Toth - Direct

```
 1   experience I needed.  He had investigational experience and he

 2   was a certified VIN inspector.  So I brought him in,

 3   interviewed him and hired him, basically.

 4   Q.  Just so we're clear, when you say app, do you mean

 5   application?

 6   A.  Application, yes, ma'am.

 7   Q.  When you met with Mr. Reigenborn, when you were considering

 8   hiring him, did you tell him about your career in law

 9   enforcement?

10   A.  Yes.

11        MS. HALPERN:  Your Honor, if I may, does -- is there

12   notes -- do you have notes in front of you, Mr. Toth?

13        THE WITNESS:  No, it's my subpoena.

14        MS. HALPERN:  Okay.

15   BY MS. REDMOND:

16   Q.  About how long did Mr. Reigenborn work with you at the

17   Mountain View Police Department with you?

18   A.  About two years until he was elected Sheriff of Adams

19   County.

20   Q.  Did you develop a personal relationship with Mr. Reigenborn

21   while he worked at Mountain View?

22   A.  No.

23   Q.  I would like to talk with you -- you just mentioned

24   Mr. Reigenborn winning the election for Adams County Sheriff.

25   I'd like to talk to you about that 2018 election.
```

Toth - Direct

```
 1            Was Mr. Reigenborn still working at Mountain View when

 2    he ran his campaign for Sheriff in 2018?

 3    A.   Yes.

 4    Q.   Were you part of his campaign team?

 5    A.   No.

 6    Q.   Did you donate to his campaign?

 7    A.   No.

 8    Q.   Did you canvass any neighborhoods for him?

 9    A.   No.

10    Q.   Did you attend any of his campaign events?

11    A.   No.  The only campaign event I attended was the night of

12    the election.

13    Q.   Did Mr. Reigenborn tell you about any personnel changes he

14    wanted to make if he won the race for Sheriff?

15    A.   The only comments he made to me about that was that he

16    wanted to clean house because it was the good old boys, that

17    was the culture.  That's all he ever told me about it.  That's

18    all he ever said about it.

19    Q.   Did you know what that meant?

20    A.   I had a good idea.  I've been in the business a long time.

21            MS. HALPERN:  Object to form, speculation.

22            THE COURT:  Response?

23            MS. REDMOND:  Your Honor, I was just asking if

24    Mr. Toth knew what that meant.

25            THE COURT:  Sustained.
```

Toth - Direct

1    BY MS. REDMOND:

2    Q.  Mr. Toth, did you live in Adams County at the time of the

3    2018 election?

4    A.  No.

5    Q.  Could you have voted in the Adams County Sheriff election

6    at that time?

7    A.  No.

8    Q.  You mentioned that Mr. Reigenborn ultimately won the 2018

9    election; correct?

10   A.  That is correct.

11   Q.  After winning the election, did Mr. Reigenborn ask you

12   about your interest in working for the Adams County Sheriff's

13   Office?

14   A.  Well, he actually asked me before he won the election.  I

15   had two officers there that ran for Sheriff; Tyler Brown for

16   Arapahoe, Reigenborn for Adams.  They both won.

17          During conversations just around the police

18   department, both of them at one time said, hey, if I win, would

19   you be interested in working for me.  My comment to them was

20   the same to both.  I said, look, I got a good job, I'm a chief.

21   If you win, we'll talk, let me know, you know what I mean.

22          I'm in a position where me being involved just wasn't

23   a thing.  I'm a supervisor.  I'm the chief of police.  I don't

24   want nothing to do with any of that.  So they did say something

25   to me, both of them, before the election.  But that was the

Toth - Direct

1    comments that was made.

2    Q.  And then once Mr. Reigenborn won the 2018 election for

3    Adams County Sheriff, did he follow up with you again about

4    your interest in working at the Adams County Sheriff's Office?

5    A.  Yeah, he called me and wanted to know if I would come work

6    for him.

7    Q.  About when was that?

8    A.  I'm guessing within a week or so after he was elected.

9    When he won the election, a week or two, maybe, somewhere in

10   there.  It was shortly thereafter.

11   Q.  Do you recall what that conversation entailed?

12          MS. HALPERN:  Object to form, hearsay.

13          THE COURT:  Response?

14          MS. REDMOND:  Yes, your Honor.  With respect to

15   Mr. Reigenborn's statements, it would be 803(3) as to his then

16   existing mental state and plan.

17          THE COURT:  Counsel, approach.

18      (Continued on next page)

19

20

21

22

23

24

25

909
Toth - Direct

1        (At sidebar)

2        THE COURT:  Where are we going for this witness?  He's

3    been up there for 25 minutes.  I don't think he's said anything

4    that's relevant at all to anything in this case.  What is the

5    purpose of this witness?

6        MS. REDMOND:  We don't have too much more.  First, his

7    testimony about his qualifications and his IA were relevant,

8    counsel brought that up during their examination of

9    Mr. Reigenborn, that he hired Mr. Toth, despite knowing he had

10   been criminally charged relating to an IA back in 2005.

11       Where we're going with this witness specifically is,

12   once he joined the Adams County Sheriff's Office, about his

13   observations of what the culture was like and the changes they

14   made in that structure and his working relationship with

15   Mr. Reigenborn.  When he was in the role of division chief,

16   what that entailed, in terms of how closely they had to work

17   together and what discretion he had in running his department

18   and his implementation of policies.

19       THE COURT:  Let's get to those questions.  Let's move

20   forward.

21       MS. REDMOND:  Yes, your Honor.

22       (Continued on next page)

23

24

25

Toth - Direct                                                    910

```
 1        (In open court; jury present)

 2   BY MS. REDMOND:

 3   Q.  Mr. Toth, we were just talking about your conversations

 4   with Mr. Reigenborn after he won the 2018 election.

 5        Before he talked to you about coming to work for the

 6   Adams County Sheriff's Office, at that time, did he ask you

 7   about your political beliefs?

 8   A.  No.

 9   Q.  Did he ask you about your political party affiliation?

10   A.  No.  That had come up in general talk around the police

11   department in Mountain View when they were both running.

12   They're both running Democratic ticket.  I'm a staunch

13   Republican.  And they knew that, but it was an issue, it was

14   never brought up in reference to my employment there.

15   Q.  After Mr. Reigenborn won the 2018 election, did he tell you

16   about any changes he wanted to make at the Adams County

17   Sheriff's Office?

18   A.  No, just what I told you before.

19   Q.  When did you begin working at the Adams County Sheriff's

20   Office?

21   A.  I was hired January 14th of 2019.

22   Q.  And what division or what position were you hired in?

23   A.  The patrol division chief.

24   Q.  Working in the position of patrol division chief, what did

25   you observe about the culture of the patrol division in your
```

Toth - Direct

1    first six months at the agency?

2    A.  Basically, there was a lack of trust of administration.

3    There was a lack of willingness to go out and do the job for

4    fear of getting in trouble.  They just -- they didn't have any

5    trust in anybody, including myself when I first got there,

6    because they didn't know me.  So it was just fear and

7    intimidation, basically.

8    Q.  Did you speak with any of your subordinates in the patrol

9    division about why people seemed afraid to do their jobs?

10              MS. HALPERN:  Object to the form, your Honor.  This is

11   what we brought up earlier today about personal knowledge.

12              THE COURT:  Response?

13              MS. REDMOND:  Yes, your Honor.  I'm laying the

14   foundation, as we discussed earlier today, about an 803(21)

15   exception.

16              MS. HALPERN:  It is also hearsay.

17              THE COURT:  You can ask that question about whether he

18   spoke with people in patrol division about why people seemed

19   afraid to do their jobs without getting to what those people

20   said.

21              So the witness can answer if he spoke to people.  But

22   at this point, not as to what those people said.

23   BY MS. REDMOND:

24   Q.  Mr. Toth, just to restate the question.

25              Did you speak to any of our subordinates in the patrol

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

                            Toth - Direct

 1   division about why people seemed afraid to do their jobs?

 2   A.  Yes.

 3   Q.  And did any of the people you spoke with tell you anything

 4   specifically about Mark Mitchell?

 5           MS. HALPERN:  Object.  Same to form -- same objection.

 6   Sorry.

 7           Your Honor, if I may voir dire the witness, or we can

 8   talk about it --

 9           THE COURT:  Let's talk about it at the sidebar.

10           MS. HALPERN:  -- his deposition testimony.

11       (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Toth - Direct

1        (At sidebar)

2            THE COURT:  An exception to the hearsay is if it's

3    under 803(21), if it's being offered as character evidence,

4    that's where I think counsel is trying to go with this, to

5    offer about character evidence.  As long as they're specific

6    about did you talk about this person, did you talk about this

7    person, which is what counsel's question was.

8            MS. HALPERN:  But your Honor, the reason I said to

9    voir dire is because, in his deposition -- and I have the

10   testimony here -- it was not specific to any specific person.

11           THE COURT:  You can try to impeach him with that.  It

12   doesn't mean it gets excluded.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Toth - Direct                          914

1        (In open court; jury present)

2    BY MS. REDMOND:

3    Q.  Mr. Toth, did any of the subordinates you spoke with in the

4    patrol division tell you specifically anything specifically

5    about working with Mark Mitchell?

6    A.  Yes.

7    Q.  What did they tell you?

8    A.  Basically, that he was rude and mean to everybody.  And if

9    you weren't one of the guys that he liked, that you were just

10   treated poorly.

11   Q.  Did the subordinates you spoke with in the patrol division

12   tell you anything specifically about working with Timothy

13   Coates?

14   A.  Yes, basically the same, although what they -- what they

15   told me about Mr. Coates was that, although he was the division

16   chief of investigations, he had a lot of say so in what was

17   going on in patrol.  And same reason, he was standoffish,

18   vindictive.  Same thing about Mitchell, vindictive,

19   standoffish.  Just treated them poorly.

20   Q.  In your role as division chief at the Adams County

21   Sheriff's Office, did you work closely with Sheriff Reigenborn?

22   A.  Yes.

23   Q.  How often would you speak to one another when you worked in

24   that role?

25   A.  Well, for the first year, we talked all the time.  I mean,

Toth - Direct

1    probably close to almost every day of the week, including the

2    weekends, maybe not Sundays, but yeah, we talked a lot for at

3    least the -- had to be at least the first eight months for

4    sure.

5    Q.  Without getting into specifics of those conversations, what

6    was the nature of those conversations generally?

7    A.  A lot of the conversation was just about what I was doing,

8    what's going on in patrol, the things I'm looking at, the

9    things I'm hearing, the things I'm talking about, the things

10   we're trying to change.  His direction when he hired me was

11   change the culture.  That's the direction I got, change the

12   culture.

13        And we talked a lot about his position, because he had

14   never been in that position before.  The only rank he ever

15   achieved was a sergeant.  And now he's running one of the

16   biggest agencies, county agencies in the metro area.  So we

17   talked a lot about that, his responsibilities, the things I

18   learned as a chief from my training and command classes, all

19   that.  So we talked a lot about everything.  Talked a lot about

20   the Undersheriff.

21   Q.  In your opinion, is it important for a Sheriff to be able

22   to trust his command staff to carry his mission and policies

23   forward?

24   A.  Absolutely.  That's why he hires you.

25   Q.  When you began working at the Adams County Sheriff's

Toth - Direct

1    Office, did it seem like Mr. Reigenborn just wanted a yes man?

2    A.   No.   He even made a point of telling us at a division

3    meeting that he didn't want a yes man.

4    Q.   Did you know Timothy Coates, Gene Claps, Mark Mitchell or

5    Kevin Currier before you began working at the Adams County

6    Sheriff's Office?

7    A.   I knew Timothy Coates because I went to grade school with

8    him and his family, so I knew him basically my whole life.   I

9    knew him as an officer at Northglenn and when he went to Adams

10   County.

11        And Mark Mitchell, I didn't know him personally.   I

12   met him a couple times because his wife was a dispatcher for

13   the City of Westminster when I worked there, so I met him.   I

14   didn't really know him, but I met him.

15        The other two, no, I didn't know them.

16   Q.   Did Mr. Reigenborn ever tell you why he chose to revoke

17   their positions with the Adams County Sheriff's Office?

18   A.   Nope.   Nothing other than what I told you.

19   Q.   I'd like to talk with you about your responsibilities as

20   division chief of patrol when you were with the Adams County

21   Sheriff's Office.

22        What did your responsibilities include as division

23   chief of patrol?

24   A.   Well, as the division chief, I oversaw patrol, which

25   included the SWAT team, the bomb squad, our traffic unit, our

Toth - Direct

1    SET team, which is special enforcement team, our normal field

2    force, our juvenile services unit, and I had one civilian

3    manager who was head of records.  I oversaw all of those as

4    division chief.

5    Q.  Approximately how many years of experience did you have in

6    patrol before you became division chief of patrol?

7    A.  Every year up until I got there, even at Mountain View, I

8    was still on patrol.  I mean, a small agency, I covered on

9    calls, I answered calls, I made arrests, I went to different

10   things.  I mean, it wasn't my main function, but I had no

11   choice.  Because when I was at Mountain View, we had one

12   officer out at a time.  It was a small department.

13          We were right across the street from Denver, so we

14   were busy.  Not in the town itself, but Lakeside and Edgewater

15   were smaller agencies.  We were all on the same dispatch system

16   when I was there, Jefferson County dispatch.  They dispatched

17   for five agencies on their main channel; Morrison, Jefferson

18   County Sheriff's Department, Mountain View, Edgewater and

19   Lakeside.  So Lakeside, Edgewater and Mountain View usually,

20   because they were small, had one officer at a time.  So if they

21   needed help to cover, they would dispatch us to different

22   things, so -- yeah, I've been working street my whole career,

23   basically, yes.

24   Q.  And how much discretion did you have in running the patrol

25   division as division chief at Adams County Sheriff's Office?

                              Toth - Direct

 1   A.  Pretty much complete discretion.

 2   Q.  As a division chief, did you have access to confidential

 3   information?

 4   A.  Yes.

 5   Q.  Did you have input regarding the budget with respect to

 6   your division?

 7   A.  Yes.

 8   Q.  Could you change officer's assignments within your

 9   division?

10   A.  Yeah, just -- within the division, if somebody wanted to be

11   a training officer or stuff like that, we could change them.

12   If they wanted to go to traffic, yes.  We just couldn't do

13   promotions.  I couldn't do promotions in the division, that had

14   to run through the process and through the Sheriff.

15   Q.  I would like to speak with you briefly about why you left

16   Adams County Sheriff's Office.

17           Why did you leave?

18   A.  I was terminated.

19   Q.  When did that occur?

20   A.  May 19th, 2021.

21   Q.  Did you meet with Mr. Reigenborn before you were

22   terminated?

23   A.  Yes.

24   Q.  Did he tell you why he chose to terminate you?

25   A.  He said it was unsatisfactory performance.


                  SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

Toth - Cross

 1    Q.  Did you agree with that reason?

 2    A.  None whatsoever.

 3    Q.  Did the termination affect your retirement benefits?

 4    A.  No.

 5         MS. REDMOND:  I have no further questions, your Honor.

 6         THE COURT:  Cross-examination.

 7  CROSS-EXAMINATION

 8  BY MS. HALPERN:

 9    Q.  Good morning, Mr. Toth.

10    A.  Good morning.

11    Q.  So I'm going to have some follow-up questions, based on

12  what the attorney for the County asked you.

13         First, I want to ask you a little bit about that

14  transition time from Mountain View to the Adams County

15  Sheriff's Office.  You testified that you were originally

16  hired -- you had been working at Mountain View; is that right?

17    A.  Yes, ma'am.

18    Q.  And Mountain View had about 15 employees?

19    A.  10, was about the max.  When I started, there was 15, but

20  they're all part time.  Once I got the city to -- or the town

21  to buy off on full time, we had money, those type of things, it

22  was around 10 officers.

23    Q.  And --

24    A.  Total.  And that included me.

25    Q.  Go ahead, sorry.

Toth - Cross

1   A.   Sorry.

2   Q.   And while you were Chief of Police at Mountain View, you

3   hired Rick Reigenborn; right?

4   A.   Yes, ma'am.

5   Q.   And that was in about 2017?

6   A.   I thought it was '16, but it might have been '17.  Yeah, it

7   was just a couple years, so it might have been '17.  I don't

8   remember off the top of my head.

9   Q.   You said you hired him as a part-time detective and VIN

10  inspector?

11  A.   Yes.

12  Q.   So you had worked with him for about two years before you

13  went to the Adams County Sheriff's Office?

14  A.   Correct.

15  Q.   And you were his boss in 2018, when Mr. Reigenborn was

16  campaigning for Adams County Sheriff?

17  A.   Correct.

18  Q.   And I want to ask you about some of the conversations that

19  you had with Mr. Reigenborn kind of in that interim period when

20  he was running for office and you were his boss, okay.

21       So you and Mr. Reigenborn occasionally spoke about you

22  working for him if he won the 2018 election; is that right?

23  A.   Not occasionally.  It was once he asked me.

24  Q.   And the one thing Mr. Reigenborn did say to you before he

25  was elected was that, if he won, he would go in there and clean

Toth - Cross

 1   house; is that right?

 2   A.  Yes.

 3   Q.  But you didn't ask him what he meant, what he meant by

 4   that; isn't that right?

 5   A.  Correct.

 6   Q.  And he didn't say anything about good old boys; isn't that

 7   right?

 8   A.  No, he did.

 9   Q.  Do you recall when I deposed you?  It was probably about

10   four years ago?

11   A.  Yes, I do.

12   Q.  Okay.  And you swore to take an oath; right?

13   A.  Yes.

14   Q.  And tell the truth?

15        MS. HALPERN:  Could we please pull up Mr. Toth's

16   deposition transcript.  Turn to Page 46.

17   Q.  If you could please read Page 46, Lines 10 to 22.

18   A.  Okay.

19   Q.  Mr. Toth.

20   A.  Ten, question --

21   Q.  Remember -- it's okay, I can do that, but follow along.

22   A.  Okay.

23   Q.  So question:  "Did he ever tell you kind of, you know, what

24   changes he wanted to maybe make at the ACSO if he were elected

25   for Sheriff?"

Toth - Cross

1          Answer:  "The only comment he ever made to me before

2    he was elected was that if he won, he would go in there and

3    clean house."

4          Question:  "I'm sorry, I didn't hear you."

5          "The only comment he made to me before he got elected

6    was that if he won, he would go in there and clean house."

7          "Clean house, do you know what he meant by that,

8    Sheriff Reigenborn, when he said that?"

9          "Nope, I didn't ask."

10         Did I read that right?

11   A.  Yes.

12   Q.  Within the first couple days of winning the 2018 election,

13   he called you and offered you a job; is that right?

14   A.  Yeah, within the first week or so.  Week or two, I don't

15   remember, but yeah.

16   Q.  And he asked you if you would come work for him, to which

17   you responded you would do so under two conditions, you did not

18   want to be Undersheriff and you did not want to work in a jail;

19   is that right?

20   A.  That is correct.

21   Q.  In response, Mr. Reigenborn said okay and offered you the

22   patrol division chief; is that right?  The position?

23   A.  Well, when I made that comment, he said, well, you know,

24   what do you want?  I said, I prefer patrol.  And he said -- and

25   basic comments was okay.

Toth - Cross

1   Q.  And you did not discuss any other personnel decisions while

2   Mr. Reigenborn was waiting to take office; is that right?

3   A.  That is correct.

4   Q.  He did not ask your advice on any personnel matters?

5   A.  No.

6   Q.  He did not talk to you about any operational changes he was

7   interested in implementing?

8   A.  No.

9   Q.  And Mr. Reigenborn mentioned he wanted to change the

10  culture of the ACSO to you?

11  A.  Yes.

12  Q.  But he never told you what he thought needed to be changed

13  in the culture?

14  A.  All he said is -- that I remember, you know, I -- that he

15  said it was toxic.  That was the only comment I can ever think

16  I remember hearing him saying, at this juncture, yes.

17         MS. HALPERN:  If we could pull back up Mr. Toth's

18  deposition transcript and bring it to Page 58.

19         Mr. Toth, if you could -- please, can I draw your

20  attention to Page 58, 12 through 24.

21         Question:  "Did he discuss any kind of operational

22  changes that he wanted to make at the ACSO?"

23         "Just change the culture.  That's the only thing he

24  said, change the culture."

25         "What do you recall about him saying that he wanted to

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

924

Toth - Cross

1  change the culture?"

2          "Before?"

3          Question:  "Correct, before."

4          Answer:  "Nothing.  He just said he wanted to change

5  the culture."

6          Question:  "Did he tell you what he thought needed to

7  be changed in the culture?"

8          Answer:  "Never."

9          Did I read that right?

10  A.  Yes.

11          MS. HALPERN:  If we could please take that down.

12          I apologize for speaking so quickly.  I do do that

13  sometimes.

14  Q.  So he didn't talk -- Mr. Reigenborn didn't talk to you

15  about any written policies he wanted to change before he got

16  into office; is that right?

17  A.  That is correct.

18  Q.  And he did not mention any of the gentleman who are the

19  Plaintiffs in this lawsuit at all?

20  A.  No.

21  Q.  In fact, you didn't have any conversations about anybody

22  before you got hired?

23  A.  Correct.

24  Q.  I want to change now to the early period at the Adams

25  County Sheriff's Office when you were working there, okay.

925
Toth – Cross

 1            You testified that your first day was January 14th,

 2    2019; is that right?

 3    A.  That's when I was sworn in, correct.

 4    Q.  And you didn't know beforehand that Mr. Reigenborn had made

 5    a decision to terminate these four gentleman sitting in the

 6    room today?

 7    A.  No.

 8    Q.  And you had never consulted with him or talked to him about

 9    that?

10    A.  No.

11    Q.  And you had never worked with any of them?

12    A.  That is correct.

13    Q.  For the first three or four months, you still went back and

14    forth between your two jobs in Mountain View and as a division

15    chief at the Adams County Sheriff's Office?

16    A.  That is correct.

17    Q.  So you were working three days a week at the Adams County

18    Sheriff's Office and two days a week at Mountain View?

19    A.  Yes.

20    Q.  And when you got to the ACSO, you took about six months to

21    figure out what was going on and what the culture was.  I think

22    you were asked a little bit about that time period; right?

23    A.  Yes.

24    Q.  And your observations after six months was that nobody in

25    the patrol department wanted to do police work?


            SADIE L. HERBERT, RPR, RCR
   901 19th Street, Denver, CO 80294  (303)335-2105

Toth - Cross

1   A.  Was that a question?

2   Q.  Yes.

3        Was that your observation after six months, that

4   nobody in the patrol department wanted to do police work?

5   A.  That was one of the observations that I made, yes.

6   Q.  And that the sergeants didn't know how to discipline people

7   because the ACSO was not allowing them to do so?

8   A.  Correct.

9   Q.  And those are the cultural changes you discussed with

10  Mr. Reigenborn after six months?

11  A.  Yeah, that was part of them, yes.

12  Q.  And the only other one you discussed with him was the

13  deputies' fear of getting in trouble if officers did police

14  work; is that right?

15  A.  Yes.

16  Q.  And there was no other cultural changes that you discussed

17  with Mr. Reigenborn during those first six months?

18  A.  Like I told you in my deposition, we had a lot of

19  conversations.  I don't remember everything that we talked

20  about.  We talked about everything, in terms of patrol and just

21  his responsibilities.

22  Q.  But those were the three cultural changes you discussed

23  with Mr. Reigenborn after -- during those six months?

24  A.  Yes.

25  Q.  And you knew up front, once you had your initial

Toth - Cross

1   conversation with him and you started working there, that he

2   wanted to change the culture, in terms of their attitude of

3   being afraid to do police work; is that right?

4   A.  Yes.

5   Q.  After that, you attempted to implement changes like

6   reinstating chases and pursuits to catch criminals?

7   A.  Correct.

8   Q.  And TBI training?

9   A.  Correct.

10  Q.  And you trained your sergeants on instituting discipline

11  more, advising them to consider this part of their job

12  responsibilities and telling them that, if they wanted to come

13  in here and bring an officer into their office and yell at him

14  because he screwed up, yell at him.  If you need to write

15  somebody up, then write them up.  Is that right?

16  A.  Yes.

17  Q.  And those were the changes you made in the patrol division?

18  A.  Those were some of them, yes.

19  Q.  And you didn't have any other conversations with

20  Mr. Reigenborn about changes to the culture in your division?

21  A.  Like I said, I probably did.  I don't remember everything

22  that we talked about.  I mean, that's -- you are asking a lot

23  of things about too many conversations, and that was, what now,

24  four or five years ago.

25  Q.  Let me see if this refreshes your recollection.

Toth - Cross

 1            MS. HALPERN:  Could we please bring up Mr. Toth's

 2    deposition transcript and go to Page 75.  It's going to

 3    actually start on Page 72.  I think we can just do 72.

 4    Q.  Mr. Toth, can you please read 72 and see if that refreshes

 5    your recollection.

 6    A.  Okay.

 7    Q.  Does that refresh your recollection that those are the

 8    changes you spoke about with Mr. Reigenborn?

 9    A.  Yes.

10    Q.  And Mr. Reigenborn --

11            MS. HALPERN:  You can take that down.  Thank you.

12    Q.  And Mr. Reigenborn did not discuss any general themes of

13    things he wanted to change in your division with you?

14    A.  No.  He pretty much left it up to me.

15    Q.  Just what you brought to him was what you discussed?

16    A.  Correct.

17    Q.  And I want to ask you about some of your duties as the

18    division chief, okay.

19            Now, you just testified a little bit about what some

20    of your duties were when the County's attorneys asked you about

21    that; is that right?

22    A.  Yes.

23    Q.  But as a division chief at the ACSO, you didn't have any

24    input into who was transferred or demoted; right?

25    A.  I mean, in what -- in what relevance?  In what terms?  I

Toth - Cross

1   mean, because not as far as demotions.  I had nothing to do

2   with those.  But if people wanted to be transferred, we had a

3   say so in some of that stuff, in terms of just general transfer

4   stuff.

5          MS. HALPERN:  If we could please pull up Mr. Toth's

6   deposition and turn to Page 80.

7   Q.  You could turn your attention to Lines 20 through 25.

8          Do you recall I asked you:  "Did you have any input

9   into who was, you know, transferred, demoted, et cetera when

10  you came on to work with Sheriff Reigenborn?"

11         And you answered:  "None whatsoever."

12         Isn't that right?

13  A.  Yeah.  But there's a context to that statement.

14  Q.  Mr. Reigenborn did not discuss any promotions or transfers

15  with you; is that right?

16  A.  To the best of my recollection, and this was being

17  discussed is when I first came on, not throughout my career,

18  not throughout the whole time I was there.  And maybe I

19  misunderstood it at the time.  But to the best of my knowledge,

20  this is when I first came on, I had no say so in any of that

21  stuff.

22  Q.  And Mr. Reigenborn also did not discuss any promotions or

23  transfers with you; is that right?

24  A.  In the beginning, no.

25  Q.  And you had no input into demotions, promotions or

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Toth - Cross

1    terminations?

2    A.  No.

3    Q.  And you were overruled every time, but once you recommended

4    termination to the Sheriff, and that one time -- okay, you

5    were -- sorry.

6         You were overruled every time, except the one time

7    when you made a recommendation to the Sheriff about

8    termination; is that right?

9    A.  I believe so.

10   Q.  And the one time that you were not overruled was because a

11   deputy was arrested for sexual misconduct?

12   A.  Correct.

13   Q.  And you were hired by Mr. Reigenborn because of your

14   experience, and your political party affiliation made no

15   difference in whether you could successfully perform as a

16   division chief; isn't that right?

17   A.  Yes.

18   Q.  And you have never asked any of your commanders if they had

19   supported Sheriff Reigenborn because it doesn't matter to the

20   successful performance of their job duties; isn't that right?

21   A.  Yes.

22   Q.  And you would maintain the same for sergeants, that who

23   they supported was not important to the successful performance

24   of their job duties?

25   A.  Correct.

Toth - Cross

1    Q.  And you spoke a little bit about your termination hearing

2    with Mr. Reigenborn.

3              Do you recall that?

4    A.  Yes.

5    Q.  And you observed that Mr. Reigenborn is a wishy-washy hot

6    head who, when he gets mad, he gets mad to the point of

7    screaming and carrying on; isn't that right?

8    A.  Yes.

9    Q.  And Mr. McLallan came to your house two days earlier to

10   deliver your termination notice and tell you about that notice

11   of hearing; isn't that right?

12   A.  Who did you say?

13   Q.  Mr. McLallan?

14   A.  Oh, yes.  The Undersheriff, yes.

15   Q.  When he was trying to comfort you, he said, you know this

16   is how Mr. Reigenborn is, he's just mad about something, and

17   it's your turn.  He then told you that -- Mr. McLallan told

18   you, he gets that stuff all the time; isn't that right?

19   A.  Yes.

20   Q.  And during your termination, when you were trying to defend

21   yourself against his laundry list of performance deficiencies

22   against you, he lost his temper?

23   A.  Yes.

24   Q.  During the meeting?

25   A.  Yes.

                                                            932
                              Toth - Cross

1    Q.  And he got so angry that the county attorney, Kasandra,

2    told him to calm down and asked to take a break?

3    A.  Correct.

4    Q.  He also became so angry and frustrated when you were saying

5    his allegations weren't true that halfway through, he tried to

6    call the meeting off and end it?

7    A.  Yeah, he tried to call off continuing.  I don't know if he

8    wanted to end it.  I don't know what he really said -- I mean,

9    what he really wanted.  He just said, let's just call it here.

10   And the attorneys argued and said, no, we're not going to do

11   that, we're going to continue with the hearing.

12   Q.  And he was very angry and frustrated at that time?

13   A.  Correct.

14            MS. REDMOND:  Objection, relevance.

15            THE COURT:  Response?

16            MS. HALPERN:  Your Honor, this goes to the

17   impulsiveness of Mr. Reigenborn.

18            THE COURT:  Overruled.

19   BY MS. HALPERN:

20   Q.  And I want to ask you about your personal knowledge about

21   the four gentleman who are sitting here today and some of the

22   decisions that were made with respect to their employment;

23   okay?

24   A.  Okay.

25   Q.  Now, as we discussed, Sheriff Reigenborn did not discuss

Toth - Cross

1    with you any of the personnel decisions he had made when he

2    first came on board and took office?

3    A.  Correct.

4    Q.  He never spoke with you about why he let T.J. Coates go?

5    A.  Correct.

6    Q.  He never said anything to you about why he terminated Gene

7    Claps?

8    A.  Correct.

9    Q.  He never said anything to you about why he terminated Mark

10   Mitchell?

11   A.  Correct.

12   Q.  He never said anything to you about why he terminated Kevin

13   Currier?

14   A.  Correct.

15   Q.  Mr. Reigenborn actually never ever discussed with you the

16   reason he terminated the Plaintiffs your entire time at the

17   Adams County Sheriff's Office?

18   A.  Not specifically, no.

19   Q.  And Mr. Reigenborn never shared with you why the Plaintiffs

20   weren't good for the organization or in line with his line of

21   thinking?

22   A.  The only comment he ever made was it was a toxic

23   organization.

24   Q.  But he didn't share any specifics about the Plaintiffs

25   sitting here?

Toth - Redirect

 1    A.  No.

 2    Q.  And he didn't tell you anything about the four Plaintiffs

 3    and why they didn't align with his future trajectory at the

 4    Adams County Sheriff's Office; right?

 5    A.  Correct.

 6    Q.  And you don't know anything about any of the Plaintiffs'

 7    performance when they worked at the ACSO?

 8    A.  Correct.

 9    Q.  And all those complaints you described about staff, you are

10    just referring generically to staff; right?

11    A.  I don't understand your question.

12    Q.  I believe you were talking earlier that you had spoken to

13    employees kind of generically about a situation before you were

14    there.

15    A.  Yes.

16    Q.  And in those conversations that you had with them, you

17    weren't referring specifically to Plaintiffs, just generically

18    to the change in leadership that occurred?

19    A.  Yes.

20         MS. HALPERN:  And I believe those are all the

21    questions I have.  Thank you, Mr. Toth.

22         THE COURT:  Redirect.

23         MS. REDMOND:  Briefly, your Honor.

24    REDIRECT EXAMINATION

25    BY MS. REDMOND:

Toth - Redirect                                               935

1   Q.  Mr. Toth, just to clarify, when you began working in the

2   patrol division, as division chief, you testified that you

3   spoke with line level subordinates in your division; right?

4   A.  Correct.

5   Q.  And those line level subordinates within your division --

6   A.  Yes.

7   Q.  -- did they tell you specifically about the experiences

8   they had working with Mark Mitchell?

9   A.  Nothing more than what I told you, as far as his attitude

10  and the way he -- the way they were treated by him.

11  Q.  And the same question, did they tell you specifically about

12  their experience working with Timothy Coates?

13  A.  The same, same thing I already said about his attitude and

14  standoffishness and just treated them all badly.

15  Q.  We discussed in your direct examination, and you were asked

16  this in cross-examination, about a description of the culture.

17  You testified that Mr. Reigenborn described the culture as

18  being toxic; is that right?

19  A.  That is correct.

20  Q.  Would you agree with that description, based on the first

21  six months you spent at the agency?

22  A.  Absolutely, absolutely.

23          MS. REDMOND:  Nothing further, your Honor.

24          THE COURT:  Do our jurors have any questions for this

25  witness?


              SADIE L. HERBERT, RPR, RCR
       901 19th Street, Denver, CO 80294  (303)335-2105

                                936
                        Toth - Redirect

1              Thank you.  You may be excused.

2              THE COURT:  It's about 11:45.  Rather than attempting

3      to begin a new witness at this point, I think now is a good

4      time for us to break.

5              Counsel, very briefly.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

937
Toth - Redirect

1        (At sidebar)

2            THE COURT:  You only have one witness left.  About how

3    long is that witness?

4            MR. THAPA:  An hour.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          Toth - Redirect

 1          (In open court; jury present)

 2              THE COURT:  Members of the jury, we're moving along

 3      pretty well.  There's some things we may need to take up at the

 4      lunch break, but we are moving I think ahead of schedule at

 5      this point, so I'm going to give you a little longer lunch

 6      break, today.  If you can come back at 1:00 o'clock.

 7              (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1      (In open court; jury not present)

 2          THE COURT:  Is there anything else we need to take up

 3  at the lunch break?

 4          MS. HALPERN:  Your Honor, I think the question of a

 5  rebuttal witness, potential rebuttal witness.

 6          THE COURT:  Why don't we plan to be back by

 7  12:40 p.m., then.  Do you think 20 minutes is enough to address

 8  that?

 9          MS. HALPERN:  Your Honor, if I may just add a

10  consideration.  If we deal with it now, we would know one way

11  or the other.

12          THE COURT:  Let me give my court reporter a quick

13  break.

14          (Recess)

15          THE COURT:  Let me ask, what testimony are you seeking

16  to elicit in rebuttal from that witness?

17          MS. HALPERN:  Your Honor, if I may, there was a few

18  chapters.

19          The first one would be Mr. Gregory's time working, he

20  has worked with all of the Plaintiffs, and since their

21  general -- you know, their job performance has been critiqued

22  by Defendant's witnesses, we think he should be able to come

23  back on and talk about the positive experiences in performance

24  that he had directly working with all of them.  So that was one

25  section of testimony.

1          The other one is Mr. Toth had just talked about kind

2    of the culture after he came and while he was there after the

3    Plaintiffs were no longer there.  He was talking about the

4    culture, he just finished on that testimony, so we would like

5    to use Mr. Gregory to counter that description of the culture

6    that was at the Adams County Sheriff's Office in those months

7    immediately following.

8          And then the political loyalty defense, it seems

9    fairly basic, but you know, Mr. Gregory could obviously testify

10   about the fact that he did not think it was particularly

11   relevant who you supported in the election in order to perform

12   the job duties, including of the Undersheriff, given the nature

13   of his progression at the Adams County Sheriff's Office.

14         And we would like to note that we did endorse

15   Mr. Gregory in the final pretrial order and disclose him in

16   initial disclosures in September of 2022 -- that's a while

17   ago -- but he's also included in our final pretrial order as a

18   may call, and that's ECF 120.

19         MR. THAPA:  Your Honor, we object to Mr. Gregory being

20   called.  Obviously, none of the three topics that counsel just

21   referred to -- well, all of the three topics that counsel just

22   referred to are outside the scope of the direct examination.

23         THE COURT:  But that's not what's at issue.  The issue

24   is can he be now called as a rebuttal witness in the case, and

25   scope of examination is no longer an issue, then.

          1          MR. THAPA:  I understand, your Honor.

          2          He should not be called as a rebuttal witness at this

          3    point.  203 F.3d 1202, Tenth Circuit 2000, I believe it's

          4    pronounced Koch v. Koch Industries, it's spelled K-O-C-H.  When

          5    Plaintiffs seek to rebut defense theories, which they knew

          6    about or reasonably could have anticipated, rebuttal testimony

          7    is not proper.

          8          All this testimony that counsel just referred to,

          9    these are the theories that have been in play throughout the

          10    litigation; the culture, political loyalty, of course, and how

          11    the Plaintiffs contributed to the culture or the impression

          12    that people have of Plaintiffs, these are all things that --

          13          THE COURT:  Your defense, they don't need to

          14    anticipate -- they don't need to rebut your defense in their

          15    affirmative case.

          16          MR. THAPA:  Well, your Honor, they never called him as

          17    a witness in their case.  This is not proper rebuttal

          18    testimony, because these are issues, defense theories that they

          19    knew or should have known about before they -- before today.

          20          THE COURT:  Are you saying that your defense, the

          21    political loyalty defense -- that's one of the topics they plan

          22    to inquire into -- are you saying that, in their affirmative

          23    case, they need to knock down your affirmative defense?

          24          MR. THAPA:  They wouldn't necessarily need to knock it

          25    down.  But the topics and issues that are relevant to that is

1    something they could have anticipated, reasonably knew about.

2    That's what Koch Industries says.

3                THE COURT:  The objection is overruled.

4                I think these are proper areas on rebuttal testimony,

5    and I will permit that witness to be called to explore those

6    topics in rebuttal.

7                Do you anticipate any other rebuttal witnesses at this

8    point?

9                MS. HALPERN:  Your Honor, maybe, though I've not

10   talked to our clients.  But it would be extremely short, like

11   30 seconds, just to get some statistical data down on how many

12   people they supervised.

13               THE COURT:  So jury comes back at 1.  We have another

14   witness that may be an hour and a half.  I can't imagine more

15   than a half an hour with the rebuttal witness that I'm

16   permitting.  That takes us to 3, 3:30 or so.  My intent is to

17   release the jury at that point.  We'll work on jury

18   instructions, and then close tomorrow morning.  And it should

19   be to the jury by noon tomorrow.

20               I'll instruct the jury first tomorrow morning, and

21   then do closings.  That way, if you wish to refer to the

22   instructions, we can do so.

23               We'll be in recess.

24               (Lunch recess)

25               (Continued on next page)

943

1                          AFTERNOON SESSION

2                              1:07 p.m.

3          (In open court

4               THE COURT:  Let's bring in our jury.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Members of the jury, I wanted to talk to

3     you a little about where things stand.

4          As I had indicated before the break, we're moving

5     along a little faster than was anticipated.  I anticipate that

6     we are likely going to finish up all evidence today and

7     probably a little bit early.

8          There's some legal items that we all need to work on

9     outside of your presence once that's completed, before we can

10    turn the case over to you.

11         But I anticipate that the evidence will be concluded

12    today, let's say probably a little bit early, 3, 3:30,

13    something like that.  I'll then release you for the day so we

14    can work on items we need to work on.

15         And then tomorrow morning, I am anticipating it will

16    be jury instructions and then closing arguments.  And then it

17    will finally be to you, and you all can finally talk about the

18    case amongst yourselves.

19         Can the defense call their next witness.

20         MR. THAPA:  Yes, your Honor.

21         The Defendant calls Chris Laws.

22    CHRISTOPHER LAWS,

23        called as a witness by the Defendant,

24        having been duly sworn, testified as follows:

25    DIRECT EXAMINATION


                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Laws - Direct

1  BY MR. THAPA:

2  Q.  Good afternoon, Mr. Laws.

3  A.  Good afternoon.

4  Q.  Mr. Laws, when did you start working in law enforcement?

5  A.  It was in 1992.

6  Q.  And where did you start working?

7  A.  The Adams County Sheriff's Office.

8  Q.  Please walk the jury through the positions you have held at

9  the Adams County Sheriff's Office.

10  A.  So I started in '92 as a facilities maintenance.  At that

11  time, we weren't hiring for deputies, so I took that job.

12          Then, within a year, I tested for deputy.  And in

13  the -- December of '93, I was sworn in as a deputy.  Then

14  throughout that, I went to 1999, I became the booking sergeant.

15  Then I worked as a sergeant from 1999 to 2008.  2008 I became

16  an acting commander.  And then was promoted to -- at that time

17  it was lieutenant, but then was promoted to full-time commander

18  the following year, 2009.

19          And then I retired in 2016 at the rank of commander.

20  I was the admin commander at the jail.

21          And then after -- I came back in 2019 as the division

22  chief, after Sheriff Reigenborn asked me to come back.  And I

23  served as a division chief for four years.  And then was

24  demoted to commander on patrol from 2019 -- no, I'm sorry,

25  20 -- what was the last one, 2022 until '24 when I left, which

Laws - Direct

1    was May of this year -- of last year.

2    Q.  I'm going to ask you about those more specifically.

3         So you mentioned that you worked as the admin

4    commander in the jail?

5    A.  Yes.

6    Q.  Until you retired in 2016 ==

7    A.  Correct.

8    Q.  -- for the first time.

9         Did you ever work as a technical services commander?

10   A.  Yes.  So I was also -- I started as the admin commander,

11   then I became the technical services commander for a few years.

12   And then went back to the admin commander right before -- like

13   a year before I retired.

14   Q.  And what is a technical services commander?

15   A.  So technical services commander was originally a civilian

16   position, and they changed it to an official position for law

17   enforcement.  And in that position, we were in charge of the

18   medical unit.  I was in charge of the kitchen.  Anybody who had

19   a contract through the facility was under the technical

20   services manager, as well as all of the court services staff

21   that worked at the jail, and the record tech staff that worked

22   at the jail.

23   Q.  And these positions that you have mentioned, these are all

24   within the jail division at the Adams County Sheriff's Office?

25   A.  Yes, they are.

Laws - Direct

1  Q.  Tell the jury about the some of the duties you had as an

2  administrative commander.

3  A.  So as an administrative commander, you are in charge of

4  booking people, at that time, we're in charge of the

5  courthouse.  Also, in charge of basically the day-to-day duties

6  within the facility.  You're in charge of making sure that

7  everything was going smooth.  If there was any meetings or

8  anything that should be -- the captain couldn't go to or the

9  chief, at that time, then that would be my responsibility to go

10 to in their place.  Basically, I run the jail for the chief,

11 and the chief just had to worry about the major things.

12 Q.  Did you receive any leadership awards while working at the

13 jail division?

14 A.  I did receive the Dale R. McLaughlin award.  I received

15 that award for when the H1N1 flu claim.  Due to my planning,

16 along with the other staff members, we were able to keep the

17 H1N1 flu to a minimum.  So that was one of the things that I

18 got the award for.

19 Q.  And that was also for your work in the jail division of the

20 Sheriff's Office?

21 A.  Yes.

22 Q.  You mentioned that you retired for the first time in 2016.

23          Why did you retire?

24 A.  I was having some back issues, and they were starting to

25 become a problem.  And I let them know that I didn't want to

Laws - Direct

1   get promoted because, at that time, they were talking about

2   promoting somebody to the chief position.  And I told them, I'm

3   really not there.  My doctor said I should probably retire.  So

4   I retired in 2016 due to back issues.

5   Q.  What did you do after you retired in 2016?

6   A.  I worked for a couple of places.  I worked for Top Cops

7   Driving School for about a year and a half, teaching kids how

8   to drive.  And then I also worked for Adams 12 School District.

9   I was a campus supervisor at Westlake Middle School.

10  Q.  And why did you choose to take those positions?

11  A.  I really wanted to work with kids to try and keep them on

12  the right path.  And I picked the middle school because it

13  seems like a lot of middle school kids get picked on a lot, and

14  I just wanted to be an influence within the school to help make

15  a difference.

16  Q.  And when you retired in 2016, you left the commander

17  position under the McIntosh administration; is that correct?

18  A.  Correct.

19  Q.  I want to ask you about former Sheriff Reigenborn.

20       Prior to retiring in 2016, how well did you know

21  Mr. Reigenborn?

22  A.  I knew him.  We would see each other once in a while, like

23  if he happened to come to the jail for something.  Other than

24  that, I didn't really know him.

25  Q.  Were the two of you friends?

Laws - Direct

1    A.  No.

2    Q.  Did your wife ever work with Mr. Reigenborn at the

3    Sheriff's Office?

4    A.  Yes.  She was in the IT department at the Sheriff's Office,

5    and so she worked more with him, because she was stationed down

6    at patrol for a while.  And so she kind of worked directly with

7    all of the sergeants that were down on patrol, and he was one

8    of them.

9    Q.  When you IT, information technology department?

10   A.  Yes.

11   Q.  Focusing on the 2018 election for Adams County Sheriff.

12            Did your wife make the campaign website for

13   Mr. Reigenborn?

14   A.  Yes, she did.

15   Q.  And did you attend Mr. Reigenborn's campaign kickoff for

16   the election in 2018?

17   A.  Yes, I did.

18   Q.  Why did you attend that?

19   A.  My wife asked me to go with her.  She was going, and I told

20   her I would go with her.

21   Q.  Did you attend any other of Mr. Reigenborn's campaign

22   events?

23   A.  No.

24   Q.  Did you attend any of his campaign fundraisers?

25   A.  No.

Laws - Direct

1   Q.  Did you work on preparing Mr. Reigenborn's campaign

2   website?

3   A.  No.

4   Q.  Were you on his campaign committee?

5   A.  No.

6   Q.  Did you place any yard signs in his support?

7   A.  No.

8   Q.  Did you solicit any donations on his behalf?

9   A.  No.

10  Q.  Did you host any fundraiser events for him?

11  A.  No.

12  Q.  What was the extent of any discussions you had with your

13  wife about her involvement in making this website and the

14  campaign?

15  A.  She told me that he had asked her to do the website.  I

16  said, that's a lot of work.  She was like, I don't mind.  Other

17  than that, it was just if she was updating something, she would

18  say, I just updated the website or something.  But we rarely

19  ever talked about it.

20  Q.  Moving forward to after the 2018 election.

21       Did you speak with Mr. Reigenborn about potentially

22  joining his administration at some point?

23  A.  So it was after the election, I don't remember exactly what

24  day.  I know it was a Friday.  I was at an afterschool

25  function, I think the choir was singing, and I had gone to that

Laws - Direct

1    at the Horizon High School.  And I received a phone call from

2    Reigenborn.  And so I answered it, and I said, you know, what's

3    going on.

4            He said, you know, I've been talking to people and

5    several people say that because of your past experience of

6    working through the jail and knowing it inside and out, that I

7    would like to offer you a position as the division chief of the

8    jail.  And I told him that -- thank you for the offer, I'm not

9    sure, let me talk to my wife, see what's going on, and I'll get

10   back to you.

11           So eventually, I talked to Pam that night.  And I was

12   a little worried about what would happen with my retirement.

13   So I made a couple of phone calls to the County, just to find

14   out how it would affect my retirement.  And it seemed like it

15   was going to be okay.  And so I went ahead and called

16   Reigenborn back and told him that I would serve as his division

17   chief.

18   Q.  And this wasn't all in the same day; correct?

19   A.  No.  That call was Friday, and then I think the Monday is

20   when I talked to the County about my retirement.  So it was

21   probably Monday or Tuesday when I called him back.

22   Q.  And was this after he had already been elected Sheriff?

23   A.  Yes.

24   Q.  Prior to that call, after he had been elected Sheriff, did

25   you tell anyone that you would be willing to join his

Laws - Direct

1    administration?

2    A.  No.  I didn't talk to anybody.

3    Q.  During that call that you just mentioned between you and

4    Mr. Reigenborn, did he tell you that he was going to terminate

5    Mr. Claps?

6    A.  He didn't say what he was going to do with anybody.  He was

7    just interested in what I was willing to do for him.

8    Q.  Let's talk about Mr. Claps.

9         Did you ever work with him?

10   A.  Not directly with him.  But I think he worked on the

11   opposite side of the week that I did in the jail.  So if I was

12   over there, maybe once in a while, we would cross paths, but

13   never directly with him.

14   Q.  Let's focus your attention to prior to retiring in 2016.

15   A.  Okay.

16   Q.  Were you already working in the jail division when

17   Mr. Claps was assigned there?

18   A.  Yes.

19   Q.  In 2015?

20   A.  Yes.

21   Q.  Tell us about your experience when you were working

22   together in the same division.

23   A.  So he had a position -- at one point, he was going to take

24   over for the admin commander position, because I was leaving.

25   And so I had to train him on just some of the stuff that we had

Laws - Direct

1    as an admin commander position, but that was it.

2    Q.  And what was your impression of him during that time?

3    A.  He wasn't really interested in what I had to say.  He acted

4    like he already knew the job and didn't need to have any

5    information from me.

6    Q.  And at the time that you worked with Mr. Claps at the jail,

7    in 2016, had you already made it known that you were going to

8    retire?

9    A.  Yes.

10   Q.  During that experience, what was your impression of whether

11   Mr. Claps respected people's opinions?

12   A.  No, he did not respect -- at least not my opinion.  I know

13   that he kind of liked to do things his own way.

14   Q.  Did you get the impression that he was polite?

15   A.  No.

16   Q.  You mentioned your extensive history working in the jail

17   division.

18        What was Mr. Claps' reputation among the employees in

19   the jail division?

20        MS. BUTLER:  Objection, speculation, 404(b) and

21   cumulative and hearsay.

22        THE COURT:  Response?

23        MR. THAPA:  Your Honor, it's 803(21), reputation and

24   relevant to the jail division.  It's not hearsay, FRE 45

25   permits reputation.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

954
Laws - Direct

1              THE COURT:  Counsel.

2         (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Laws - Direct                                955

1         (At sidebar)

2         THE COURT:  So I'm allowing some of this testimony,

3    rebuttal testimony for contrary evidence.  We're deep into the

4    weeds here as to whether or not Mr. Claps was a good employee,

5    nice employee, bad employee.  That's not really all that

6    relevant to the decision here.  It does, to some extent,

7    support testimony of Mr. Reigenborn, that Mr. Reigenborn

8    terminated him based on this, but this is about the third

9    witness we have had on this.  I think we're getting into the

10   weeds on this.  Let's move on from that.

11        MR. THAPA:  Your Honor, if I could just make a record.

12        We're not necessarily going into if he was a good

13   employee or bad.  As you have heard, Mr. Reigenborn gave the

14   impression of how Mr. Claps was received in the community with

15   the culture of fear and intimidation, and this goes directly to

16   that.  Because the other side is arguing, basically,

17   Reigenborn, these reasons are pretext, these weren't the real

18   reasons.  So it goes to that.

19        THE COURT:  At some point, it's cumulative.  I'm sure

20   you could call 50 more witnesses, and they could call 50 more.

21   I'll let you ask a couple more questions, but then let's move

22   on.

23        MR. THAPA:  Thank you, your Honor.

24        (Continued on next page)

25


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

956
Laws - Direct

1      (In open court; jury present)

2   BY MR. THAPA:

3   Q.  Mr. Laws, what was Mr. Claps' reputation amongst the

4   employees in the jail division?

5   A.  They felt he was arrogant and a jerk.

6   Q.  Based on your experience of working in the jail division,

7   how did that affect the morale amongst the employees?

8           MS. BUTLER:  Objection, your Honor, speculation.

9           THE COURT:  Overruled.  If he knows.

10          THE WITNESS:  They were afraid to work for him.  They

11  were afraid to do their job.  And they were afraid that if they

12  did their job that he would find something wrong to search them

13  out and try and get them in trouble.

14  BY MR. THAPA:

15  Q.  Moving on to your position as the division chief at the

16  jail division.

17          So you started at that position in 2019?

18  A.  Correct.

19  Q.  Please tell the jury about your responsibilities in that

20  position.

21  A.  So as a division chief, you're in charge of the entire jail

22  division, which is over 300 employees.  You have a

23  responsibility to -- you are also in charge of the courthouse.

24  And at the time, we were also in charge of civil.  So my job

25  was to make sure that everything flowed smoothly, we were

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Laws - Direct

 1    within budget, that -- you know, making sure that all the

 2    contracts were doing good, even though that's somebody else's

 3    job, it's still my responsibility to make sure everything was

 4    smooth.  And just basically that there was an orderly running

 5    of the facility, that we were keeping the inmates safe, the

 6    employees safe and the public safe.

 7    Q.  Was part of that also making sure commanders and managers

 8    were doing their jobs?

 9    A.  Yeah.  Because you have to make sure that whatever their

10    assigned duty is, that they're taking care of that.

11    Q.  When you became the chief of the jail division, did you

12    make any recommendations to Sheriff Reigenborn regarding

13    personnel you thought would best fit the jail division?

14    A.  So I was asked to come meet with him.  And at that time, it

15    was Undersheriff Tommie McLallan.  And they sat down and said,

16    you know, we need to figure out what your command staff looks

17    like at the jail, who would you like to be working for you.

18    And so I was given the opportunity to pick commanders and also

19    a couple of sergeants positions that I needed to fill.

20    Q.  And you mentioned that you were given the opportunity to

21    pick those personnel.

22         Did Sheriff Reigenborn listen to your recommendations?

23    A.  He did.  And a couple of the people that had been let go or

24    were demoted were either re-promoted or added to my staff.

25         MR. THAPA:  If we could pull up Defendant's Exhibit Y,

Laws - Direct

 1  please.  I believe this is already admitted into evidence.

 2              THE COURT:  Yes.

 3              MR. THAPA:  May we publish, your Honor.

 4              THE COURT:  Yes.

 5  BY MR. THAPA:

 6  Q.  Mr. Laws, take a look at that document in front of you.

 7              Have you seen this document before?

 8  A.  Yes.

 9  Q.  What is it?

10  A.  It is the job description of the division chief at the

11  jail.

12  Q.  And looking through these descriptions here, there's

13  various bullet points.  Can some of these --

14              MR. THAPA:  We can just stick to the first page,

15  please.  Thank you.

16  Q.  Can some of these descriptions overlap with duties for a

17  position lower than the chief?

18  A.  That's correct.

19  Q.  I want to direct your attention to the eighth bullet point

20  there, directly supervises employees.

21              Was that one of your responsibilities as division

22  chief?

23  A.  Yes.

24  Q.  Who did you supervise as the division chief?

25  A.  I had two admins, so I supervised them.  As well as I

959
Laws - Direct

 1   originally had five commanders and a civilian person that was a

 2   manager that was ranked basically as a commander.

 3   Q.  Now, a sergeant also supervises some employees; correct?

 4   A.  Correct.

 5   Q.  But a sergeant doesn't supervise commanders?

 6   A.  No.

 7   Q.  Is there a difference in the employees and the type of

 8   supervision done by a chief versus a sergeant?

 9   A.  Yes.

10   Q.  So does this list -- even though some of these may overlap,

11   are the nature and degree of the duties the same as between the

12   chief and the lower level employee?

13   A.  No.  I would say the lower level employee actually does

14   more of like the direct supervision of the inmates more so than

15   any of the command or sergeant staff.  But there's still

16   responsibility for those positions to also supervise.

17   Q.  And a chief supervises people at higher ranks, though?

18   A.  Correct.

19   Q.  Does this list contain every single job duty or

20   responsibility that you had as a division chief?

21   A.  Well, the bottom line kind of covers everything else, which

22   is perform other duties as assigned.  So basically, anything

23   that the Sheriff or the Undersheriff wanted done, they could

24   call me and say, take care of this.

25   Q.  Okay.  So those other duties that are assigned are not well

                            Laws - Direct

 1   defined?

 2   A.  No.

 3   Q.  What are some of the duties that, in your experience, would

 4   fall into this category?

 5   A.  A lot of it was like covering for the Sheriff on certain

 6   meetings or being put on different committees that weren't

 7   considered part of the job description, but they wanted a

 8   representative from the Sheriff's Office on that committee.

 9   Q.  Is it more like anything that comes up that's necessary to

10   run the jail?

11   A.  Correct.

12           MS. BUTLER:  Objection, leading.

13           THE COURT:  Overruled.

14   BY MR. THAPA:

15   Q.  Did you have discretion in running the jail division?

16   A.  Yes.

17   Q.  Please tell the jury about that.

18   A.  So I met with the Sheriff about the jail division and what

19   direction I felt it needed to go in.  We were in agreement, as

20   far as making sure that the inmates were safe and everything

21   was clean and that we got back to doing some regular

22   inspections within the facility.

23           So basically, he understood that I had a grip on what

24   was going to happen at the jail.  And unless it was an extreme

25   emergency, I didn't need to contact him about any decisions I

Laws - Direct

1  made.  I would just go ahead and make them.

2  Q.  Did you have discretion about which personnel you would put

3  on which platoon and et cetera, things like that?

4  A.  I had the ability to assign people wherever I wanted within

5  the facility.  So yeah, all the assignments were basically

6  authorized by me.

7  Q.  As a division chief at the jail division, did you

8  participate in chief meetings?

9  A.  Yes.  So at the beginning of the term, we used to meet with

10  the Sheriff and all the chiefs on a biweekly basis.  And then,

11  after that, some of the people -- some of the commanders or

12  some of the chiefs felt like they weren't in the loop enough.

13  Things were happening and they didn't know what was going on,

14  so we switched that to a once-a-week meeting with the Sheriff

15  and all the chiefs.

16  Q.  Okay.  What kind of matters would be addressed in these

17  meetings?

18  A.  So basically, most of the time, it was just going around

19  the table, updating what was going on currently within our

20  facility.  But if we had like an issue that was coming up, you

21  know, whether there was the fair is coming up or, hey, we got

22  the parades coming or whatever, those kind of things would get

23  discussed in there, whatever business the Sheriff had to take

24  care of.

25  Q.  What kind of fairs or parades are you referencing?

Laws - Direct

1   A.  So once a year, the County has a fair that the Sheriff's

2   Office is completely responsible for the security.  And so we

3   have to do a lot of planning for that, so we discussed it a lot

4   in those meetings.  As well as, we have parades we participated

5   in throughout the county.  And Sheriff's Office representatives

6   knew what their portion was in that parade or whatever.

7   Q.  Did you discuss disciplinary issues?

8   A.  Yes.

9   Q.  Any hot topics potentially affecting the Sheriff's Office?

10  A.  So anything that was happening that week or maybe coming

11  up, we would discuss during that meeting.

12  Q.  Would you discuss any potential new policies or procedures

13  that needed to be changed?

14  A.  So anything that got proposed, the final decision came from

15  that group, whether or not it was going to be pushed through or

16  not.  Including changing policy and procedure or post orders

17  for the jail.

18  Q.  Your position as chief of the jail division, did you act as

19  an advisor to the Sheriff?

20  A.  On different stuff, yes.

21  Q.  Did you have the ability to give him input, in terms of

22  what policies should be implemented?

23  A.  Yeah.  We definitely had our input.  The policies were

24  given to the chiefs.  We were to review them, make any

25  suggested changes, and then bring it back.  And then he would

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Laws - Direct

 1  take those suggestions and change or not change it.

 2  Q.  Mr. Laws, are you familiar with the term post order?

 3  A.  Yes.

 4  Q.  What is a post order, please?

 5  A.  So post orders are more directly how to do the job, kind of

 6  a step by step, this is what you need to do to this job.  And

 7  where policy is kind of overarching, it just kind of tells you

 8  what needs to be done.  The post order tells you how to do it.

 9  Q.  Did you have any discretion on what the post orders should

10  be?

11  A.  Yeah, I was final authority on whether -- what post orders

12  we had in the facility and whether they got updated or struck

13  or whatever.

14  Q.  And just so we have a better understanding of the post

15  orders, did they allow you to make day-to-day changes about how

16  things are done within the policy?

17  A.  Yeah, we could make changes as we saw fit.  If it was

18  something that we thought we needed to update a post order

19  because it was out of date, then we could just do that.

20  Q.  As a division chief of the jail, was it one of your duties

21  to make sure that the jail division employees were working

22  within policy?

23  A.  Yeah, my job was to make sure that if there's a policy that

24  our people were following it, so yes.

25  Q.  Did you have any role in disciplining employees?

964
Laws - Direct

1  A.  So my role as a division chief was basically to review any

2  internal affairs investigations and make recommendations on

3  those, on what should be done, whether it should be upheld or

4  if there should be punishment or not.

5  Q.  Did you have discretion to give out discipline by yourself

6  up to a certain level?

7  A.  So yeah, there was -- the way they set up the policy, there

8  was a certain level of discipline that could be given straight

9  from the sergeant's level, and then it kind of went up from

10  there.  So we could do some discipline right away, kind of on a

11  lower level charge.

12        And then on the higher level charges, it would be

13  something that we would meet, and I would write up a

14  recommendation and that would be given to the Undersheriff.

15  And then whatever my decision was, whether it was to be upheld

16  and then what punishment needed to be done or whatever, then

17  the Undersheriff could decide if they wanted to follow those

18  same recommendations or do something on their own.

19  Q.  Let's talk about in cases of emergency.

20        Did you have the authority just to make decisions

21  yourself?

22  A.  Yes.

23  Q.  And did you have to publicly appear or speak on behalf of

24  the Sheriff's Office in your role as a division chief?

25  A.  I attended several meetings for the Sheriff, as a

Laws - Direct

1    representative of the Sheriff's Office.  And I was part of

2    committees that I represented the Sheriff's Office in.

3    Q.  Did you, as a division chief, of the jail division, did you

4    have any input in budgetary matters?

5    A.  So it was responsibility for the budget for the jail

6    division.  So it came down to we made our recommendations to

7    the budget committee, they decided whether or not things that

8    we asked for would be kept in.  But as far as the regular

9    budget, it was definitely the responsibility of the chief to

10   make sure that we stayed inside the budget of the jail.

11   Q.  Was part of that writing proposals --

12   A.  Yes.

13   Q.  -- on the budget?

14          Now, you worked at the Adams County Sheriff's Office

15   for -- well, how long did you work in total at the Adams County

16   Sheriff's Office?

17   A.  In total, just shy of 30 years.

18   Q.  And you became a part of the command staff when you were

19   promoted to commander?

20   A.  Correct.

21   Q.  At that time, before you were promoted to commander, did

22   you have any concerns as to your job security when you were

23   promoted to commander?

24   A.  Yeah.  I was a little nervous to become a commander,

25   because everybody knows, once you get into the command staff

Laws - Direct

1  area, your chances of keeping your job go down.  They usually

2  don't mess with sergeants and below.  But once you made the

3  command staff, your chances of staying -- you had the chance of

4  staying in that position, you may be demoted.

5  Q.  Why is that a concern?

6  A.  Basically because, whenever a new Sheriff comes in, they

7  try to bring people that are loyal to them into the positions

8  that they want, like the higher positions.  Usually they don't

9  go down as far as commander, but at times, back when -- I

10  remember when I first started with the Sheriff's Office and

11  Gene Claps -- or not Gene Claps -- Sheriff Camp and Bill

12  Shearer were both running for Sheriff, and when the Sheriff

13  found out that Bill was going to run, he was let go, basically

14  told he had to leave.

15        And then after the election, when Shearer came in, he

16  brought in his own people and fired several of the staff that

17  were currently working there.

18  Q.  And you mentioned the word loyalty.  What do you mean by

19  that, loyal to the Sheriff?

20  A.  So the Sheriff wants to know that the people who are

21  working for him are going to follow his orders completely.  And

22  they tend to pick people that they know they can trust, that if

23  they give them an order, they know they're going to fulfill it.

24  Q.  So based on your decades of experience, was it your

25  understanding that the command staff works at the will of the

Laws - Direct

1    Sheriff?

2              MS. BUTLER:  Objection, leading.

3              THE COURT:  Sustained.

4    BY MR. THAPA:

5    Q.  Based on your experience of working decades at the Adams

6    County Sheriff's Office, what was your understanding of the job

7    security of a command staff position?

8    A.  It's common knowledges within the jail that, once you get

9    promoted to a command staff position, you have -- you may lose

10   your job or you may be demoted.  I knew that from the time I

11   started there in maintenance, just because people would talk

12   about it.  And so throughout my career, from the person that

13   works in facilities maintenance all the way up knows that, once

14   you take that promotion, you're in a command staff position,

15   your chances of staying in that position depend on what the

16   Sheriff decides.

17   Q.  Is the command staff responsible for providing accurate

18   information to the Sheriff?

19   A.  Yes.

20   Q.  Is the command staff responsible for conveying the

21   Sheriff's message in good faith?

22   A.  Yes.

23   Q.  Down the line to the troops?

24   A.  Yes.

25   Q.  If a command staff member isn't loyal to the Sheriff, would

968
Laws - Direct

1    that cause any dissension among the ranks?

2    A.  Definitely.  If they're not following the same path of the

3    Sheriff, they're definitely doing something different than what

4    they're looking for that staff to be doing.

5    Q.  For example, if a command staff member doesn't see eye to

6    eye with the Sheriff on matters of the Sheriff's Office, would

7    that make it hard for them to effectively perform their

8    positions?

9          MS. BUTLER:  Objection, speculation, lack of personal

10   knowledge.

11         THE COURT:  If you can answer based upon your own

12   personal knowledge, you can.

13         THE WITNESS:  Sure.  So there's been times when I

14   disagreed with what the Sheriff had to say.  We would have it

15   out within the chief's meeting or whatever.  And then once you

16   walk out of that door, it's whatever the Sheriff wants.

17   BY MR. THAPA:

18   Q.  Based on your experience, is it important to have a good

19   working relationship between the command staff member and the

20   Sheriff?

21   A.  Yes.  They have to be on the same page, and they've got to

22   be sharing information, and the Sheriff needs to know what's

23   going on.

24   Q.  Is it also important for the effective performance of a

25   command staff position for them and the Sheriff to have trust

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Laws - Direct

 1   in each other?

 2   A.  Yes.

 3   Q.  And I recall you mentioned earlier about a demotion.  I

 4   want to talk about that.

 5        At the end of Mr. Reigenborn's administration, what

 6   was your position?

 7   A.  I was a division chief at the jail.

 8   Q.  And what happened to your position after Sheriff Claps took

 9   office?

10   A.  I was demoted to commander and placed on patrol.

11   Q.  How many years had you worked in the jail division at the

12   Adams County Sheriff's Office at the time that you were

13   demoted?

14   A.  Out of my 28 years up to that point, probably a year and a

15   half on patrol and detectives, maybe 2.  Otherwise, the rest of

16   my career was in the jail.  So 26 years out of my 28 years or

17   whatever.

18   Q.  So roughly 26 years were spent working in the jail

19   division?

20   A.  Yes.

21   Q.  And we talked about the various positions you have worked

22   in the jail division.

23        You said you were demoted, but then also transferred

24   to the patrol division; is that right?

25   A.  Correct.

970
Laws - Direct

1   Q.  Did Sheriff Claps give you a reason as to why he demoted

2   you?

3   A.  No.  They were going a different way is all I was told.

4   Q.  Did he give you any reason as to why he transferred you

5   from the jail division to the patrol division?

6   A.  No.

7   Q.  How old were you when he demoted you and transferred you?

8   A.  53.

9   Q.  So you mentioned the division chief position.  You were

10  demoted to the commander position.

11        Was there also a captain position in Sheriff Claps'

12  administration?

13  A.  Yes.

14        We didn't have it while Reigenborn was there.  He had

15  done away with the captain position.  And then, when Sheriff

16  Claps came back, he reinstated the captain position, which is

17  in between commander and division chief.

18  Q.  Was there a captain position under Sheriff McIntosh's

19  administration?

20  A.  Yes, there was.

21  Q.  There was no captain position under Sheriff Reigenborn's

22  administration?

23  A.  Correct.  They did away with those and asked for additional

24  sergeants for patrol.

25        And then, when Sheriff Claps came back, they got rid

Laws - Cross                                   971

1    of the extra sergeants and brought the commanders -- or the

2    captains back.

3    Q.  So when you were demoted from chief of the jail division to

4    a commander in patrol, how many levels was that demotion?

5    A.  Basically two.

6    Q.  So there was a patrol captain and a patrol chief above

7    you --

8    A.  Yes.

9    Q.  -- as a commander after your demotion?

10            MR. THAPA:  I have no further questions.  Thank you.

11            THE COURT:  Cross-examination.

12   CROSS-EXAMINATION

13   BY MS. BUTLER:

14   Q.  Good afternoon, Mr. Laws.

15   A.  Good afternoon.

16   Q.  My name is Virginia Butler, and I have some questions for

17   you about what Mr. Thapa just went through with you.

18   A.  Sure.

19   Q.  So you started back in the jail in 1992; correct?

20   A.  Right.

21   Q.  And then you worked your way up over your career to the

22   position of commander, which you first achieved in 2008?

23   A.  Yes.

24   Q.  And then, when you retired in 2016, you retired as a

25   commander?

Laws - Cross

1   A.  Yes.

2   Q.  So you had a 24-year career between 1992 and 2016 where

3   your highest rank you achieved was a commander?

4   A.  Correct.

5   Q.  And in that multi decade career, you worked with each of

6   the Plaintiffs in this lawsuit?

7   A.  Yes.  Some directly and some just kind of, sort of.

8   Q.  I want to talk about each of these men.

9          Mr. Mitchell, you knew Mr. Mitchell when you were a

10  deputy?

11  A.  Yes.

12  Q.  And later on, you worked together in the jail when he was

13  an acting commander and you were a commander?

14  A.  Yes.

15  Q.  And you had a good working relationship with Mr. Mitchell;

16  right?

17  A.  Yes.

18  Q.  And based on your observations, Mr. Mitchell was effective

19  in leading his platoon in the jail?

20  A.  Yes, he was.

21  Q.  And based on your observations, Mr. Mitchell was liked and

22  respected by his peers?

23  A.  Yeah, people actually wanted to work on his shift, they

24  were trying to start on his shift.  So yeah, he was a good

25  leader.

Laws - Cross

1   Q.  And based on your observations, Mr. Mitchell treated his

2   employees well?

3   A.  Yes.

4   Q.  And when you were working with Mr. Mitchell, you never

5   heard any allegations of misconduct by Mr. Mitchell?

6   A.  No.

7   Q.  I want to talk about Mr. Currier next.

8         You worked with Mr. Currier when you were detectives

9   together?

10  A.  Correct.

11  Q.  And you had an effective working relationship with

12  Mr. Currier?

13  A.  Very.

14  Q.  And you thought Mr. Currier was an effective detective?

15  A.  Yes, he was.

16  Q.  Excuse me, effective detective?

17  A.  Yes, he was.

18  Q.  And though he may be a bit of a joker, when it was time for

19  business, it was all business?

20  A.  When it's time, it's time, yeah.

21  Q.  And based on your observations, Mr. Currier was respected

22  in the Sheriff's Office?

23  A.  Yes, he was.

24  Q.  And based on your observations, Mr. Currier treated his

25  fellow employees well?

Laws - Cross

1    A.  Yes, he did.

2    Q.  And when you were working with Mr. Currier, you never heard

3    any allegations of misconduct by Mr. Currier?

4    A.  No.

5    Q.  And you talked about Mr. Claps a little bit before.

6          So you have worked with him at various times

7    throughout your career?

8    A.  Yeah.  Like not directly.  But we worked in the same area,

9    but not really directly.

10   Q.  Understood.

11         And you testified about how, at the end of your

12   career, you were going to be retiring from the position you

13   held in the jail as a commander?

14   A.  Yes.

15   Q.  And Mr. Claps trained underneath you to take over your

16   duties when you were getting ready to leave?

17   A.  Yes.

18   Q.  But before Mr. Claps came over to the jail for your last

19   year, you had already identified Glover Scott Jarmin as who you

20   wanted to take over your duties; right?

21   A.  I said he would be a good recommendation, only because he

22   had all the years of experience and he had been the one that

23   was in charge of like all our facility inspections that I

24   placed on him.  And then I also placed on him being in charge

25   of the post orders and policies and keeping those up to date.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Laws - Cross

1   Q.  You had been grooming Mr. Jarmin to take over your position

2   before Mr. Claps came over to the jail?

3   A.  Technically, that's your job as a lieutenant -- or a

4   commander, it's your job to groom the people beneath you to

5   take your position.  So yes, that's what I was doing.

6   Q.  And when Mr. Claps came over to the jail, it was a bit of a

7   duel between Mr. Claps and Mr. Jarmin as to which of the two of

8   them would take over your duties when you retired?

9   A.  Sure, I guess so.

10  Q.  But ultimately, it was Mr. Claps, not Mr. Jamin, who was

11  the one who took over when you retired; right?

12  A.  Yes.

13  Q.  But you felt that Mr. Jarmin held a grudge against

14  Mr. Claps when Mr. Claps had changed his position from

15  administrative sergeant to shift sergeant?

16          MR. THAPA:  Objection, calls for speculation.

17          THE COURT:  Overruled.  If he knows.

18          THE WITNESS:  So that happened while I wasn't there,

19  so that would be while I was gone.  So my opinion, as a friend,

20  yeah, I mean, I thought that was pretty crappy.  But it's his

21  jail to run, so he moves people wherever.

22  BY MS. BUTLER:

23  Q.  But based on your conversations with Mr. Jarmin, your

24  observations of Mr. Jarmin, Mr. Jarmin held a grudge against

25  Mr. Claps because of that?

Laws – Cross

1    A.    Sure.

2              MR. THAPA:   Objection, your Honor.   Same objection.

3              THE COURT:   Overruled.   It was prefaced with based on

4    his conversations with him, so it's overruled.

5    BY MS. BUTLER:

6    Q.   And when you observed Mr. Claps at the jail, your

7    observations was that he was there to get the job done when he

8    was at work?

9    A.   Mr. Claps?

10   Q.   Yes.

11   A.   Yeah, the little bit that he worked with me, yeah, sure.

12   Q.   And you never heard any allegations of misconduct by

13   Mr. Claps while you worked with him?

14   A.   While I worked with him, no.

15   Q.   I want to talk about Mr. Coates.

16             You worked with Mr. Coates at various times throughout

17   your career?

18   A.   I mostly worked for him, but not with him.   I was a

19   sergeant, and he was a commander on the other side of the week,

20   but yeah.

21   Q.   And when he was your supervisor, you thought he was

22   effective?

23   A.   Very.

24   Q.   And he took the time, when he was a commander, to visit

25   with deputies and mentor them on how to effectively do parts of

Laws - Cross

 1   their jobs, like in cell inspections or things like that?

 2   A.   Yes.

 3   Q.   And he went above and beyond most commanders?

 4   A.   Yeah.  I wish all the commanders were like him.

 5   Q.   And he was one of the most effective commanders you ever

 6   saw in the jail in your tenure?

 7   A.   Yes.

 8   Q.   And based on your observations, Mr. Coates was respected at

 9   the Sheriff's Office and thought of as very professional?

10   A.   Yes.

11   Q.   And based on your experience, he treated other employees

12   well?

13   A.   Very well.

14   Q.   And you never heard any allegations of misconduct by

15   Mr. Coates while you worked with him?

16   A.   No.

17   Q.   I want to talk about something you covered with Mr. Thapa

18   about the conversation you had with Mr. Reigenborn about coming

19   back to the jail.

20   A.   Sure.

21   Q.   So you testified that after you retired, you had a couple

22   of jobs, but the longest one was working for a school district

23   for a couple of years?

24   A.   I actually only worked for them for about six months.  It

25   was Top Cops Driving School I worked for about a year and a

Laws - Cross

1   half.

2   Q.  But the position you held prior to being asked by

3   Mr. Reigenborn to come back as a chief --

4   A.  Yeah.

5   Q.  -- was --

6   A.  Supervisor, yeah.

7   Q.  And let's talk about what that process of you coming back

8   to the Sheriff's Office looked like.

9   A.  Okay.

10  Q.  So you received a text message from Mr. Reigenborn saying

11  that he had gotten your cellphone number from your wife, Pam,

12  and that he wanted you to call him?

13  A.  Yup.

14  Q.  And this text message was in late November of 2018?

15  A.  Yes.

16  Q.  And you went ahead and did call him and spoke to him about

17  this?

18  A.  Yes.

19  Q.  And he told you he would like you to come back and be the

20  chief of the jail?

21  A.  Yes.

22  Q.  And you told him, it could impact your retirement, so you

23  had to check with your wife and the retirement board and think

24  about it.  Then, the following week, you called him back and

25  said that you would indeed accept that position?

Laws - Cross

1    A.  Yes.

2    Q.  And that would have been in late November, early December

3    of 2018?

4    A.  Yes.

5    Q.  And when you told him that, he said, great, and then that

6    was the last that you all talked until January?

7    A.  Correct.

8    Q.  And then you were working at a school, so there was a

9    winter break coming up?

10   A.  Correct.

11   Q.  So you gave your two weeks notice before winter break, so

12   that you would have time to work a full two weeks on -- one

13   week before break and one week after break?

14   A.  Correct.

15   Q.  So you gave your two weeks notice at least four weeks

16   before January 15th, 2019?

17   A.  Yeah, that sounds right.

18   Q.  And you did this because Mr. Reigenborn had asked you if

19   you would take the position, and you said you would take the

20   position.  He said, great, we'll start on January 15th?

21   A.  Correct.

22   Q.  So you gave your two weeks notice in reliance on having a

23   job on January 15th at the jail?

24   A.  Yes.

25   Q.  And you didn't have to interview for this position?

980
Laws - Cross

1    A.  No.

2    Q.  And you testified that you had no idea he was going to ask

3    you to come back; right?

4    A.  Correct.

5    Q.  But there had been rumors that you might come back,

6    starting as early as January of 2018?

7    A.  There were rumors when I left the -- as soon as I left,

8    that I was going to be back.  So they were already talking

9    about that before the election even happened.

10          And at that point, I had no interest in going back to

11   the facility.  I had done my time.  I was happy working for the

12   school district, figured I would have a second retirement going

13   through the school district, and we would be able to kind of

14   have it easy.

15   Q.  So you always said, I'm not going back, I'm not going back,

16   I'm not going back?

17   A.  Yes.  Especially because part of that problem, the reason I

18   had retired was back issues.  And my back had gotten better.

19   So part of the whole deciding to go back was, well, you know, I

20   didn't want to get into anything where I would jack up my back.

21   But as a captain -- or as division chief, I should be okay.  I

22   shouldn't have to wear my vest all the time.  So that was part

23   of my reasoning for leaving in the first place.

24   Q.  So there were a lot of considerations for when you were

25   thinking about taking this job?

Laws - Cross

1    A.  Yes.

2    Q.  But when Mr. Reigenborn offered the job, you did indeed say

3    yes, you would go back --

4    A.  Yes.

5    Q.  -- after you thought about it?

6    A.  Yes.

7    Q.  And you came back as a chief?

8    A.  Yes.

9    Q.  And you had retired as a commander?

10   A.  Yes.

11   Q.  And chief is above commander in rank?

12   A.  Yes.

13   Q.  And going back to that initial text that Mr. Reigenborn

14   sent you, he said he had gotten your phone number from your

15   wife, Pam?

16   A.  Yes.

17   Q.  And your wife was an IT specialist at one point in the

18   Sheriff's Office?

19   A.  Yes.

20   Q.  And she made Mr. Reigenborn's campaign website in 2014 and

21   2018?

22   A.  Yes.

23   Q.  And you mentioned on direct that you went to a campaign

24   event with your wife when Sheriff Reigenborn was running in

25   2018?

Laws - Cross

1    A.  Yes.

2    Q.  And when you were there, you made a donation to

3    Mr. Reigenborn's campaign?

4    A.  If I did, I don't remember it.

5         MS. BUTLER:  Could we please bring up Mr. Laws'

6    deposition, Page 65.

7    Q.  Mr. Laws, could we zoom in on Lines 5 through 15, please.

8    I'm going to read this to you, Mr. Laws, and let me know if I

9    have read it correctly.

10        Question:  "Okay.  Did she participate in any other

11   ways?"

12        Answer:  "We went to his kickoff.  She actually is

13   like, hey, Rick's going to have his kickoff -- whatever day it

14   was -- you want to come.  And I'm like, yeah.  So I guess I'll

15   go, you know, I'll go with you.  So I went with her, and I

16   believe we made a contribution at that time, and I don't

17   remember the amount."

18        Question:  "Okay."

19        Answer:  "But I remember making a contribution that

20   day."

21        Did I read that correctly?

22   A.  Sure.

23        MS. BUTLER:  You can take that down.

24   Q.  And you took a picture with Mr. Reigenborn at this campaign

25   event?

983
Laws - Cross

 1  A.  I did.

 2  Q.  And you put it on your Facebook page?

 3  A.  I did.

 4  Q.  And the reason you put it on your Facebook page was so that

 5  friends who weren't at the Sheriff's Office would know who you

 6  were supporting in the election?

 7  A.  Yes.

 8  Q.  And this is the 2018 Sheriff's election?

 9  A.  Yes.

10  Q.  And after you joined -- after you rejoined the Sheriff's

11  Office, you learned that Sheriff Reigenborn had rescinded all

12  existing personnel and employment policies?

13  A.  Yes.

14  Q.  And this was surprising to you?

15  A.  Yes.

16  Q.  You had never seen a new Sheriff come in and rescind all

17  the employment policies like Mr. Reigenborn did?

18  A.  Never before.

19  Q.  I want to talk about some of your duties as chief of the

20  jail division.

21       And you talked about your role with policies on

22  direct.

23       Do you remember that?

24  A.  Yeah.

25  Q.  So part of your role as chief was making suggestions for

Laws - Cross

1  policy changes?

2  A.  Correct.

3  Q.  But every policy had to be approved by the Sheriff before

4  it could be implemented?

5  A.  Yes.

6  Q.  And if the Sheriff's Office needed to create a totally new

7  policy to deal with something new, then there was a policy

8  committee that would work on it?

9  A.  Yes.

10  Q.  And the policy committee would present its draft to the

11  command staff, and the command staff might have some

12  suggestions?

13  A.  Yes.

14  Q.  And then the Sheriff's Office might take those suggestions

15  into account, but would make a decision on the policy?

16  A.  Yes.

17  Q.  Your role as chief was not to make policy for the Sheriff's

18  Office, was it?

19          MR. THAPA:  Objection, ambiguous.

20          THE COURT:  Overruled.

21          THE WITNESS:  We weren't supposed to make policy.  We

22  did make post order, but not policy.

23  BY MS. BUTLER:

24  Q.  And let's talk about your role with respect to personnel

25  decisions.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Laws - Cross

```
 1            As chief, you couldn't unilaterally promote sergeants
 2   or commanders?
 3   A.  No.
 4   Q.  And you couldn't unilaterally demote anyone?
 5   A.  No.
 6   Q.  And you couldn't fire anyone?
 7   A.  No.
 8   Q.  And you talked about your role in internal affairs
 9   investigations?
10   A.  Yes.
11   Q.  And those were always recommendations?
12   A.  Yes.
13   Q.  Because the decision was always made by the Sheriff?
14   A.  Undersheriff, not the Sheriff.  Sheriff is supposed to be
15   responsible for all appeals, so the Undersheriff made all
16   decisions.
17   Q.  But the employee could always then appeal to the Sheriff?
18   A.  That's why he didn't make any decisions.
19   Q.  So your decision on an internal affairs investigation was
20   just a recommendation?
21   A.  Correct.
22   Q.  You talked about when you started picking some of the
23   commanders and sergeants who were coming over to the jail with
24   you?
25   A.  Yes.
```

Laws - Cross

1    Q.  And you mentioned that you had picked some individuals who

2    had received demotion or termination letters?

3    A.  Yes.

4    Q.  And did you tell Mr. Reigenborn that you wanted Sam Thede

5    to come to the jail, even though he had received a termination

6    or demotion letter?

7    A.  Yes, I did.

8    Q.  And did you tell Mr. Reigenborn that you wanted Manuel

9    Carillo to come over to the jail, even though he had received a

10   demotion or termination letter?

11   A.  Yes.

12   Q.  Mr. Laws, in 2020, you were the jail chief; right?

13   A.  Yes.

14   Q.  And Terrance O'Neill was a commander who worked under you?

15   A.  Yes.

16   Q.  And you had brought Mr. O'Neill over from headquarters to

17   the jail to work underneath you?

18   A.  Yes.

19   Q.  And you thought he was a very professional person?

20   A.  Always was, yes.

21   Q.  And you were at a chief's meeting in June of 2020 where the

22   people at the meeting started speculating about whether

23   Mr. O'Neill was thinking of running for Sheriff in 2022?

24   A.  Yes.

25   Q.  And you had a good working relationship with Mr. O'Neill?

Laws - Cross

  1    A.  Yes.

  2    Q.  So you said, I'll go talk to him, and I'll ask him?

  3    A.  Yeah, I don't like beating around the bush, so I'll just go

  4    ask him.  We don't need to play these games.

  5    Q.  So the next day you did, he was in the office, and you went

  6    over to talk to him?

  7    A.  Correct.

  8    Q.  And you told him that, at the chief's meeting everyone was

  9    talking about how they thought he might be running for Sheriff

 10    in the next election?

 11    A.  Correct.

 12    Q.  And you asked him if he was running?

 13    A.  Correct.

 14    Q.  And he said no, he wasn't going to run?

 15    A.  Correct.

 16    Q.  But then he asked you what would happen if he was running?

 17    A.  Correct.

 18    Q.  And you told him that if he was running for Sheriff, you

 19    thought that they might fire him?

 20    A.  Just based on past experience, like I said, when Bill

 21    Shearer was running, the Sheriff was like, you're not working

 22    for me if you're running for Sheriff.  Based on that knowledge,

 23    I just assumed that might happen.  There was no guarantee of

 24    that.

 25    Q.  And you mentioned this instance with Bill Shearer and Ed

988
Laws - Cross

```
 1   Camp in the 1990s?

 2   A.  Yes.

 3   Q.  And that's the basis for your understanding that command

 4   staff might get fired when a new sheriff comes in?

 5   A.  Yes.

 6   Q.  And you're aware there was a lawsuit about that; right?

 7   A.  I was.

 8   Q.  And you're aware that the County entered into a

 9   multi-million dollar settlement for --

10           MR. THAPA:  Objection, your Honor, 401, 402, 403.

11           MS. BUTLER:  Your Honor, they opened the door to this

12   line of questioning.

13           THE COURT:  The jury has already heard testimony on

14   this.  Overruled.

15           THE WITNESS:  Could you ask it again, please.

16   BY MS. BUTLER:

17   Q.  Mr. Laws, you are aware that these terminations in the

18   1990s resulted in a multi-million dollar settlement?

19   A.  Yes.

20   Q.  So your understanding that Mr. O'Neill might get fired was

21   because of these terminations in the 90s that had resulted in

22   settlements?

23   A.  It wasn't just those.  I had seen people gone between other

24   elections.  It wasn't as much because it wasn't an outside

25   person as much.  It was always -- like the next few elections,
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Laws - Cross

1    Shearer, Shearer, and then he had --

2    Q.  That's not my question, Mr. Laws.

3         My question is:  Did this 1990s lawsuit -- excuse

4    me -- these 1990s terminations inform your understanding of why

5    you thought Mr. O'Neill might get terminated?

6    A.  Yes.  Not only that.  Like I said, there were other ones

7    that happened, but that was the main part of the basis.

8    Q.  And you were a commander from 2008 to 2016?

9    A.  Yes.

10   Q.  And so you were a commander when Sheriff Darr ended his

11   tenure as Sheriff in 2014 and Sheriff McIntosh was elected?

12   A.  Yes.

13   Q.  And Sheriff Darr was a Democrat?

14   A.  I don't know whether they were Democrat or not.  I didn't

15   follow that, but I assume so.

16   Q.  And Sheriff McIntosh was a Republican, do you know?

17   A.  I guess so, yeah.

18   Q.  And you didn't see Sheriff McIntosh terminate any of

19   Sheriff Darr's command staff; right?

20   A.  I didn't see him terminate, no.

21   Q.  And you came back under Mr. Reigenborn, who was a Democrat?

22   A.  Yes.

23   Q.  And you testified on direct that it was common knowledge in

24   the Sheriff's Office that you might get fired when a new

25   Sheriff came in if you were command staff?

Laws - Redirect

```
 1   A.   Yes.

 2   Q.   There are no written policies that describe this common

 3   knowledge?

 4   A.   No.  But everybody knows.

 5   Q.   And when you were in command staff, you never saw an

 6   incoming Sheriff fire the command staff of the outgoing

 7   Sheriff?

 8   A.   No.

 9   Q.   And you testified that part of this understanding was based

10   on this 1990s incident; right?

11   A.   Part of it, yes.

12        But there had been other chiefs at the jail, or there

13   were captains that left and were told to leave, so it's not the

14   only time that they are told to leave.

15   Q.   One moment, Mr. Laws.

16   A.   Sure.

17        MS. BUTLER:  No further questions, Mr. Laws.

18        THE COURT:  Redirect.

19        MR. THAPA:  Thank you, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. THAPA:

22   Q.   Mr. Laws, you were just asked by counsel about Mr. Terrance

23   O'Neill.

24        Did anyone ask you to go ask Mr. O'Neill if he was

25   running for Sheriff?
```

Laws - Redirect

 1   A.  No.  I volunteered to go do that.

 2   Q.  You did that on your own?

 3   A.  Yes.

 4   Q.  Did Sheriff Reigenborn tell you to do so?

 5   A.  No.

 6   Q.  Did Sheriff Reigenborn tell you that O'Neill would be fired

 7   if he was running for Sheriff?

 8   A.  No, he did not.

 9   Q.  You were asked questions about Sam Thede and Manuel

10   Carillo.

11        Did Mr. Reigenborn take your recommendation and keep

12   those people on?

13   A.  Yes, he did.

14   Q.  You were asked questions about your observations of some of

15   the Plaintiffs.

16        Prior to retiring in 2016, when was the last time you

17   had observed Mr. Mitchell during work?

18   A.  I don't remember when he went to patrol.  Probably a few

19   years before 2016.  I don't remember exact dates.

20   Q.  Did you work with Mr. Mitchell at the jail division in

21   2008?

22   A.  Yes.  We were both at the jail as acting commanders.

23   Q.  How long did you work with him at the jail division in that

24   time?

25   A.  He became -- like I said, he was a commander, and I don't

Laws - Redirect

1    remember at what point he went from the jail to patrol.  I know

2    he wasn't there in 2016, but I don't remember like dates of

3    when he went.

4    Q.  Did you ever see Mr. Mitchell interact with Mr. Reigenborn?

5    A.  No.

6    Q.  You never saw their interactions?

7    A.  No.

8    Q.  Do you have any knowledge of Mr. Mitchell's interactions

9    with other subordinates after he left the jail division?

10   A.  No.

11   Q.  Was your opinion that you testified to on direct limited to

12   the time that he worked with you in the jail division?

13   A.  Yes.

14   Q.  When was the last time that you worked directly with

15   Mr. Coates?

16   A.  I couldn't give you a date.  I don't remember the last time

17   he was at the jail, that would have been the last time I

18   directly worked with him.  I don't know the date.

19   Q.  Was that before you worked with Mr. Mitchell in the jail

20   division?

21   A.  That was kind of the same time.  Coates would have been

22   more before that, I guess, because it would have been while I

23   was a sergeant, so...

24   Q.  Did you ever observe Mr. Coates' interactions with

25   Mr. Reigenborn?

Laws - Redirect

 1   A.  No.

 2   Q.  Did you observe Mr. Coates' interactions with his

 3   subordinates after the time frame that he didn't work with you?

 4   A.  No.

 5   Q.  So the opinion you testified to on direct was limited to

 6   the time frame years before 2016?

 7   A.  Yes.

 8   Q.  Did you ever observe Mr. Currier's interactions with

 9   Mr. Reigenborn?

10   A.  No.

11   Q.  I believe you testified that you retired for the second

12   time in 2004[sic] after Sheriff Claps came into office?

13   A.  I retired in 20 --

14   Q.  Sorry, 2024?

15   A.  '24, yes.  I retired last year, May, May 2nd.

16   Q.  Why did you retire last year?

17   A.  I --

18        MS. BUTLER:  Objection, your Honor.  May I approach.

19        THE COURT:  Sure.

20   (Continued on next page)

21

22

23

24

25

Laws - Redirect

1          (At sidebar)

2              MS. BUTLER:  Your Honor, this is beyond the scope of

3      cross-examination.  And Mr. Laws was never disclosed for

4      anything after 2021 to give any testimony.  They never updated

5      his disclosure to disclose anything that could have happened

6      after Mr. Claps returned.

7              MR. THAPA:  I just want to know why he retired.

8              THE COURT:  It's not in that time frame.  I'll sustain

9      the objection.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Laws - Redirect

1        (In open court; jury present)

2            MR. THAPA:  I have no other questions.  Thank you,

3    Mr. Laws.

4            THE COURT:  Any questions from our jury?

5            You are excused.

6            Is there anymore evidence or witnesses for the

7    defense?

8            MS. PRATT:  No, your Honor.  The defense rests.

9            THE COURT:  Members of the jury, as you just heard,

10   the defense has rested its case now.

11           The Plaintiffs may have some rebuttal evidence to put

12   on.

13           Let me ask, any witnesses for the Plaintiff?

14           MS. HALPERN:  Your Honor, we would like to recall to

15   the stand Paul Gregory.

16           THE COURT:  Okay.

17           MS. PRATT:  Your Honor, we will reraise our objection,

18   as previously noted.

19           THE COURT:  And it's overruled.

20           THE DEPUTY CLERK:  Your Honor, does he need to be

21   sworn in again.

22           THE COURT:  Yes, let's swear him in.

23   PAUL GREGORY,

24       called as a rebuttal witness by the Plaintiffs,

25       having been duly sworn, testified as follows:

Rebuttal                          Gregory - Direct

1    DIRECT EXAMINATION

2    BY MS. HALPERN:

3    Q.  Good afternoon, Mr. Gregory.  Thank you for your patience,

4    and thank you for being willing to come back up on the stand.

5           So I just had a couple questions I wanted to ask you.

6    One of them involves your employment history at the ACSO with

7    the four gentlemen who are sitting here at the table, who are

8    the Plaintiffs in this case.

9           Now, I think, earlier today, you testified that you

10   had worked at the Adams County Sheriff's Office since 2001; is

11   that right?

12   A.  Yes.

13   Q.  And you are currently serving as Undersheriff to Sheriff

14   Claps?

15   A.  Yes.

16   Q.  But before that, you have worked with him in the past?

17   A.  With the Sheriff?

18   Q.  Correct.

19   A.  Yes.

20   Q.  And in what capacities did you do that?

21   A.  We taught firearms together for a number of years through

22   the police academy.  We were also promoted together in 2015 to

23   the rank of commander and worked in the jail division after

24   that.  We loosely worked together in patrol division when he

25   was the traffic sergeant, and I was in the patrol division as

Rebuttal                        Gregory - Direct

```
 1   well at the same time.

 2   Q.  And could you describe your work relationship with

 3   Mr. Claps in these earlier periods when you worked with him.

 4   A.  Our relationship was very good.  As I said before, we

 5   taught together in the academy, firearms.  And we relied on

 6   each other commonly when we would teach in that capacity,

 7   because we were both lead firearms instructors.  So the care

 8   that had to be taken to ensure the program ran properly

 9   depended on our relationship, so it was good.

10   Q.  And to your knowledge, did Mr. Claps have a good reputation

11   at the Adams County Sheriff's Office before he became Sheriff

12   in 2022 -- 2023, technically?

13   A.  Yes, he did.

14   Q.  And did you find him credible?

15           MS. PRATT:  Objection.

16           THE COURT:  Sustained.

17   BY MS. HALPERN:

18   Q.  How did you think he performed his job?

19   A.  I knew him to perform his job very well, and he still does

20   to this day.

21   Q.  Have you ever heard any complaints from any of your

22   coworkers about Mr. Claps when he was working together with you

23   at the ACSO?

24   A.  No.

25   Q.  Now, let's turn to Mr. Currier.
```

Rebuttal                          Gregory - Direct

1              Have you ever worked with Mr. Currier at the ACSO?

2    A.  Yes.

3    Q.  And could you describe the circumstances of your working

4    with him?

5    A.  Chief Currier was one of my first FTOs when I was in the

6    patrol division in 2003.  We then worked together for a short

7    period of time on the SWAT team.  Then he was my supervisor in

8    mid 2000s when he was a detective sergeant, I was one of his

9    direct reports as a detective.

10   Q.  And -- go ahead.  Sorry about that.

11   A.  And just most recently, he's one of my division chiefs, so

12   he and I work closely now.

13   Q.  How would you describe your working relationship with Kevin

14   Currier throughout the years?

15   A.  Very good.

16   Q.  And to your knowledge, does he have a good reputation at

17   the ACSO?

18   A.  Yes.  Very easy to work with, very solid supervisor.

19   Q.  And did you ever, during the time that you worked with him,

20   hear any of his coworkers raise any specific concerns or

21   complaints about him?

22   A.  No.

23   Q.  And let me turn to Mark Mitchell.

24              Have you worked with Mark Mitchell in your time at the

25   Adams County Sheriff's Office?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Rebuttal                    Gregory - Direct

1   A.  Yes.

2   Q.  And in what capacity did you do that?

3   A.  Similar to Chief Currier, Commander Mitchell was one of my

4   first FTOs when I went to patrol division in 2003.  We then

5   worked on the SWAT team together for a number of years,

6   probably a decade or so, where he was the team commander, I was

7   one of the team leaders.

8           When I was promoted to commander in 2015, Commander

9   Mitchell was the patrol division captain, so I worked directly

10  underneath him for probably a year and a half or two, somewhere

11  in there.

12          And more recently, he's part of the executive team,

13  and we work closely together.

14  Q.  How would you describe your working relationship with

15  Mr. Mitchell?

16  A.  Good.

17  Q.  And does he -- during the period that you have worked with

18  him at the ACSO, are you aware of his reputation with his

19  coworkers?

20  A.  I find it to be good, yes.

21  Q.  And let me ask you about T.J. Coates.

22          Have you ever worked with T.J. Coates?

23  A.  Yes.

24  Q.  And in what capacity did you do that?

25  A.  He was my sergeant when I went to the patrol division.

Rebuttal                        Gregory - Direct

 1    Again, this was probably 2003 through 2005.  And at the same

 2    time, I was actually working the same shift with Chief Currier.

 3    But at the time, Sergeant Coates was our direct supervisor.

 4    And then he was later on the patrol division chief when I was

 5    part of that division.

 6    Q.  And how would you describe your work relationship with

 7    Mr. Coates throughout the years?

 8    A.  Excellent.  I -- he was one of my mentors that I hold in

 9    very high regard.

10    Q.  And as far as you are aware, did he have a good reputation

11    with his coworkers?

12    A.  Yes.

13    Q.  And did you ever hear anyone specifically complain about

14    T.J. Coates to you those years that you worked with him?

15    A.  No.

16    Q.  Was he well respected by his peers?

17    A.  He still is.  Yes, he was.

18    Q.  What do you mean by "he still is?"

19    A.  We talk about him to this day still, in a good way.

20    Q.  And I want to ask you a little bit about the culture at the

21    Adams County Sheriff's Office right after the election in 2018

22    when Mr. Reigenborn was sworn into office.

23          Could you describe what the culture was like after

24    Mr. Reigenborn was sworn into office?

25    A.  It was terrible.


                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Rebuttal                         Gregory - Direct

 1  Q.  Why is that?

 2  A.  You know, he did something that should not have been done.

 3  Sheriff Reigenborn did away with an entire executive staff and

 4  expected an organization to run.  You can't do that.

 5       Not only did the organization culture fall to an all

 6  time low, as far as I know it, it promulgated a culture of

 7  fear.  People, they were afraid to act, they were afraid to

 8  make decisions.  It was -- it was terrible going through that.

 9  And I -- I am certain that we have not even -- we have barely

10  recovered from it as of probably a year ago.  It just -- it was

11  terrible.

12  Q.  What was the impact on the department, the culture that you

13  are talking about?

14  A.  The retention was low.  If I remember right, when Sheriff

15  Claps took office, we were down probably 15 percent in

16  personnel, which is exceptionally low for our organization.

17  And just in comparison now, we are like 1 percent down, you

18  know, so the change.

19       People didn't want to test.  They didn't want to

20  promote, which was unfortunate, because we were lacking

21  leadership, you know.  And those who were leaders were lacking

22  mentorship.  And we didn't have anyone to guide us or help

23  direct us.  We were kind of left to figure it out.

24  Q.  And you talked a little bit -- I wanted to ask you a little

25  bit about your duties now as the -- your duties when you were a

Rebuttal                          Gregory - Direct

1  commander at the ACSO.

2          You supported Mr. McIntosh in 2014 and 2018 for

3  Sheriff; isn't that right?

4  A.  Yes.

5  Q.  And did that have any impact on your ability to effectively

6  perform your job duties as a commander when you were working

7  for Mr. Reigenborn?

8  A.  No.

9  Q.  And did your support of Mr. McIntosh impact your ability to

10 perform any of your duties effectively when you were division

11 chief under Mr. Reigenborn?

12 A.  No.

13 Q.  And how about Undersheriff, did the fact that you had

14 supported Mr. McIntosh in 2014 and '18, did that impact your

15 ability to effectively carry out your job duties under

16 Mr. Reigenborn as Undersheriff?

17 A.  No.

18 Q.  And you remain Undersheriff now under Mr. Claps, who beat

19 Mr. Reigenborn in the primaries in 2022; isn't that right?

20 A.  Yes.

21 Q.  And would you agree, Mr. Gregory, that whoever one supports

22 during an election for Sheriff, it really has no bearing on the

23 ability to perform the duties of any position in the command

24 staff at the Adams County Sheriff's Office?

25 A.  Yes.

Rebuttal                          Gregory - Cross

1  Q.  And you have never considered such factors when suggesting

2  promotions or demotions or terminations?

3  A.  No.

4  Q.  And that the key is to be loyal to the Adams County

5  Sheriff's Office and just doing your job to protect the public;

6  is that right?

7  A.  That's right.

8          MS. HALPERN:  I have no further questions.  Thank you,

9  Mr. Gregory.

10          THE WITNESS:  You're welcome.

11          THE COURT:  Cross-exam.

12          MS. PRATT:  Yes, your Honor.

13  CROSS-EXAMINATION

14  BY MS. PRATT:

15  Q.  Good afternoon, Undersheriff.  Just a few questions for

16  you.

17          You testified on direct regarding basically each of

18  the Plaintiffs' good reputation in the Adams County Sheriff's

19  Office.

20          Do you remember that line of testimony?

21  A.  Yes.

22  Q.  And you also testified that you had never received any

23  complaints regarding any of the Plaintiffs and their treatment

24  of their subordinates; correct?

25          MS. HALPERN:  Objection, your Honor.  I didn't ask

Rebuttal                    Gregory - Cross

1  that question for each one of the Plaintiffs.

2          THE COURT:  Response?

3          MS. PRATT:  The question was certainly asked whether

4  he had ever heard of any complaints about each of the

5  Plaintiffs' treatment of their subordinates.

6          THE COURT:  I think the question -- well, I will find

7  the exact question.  Give me a moment.

8          MS. HALPERN:  Your Honor, we can approach.

9          THE COURT:  Yes.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rebuttal                        Gregory - Cross

1       (At sidebar)

2           MS. PRATT:  Your Honor, I would like to check the

3   record on that.  I think that question was asked.

4           MS. HALPERN:  I did not ask it for Mr. Mitchell.

5           MS. PRATT:  For Mr. Mitchell you are saying?

6           We'll take them one at a time.

7           THE COURT:  The question that was asked, are there any

8   allegations of misconduct were the exact -- the question with

9   Mitchell was:  You never heard any allegations of misconduct.

10          MS. HALPERN:  For who?

11          THE COURT:  Mitchell.

12          MS. HALPERN:  I don't think I asked that.

13          THE COURT:  You did.

14          MS. HALPERN:  Okay.

15          MS. PRATT:  And as to the other two, I think the

16   question was asked, did you hear any complaints from their

17   subordinates; right?

18          What I wrote down was that what he said was that

19   Claps, Currier and Mitchell had a good reputation within the

20   Sheriff's Office and that also he had not received any

21   complaints about them, essentially, from subordinates or hadn't

22   heard of any such complaints.

23          THE COURT:  So you asked each of those if you had ever

24   heard of any allegations of misconduct.

25          MS. PRATT:  You asked it about all of them.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Rebuttal                    Gregory - Cross

1          THE COURT:  Okay.

2          (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rebuttal                          Gregory - Cross

1      (In open court; jury present)

2          THE COURT:  You can ask your question.

3  BY MS. PRATT:

4  Q.  Undersheriff Gregory, you were asked during direct

5  examination whether you have ever heard any allegations of

6  misconduct as to Sheriff Claps.

7          Do you remember that?

8  A.  No, allegations of misconduct, what I heard was have you

9  heard -- I didn't hear the misconduct part, so I'm sorry.

10  Q.  Okay.  We have just checked the record, but regardless --

11  A.  Okay.

12  Q.  -- on direct examination -- my point being simply that, you

13  would not be in a position to observe all of the conduct of,

14  say, Mr. Claps and everyone else that he ever interacted with

15  at the ACSO; correct?

16  A.  Correct.

17  Q.  And you would not be in a position to observe all of the

18  interactions between Mr. Currier and his colleagues at the

19  ACSO; correct?

20  A.  Correct.

21  Q.  Likewise, you wouldn't have been in a position to observe

22  all of the interactions between Mr. Mitchell and his

23  colleagues; right?

24  A.  Correct.

25  Q.  And finally, just to close this out, you also would have

Rebuttal                          Gregory - Cross

 1    been in a position to observe all of the interactions between

 2    Mr. Coates and his colleagues; correct?

 3    A.  Correct.

 4    Q.  Now, you also testified that Mr. Reigenborn had dismissed

 5    the entire executive staff.

 6          Do you recall that line of questioning?

 7    A.  Yes.

 8    Q.  But the executive staff includes commanders, captains,

 9    division chiefs and the Undersheriff; correct?

10    A.  No.

11    Q.  It's your testimony that the executive staff only includes

12    the four Plaintiffs?

13    A.  No.

14    Q.  Who is on the executive staff?

15    A.  As it is now, it's division chiefs and captains, which is

16    what I would have thought it would have been then, captains and

17    above.

18    Q.  Mr. Reigenborn did not dismiss all division chiefs and all

19    captains; correct?

20    A.  Let me think, here.  I might be missing something, but I

21    believe he did.

22    Q.  That's your recollection?

23    A.  Yes.  Again, I might be missing something, but my belief

24    was he did.

25          MS. PRATT:  I don't have anything further for you.


                      SADIE L. HERBERT, RPR, RCR
            901 19th Street, Denver, CO 80294  (303)335-2105

Rebuttal                          Gregory - Cross

 1    Thank you.

 2              THE COURT:  Any redirect?

 3              MS. HALPERN:  No, your Honor.  No redirect.

 4              THE COURT:  Do the jury members have any questions for

 5    this witness?

 6              You are excused, and now you are excused.

 7              THE WITNESS:  Thanks.

 8              THE COURT:  Any further witnesses from Plaintiff?

 9              MS. HALPERN:  No, your Honor.

10              THE COURT:  Do you rest your rebuttal case?

11              MS. HALPERN:  We do rest.  Thank you.

12              THE COURT:  Members of the jury, that is all of the

13    evidence in this case.

14              As I indicated to you earlier today, there's some

15    legal items that we need to take care of outside of your

16    presence now.  But I will excuse you for the day.

17              If you could return slightly before 8:30 tomorrow.  We

18    will have jury instructions and then closing arguments, and

19    then the case will be to you.

20              Even though the evidence is closed in the case, you

21    still have not received instructions or the closing arguments,

22    so you are still under the same caution not to discuss this

23    case amongst yourselves or amongst anybody else and not to do

24    any independent research.  Have a good evening.

25              (Continued on next page)

1      (In open court; jury not present)

2          THE COURT:  So we still have to do jury instructions.

3    I will take a recess before we turn to those.

4          What I intend to do with those, you have received

5    preliminary copies, is to go through each one briefly, and I

6    can give you my rationale for why I have adopted any that

7    weren't stipulated to, and to the extent anybody needs to raise

8    anything with those.  Most of these are minor variations

9    between each of them.

10         The exceptions are jury instruction what is now 14 and

11   jury instruction which is now 15, those will be more

12   substantive discussions that we can discuss once we get there.

13   There may be 16 too, but certainly 14 and 15.

14         Before, however, we take a recess to do that, is there

15   anything else that we need to take up, other than jury

16   instructions, before tomorrow?

17         MS. PRATT:  Your Honor, we would just simply reraise

18   at the close of evidence our previously stated Rule 50 motion.

19         MS. BUTLER:  Your Honor, Plaintiffs, at the close of

20   evidence, would move on the first element and damages in a

21   Rule 50 motion.  And I'm happy to make that record now or after

22   we come back.

23         THE COURT:  Let's take a brief recess, and then we can

24   make that record.

25         Why don't we say 2:50.

1          (Recess)

2          THE COURT:  Let's take up Plaintiffs' Rule 50 motion.

3          MS. BUTLER:  Thank you, your Honor.

4          Plaintiffs move on the first element, the free

5    association claim that Plaintiffs engaged in protected

6    political beliefs, activity and association and on economic

7    damages under Rule 50.

8          The evidence in this case is only susceptible to one

9    reasonable inference, which is that Plaintiffs engaged in

10   protected conduct and that Plaintiffs' economic damages are as

11   they said so in their testimony.  The evidence in this case

12   that Plaintiffs engaged in protected beliefs, activity or

13   association is overwhelming.

14         Mr. Coates testified he supported Mr. McIntosh in 2014

15   and 2018.  He donated $1,225 in 2014.  Family members donated

16   over $2,000 in 2014.  He contacted a friend to place a McIntosh

17   billboard at his Ford dealership and another friend about

18   another intersection.  He attended fundraisers and had yard

19   signs.  In 2018, Mr. Coates testified that he hosted a

20   fundraiser for Mr. McIntosh at the Ranch Country Club, which

21   cost him around $1,800 and had around a hundred attendees, that

22   he donated to the campaign, yard signs, solicited contributions

23   from friends and family.

24         Mr. Currier testified that he supported Mr. McIntosh

25   in both 2014 and 2018, that he donated in 2014.  And then, in

1   2018, he joined Mr. McIntosh's campaign team, donated around a

2   thousand dollars, routinely attended fundraisers, parades and

3   other events.

4           Mr. Mitchell testified that he supported Mr. McIntosh

5   in 2014 and 2018.  In 2014, he donated money, had yard signs in

6   his yard, placed yard signs in front of the barbershop that he

7   was friendly with and participated in a fundraiser.  And in

8   2018, again, he donated money, had yard signs and attended a

9   fundraiser at the Grisley Rose.

10          Mr. Claps testified that he supported Mr. McIntosh in

11  the 2014 election and put up signs and talked to people and

12  donated money in 2014.  And then, in 2018, he again donated

13  money.  At that same Grisley Rose fundraiser that Mr. Mitchell

14  testified about, Mr. Claps testified that he donated 300 pounds

15  of pork butt.  He attended numerous different functions and

16  spoke publicly in support of Mr. McIntosh.

17          Defendants have not introduced any evidence that could

18  call any of this into question.  And it is -- the evidence

19  points in only one direction, which is that Plaintiffs engaged

20  in protected political beliefs, activity and association with

21  Mr. -- by supporting Mr. McIntosh in 2014 and in 2018 publicly.

22          Plaintiffs also move for economic damages.  Each

23  Plaintiff testified about their economic damages and each

24  Plaintiff walked the jury through how they calculated that.

25          Mr. Coates testified that his economic damages were

1    $637,881.51.

2         Mr. Currier testified that his economic damages were

3    $553,012.45.

4         Mr. Mitchell testified that his economic damages were

5    $465,108.45.

6         And Sheriff Claps testified that his economic damages

7    were $638,900.21.

8         Defendants have introduced no countervailing evidence

9    or called in any of these damages into question.  They didn't

10   cross-examine any of the Plaintiffs about these damages.  The

11   evidence points only in one direction.  And Plaintiffs move the

12   Court to find that Plaintiffs' damages are as they have

13   testified to as a matter of law.

14        THE COURT:  Response?

15        Especially on the first issue, it doesn't appear that

16   there's been any testimony to the contrary, that they engaged

17   in political activity.

18        MS. REDMOND:  Yes, your Honor.

19        I understand that they all testified about supporting

20   Mr. McIntosh in the election.  However, Plaintiffs did not

21   present any evidence that the support they rendered him rose to

22   the level of a public concern, which is a requirement under the

23   case we cited this morning with respect to political concern

24   being an element of an association claim.  Rather, they

25   testified as to their personal reasons that they supported

1   Mr. McIntosh in the election, but not why that rose to a matter

2   of public concern.

3          THE COURT:  The case law is engaging in political

4   activity is a matter of public concern.  They testified that

5   they were at an event where they raised, this Grisley Rose

6   event.  I mean, I'm hard pressed to conclude that it's not any

7   matter of political concern that they engaged in this activity.

8          MS. REDMOND:  I understand, your Honor, and your point

9   is well taken about the case law issue.

10          However, on cross-examination, each of the Plaintiffs

11   testified that their political activities were relatively

12   minimal in support of Mr. McIntosh.  Now, I understand hosting

13   a fundraiser event applies to one of them.  Otherwise, it's

14   nominal donations they didn't seem to be particularly public

15   about and yard sign.  So again, it would seem the evidence is

16   pretty insufficient on that.

17          Would the Court like me to move on to the damages

18   issue?

19          THE COURT:  Yes, just a moment.

20          MS. REDMOND:  Yes, your Honor.

21          THE COURT:  Go ahead.

22          MS. REDMOND:  With respect to the damages issue, we

23   submit that's an appropriate question for the jury, that the

24   jury has to determine whether the damages or alleged damages at

25   issue were in fact caused by the alleged adverse action in this

1    case.  So while each of the Plaintiffs testified as to what

2    their annual payments were, what their lump sum bonuses were,

3    et cetera, et cetera, it's still up to the jury to determine

4    whether the money that they're claiming that they lost out on

5    during these periods of time were actually caused by the

6    termination decision in this case.

7           An example I think that is important here is

8    Mr. Currier testified that he had a job at the Arapahoe County

9    Sheriff's Office, he left that job willingly to go run for

10   office, during which time he chose not to work.  When he was

11   done with his candidacy in March of '22 having not won office,

12   he then chose to remain unemployed.

13          THE COURT:  I am going to defer both Rule 50 motions

14   until after the jury's verdict, as Rule 50(b) allows me to do.

15          I think that the First Amendment, Plaintiffs' First

16   Amendment argument on the first claim of their First Amendment

17   claim -- if I am making any sense at this point -- Plaintiffs'

18   liability argument is a strong one, and I think that's one, if

19   the jury were to come back and Plaintiffs were to lose on that

20   verdict, I'd be shocked.

21          My only concern, as I'm sitting here, telling it is we

22   would have to retry the whole case because, if they don't find

23   on one, they're instructed not to go forward.  I'm going to

24   take that one under advisement until tomorrow morning.

25          MS. REDMOND:  Understood, your Honor.

 1          THE COURT:  I would be shocked if the jury came back

 2    as anything other than yes, that they engaged in political

 3    activity.  Obviously, that's a very different question than the

 4    third question on whether or not it's because of that political

 5    activity that they were terminated.  I think that's what this

 6    case is really about.

 7          I'm going to defer that ruling until tomorrow morning

 8    as to whether or not I'm deferring that to the jury, I simply

 9    defer or as to whether I issue a ruling on that.

10          And as we go through these jury instructions and

11    verdict form, it's going to potentially impact that.  So I want

12    us to be prepared on that.

13          Again, I would be shocked if they don't find that way,

14    but I don't I'd get reversed on -- well, I'm not going to get

15    reversed if I defer to the jury.  It may result in having to

16    retry this whole thing again, and I don't think any of us want

17    that.  I can't imagine I would get reversed on that, there's no

18    other evidence than that they engaged in political activity,

19    but I'm going to defer until tomorrow morning.

20          Let's then turn to the jury instructions.  And like I

21    said, what I think is going to be most efficient is to simply

22    go through each one to see whether there's any additional

23    issues.  Like I said, you don't need to reargue what's already

24    been argued, with the exception of the ones that are disputed

25    moving forward.  They're the ones that I want further argument

1   on.

2          So if I rule against you and I say why in these

3   preliminary statements, you don't need to reassert your

4   argument that you made before.  If there's something new or

5   something different that you think we haven't considered or I

6   haven't given a reason for rejecting it, then feel free to

7   raise it.  But you don't need to reraise your objections.

8          So the first instruction, I believe, was a stipulated

9   instruction.  So I don't think we need any further explanation

10   on that.  Same with the second instruction and the third

11   instruction.

12          Anything with respect to any of those first three from

13   either side?

14          MR. BOHNET-GOMEZ:  Not from the Plaintiffs.  We don't

15   object to those.

16          MR. THAPA:  Instruction Number 2, moving forward,

17   based on what your Honor said, we want to reraise the objection

18   we made throughout about Adams County not being the proper

19   defendant.

20          THE COURT:  That objection is noted, and other than

21   that, it's overruled.

22          So the parties are clear on this for any appeal, I

23   think the argument has been waived.  We argued it twice.

24   Certainly, it was argued by prior counsel up on appeal.  The

25   Sheriff's Office was not the proper party.

 1          We substituted the Board of County Commissioners in

 2     for the Sheriff's Office, based in large part on that argument.

 3          I further gave the parties the opportunity just last

 4     week to make a substitution, and that was declined.  Moreover,

 5     as I have indicated throughout, this is a municipal liability

 6     claim, everybody knows what it is.  And I think it is form over

 7     function to get into any further weeds as to whether it should

 8     be Adams County or the Sheriff in his official capacity or the

 9     Board of County Commissioners.  And so that argument is

10     overruled.

11          Let's go to Instruction 4.  Here, I largely adopted

12     the Plaintiffs' proposed instruction at the trial preparation

13     conference.  Again, this largely gets into the same objection

14     that Defendants made previously.

15          But any further argument that needs to be made on 4?

16          MR. BOHNET-GOMEZ:  Not from the Plaintiffs, your

17     Honor.

18          MR. THAPA:  No, your Honor.

19          THE COURT:  Number 5, I adopted a modified version of

20     each parties' statement of the case, largely reflecting the

21     changes I made in the preliminary instructions, in that I

22     removed some of the more inflammatory components of each.

23          Anything further with 5?

24          MR. BOHNET-GOMEZ:  Yes, your Honor.  We want to raise

25     one thing about the Defendant's statement of the case, which is

1    we don't believe it accurately reflects their claims and

2    defenses.  Particularly, the last sentence that reads,

3    Defendant contends that each Plaintiffs' employment position

4    required loyalty.  This is misleading.  What they're actually

5    claiming is that it required political loyalty.

6            THE COURT:  I agree.  I think that that change should

7    be made to it.

8            Any objection from the Defendant?

9            Okay.  I will make that change.  That's what the

10   affirmative defense is, and I think it should accurately

11   reflect that to avoid confusing the jury.

12           MS. PRATT:  Your Honor, there is one thing that we can

13   remove from Instruction Number 5, statement of the case.  I

14   think the statement there, Defendant alleges that former

15   Sheriff Reigenborn's decision to terminate Plaintiffs'

16   employment was not motivated by Plaintiffs' --

17           THE COURT:  I agree with you.  That sentence comes

18   out.

19           MS. PRATT:  Right.  But as to the final statement,

20   Defendant contends that each Plaintiffs' employment position

21   required political loyalty, I would like to reserve some

22   argument as to that because of the dispute that we have with

23   regard to the affirmative defense instruction.  So I understand

24   inserting that word here based on the language of the

25   affirmative defense, but we have additional arguments as to

 1    that defense instruction that I think impacts this.

 2              THE COURT:  Well, for now, I'm going to put political

 3    in.

 4              And Plaintiffs' agree that statement comes out on the

 5    union activity; correct?

 6              MR. BOHNET-GOMEZ:  Yes.  Just to be clear, the whole

 7    sentence there, Defendant, through Sheriff's Office --

 8              THE COURT:  Yes, that comes out.

 9              MR. BOHNET-GOMEZ:  No objection to that, your Honor.

10              THE COURT:  6 through 9 I don't believe were disputed

11    at all.  Although, as I am looking at this, there may be some

12    in here that deal with the FOP that probably should come out at

13    this point.

14              Have you flagged those?

15              MS. PRATT:  We certainly can, yes, your Honor.

16              We would agree that the stipulations as to FOP matters

17    should be stricken, because it would confuse the jury and waste

18    their time.

19              THE COURT:  I agree.

20              So why don't we do this.  Rather than us going through

21    this now, let's skip to the next one.  And then once we recess

22    here, you all can go through then and decide which one of these

23    come out and that -- during that time, I can edit the rest of

24    these.  But I agree there's going to be some of those that come

25    out.

```
 1              7 and 8 and 9, I think are all noncontroversial; is
 2   that correct?
 3              MR. BOHNET-GOMEZ:  Yes, your Honor.  No objections
 4   from the Plaintiffs on those.
 5              MR. THAPA:  No objection from the Defendant either.
 6              THE COURT:  Okay.  10, the instructions were largely
 7   the same between the two.
 8              Plaintiff gave an example.  I removed it just because
 9   I usually don't give the example.  I don't feel super strongly
10   one way or another, but do you have any issues with 10 as it's
11   written?
12              MR. BOHNET-GOMEZ:  We would like the example just for
13   the reason that the jury is composed of nine.  It would help
14   them understand the meaning of circumstantial evidence more
15   clearly.
16              THE COURT:  Defendant?
17              MR. THAPA:  We would object to giving the example.  We
18   think the way the Court has it now is the best way to go about
19   it, and I think it is closer to how the Court's template is.
20              THE COURT:  I'm going to keep it as it is.  I
21   typically don't.  I don't feel strongly about that, but I'm
22   going to leave it as is.
23              Number 11, here I have adopted the Defendant's
24   instruction.  Honestly, I don't think Plaintiffs' differed
25   greatly, but I find it to be slightly redundant and that's why
```

1    I have adopted the Defendant's proposed instruction on this.

2         Any issue with that?

3         MR. BOHNET-GOMEZ:  No, your Honor.  We don't object to

4    Number 11.

5         THE COURT:  12, I think is stipulated.

6         13, here, Plaintiffs' version did not include language

7    that the use of the evidence was credibility only, so I have

8    adopted Defendant's proposed instruction, a modified version of

9    Defendant's proposed instruction to include official misconduct

10   in the list of convictions.  I think official misconduct is

11   proper to go in there.  I frankly don't think it matters much,

12   because the other offense is.  And then I have modified it

13   slightly to comply with the model jury instructions from the

14   Eighth Circuit and the Ninth Circuit.

15        Any further record that needs to be made on Number 13?

16        MR. BOHNET-GOMEZ:  Your Honor, we just have a small

17   proposal on 13, which is to change the language that reads

18   "have pled guilty to" to "have been convicted of" to match the

19   language of Rule 609.

20        MR. THAPA:  We object, your Honor.

21        THE COURT:  Why?

22        MS. PRATT:  They weren't convicted by a jury, and I

23   think stating convicted suggests that there was a jury trial.

24   There was not.  There was a guilty plea, so this is more

25   accurate, pled guilty to.

 1          THE COURT:  Here is what I will do.  I will do, have

 2    pled guilty and therefore been convicted of.  That way, it

 3    eliminates the confusion that the Defendant's raise, but makes

 4    clear that a guilty plea is a conviction, which I think takes

 5    care of the concerns that Plaintiff has.

 6          14, so I handed you all a renewed version of 14 that's

 7    changed.  And it may change again, depending on my ruling on

 8    the halftime motion.

 9          What I have done is I have taken the first element --

10    and this is beginning right after all three of them -- and I

11    have listed what the political beliefs, activities or

12    associations that there was testimony of are.  And then I have

13    instructed the jury that those actions constitute protected

14    beliefs, activity or association.

15          Let me ask, because I think it's just going to

16    simplify things, is the only argument that Defendant is raising

17    with respect to this first element that last conclusion, that

18    finding of law that these actions constitute protected

19    political beliefs, activity or association?

20          Because I don't think there's any dispute that they

21    did donating, hosting and organizing fundraisers, soliciting

22    funds and placing yard signs.  And as I understood the argument

23    today, the only argument is what they did not rise to the level

24    of protected political beliefs, activity or association.

25          MS. PRATT:  Correct.  Based on the lack of evidence as

1    to a matter of public concern.

2            And then, of course, I think the second sentence

3    there, your Honor, on the back of Page 18, Therefore, if you

4    find that a Plaintiff engaged in such activities, the first

5    element is satisfied as to that Plaintiff.  I think the jury

6    still has to make that factual determination as to each

7    Plaintiff, because they did indeed participate in different

8    actions.

9            THE COURT:  Well, the jury would need to make a

10   factual finding that each Plaintiff engaged in that activity.

11   But it doesn't sound like you are disputing that each Plaintiff

12   engaged in that activity, you are just disputing the finding of

13   law that I made.

14           MS. PRATT:  Correct.

15           THE COURT:  Here is what I'm going to do, I am going

16   to remove the complication, and I am going to grant the

17   halftime motion to Plaintiff on element one of the claim.

18           So how I think I'm going to word this, then --

19           MR. BOHNET-GOMEZ:  Your Honor, we would suggest just

20   mirroring the language from the second element.

21           THE COURT:  Well, I want the jury to be aware of what

22   I have found to be their political activity, so I think what

23   I'm going to do is "such as" is going to become "including."

24   So this is Line 3.  And the Court instructs you that it has

25   found as a matter of law that these actions constitute

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1   political beliefs, activity or association.  And then I'll

2   mirror -- let me do this.  Let me take a five-minute recess,

3   write it all out and give it to you clean so you can see what

4   it looks like, because we're all scratching things down here,

5   and better than us trying to guess what I'm scratching --

6           MR. RATHOD:  Your Honor, there's two quick typos.  It

7   says, the First Amendment to the United States Constitution

8   also protects.  It should just be the Constitution protects.

9           THE COURT:  Do this, just give it to my law clerk.

10          (Recess)

11          THE COURT:  Let's go back to Instruction 14.

12          Any further issues that the parties wish to raise with

13  respect to 14?

14          MS. PRATT:  Yes, your Honor.

15          We would like to just ensure that we have clarity on

16  this.  So is the Court's ruling on the Plaintiffs' Rule 50

17  motion that in fact each Plaintiff has established the list of

18  protected activities?

19          THE COURT:  Yes.  My understanding from my questioning

20  here is that you all are not disputing that each Plaintiff has

21  established without any contradiction that they engaged in

22  these activities.  The dispute is whether those activities

23  legally constitute protected political beliefs, activity or

24  association or rise to that level.

25          I think the undisputed facts are that they each

1    engaged in this.  And it's my conclusion, as of law, that that

2    activity does become matters of public concern.

3            I will just cite so the record is clear, Bass v.

4    Richards, 308 F.3d 1081, 1089, Tenth Circuit case from 2002,

5    recognizing that speech of about political elections

6    undoubtedly touches upon that as a public concern.

7            Cragg v. City Osawatomie, 143 F.3d 1343, 1346, Tenth

8    Circuit 1998.  We would be hard pressed to classify the

9    election of city council members as anything other than a

10   matter of great public concern.

11           Gardetto v. Mason, 100 F.3d 803 at 812, a Tenth

12   Circuit decision from 1996.  The advocacy of a particular

13   candidate in public office is the type of core political speech

14   the First Amendment was designed to protect.

15           There's many, many others that I could cite that I'm

16   sure, if this goes up on appeal on that issue, both sides will

17   adequately brief.  So yes, so I think that that then removes

18   the first and second element of Plaintiffs' claims as a matter

19   of law.  Leaving only what I think is the real issue in this

20   case, one of the real two real issues of this case.

21           MS. PRATT:  And with that understanding, of course, we

22   have already made our record, I understand that.

23           But then I think that following paragraph, The Court

24   instructs you that those actions constitute protected political

25   beliefs, activity or association, I think that is duplicative.

```
 1                THE COURT:  Which one?  I'm sorry.

 2                MS. PRATT:  On Page 18, your Honor.

 3                THE COURT:  I think the paging has changed a little

 4    bit.  Point me to what part of the sentence.

 5                MS. PRATT:  So I'm sorry.

 6                THE COURT:  What paragraph does it start with?

 7                MS. PRATT:  Let's start with Paragraph 3.  So not all

 8    three elements --

 9                THE COURT:  Yup.

10                MS. PRATT:  So all of that on the first page, subject

11    to our previously stated objection, fine.

12                THE COURT:  Right.

13                MS. PRATT:  And then, I have already ruled as a matter

14    of law that each Plaintiff engaged in such activity and that

15    such activity constitutes protected political beliefs, activity

16    or association.

17                THE COURT:  Let me tell you why I have added this, and

18    I'm happy to simplify this and simply say, I have determined as

19    a matter of law one and two.  I was trying to protect your

20    argument earlier that we want the jury to know what is that

21    political speech.

22                MS. PRATT:  And I have no problem with that, in light

23    of the Court's ruling, again, subject to our previously stated

24    objection.  My problem is with the paragraph, the next

25    paragraph that starts, the Court instructs you that those
```

 1   actions constitute, because it's duplicative.

 2        THE COURT:  You are right, you are right.

 3        MS. PRATT:  And then, likewise, the second sentence

 4   there, Therefore --

 5        THE COURT:  Yup, yup.

 6        MS. PRATT:  I think that whole paragraph there comes

 7   out.

 8        THE COURT:  You are right.  This is what trying to do

 9   this on the fly happens, I appreciate that.

10        MS. PRATT:  I understand.

11        THE COURT:  That comes out.

12        Anything else from Defendant on 14?

13        MS. PRATT:  Yes, your Honor.

14        MR. THAPA:  Yes, your Honor.

15        As to the third element, we renew our objection, as we

16   stated in our briefing, ECF 141, that the standard should read

17   substantial motivating factor.  We have the case law we have

18   put in there.  I understand your Honor's position on that.

19        But we would also propose that, if your Honor is not

20   inclined to go with substantial motivating factor, at a

21   minimum, it should read "a substantial factor, in other words,

22   a motivating factor," which is verbatim the language used from

23   the seminal case, Mt. Healthy, itself.  It's not just limited

24   to motivating factor, it's a substantial factor, in other

25   words, a motivating factor, and that's really important.

1  Because without substantial in there, motivating factor is

2  misleading.  I mean, anything could -- like a grain of sand

3  could be a motivating factor.  And the case law is clear that

4  it played a substantial part, otherwise there's no

5  Constitutional violation.

6       I also refer to the Ninth Circuit pattern, which uses

7  substantial motivating factor, it says, "is a significant

8  factor, although not necessarily the only factor," and that

9  balances the instruction well with what's included later on,

10 because the jury is already being told that it doesn't have to

11 be the only factor or the primary factor.  It needs to know

12 that it has to be at least a significant or a substantial

13 factor.

14      THE COURT:  The patterns are all over the place on

15 this.  I think three of the circuits just use motivating, the

16 Ninth is, as you mentioned, one of them says a substantial

17 motivating.

18      Let me ask Plaintiffs, I'm not going to do substantial

19 motivating, because I think that that's -- some of the case law

20 uses that phrase, I think that incorrectly states the Supreme

21 Court's case.

22      I think that their alternative, which is "a

23 substantial factor, in other words a motivating factor in

24 Mr. Reigenborn's decision" closely tracks the Supreme Court's

25 language.

1          I have -- I have a little bit of Defendant's concerns

2    that the language isn't great, but it uses both terms, and I

3    have a little bit of concern not having substantial in there.

4    I don't want to call it a substantial motivating factor, but

5    there is at least one circuit that essentially does what they

6    are suggesting, which is -- I think what the circuit says is

7    it's a substantial or motivating factor and the Court instructs

8    you these are the same things.  I think that makes it more

9    confusing.

10         What is your position on was "a substantial factor, in

11   other words a motivating factor" in the --

12         MR. BOHNET-GOMEZ:  Yes, your Honor, our position is

13   that motivating factor correctly states the law, as the Supreme

14   Court held in Mt. Healthy.  And for the reasons we discuss in

15   our jury instructions brief, the inclusion of both these terms

16   in a single instruction introduces potential confusion, which

17   is why several of the circuits have used only motivating factor

18   in their patterns, and we would urge the Court to do the same

19   thing.

20         THE COURT:  I'm going to take the alternative language

21   under advisement at this moment.

22         Anything else on 14, from Defendant's perspective?

23         MR. THAPA:  Your Honor, just more to the same point,

24   because the substantial language is also necessary in the

25   clarification later on in the instruction.  I think it's the

1    second to last paragraph, motivating -- it mentions, shown by

2    Plaintiffs' political activity or association was a motivating

3    factor.  So that would apply there as well.  Was not required

4    to prove --

5            THE COURT:  I'm not going to change that one, because

6    I think then it gets confusing.  If I change your first one --

7    and I haven't ruled on that -- if I'm not going to change the

8    first one, I'm not changing the second one.

9            If I'm going to change your first one, then I think

10   you get the substantial in there already referenced as this is

11   what substantial means.  It's a motivating factor.  It then

12   gets confusing if you use -- it doesn't read naturally if you

13   use it later as was a substantial, in other words a motivating

14   factor, that sentence gets really confusing.  And I don't want

15   to say "substantial or motivating factor," because then it

16   opens up the idea these are two different things, and jury

17   thought, oh, it wasn't motivating, it was substantial, then

18   they find a verdict against you they shouldn't find.

19           So the second one I'm not going to change, but I will

20   entertain the first one.  And honestly, as I am thinking out

21   loud, if I change the first one, given the second one that it

22   is only motivating, I think that addresses your concern to some

23   extent that it still keeps the focus on motivating, but just

24   gives a little more gravitas to match the Supreme Court's

25   decision.

 1          Again, I'm going to take this first suggestion under

 2     brief advisement while we get through the rest of this.  But

 3     let me think about it.  Let me think about it.

 4          Anything further from Defendants on 14?

 5          MS. PRATT:  Your Honor, I think we have already

 6     addressed this previously in our briefing, but we would just,

 7     again, for the record reraise that we believe the same decision

 8     defense should have been permitted.  We understand the Court

 9     has already ruled on that.  We have already stated that again.

10     Just want to make sure that's clear on the record.

11          THE COURT:  Okay.

12          Anything further from Plaintiff on 14?

13          MR. BOHNET-GOMEZ:  We just have some small sort of

14     clarifying suggestions.

15          So I think the first element describes that the

16     Plaintiff engaged in protected political beliefs, activity or

17     association, which does track with the --

18          THE COURT:  Where you are?  I'm sorry.

19          MR. BOHNET-GOMEZ:  The definition of the first

20     element, that the Plaintiff engaged in protected political

21     beliefs, activity or association.  So that kind of trilogy of

22     protected activity, we would ask that that be kind of used

23     throughout.  In some of the later paragraphs, it's pared down

24     to just political activity or association.

25          THE COURT:  I see.

1          MR. BOHNET-GOMEZ:  So I ask that beliefs be used there

2     as well for consistency.

3          THE COURT:  I think that's right.  I'm only seeing it

4     once, maybe twice.  I'll go through that.  But I think that's

5     right.  It should be --

6          MR. BOHNET-GOMEZ:  I think it's three times in the

7     second to last paragraph.

8          THE COURT:  Yes.  Yes, I agree.

9          Let me ask, on the substantial factor, one other

10    alternative to do, I think it's what the Ninth did, which is to

11    keep it as motivating factor that includes language that says,

12    a motivating factor is a significant factor, though not

13    necessarily the only factor.

14         What do the sides think about that, as compared to

15    substantial factor, in other words, a motivating factor?

16         MR. THAPA:  I think, your Honor, if my notes are

17    correct, I believe the Ninth Circuit patters says a substantial

18    or motivating factor, I think it used substantial or

19    motivating.

20         THE COURT:  If I'm going to do anything, I'm going to

21    do --

22         MR. THAPA:  Mt. Healthy itself says substantial

23    factor, in other words.

24         THE COURT:  Anything further from Plaintiffs on 14?

25         MR. BOHNET-GOMEZ:  Yeah, I just -- as we're talking

1    about this, I think I would object.  Again, a third term,

2    significant, in addition to substantial and motivating.  And

3    then kind of the idea of using the substantial or motivating, I

4    think it would potentially cause confusion.

5              THE COURT:  I agree.  You don't need to address the

6    Ninth Circuit instruction anymore.  You all have convinced me

7    I'm not going with that one.

8              MR. BOHNET-GOMEZ:  Okay.

9              And then just on the sort of reworded paragraph that

10   incorporates the Court's rulings as a matter of law, the last

11   paragraph on the first page, I think after the elements, we

12   would suggest that a change to the sentence that reads, "I have

13   already ruled" to change it to "I have already ruled on the

14   first and second element" and then kind of -- elements, excuse

15   me -- and kind of go from there.

16             THE COURT:  That's fine.  That's fine.  Again, I was

17   trying to do this on the fly.

18             Anything further on 14?

19             MR. BOHNET-GOMEZ:  No, your Honor.

20             THE COURT:  15 is pretext.  Let's see.  Well, first,

21   we have eliminated -- so the first issue with 15 was where

22   it -- hang on one second.

23             So before we get there, there was the direct evidence

24   of intent not required.  I don't think this is a necessary

25   instruction.

 1              Plaintiff argues that this instruction prevents the

 2      jury from being confused as to why it may not have heard direct

 3      evidence of intentional retaliation.  But I think the elemental

 4      instructions regarding the First Amendment, the free

 5      association is sufficient and instructs the jury as to what

 6      must be proven in the case.  And you couple that with the

 7      direct and circumstantial evidence instructions, I think that's

 8      sufficient to satisfy this, so I'm not going to give that

 9      unstipulated instruction.

10              So then the next one is pretext.  And here what I have

11      done is I have adopted a new instruction from the instruction

12      given in Mason v. Oklahoma Turnpike Authority, which is

13      115 F.3d 1442, or -- and I have put the alternative instruction

14      out there -- the Federal Jury Practice and Instruction

15      instruction.

16              Defendant's instruction includes the same instruction

17      that I have already ruled on.  You have already made your

18      record on that.  You don't need to remake that record here.

19              Defendant argues that Plaintiffs' proposed instruction

20      is inappropriate outside of the discrimination context or the

21      Douglas framework.  I don't agree.  Although analysis of

22      pretext most often appears in discrimination cases, the Tenth

23      Circuit and district courts within this court have concluded

24      that evidence of an employer's stated reason for an adverse

25      action were false or inconsistent may be relevant in

 1    retaliation cases.  And that's Seifert v. Unified Government of

 2    Wyandotte County, 779 F.3d 1141 at 1157, a Tenth Circuit from

 3    2015.  Coffee[ph] v. School District No. 501, 882 F.2d 1437,

 4    1454, a Tenth Circuit case from 1989, which was a First

 5    Amendment retaliation case.  Walker v. Town of Hennessey, 951

 6    F.Supp. 2d 1263 at 1274, a Western District of Oklahoma case

 7    from 2013, which was First Amendment retaliation.  And

 8    Montgomery v. Board of County Commissioners, 697 F. Supp 2d.

 9    934 at 942, which is a First Amendment retaliation case from

10    the District of Colorado.

11         Other circuits have done the same.  I cite Stevens v.

12    City of Austin, 2014 WL 3566537 at stars 4 through 7, Western

13    District of Texas case, which cites and collects cases from

14    Fourth, Fifth, Seventh and Ninth Circuit.

15         And so I agree that evidence shown in an employer's

16    stated reasons for an adverse action could help support the

17    inference that the employer acted with an illegal motive.

18         Moreover, Defendants do not argue that as a matter of

19    law, evidence of pretext is irrelevant.  They propose their own

20    instruction.  And importantly, when a pretext instruction is

21    requested and supported, omission of the instruction requires

22    a -- so I think the instruction of pretext needs to be given.

23    I don't feel strongly about the two options that are here, but

24    I'll hear from each side on that issue.

25         Since it's Plaintiff who seeks the instruction, why

1    don't I hear from you first, and then I'll hear from Defendant.

2            MR. BOHNET-GOMEZ:  Yes, your Honor.

3            I have -- just before we get into that, I have, just

4    for the record, we would tender our previous instruction, and

5    that may or may not be necessary.  But we have also got a

6    proposed political loyalty instruction.  And so maybe, at this

7    point, I can pass these up to counsel and your Honor.

8            THE COURT:  Sure.  But weren't these already

9    submitted?

10           Are these ones different than what was submitted

11   previously?

12           MR. BOHNET-GOMEZ:  The previous one is the same, but

13   the political loyalty one will be different, so I can wait to

14   do that at that time.

15           THE COURT:  Let's do it when we get there.  And I

16   think you should file it so the record is clear as to what the

17   proposed --

18           MR. BOHNET-GOMEZ:  Yes, we can do that.

19           THE COURT:  But before we get there, any issues with

20   either of the two pretext instructions?

21           MR. BOHNET-GOMEZ:  Yes.  As to the -- I'll take on,

22   first, the alternative instructions from the federal jury

23   practice treatise.  We think that this does not track with the

24   law in this circuit on pretext.  Particularly, the last

25   sentence, that seems to require the jury to find that the

1   reasons were so unbelievable that they were a coverup.

2        And I think, in this circuit, the law on pretext is

3   more nuanced.  The jury can find that some of the reasons are

4   not worthy of belief.  They don't have to find that all of them

5   are necessarily false or unbelievable.  And they certainly

6   don't have to find that they are so unbelievable that they

7   were --

8        THE COURT:  So let's turn to the Tenth Circuit one,

9   because I think it does track with the Mason v. Oklahoma

10  Turnpike Authority case.

11       MR. BOHNET-GOMEZ:  Yes.  And the Court's proposed

12  instruction, we really just have an issue with the first

13  paragraph starting with the second sentence, The Defendant does

14  not bear the burden of proof, et cetera, through the rest of

15  that paragraph.  We think that language is confusing and

16  unnecessary, given the Court's other instructions on the burden

17  of proof and the elements of Plaintiffs' First Amendment claim.

18  Just to restate them there, it's --

19       THE COURT:  Okay.

20       MR. BOHNET-GOMEZ:  -- duplicative.

21       THE COURT:  Okay.

22       MR. BOHNET-GOMEZ:  And then, as to the -- we had in

23  our instruction sort of a definition of pretext as an excuse,

24  so we would propose reinserting that, kind of the first mention

25  of pretext.  Then in the second paragraph, because pretext is

1    essentially legalese that we are all familiar with, but the

2    jury may not necessarily understand what that is, so define it

3    as an excuse will help them understand the issues.

4           THE COURT:  I think it's clear enough on the

5    instruction as given or as proposed here.

6           Anything further from Plaintiff on that?

7           MR. BOHNET-GOMEZ:  No, your Honor.

8           THE COURT:  How about Defendants?

9           You don't need to restate your objection that was

10   previously in there, that pretext shouldn't be given at all.

11   Beyond that, if I were to give the pretext instruction from the

12   Tenth Circuit, with the two sentences removed that Plaintiffs

13   are proposing removed, any further objection to this pretext

14   instruction?

15          MR. THAPA:  Yes, your Honor.  With the understanding

16   of what the Court just said, I think the alternative

17   instruction is better than the first one, with certain

18   modifications.  I think the last sentence there is unnecessary,

19   because this is a case where the burden goes back and forth,

20   and then they have to show that the reason is pretext, the

21   causation standard is different.  So it's whether the jury,

22   like your Honor has mentioned before, if the jury believes them

23   or not is kind of the question.  So I think with the two -- the

24   second one tracks that better, with the exception of the last

25   sentence, which is unnecessary, we believe.

 1                And I think it also needs the language that we have

 2      proposed in there, which says, under the statute itself, the

 3      reason -- the jury does not have to agree with the reason or

 4      the wisdom of it or whether they think it's harsh or wise or

 5      fair, that's not the point, it's whether it was retaliation for

 6      protected activity.  That should go somewhere in there as well.

 7                THE COURT:  I think I'm going to give the one from the

 8      Tenth Circuit modified to remove these two sentences.  It

 9      tracks the one in the Tenth Circuit, so I'm going to stick with

10      that.

11                MR. BOHNET-GOMEZ:  Your Honor, before we move on.

12      There is a typo, a small typo in the second sentence, the

13      second sentence of the second paragraph that begins, If you

14      find that the state reasons, it should be stated.

15                THE COURT:  Stated, okay.

16                MS. PRATT:  I'm sorry, your Honor.  For clarity, I'm

17      just not sure which two additional sentences we're talking

18      about.

19                THE COURT:  Sure.  So first paragraph, everything

20      after the first sentence, I think that that's -- I agree with

21      Plaintiff that it's duplicative of the earlier instructions.

22      And I think to state it again could perhaps taint the jury.

23      And so because it's duplicative, I'm removing it, the rest of

24      the first paragraph after the first sentence.

25                MR. THAPA:  Your Honor, just one more point to follow

1  up on that.  I think the same rationale with the last

2  paragraph, Plaintiffs are not required to prove, and that also

3  kind of goes back to what is already included in --

4       THE COURT:  I agree.  I agree.  I think it comes out

5  of both.

6       MS. PRATT:  Your Honor, just for the record, we would,

7  again, restate our position as to the Mt. Healthy language, we

8  think should also be included here.

9       THE COURT:  I understand.

10      That then brings us to Instruction Number 16, which I

11 think is the last significantly disputed instruction.  So let

12 me hear from -- let me tell you what I think here.  The

13 Defendant has argued that this exception should be addressed

14 immediately succeeding the elemental section, free association,

15 says the jury can follow the elements and defenses.  Therefore,

16 I have added to the language in what was Instruction 15, I

17 think it's now 14, that they consider the affirmative defense

18 if they find the Plaintiffs have established a free association

19 claim.

20      Ultimately, I adopted a modified version of

21 Plaintiffs' proposed nonstipulated instruction, except the

22 following:  One, plaintiffs' proposed instruction includes

23 statement of a state law, which I have prohibited at the trial

24 preparation conference.  And two, Plaintiff includes the

25 following sentence, which I omitted, which is, quote, In close

 1   cases doubt should result in favor of the public employee

 2   subject to dismissal.  Your determination should focus on

 3   whether the Defendant has proven that each Plaintiff could not

 4   effectively do his job unless he was politically loyal to

 5   Mr. Reigenborn.

 6           I deleted that because I think the burden of proof has

 7   been stated plainly, it doesn't need to be repeated.  The same,

 8   I think continuing to tell them the same thing over and over

 9   emphasizes the point, so I have omitted that.

10           Finally, Defendant's proposed political loyalty

11   instruction provides an extensive list of factors for the jury

12   to consider by citing the Poindexter v. Board of County

13   Commissioners, 548 F.3d 1916 and 1918, I don't think that that

14   case supports the vague descriptions provided.  Moreover, the

15   case does not support the list of factors as exhaustive.  And

16   as the Tenth Circuit, as the Supreme Court noted in Elrod v.

17   Burns, 427 US 347, 367, no clear line can be drawn between

18   positions that require political allegiance and those that do

19   not.

20           But for guiding the jury's analysis, I have adopted a

21   modified version of the factors from the Eleventh Circuit

22   pattern jury instructions.

23           So with that said, I'll let each side make any record

24   with respect to 16.  Since it's the affirmative defense, I'll

25   let Defendant go first on this one.

1          MR. THAPA:  Thank you, your Honor.

2          Just to start off with, we believe that the proposed

3  one we have is the one that should be given.  I understand the

4  Court has made modifications and you want to hear about the

5  language in the modification.

6          On the first paragraph, I believe it should say, the

7  third line, that you must return if the Defendant has proven

8  its affirmative defense.

9          THE COURT:  Yes.  Made that change.

10          MR. THAPA:  And then I believe that -- let's take it

11  one by one.

12          And then moving down to the second full paragraph, I

13  think at the end of the paragraph, you need a statement that --

14  there should be a statement that says, in this context,

15  political loyalty does not mean loyalty to any particular

16  political party, but rather loyalty to the Sheriff.  And that's

17  language based on Snyder v. City of Moab, 354 F.3d 1179, 1187,

18  Tenth Circuit 2003, where it said, clearly believed whoever was

19  the city treasurer had to be loyal to the mayor, political

20  loyalty to a particular person, rather than to a particular

21  political party is a distinction without a difference.  And

22  also Green v. Henley, 924 F.2d 185, 187, Tenth Circuit 1991,

23  which says basically reference it as perform the job adequately

24  and someone that is loyal to the commission regardless of their

25  political affiliation.

1          THE COURT:  What was the second case?

2          MR. THAPA:  It's Green v. Henley, 924 F.2d 185, 187,

3     it's a Tenth Circuit 1991.

4          THE COURT:  Okay.

5          MR. THAPA:  It's clarifying that it doesn't mean

6     political party, but it's loyalty to the Sheriff itself.

7          Moving on to the next page, we propose that, before

8     you go through the factors, there should be a statement that

9     the question is not whether any Sheriff actually takes

10    political loyalty into account, but the nature of the position

11    would appropriately permit him to do so.  That comes from

12    Poindexter, 548 F.3d 916, 919 Tenth Circuit 2008, which says

13    the question is not whether any particular political superior

14    (in this case Commissioner Huff) actually takes political

15    loyalty into account, but whether the nature of the position

16    would appropriately permit him to do so, and also Snyder v.

17    City of Moab says basically the same thing.

18         And as we're going through these factors, tracking

19    that language, it's not whether any particular Sheriff

20    considers this, but whether the nature of the position permits

21    him to do so.  It would be important to change from whether the

22    Plaintiffs acted as X, Y and Z to whether the position involved

23    acting as an advisor formulating plans.  Because it focuses on

24    the position, not necessarily these Plaintiffs.

25         Same thing with the second bullet point, instead of

1  whether the Plaintiffs exercised, it should be whether the

2  position had the authority to exercise independent judgment or

3  discretion is what we would add in carrying out the

4  responsibilities.

5        On the third point, whether the position entailed

6  regular contact with or worked closely with the Sheriff,

7  instead of Mr. Reigenborn.  And that goes, again, to Poindexter

8  and Snyder.

9        THE COURT:  I get it for 4 and 5.

10       Anything further that you have moving forward?

11       MR. THAPA:  Yes.  We would just add some of the

12  language from Poindexter as to the supervisory position,

13  because there was testimony about the supervisory position, and

14  that is -- based on these facts, whether the position was a

15  supervisory position and had authority to delegate

16  responsibilities or assignments.  And whether the position had

17  budgetary or spending authority, there was evidence of that.

18  And whether the position had input into disciplinary hiring,

19  firing, promotional, training decisions.  And then similar to

20  what I have talked about in the earlier bullet points, just

21  changing "whether the Plaintiffs" into "whether the position."

22       THE COURT:  Okay.  Let me hear from --

23       MR. THAPA:  Sorry, your Honor, one more point.  If I

24  may, your Honor, I apologize, it was on the next page.

25       THE COURT:  I do want to give an instruction to a jury

1    tomorrow morning, so I want to make sure --

2             MR. THAPA:  Yes, your Honor.  Just no one of these

3    factors is more important than any others, political loyalty

4    may be an appropriate requirement for the effective

5    performance --

6             THE COURT:  I am not putting all of those in.  They

7    were in your original instructions, and I'm not putting all of

8    those in.

9             MR. THAPA:  Just a couple more of the "his" to "its"

10   in the last paragraph.  Its affirmative defense, there's two of

11   those on the first line and the fourth line there.

12            THE COURT:  Let me hear from Plaintiffs, first, on the

13   loyalty to the office versus loyalty to the -- adding language

14   in there that is loyalty to the office.

15            MR. BOHNET-GOMEZ:  Again, I just want to hand out

16   these tendered instructions so the record is clear, and we'll

17   file them on ECF.

18            THE COURT:  Okay.

19            MR. BOHNET-GOMEZ:  So to respond to the issue of

20   loyalty to the Sheriff, we think that misstates the law here.

21   It should be personal political loyalty to Mr. Reigenborn.

22   What this defense is about is not loyalty to the office,

23   loyalty to the workplace, loyalty to the community it serves,

24   and these are the things that have been testified about.

25            It's about partisan political loyalty.  The Supreme

1    Court has made that clear in Branti v. Finkel, 445 US 507, a

2    Supreme Court decision from 1980, it is not, you know,

3    dedication to the job or ability to follow orders, it is

4    political loyalty.

5         THE COURT:  Let me ask your position on actual duty

6    involved versus what the Plaintiffs did.  I think their point

7    is it's the actual duty.

8         MR. BOHNET-GOMEZ:  I think I want to sort of take a

9    step back and object to the inclusion of these factors at all.

10   I think it directly contradicts what the Supreme Court has laid

11   out as the ultimate test, again, in Branti.  At 518, the

12   Supreme Court discussed the example of a state university

13   football coach.  And it said, it is equally clear that party

14   affiliation is not necessarily relevant to every policy making

15   and confidential position.  The coach of a state university's

16   football team formulates policy, but no one can seriously claim

17   that Republicans make better coaches than Democrats or vice

18   versa.  So I think that focusing on these factors, which every

19   Supreme Court and the Tenth Circuit have said are not

20   dispositive, detracts from the ultimate question, which is not

21   whether the Plaintiffs' job had any of these factors, but

22   again, as the Supreme Court said in Branti, whether those

23   factors or job duties actually relates to partisan political

24   interests.

25         THE COURT:  Counsel, how in the world is the jury

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1    supposed to make this determination if you just say, is it

2    political loyalty?

3          You are not give them anything to consider.  I am

4    going to give them some factors to consider.

5          What I will do is I will change, on the bottom of the

6    first page of this, where it says, "you may consider factors

7    such as," I'm going to change that to "you may consider the

8    following nondispositive factors, including" and you have made

9    your record.  You don't need to make it any further on that.

10         MR. BOHNET-GOMEZ:  And again, I would point the Court

11   again to the Branti case.

12         THE COURT:  Counsel, you have made your record.  You

13   don't need to make it -- I am giving them something to

14   consider.  I am not just throwing it out there and saying, this

15   is -- you walked through on your examination many of these

16   factors.  But now you want me to tell them -- to leave them

17   with no factors to consider.

18         MR. BOHNET-GOMEZ:  I think that highlighting these

19   factors, especially how vague some of them are, like whether

20   Plaintiffs exercised independent judgment, is going to mislead

21   the jury.  They're going to argue, presumably, that, well,

22   these jobs all tick all these off, and therefore, it's

23   political.  But that's not the ultimate analysis.

24         In Branti, the Supreme Court considered the job duties

25   of a public defender and concluded that some of these factors

1    were met, but because the factors didn't relate or have any

2    bearing on partisan political concerns, the ultimate question

3    of whether the political affiliation or loyalty was an

4    appropriate requirement for the position was answered in the

5    negative.

6            So if -- you know, I think that the list is vague and

7    both over inclusive in the way it's framing these factors.  The

8    Eleventh Circuit pattern doesn't cite any support in case law

9    for these.  And I don't think they track with any of the

10   discussion that the Supreme Court has issued on this.  And

11   they're also under inclusive in the Jantzen v. Hawkins case

12   from the Tenth Circuit, 188 F.3d 1247, the Court considered

13   other evidence, not relating to job duties.  It considered

14   proof that they actually did perform their jobs effectively,

15   despite political differences with the Sheriff.  It considered

16   also, quote, the lack of evidence of meaningful disruptions at

17   work.  So these are other things that could be considered.  And

18   the language in this jury instruction, that the jury must focus

19   on the job duties --

20           THE COURT:  I'm not saying they must focus on it.

21   I'll add a sentence that says --

22           MR. BOHNET-GOMEZ:  So the instruction does use the

23   word focus at the bottom of Page --

24           THE COURT:  It says, you must focus on the inherent

25   powers of the position and the actual duties performed.  And

1 then it says, you may consider the following nondispositive

2 factors, including.

3        MR. BOHNET-GOMEZ:  Right.  And in the Jantzen case,

4 which predates Poindexter and some of these other cases, where

5 that language is drawn from, and therefore is controlling, the

6 Tenth Circuit considered evidence of functioning effectively

7 and lack of disruption from employing people with various

8 political affiliations.

9        THE COURT:  With that objection, let me ask you, do

10 you agree that if I do consider factors that it should be

11 whether the Plaintiffs' position versus what the Plaintiff

12 actually did?

13        MR. BOHNET-GOMEZ:  I think -- and again, this is a

14 reason I think weighing against the factors is that it's -- the

15 case law seems to embrace both, the inherent powers of the

16 position and the actual duties performed.

17        THE COURT:  Here is what I'm going to do.  I'm going

18 to take another brief recess.  I'm going to redo this

19 instruction.

20        Well, let's get through the rest of them, and then

21 I'll come back to this instruction.

22        I am going to add -- I will tell the parties what I'm

23 going to do is I'm going to give this list.  I'm going to give

24 it as it is, as opposed to changing to the position.  And I'm

25 going to include, at the end a statement, right after giving

1    this list, a statement that says, once again, this list is

2    nonexhaustive and there may be other factors relevant to this

3    analysis.  The ultimate question is whether political loyalty

4    was an appropriate requirement for the effective performance of

5    the public office involved.

6         MS. PRATT:  Your Honor, with regard to that statement,

7    I really must point the Court to the last couple of factors,

8    because I think it's going to confuse the jury if it's saying

9    whether the Plaintiffs frequently interacted with the public as

10   Mr. Reigenborn's representative or alter ego.  They clearly

11   could not possibly have done so, given that they were

12   terminated.  So I think that at least would have to take out

13   Mr. Reigenborn in that factor and the final factor and at least

14   just say the office.  Because inherently, these four Plaintiffs

15   could have not have been acting on Mr. Reigenborn's behalf

16   because they didn't work for him.

17        THE COURT:  Well, I agree on -- I'm going to take this

18   under advisement.  I'll give you one tomorrow morning, and then

19   you all can make your record on this.  This -- I'll give you

20   one tomorrow that's going to be the final one.  You can make

21   your final objections before we bring the jury in on that.

22        Then that brings us to what I'm proposing is 17.  I

23   think it's 17 because I think it makes sense to come in right

24   after the elements of the offense.  And it's as follows --

25   well, I have given you each one.

1           I do think that there needs to be a limiting

2    instruction, and I told the Defendants that I would give them a

3    limiting instruction on the issue of violation of policies.

4    And I think it's clear, in the Tenth Circuit, that near

5    violation of policies is not enough.

6           My substantial problem with the Defendant's limiting

7    instruction is it essentially contradicts my prior order in

8    which I said it was a factor that could be considered, and here

9    it says that you may not consider such evidence to determine

10   that any of the Plaintiffs' First Amendment rights were

11   violated.  I think it's a factor to be considered, it's not

12   ultimate conclusion, but it's a factor to be considered.

13          Any further record anybody needs to make on Number 17?

14          MS. PRATT:  No, your Honor.

15          MS. HALPERN:  Your Honor, if I may, this came up when

16   we were talking, I think, about -- it only came up with one

17   policy, so I do think this is very vague.  It came up with the

18   policy, the internal discipline policy, which I believe is

19   Exhibit 79.  It didn't come up in the context of other

20   policies, nor was the limiting instruction sought.  An argument

21   had been made, from what I recall is that, while we understand

22   that I think there might be a need for a limiting instruction,

23   but that we were using it to just show pretext and diverging

24   from standard policies, and so I think, to the extent that

25   there is a limiting instruction, it has to be limited to the

 1    actual policy where one was requested.  And I think it has to

 2    be clarified.  Because in that particular policy, it was that

 3    it can still be considered as evidence of pretext.  And it was

 4    only kind of the internal investigations before termination

 5    policy, Exhibit 79.  That's the only time.

 6         THE COURT:  I think this one is a sufficient

 7    instruction, so I'm keeping this one as written.  It

 8    essentially says it's a factor that can be considered, but

 9    cannot alone constitute a Constitutional violation.

10         What was 17 and now becomes 18 is damages.  It's my

11    understanding that one was not disputed.

12         Am I correct on that?

13         MR. BOHNET-GOMEZ:  Yes, your Honor.  I believe it was

14    stipulated.

15         THE COURT:  And then what is -- was 18 now is going to

16    become 19 is First Amendment retaliation damages.  And it's my

17    understanding that's stipulated; correct?

18         MR. BOHNET-GOMEZ:  Correct, your Honor.

19         THE COURT:  Okay.

20         MR. BOHNET-GOMEZ:  We would have, in light of the

21    Court's rulings eliminating one of our claims, we think the

22    last paragraph of this instruction, which goes to duplication

23    of damages is no longer necessary.

24         THE COURT:  I will remove that.

25         Number 19, now 20, uncertainty as to damages.  This

 1    dispute concerning the first statement of the instruction, what

 2    I have taken is from another case that I have used as to

 3    uncertainty as to damages, and I think it adequately states

 4    what the law is in this circuit, and so I'm adopting -- I think

 5    it's verbatim out of Defendant's proposed instruction.

 6           Anything further on this one?

 7           MR. BOHNET-GOMEZ:  Just on that first sentence, your

 8    Honor, I think, in light of the emotional distress damages that

 9    Plaintiffs seek, it may be confusing that the jury is being

10    instructed to not -- to be dispassionate.  But it does involve

11    emotions, so to speak.  So in light of kind of the minimal

12    worth that this sentence is doing, I think the confusion -- the

13    potential risk of confusion outweighs the need for including

14    it.

15           THE COURT:  I don't think they're going to be confused

16    on that.  So as a result, I'm going to leave that as is.

17           Instruction Number 20 is stipulated to, but I'm not

18    sure it's necessary in this case.  Nobody said they had seen

19    any pretrial publicity on the case.

20           And I can tell you what my concern about it is, is

21    we've introduced testimony from the media here, and I'm worried

22    they're going to look at that and say, am I supposed to ignore

23    this exhibit that was pretrial.

24           Given that nobody knows anything, I think we just

25    eliminate what was Instruction 20.

 1          MR. BOHNET-GOMEZ:  We have no objection.

 2          MS. PRATT:  No objection.

 3          THE COURT:  So old 20 is going to be gone.  So now

 4     we're back at -- we inserted the limiting instruction, now

 5     we're back to the pre-limiting numbers then.  And the rest of

 6     these, I believe everybody was okay with.

 7          Am I correct?

 8          MR. BOHNET-GOMEZ:  Yes, your Honor.

 9          THE COURT:  Okay.

10          MR. BOHNET-GOMEZ:  And your Honor, if we could make

11     one different point about a different part of the political

12     loyalty instruction, which is that the second paragraph in the

13     middle, it has a sentence that reads, In assessing the need for

14     political loyalty of employees, the law asks you to -- excuse

15     me -- the law requires you to ask whether loyalty is essential

16     to the implementation of policies of the new administration.

17          And again, as we have been discussing, this defense is

18     focused on political loyalty and partisan concerns, as the

19     Supreme Court has said, not a more abstract notion of loyalty

20     to the job and so on.  So we would ask that --

21          THE COURT:  I think political should go in there too.

22     Okay.

23          Anything further before we turn to the verdict forms?

24          MS. BUTLER:  Your Honor, just briefly on the Court's

25     new Instruction Number 14.  In the last paragraph, there's

1   still a discussion of element one in two places; in the first

2   sentence and in the second sentence.  And we would ask the

3   Court to remove that, given the Court's ruling.

4           THE COURT:  Okay.

5           Let's then turn to the verdict form.

6           Any issues with the revised verdict form as submitted?

7           MR. BOHNET-GOMEZ:  Not from the Plaintiffs, your

8   Honor.

9           MS. PRATT:  Your Honor, with regard to the questions

10  that pertain to the affirmative defense, again, we don't

11  believe that it should -- that the language should be, did

12  Defendant prove by a preponderance of the evidence that

13  political loyalty to Mr. Reigenborn, but it is to the Sheriff

14  is our reading of Poindexter and other authorities from the

15  Tenth Circuit, that it is about political loyalty and whether

16  the specific position can be found to be -- can be -- sorry,

17  there we go, there's my colleague helping me out -- was of a

18  nature to require political loyalty to the office itself.  It's

19  not dependent on the specific office holder.  And so that would

20  be our continuing objection throughout each of the questions

21  that pertain to the affirmative defense.

22          THE COURT:  Here is what I'm going to do.  I'm going

23  to make the change that we have already made.  I want to excuse

24  our court reporter, because I don't want to make her stay here

25  past 5.  I'm going to make these changes with that objection

1    noted, give you all the instructions as they stand now, with

2    the understanding that the objection to that portion of the

3    verdict form, as well as to the political loyalty affirmative

4    defense, the version you're getting is not going to be the

5    final version.

6         I told the jury to get here at 8:25.  I want everybody

7    here at 8 o'clock tomorrow.  You'll have a chance to go back

8    over the jury instructions, make sure there's no typos or

9    anything.  And then I will give you, at that point, my final

10   version of the political loyalty, as well as my ruling on the

11   verdict form issue.  And then you can make any last objections

12   you want to that.  And then we should still be able to get the

13   jury in by 8:30 and move forward.

14        MS. PRATT:  Your Honor, just to that point, with

15   regard to the discussion that we had previously about the

16   Mt. Healthy factors, we think that there should be at least --

17   again, if the Court is inclined to rule in favor of including

18   the entirety of the Mt. Healthy language, that that should also

19   be included in the verdict form, because otherwise it would be

20   inconsistent.  I understand the Court hasn't made a ruling on

21   that yet.  But to the extent that you do find that the

22   Mt. Healthy language should be in the jury instruction, then I

23   think it should be in the verdict form.

24        THE COURT:  I don't think it's inconsistent, because

25   Mt. Healthy says they're the same thing.  And it's defined --

1    if I take the instruction that you have proposed, it's

2    essentially defining substantial as motivating, so the jury is

3    being told, this is what it is.  I don't think the verdict form

4    needs to change as a result of that if I do adopt that.

5          What I want to do is I'm going to make these changes.

6    I want to excuse my court reporter.

7          I'm going to ask you to stick with my law clerk.  I

8    have what I think the exhibits are that have been admitted and

9    marked on here.  Have at least one of you all meet with my law

10   clerk and make sure we're all in agreement on what should go

11   back to the jury.  Because I want to have that dealt with

12   tonight so we don't have confusion tomorrow as to what books go

13   back to the jury.

14         So I'll give this to one of my law clerks.  And then

15   I'll make these changes and get it to you, what we have at this

16   point.  We'll get you some tomorrow morning.

17         (Adjourned to January 28, 2025 at 8:00 a.m.)

18                        * * *

19

20

21

22

23

24

25

1059

```
 1                    INDEX OF EXAMINATION

 2    Examination  of:                          Page

 3    GLOVER SCOTT JARMIN

 4    Direct By Ms. Pratt . . . . . . . . . . . . 829

 5    Cross By Ms. Halpern . . . . . . . . . . . 853

 6    Redirect By Ms. Pratt . . . . . . . . . . 861

 7    SUSAN ARGO

 8    Direct By Ms. Redmond . . . . . . . . . . 862

 9    PAUL GREGORY

10    Direct By Mr. Thapa . . . . . . . . . . . 876

11    Cross By Ms. Halpern . . . . . . . . . . . 878

12    Redirect By Mr. Thapa . . . . . . . . . . 890

13    MARK TOTH

14    Direct By Ms. Redmond . . . . . . . . . . 893

15    Cross By Ms. Halpern . . . . . . . . . . . 919

16    Redirect By Ms. Redmond . . . . . . . . . 934

17    CHRISTOPHER LAWS

18    Direct By Mr. Thapa . . . . . . . . . . . 945

19    Cross By Ms. Butler . . . . . . . . . . . 971

20    Redirect By Mr. Thapa . . . . . . . . . . 990

21    PAUL GREGORY

22    Direct By Ms. Halpern . . . . . . . . . . 996

23    Cross By Ms. Pratt . . . . . . . . . . . .1003

24

25
```

        I hereby certify that the foregoing is a true and accurate

transcript, to the best of my skill and ability, from my

stenographic notes.




                    *Sadie L. Herbert*
                    Official Court Reporter
                    U.S. District Court