1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-01936-STV

4    TIMOTHY JAMES COATES, et al.,

5          Plaintiffs,

6          vs.

7    BOARD OF COUNTY COMMISSIONS FOR THE COUNTY OF ADAMS,

8          Defendant.

9    --------------------------------------------------------------

10                   REPORTER'S TRANSCRIPT

11                    Trial, Vol. VI

12   --------------------------------------------------------------

13          Proceedings before the HONORABLE SCOTT T. VARHOLAK,
     Magistrate Judge, United States District Court for the District
14   of Colorado, commencing on the 28th day of January, 2025, in
     Courtroom A402, United States Courthouse, Denver, Colorado.

15

16                       APPEARANCES
     For the Plaintiffs:
17   IRIS HALPERN, FELIPE S. BOHNET-GOMEZ, VIRGINIA BUTLER and
     SIDDHARTHA RATHOD, Rathod Mohamedbhai LLC, 2701 Lawrence
18   Street, Suite 100, Denver, Colorado 80205

19

20   For the Defendant:
     KATHERINE PRATT, CHRISTY REDMOND and SAUGAT THAPA, Thompson Coe
21   Cousins & Irons LLP, 1700 Broadway, Suite 900, Denver, Colorado
     80290
22

23
     Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street,
24   Denver, CO 80294, (303)335-2105

25

20-cv-01936-STV   Trial, Vol. VI   January 28, 2025

1        P R O C E E D I N G S

2        (Proceedings commenced at 8:31 a.m.)

3        (In open court; jury not present)

4             THE COURT:  First, any typos or other corrections that

5    anybody saw in the final jury instructions?

6             MR. BOHNET-GOMEZ:  No typos, your Honor.  But we do

7    have some other things to raise.

8             THE COURT:  Okay.

9             MR. THAPA:  We have some typos, if you want to address

10   theirs first.

11            THE COURT:  Let's deal with the typos first.

12            MR. THAPA:  Your Honor, Page 17, Instruction 14, the

13   last paragraph.  I believe it should say -- I believe there's a

14   "not" missing before proven, if after considering all of the

15   evidence, you find that a Plaintiff has not proven element 3,

16   then you should so state.  Otherwise, the two sentences are

17   redundant.

18            THE COURT:  I think that's right.

19            Any other typos?

20            MR. THAPA:  I think that was the only typo, your

21   Honor.

22            THE COURT:  Then I'll take any further argument -- and

23   again, the jury was to be here at 8:30 -- before I issue any

24   ruling on political loyalty, affirmative defense or anything

25   else.

20-cv-01936-STV   Trial, Vol. VI   January 28, 2025

1   MR. BOHNET-GOMEZ:  Yes, your Honor.

2   On the political loyalty defense, we understand the

3   Court's ruling on the factors, but we would ask that factors

4   from Tenth Circuit law that are consistent with our theory of

5   the case be included, such as that the jury can consider

6   evidence that Plaintiffs' professional judgment would be or was

7   skewed by the political loyalties, as well as evidence that

8   Plaintiffs actually did effectively perform their jobs, despite

9   political differences with the Sheriff, and evidence of whether

10  there were any meaningful disruptions at work.  Those three are

11  all from the Jantzen case.

12  THE COURT:  But I don't see how the jury could

13  possibly consider whether they effectively performed their job

14  or whether their actions were skewed when they never did

15  perform their job under this sheriff.

16  MR. BOHNET-GOMEZ:  Under previous administrations.

17  THE COURT:  I don't think that that's -- the issue in

18  this case, as I'll issue in a moment, is clear that the

19  question is the loyalty to this sheriff.  It's not to the

20  Sheriff's Department in general or anything else.  The issue is

21  can they be loyal to this particular sheriff.  And we don't

22  know whether or not they were working effectively under this

23  sheriff because they never began.

24  MR. BOHNET-GOMEZ:  There were other witnesses who

25  testified, like Mr. Gregory, who did work with Mr. Reigenborn,

1    despite his affiliation with Mr. McIntosh.

2        THE COURT:  I'm not including those ones because I

3    think that it's -- again, I think the question is loyalty to

4    this particular sheriff.  So your objection is noted, but I'm

5    not adjusting those.

6        MR. BOHNET-GOMEZ:  We have an additional proposed

7    factor, which is whether the Plaintiffs would report directly

8    to the Sheriff or whether there are any intermediate

9    supervisory levels.

10        THE COURT:  Do you have a case for that?

11        MR. BOHNET-GOMEZ:  Yeah, it's Poindexter, 548 F.3d 916

12    at 920.

13        THE COURT:  Okay.

14        MR. BOHNET-GOMEZ:  And that was also a consideration

15    in the Court's summary judgment order as well.

16        THE COURT:  Let me hear from Defendants on that

17    additional factor.  And any additional argument you wish to

18    make?

19        MR. THAPA:  Your Honor, on that factor specifically, I

20    believe there's already whether they would have had regular

21    contact or worked closely with Mr. Reigenborn.  I believe that

22    factor already addresses that.  I don't think that needs to be

23    directly reporting to him.

24        MR. BOHNET-GOMEZ:  Poindexter specifically discusses

25    reporting directly versus intermediate supervisory authority.

20-cv-01936-STV    Trial, Vol. VI    January 28, 2025

1  Whereas, the factor in the jury instructions about directly --

2  or having regular contact with is vague, and it doesn't really

3  track the actual consideration.

4          THE COURT:  I will add a factor.  I'll put it as D,

5  which will then push the others down, as to whether the

6  Plaintiffs -- I'm just going to read this directly -- would

7  have reported directly to Sheriff Reigenborn or whether there

8  were -- I'm trying to find the exact wording from Poindexter.

9          MR. BOHNET-GOMEZ:  It's intermediate supervisory

10  authority.

11          THE COURT:  Okay, or whether there were intermediate

12  supervisory authority.  Okay.  I will add that factor in here.

13          Any further argument you wish to make?

14          And again, I do want to get the jury in here, because

15  I want to get the case to them by lunch.

16          MR. BOHNET-GOMEZ:  Nothing further on that.

17          THE COURT:  Anything further from the Defendant?

18          MR. THAPA:  Yes, your Honor.

19          With the factors, I think it would be important to

20  kind of put some of the terms in layperson speak, so to speak,

21  under -- before you get into the factors, it says, you may

22  consider the following nondispositive factors.  I think you

23  should add the language from Snyder, 354 F. 3d 1185, it says,

24  though no one specific factor needs to be proven.

25          MR. BOHNET-GOMEZ:  Your Honor --

20-cv-01936-STV    Trial, Vol. VI    January 28, 2025

1    THE COURT:  I think that's clear from both the fact

2    that it's nondispositive, and that's the definition of

3    nondispositive, and the fact that I then again later say, once

4    again, this list is nonexhaustive, and there may be other

5    factors -- I think that's clear as can be.

6        Anything further from Defendant?

7        MR. THAPA:  On the last paragraph, your Honor, starts

8    on end of Page 20, last sentence there, if you find the

9    evidence -- if you find that the Defendant has proven as an

10   affirmative defense by a preponderance of the evidence, then

11   you must find for Defendant on this claim, then you should so

12   state on the appropriate place on the verdict form.  And then,

13   if on the other hand you find -- after the find, it should say,

14   a Plaintiff has proven his claim, but the Defendant has not

15   proved its affirmative defense.  I would ask that be added so

16   the jury is not confused as to, if I don't find the Defendant's

17   affirmative defense proven, then though I didn't find for the

18   Plaintiffs, I go back and find for the Plaintiffs.

19       THE COURT:  That gets confusing, though.  I think it's

20   clear from the verdict form.

21       Let me pull up the verdict form.  Because I think they

22   don't go to the next stage.

23       MR. BOHNET-GOMEZ:  One way to maybe resolve the

24   ambiguity, in that paragraph, instead of talking about a claim,

25   just to replace the word "claim" with "affirmative defense."

20-cv-01936-STV    Trial, Vol. VI    January 28, 2025

 1          THE COURT:  Why don't we just do, then your verdict

 2   must be for the Defendant.  We don't have multiple claims

 3   anymore.  I can say, if you find the Defendant has proved its

 4   affirmative defense by a preponderance of the evidence, then

 5   your verdict must be for the Defendant and you should so state

 6   at the appropriate place on the verdict form.  I think that

 7   clarifies it.

 8          MS. PRATT:  For clarity, we're taking out --

 9          THE COURT:  On this claim.

10          MS. PRATT:  On this claim.

11          What are we doing for, if on the other hand?

12          THE COURT:  If on the other hand stays the same.

13          MS. PRATT:  Okay.

14          THE COURT:  Because they're not going to get to here

15   unless they find already that the Plaintiffs have proven their

16   case.  Then you get to the affirmative defense, it says, if you

17   find that the Defendant has proven its affirmative defense by a

18   preponderance of the evidence, then your verdict must be for

19   the Defendant and you should so state.

20          MS. PRATT:  Got it.

21          THE COURT:  Let me do this.  I'm going to take a very

22   brief recess.  I'm going to make these couple changes, reprint

23   this out so that I'm reading from the final version of it.

24          I'm not going to require my court reporter to record

25   down what I'm reading, but just everybody follow along with me

20-cv-01936-STV    Trial, Vol. VI    January 28, 2025

1    as I'm reading to make sure that there's no issues with it.

2         And I'll bring our jury in.  I will read them the

3    closing instructions.  Then we will briefly recess for the

4    morning break, and then we'll have closing arguments.  And that

5    should take us right to the lunch hour, hopefully.

6         Let me actually put on the record -- sorry -- let me

7    put on the record my reasons for this final instruction since I

8    didn't yesterday.

9         I have modified the language of the instruction to

10   include some portions of the Defendant's proffered instructions

11   about political loyalty.  Specifically, I have adopted the

12   slightly modified following language:  Quote, Political loyalty

13   does not necessarily mean loyalty to a particular party, but

14   can instead mean loyalty to a particular person, such as then

15   Sheriff Reigenborn.  And the question is not whether any

16   particular Sheriff takes political loyalty into account, but

17   whether the nature of the position would appropriately permit

18   him to do so.

19        I note that the Tenth Circuit has repeatedly

20   referenced loyalty to the individual, as opposed to the office.

21   In Dickeson v. Quarberg, 844 F.2d 1435 at 1442, Tenth Circuit

22   decision from 1988, the Court stated, quote, with Elrod and

23   Branti in mind, we must determine whether Plaintiffs were in

24   positions where party affiliation is an appropriate requirement

25   for the effective performance of the public office involved or,

1    more precisely, in these circumstances, the issue is whether

2    political loyalty or affiliation with particular persons can be

3    made an appropriate requirement for effective performance in

4    the positions that Plaintiffs held.

5            Similarly, in Gann v. Cline, 519 F.3d 1090 at 1092, a

6    Tenth Circuit decision from 2008, the court identified the

7    political loyalty claim as being loyal to a specific person,

8    stating, quote, all that matters is that Ms. Gann was

9    discharges because she did not campaign for or support

10   Mr. Rinehart.  The same standard applies in other circuits.

11   Terry v. Cook, 866 F.2d 373 at 377, Eleventh Circuit from 1999,

12   quote, under the Elrod/Branti standard, loyalty to the

13   individual sheriff and goals and policies he seeks to implement

14   through the office is an appropriate requirement for the

15   effective performance of a deputy sheriff.  Jenkins v. Medford,

16   119 F.3d 1156 at 1163, a Fourth Circuit decision from 1997,

17   similarly describing the political loyalty as relevant to the,

18   quote, individual sheriff.  DiRuzza v. County of Tehama,

19   206 F.3d 1304 at 1312, a Ninth Circuit decision from 2000, also

20   referring to the individual sheriff.

21           Indeed, the argument that the jury needed to be

22   instructed as to loyalty to the office in general first arose

23   yesterday as Defendant's proposed instructions to the Court

24   submitted on November 22nd, 2024, and rely upon that in

25   fashioning political loyalty instruction said, quote, keep in

20-cv-01936-STV   Trial, Vol. VI   January 28, 2025

1   mind that, quote, political unquote, loyalty or allegiance does

2   not necessarily mean loyalty or allegiance to any particular

3   party, rather loyalty or allegiance to former Sheriff

4   Reigenborn suffices as political loyalty or allegiance in this

5   case.  Thus, I have kept the instruction and verdict form as

6   loyalty to Sheriff Reigenborn with the modifications previously

7   noted.

8          I'm going to make these changes, and then we'll be

9   back.

10          (Recess)

11          THE COURT:  Please bring in our jury.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

20-cv-01936-STV    Trial, Vol. VI    January 28, 2025

1      (In open court; jury present)

2          THE COURT:  Members of the jury, first, I apologize,

3    we had a few things that drifted over from last night into this

4    morning.  So that's why we're starting a few minutes late.  But

5    we're now ready to go with jury instructions, which I will read

6    to you.  I apologize in advance, I will be reading this

7    literally word for word, so I do apologize in advance for

8    reading directly from this.

9          You do not need to take notes while I read these

10   instructions.  You will receive a copy of these instructions in

11   the back.  So please pay attention as I am reading them, but

12   you will also receive a copy of them.

13          (Jury instructions read)

14          THE COURT:  Members of the jury, those are the

15   instructions.

16          What we're going to do next is we'll take a brief

17   recess to allow you all to use the restroom, if you need to, or

18   just take a break.  We'll take that for about 15 minutes.  Why

19   don't we have you return by 10.  Then the sides will give you

20   closing arguments.

21          The case is not to you yet, so the same instructions I

22   have given you all along, that you are not to deliberate and

23   discuss the case with each other still remain in effect.

24          The closing arguments will begin at 10.  I anticipate

25   those will go until right about the 11, 11:30, 12:00 o'clock,

20-cv-01936-STV    Trial, Vol. VI    January 28, 2025

1   somewhere in that range.  And then the case will be to you.  We

2   have lunch ordered for you.  You will receive that and your

3   deliberations will begin once those closing arguments are

4   given.

5           So we will recess now.  If you all will be prepared to

6   be brought back in for closing arguments at 10:00 o'clock.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (In open court; jury not present)

 2              THE COURT:  A couple of minor things.

 3              I caught a few minor typos as I was reading that I'll

 4    just correct.  Page 2, the title of Instruction Number 2, it

 5    should be duty to follow instructions plural, instead of

 6    instruction.

 7              Page 6, stipulation 3 was missing "with" between it

 8    and ACSO, so I have added that.

 9              And then there were a couple points where either a

10    spacing looked odd or a comma or an apostrophe was going the

11    wrong way.  So I'll just fix those so that it's clean for the

12    jury.

13              I can look at my notes.

14              Does each side remember how long I gave for closing

15    arguments?

16              MR. BOHNET-GOMEZ:  45 minutes.

17              THE COURT:  Okay.  Again, if we're at -- I'll give you

18    each a warning as we get close to 45.  I'm not going to hit a

19    hard stop at 45.  But if we're starting to get to 50, then I

20    will.  So that way we are sure to get the jury their case

21    before the lunch hour.

22              Obviously, for Plaintiff, if you intend to have any

23    rebuttal, the 45 counts to that.

24              Anything else we need to take up before closing?

25              I'll see everybody in about 15.
```

1           (Recess)

2           THE COURT:  Let's go get our jury.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation - Ms. Halpern

1      (In open court; jury present)

2          THE COURT:  Counsel, closing arguments.

3          MS. HALPERN:  The First Amendment of the United States

4    Constitution guarantees each of us the right to support the

5    candidate we believe will best serve the public.  And when we

6    go to work each day, we expect that right to be honored, that

7    we won't lose our jobs because we voted for someone our boss

8    did not.

9          But that is not what happened to T.J. Coates, Mark

10   Mitchell, Kevin Currier and Gene Claps.  After the more than a

11   century of combined service fighting to keep our community

12   safe, each one of them found themselves kicked to the curb in a

13   parking lot holding boxes of their personal belongings,

14   scrambling to find a way home.  Their careers were ruined.

15   Their livelihoods lost.  Their dignity stolen.  Just one day

16   after Rick Reigenborn, the new Sheriff of Adams County took

17   office, rescinding all of the agency's personnel policies and

18   exacting his dream of political retribution.

19         We expect our safety and not political partisanship to

20   guide our law enforcement leadership.  Officers must enforce

21   the law equally and fairly, regardless of politics, across

22   communities, no matter what that political community is.

23         What Mr. Reigenborn did is a double blow.  He deprived

24   these gentleman of their rights as Americans, while depriving

25   the rest of us of the best that law enforcement can be.

Summation - Ms. Halpern

1        So what happened in this case?

2        Last week, we started by telling you that Rick

3   Reigenborn fired T.J. Coates, Mark Mitchell, Kevin Currier and

4   Gene Claps because they were not personally loyal to him in the

5   2014 and 2018 Sheriff elections, instead supporting his

6   opponent, Mike McIntosh.

7        After a bitterly-fought campaign, Mr. Reigenborn lost

8   in 2014.  And he nursed a paranoid grudge for four years

9   against Mr. McIntosh's most prominent supporters.  When he won

10  in 2018, Mr. Reigenborn wasted no time carrying out his

11  personal vendetta, purging the command staff and cleaning house

12  of McIntosh supporters.  That was his own words.

13       Now, members of the jury, it is your turn to hold

14  Adams County accountable for what Mr. Reigenborn did.  You have

15  one important question -- this case boils down to one

16  question -- to ask yourself in jury deliberations, would T.J.

17  Coates, Mark Mitchell, Kevin Currier and Gene Claps be sitting

18  in front of you today if they had supported Rick Reigenborn in

19  2018?

20       Because the answer is no, you must find for the

21  Plaintiffs.

22       Put another way, would Gene Claps, T.J. Coates, Kevin

23  Currier and Mark Mitchell have ended up on this list of

24  individuals that were handed termination notices in 2019, on

25  January 9th, 2019, if they had supported Rick Reigenborn?

1076
Summation - Ms. Halpern

1      Again, that answer is no.

2      The Constitution of the United States forbids

3  retaliation against public employees for their political

4  beliefs, activity or association.  And it is your duty today to

5  enforce that law.

6      So we're going to talk about a number of issues.

7  We're going to talk about the claims, the defenses, the

8  evidence and damages in this case.  This is just an overall

9  roadmap to help you kind of assimilate the information.

10     But I think the most important thing to start with is

11  going to be Jury Instruction Number 14.  So the Jury

12  Instruction Number 14 is the one that instructs you on the

13  First Amendment claim and the motivating factor.

14     So as the judge instructed you only moments ago, the

15  Plaintiffs' claims have three elements, but only the third one

16  is before you today.  The judge has already ruled that they've

17  engaged in protected activity and that they have been

18  terminated and had an adverse action taken against them.  So

19  the only claim before you -- the only element before you on the

20  Plaintiffs' First Amendment claims is whether the Plaintiffs'

21  political beliefs, activity or association was a substantial

22  factor, in other words, a motivating factor in Mr. Reigenborn's

23  decision to discharge the Plaintiffs.

24     But what exactly is a motivating factor?

25     A motivating factor, importantly, is that -- that is


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Summation - Ms. Halpern

1   not required, the Plaintiffs are not required to prove that

2   their political beliefs, activity or association was the only

3   motivation or even the primary motivation for Mr. Reigenborn's

4   decision.

5          They need only to prove that his political beliefs,

6   activity or association played a motivating part in

7   Mr. Reigenborn's decision, even though other factors may also

8   have played a part as well.  And that is the important issue

9   around the motivating factor standard.  Importantly, it doesn't

10  have to be the only reason.

11         And the Plaintiffs need to prove that motivating

12  factor only by a preponderance of the evidence.  And you have

13  heard a little bit about the preponderance of the evidence

14  standard.  I like to think of it as basically a scale, right,

15  it starts out even, but if you put a little bit more on one

16  side than the other and it starts tipping in the direction of

17  the party who has the burden of proof, that is essentially what

18  a preponderance of the evidence is.  It's a little more than

19  50 percent.  And so that -- the Plaintiffs have to prove by a

20  preponderance of the evidence that their political

21  associations, beliefs and activities were a motivating factor

22  in Mr. Reigenborn's decision.

23         So now that that's the landscape for their First --

24  for their First Amendment claim, I want to talk to you about

25  some of the evidence that you have seen in this trial.

Summation - Ms. Halpern

 1              The judge also talked to you a little bit about direct

 2      evidence and indirect evidence.  Direct evidence, generally

 3      speaking, is basically an admission, it is testimony that

 4      basically admits to a fact.

 5              And so what we quintessentially think of that, is

 6      think of an arrestee who the police arrest and then makes a

 7      confession.  It's direct evidence of what happened, they have

 8      admitted that they did it, and that tends to straightforward

 9      just prove that an individual acted the way that we have

10      alleged that they acted.

11              So there's direct evidence in this case, including

12      Mr. Reigenborn's testimony, that the Plaintiffs' political

13      beliefs and associations and activities did in fact influence

14      and were a motivating factor in the decision that he made when

15      he decided to terminate them.

16              So how do we know this?

17              Here is several examples of testimony that you heard

18      in trial from Mr. Reigenborn out of his own mouth.

19              You recall that Mr. Reigenborn said that he was

20      canvassing and looking and surveilling Mike McIntosh

21      supporters.  He didn't know who was genuinely supporting

22      Mr. McIntosh and who was potentially being forced to do so.

23      And so here, that conversation that took place with my

24      colleague, where he admitted he was trying to figure out who

25      genuinely supported Mike McIntosh and who didn't, and that he

                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

Summation - Ms. Halpern

1  would use that knowledge to decide what position they were

2  going to be in, if they were retained at all, amongst other

3  factors.  That is direct evidence of a motivating factor.

4          There's also Doug Templeton's testimony.  That was

5  Mr. Reigenborn's friend, he was a supporter.  And at that time,

6  Mr. Reigenborn told him that he's going to get rid of McIntosh

7  supporters, and that he was going to do that and that he had

8  found a legal loophole in order to be able to do that.

9          Those are the kinds of statements and testimony that

10 you heard that are direct evidence of a motivating factor.

11         Now, there's circumstantial evidence.  Circumstantial

12 evidence is a little bit different.  There's a lot of it in

13 this case, so we'll try to wade through some of it.  But in

14 effect, it is a set of inferences that you have to make.  An

15 example I give is you came in this morning to jury duty and it

16 was sunny out, right.  But later in the day, even though

17 there's no windows here in the courtroom, if a witness came in

18 and takes off his coat and has to get the water off of it and

19 closes an umbrella, you can assume it's probably raining

20 outside at that point in time, even though you haven't directly

21 seen it.  You have done a series of inferences based on the

22 information that you have in order to establish what you think

23 is actually happening outside, which is that it's raining.  So

24 that is circumstantial evidence.

25         Almost everything can be circumstantial evidence.  But

Summation - Ms. Halpern

1    there are certain types that tend to show up frequently.

2         So some of the circumstantial evidence that you have

3    seen in this case has been giving inconsistent, after the fact,

4    changing or not believable reasons for the termination

5    decisions here.  Not following Adams County Sheriff's Office's

6    normal practices and routine practices.  Not following the

7    ACSO's own policies and Colorado law.  The sequence and timing

8    of events is also evidence.  Comments that reveal true motive,

9    even though they're not necessarily direct evidence.  And the

10   use of entirely subjective criteria in making an employment

11   decision, instead of relying on objective criteria.  And just a

12   lack after credibility.

13        So let's talk about the Jury Instruction Number 15.

14   That's the pretext instruction.  Pretext overlaps with

15   circumstantial evidence.  So circumstantial evidence, you have

16   to make a series of inferences in order to assume what is

17   happening.  The pretext evidence overlaps that and says, if you

18   do not believe for the reason -- the reasons that Defendant

19   gives, that Mr. Reigenborn gave because they're inconsistent or

20   implausible, you can infer from that that the Plaintiffs'

21   political association or activities or beliefs was a motivating

22   factor in Mr. Reigenborn's employment decision.  In other

23   words, because those reasons lack credibility and you doubt

24   them, you are allowed to assume that there's been a coverup and

25   those explanations are a coverup for the true motive for what

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1081
Summation - Ms. Halpern

1    Mr. Reigenborn was operating under.

2            So let's take a look at that.  So here are some of the

3    reasons that you heard about that may not be credible to you,

4    right.

5            One of them, the most basic one is what happened with

6    Mr. Claps.  And you saw that because Mr. Reigenborn, Rick

7    Reigenborn testified that Gene Claps had demanded his badge

8    when he was sent home and got his letter -- the termination

9    letter on January 9th in 2019.  He also said that Sheriff Claps

10   was rude, and again, kind of demanded his badge during his

11   termination hearing.

12           But then we played Mr. Claps', Sheriff Claps' audio,

13   and you have that with you, you can listen to it, it is

14   Exhibit 18A.  It was the audio and the transcript combined.

15   And Mr. Reigenborn had to admit that nothing he had said during

16   this entire litigation was actually confirmed by that audio

17   recording.

18           So at no point in time did Sheriff Claps ask or demand

19   his badge.  At no point in time was he rude or condescending.

20   And at no point in time, for example, another allegation was

21   that he didn't ask to keep his job, when he very clearly did.

22           And so sitting here in court, Mr. Reigenborn had to

23   admit that all of the reasons that he had given during this

24   litigation were not in fact true, and that was not the reason

25   that he actually had for terminating Sheriff Claps.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Summation - Ms. Halpern

1            So that is an example of reasons that lack

2    credibility.  And this happened over and over again, right.

3            Mr. Reigenborn testified regarding Mark Mitchell, that

4    he had heard rumors about his affairs, et cetera, and that that

5    was the reason.  But instead, when he was actually asked in

6    trial what the reason was, he simply stated that Mark Mitchell

7    has some sort of beef with me, that there was a rub, and he

8    didn't even know where that rub came from.  Which, again,

9    completely alters the story that he had given throughout this

10   litigation.

11           Another example is reasons for terminating T.J.

12   Coates.  He talked about a naked Barbie doll and that T.J.

13   Coates was condescending.  But no one else had ever seen this

14   naked Barbie doll.  Other witnesses said it was a fully clothed

15   stress doll, a couple inches tall that was fully clothed,

16   similar to the ones that the victim's advocates at the Adams

17   County Sheriff's Office had.  We heard testimony from a number

18   of individuals, Chris Laws, Paul Gregory that said that

19   Mr. Coates is still talked about very fondly and was one of the

20   best division chiefs they had ever had.  And there's been no

21   third-party documentary evidence that any of these individuals,

22   any of these gentleman have ever been complained about for rude

23   or condescending or bad behavior.

24           Same with Kevin Currier.  And Kevin Currier is a very

25   interesting scenario, because really, Rick Reigenborn doesn't

1083

Summation - Ms. Halpern

1  really say anything much about him at all, and neither did any

2  of the other witnesses.  You have not heard anyone complain

3  about Kevin Currier.  You have not heard anyone say he stirred

4  up trouble.  You have not heard any complaints against him.

5  And in fact, Rick Reigenborn said he was not even intending on

6  terminating Mr. Currier.  But that wasn't backed up by the

7  record.  Mr. Kevin Currier got the same letter as everyone else

8  that specifically said he was going to get terminated.  He

9  walked into that meeting, and you heard the audio recordings,

10  nothing about saving his job or letting him continue to work at

11  the Adams County Sheriff's Office.

12       So those are kind of changing, shifting reasons that

13  change over time.  They all changed, also, from the original

14  meeting that Mr. Reigenborn had with these gentleman, where he

15  didn't give them any reasons at all for why they were being

16  terminated.  He just said, we're going in a different direction

17  or we're downsizing.  And then throughout the litigation, he

18  had to add additional explanations when that turned out to not

19  be true.  So those are examples of changing excuses or

20  implausible excuses and explanations.

21       So on a grander scale, as I just mentioned, another

22  implausible explanation was that he had an intention of

23  finding, that Rick Reigenborn had the intention of finding all

24  of them positions.  So he's been arguing it in both directions,

25  right.  He said, on the one hand, here's the reasons that I

Summation - Ms. Halpern

1   want to terminate the Plaintiffs who are all sitting here.  On

2   the other hand, he said, I never had an intention to terminate

3   them, I was testing them, I was trying to see how they would

4   act under stress, in a crisis like situation, like if there was

5   an active shooter situation.  And so Mr. Reigenborn testified

6   about that, except all of these gentleman have been in actual

7   crises.  They have been in law enforcement for decades.  You

8   could have easily looked at how they responded to an actual

9   crisis, instead of saying that you're going to secretly --

10  instead of Mr. Reigenborn saying he was going to secretly test

11  them and see how they handled the stress of thinking they were

12  being terminated, and then he intended to retain them.

13          So none of these explanations are plausible.  This is

14  all examples of circumstantial evidence.

15          And again, if you look at the text messages in this

16  case, right, along the same lines, oh, I intended to try to

17  keep all of them and I intended to find positions for all of

18  them.  But even before those termination letters were handed

19  out on January 9th, here he is texting with Tommie McLallan,

20  clearly making -- clearly commenting on the fact that he

21  intended to terminate those individuals that showed up on the

22  restricted access list on January 10th, and who were handed

23  those termination letters on January 9th.

24          Not following normal practices, this is another very

25  common form of circumstantial evidence.  Circumstantial

Summation - Ms. Halpern

1   evidence -- because when there's routines and there's written

2   policies and there's operations, there's a reason those exist.

3   There's a reason that, for decades, there's been policies at

4   the Adams County Sheriff's Office that regulate the hiring,

5   discipline of employees, termination of employees and promotion

6   of employees, and that's to make sure they're fair, right, to

7   make sure that certain objective criteria and investigations

8   take place.

9           And so you saw how, on January 8th -- well,

10  January 9th, it went out -- January 9th, hours before these

11  termination letters were handed out to the Plaintiffs and to

12  their colleagues that had supported Mr. McIntosh, that all

13  those policies were suddenly rescinded.  Some divergence from

14  practices and policies that have been in place for a long time,

15  are circumstantial evidence of a motivating factor that

16  Mr. Reigenborn is trying to conceal.  So you heard that's never

17  happened before.  All of the witnesses uniformly say, IAs are

18  generally always -- that there's always been investigations

19  before there's terminations.  One or two examples in the course

20  of decades has been when there's a police officer who has

21  actually been arrested and is in jail and has been criminally

22  charged is really the only exceptions.

23          So in addition, Mr. Reigenborn didn't just violate the

24  Adams County Sheriff's Office own policies, he violated state

25  law.  So it says right here in Exhibit 49, which you have, that

Summation - Ms. Halpern

1   the policy complies with state law and incorporates its

2   standards.  And one of those is that when a deputy is

3   terminated, they will be notified of the reason for that

4   termination.

5          But here, you see Mr. Reigenborn testified to you at

6   trial that he never did actually tell the Plaintiffs any of the

7   reasons that they were terminated.  So that's not just a

8   violation of policy, that's a violation of state law.  And this

9   is a Sheriff, so that's particularly significant that they're

10  violating the requirements of state law.  That is

11  circumstantial evidence.

12         We have talked a little bit about the replacements,

13  all of these replacements.  This is the timing of events.  So

14  the timing and chronology of events, that is also

15  circumstantial evidence.

16         If I go complain about the fact that -- to my boss

17  that I haven't been paid my wages, that I've been working for

18  5 years, never had a problem, want my wages, say you need to

19  give me my wages to my boss, I get fired the next day without

20  getting paid, we can all say that that's suspicious timing,

21  right.  The same thing can be true in circumstantial evidence

22  in all types of scenarios.  And here, we have the same

23  sequencing of events and the same timing that can lead to an

24  inference of pretext.

25         Rick Reigenborn testified that he had not made any

Summation - Ms. Halpern

1   formal offers to anybody, that he had not made any decisions

2   about terminations until he took office on, I believe it was,

3   January 8th, he was sworn in.  But then we have heard from

4   witnesses that, in fact, he did make firm offers before that

5   point in time.  And he also rescinded these policies within

6   hours of taking office and terminated and handed out the

7   termination letters within 24 hours of taking office.  That

8   timing of events and the sequence of events is suspicious and

9   contradictory to his own testimony that he did not make any

10  formal decisions about personnel decisions.

11       Another type of circumstantial evidence is comments

12  that reveal a true motive, even though they're not true

13  admissions.  So we talked about admissions before.  So

14  Mr. Reigenborn -- I was going to ask for it to be -- but I

15  think the jury probably remembers this.  So comments that

16  reveal kind of hostility towards the Plaintiffs in their

17  political affiliation or a distrust of the Plaintiffs in their

18  political affiliation, even when not directly connected to the

19  act of terminating them are also circumstantial evidence that

20  can yield pretext and the inference of a motivating factor.  So

21  in this, this was the news clip that you heard where he said

22  that command staff was continuing to be loyal to Sheriff

23  McIntosh right after he got elected.

24       He also spoke with Terrance O'Neill and texted about

25  Terrance O'Neill when he found out that Mr. O'Neill was

Summation - Ms. Halpern

1   interested in running for Sheriff.  And after a meeting,

2   Mr. Laws went and asked Mr. Terrance O'Neill if that was true.

3   And they discussed kind of the lack of loyalty.  This was Rick

4   Reigenborn and Bill Dunning, and kind of the threat of the fact

5   that Mr. O'Neill was going to be running for office.  And he

6   was warned against doing that if he wanted to keep his job.

7          So that's kind of hostility towards -- or the demand

8   of political loyalty, personal political loyalty that is at

9   issue in this case.

10          So those are big categories of circumstantial

11  evidence.  There's a lot of other circumstantial evidence as

12  well that you were introduced to, but those are some of the

13  examples and the buckets and the categories that you can look

14  to find a motivating factor.

15          Now, credibility, I want to switch to credibility a

16  little bit, because credibility, while it also plays into the

17  types of evidence that you have seen, is incredibly important

18  in this particular case.  As the judge instructed you -- and

19  you have this instruction -- there is particular attraction to

20  the fact that Mr. Reigenborn was convicted of felony forgery,

21  official misconduct and second degree forgery.  While that

22  can't necessarily be used here to assume that he lied, you can

23  use it to question his credibility, right.  To question if you

24  really believe what he's saying on the stand, if you think he

25  has a character for credibility, right, and if he has really

Summation - Ms. Halpern

1    taken accountability for that.  So you heard him on the stand

2    now, he still isn't really admitting that he did anything

3    wrong.  He said, it was a misunderstanding, it wasn't

4    intentional.  It was a little accident.  You have to ask

5    yourself if you really believe that, if you think he's really

6    being honest on the stand, and you can consider the fact that

7    he has lied in the past under oath, because that's why the

8    special criminal conviction can come in for the purposes of

9    assessing credibility.

10          So that's the framework for how to look at the

11   Plaintiffs' First Amendment claims.

12          Now, we have the -- they have the burden of persuasion

13   for that claim.  But it does shift over to the Defendant when

14   they talk about their political loyalty defense.

15          And I think their political loyal defense is -- you

16   have seen this right here, this is the Jury Instruction

17   Number 16, it's very important because it talks about whether

18   political loyalty is essential.  But it's political loyalty to

19   Mr. Reigenborn, right.

20          You have heard testimony from almost everybody that

21   took the stand that loyalty to the Adams County Sheriff's

22   Office or loyalty to whoever wins the Sheriff position and

23   holds that office, the Sheriff's Office or loyalty to serving a

24   community, that's going to be necessary, to wanting to protect

25   the community, to do the best you can as an officer of the law,

Summation - Ms. Halpern
1090

1    that may be essential.  But the question you have to ask when

2    it comes to the political loyalty defense, affirmative defense

3    that Defendant is putting forth is:  Was political personal

4    loyalty to Mr. Reigenborn essential for carrying out the

5    responsibilities of the positions that the Plaintiffs held?

6            And this is how you know that it is not, right.

7    Basically, Defendant is trying to argue, no harm, no foul here,

8    right, and have it both ways.  Mr. Reigenborn, on the one hand,

9    has flatly denied ever even considering political association

10   or beliefs or activities in making his termination decisions.

11   And he's always taken that position, but now is trying to

12   testify that loyalty might be essential as well, right.  But

13   it's not loyalty to the County Sheriff's Office or the office

14   of the Sheriff.  And he can't -- the Defendant can't meet their

15   burden because the Sheriff's Office has written policies that

16   permit and protect employees' freedom to participate in a

17   political process.  It applied to division chiefs, it applied

18   to commanders, it applied to captains, it applies to everyone

19   at the Adams County Sheriff's Office.  So political loyalty to

20   a particular individual, in this case Mr. Reigenborn, cannot be

21   a way to -- cannot influence the way that the employees'

22   complete their job duties, right.

23           And so there's evidence -- and I don't want you to get

24   bogged down in the weeds, right -- so we spent a lot of time

25   talking about different job duties.  I think you have heard

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Summation - Ms. Halpern

1   about the scope of those job duties, everyone -- you know, what

2   those responsibilities are and who else in the agency actually

3   holds those responsibilities.  A lot of the responsibilities

4   that were discussed, many different ranks, from deputy to

5   sergeant, et cetera, also participated in.  And there was a lot

6   of duties that overlapped.  But none of that really matters,

7   right.  Because political loyalty is protected, as we said,

8   explicitly.  So how can it then be an appropriate consideration

9   for determining whether the positions that Plaintiffs held

10  could complete their jobs?

11          It cannot be.  There's multiple policies that

12  precluded anyone from considering them, from making that

13  consideration when it came to the Adams County Sheriff's

14  Office.

15          So you can look at Exhibit 59, Exhibit 98.  They all

16  say it expressly.  And it applied to all employees, including

17  command staff.

18          So by definition, Mr. Reigenborn could not demonstrate

19  that political loyalty to him personally is an appropriate

20  requirement for consideration.

21          In addition, you have the fact that Mr. Reigenborn

22  himself flatly testified that it is not an appropriate

23  consideration and is not essential for actually completing

24  effectively the Plaintiffs' job performance and job duties for

25  their ranks.  So his own testimony, both here at trial and you

Summation - Ms. Halpern

1   saw a declaration as well, that he signed under oath, that also

2   testified under oath that loyalty was not necessarily -- all of

3   the testimony from every witness that was on the stand here

4   said it didn't matter.  Nobody asks about political affiliation

5   or who voted for who, and it had no impact on whether

6   commanders or captains or division chiefs could effectively

7   complete their jobs and their job duties.  So regardless of

8   what those job duties are, on the ground, realistically, on the

9   ground, it did not matter who supported -- you saw that example

10  with Paul Gregory, who supported McIntosh two times, 2014,

11  2018, ended up being Undersheriff and a division chief and a

12  commander for Mr. Reigenborn after initially being terminated.

13  And you have seen that with all of Plaintiffs here, all of the

14  gentleman here served under multiple administrations.  And

15  again, this isn't about loyalty to the Sheriff's Office.  Here,

16  Mr. Reigenborn is basically saying, you have to be loyal to me

17  in order to effectively complete the job duties, that is the

18  defense in this case.  And there's no evidence of that.

19          And he swore as much under oath in the past, when

20  there was another lawsuit, but one where he didn't have skin in

21  the game and he was actually trying to support the Plaintiffs.

22  So that is Exhibit 116.  You have seen that as well.

23          So instead of getting in the weeds, I think it's

24  important to have that bird's eye view of what actually is

25  happening at the Adams County Sheriff's Office and at police --


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1093
Summation - Ms. Halpern

 1    at sheriff's office and police offices across the state,

 2    because no one has been looking into those inquiries or found

 3    them to be essential.

 4            So political loyalty to Mr. Reigenborn.  You are going

 5    to see on your jury verdict that that is the standard here.

 6    This isn't just -- the defense has talked multiple times about

 7    loyalty to the Sheriff's Office, to the Office of the Sheriff,

 8    to the Adams County Sheriff's Office.  But that is not the

 9    standard.  You have to ask yourself, was loyalty to

10    Mr. Reigenborn an appropriate requirement.  And the answer is

11    no.  There's no evidence supporting that.

12            And I want to flip quickly, because I'm running a

13    little bit out of time, to talk to you about damages.  And I

14    want you to write this down, because we tried to do the math

15    for you after the first kind of rocky start.  Because those are

16    Mr. Coates', Mr. Currier's, Mr. Mitchell's and Mr. Claps' back

17    pay.  Those are the numbers we walked you through when we

18    talked about the amount of compensation that they were owed, in

19    terms of the wages for four years when they were not working at

20    the Adams County Sheriff's Office, before Sheriff Claps won the

21    election and was able to return.  So those are the damages for

22    those four years, including base salary, the bonuses, the

23    expected cost of living adjustments, and then the compensation.

24    Some of these gentleman had to pay more for healthcare

25    benefits.  So we walked you through that process.

Summation - Ms. Halpern

 1              And that evidence is uncontested.  I think that's
 2    important to know.  No one has questioned.  No one has put
 3    evidence on questioning if that was their salaries or that was
 4    how much they would have earned or how much the cost of living
 5    adjustment was or what the bonuses were, et cetera, so that
 6    number is accurate and has not been challenged, in terms of
 7    their back pay damages.
 8              Emotional distress is harder, though, right.  And you
 9    heard the judge instruct on that.  You have heard these
10    gentleman talk about the impact on their lives, the indignity
11    that they went through, losing their careers, losing their
12    identities.  They're not -- they have faced some of the most
13    dangerous situations for decades.  These are not people who are
14    going to fall apart on the stand and just start crying.  They
15    have confronted so much more violence and sadness than we have
16    ever done, but that doesn't mean it did not impact them.  And
17    you have heard that.  You heard that in the voices of some of
18    them during the termination meetings.  If you listen to the
19    audio in the termination meetings, you can tell the pain and
20    the suffering that they're going through, as their careers were
21    cut short, as they were kicked out, treated like criminals, as
22    they were escorted from the building on January 9th.  They
23    didn't know what to do with their careers.  They all struggled
24    afterwards.  They lost a real sense of self.  All of them loved
25    their jobs, and they testified about that.  And it's important

                              1095
Summation - Ms. Halpern

1    to understand how painful it is, even though these individuals

2    have confronted so many difficult things in their lives as part

3    of their careers that they're not just going to fall apart on

4    the stand for you and start crying, that's not who they are and

5    that's not how they have handled adversity in the past.

6            So we are going to ask for $1 million for each year

7    that they were out for each Plaintiff.  That makes sense.  That

8    is 4 million per Plaintiff, 1 million per year, for the time

9    that they were deprived of their work, of their pride, of their

10   dignity, of their identity, and for what they suffered when

11   they were terminated by Mr. Reigenborn and kicked out of the

12   Adams County Sheriff's Office.

13           I told you that you had one question, that this case

14   boiled down to one question.  Would Mr. Reigenborn have fired

15   these men if they had supported him in 2018?

16           The answer is no.  They would not be sitting here

17   today.

18           And does partisan politics have any role in

19   professional law enforcement?

20           The answer is no.

21           When you answer no, that is a motivating factor.

22   Partisan and personal politics have no place in law

23   enforcement.  That is a disaster for our communities.  You

24   heard what happened when Mr. Reigenborn fired these gentleman

25   and demoted the rest of the command staff or fired them or had

                  SADIE L. HERBERT, RPR, RCR
        901 19th Street, Denver, CO 80294  (303)335-2105

Summation - Ms. Pratt

1   them resign.  No one wanted to promote at that point in time.

2   There was a derth of qualified leadership and experience, it's

3   taken years to rebuild under Sheriff Claps.  Only now is the

4   Adams County Sheriff's Office at full capacity.  That's not

5   what we expect of our law enforcement agencies.  Politicizing

6   them has only the effect of harming all of us.

7       These four gentleman have done nothing except to

8   sacrifice to keep us safe for decades.  They should not have

9   had to give up their First Amendment rights in order to do so.

10  We should not demand that of anyone.  They upheld the law, and

11  now it was your turn to do so.  As hard as that might be and as

12  long as that might take, hold Defendants accountable.  The

13  power is solely in your hands.

14      And your Honor, we reserve the remaining time to

15  rebut.

16      THE COURT:  Thank you, Counsel.

17      Counsel for the Defendant.

18      MS. PRATT:  Your Honor, Counsel and members of the

19  jury.  This case is not about Plaintiffs' political beliefs or

20  their political support of former Sheriff McIntosh.  This case

21  is about people.  It's about how we want to be treated as

22  people.  It's not about who supported who in which election

23  between Mr. Reigenborn and Mr. McIntosh.  This case comes down

24  to respect and being treated well by your coworkers.  Everyone

25  deserves respect.  Everyone deserves to have their voice heard.

Summation - Ms. Pratt

1          Now, throughout this trial, you have heard some rough

2    language.  You have heard words like bully and hatchetman and

3    tyrannical and autocratic.  And those aren't my words; those

4    are the words of several witnesses.

5          Mr. Coates himself described himself as autocratic.

6    And you also heard the testimony of several other witnesses who

7    came forward to tell you their story of what their lives were

8    like working with these four men.  And your oath was to listen

9    to what each one of them had to say.

10          You don't have to agree with Mr. Reigenborn.  You

11    don't have to think his decision was fair.  You don't have to

12    think that he made the right call.  And you certainly don't

13    have to think that his decision to forge documents was the

14    right decision.  Of course, it wasn't.  We all know that.  And

15    you heard him admit as much on the stand, and he was held

16    accountable for those actions.  But that's not the point of

17    this case.

18          This isn't Mr. Reigenborn's trial.  The only thing

19    that matters is whether his decision to terminate the

20    employment of these four men violated the First Amendment of

21    the United States Constitution.  That's it.  That's the only

22    question here.  And it didn't.

23          This wasn't about Plaintiffs' political support for

24    Mr. McIntosh.  It was about how they treated their coworkers at

25    the Adams County Sheriff's Office.

Summation - Ms. Pratt
1098

 1          Richard Reigenborn worked for the Adams County

 2    Sheriff's Office as a deputy for over two decades before he ran

 3    for office in 2018 and was elected.  He worked with Mr. Claps,

 4    Sheriff Claps today.  He worked with Mr. Coates.  He worked

 5    with Mr. Mitchell.  And he worked with Mr. Currier.  Maybe not

 6    always closely, maybe they had different assignments from time

 7    to time, but he knew all four men through his long experience,

 8    both -- even in some cases, going back to grade school and high

 9    school, and certainly during his work history at the Adams

10    County Sheriff's Office.  He saw how they treated him.  He saw

11    how they treated their coworkers.  He saw firsthand how

12    Plaintiffs belittled others, demeaned their colleagues and did

13    not treat the people of the Adams County Sheriff's Office with

14    the kind of respect that everyone deserves in the workplace.

15          And you don't have to take Mr. Reigenborn's word for

16    it.  You heard from other witnesses who said substantially the

17    same thing.

18          When Mr. Reigenborn was elected Sheriff of Adams

19    County in 2018, he set out to make two critical changes.

20    First, he wanted to change the dysfunctional culture at the

21    Adams County Sheriff's Office.  He wanted employees to have

22    more of a say in their workplace.  And he wanted to get rid of

23    what you have heard described by multiple people as a culture

24    of fear and intimidation.  And he wanted to be able to chart

25    that new path forward with a team that he could trust would

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Summation - Ms. Pratt

 1    support that vision.  And Mr. Reigenborn knew full well, as the

 2    evidence has shown to you in this trial, that he couldn't trust

 3    these four men to help him with that mission.

 4          This case isn't about whether Mr. Reigenborn

 5    ultimately succeeded in those goals.  It's about what he set

 6    out to do at the beginning of his term and how he planned to

 7    get there.

 8          Now, the second critical thing that Mr. Reigenborn set

 9    out to change was what was, in his view, a very top heavy, good

10    old boys system at the Adams County Sheriff's Office where who

11    you knew meant a lot more than what you knew.  And to do that,

12    in his mind, he thought, I think I need to make some structural

13    changes to how the Sheriff's Office was operating.  And so he

14    did away -- you saw the two organizational charts, I won't

15    bring them up again on the screens, because you have seen them

16    multiple times -- but you have saw where he got rid of those

17    captain positions, that captain that was really only

18    supervising maybe one other person or a couple of other people,

19    depending on the department.  Some departments didn't have

20    captains.  And he thought that that was inefficient, and you

21    heard that testimony.

22          Rather, Mr. Reigenborn set out to add more sergeants

23    so that the line level deputies would have more resources.  You

24    heard him talk about why that's important to have more

25    resources on the ground, such that if there's a critical

Summation - Ms. Pratt

1    incident in one part of the community and another one going on

2    at the same time that there will be a sergeant available to

3    cover both of those.  And in his view, that was a better use of

4    Adams County Sheriff's Office resources.

5            Again, you don't have to agree or disagree, but those

6    were the two main things that Mr. Reigenborn saw that, when he

7    took office, he wanted to make -- he wanted to change.

8            Now, we're also not here to second guess

9    Mr. Reigenborn's personnel decisions.  The only question here

10   is was it unlawful.  Again, whether you agree, disagree, like

11   it, thought it was fair, thought it was unfair, that's not the

12   legal question here.  The legal question, as the judge just

13   instructed you, is whether it was unlawful under the First

14   Amendment.  And we submit to you that it was not.

15           So let's talk more about the some of the actual

16   evidence in this case.  There are three critical points in the

17   evidence for you to keep in mind while are you deliberating.

18           The first one -- you have heard lots of testimony

19   about this -- is Mr. Reigenborn in fact kept the vast majority

20   of Mr. McIntosh's supporters who worked at the Adams County

21   Sheriff's Office.  When he took over, we have heard some folks

22   refer to it as he said he was going to clean house.  Well, if

23   he was going to clean house, that's a pretty small house.

24   Because of 600 odd employees and Mr. Reigenborn's testimony was

25   he knew that at least some substantial portion of those people

Summation - Ms. Pratt

1   must have supported his opponent, he got rid of four; not

2   hundreds, not the entire command staff, it was four.  Now,

3   there were other individuals listed that he considered what he

4   was going to do with their employment; was he going to move

5   them, was he going to change their position, maybe he was --

6   maybe they would be reassigned to a different division.  But we

7   are here to talk about these four Plaintiffs.  And the evidence

8   is uncontested that there were multiple McIntosh supporters

9   that Mr. Reigenborn did keep on his staff.

10        The second key point in the evidence is that the

11  Sheriff's Office is and always has been an at will employer.

12  And yes, the judge has instructed you on the law.  That's not

13  the final question on the matter.  The question is, again, did

14  the terminations of the four Plaintiffs violate the First

15  Amendment of the United States Constitution.  We all understand

16  that.

17        But there's been also a lot of testimony and

18  discussion from counsel about these policies.  There were

19  multiple policies put up for you.  You have had a chance to

20  review them.  Some are coming back and you can look at them

21  again in the jury room, if you wish.  But bear in mind the

22  judge's instruction to you as well, that those policies are not

23  a substitute for the legal test in this case.  The legal test

24  in this case -- which we'll come to in a moment, we'll talk

25  through it again -- is what governs here.  Not whether the

Summation - Ms. Pratt

1    Adams County Sheriff's Office had a particular policy in place.

2         I also think it's important that you remember that

3    there were multiple witnesses who testified that the Adams

4    County Sheriff's Office has always been at will.  You saw that

5    memo where Sheriff Reigenborn revoked a number of personnel

6    policies, and he talked about that.  He said he did that on

7    advice of counsel.  And then he put up the four additional

8    policies that you have in that memo in their place, to just

9    kind of be a placeholder until he could do more to figure out

10   what the personnel policies were going to be going forward.

11   But multiple witnesses explained to you that that was always

12   the case.  The Sheriff always had ultimate hiring and firing

13   authority.  So when you are assessing that evidence, bear in

14   mind that that really wasn't a change.  That wasn't something

15   that used to be one way and then changed to be another way.

16        Now, the third point is that you have heard evidence

17   about how the Plaintiffs were very high up in the command

18   structure.  You have heard about their substantial authority in

19   the Sheriff's Office.  And we're going to talk in some more

20   detail about that.  We won't go back through all of their job

21   descriptions and duties, because you have those, but I think

22   it's important to the Defendant's defense to revisit some of

23   those authorities that they all testified they had.

24        So let's, again, talk about Mr. Reigenborn and the

25   fact that he kept any number of McIntosh supporters employed in

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Summation - Ms. Pratt

1   his administration.  Again, you heard testimony that the Adams

2   County Sheriff's Office employs roughly 600 employees, many of

3   whom were McIntosh supporters, clearly.  And it was commonplace

4   for many in the command staff to the support the current

5   sitting Sheriff in the next election if he or she was running.

6   Now, despite that, you heard of multiple people that

7   Mr. Reigenborn retained.  And the testimony revealed that, in

8   some instances, he knew that they were a McIntosh supporter,

9   and in other instances, he didn't even know who they were

10  supporting and yet he retained them anyway.

11          Examples of that, think back to Terrance O'Neill.

12  Mr. O'Neill actually actively worked on Mr. McIntosh's

13  campaign.  And you heard from Mr. O'Neill, he was right there,

14  and he was -- he stayed employed at the Adams County Sheriff's

15  Office.  You heard about James Gerdeman.  You also heard about

16  Sam Thede, John Bitterman, Shane Heiter, Alex Condos, John

17  Bungartz.  The list goes on and on of all these different

18  individuals who Mr. Reigenborn either knew supported his

19  opponent and he kept them on staff anyway, or had no idea and

20  kept them regardless of who they supported in the election.

21          You even heard a story about Jim Morgen.  Remember

22  him?  The public information officer.  And that was the one

23  where we saw a little bit more of the video clip of Mr. Morgen

24  and his comments, because he had in fact referred to the Adams

25  County voters in rather vulgar terms when they decided to elect

Summation - Ms. Pratt

1   Mr. Reigenborn.  He clearly didn't agree with that decision.

2   Even Mr. Morgen was retained.  Now, you heard Mr. Reigenborn

3   say, he couldn't keep him as the public information officer,

4   but he did move him to another position in his administration,

5   notwithstanding his very public insult to the voters of Adams

6   County.

7           Now, what does this all -- why does that matter?  How

8   does that really matter in this case?

9           It shows you that political support and affiliation

10  with one side or the other just wasn't the determining factor

11  here.  It wasn't even a motivating factor.  And we're going to

12  come back to that jury instruction and talk a little bit more

13  about it.  But that evidence demonstrates to you that who

14  somebody supported in the election was not what was forefront

15  on Mr. Reigenborn's mind.  You heard him say the same thing.

16  You heard him say, that wasn't why I made the decisions I made.

17          So what was different about each one of the

18  Plaintiffs?

19          Why did Mr. Reigenborn make the decisions he made as

20  to these four gentleman and not others?

21          Well, you heard Mr. Reigenborn's testimony, and you

22  can choose to give it whatever weight you deem fit.  That's

23  what the instructions say.  And that's up to you, that's your

24  job as the jury.  But remember that you didn't hear only from

25  Mr. Reigenborn.

Summation - Ms. Pratt

1          You heard from others.  You heard from Scott Jarmin,

2    for example, just yesterday.  And Mr. Jarmin gave you an

3    example of the fact that -- remember where Mr. Jarmin worked,

4    he worked in the jail under Mr. Claps at the time.  And he gave

5    you the example that when Mr. Claps was walked out of the jail

6    that other deputies were so emotional that they were crying in

7    relief that Mr. Claps was not going to be their boss anymore.

8    You have heard him described as a micromanager, as bullying and

9    demeaning and calling people traitors after Mr. Reigenborn was

10   elected.  You heard all of that from various witnesses, not

11   just Mr. Reigenborn himself.

12         You also heard Mr. Jarmin tell you on the stand that

13   he was even concerned to be in court yesterday to testify

14   because he doesn't know if his testimony is going to have

15   blowback on him.  That's what he explained to you yesterday.

16         You heard examples from Susan Argo.  Susan Argo,

17   remember, was the -- she was a civilian employee in the jail

18   who was responsible for a lot of the jail administration.  And

19   you heard her testimony about how Mr. Claps would undermine her

20   decisions and isolate her from her staff and would exclude her

21   from other decisions that she should have been involved in

22   given her role.  And her role as a manager is essentially the

23   civilian equivalent of a commander, right.  So Ms. Argo had a

24   lot of authority.  She had a lot of responsibilities that she

25   was trying to keep up with, and she told you about those from

Summation - Ms. Pratt

1   the stand.  And she also explained how Sheriff Claps had really

2   just undermined her authority.

3            You heard about Mark Toth.  And Mark Toth, remember,

4   was the gentleman from the Mountain View Police Department who

5   was the chief there, that Mr. Reigenborn had worked with for a

6   time that then came in to be the division chief over the patrol

7   division.  And he testified yesterday, he explained to you how,

8   when he started as the division chief, that he saw line level

9   deputies who were afraid to do their jobs, afraid to do police

10  work, because they just didn't know were they going to get in

11  trouble for something small.  And they shared with Mr. Toth --

12  and he told you about this -- how Mr. Mitchell treated them

13  really poorly.  And how even though T.J. Coates, for some

14  reason, wasn't in the patrol division, he still had significant

15  sway over how these people were treated.  And Mr. Toth

16  explained that to you during his testimony and how troubling

17  that was for him to see.

18           You also heard from Chris Laws yesterday.  Once again,

19  he gave you his perspective of what he saw of Sheriff Claps'

20  reputation in the jail and that people felt he was arrogant and

21  people were afraid of him and afraid that they might lose their

22  jobs.

23           And something else to bear in mind about -- we have

24  heard testimony about the four Plaintiffs, and they were let go

25  from their positions, and then Mr. Reigenborn brought in new

Summation - Ms. Pratt

1    people to fill those positions.  We heard about Chris Laws, we

2    just mentioned him.  Mr. Laws came in with long years of

3    expertise in the jail, and he came in to be the division chief

4    over the jail.  He had very deep experience in that position.

5            You heard from Scott Jarmin, who was a commander under

6    Mr. Laws, and his deep knowledge of policies and procedures at

7    the jail.

8            You heard from Mr. Toth, who had spent his entire

9    career in basically two places, the patrol division for

10   Westminster and then also as the chief in that small community

11   of Mountain View.  And one thing Mr. Toth testified to

12   yesterday that I just want to remind you about, there was

13   testimony about Mountain View being a sneeze of a town, I

14   think, but Mr. Toth mentioned the fact that Mountain View,

15   despite its small size, borders Denver.  And so they have got

16   any number of issues that they have to deal with.  So just

17   because his time as a chief of police was in a small

18   jurisdiction, it doesn't mean it was any less vibrant or less

19   important to his background and his qualifications to come in

20   and be the chief of the patrol division.

21           You heard about Mr. Dunning.  Mr. Dunning was the

22   gentleman who was -- he was the RV salesman prior to coming

23   back into law enforcement, so he had outside business

24   experience.  And Mr. Reigenborn brought him in hoping to gain

25   insight from that experience.  Now, there was some implication

Summation - Ms. Pratt

1    that Mr. Dunning, given that he had had experience in outside

2    business and had taken a long hiatus from law enforcement, that

3    that somehow means he's not qualified.  He's still there today.

4    So if he's so unqualified, why is he still employed there?

5            And you heard about Dirk Budd.  He was brought in to

6    be over the detectives division.  And Mr. Reigenborn brought

7    him in from out of state.  He was from a larger jurisdiction,

8    and brought him to bring in perspectives about how could Adams

9    County better address the issues that it was facing.

10           So all of that evidence combined demonstrates that for

11   yet this additional reason, this wasn't about political beliefs

12   or political support for any given candidate.  It was that

13   Mr. Reigenborn wanted to have the people in his administration

14   that he felt he could trust.  He didn't believe that he could

15   trust the Plaintiffs to execute his vision going forward.

16           Moving on to the second point.  Let's go back to these

17   personnel policies.  There's lots of testimony about

18   Mr. Reigenborn revoking certain policies and then putting into

19   place a very short list of his own policies.  Once again, I

20   just want to highlight for you the fact that that at will

21   employment policy wasn't really a change from any prior

22   administration.

23           Mr. Reigenborn testified to you that he did that on

24   the advice of counsel.  That was what he explained to you.  So

25   a lawyer told him, well, if you're not sure which policies

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Summation - Ms. Pratt

1    exist and which don't, revoke them, and then go forward from

2    there.

3              And you have heard multiple witnesses, including the

4    Plaintiffs, testify that the Sheriff has always had the

5    authority to hire and fire within his own department.  You

6    heard that from many of the Plaintiffs.  You heard that from

7    Mr. Dunning, Mr. O'Neill.  And the point of this is not that

8    it -- it's not solely that there's the at will employment

9    policy, it's that the Sheriff has a lot of flexibility in who

10   he brings into his administration and particularly who he

11   brings in at the command staff level.

12             On that point, I would also remind you of Mr. Laws'

13   testimony from yesterday.  He explained how when he became a

14   commander, he was kind of nervous -- I don't know if that was

15   his exact word, but words to that effect -- because he knew and

16   it was common knowledge that when someone is promoted to that

17   command staff level, that your job isn't quite as secure; you

18   could lose your job, you could be demoted.  That was Mr. Laws'

19   testimony to you.

20             And you also heard multiple witnesses talk about how

21   it was so important for command staff to have a good, solid

22   working relationship with the Sheriff that they were serving.

23             Now, let's talk some about the command staff

24   specifically.  And you heard Sheriff Claps explain during his

25   testimony that all four of these gentleman were absolutely part

Summation - Ms. Pratt

1    of the command staff at the time that they were let go.

2            So if we could first bring up Jury Instruction

3    Number 14, please.  Joanna, if you wouldn't mind scrolling down

4    to that third factor, just kind of blow it up a little bit,

5    maybe give it a highlight, that would be great.

6            So that third factor, before we talk more about job

7    duties and command staff and positions within the Sheriff's

8    Office, I want to highlight something for you about this third

9    legal factor in the First Amendment retaliation jury

10   instruction that the judge just read to you.  And that

11   factor -- and this is the one that you have to decide -- is

12   whether any of the Plaintiffs' political beliefs, activity or

13   association was a substantial factor, in other words, a

14   motivating factor in Mr. Reigenborn's decision to discharge

15   that particular Plaintiff.

16           And remember, you are instructed to assess these

17   claims independently.  Each Plaintiff has a burden to prove his

18   case to you.  Just because you find for one Plaintiff doesn't

19   mean you have to find for all four.  So that language is what I

20   would urge you to focus on.  You have to read all the

21   instructions, they're all important.  But that question about

22   what was the substantial factor, in other words, a motivating

23   factor for Mr. Reigenborn's decision, you should be guided by

24   that as you begin your deliberations.

25           Thanks, Joanna.  We can take that one down.

Summation - Ms. Pratt

1        And now, let's bring up Jury Instruction Number 16,

2   please.

3        So Jury Instruction 16, this is about the Defendant's

4   affirmative defense.  Now, there's a lot of language there, but

5   what I want to focus on is basically in that third -- starting

6   in the third paragraph, and it's going to carry over to the

7   fourth page, and we'll talk some more about the Plaintiffs' job

8   duties and their responsibilities.  So right here, at the

9   bottom of Page 19, it talks about the Defendant bears the

10  burden of proof on whether political loyalty was an appropriate

11  requirement for the effective performance of the public office

12  involved.  Political loyalty does not necessarily mean loyalty

13  to a particular party, but can instead mean loyalty to a

14  particular person, such as then Sheriff Reigenborn.  And I want

15  to stop there for a second and emphasize that.  Because you

16  heard multiple witnesses across all the days of this trial talk

17  about how important that working relationship is between the

18  Sheriff and his command staff.

19       So moving along from there.  So then the next part of

20  this instruction says, and not whether any -- and I'm sorry,

21  Joanna, can we keep the entire instruction, please.  Thanks.

22  And maybe just maybe blow up that top part of the paragraph.

23       And not whether any particular Sheriff takes political

24  loyalty into account, but whether the nature of the position

25  would appropriately permit him to do so.  That's the question

Summation - Ms. Pratt

1    here.

2           So the question is not whether Mr. Reigenborn in fact

3    took political loyalty into account.  You heard pretty much

4    everybody say, he didn't.  And everybody testified that it

5    wasn't important.  That who you supported in the election

6    really shouldn't have to do with your job duties one way or the

7    other.  But that's not the final question here.

8           The question is whether the nature of the position

9    would have allowed him to take that into account.  That's what

10   the law says here.

11          And because of all of the very high level duties that

12   each one of these gentleman held when they were let go, all of

13   them qualify under that instruction as being in the nature of a

14   position where it would have been appropriate for

15   Mr. Reigenborn to take that into account, even though he said

16   he didn't and everyone said politics wasn't something that

17   anyone should make their decision based upon, right.

18          So thinking about some of these duties -- and then,

19   Joanna, if we could start to scroll down -- because there are a

20   number of factors here, and I would urge you to read through

21   all of them.  They are not exhaustive.  They are not exclusive.

22   You can certainly look through these factors and you can think

23   of others.  But in doing that, when are you going through those

24   factors and analyzing this, focus on a few things.

25          Mr. Coates was a top ranking officer.  He held a

Summation - Ms. Pratt

1   leadership position.  He was one of the division chiefs.  If

2   you remember, you remember again the org chart that talked

3   about that.  And that's basically third in command.  It goes

4   Sheriff, Undersheriff, division chief, right.  So he was

5   basically third in command at the detectives division.  And he

6   was entrusted with high level information.  He interacted with

7   the public and other agencies, his word, I believe, was

8   constantly.  And he also had some discretion with the budget,

9   within limits.  He couldn't maybe make solitary budgetary

10  decisions, but there was some input at the division chief level

11  into what the budget should be going forward, and then there

12  would be a back and forth between the Board of County

13  Commissioners and the division chiefs about what should be

14  included.  Mr. Coates could also make recommendations about

15  policies and procedures.  And although he didn't have the final

16  hiring and firing authority, he certainly did testify that he

17  participated in promotions and the oral board process.

18          Mr. Currier, he was a commander in the detectives

19  division.  And he testified that he oversaw the day-to-day

20  operations of the detectives.  And he could make decisions --

21  pardon me -- he could make suggestions about policies.  He was

22  also, in part, responsible for implementing the Sheriff's

23  policies.  And he also had access to confidential information,

24  acted as a mentor and would interact with the media and other

25  agencies from time to time.

Summation - Ms. Pratt

1          Mr. Mitchell, captain in the patrol division.  He also

2    testified that he could make suggestions to the division chief

3    about operational matters, policies and procedures.  He would

4    sometimes have a role in reviewing internal affairs

5    investigations.  So that's, you know, again, potential

6    discipline for possible employees, even if he wasn't the final

7    decision-maker on that point.  He also had a role ensuring

8    policy compliance.  And he had at least a small role in being

9    able to approve some purchase orders.  So maybe not a high

10   budgetary responsibility, but he did have some role with the

11   finances of the patrol division.

12         And then, finally, Sheriff Claps, when he was the

13   division chief at the jail, he testified he was part of the

14   command staff and that he regularly engaged with the community,

15   participated in training, mentoring, budgeting, advising about

16   policies and that that he had the ultimate say on day-to-day

17   operations at the jail.  He had involvement in work assignments

18   and received confidential information that wasn't broadly

19   available to the entire division.

20         Now, why does any of this matter?

21         It matters because of this defense.  And it matters

22   because each of the Plaintiffs, the nature of the position that

23   they held was such that they needed to be able to have a close,

24   trusting, working relationship with the Sheriff.  They needed

25   to be able to have open dialogue in meetings, and the Sheriff

Rebuttal - Ms. Halpern

1  needed to be able to trust them.  They needed to be in tune and

2  on the same page.  And Mr. Reigenborn believed that he wasn't

3  going to be on the same page with these four individuals that

4  he had known for years, he knew their personalities, he knew

5  how they operated, and he didn't think that they were the right

6  fit for what he wanted to see going forward.

7        Now, we told you at the beginning of this case, and I

8  re-emphasized this just now, that this really is a case about

9  people and it's a case about how we want to be treated by our

10 fellow coworkers and it's not about politics.

11       We would ask that, based on all of the evidence that

12 you have heard, all of the jury instructions, we ask that you

13 find the Defendant not liable to any of the Plaintiffs and that

14 you award them no damages.

15       And with that, we thank you.  I thank you for your

16 service.

17       THE COURT:  Thank you, Counsel.

18       Counsel, just for your planning purposes, you have

19 about seven minutes or so.

20       MS. HALPERN:  Joanna, do you have Jury Instruction

21 Number 5?  And can we highlight the last two sentences -- the

22 last two sentences of the second paragraph.

23       You all just heard the attorneys for the County talk

24 about respect.  But Mr. Reigenborn had no respect for the law.

25 He had no respect for the safety of our communities.  And he

Rebuttal - Ms. Halpern

1   certainly had no respect for the four gentleman who had

2   dedicated decades of their lives keeping us safe from crime.

3   This case is about people and respect, and Mr. Reigenborn did

4   not have any of that.

5        Now, I want to address -- sorry, the last two

6   sentences on the second paragraph, the last two.

7        I want to try to talk about everything that the

8   defense counsel just talked about, but looking at the

9   contradiction between the last two sentences, I'll just read

10  them, where it says, Defendant's position is that this was an

11  appropriate exercise of then Sheriff Reigenborn's authority as

12  Sheriff and that former Sheriff Reigenborn's decision to

13  terminate the Plaintiffs' employment was not motivated by party

14  affiliation or other political activity.  And then the next

15  breath says, Defendant contends that each Plaintiffs'

16  employment position required political loyalty.

17       This has been a theme throughout the entire

18  litigation.  Contradictions.  Things that don't make sense,

19  evidence that doesn't exist.  You heard about so-called

20  complaints against the four gentleman sitting here, but there's

21  not a single piece of paper, there's not a single text message,

22  there's not a single email.  They put together -- they kept

23  talking about all these witnesses, but folks like Mr. Toth

24  didn't actually identify any witnesses, right.  They brought up

25  two witnesses, one who answered about three questions.  Neither

Rebuttal - Ms. Halpern

1    of whom ever testified that they actually communicated their

2    complaints about Plaintiffs to Mr. Reigenborn, so it could not

3    have been the basis for his decision back in 2019.  They're

4    just finding one or two complainers out of the hundreds and

5    hundreds of people that these individuals have collectively

6    supervised.

7          Mr. Jarmin, you heard he was supposed to get a

8    promotion that he didn't get because Sheriff Claps got it.

9          They have overseen, probably, collectively between a

10   thousand employees in their life, and there's two individuals

11   that never even reported those problems to Mr. Reigenborn

12   before he made that decision.  They have certainly never had

13   any complaints from those individuals filed against the

14   Plaintiffs sitting here.

15         Now, the Plaintiffs have been able to produce a lot of

16   text messages and emails in this trial.  Most of them, many of

17   them from Mr. Reigenborn and Mr. McLallan and all of the

18   witnesses that the Defendant relies on.  But where are all of

19   the messages that are supposed to be supporting what

20   Mr. Reigenborn has said about the complaints, right, about the

21   problems, the changing of policies, et cetera?

22         There aren't any.

23         All of the documentary evidence is on the Plaintiffs'

24   side, even when it came from the Defendant's own phones.  You

25   heard the witnesses say, you guys have the phones, you guys got

Rebuttal - Ms. Halpern

1   the phones, you downloaded everything, you have everything.

2           So if all of these complaints existed, all of these

3   subordinates were complaining, where is the IAs?

4           Where is the written discipline?

5           Where is any emails or text messages or any evidence

6   containing any of those complaints, let alone ones that were

7   communicated to Mr. Reigenborn when he made his decision in

8   2018?

9           That is all contradicted and unsupported by the

10  record.

11          And let's also talk about the word retained or kept.

12  It is clear that the command staff was the one in the hairs of

13  Mr. Reigenborn.  He refers to the command staff all the time.

14  There also seems to be a different set of rules that are --

15  that tacitly Mr. Reigenborn played by when it came to sergeants

16  or lower or deputies.  He did not retain -- he couldn't fire

17  600 deputies because maybe they voted for or donated to

18  Mr. McIntosh.  Retained or kept is tricky.  Retained or kept

19  seems to imply that nothing bad happened to anyone else who was

20  on that list, who got termination letters on January 9th, when

21  all of them were substantially demoted out of command staff,

22  many of them resigned, which was what Mr. Reigenborn said was

23  the case with the four gentleman sitting here, the Plaintiffs,

24  instead of admitting they were terminated.  Some of them were

25  demoted and to lower positions.  Anyone on that list, like I

Rebuttal - Ms. Halpern

1    said, the question was on that list, were those people on

2    there -- would they have been on there if they had supported

3    Rick Reigenborn in 2018?

4        If the answer is they wouldn't have been on there, all

5    of those individuals were affected adversely.  It wasn't -- you

6    know, it wasn't that they didn't suffer also.  And maybe some

7    of them got saved.

8        You saw the county attorney, Kasandra, jump in when

9    they were about to potentially terminate Mr. O'Neill because

10   Tommie McLallan had asked about his -- whether he was running

11   for office.  You heard Chris Laws say he saved two of the

12   individuals who were on that list too because he wanted them in

13   the jail.

14       We don't know the circumstances around these other

15   individuals, but we do know that they were all demoted and we

16   do know that they were all McIntosh supporters.

17       So I want to talk about the policies as well and the

18   Defendant's affirmative defense of loyalty.  They have been

19   unable to talk about the fact that there's multiple policies

20   that were in place that prohibited a consideration of political

21   association or affiliation or activities when considering

22   whether to retain any of the individuals who are here or who

23   have ever worked at the Sheriff's Office.  And it cannot be a

24   permitted consideration, an appropriate consideration when it's

25   not permitted.

Rebuttal - Ms. Halpern

 1        Also, the only evidence you have seen that political

 2   loyalty in this case, loyalty to Mr. Reigenborn when he was

 3   running for office, you have only heard argument about that

 4   from the attorneys.  There's no evidence of that on the record.

 5   There's been no evidence introduced at all that anyone would

 6   have had a problem working with Mr. Reigenborn if they had

 7   retained their jobs.

 8        In fact, all of the Plaintiffs said in their meetings

 9   that they could be loyal to the Sheriff's Office.  And they

10   have been under numerous other administrations.

11        The question isn't whether they could be loyal to the

12   Sheriff's Office.  Mr. Reigenborn wanted them to support him

13   during these campaigns, and his comments throughout show the

14   difference between how we're arguing loyalty is being used and

15   what he really meant by it.

16        And we should also talk a little bit about this notion

17   that it was an at will employment office.  It wasn't.  There

18   was IAs for everyone.  You heard that.  And once again, all of

19   the witnesses, including witnesses put on by the Defendant,

20   said that it was unusual for individuals to get fired without

21   an IA, without a process.  Everyone was shocked when all of

22   those policies had been rescinded and that the policies that

23   existed before had in fact been complied with, whether it's an

24   at will or not state or whether it's an at will or not office,

25   clearly the Adams County Sheriff's Office voluntarily decided

Rebuttal - Ms. Halpern

1    to put a process in place that protected employees.

2          And at will doesn't mean you can break the law either.

3    At will employers, like I gave the example earlier, if I go ask

4    for my wages, you can't retaliate against me as an employer and

5    fire me because I'm insisting on my wages.  Whether it's at

6    will employment or not, you can't just fire someone because

7    they are female, you can't just fire someone because they're

8    black.  At will employment still needs a legitimate legal

9    reason.  You cannot circumvent the law by simply saying that

10   you are an at will employer.

11         And finally, I want to finish with the fact that

12   Defendant is resting an awful lot on Mr. Reigenborn's actual

13   testimony and credibility.  There's little evidence of many of

14   his allegations outside of his own testimony.  But

15   Mr. Reigenborn is hardly the most credible individual in

16   this -- during this trial.  And that -- the fact that you can

17   assess that credibility and the fact that you can go and

18   understand and apply the fact that he has pled guilty to crimes

19   of dishonesty in the past and that much of his testimony is not

20   supported by what he's saying today, that he has changed his

21   story numerous times throughout even this case, and flatly so,

22   really begs the question about his credibility and his -- and

23   the testimony that he's giving about his experiences and his

24   reasons for why he made the decisions he did.

25         So I want to close, again, by reminding you that this

Rebuttal - Ms. Halpern

 1    is in fact about respect.  And it is about respecting the law

 2    and it's about respecting our law enforcement, making sure we

 3    have the best law enforcement that we possibly can have,

 4    because the department actually fell apart when they insisted

 5    on political loyalty to an actual individual, to

 6    Mr. Reigenborn.  And that doesn't respect the community, it

 7    doesn't respect the longtime career servants who have dedicated

 8    their whole entire lives to the Adams County Sheriff's Office.

 9    It certainly doesn't show respect for our Constitution.

10          Thank you so much.  And we thank you for your service.

11    I know it's been a while, but you are about to go deliberate.

12    And we ask that you rule in favor of the Plaintiffs and award

13    them the damages that they deserve.

14          THE COURT:  Thank you, Counsel.

15          (Bailiff sworn)

16          THE COURT:  You may escort the jury to deliberations.

17          (The jury retired to deliberate at 11:32 a.m.)

18          (Continued on next page)

19

20

21

22

23

24

25

 1          (In open court; jury not present)

 2          THE COURT:  We have copies of the instructions for

 3    each juror.  We have the original verdict form.  Those will all

 4    go back.  Make sure you each take a glance at those before we

 5    send them back.

 6          To the extent the exhibit lists have not already been

 7    finalized, make sure you check those before you send those

 8    back.  My law clerks will assist you with each of those.

 9          Otherwise, just make sure that we have a good phone

10    number to reach each of you.  Stay close.  I don't know what

11    kind of questions or sort of where things are going to be.  But

12    I want to make sure that we're able to respond relatively

13    quickly.  So if we can make sure everybody can be back here in

14    10 minutes or so, that would be great.

15          Anything else that we need to do?

16          MS. BUTLER:  Your Honor, do you intend to bring the

17    jury in at the end of the day, or should we plan to be here for

18    that?

19          THE COURT:  Yes, I will bring the jury in once we get

20    close to the 5 o'clock hour, just in case they were to say,

21    give us 10 more minutes, we're almost done or something along

22    those lines.  So 4:50, 4:55, I'll bring the jury back in and

23    either excuse them for the day, or if they want 10 more minutes

24    or so, I'll give them that.

25          Anything?

 1          MS. PRATT:  That was my question too.

 2          THE COURT:  Good.  We're all on the same page.  We'll

 3     just wait for the jury.

 4          (Recess pending verdict)

 5          THE COURT:  So we have a question from the jury, and

 6     it states as follows:  Please confirm the total amount per

 7     Plaintiff requested in damages, emotional and back pay, then in

 8     parentheses, economic.  Please breakdown by individual and give

 9     to us in writing.

10          My inclination is to simply write back and say that

11     the jury's recollection of the evidence on damages controls.

12          Anybody have any issue with that?

13          MR. BOHNET-GOMEZ:  Yes, your Honor.  I guess it's in

14     the instructions that they can rely on their notes.

15          THE COURT:  Well, that's in their instructions.  But I

16     mean, I could say -- if anybody has a better way to respond.

17     But there's no exhibits with it back there.

18          MS. HALPERN:  Your Honor, I think it was just because

19     I probably promised to do the math with them and put it up on

20     the slide.  I don't know what else to do beyond that.

21          THE COURT:  I don't think there's anything we can do

22     beyond that.

23          MS. HALPERN:  We can refer them maybe to the

24     underlying exhibits.  We had -- Exhibit 8 is the only one I

25     remember, but there was the payroll ones that maybe they can

 1    look at if they remember what was testified about.

 2          MS. PRATT:  Your Honor, I think the jury's

 3    recollection of the testimony is -- and they obviously have the

 4    exhibits they can look at.  I don't think directing them to

 5    particular exhibits is appropriate.

 6          THE COURT:  I think the only thing I would do is, the

 7    jury's recollection -- I can do something along the lines of,

 8    the jury's recollection as well as any -- I don't even want to

 9    say along the lines -- I just think the jury's recollection.

10          MS. PRATT:  Of the evidence.

11          THE COURT:  Of the evidence controls.

12          I mean, honestly, I don't know what this means.  But

13    if they are already to damages -- that doesn't necessarily mean

14    that, it could mean that they all came back and had that

15    immediate question -- it doesn't break one way or the another

16    for you all, because if we do get to damages, it could mean

17    they award more because their recollection is more than what

18    the economic damages are, or it could mean they award less

19    because it's -- I don't -- you know, I don't think however I

20    instruct them is necessarily going to be prejudicial to either

21    side.  I just don't want to start pointing at -- telling them

22    where to look, because I think that's the clearest way to get

23    reversed is me telling them what to look to.  So I think just

24    simply, the jury's recollection of the evidence controls.

25          Everybody okay with that?

1        MS. PRATT:  I'm sorry, your Honor.

2        THE COURT:  The jury's recollection of the evidence

3   controls.

4        MS. PRATT:  Correct, yeah, I agree with that.

5        MS. BUTLER:  Your Honor, just because the question is

6   asking what Plaintiffs asked for, I think wording it as the

7   jury's recollection controls, as opposed to the jury's

8   recollection based on the evidence, because they were asking

9   about what my colleague asked for in closing argument.

10       THE COURT:  I can say the jury's recollection

11  controls, that's fine.

12       MS. BUTLER:  But I think they were asking what

13  Plaintiffs had asked for in closing argument.

14       THE COURT:  I think that's probably right.  I think

15  it's probably cleaner to say the jury's recollection controls.

16       MS. PRATT:  I don't have a problem with that.

17       And just for the record, I think even restating what

18  the Plaintiffs asked for, if Plaintiffs wanted to in their

19  closing make a bigger show of what specifically they were

20  asking for, they could have done that, and redoing that now

21  would be improper.

22       THE COURT:  I agree.  That's why I think the jury's

23  recollection controls.

24       So I have answered it, "The jury's recollection

25  controls," and dated it January 28th, 2025 at 12:21 p.m.

 1        A couple things -- well, we'll talk about that.  Let's

 2   hand this to the jury.

 3        So a couple things, at least for the next -- I mean,

 4   again, I don't know what exactly this means.  It could mean

 5   that they just all went back there and all of them had the same

 6   question and they want to figure that out before they -- you

 7   can stay with the jury, at least making sure that nobody else

 8   comes in and out.

 9        we are switching this.  It used to be the CSOs did

10   this, and now they have the courtroom deputies acting as court

11   security officers.

12        It could be that the jury just had this question

13   immediately and wanted to get it clarified.  It could also mean

14   they're on to damages already.  And if that's so, I don't think

15   this will take that much longer, because I think it's going to

16   go pretty quickly at that point.  So at least, for the next

17   15 minutes or so, if you can stick close by.  I'm going to step

18   out and get lunch across the street to go.  But if we can have

19   everybody ready to go fairly quickly.

20        The other thing is, I don't remember if I discussed

21   this earlier, I do allow the jurors to come meet with me if

22   they want and meet with the attorneys if they want.  So you are

23   free to stick around afterwards.  What I do is I tell the

24   jurors nobody is required meet with anybody.  Under our local

25   rules, you can't approach them.  But I tell them, if anybody

1    wants to meet with me, they can.  And typically, I get some.

2    And then I say, if anybody wants to stick around after that to

3    meet with the attorneys, or if they just want to meet with the

4    attorneys and don't want to meet with me, that's fine, too.

5    But I give them that option to do so.  So if you would like to

6    stick around afterwards, you are free to stick around in here,

7    and then we will let you know when I am done meeting if anybody

8    wants to stick around and meet with you all too.  Sometimes

9    they do.  It's about 50/50 if they do or don't.

10            (Recess pending verdict)

11            THE COURT:  We have a verdict.  What I will do is I

12    will bring the jury out with the verdict.  I'll have them give

13    the verdict to me.  I'll look at it to make sure there's

14    nothing strange like, for example, we find for the Defendant

15    and then they have damages on there.  If there's something that

16    makes no sense, I will excuse the jury at that point, and then

17    call the parties in to talk about it.

18            Assuming everything is in order and it makes sense,

19    what I will do then is I will give it back to my courtroom

20    deputy to give back to the foreperson and I will allow the

21    foreperson to read the verdict out.

22            Any questions about any of that?

23            Let's go get our jury, then.

24            (Continued on next page)

25

1      (In open court; jury present)

2           THE COURT:  Give this back to our foreperson.  And

3      I'll ask the foreperson to please read the verdict out to the

4      parties.

5           THE FOREPERSON:  Do I read just the answers?

6           THE COURT:  Read the question and the answer to each

7      question.

8           THE FOREPERSON:  Okay.

9           THE COURT:  If you prefer, I'm happy to.

10          THE FOREPERSON:  I can try, but if I am slow or

11     messing up, you can take over.

12          THE COURT:  You will do great.

13          THE FOREPERSON:  Item 1, Mr. Coates' claim against

14     Defendant.  Question Number 1:  Did Mr. Coates establish the

15     third element of his claim for First Amendment retaliation,

16     political affiliation by proving by a preponderance of the

17     evidence that one or more of his political beliefs, activities

18     or associations was a motivating factor in Mr. Reigenborn's

19     decision to discharge him as set forth in Instruction

20     Number 14?

21          Yes.

22          Question Number 2:  Did Defendant prove by a

23     preponderance of the evidence that political loyalty to

24     Mr. Reigenborn was an appropriate requirement for the effective

25     performance of the position Mr. Coates held as set forth in

1    Instruction Number 16?

2              No.

3              If your verdict -- sorry.

4              Question Number 3:  What is the amount of back pay

5    damages you find Mr. Coates incurred as a result of Defendant's

6    conduct?

7              $523,062.90.

8              What is the amount of emotional distress damages you

9    find Mr. Coates incurred as a result of Defendant's conduct?

10             $818,750.

11             Okay, Part 3, Mr. Claps.  Did Mr. Claps establish the

12   third element of his claim for First Amendment retaliation,

13   political affiliation by proving by a preponderance of the

14   evidence that one or more of his political beliefs, activities

15   or associations was a motivating factor in Mr. Reigenborn's

16   decision to discharge him as set forth in Instruction

17   Number 14?

18             Yes.

19             Did Defendant prove by a preponderance of the evidence

20   that political loyalty to Mr. Reigenborn was an appropriate

21   requirement for the effective performance of the position

22   Mr. Claps held, as set forth in Instruction Number 16?

23             No.

24             What is the amount of back pay damages you find

25   Mr. Claps incurred as a result of Defendant's conduct?

1          $523,898.17.

2          What is the amount of emotional distress damages you

3    find Mr. Claps incurred as a result of Defendant's conduct?

4          $818,750.

5          Mr. Mitchell.  Did Mr. Mitchell establish the third

6    element of his claim for First Amendment retaliation, political

7    affiliation by proving by a preponderance of the evidence that

8    one or more of his political beliefs, activities or

9    associations was a motivating factor in Mr. Reigenborn's

10   decision to discharge him as set forth in Instruction

11   Number 14?

12         Yes.

13         Did Defendant prove by a preponderance of the evidence

14   that political loyalty to Mr. Reigenborn was an appropriate

15   requirement for the effective performance of the position

16   Mr. Mitchell held as set forth in Instruction Number 16?

17         No.

18         What is the amount of back pay damages you find

19   Mr. Mitchell incurred as a result of defendant's bucket?

20         $381,388.93.

21         What is the amount of emotional distress damages you

22   find Mr. Mitchell incurred as a result of Defendant's conduct?

23         $818,750.

24         Mr. Currier.  Did Mr. Currier establish the third

25   element of his claim for First Amendment retaliation, political

1   affiliation by proving by a preponderance of the evidence that

2   one or more of his political beliefs, activities or

3   associations was a motivating factor in Mr. Reigenborn's

4   decision to discharge him as set forth in Instruction

5   Number 14?

6          Yes.

7          Did Defendant prove by a preponderance of the evidence

8   that political loyalty to Mr. Reigenborn was an appropriate

9   requirement for the effective performance of the position

10  Mr. Currier held as set forth in Instruction Number 16?

11         No.

12         What is the amount of back pay damages you find

13  Mr. Currier incurred as a result of Defendant's conduct?

14         $371,470.21.

15         What is the amount of emotional distress damages you

16  find Mr. Currier incurred as a result of Defendant's conduct?

17         $818,750.

18         THE COURT:  Thank you.

19         If you can get the verdict back from our foreperson.

20         Does either side wish to poll the jury?

21         MS. HALPERN:  No.

22         MS. PRATT:  Excuse me, I'm sorry?

23         THE COURT:  I asked if either side sought to poll the

24  jury.

25         MS. PRATT:  No, your Honor.

 1          MS. HALPERN:  No, your Honor.

 2          THE COURT:  Members of the jury, I want to thank you

 3    for your service.  I know it has been more than a week that you

 4    all have been sitting and listening to testimony.  I have

 5    observed you during this time, I know you have paid close

 6    attention.  I have seen some of you taking notes.  And as I

 7    indicated, this is a great service to both the courts and the

 8    parties, so I want to thank you for that.

 9          I give every juror who serves the opportunity, if you

10    want to -- and it is completely up to you -- to meet with me

11    afterwards.  If there's questions you have, some I won't be

12    able to answer, some I might be able to, or if you just have

13    questions about what it's like to be a judge or anything, I

14    give you all an opportunity to do that.  Again, it's not

15    required to, but you are welcome to.

16          I also allow the attorneys to stay after, in the

17    courtroom afterwards, if any of you would like to meet with the

18    attorneys, you are free to.  A lot of times the attorneys want

19    to hear from jurors because they want to hear what was

20    effective, what wasn't.  But they are not permitted to approach

21    you without you agreeing to do it.  Again, that's completely up

22    to you.  There's no requirement that you do so.  But if you

23    would like to stay after and meet with any of the attorneys who

24    remain afterwards, you are free to do that too.

25          So if you would like to go, make sure you have

1   everything.  Leave the notebooks behind.  You are free to go.

2   But otherwise, if any of you would like to stay, my courtroom

3   deputy will be happy to walk any of you back to meet with the

4   attorneys or myself.

5           We'll be in recess.

6           (Jury excused)

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (In open court)

2            THE COURT:  Anything else that needs to be taken up

3   today?

4            Hearing murmured nos.

5            MS. PRATT:  I don't think so, your Honor.

6            MR. BOHNET-GOMEZ:  Your Honor, we did want the

7   opportunity to speak with the jurors who are interested.  Could

8   you let us know how that works.

9            THE COURT:  Any that want to will meet with me.

10  Typically, anywhere from 15 to 30 minutes.  And then afterward,

11  we give any the opportunity to come meet with you.  So you are

12  not going to know until we're done.

13           Obviously, if I'm done with the meeting and they all

14  say no, then Ms. Chaplin will come out and let you all know

15  that they didn't want to.  Again, it's about 50/50 in the

16  trials that they are willing to or they're not.

17           All right.  Well, Counsel, I appreciate the

18  professionalism that both sides showed during the trial.  This

19  was not one where people were snipping at each other in an

20  unprofessional manner.  Throughout this case, I think both

21  sides have acted professionally towards each other, so I do

22  appreciate that from all counsel.

23           We are in recess.

24       (Adjourned)

25

I hereby certify that the foregoing is a true and accurate
transcript, to the best of my skill and ability, from my
stenographic notes.




                        Sadie L. Herbert
                    Official Court Reporter
                     U.S. District Court









                    SADIE L. HERBERT, RPR, RCR
            901 19th Street, Denver, CO 80294  (303)335-2105